## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF VIRGINIA

Mark Lenzi,

               Plaintiff,

    v.

United States Department of State, and
Antony J. Blinken,
United States Secretary of State,

               Defendants.

Case No. 21-1371

**JURY TRIAL DEMANDED**

## COMPLAINT

Mark Lenzi, by and through his undersigned counsel, hereby alleges and states as follows:

### PRELIMINARY STATEMENT

1.      Plaintiff Mark Lenzi brings this action against the United States Department of State ("Defendant," "State Department," or "Agency"), for violations of Section 501 of the Rehabilitation Act of 1973, 29 U.S.C. § 791 (the "Rehabilitation Act"), and relevant provisions of the Americans with Disabilities Act of 1990 ("ADA") as amended by the ADA Amendments Act of 2008 ("ADAAA"), 42 U.S.C. §§ 12101 to 12213 (collectively, the "ADA"), and for violations of the free speech clause of the First Amendment to the United States Constitution.  Specifically, Mr. Lenzi's claims are directed toward disability discrimination: the Agency's failure to reasonably accommodate his disability, retaliation, and disparate treatment.

2.      Mr. Lenzi received his Bachelor's degree in Civil Engineering from the University of New Hampshire in 1997, along with minors in Political Science, Hydrology and Water Resource

Management.  Mr. Lenzi then served as a Peace Corps volunteer in Poland as an environmental engineer before earning a prestigious Fulbright scholarship.  He went on to work as a deputy spokesperson for Senator John McCain's presidential campaign in 2007 and 2008, then as a spokesperson for the New Hampshire Republican Party.  In 2011, Mr. Lenzi joined the State Department to serve his country and put his engineering and foreign language skills to use.  Since then, he has worked in dozens of countries—including war zones—helping to further the State Department's goal of creating a more secure, democratic, and prosperous world for the benefit of the American people and the international community.

3.      Mr. Lenzi's specialized skills and integrity have marked his 10-plus years of exemplary government service.  For a significant portion of his career at the State Department, Mr. Lenzi has been employed overseas as a Security Engineering Officer ("SEO") at the Diplomatic Security Bureau ("DS" or "Diplomatic Security") within the State Department, and has consistently received outstanding performance reviews throughout those years of federal employment.  For example, in April 2012, when Mr. Lenzi was an FP-06 grade level employee at the start of his career,[1] his performance reviewers "strongly recommend[ed] that Mr. Lenzi be tenured and promoted at the earliest opportunity."  Mr. Lenzi's reviewers raved that he "performed at a high level" and "set a high standard for managerial performance," and noted that his "impressive" language and analytical skills were "of significant value to the U.S. Government."  In later years, he was praised for being proactive, collaborative and hard-working, with "excellent" interpersonal skills and "impressive" substantive knowledge.  Mr. Lenzi received his well-earned tenure in 2015 and has received multiple nominations for SEO of the Year, and for DS Employee

---

[1] FP-06 refers to a Foreign Service employee at Grade 6.  Currently, Mr. Lenzi is an FP-03 grade level, or Grade 3, employee.  In the Foreign Service, grade numbers decrease as one advances in employment grade.  Therefore, an FP-03 employee has advanced three grade levels over an FP-06 employee.

of the Year.  He has been promoted in grade on several occasions, and is presently employed at the FP-03 grade level, which he attained in 2016.

4.    Mr. Lenzi originally began working at the State Department in order to make use of his extensive language, engineering, and management skills in foreign service.  As a Security Engineering Officer, Mr. Lenzi has worked at various U.S. Embassies abroad managing and upgrading security networks and advising on technical issues.  He started his career overseas at locations such as Frankfurt, Germany and Guangzhou, China, and has completed temporary duty assignments at many other locations such as Afghanistan, Ukraine, Uzbekistan, Russia, Chad, the Philippines, Estonia, Moldova, and many others.  Mr. Lenzi's most recent foreign position as an SEO was described as one that "applies technology to protect the people, information, and property at U.S Consulate Hong Kong and U.S. Consulate Guangzhou."  In that role, Mr. Lenzi provided policy guidance, led multi-million-dollar security upgrade projects, administered security networks and countermeasures unique to the U.S. Consulate in Guangzhou, and briefed members of the Senior Foreign Service on matters of technical security.  Mr. Lenzi is a particularly valuable asset to the State Department's missions abroad due to his fluency or advanced proficiency in multiple languages, including Russian and Polish, and working knowledge of other languages.  With his advanced technical knowledge and cultural competency, Mr. Lenzi has been called upon to lead investigations into technical issues at U.S. Embassies abroad, and to lead "highly sensitive technical mission[s]" to "critical threat" posts.

5.    The issues that gave rise to this complaint occurred in connection with Mr. Lenzi's employment as a grade level FP-03 SEO with the State Department while he was stationed abroad at the U.S. Consulate in Guangzhou, China.  That assignment began in August 2016.  While living in Guangzhou, in or about November 2017, Mr. Lenzi, his wife, and their two children began

3

experiencing sudden and unexplained physical and psychological symptoms, including headaches, sleeplessness, lightheadedness, nosebleeds, and memory loss.  This affliction, now known as Havana Syndrome, has plagued dozens of American officials stationed abroad in China, Cuba, and elsewhere. According to a 2020 National Academies of Science, Engineering, and Medicine report commissioned by the Department of State,[2] the diagnosed injuries from this affliction are most likely due to pulsed microwave radio frequency radiation.  In response to the Havana Syndrome crisis in Cuba, the Trump administration withdrew most of its staff members from the embassy in 2017, stating publicly that U.S. diplomats abroad had experienced targeted attacks.  Those responsible for these incidents have not yet been identified.  Politico recently reported that the number of these suspected "directed, pulsed radio frequency energy" "attacks on diplomats and CIA officers has risen substantially in the past year and have been reported on every continent except Antarctica."[3]

6.      In June 2018, months after he and his family began experiencing these symptoms, and months after Mr. Lenzi initially voiced his concerns to his supervisors at the U.S. Consulate in Guangzhou, he and his wife were finally administered Department of State Havana Acquired Brain Injury Tests ("HABIT"), the results of which led to them being medically evacuated, or "medevac'd," to the Brain Injury Repair Center at the University of Pennsylvania, which is known to have treated numerous Havana Syndrome victims.  There, Mr. Lenzi underwent testing and finally began receiving treatment for his injuries.

---

[2] *See* NATIONAL ACADEMIES OF SCIENCES, ENGINEERING, AND MEDICINE, AN ASSESSMENT OF ILLNESS IN U.S. GOVERNMENT EMPLOYEES AND THEIR FAMILIES AT OVERSEAS EMBASSIES (David A. Relman and Julie A. Pavlin eds., The National Academies Press, 2020), https://www.saferemr.com/2020/12/national-academy-of-sciences-report-on.html.

[3] Andrew Desiderio and Lara Seligman, *State Department tested diplomats for 'directed energy exposure' years before telling Congress*, POLITICO (Oct. 25, 2021), https://www.politico.com/news/2021/10/25/state-department-2018-directed-energy-exposure-517055.

7.     On or about October 2018, Mr. Lenzi requested accommodation for his disability from the State Department's Disability and Reasonable Accommodation Division ("DRAD").  The requested accommodations included 2-4 hours of telework per day, extra time to complete tasks, and permission to wear prescribed tinted glasses at work as needed, among other accommodations detailed below.   On or about November 15, 2018, DRAD granted Mr. Lenzi official accommodations for a period of six months and notified Diplomatic Security of such accommodations.   Thereafter, DRAD approved Mr. Lenzi's requests to extend his official accommodations numerous times, and such accommodations are still valid and in place at the time of filing of this Complaint.

8.     While Mr. Lenzi received certain accommodations in the form of job modifications, on December 18, 2018 Mr. Lenzi was reassigned to a domestic position as a Government Technical Monitor at the Domestic Management and Engineering ("DME") Branch of Diplomatic Security within the State Department.  In that position, his primary responsibilities included reviewing work orders for outside contractors and ensuring the completed projects met certain quality standards.  These work assignments differ substantially from Mr. Lenzi's past work assignments and technical SEO duties overseas.  Though he has since been medically cleared for overseas service, has sought to be accommodated overseas, and has applied to numerous positions overseas that are more commensurate with his past employment opportunities at the State Department and for which he is exceptionally well qualified, the State Department has repeatedly denied him those opportunities.

9.     While perhaps acceptable as a temporary measure while Mr. Lenzi was initially obtaining treatment for his brain injury in the United States, his continued reassignment to domestic positions for more than three years has amounted to a long-term diminution in duties and

responsibilities.  Domestic postings do not provide the same opportunities for Mr. Lenzi to put his technical DS capabilities and language skills to use, and present him with fewer challenges and opportunities for career advancement.  As a quantitative example, whereas his previous posting in Guangzhou, China required him to oversee "$2.5 million dollars of inventory" according to his Employee Evaluation Report ("EER"), his 2019 EER from the domestic DME position noted that he oversaw mere "thousands of dollars of project labor, equipment, and materials."  This is just one example of the ways in which his most recent domestic assignments constitute a diminution in duties compared to his previous foreign employment.

10.     Mr. Lenzi's work experience and training are geared toward foreign assignments. In fact, for years he has completed training programs to improve his efficacy as an officer overseas, where security networks differ from those employed by Diplomatic Security domestically and where he is able to put his extensive language abilities to use.  Mr. Lenzi's true value to the State Department is inextricably tied to his foreign service where his skills and training can be fully utilized.  Given his background, the State Department is required to provide (and indeed, would benefit from providing) Mr. Lenzi with a position that is commensurate with his experience, training, and qualifications.  The Agency has instead reassigned Mr. Lenzi, solely on the basis of his disability, to a position at which he cannot fully apply his skills and training.  On information and belief, no similarly-situated Agency employee without a disability has been subjected to this type of treatment.

11.     Furthermore, Mr. Lenzi's career trajectory prior to his injury shows that he was well on his way to being promoted from grade level FP-03 to FP-02, and that he would likely have already been promoted to an FP-02 had he remained employed (or been allowed to return) overseas.  Such a promotion would have increased Mr. Lenzi's pay rate and expanded his

responsibilities. Instead, Mr. Lenzi has been stuck at the FP-03 grade level since 2016, despite his performance review from 2017 indicating he was "well on his way to performing at an FP-02 level and should be promoted at the next opportunity." On information in belief, promotions for a well-performing SEO from an FP-03 to an FP-02 typically occur within three years. Also on information and belief, the Agency has refused to promote Mr. Lenzi on account of his disability. Mr. Lenzi's lack of promotion is clearly not due to his work performance or capabilities—as further detailed below, he is currently being asked to perform work duties in an FP-02 position (and has done so in the past) despite being designated and compensated at the lower FP-03 grade level.

12. His domestic positions over the past three-plus years have also afforded Mr. Lenzi lower effective pay than the foreign postings he had held in the past, and do not provide some of the benefits to which Mr. Lenzi would have been entitled in a foreign posting, such as housing, paid schooling for his children, and increased pay for hardship postings such as U.S. Embassy Belgrade.[4] Additionally, the domestic positions prevent Mr. Lenzi from experiencing the benefits and privileges associated with on-the-ground experiences in an international post—experiences that encouraged him to take employment with the State Department in the first place. In addition to receiving treatments for his brain injury and fulfilling his responsibilities in both of his domestic positions, Mr. Lenzi has spent countless hours researching and applying to vacant SEO positions for which he is exceptionally qualified, at foreign U.S. Embassies that can accommodate his disability.

---

[4] The State Department website lists the compensation differentials afforded to employees in "hardship" posts. Based on rates that have been effective since October 2020 when Mr. Lenzi applied for the Belgrade position, Mr. Lenzi would have been entitled to a 15% increase in his base compensation if he had occupied the Belgrade post. *See* U.S. Department of State, Office of Allowances, *Post (Hardship) Differential (DSSR 500) Percentage of Basic Compensation*, https://aoprals.state.gov/Web920/hardship.asp?EffectiveDate=20201025.

13.     In late 2017, Mr. Lenzi was selected by Diplomatic Security to serve as Officer in Charge for U.S. Embassy Baku, Azerbaijan's Engineering Services Office, an FP-02 position where he would have received additional language incentive pay because of his Department of State language rating in Russian.  But because he was medevac'd and diagnosed with an acquired brain injury, his medical clearance was lowered and he was prevented from being posted to Azerbaijan in 2018.

14.     In 2019, after presenting doctors' notes and documentation to the Department of State showing improvements in his condition, Mr. Lenzi's medical clearance was raised so that he could "bid" on at-grade positions (*i.e.*, FP-03 positions) for which he could effectively perform the relevant job functions, with or without accommodation, at various U.S. Embassies abroad, including positions in Frankfurt, Germany; Belgrade, Serbia; Warsaw, Poland; and Athens, Greece.  However, despite the availability of these positions and Mr. Lenzi's superior qualifications for them, the State Department began a pattern of denying Mr. Lenzi those opportunities and preventing him from continuing to serve at foreign embassies, even to the tune of withdrawing the positions or assigning them to employees at a lower grade—a rarity in the State Department.  This pattern of conduct at the State Department constitutes discrimination against Mr. Lenzi on the basis of his disability and protected activities related to his disability.

15.     If Mr. Lenzi's efforts to obtain a foreign post had been successful, he would have been entitled to benefits that he is not afforded in his current domestic position, including a pay increase for his foreign language skills, housing, free schooling for his children, and increased pay for hardship posts such as Belgrade.  Having been sidelined as a domestic employee for more than three years in positions that, on information and belief, no other SEO applied for has damaged Mr. Lenzi's reputation and career prospects at the State Department and significantly reduced Mr.

Lenzi's opportunities for advancement, despite the years of exemplary service he has devoted to the U.S. Government.  Now, Mr. Lenzi seeks intervention from this Court to rectify these harms imposed by the Agency because of his disability and in retaliation for his speaking out, and to prevent the Agency from inflicting further damage on Mr. Lenzi's reputation and career trajectory.

## JURISDICTION

16.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under the Rehabilitation Act (29 U.S.C. § 791), which is a Federal statute that furnishes the causes of action at issue here.  With respect to the cause of action arising under the First Amendment to the U.S. Constitution, this Court has jurisdiction pursuant to 28 U.S.C. § 1331, which provides that "district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

17.     This Court also has jurisdiction over this action pursuant to 42 U.S.C. § 2000e-5(f)(3), the jurisdictional provision of Title VII of the Civil Rights Act of 1964, which states that "[e]ach United States district court and each United States court of a place subject to the jurisdiction of the United States shall have jurisdiction of actions brought under" the Act.  Section 505(a) of the Rehabilitation Act, 29 U.S.C. § 794a(a), cross-references Title VII of the Civil Rights Act and makes clear that "[t]he remedies, procedures, and rights set forth in" 42 U.S.C. § 2000e-16, "including the application of" 42 U.S.C. § 2000e-5(f) through (k), "shall be available" to litigants "with respect to any complaint" brought under the Rehabilitation Act.

## VENUE

18.     As noted above, the enforcement provisions of Title VII, including 42 U.S.C. §§ 2000e-5(f) through (k), apply to Rehabilitation Act claims. Pursuant to 42 U.S.C. § 2000e-5(f)(3), "[e]ach United States district court and each United States court of a place subject to the jurisdiction of the United States shall have jurisdiction of actions brought under" the Rehabilitation

Act.

19.     Venue is proper in this district under the special venue provision recited in 42 U.S.C. § 2000e-5(f)(3), which states that an action "may be brought in any judicial district in the State in which the unlawful employment practice is alleged to have been committed, in the judicial district in which the employment records relevant to such practice are maintained and administered, or in the judicial district in which the aggrieved person would have worked but for the alleged unlawful employment practice, but if the respondent is not found within any such district, such an action may be brought within the judicial district in which the respondent has his principal office.  For purposes of sections 1404 and 1406 of title 28, the judicial district in which the respondent has his principal office shall in all cases be considered a district in which the action might have been brought."  42 U.S.C. § 2000e-5(f)(3).

20.     Mr. Lenzi's employer, the Diplomatic Security Bureau of the State Department, maintains its principal office at 1801 N. Lynn Street, Arlington, Virginia 22209.  On information and belief, the assignment panels that discriminated against Mr. Lenzi on the basis of his disability were convened at the DS Bureau principal offices in the Rosslyn neighborhood of Arlington, Virginia.  Furthermore, on information and belief, the State Department officials who retaliated against Mr. Lenzi and committed other unlawful employment practices against him were, at all relevant times, stationed in Arlington, Virginia, or at other locations that are within the Eastern District of Virginia, including State Department offices at 8380 Alban Road, Springfield, Virginia, and 5800 Barclay Drive, Alexandria, Virginia.  Therefore, the unlawful employment practices at issue in this action were committed in the state of Virginia.  Furthermore, on information and belief, the employment records relevant to such unlawful employment practices are also maintained and administered at the DS Bureau offices in Arlington, Virginia referenced above.

21.     Pursuant to 42 U.S.C. § 2000e-5(f)(3), this action may therefore be brought in any judicial district in the state of Virginia. *Id.*; *Richardson v. Alabama State Bd. of Educ.*, 935 F.2d 1240, 1248 (11th Cir. 1991) (holding that Title VII venue provisions permit venue provisions permit venue "anywhere in the relevant state" where "the unlawful employment practice is alleged to have been committed."). Venue is particularly appropriate in the Eastern District of Virginia, given that the locations listed above are located in this district.

### PARTIES

22.     Plaintiff Mark Lenzi currently resides in New Hampshire. Plaintiff is a citizen of the United States and currently holds a Top Secret/Sensitive Compartmented Information (TS/SCI) security clearance.

23.     Mr. Lenzi was an employee of the United States Department of State, Bureau of Diplomatic Security during the relevant time periods recited in this complaint, for purposes of the Rehabilitation Act. *See, e.g.*, 29 C.F.R. § 1630.2(f). He began his employment with the Agency in or about August 2011.

24.     Defendant United States Department of State maintains its principal office at 2201 C St., NW, Washington, DC 20520. Mr. Lenzi was and remains employed by the Agency's Bureau of Diplomatic Security, which maintains its main office at 1801 N. Lynn Street, Arlington, Virginia 22209. Defendant Antony J. Blinken is the current United States Secretary of State and head of the Agency, and is named as a defendant in his official capacity.

### FACTS

25.     Mr. Lenzi received his Civil Engineering degree in 1997 from the University of New Hampshire and then served as a member of the Peace Corps in Poland. He was then awarded a U.S. Department of State administered Fulbright scholarship to the Republic of Lithuania. He joined the State Department in 2011 in the hopes of applying his engineering, political, and foreign

language skills overseas, and since then has worked in dozens of countries in service to the U.S. Government.  Mr. Lenzi's primary goal in his employment with the State Department has always been, and continues to be, to further the Department's pursuit of a more secure, democratic, and prosperous world for the benefit of the American people and the international community at large.

26.     Over the course of his career, Mr. Lenzi has been a successful State Department employee.  During 10-plus years of government employment experience with the State Department, Mr. Lenzi consistently received exemplary performance reviews in his Employee Evaluation Reports, including in his most recent posting after he became disabled.

27.     After being injured in the line of duty, Mr. Lenzi was medevac'd from his assignment in Guangzhou in June of 2018, and assigned "Overcomplement" or "DS/NOC" status in November 2018.  As further detailed below, the State Department occasionally assigns employees to Overcomplement status on a temporary basis until they can be reassigned.  Here, that status has been anything but temporary.  Mr. Lenzi was assigned Overcomplement status in November 2018, and in December 2018 was assigned a position as a Government Technical Monitor at his FP-03 grade level in Portsmouth, New Hampshire, within the Domestic Management and Engineering (DME) Branch of Diplomatic Security.  He held that position for nearly three years.  Then on September 29, 2021, only three weeks after several of Mr. Lenzi's EEOC Complaints were dismissed and the Agency became aware that Mr. Lenzi would be initiating this action, Mr. Lenzi was informed that he was being directed to another assignment against his wishes, to serve as an SEO in the Field Support Branch ("FSB") of Diplomatic Security. On information and belief, the Agency has continued to keep Mr. Lenzi in employment purgatory through his improper Overcomplement status, and through refusing to grant Mr. Lenzi any of the foreign positions he has sought, solely based on his disability and in retaliation for Mr. Lenzi's

protected activities related to his disability.

28.     While his initial domestic assignment at DME may have been appropriate on a temporary basis while he received treatment for his injury, Mr. Lenzi has had clearance from the State Department's Bureau of Medical Services ("MED") to apply to foreign positions for the vast majority of the past three years, as further detailed below.  The Agency's efforts to confine Mr. Lenzi to a domestic post have been improper, especially given that Mr. Lenzi has long been cleared by MED as eligible for foreign assignments.  They also underscore that Mr. Lenzi could be accommodated to work in the overseas positions for which he has applied.

**A.  Employment History at the State Department**

29.     Between the start of Mr. Lenzi's employment at the State Department and when he and his family were medevac'd from Guangzhou to the United States in June 2018, Mr. Lenzi had no significant gaps in his employment.

30.     Mr. Lenzi underwent Basic Security Engineering Officer Training from on or about August 2011 to November 2012, which included approximately 22 weeks of training and orientation with the Diplomatic Security Training Center and the Foreign Service Institute, and a 45-week assignment to Diplomatic Security's Emanations Countermeasures Branch in the Rosslyn neighborhood of Arlington, Virginia.  In this first post, Mr. Lenzi was commended for his strong technical skills, foreign language proficiency, and leadership skills.  It was in this first posting that his performance reviewers "strongly recommend[ed] that Mr. Lenzi be tenured and promoted at the earliest opportunity."  They also noted that he "performed at a high level," "set a high standard for managerial performance," and altogether proved to be "of significant value to the U.S. Government."  During this domestic posting, he also served on temporary duty assignment in Afghanistan, working on security issues at Embassy Kabul, and U.S. consulates in Herat and

Mazar-i-Sharif. While stationed at a German military base in Afghanistan, he received recognition for using his Russian language skills to communicate on security issues with Armenian armed forces personnel. His supervisors described Mr. Lenzi as a "great asset" both "in Washington and in the field."

31.      Mr. Lenzi was then promoted from FP-06 to the FP-05 grade level on or about August 2012, and continued working in the Emanations Countermeasures Branch, this time serving in an FP-04 position in a "stretch" capacity. Exceeding expectations in this more challenging role, his supervisors once again recommended that Mr. Lenzi "be promoted to [FP]-04 and tenured at the earliest opportunity." He was also selected to participate in, and graduated from, the prestigious Combating Terrorist Networks interagency course at Joint Special Operations University at MacDill AFB, and worked extensively in the Philippines on several important security and technical projects. In this role he was lauded for his leadership and interpersonal skills, integrity, and technical and analytical skills, among others.

32.      Once again Mr. Lenzi was promoted in grade, and he began a new assignment at the FP-04 level on or about August 2013 in the Technical Surveillance and Countermeasures Branch. In recognition of his performance "at an extremely high level in difficult and challenging overseas environments," his reviewers stated that "[t]enure and promotion to [FP]-03 are highly recommended." During this posting he conducted multiple DS missions to Russia and China. He then prepared for his first two-year overseas assignment, completing the Overseas Security Engineering Officer course in December 2013.

33.      Mr. Lenzi's first foreign posting began on or about September 2014 at the U.S. Consulate in Frankfurt, Germany, where he was once again on a "stretch" assignment—this time, filling an FP-02 position while at the FP-04 level. Recommending that Mr. Lenzi be "promoted

to [FP]-03 and tenured at the earliest opportunity," his supervisors praised him once again for, among other things, his "engineering and technical prowess," "impressive leadership skills," and high-level intellectual skills." They also noted that Mr. Lenzi was "able to calmly and judiciously" prioritize tasks and coordinate responses in emergency situations. Mr. Lenzi was described as an "excellent officer and essential member of the Frankfurt Engineering Services Center." He continued to serve in Frankfurt in this stretch position through the summer of 2016, performing at an "even higher level" in his second year at the posting, according to his reviewers. He also served on temporary duty assignments to Moldova and Ukraine, provided security support to The Hague and Amsterdam, and provided countermeasures support to a post in Africa. Because of his foreign language skills and specialized work background, Mr. Lenzi was requested by name by Diplomatic Security managers to perform two DS missions in Europe after Russia annexed parts of Ukraine. Once again, his reviewers recommended his promotion to FP-03. Mr. Lenzi clearly thrived in his assignments abroad, receiving increasingly positive performance feedback while filling increasingly advanced roles at higher grade levels.

      34.    Mr. Lenzi was promoted to the FP-03 grade shortly after arriving for duty with his family at U.S. Consulate Guangzhou, China in August 2016. His performance reviews in April 2017 stated that "SEO Mark Lenzi's performance is excellent in all areas and his potential for advancement and achievement in the Foreign Service is high." He served as the lead SEO for U.S. Consulate General Hong Kong's Technical Security Upgrade, a "year-long multimillion dollar project that modernized every security system at post." In his performance reports after only eight months in Guangzhou, his supervisors noted that Mr. Lenzi had demonstrated "excellent technical and managerial skills but also has made significant contributions to post morale." They further stated that Mr. Lenzi's "professional capabilities are undeniable, but what makes him stand out are

his contributions to the larger consulate community . . . We are very lucky to have an officer of Mark's caliber who is an invaluable member of our consulate's security and morale."

35.     Throughout his tenure, and certainly before Mr. Lenzi's brain injury, Mr. Lenzi's reviewers have praised him for his technical expertise, language abilities and positive impact on workplace morale, but have also commended his level-headedness: "Mark set for himself a high level of integrity and workplace behavior by example and instruction as demonstrated by the fact that he has never lost composure under stress or in crisis working in a variety of extremely difficult working environments whether in Washington or Afghanistan."

**B.  Mr. Lenzi's Injury and Diagnosis**

36.     Around November 2017, approximately 15 months after they arrived in Guangzhou, Mr. Lenzi was injured in the line of duty.  Mr. Lenzi and his wife and children began experiencing sudden and unexplained mental and physical symptoms, including headaches, lightheadedness, nausea, nosebleeds, sleeplessness, and memory loss.  Mr. Lenzi verbally complained of these symptoms to his superiors in Guangzhou through the Spring of 2018.

37.     On or about April 11, 2018, unbeknownst to him, Mr. Lenzi's closest American neighbor at his apartment complex in Guangzhou was medevac'd to the United States.

38.     In April 2018, Mr. Lenzi became aware that Security Engineering Officer Rahim Theriot from Embassy Beijing was conducting a last-minute visit to Guangzhou.  At that time, Mr. Lenzi was serving as acting Officer in Charge of the Engineering Security Office.  Mr. Theriot informed Mr. Lenzi that he was visiting Guangzhou because an officer had been medevac'd, and told him that the State Department thought the reasons for the medevac could be the same as those for officers being medevac'd from Cuba.

39.     In order to conduct a technical inspection of the medevac'd officer's apartment,

Mr. Theriot asked Mr. Lenzi for a specific piece of radio frequency/microwave detection equipment. The specific unit Mr. Theriot requested was antiquated and out of date, was not working properly, and was disfavored by SEOs who use this type of equipment frequently. Mr. Lenzi informed Mr. Theriot of those facts and showed him a superior device that was designed for the same purpose. Mr. Theriot told Mr. Lenzi that this technical inspection of the medevac'd officer's apartment was a "check-the-box" exercise, and stated that DS Deputy Assistant Secretary of State John Fitzsimmons had expressly requested that this inferior device be used for the search. Mr. Lenzi located the inferior detection unit, got it in working condition, and gave it to Mr. Theriot.

40.    On information and belief, Mr. Theriot used this inferior device at the direction of Mr. Fitzsimmons to conduct a technical inspection of the medevac'd officer's apartment in Guangzhou in order to complete this "check-the-box" exercise. On information and belief, Mr. Theriot thereafter prepared a classified report summarizing his findings.

41.    On April 19, 2018, just a few days after Mr. Theriot conducted the "check-the-box" exercise and approximately eight days after his neighbor was medevac'd, Mr. Lenzi was informed by his supervisor, SEO Brian Hayes, that he was being given an urgent official counseling session, which, on information and belief, is extremely rare for officers in the Foreign Service and usually only given for extreme misconduct. With full knowledge of the symptoms Mr. Lenzi had been experiencing for months, Mr. Hayes advised Mr. Lenzi that he was "being too emotional" in his interactions with the Regional Security Officer about a security equipment issue. This comment stands in stark contrast to Mr. Lenzi's history of performance reviews noting his level-headedness.

42.    On or about May 23, 2018, the Consul General in Guangzhou held a town hall meeting for hundreds of officers addressing the medevac'd officer. On information and belief, the

Consul General represented that an officer had been medevac'd but that Diplomatic Security technical experts had checked the officer's apartment and found nothing out of the ordinary. By using deliberately inferior equipment in the apartment for a very short period of time, SEO Theriot had conducted exactly what Mr. Fitzsimmons and DS leaders in Arlington wanted: a check-the-box exercise that would not find any anomalies.

43.    From mid-April 2018 onward, Mr. Lenzi made multiple requests to receive a copy of the classified report that Mr. Theriot had prepared after his "check-the-box" exercise inspecting the medevac'd officer's apartment. Mr. Theriot informed Mr. Lenzi that Mr. Fitzsimmons did not want the report filed on the State Department's classified file system (as is normal procedure) and wanted to limit access to the report to a select few. Despite repeated requests to both Mr. Hayes and Mr. Theriot, he was not sent the report. Mr. Lenzi finally received the classified report on or about May 25, 2018 from Mr. Hayes, and upon information and belief the report is currently maintained by the Department of State.

44.    On or about May 26, 2018, Mr. Lenzi contacted his former neighbor, who had been medevac'd to University Pennsylvania Hospital in Philadelphia. Mr. Lenzi informed her of the numerous symptoms he and his family had been experiencing over the past six months. After Mr. Lenzi described their short-term memory loss, Mr. Lenzi's former neighbor stopped him and said that Mr. Lenzi needed to get himself and his family out of their apartment "right now." She went on to say that she had pleaded with the State Department on three different occasions to inform and get her American consulate neighbors out of the Tower 7 Apartment Complex in Guangzhou, but that each time the State Department did nothing. She agreed with Mr. Lenzi that their American diplomatic colleagues should be warned about the potential risk to their health and safety.

45.     On or about May 27, 2018, Mr. Lenzi moved his family out of their apartment for their safety, and sent an unclassified email to his American diplomat colleagues warning them about the potential danger to their health and safety.

46.     Diplomatic Security retaliated against Mr. Lenzi for communicating his concerns to his colleagues, and on or about May 29, 2018, Diplomatic Security and consulate management ordered Mr. Lenzi to undergo a psychiatric evaluation.  This ordered evaluation constituted a crude and cruel act of retaliation against Mr. Lenzi for discussing his injuries and his concern for his own health and that of his colleagues.  Despite noting that Mr. Lenzi had no personal or family history of mental illness, the evaluative report questioned Mr. Lenzi's judgment in sending the aforementioned email and stated that "leadership at post wants to make sure a serious mental illness has not been missed."  By this time, "leadership at post" was well aware that numerous American officials stationed in Guangzhou and elsewhere were experiencing the same symptoms as Mr. Lenzi and his medevac'd neighbor.

47.     Notably, on or about June 1, 2018, Mr. Lenzi and his wife had each taken and failed the Havana Acquired Brain Injury Test (HABIT), described by the State Department as "a clinical assessment tool designed with clinical researchers to evaluate medical findings associated with directed energy exposure in certain foreign environments."[5]  These exams reportedly "test the patients' brain function and eye movements in order to determine whether a brain injury has occurred."[6]  For the avoidance of confusion, to "fail" the HABIT test means that the patient demonstrates brain injury symptoms consistent with exposure to directed energy (the same

---

[5] Andrew Desiderio and Lara Seligman, *State Department tested diplomats for 'directed energy exposure' years before telling Congress*, POLITICO (Oct. 25, 2021), https://www.politico.com/news/2021/10/25/state-department-2018-directed-energy-exposure-517055.
[6] *Id*.

symptoms as the injured U.S. diplomats in Havana) and qualifies for medical evacuation to the U.S.  On information and belief, these tests were developed in response to the crisis in Cuba, after numerous American officials stationed there were diagnosed with brain injuries and symptoms similar to those Mr. Lenzi experiences.  After he and his wife failed HABIT testing, both were medevac'd along with their two children to the University of Pennsylvania Brain Injury Repair Center for further evaluation and treatment.

48.     On or about June 22, 2018, Mr. Lenzi was officially diagnosed with an "acquired brain injury/concussion", with symptoms including, *inter alia*, light sensitivity, insufficient eye convergence, headaches and lightheadedness, nausea, difficulty sleeping, and memory loss.  Dr. Teena Shetty at the Hospital for Special Surgery recommended that Mr. Lenzi receive adequate mental and physical rest in order to recover in addition to prescribing a concussion medication regime that greatly reduced the severity of Mr. Lenzi's headaches.

**C.  Agency's Differing Treatment of Officials Injured in China and Cuba**

49.     On or about June 2018, Mr. Lenzi began testing and treatment at the University of Pennsylvania Brain Injury Repair Center.  After 15-plus hours of comprehensive neurological testing, Dr. Rosette Biester at the University of Pennsylvania noted that Mr. Lenzi's cognitive deficiencies, which she described as "eerily similar" to the deficiencies exhibited by more than a dozen American diplomats she had examined after they were medevac'd from Cuba.

50.     Despite the similarity of Mr. Lenzi's symptoms to those experienced by American officials stationed in and medevac'd out of Havana the previous year, Dr. Behzad Shahbazian at the University of Pennsylvania towed the State Department's line and suspiciously determined that Lenzi's "symptoms and findings do not correlate with the Havana Cohort."

51.     In June 2020 Mr. Lenzi requested that MED reconsider this decision, providing

evidence showing that his own diagnosed conditions overlapped significantly with conditions diagnosed for two individuals injured in Havana.  Dr. Shahbazian denied his request, but added, "[n]obody doubts your symptoms, many of which are similar to the Havana Cohort of patients."

52.    On information and belief, the State Department has provided no justification for its differing treatment of injured American employees stationed in China compared to those stationed in Cuba.  For Mr. Lenzi, this difference has meant that he received less support from the State Department in pursuing treatment, and has had to jump through needless, time intensive, and burdensome administrative hurdles to try to receive the medical care he needs.  As an example, while officers injured in Cuba with the same diagnosed injuries were permitted by the Department of State to use administrative leave in order to receive treatment for their injuries, Mr. Lenzi had to use his own sick leave to attend similar treatments for the same injury.

53.    In a letter dated February 1, 2019, United States Senator Jeanne Shaheen addressed then-Secretary of State Michael Pompeo, questioning the Department's differing treatment of employees stationed in China and Cuba.  Senator Shaheen noted that "[t]he State Department's perplexing response has resulted in disparate treatment regarding leave, medical benefits and travel between the two groups of employees, potential adverse security clearance actions and a dangerous lack of information regarding the causation and potential prevention of these attacks."  Senator Shaheen requested that then-Secretary Pompeo "immediately instruct the Bureau of Medical Services to re-examine the cases from China . . . and ensure that the same standards are being used to confirm and treat all reported cases."

54.    The State Department's motivations behind the disparate treatment of these two group of employees is key to answering one fundamental question posed in this action: why has Mr. Lenzi been subject to disparate treatment, repeated refused reassignments, and retaliation for

his disability, while officials injured in Cuba have largely—on information and belief—not faced

similar adversity?  While this Complaint relies only on unclassified information, Plaintiff reserves

the right to seek discovery of classified documents from the State Department that will provide an

answer to this question.

### D.  Mr. Lenzi's Disability and Official Accommodations

55.    On or about October 2018, Mr. Lenzi formally requested official disability

accommodation arrangements from the State Department's Disability and Reasonable

Accommodation Division ("DRAD").  Mr. Lenzi received official accommodations on or about

November 15, 2018.  These accommodations provided:

a.    "Work 8 hour days: 4-6 hours per day in the office – five days per week

b.    2-4 hours per day to telework

c.    Take a 5-10 minute break every 30 minutes

d.    Reduced workload

e.    Extra time to complete tasks

f.    Limit multi-tasking

g.    Permission to wear prescribed tinted glasses at work – as needed

h.    F.lux color filtration software in office desk computer"

56.    With these accommodations, on or about December 18, 2018, Mr. Lenzi began a

new position as a Government Technical Monitor at Domestic Management and Engineering

(DME) in Portsmouth, New Hampshire.  This domestic position assigned him lower effective pay

than the foreign postings he had held in the past, and did not provide some of the benefits to which

Mr. Lenzi would have been entitled in a foreign posting, such as housing, paid schooling for his

children, and other benefits.  On information and belief, none of the above accommodations are

incompatible with the positions that Mr. Lenzi sought and could have secured abroad, or would have prevented Mr. Lenzi from performing the essential functions of those positions.

57.     As stated above, on September 29, 2021, Mr. Lenzi was informed that he was being directed—against his wishes—to another domestic assignment as an SEO in the Field Support Branch (FSB).  On information and belief, directing a tenured officer such as Mr. Lenzi into an assignment is extremely rare in the Department of State and is usually only done for disciplinary reasons or misconduct.  This new position, at which Mr. Lenzi has been employed since on or about October 2021, is at the FP-02 grade level, one grade level above Mr. Lenzi's FP-03 status.  However, the Agency has not promoted Mr. Lenzi to the FP-02 grade level, which would entitle him to an increased salary.  Instead, Mr. Lenzi now fulfills the duties and responsibilities of a more senior FP-02 position while being compensated at the more junior FP-03 level, a situation referred to a as a "stretch."  Mr. Lenzi would most likely have been promoted already if not for the Agency's discrimination and retaliation against him.  His performance reviewer at his last foreign posting in Guangzhou commented in April 2017 that Mr. Lenzi "is well on his way to performing at an FP-02 level and should be promoted at the next opportunity."  Indeed, in late 2017, Diplomatic Security selected Mr. Lenzi for a two-year FP-02 position as Officer in Charge at U.S. Embassy Baku, Azerbaijan.  He received State Department orders for this position in Baku in early 2018.  Now, more than four years have passed without Mr. Lenzi receiving such a promotion to FP-02, despite his continued exemplary work performance.

58.     This stretch assignment speaks to Mr. Lenzi's capabilities and success as a State Department employee—Mr. Lenzi is being asked to take on the responsibilities of a more senior position due to his exemplary performance history.  The State Department would not have assigned him such a position if they did not view Mr. Lenzi as an extremely skilled and capable employee.

However, he is not being compensated or recognized accordingly. Because the State Department has not promoted Mr. Lenzi to the FP-02 grade level that is in line with the position he now holds, Mr. Lenzi has been denied the compensation, privileges, and opportunities that he would have otherwise received.

59. On information and belief, it is extremely unusual for the State Department to direct tenured officers such as Mr. Lenzi into particular assignments against their wishes, and such directed assignments are typically used for disciplinary reasons. Prior to his injury in Guangzhou, Mr. Lenzi was never subject to formal or informal disciplinary action. On information and belief, the Agency directed Mr. Lenzi into this new domestic assignment (without promoting or appropriately compensating him) in retaliation against Mr. Lenzi for engaging in protected activities related to his disability.

### E. Attempts to Obtain Foreign Postings

60. Mr. Lenzi has remained in a form of employment purgatory with the State Department ever since he returned to the United States from Guangzhou in 2018. He has been eligible for foreign employment for more than two years from on or about September 2019 to the present, except for a period of less than six weeks, from on or about November 10, 2020 to on or about December 22, 2020. During that period, the Bureau of Medical Services temporarily downgraded his medical clearance level from Class 1 to Class 5, which cleared him only for domestic work. Prior to that period, Mr. Lenzi's Class 1 status allowed him to be employed at any post worldwide. After that six-week period, during which he appealed MED's decision to downgrade his medical clearance, Mr. Lenzi held—and continues to hold—Class 2 status, which would have allowed him to work at any post abroad with approval by MED. Since receiving Class 2 clearance, MED has given approval many times to allow Mr. Lenzi to apply for foreign

postings—however, the relevant decisionmakers in Diplomatic Security, led by Mr. Fitzsimmons, have not permitted a single reassignment to positions Mr. Lenzi sought and for which he was qualified abroad.

61.    Specifically, for more than two years, Mr. Lenzi has spent countless hours and made numerous attempts to obtain an assignment at U.S. Embassies and Consulates abroad in Frankfurt, Belgrade, Athens, and Warsaw, among others.  Mr. Lenzi is highly qualified for such positions, having performed exceptionally well at similar positions throughout his career.  However, despite numerous positions being available, the State Department has repeatedly and consistently prevented Mr. Lenzi from successfully obtaining such a posting, and has relegated him to less desirable domestic positions for more than three years.  The Agency has provided no justification for its efforts to keep Mr. Lenzi sidelined and to limit his benefits, privileges, and opportunities for career advancement.

### i. Frankfurt

62.    On or about September 2019, Mr. Lenzi received Class 1 medical clearance from MED, allowing him to apply to and serve in any overseas post with the State Department, without prior special approval from MED.  After receiving his medical clearance, two SEO positions opened at his FP-03 grade level at the U.S. Consulate in Frankfurt, Germany.  Mr. Lenzi spent dozens of hours researching these positions and discussing his accommodations with the medical unit at the Consulate.  Assured that the Frankfurt Consulate would be well-equipped to accommodate his disability, and confident that he had the necessary medical clearance, experience, and qualifications to be eligible for these posts, Mr. Lenzi submitted applications for both FP-03 level assignments in September 2019.

63.    For a period of six months, these two positions in Frankfurt sat unfilled with only

two at-grade bidders: Mr. Lenzi and one other individual.  Rather than fill these two open positions

with the only two candidates that had applied, on or about March 2, 2020, Mr. Lenzi was informed

that an assignments panel at Diplomatic Security decided to cede these positions to Entry-Level,

making them open to first- and second-tour entry-level employees only.  After six months of

waiting, Mr. Lenzi was simply rendered no longer eligible for the Frankfurt positions.  Meanwhile,

there was no indication or communication provided to Mr. Lenzi suggesting that he could not have

performed the essential functions of the position in Frankfurt with appropriate accommodation.

### ii. Belgrade

64.    In October 2020, Mr. Lenzi placed a bid on another at-grade FP-03 SEO position

in Belgrade, Serbia, having communicated extensively over the previous months with staff at the

U.S. Embassy in Belgrade to ensure they could accommodate his disability.

65.    On or about November 4, 2020, Mr. Lenzi was informed that the Belgrade position

had been offered to another applicant.  The prevailing applicant was a below-grade FP-04

employee with no reported language abilities, who had worked at the State Department only since

2017.  By comparison, Mr. Lenzi was a more senior FP-03 employee with Slavic language ratings

(Serbian is a Slavic language) who had worked for the Department for nearly a decade.  As the

more experienced, more senior, and more qualified of the two applicants, Mr. Lenzi promptly

instituted an assignments challenge, or a "shootout."

66.    On November 10, 2020 Mr. Lenzi submitted a statement in support of his

challenge, noting his disability and the capacity of the Embassy in Belgrade to accommodate him.

67.    The very same day, approximately four hours after submitting his statement, MED

notified Mr. Lenzi that they had downgraded his medical clearance from Class 1 to Class 5, thereby

making him eligible for domestic work only.  On information and belief, MED downgraded his

medical clearance level for the sole purpose of rendering Mr. Lenzi ineligible for the Belgrade position and undermining his assignments challenge. Mr. Lenzi appealed MED's decision the next day.

68.     Nearly six weeks after improperly downgrading Mr. Lenzi's medical clearance to Class 5, MED informed him that "[a]fter an individualized assessment and careful deliberation, the panel recommends your medical clearance will change to Class 2 Belgrade Approved." MED's correction of its error was timed such that Mr. Lenzi had already lost the assignment challenge due to his Class 5 status and the position had been filled in the interim. In other words, the period where Mr. Lenzi had been downgraded to Class 5 medical clearance coincided directly with the timeframe that the Belgrade position was open, and the downgrade was maintained just long enough to ensure that the position was filled by someone other than Mr. Lenzi.

69.     Nevertheless, Mr. Lenzi appealed the results of the assignments challenge, asking that Director General of the Foreign Service Carol Perez reverse the decision. Andrew Kaleczyc, Mr. Lenzi's Career Development Officer ("CDO") and the person responsible for advocating for Mr. Lenzi in situations such as these, did precisely the opposite and drafted an action memo to Director General Perez advising her to deny Mr. Lenzi's request. His memo cited Mr. Lenzi's disability and stated that he "regularly conducts media interviews which are widely reported around the world," referring to Mr. Lenzi's public comments about his disability and the Agency's retaliatory acts against him. On information and belief, Director General Perez denied Mr. Lenzi's appeal on the basis of his disability and in retaliation for Mr. Lenzi's protected activities related to his disability. There was no indication or communication provided to Mr. Lenzi suggesting that he could not have performed the essential functions of the position in Belgrade with appropriate accommodation.

### iii. *Athens*

70.     In October 2020, Mr. Lenzi placed a bid on an SEO position in Athens, Greece. While he had a Class 1 medical clearance at the time, allowing him to apply to any overseas post in the world, Mr. Lenzi's efforts to obtain this position also coincided with MED's wrongful downgrade of his clearance to Class 5 on or about November 10, 2020, making him temporarily ineligible for overseas assignment. As noted above, Mr. Lenzi promptly appealed the decision and prevailed, gaining Class 2 clearance on or about December 22, 2020. At that time, Mr. Lenzi remained the only bidder on the Athens assignment, and required only approval from MED in order to be fully eligible for the posting. He promptly sought such approval.

71.     On January 13, 2021, Mr. Lenzi checked the list of assignments on which he had placed bids, noting that his remained the only bid on the post in Athens. He took a screenshot of his bid list for his records.

72.     The very next day, on January 14, 2021, Mr. Lenzi notified his CDO, Andrew Kaleczyc, that that he had received Class 2 medical clearance and approval from MED for the position in Athens. He added in his email to Mr. Kaleczyc that the Regional Security Officer in Athens (whom Mr. Lenzi had worked for previously on sensitive missions) had welcomed him to serve there.

73.     Mere hours after learning that Mr. Lenzi had received the appropriate clearance and was now eligible for the assignment in Athens, Mr. Kaleczyc informed Mr. Lenzi that rather than offer him the post, the assignments panel had once again ceded the position to Entry Level, exactly as they had done with the positions in Frankfurt. This decision had not been reflected in the assignments system and on information and belief, was made with the sole motivation of denying Mr. Lenzi the posting. There was no indication or communication provided to Mr. Lenzi

suggesting that he could not have performed the essential functions of the position in Athens with appropriate accommodation.

### iv. Warsaw

74.     In October 2020, Mr. Lenzi also placed a bid for a grade FP-02 SEO position in Warsaw, Poland.  However, an assignments panel offered the position to another bidder, and Mr. Lenzi thereafter initiated an assignment challenge.

75.     On or about November 24, 2020, Mr. Lenzi provided his CDO, Andrew Kaleczyc, with a statement supporting his assignment challenge regarding the Warsaw position.  On or about January 28, 2021 Mr. Lenzi received Class 2 "Warsaw" clearance (medical approval for the Warsaw position from MED).

76.     On or about February 11, 2021, Mr. Lenzi was informed that the assignments panel had denied his assignment challenge for the Warsaw position.  There was no indication or communication provided to Mr. Lenzi suggesting that he could not have performed the essential functions of the position in Warsaw with appropriate accommodation.  In accordance with 3 FAH-1 H-2425.3-2(a), Mr. Lenzi appealed the assignment panel's decision in writing to the Director General of the Foreign Service.

77.     On March 3, 2021, Mr. Lenzi received a reply from Kenneth Merten, Principal Deputy Assistant Secretary in the Bureau of Global Talent Management, Office of the Director General.  Mr. Merten stated:

> I am writing in response to your request that I review the outcome of the Assignments Challenge for the FP-02 Security Engineering Officer assignment in Warsaw. It is my decision that the outcome of the Assignments Challenge will remain unchanged.
>
> You have been assigned to overcomplement since November 2018. Assignments to overcomplement should be limited to the minimum time period necessary to make you available for reassignment or separation (3 FAH-1 H-2425.8-11).

> I encourage you to remain active in your pursuit of your
> next assignment. As a NOW bidder in overcomplement status,
> your search should focus on positions posted on the NOW bidding
> cycle. Should you continue to be unassigned, the Bureau of Global
> Talent Management and I will consider directing you into an
> assignment.

78.    Mr. Lenzi was designated as Overcomplement on or about November 2018, and

remained designated as Overcomplement for almost three full years after he was assigned such

"temporary" status.  His Overcomplement designation was finally removed on or about October

2021 when he was directed against his wishes into a new assignment at FSB.  On information and

belief, Mr. Lenzi was originally assigned to Overcomplement status, and was kept in this status

for so long, only because of his documented disability and in retaliation for his protected activities

related thereto.  The State Department has used Mr. Lenzi's Overcomplement status as a

justification for denying him assignments for which he is qualified and medically cleared, and for

directing him into less desirable domestic positions against his wishes.  This discrimination based

on his disability constitutes an adverse employment action.

### v. *Overcomplement Status*

79.    Mr. Lenzi has been largely unable to locate any information about the nature of

Overcomplement status.  The only publicly available information he was able to locate appears in

3 FAH-1 H-2425.8-11, and states:

> a. We may assign you to overcomplement status in a bureau ***for
> specified reasons of a temporary nature, rather than to a position
> in the Department***.  It is our intention that your status in
> overcomplement be limited to the minimum time period necessary
> to make you available for reassignment or separation.
>
> b. In general if you are returning from overseas, you will be assigned
> to overcomplement in the bureau that has jurisdiction over the post
> from which you return.
>
> c. We will assign you to HR overcomplement only with the
> approval of the DG or the director of GTM/CDA.

3 FAH-1 H-2425.8-11 (emphasis added).

80.     This is the only provision of the Foreign Affairs Manual or Foreign Affairs Handbook that sheds any light on Overcomplement status.  The only other provision of the Manual or Handbook that mentions such status is 3 FAM 6215 concerning "mandatory retirement of former presidential appointees," which does not apply to Mr. Lenzi.[7]

81.     A plain language reading of 3 FAH-1 H-2425.8-11(a) indicates that Overcomplement status is (i) temporary in nature, (ii) assigned for "specified reasons" that presumably must be communicated to the employee being given such status, and (iii) a status that is assigned "rather than"—and not in addition to—a position in the Department.  Mr. Lenzi was assigned Overcomplement status in November 2018, but was thereafter assigned to a Department position in DME in December 2018.  According to this plain language reading of 3 FAH-1 H-2425.8-11(a), Mr. Lenzi's Overcomplement status terminated in December 2018 when he began his Department position.  Furthermore, Mr. Lenzi was never notified of the "specified reasons" for his Overcomplement status, and the Agency has failed to inform Mr. Lenzi of its justification for continuing this designation for almost three years—a period that certainly cannot qualify as "temporary" as contemplated by 3 FAH-1 H-2425.8-11(a).

82.     When Mr. Lenzi first applied for the Belgrade, Athens, and Warsaw positions in October 2020, he had already served for nearly two years in his State Department position at DME—surely, his purported "temporary" Overcomplement status could not have prevented him from being eligible to apply for those or any other postings.  Furthermore, Mr. Lenzi's Overcomplement status had never been raised as a concern with respect to his applications for the Frankfurt, Belgrade, or Athens positions, despite the fact that Mr. Lenzi was purportedly

---

[7] A searchable version of the Foreign Affairs Manual and Handbook can be found on the State Department's website, at https://fam.state.gov/Default.aspx.

designated as Overcomplement while he was applying for those posts as well.

**F. 2020 EEOC Complaints**

83.     Mr. Lenzi filed three Formal Complaints of Discrimination with the Equal Employment Opportunity Commission ("EEO" or "EEOC") against the State Department in 2020 that are at issue in this action:

> a.     On June 1, 2020 Mr. Lenzi filed EEO Case No. DOS-0158-20 (the "June 1 Complaint");
>
> b.     On July 3, 2020 Mr. Lenzi filed EEO Case No. DOS-0232-20 (the "July 3 Complaint"), and
>
> c.     On August 14, 2020 Mr. Lenzi filed EEO Case No. DOS-0213-20 (the "August 14 Complaint," and together with the June 1 and July 3 Complaints, the "2020 EEO Complaints").

84.     The 2020 EEO Complaints were investigated by the State Department's Office of Civil Rights ("OCR"), which informed Mr. Lenzi on March 15, 2021 that it had completed its investigation.  Mr. Lenzi in turn exercised his right to request a hearing before an administrative judge with the EEOC.  The matter was assigned to Administrative Judge Neile F. Eisner of the Boston Area Office of the EEOC.

85.     On June 2, 2021, Mr. Lenzi filed a request to consolidate the 2020 EEO Complaints for prehearing and hearing proceedings, on the grounds that all three cases stem from related circumstances and the Agency had prepared a single Report of Investigation for the three cases.  This request was granted in a Post Conference Order on June 29, 2021.

86.     The 2020 EEO Complaints concern several discriminatory practices on the part of the Agency.  In a Joint Pre-Conference Statement filed by Mr. Lenzi and the Agency, the parties

stated their agreement that the following claims would be decided in connection with the 2020 EEO Complaints:

     a.    "Because of Complainant's disability and as an act of reprisal, he was discriminated against when on or about March 2, 2020, he was not selected when he bid for a position as a Security Engineering Officer in Frankfurt;"

     b.    "As an act of reprisal, Complainant was discriminated against when on June 3, 2020, his request for MED to review and revise his status designation was denied;"

     c.    "Complainant was discriminated against on the basis of his disability when, per 20STATE 44902, his performance appraisal could not include reference to his disability or reasonable accommodation, negatively impacting his appraisal."

     d.    "Because of Complainant's disability and as acts of reprisal, he was discriminated against when:"

        (1)    "On or about November 4, 2020, he was not assigned to an Embassy Belgrade position;"

        (2)    "On or about November 10, 2020, his medical clearance was downgraded from class 1 to class 5."

87.     Rather than pursuing his case in front of the administrative judge for the EEOC, Mr. Lenzi decided to exercise his right to file a civil action in this Court. On September 3, 2021, after informing the Agency of his intention to file this action, Mr. Lenzi filed a Notice of Withdrawal of Claims with the EEOC. On September 9, 2021, the EEOC entered an Order of Dismissal noting Mr. Lenzi's intention to file a civil action and dismissing the three 2020 EEO

Complaints.  In accordance with 29 C.F.R. § 1614.407(b), more than 180 days have passed since the date of filing of each of the 2020 EEO Complaints, and Mr. Lenzi is therefore "authorized under title VII, the ADEA and the Rehabilitation Act to file a civil action in an appropriate United States District Court" with respect to these claims.  *See* 29 C.F.R. § 1614.407(b).

### G.  February 2021 EEOC Complaint and Amendments

88.     Also at issue in this action are the Formal EEO Complaint Mr. Lenzi filed on February 5, 2021 and amendments thereto.

89.     On February 5, 2021, Mr. Lenzi filed EEO Case No. DOS-0076-21 (the "February 2021 EEOC Complaint"), and on March 18, 2021 the February 2021 EEOC Complaint was accepted by the OCR for further investigation.  On August 4, 2021, the OCR informed Mr. Lenzi that the investigation of his complaint had not been completed within 180 days, and further informed Mr. Lenzi of his right to file a civil action with this Court.

90.     On April 27, 2021, Mr. Lenzi amended his February 2021 EEOC Complaint to include several discriminatory practices on the part of the Agency:

   a.     On or about January 14, 2021, Mr. Lenzi was informed that a posting in Athens, on which he was the sole bidder, had been reduced to an Entry-Level position, making Mr. Lenzi no longer eligible for the assignment.  On information and belief, the Agency altered this position in order to prevent Mr. Lenzi, the sole bidder, from being awarded the assignment.

   b.     In February 2021, the Agency denied Mr. Lenzi the ability, which he had previously exercised, to mention supporting testimony from the Secretary and Deputy Assistant Secretary in defense of his assignment challenge regarding a post in Warsaw.

    c.    On or about February 11, 2021, Mr. Lenzi was informed that his assignment challenge on the Warsaw post had been unsuccessful.

    d.    On or about April 23, 2021, Mr. Lenzi's supervisor, Mr. Raymond Rivera, refused to endorse Mr. Lenzi's nomination for DS Employee of the Year. On information and belief, Mr. Rivera refused to endorse this nomination because recognition of Mr. Lenzi's significant contributions to Diplomatic Security would have impeded the Agency's campaign to restrict Mr. Lenzi's career prospects.

91.    It has been more than 180 days since the February 2021 EEO Complaint and the April 27, 2021 amendment were filed.

**H.  Mr. Lenzi's Right to File this Action**

92.    Mr. Lenzi has received several Notices of Rights and Responsibilities issued by the Department of State's Office of Civil Rights.  These Notices state that "[u]nless there is a statutory exception, you have the right to file a lawsuit in Federal District Court at any time after 180 calendar days have passed since filing a formal complaint or within 90 calendar days after receipt of a [Final Agency Decision] from the Department."

93.    These Notices are consistent with 29 C.F.R. § 1614.407(b), which states that "[a] complainant who has filed an individual complaint . . . is authorized under title VII, the ADEA and the Rehabilitation Act to file a civil action in an appropriate United States District Court . . . [w]ithin 90 days of receipt of the agency final action on an individual or class complaint; [or] [a]fter 180 days from the date of filing an individual or class complaint if agency final action has not been taken."

94.    No agency final decision or decision by an administrative judge has been rendered

with respect to any of the EEO Complaints at issue here, nor is any appeal pending with the EEOC.[8]  In compliance with 29 C.F.R. § 1614.407(b), it has been more than 180 days since the date of filing of any of the EEO Complaints at issue in this action.  Mr. Lenzi therefore has the right to "file a civil action in an appropriate United States District Court in accordance with § 1614.407(b)" with respect to each of the EEO Complaints described above.

**COUNT ONE**
**(Failure to Provide a Reasonable Accommodation in Violation**
**of § 501 of the Rehabilitation Act)**

95.     Mark Lenzi repeats and realleges paragraphs 1 through 94 hereof, as if fully set forth herein.

96.     On or about June 22, 2018, Mr. Lenzi was formally diagnosed with an acquired brain injury, a long-term disability characterized by a multitude of diagnosed symptoms, including, *inter alia*, saccadic eye movements, light sensitivity, headaches and lightheadedness, difficulty sleeping, and memory loss, that substantially limit his ability to sleep, work, read, and concentrate.  Mr. Lenzi's disability therefore easily meets the definition of a disability under the ADA, which provides the applicable standards for claims under the Rehabilitation Act.  *See* 42 U.S.C. § 12102.  Mr. Lenzi's doctors have indicated that while prescribed therapies, medication, and equipment (for example, photophobia glasses for light sensitivity) can be used to manage his symptoms, his condition is likely to be permanent.

97.     Prior to this diagnosis, Mr. Lenzi could perform the essential functions of his position as an SEO at the U.S. Embassy in Guangzhou, without a reasonable accommodation, as evidenced by his exemplary performance reviews in that most recent posting, in addition to his

---

[8] Although Mr. Lenzi denies that Administrative Judge Eisner's September 9, 2021 Order dismissing Mr. Lenzi's 2020 EEO Complaints constitutes an "agency final action" contemplated by 29 C.F.R. § 1614.407(a), Mr. Lenzi has filed this Complaint within 90 days of receipt of the September 9 Order out of an abundance of caution.

excellent performance evaluations in his previous postings. Once diagnosed with an acquired brain injury, Mr. Lenzi could likewise perform the essential functions of his position, provided that he receive reasonable accommodations as dictated by DRAD on November 15, 2018 that would help mitigate his symptoms and allow him to perform the essential functions that he had successfully performed in the Guangzhou position. Mr. Lenzi's most recent Employee Evaluation Reports from his domestic position at DME indicate that his work performance continues to be exemplary. These EERs indicate that Mr. Lenzi "has done a tremendous job" and "has excellent knowledge of the security systems Diplomatic Security uses." His ability to perform the essential functions of his employment with or without reasonable accommodation makes him a "qualified individual with a disability" within the meaning of 42 U.S.C.A. § 12111 of the ADA.

98.    Mr. Lenzi verbally notified the Agency about his and his family's symptoms as early as Spring 2018 (even before his formal diagnosis). On or about October 2018, Mr. Lenzi requested official accommodations from DRAD. On November 15, 2018, DRAD provided official accommodations for a period of six months, and thereafter granted Mr. Lenzi's requests for extension. Mr. Lenzi informed his Career Development Officers, supervisors, and others many times of his desire to be assigned to foreign posts, and many of them strongly supported Mr. Lenzi's bids on those assignments. However, time and time again, the Agency—led in its efforts by Mr. Fitzsimmons—in bad faith obstructed Mr. Lenzi's attempts to obtain an appropriate position abroad, either by awarding the position to a less-qualified bidder or by altering the position itself to render Mr. Lenzi ineligible for it. The Agency's refusal to assign Mr. Lenzi a position within his desired career path has forced him to remain in an inferior domestic post for which he is over-qualified, under-paid, and at which his opportunities for career advancement are comparatively stifled.

99.     It would not have presented an "undue burden" on the Agency to have assigned Mr. Lenzi to any of the positions at foreign U.S. Embassies to which he applied, and which had been available during the relevant timeframe.  In fact, given Mr. Lenzi's exemplary performance reviews covering more than 10 years of federal service, Mr. Lenzi's engineering and management skills and proficiency in multiple languages would have been of significant value to these embassies.  Instead, Mr. Lenzi has been unfairly sidelined due to his disability and the Agency's unlawful discriminatory practices on account of such disability.

100.     Since receiving his official accommodation from DRAD, Mr. Lenzi has identified several positions that would be able to reasonably accommodate his disability while providing him with the same pay, benefits and opportunities for advancement that he enjoyed prior to his disability status.  Mr. Lenzi was qualified for these positions, and on information and belief, was the most qualified applicant for several of the positions to which he applied.  The Agency failed to meaningfully consider such positions even after Mr. Lenzi had filed several EEO Complaints alerting the Agency to its discriminatory actions, which further reflects the Agency's bad faith.

101.     As detailed above, the nature of the State Department's reassignment process, including Mr. Lenzi's unfair and inappropriate designation as Overcomplement, prevented him from being properly considered for numerous open positions within the State Department for which he was well qualified and medically cleared, but was nonetheless refused reassignment.  Furthermore, perhaps in an effort to prevent Mr. Lenzi from accessing the formal policies and procedures available to employees who seek reasonable accommodations, the State Department prohibited Mr. Lenzi from mentioning his DRAD status or accommodations in applying for these open positions, which would have informed the relevant assignments panels that the positions Mr. Lenzi was applying for were well-equipped to accommodate his disability.

102.    Mr. Lenzi and his performance reviewers were also prevented from mentioning Mr. Lenzi's disability or his accommodations in his evaluation reports.  A widely distributed list of Inadmissible Comments for Employee Evaluation Reports effective as of 2020 notes that references to disability status, whether a reasonable accommodation has been requested or provided due to a disability, the nature and type of any reasonable accommodation requested or provided, and medical information are all prohibited from being referenced in such reports.  To the extent that Mr. Lenzi's work performance has at all decreased in quality since the onset of his disability (though any such decrease would be minimal), referencing his disability status and accommodations would permit a fair review of Mr. Lenzi's performance in light of his circumstances.  Instead, he and his reviewers are barred from mentioning them at all in his evaluations.

103.    But for the Agency's bad faith, Mr. Lenzi would have been reasonably accommodated in any one of the more desirable positions at overseas U.S. Embassies for which he is qualified and to which he applied.  His current domestic position at FSB is not a reasonable accommodation in that Mr. Lenzi has been forced to accept reduced compensation, fewer benefits, and fewer opportunities for career advancement due to the Agency's discriminatory practices.  Mr. Lenzi's duties and responsibilities have been significantly decreased as a result of the Agency's discrimination against Mr. Lenzi on account of his disability.

104.    Mr. Lenzi suffered damages as a result of the Agency's unlawful discriminatory actions, including emotional distress, past and future lost wages and benefits, and the physical and emotional costs of bringing this action.

105.    The Agency intentionally violated Mr. Lenzi's rights under the Rehabilitation Act with malice or reckless indifference, and, as a result, is liable for punitive damages.

**COUNT TWO**
**(Retaliation in Violation of § 501 of the Rehabilitation Act)**

106.    Mark Lenzi repeats and realleges paragraphs 1 through 105 hereof, as if fully set forth herein.

107.    Mr. Lenzi, if accommodated, was well qualified for the SEO positions that were available, and on which he placed bids, in Frankfurt, Belgrade, Warsaw, and Athens.  Nonetheless, the Agency refused to assign Mr. Lenzi to such postings, and instead forced Mr. Lenzi to accept a lesser domestic position for which he received lower pay and fewer benefits, and which provided Mr. Lenzi with fewer opportunities for career advancement.

108.    From on or about the onset of his injury and thereafter, Mr. Lenzi engaged in protected activity by complaining to several of his supervisors at the Agency, including John Fitzsimmons, Ronald Stuart, Raymond Rivera, and his CDOs Nathan Lingenfelter and Andrew Kaleczyc, among others, about the Agency's failure to assign Mr. Lenzi to a foreign post after years of exemplary foreign service.  Mr. Lenzi engaged in further protected activity when he requested and received official accommodations from DRAD and extensions thereto, and when he filed various EEO complaints pertaining to the Agency's repeated failure to assign him postings for which he was the most qualified bidder.

109.    As discussed above, Mr. Lenzi reiterated his requests to be granted reasonable accommodations in his employment on several occasions and in numerous different ways.

110.    Almost immediately after Mr. Lenzi informed the Agency of his disability and his medical difficulties, the Agency's disposition toward him changed, and he experienced a tangible change in his working conditions at the Agency.  For example, within a few weeks of verbally informing his supervisors of his serious medical symptoms while in Guangzhou, Mr. Lenzi was given an official counseling session by his then-supervisor, SEO Brian Hayes, who told him to "be

less emotional." The Agency also ordered his psychiatric evaluation in retaliation against Mr. Lenzi for engaging in protected activities related to his disability.

111.    From that point forward, the Agency moved swiftly in its efforts to deny Mr. Lenzi reasonable accommodations, instead forcing Mr. Lenzi to accept an inferior posting rather than assign him to a single one of the numerous foreign postings for which he was the most qualified— and sometimes the only—bidder. Any one of the postings for which Mr. Lenzi applied in Frankfurt, Belgrade, Warsaw, or Athens would have been able to reasonably accommodate Mr. Lenzi's disability without harm to his compensation, benefits, and career opportunities and prospects.

112.    The Agency's alleged reasons for offering these positions to less-qualified bidders or for altering the positions to make them suitable only for Entry-Level employees are pretextual and baseless. The Agency has refused to assign Mr. Lenzi to a foreign post because he complained of the Agency's failure to do just that, and because he persisted in his efforts to hold the Agency accountable for its discriminatory acts. The fact that Mr. Lenzi's excellent work performance has continued even despite his disability shows that the decision to deny Mr. Lenzi more desirable assignments was made on account of his disability and protected actions related thereto.

113.    Mr. Lenzi has suffered damages as a result of the Agency's unlawful retaliatory actions, including emotional distress, past and future lost wages and benefits, and the emotional and physical costs of bringing this action.

114.    The Agency intentionally violated Mr. Lenzi's rights under the Rehabilitation Act with malice or reckless indifference, and, as a result, is liable for punitive damages.

## COUNT THREE
### (Disparate Treatment in Violation of § 501 of the Rehabilitation Act)

115.    Mark Lenzi repeats and realleges paragraphs 1 through 114 hereof, as if fully set

forth herein.

116.    Solely because of Mr. Lenzi's disability, the Agency has treated Mr. Lenzi very differently than it treats similarly-situated employees who are not disabled.  In addition to refusing to provide Mr. Lenzi with an overseas position for which he is well qualified, the Agency has also failed to promote Mr. Lenzi despite his exemplary work performance.  On information and belief, other similarly-situated but non-disabled officers have not similarly been refused requested assignments for which they are qualified, and promotions have not been unreasonably withheld from officers who are not disabled.

117.    Mr. Lenzi has also unfairly been designated as Overcomplement solely because of his disability, which has undercut his significant efforts to advance in his career.  This designation should have been temporary, but the Agency placed this limitation on Mr. Lenzi's career prospects for almost three years.  On information and belief, similarly-situated employees with the State Department who are not disabled have not been subject to this type of treatment.

118.    Mr. Lenzi suffered damages as a result of the Agency's unlawful discriminatory actions, including emotional distress, past and future lost wages and benefits, and the physical and emotional costs of bringing this action.

119.    The Agency intentionally violated Mr. Lenzi's rights under the Rehabilitation Act with malice or reckless indifference, and, as a result, is liable for punitive damages.

**COUNT FOUR**
**(Retaliation in Violation of Right to Free Speech under the**
**First Amendment to the U.S. Constitution)**

120.    Mark Lenzi repeats and realleges paragraphs 1 through 119 hereof, as if fully set forth herein.

121.    The Agency has subjected Mr. Lenzi to retaliation for his exercise of free speech, a right protected and guaranteed by the First Amendment to the United States Constitution.  The

right of free speech under the First Amendment "includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right. *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). Retaliation against an individual for exercising his right to free speech is "actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights." *Am. C.L. Union of Maryland, Inc. v. Wicomico Cty., Md.*, 999 F.2d 780, 785 (4th Cir. 1993) (citing *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)).

122.    During the relevant time period, Mr. Lenzi engaged in constitutionally-protected activity, exercising his First Amendment rights to speak on issues related to his disability and the Agency's unlawful discrimination against him. As described above, Mr. Lenzi has conducted interviews with various newspapers and media outlets regarding his disability. For example, he appeared on *60 Minutes* on or about March 17, 2019, months before he placed bids on any of the foreign assignments discussed above. He also provided statements regarding the Agency's handling of his disability that were published in the *New York Times* in articles dated October 19, 2020 and December 5, 2020, while many of Mr. Lenzi's bids on foreign positions were still pending. In conducting these interviews and making these statements, Mr. Lenzi spoke as a private citizen on matters of public concern—namely, the circumstances surrounding the injury of dozens of American officials abroad, and the State Department's discriminatory practices—that have garnered national media interest and sparked Congressional inquiry. Indeed, the Supreme Court has held that the purpose of the First Amendment is the protection of exactly this type of speech. *See Connick v. Myers*, 461 U.S. 138, 154 (1983) ("[T]he First Amendment's primary aim is the full protection of speech upon issues of public concern.").

123.    Mr. Lenzi's protected speech has been an explicit motive behind certain adverse employment actions the Agency has taken against him, including the Agency's refusal to assign

him to a position overseas.  For example, Andrew Kaleczyc, Mr. Lenzi's Career Development Officer, drafted an action memo to Foreign Services Director General Perez advising her to deny Mr. Lenzi's request to reverse the results of his unsuccessful assignments challenge regarding the Belgrade position.  This position had been offered to another applicant—a more junior, less experienced, and less qualified candidate than Mr. Lenzi.  Mr. Kaleczyc's memo cited Mr. Lenzi's disability and stated that he "regularly conducts media interviews which are widely reported around the world," referring to Mr. Lenzi's public comments about his disability and the Agency's retaliatory acts against him.  On information and belief, Director General Perez denied Mr. Lenzi's appeal on the basis of his disability and in retaliation for Mr. Lenzi's protected speech related to his disability and the Agency's unlawful employment actions against him.

124.    Mr. Lenzi has suffered damages as a result of the Agency's unlawful retaliatory actions, including emotional distress, past and future lost wages and benefits, and the emotional and physical costs of bringing this action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests judgment as follows:

A.  Accept jurisdiction over this matter;

B.  Award Plaintiff for his past and future loss of wages and benefits, including back pay and front pay, plus interest;

C.  Award Plaintiff an additional six years of credit toward his State Department retirement;

D.  Order Defendant to reinstate Plaintiff to a position comparable to his former positions at U.S. Embassies abroad or, in lieu of reinstatement, award him front pay (including benefits);

E.  Order Defendant to assign a DS Special Agent rather than an SEO as Mr. Lenzi's CDO for future assignment bidding, and have consideration of Mr. Lenzi's assignment bids be

44

conducted by a DS Special Agent assignment panel, so that individuals who have discriminated against Mr. Lenzi are prevented from dictating his future assignments and career prospects;

F.   Award Plaintiff financial compensation for emotional distress, pain, and suffering;

G.   Order Defendant to remove from its list of Inadmissible Comments for Employee Evaluation Reports: references to disability status, whether a reasonable accommodation has been requested or provided due to a disability, the nature/type of any reasonable accommodation requested or provided, and medical information;

H.   Order Defendant to permit employees to reference the same in assignments challenges;

I.   Order Defendant to institute EEO training focusing on disability discrimination for all DS personnel ranked FP-01 and higher;

J.   Enjoin Defendant from continuing to classify employees with an Overcomplement or similar status;

K.   Award to Plaintiff all costs and reasonable attorneys' fees incurred in connection with this action; and

L.   Grant Plaintiff such additional or alternative relief as the Court deems just and proper.

*[Remainder of Page Intentionally Left Blank]*

## JURY DEMAND

Plaintiff demands a trial by jury on all claims properly triable by a jury.


Dated: December 8, 2021                    Respectfully submitted,

                                           */s/ Christopher A. Suarez*

                                           Christopher A. Suarez (94400)
                                           Thomas M. Barba (*pro hac vice to be filed*)
                                           Steptoe & Johnson LLP
                                           1330 Connecticut Avenue, NW
                                           Washington, DC 20036
                                           Telephone: (202) 429-3000
                                           Email: CSuarez@steptoe.com
                                                   TBarba@steptoe.com

                                           Kate E. Fisch (*pro hac vice to be filed*)
                                           Steptoe & Johnson LLP
                                           1114 Avenue of the Americas
                                           New York, NY 10036
                                           Telephone: (212) 506-3900
                                           Email: KFisch@steptoe.com

                                           *Counsel to Plaintiff Mark Lenzi*