```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF VIRGINIA
 2                         ALEXANDRIA DIVISION

 3      -------------------------x
        MARK LENZI,               :     Civil Action No.:
 4                                :     1:21-CV-1371
                      Plaintiff,  :
 5          versus                :
                                  :     Thursday, April 14, 2022
 6      UNITED STATES DEPARTMENT OF:
        STATE, et al.             :
 7                                :
                      Defendants. :
 8      -------------------------x

 9           The above-entitled motions hearing was heard before
        the Honorable Patricia T. Giles, United States District
10      Judge.  This proceeding commenced at 10:27 a.m.

11                      A P P E A R A N C E S:

12      FOR THE PLAINTIFF:    CHRISTOPHER SUAREZ, ESQUIRE
                              KATE FISCH, ESQUIRE
13                            THOMAS BARBA, ESQUIRE
                              STEPTOE & JOHNSON LLP
14                            1330 Connecticut Avenue, NW
                              Washington, D.C.  20036
15                            (202) 429-3000

16
        FOR THE DEFENDANTS:   MATTHEW MEZGER, ESQUIRE
17                            CATHERINE YANG, ESQUIRE
                              LAUREN WETZLER, ESQUIRE
18                            OFFICE OF THE UNITED STATES ATTORNEY
                              2100 Jamieson Avenue
19                            Alexandria, Virginia  22314
                              (703) 299-3700

20

21          COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

22

23

24

25
                                                                    1
```

```
 1              P R O C E E D I N G S

 2         THE DEPUTY CLERK:  Civil Action 21-1371,

 3  Mark Lenzi versus United States Department of State, et al.

 4         Would counsel please note their appearances for

 5  the record.  Would counsel note their appearances for the

 6  record.

 7         MR. SUAREZ:  Good morning, Your Honor.  This is

 8  Christopher Suarez from Steptoe & Johnson on behalf of the

 9  plaintiff, Mr. Mark Lenzi.

10         MS. FISCH:  Good morning, Your Honor.  Kate Fisch

11  of Steptoe & Johnson on behalf of plaintiff, Mark Lenzi.

12         MR. BARBA:  Thomas Barba, Steptoe & Johnson, here

13  for Mark Lenzi.

14         THE COURT:  Good morning.

15         MR. BARBA:  Good morning.

16         MR. MEZGER:  Good morning, Your Honor.

17  Matthew Mezger from the United States Attorney's Office on

18  behalf of defendants.  I'm joined today by

19  Ms. Catherine Yang from the Federal Programs Branch.  She'll

20  be arguing before the Court today.  And Ms. Laura Wetzler,

21  civil chief of the U.S. Attorney's Office.

22         THE COURT:  Good morning.  Okay.  I believe this

23  is your motion.

24         MS. YANG:  Thank you, Your Honor.  Good morning.

25         THE COURT:  Good morning.
```

2

1            MS. YANG:  This is an action against the State

2    Department alleging failure to accommodate, disability

3    discrimination and retaliation under the Rehabilitation Act,

4    as well as a separate claim of a First Amendment violation

5    arising out of the federal employment.

6            As Your Honor is aware from the briefs, defendants

7    have moved to dismiss the Rehab Act claims for failure to

8    state a claim, and the First Amendment claim for lack of

9    jurisdiction.  Our position is laid out fully in the briefs,

10   so, for today, I'll just highlight the top line reasons why

11   we believe each claim should be dismissed.

12           So starting first with the Rehab Act failure to

13   accommodate claim.  We presented numerous reasons in our

14   briefs why this claim should be dismissed; today I'll just

15   focus on two.

16           The first is that plaintiff did not exhaust his

17   administrative remedies for this claim.  There's no

18   indication in the administrative materials that he raised a

19   failure to accommodate claim in those proceedings.  And

20   failure to accommodate is analytically and legally distinct

21   from a claim of disparate treatment or disability or

22   discrimination.  They involve different elements, different

23   actors, and so many courts across many circuits have held

24   that you don't exhaust one by simply alleging the other.

25           Several cases from within the Fourth Circuit that

3

1    I think are particularly illustrative of that is the *Cox*

2    case coming out of South Carolina and the *Rankin* case coming

3    out of Maryland.

4         The second reason that the failure to accommodate

5    claim should be dismissed is that plaintiff focuses on the

6    idea of overseas assignments as an alleged accommodation,

7    but critically, he doesn't allege that an overseas

8    accommodation would be needed to accommodate any limitations

9    associated with his disability.

10        The purpose of the Rehab Act is to accommodate

11   mental or physical limitations that arise from someone's

12   disability so that they can do their job.  And so, for

13   example, if someone has a disability that causes them severe

14   headaches, and that can be accommodated by limiting their

15   screen time, you know, that's the kind of thing -- the kind

16   of causal connection between accommodation and a disability

17   limitation that's required.  And I think the *Hamill* case of

18   Maryland explains this requirement very clearly.

19        So here, the limitations that plaintiff alleges

20   from his disability are things like headaches,

21   sleeplessness, light sensitivity.  Those are all things that

22   have nothing to do with overseas assignments.  The fact --

23   the geographic location of an assignment isn't going to

24   address whether someone suffers from headaches.

25        THE COURT:  And when he was before the EEOC, he

4

1    did not identify the transfer or an overseas assignment as

2    an accommodation?

3              MS. YANG:  Exactly.  That's the failure to exhaust

4    issue that I discussed.

5              THE COURT:  Right.

6              MS. YANG:  So certainly we understand that

7    plaintiff may prefer to work abroad, but really that -- the

8    focus of the Rehab Act is asking what is an accommodation

9    that is actually going to address limitations associated

10   with a disability.  And of course, as Your Honor noted, the

11   failure to exhaust issue is also a straightforward threshold

12   reason why this claim should be dismissed.

13             Moving on to --

14             THE COURT:  And if we don't have that, we don't

15   even look at the second part of it.

16             MS. YANG:  Exactly.  Exactly.

17             Moving on to the Rehab Act disability

18   discrimination claim, as I understand it, plaintiff advances

19   two theories under this claim, the first being failure to

20   promote, and the second being the non-selection for four

21   overseas assignments:  Frankfurt, Belgrade, Warsaw and

22   Athens.

23             So I'll start with the failure to promote.  And

24   this claim, again, is easily dismissed because, just like

25   failure to accommodate, it wasn't exhausted.  The

                                                              5

1    administrative materials, and even the allegations at

2    paragraphs 86 and 90 of the complaint make it very clear

3    that the scope of plaintiff's administrative complaint was

4    focused on the non-selection.

5         And I think particularly it's important in this

6    context within the foreign service to understand that

7    promotions and assignments are two completely separate

8    things by operation of statute.  They have different

9    decision-makers, different processes, different

10   requirements, different criteria, timelines.  And so that

11   kind of factual divergence between promotions and

12   assignments within the foreign service is exactly the kind

13   of divergence between claims that the Fourth Circuit

14   repeatedly has held in cases like *Dennis* and *Chacko* and

15   *Evans*, does not put the employer on notice of a claim.  So

16   the failure to promote issue I think, again, is easily

17   discriminated for that reason.

18        Turning to the non-selections, which, again, are

19   regarding four overseas assignments, these claims I think

20   fail for three primary reasons, and the reasons apply

21   equally to each.

22        So the first is -- the first reason is that

23   plaintiff relies principally on allegations that the

24   department did not select him for each of these positions

25   "because of his disability."  And there are several times

6

```
 1   throughout the complaint where that language arises.  But

 2   Supreme Court and Fourth Circuit precedent is very clear

 3   that those types of allegations, without additional factual

 4   elaboration, are not given any credit, even on the motion to

 5   dismiss stage.

 6        THE COURT:  But when you look at this in the

 7   totality and you look at all these allegations and we're

 8   taking them in the light most favorable to the plaintiff,

 9   he's alleging that prior to this date, he was an exemplary

10   employee.  He was able to work abroad fully.

11        After his injury, he was returned stateside.  He

12   was put in this status that is supposed to be temporary,

13   but, for him, has lasted three years.  He's applied for

14   these numerous assignments, and each time where he was

15   either the only person there, or even when there was a

16   second person there, this assignment is -- I don't know if

17   it's readvertised or reconfigured, but it's moved to an

18   entry-level position that he is no longer available for.

19   And the only thing that has changed is his -- his

20   disability.

21        And when we look at those facts and these

22   allegations, and there's also a memo there where he is --

23   during the process where he is seeking -- and this may

24   relate more to your retaliation -- the retaliation claim

25   than the disparate treatment claim, but there's even a memo
```

7

1    that references his disability and the fact that he's been

2    speaking out about it.

3              When we read these facts -- or when I read these

4    facts in the light most favorable to the plaintiff, why

5    isn't that enough to get beyond -- I'm not getting to the

6    merits, but why isn't that enough to get beyond a motion to

7    dismiss?

8              MS. YANG:  Certainly.  And I think I'll structure

9    my response in three parts.

10             So the first part is to I think emphasize that a

11   discrete act claim is necessarily moored to a specific

12   adverse action.  And so when we're looking to see whether a

13   particular action -- a particular employment action was

14   plausibly motivated by unlawful animus, we're looking at the

15   facts surrounding that particular claim.  You know, and this

16   sort of makes sense logically, too, because you could have

17   four employment actions over time, right, but each one maybe

18   involved different decision-makers or different

19   circumstances, you know, different factual -- a different

20   factual circumstance.

21             And so, you know, while certainly you might

22   consider the overall -- you know, the breadth of those

23   allegations as part of background understanding, when you're

24   looking and analyzing whether someone has stated a

25   particular claim with respect to a specific action, you have

                                                              8

1   to look to see whether there are factual -- sufficient

2   factual allegations with respect to that action to infer

3   plausible unlawful animus with respect to that action.  And

4   for the reasons that we explained in the papers, we think

5   that's missing here.

6          The second piece of my response, I think, is to

7   try to shed a little light on the overcomplement status

8   based on facts that are alleged in the complaint.  And so

9   taking a step back, as Your Honor knows, employment within

10  the foreign service is assignment-based.  And so, you know,

11  employees are assigned to one assignment, they perform that

12  assignment for the amount of time of the assignment, and

13  then they move on to their next assignment.

14         Because of that, when employees are between

15  regular assignments, the Department places them on

16  overcomplement status.  This occurs across the board, and so

17  that could come up in a number of different ways.

18         So, for example, let's say that an employee has

19  completed -- you know, has completed or is very close to

20  completing their current assignment but haven't yet lined up

21  their next assignment, they would be placed on

22  overcomplement status for that interim time.  Or you might

23  have a situation where the employee is, for whatever reason,

24  unable to complete their current assignment and move on to

25  their next assignment.  During that interim period, they

                                                          9

 1   would be placed on overcomplement.  So, you know -- and that

 2   is alleged in paragraph 79 of the complaint.

 3          When people -- when employees are on

 4   overcomplement status, they're given meaningful work, they

 5   continue to receive performance evaluations, they continue

 6   to be considered for promotion if they're otherwise

 7   eligible.  There's no impact on their pay, there is no

 8   impact on their grade.  Again, really, it is a temporary

 9   designation when an employee is between assignments.

10          And because foreign service --

11          THE COURT:  But he's been in it for three years.

12          MS. YANG:  Certainly.  And so -- and so because

13   overcomplement is intended to be temporary just for when

14   people are between regular assignments, when an employee

15   continues to remain unassigned for a certain amount of time,

16   the Department will then consider directing them to a

17   specific assignment because the Department has every

18   interest in making sure that its employees are in regular

19   assignments.

20          And so that's actually what happened here.

21   Plaintiff was placed in overcomplement after he was

22   voluntary medevaced from his China assignment because he was

23   no longer able to do that assignment and wasn't able to

24   continue on to his next assignment, so he was placed on

25   overcomplement.

                                                              10

1        During that time, and while he was receiving

2   treatment in the United States, the Department gave him

3   domestic duties to perform so that he was still, you know,

4   doing work, earning his paycheck.  And he alleges that he

5   took no issue with those domestic duties, at least

6   initially.  And we see that at paragraphs 9 and 28 of the

7   complaint.

8        Plaintiff didn't then start applying for overseas

9   assignments until late 2019, late 2020.  As we know, he

10  didn't get them, so he remained in overcomplement.  Again,

11  overcomplement is what happens when you are in between

12  regular assignments.

13       Then in March of 2021, the Department said that if

14  he continued to be unassigned, they would consider directing

15  him into an assignment consistent with what I mentioned

16  earlier.  That's at paragraph 77.  And six months later when

17  he still wasn't in an assignment, the Department did just

18  that and directed him into a particular assignment.  Again,

19  because the Department has every interest in making sure

20  that its employees are in regular assignments.

21       And so I certainly acknowledge that the length of

22  time that plaintiff was in overcomplement was approximately

23  three years or so, but, you know, that is an operation of

24  what happens by policy when a foreign service employee is

25  between regular assignments.  And so, you know, the fact

11

1   that he wasn't able to find a regular assignment in the

2   meantime is simply, you know -- that is why we're focusing

3   on those particular assignment decisions in grounding our

4   analysis of the disparate treatment, discrimination claim.

5            And so the third piece -- the final piece of my

6   response to Your Honor's question is to return to those

7   particular four assignment decisions and explain that, you

8   know -- so A, there are a lot of allegations about how the

9   Department did not select him for those because of his

10  disability.  We can disregard those because those are not

11  factual allegations.

12           The second attempt is to invoke these

13  similarly-situated comparators.  But there's nothing in the

14  complaint that actually provides any factual elaboration

15  into who those purported people are, you know, anything to

16  allow us to infer whether or not those people are actually

17  plausibly similarly situated to allow for a meaningful

18  comparison.  And when you take away those allegations that

19  are not to be credited, you are left with very few facts to

20  actually support a plausible inference of discrimination.

21           So just to take an example, the Warsaw assignment.

22  Plaintiff alleges only that that assignment was offered to

23  another bidder.  That appears at paragraph 74.  The fact

24  that the panel decided to go with someone else alone on

25  its -- you know, with no elaboration, that allegation is not

                                                          12

1    sufficient to give rise to a plausible inference of

2    discrimination.

3              And, similarly, you know, there are several

4    positions where plaintiff alleges that they were converted

5    to entry-level positions.  Again, on its face, a conversion

6    to entry level has nothing to do with disability,

7    discrimination.  And, in fact, you know, subscribing to

8    plaintiff's theory would require us to, you know, adopt the

9    view that the Department was willing to affect other

10   employees who had applied to those positions, apart from

11   plaintiff, by converting the whole thing to entry level.

12   And, you know, as it's pled, the complaint doesn't provide

13   the factual allegations to support that leap of logic.

14             And then -- so then turning to retaliation -- and

15   I'll address Your Honor's question about the statement about

16   media interviews.  So I'll take that first.

17             So the statement that Your Honor mentioned is with

18   respect to the Belgrade position.  And the statement

19   specifically was something to the effect of plaintiff

20   regularly conducts media interviews that are reported around

21   the world.  Something to that effect.

22             THE COURT:  In reference to -- according to the

23   complaint, it also references his disability.

24             MS. YANG:  Correct.  Correct.

25             And so I think there are two -- two main issues

13

1    with focusing on that allegation as suggestive of unlawful

2    animus.

3            The first is that that decision -- that statement

4    was actually made after the Belgrade assignment had already

5    been offered to someone else, and so the decision had been

6    made.

7            THE COURT:  Right.  But it was during the period

8    when he was requesting that they review.

9            MS. YANG:  That's correct.  Yes, that is true.

10   But I think the point that I'm trying to convey is that the

11   decision had already -- you know, the wheels of that

12   employment decision had already begun spinning.  You know,

13   after the decision not to offer him that position was made,

14   he then instituted this appeal during which we have this

15   statement.

16           THE COURT:  But if -- if that -- even if it's

17   after the decision is made and there is a statement like

18   that to the person who is supposed to reconsider it, could

19   that not be -- could there not be some animus involved in

20   even deciding not to reconsider it in making that decision?

21   Because, remember, I'm not looking at the merits; I'm just

22   looking at the allegation and read in the light most

23   favorable to the plaintiff.

24           MS. YANG:  Right.  I don't think there is, at

25   least to a plausible level, which is the level required for

                                                            14

1   pleading.

2           And the references that I go back to are the

3   Fourth Circuit authorities in *Horne*, *Buchhagen* and *Francis*,

4   among others in the briefs, that basically say when you have

5   an employment action already in process and then protected

6   activity occurs in the interim and then there's a final

7   decision, the fact that protected activity was injected into

8   the middle doesn't somehow transform the whole thing into a

9   retaliatory act, because that action was already -- you

10  know, had already been put into motion before the protected

11  activity.  And so, you know, some of those -- some of those

12  cases arose in the context of what's known as a performance

13  improvement plan in the Federal Government.  And so,

14  similarly, you know, that's a recommendation for an action

15  to be taken.

16          THE COURT:  And as I sit here, I don't recall

17  whether or not those cases involved the dismissal stage or

18  the summary judgment stage.

19          MS. YANG:  I believe *Buchhagen* was a dismissal --

20  was affirming a motion to -- was affirming a dismissal of a

21  complaint at the pleading stage.  I believe *Francis* was

22  summary judgment.  And I can't remember off the top of my

23  head what *Horne* was.  But I'm pretty sure that *Buchhagen* was

24  at the dismissal stage.  And certainly there have been

25  District Court decisions since, you know, that trio that

15

1   have applied it at the dismissal stage.  I don't think that

2   we cited those District Court decisions in our papers, but,

3   you know, certainly we would be happy to provide them if

4   that's useful.  But there have certainly been District Court

5   decisions applying those decisions -- applying the Fourth

6   Circuit decisions at the dismissal stage.

7          And then finally, I think -- the final point that

8   I would make with respect to this alleged statement is that

9   statements by non-decision-makers are not considered direct

10  evidence of any kind of unlawful animus.  Here, the

11  statement is attributed to plaintiff's career development

12  officer who I understand wrote some kind of background memo.

13         You know, so even if we're taking ourselves out of

14  the initial decision going to the appeal, it's not a

15  statement that can be attributed to the appeal authority.

16  And so I think for that additional reason, it's not terribly

17  probative of the issues that are actually properly before

18  the Court on a discrete act claim of either retaliation or

19  discrimination.

20         With respect to the other retaliation pieces, I'll

21  just briefly note I think two points.  So, first, we're

22  generally dealing with two categories of protected activity,

23  the first being plaintiff's accommodation requests; and the

24  second being his EEO activity.

25         With respect to the accommodation request, it's

16

1   undisputed that there was a multi-year lag between when he

2   requested accommodations in 2018, when he later -- you know,

3   several years later, did not get the assignments that he

4   wanted.  There's lots of case law that says that kind of

5   passage of time cannot support a plausible inference of

6   retaliation.

7           That's especially the case like, when here, the

8   Department continually provided him with accommodations

9   during that time.  And so the Fourth Circuit explained in

10  the *Hollestelle* case.  Other circuits have explained, as

11  cited in our papers, that when you have that kind of

12  extensive accommodation, that willingness to accommodate an

13  employee, you can't then turn around and say, actually, the

14  Department -- the employer was motivated to retaliate

15  against me for engaging -- for requesting that accommodation

16  when they demonstrated that willingness to engage with the

17  accommodation.

18          So that disposes, I think, of the -- of any

19  retaliation claim arising out of the accommodation request,

20  which then brings us to the EEO activity.

21          THE COURT:  Are you about to address now the

22  retaliation with respect to the EEO activity?

23          MS. YANG:  Exactly.

24          THE COURT:  Okay.

25          MS. YANG:  Exactly.  And so I think here there are

                                                              17

 1    two main flaws in the allegations, at least as they've been

 2    pled.

 3              The first is that there's no allegation that any

 4    decision-maker involved with any of the assignment decisions

 5    knew about his EEO activity.  There's none in the complaint.

 6    And logically, you know, the Fourth Circuit has said that

 7    you can't accuse someone of taking action against you

 8    because of your protected activity if they didn't know about

 9    your protected activity.  It's just a logical fallacy to say

10    that you could otherwise.

11              The second piece is that, again, there are several

12    months to years that pass between the EEO activity and when

13    plaintiff didn't get an assignment that he wanted.  The

14    specific timelines are set out in our briefs, so I won't go

15    through all that again.  But, again, the Fourth Circuit has

16    said that a delay of even two months is too long to -- can

17    be too long to infer retaliatory motive.  And that appears

18    in the *Horne* decision, which was two months, and *Perry*,

19    which was two to three months.

20              And I understand the plaintiff says there was

21    other evidence of retaliatory animus during this intervening

22    period, but as we've explained in the papers, he doesn't

23    actually plead any events that can reasonably be viewed as

24    being retaliatory.

25              THE COURT:  But what about -- and I understand

                                                              18

1   respondent's position on the overcomplement status.  So I
2   think I'm going to do this in two parts.

3           First, one, why isn't maintaining him in the
4   overcomplement status for that amount of time, why can't --
5   why isn't that an adverse action?  Because in his complaint,
6   he goes through and talks about what he's not receiving when
7   he's in the overcomplement status.  Because he's not
8   overseas, he's not entitled to certain reimbursement that he
9   receives or certain increases.  So why isn't just the
10  maintaining him in that overcomplement status, why can't
11  that alone be an adverse action?

12          And if it is, then we do have continued action,
13  even during the period where there's these EEO complaints.
14  Because there were -- I believe there were complaints in
15  June and July and August of 2020, and then there were
16  denials coming in October.  And I know what you're talking
17  about, well there's -- you know, two-month delay is not
18  enough.  But when you also have the continued period in that
19  overcomplement status, why isn't all of that read together?

20          MS. YANG:  Certainly.  So I'll take your first
21  question first about adverse action.

22          The reason the overcomplement status is not
23  considered an adverse action is because the Fourth Circuit
24  has drawn a very clear line, a very clear definition of what
25  constitutes an adverse action.

                                                            19

1          You know, I understand -- we've described in our

2    papers how the Department has taken a somewhat contrary view

3    with respect to transfers.  But, respectfully, the binding

4    precedent is what it is, and that says that adverse actions

5    have to affect pay, have to affect, you know, your title or

6    your position.  Something really significant, really

7    substantial.

8          THE COURT:  And by pay, you mean actual salary as

9    opposed to what he says that he's losing in pay --

10         MS. YANG:  Correct.

11         THE COURT:  -- because he does say he is losing

12   money.

13         MS. YANG:  Correct.  I understand the allegation

14   to be that there are additional sort of ancillary benefits

15   associated with being in a foreign post, especially some

16   that are in tougher locations.  But the base salary is the

17   same, and those sort of ancillary benefits -- you know, I

18   sort of analogize to thinking like differences in locality

19   pay for federal employees.  You know, you're still within

20   your same grade level, you're still within your same grade

21   and step level, but you might be getting paid differently

22   depending on, you know, whether you're in Portland, Oregon

23   or the D.C. area.  And so, you know, that's sort of in my

24   mind where I go with that.

25         Overcomplement doesn't change the grade level or

```
 1    anything.  Again, like I mentioned before, you're still
 2    given meaningful work when you're in overcomplement.  He
 3    describes some of that work in his complaint.  You're still
 4    evaluated for your performance during that period.  You're
 5    still being considered for promotion if you're otherwise
 6    eligible during that period.  And, again, it's kind of a --
 7    it's an interim step between regular assignments that every
 8    employee goes into.
 9            THE COURT:  Isn't adverse action, though, doesn't
10    it also include any kind of condition that you impose on an
11    employee that could cause a chilling effect and not want
12    them to, you know, proceed with other -- or file other
13    claims under the Rehab Act?  Isn't that also part of the
14    definition of what an adverse action can be?
15            MS. YANG:  Within discrimination claims, no.  The
16    Fourth Circuit precedent is very clear that it has to be --
17    it has to fall within the definition of cases like Holland
18    and others that we've cited.
19            In the retaliation context, you know, there's been
20    some debate over the last couple of years following the
21    Burlington Northern case, which I think is what Your Honor
22    was referencing.  Respectfully, that case arose in the
23    private sector context, which is different from the -- which
24    deals with a different section of Title 7.  I understand
25    that we're not talking about Title 7 here.
```

21

1          But Burlington Northern was interpreting a

2    different provision of Title 7 that applies specifically to

3    private sector employment.  There's a completely separate

4    section that deals with public federal employment under

5    Title 7.  And so, you know, our position is that the

6    Burlington Northern standard, while it might -- while it

7    does apply certainly to the private sector, there's been no

8    published Fourth Circuit decision saying that it equally

9    applies to federal sector employment.

10          THE COURT:  Thank you.

11          MS. YANG:  And then to -- so that's why the

12    overcomplement is not, itself, an adverse action; it's just

13    sort of a temporary place where you are when you're between

14    regular assignments.

15          And then to answer Your Honor's second question

16    about why this doesn't constitute, you know, continuing

17    retaliatory animus, again, I mentioned that this is just --

18    this is a status that applies to anyone who's between

19    regular assignments.  So it's not discretionary as to, you

20    know, if you're between regular assignments, we may or may

21    not put you in overcomplement.  But I think the bigger

22    piece, especially for the retaliation claim, to consider is

23    that plaintiff was placed on overcomplement status in

24    October 2018.  That is years before any of his protected

25    activity, certainly before -- you know, certainly well

                                                            22

1    before his EEO activity in June through August of 2020.

2    That is a very, very lengthy period of time.

3          And so, again, this brings me back to those Fourth

4    Circuit authorities that say when something -- when an

5    action has already occurred before protected activity and

6    then later on protected activity happens and the same action

7    continues throughout, you can't attribute retaliatory animus

8    to that action, because it was already in place before the

9    protected activity.  And that's just the same case here with

10   that overcomplement status.

11         I think finally, and just very briefly, I will

12   address the First Amendment claim.  And as Your Honor knows

13   from the papers, our position is that the Court lacks

14   jurisdiction over this claim because the Foreign Service Act

15   precludes the kind of standalone Constitutional claim that

16   plaintiff tries to bring here.

17         We describe the framework of the Foreign Service

18   Act in our briefs and why that sets out this comprehensive

19   scheme that precludes going beyond the statute for any

20   rights or remedies.  And actually, plaintiff in his

21   opposition didn't contest any of that framework.  So I think

22   that's, you know, very important to note.

23         It appears that what plaintiff is really saying is

24   that he spoke out about perceived disability discrimination,

25   how it was affecting his employment.  But that kind of claim

23

1    is precluded precisely because it has to be brought under

2    the Rehabilitation Act.  That's the whole reason why the

3    Rehab Act exists.  And many courts have held that the Rehab

4    Act is the exclusive remedy for all claims arising out of

5    federal employment with regard to disability discrimination.

6    And of course he's brought that Rehab Act retaliation claim

7    here, so he can't tack on an additional Constitutional layer

8    to that same claim.

9             I wasn't quite clear from the opposition, but to

10   the extent that he also tries to argue that this whole line

11   of authority, including the Supreme Court decisions in

12   *Fausto* and *Elgin* are irrelevant, because, unlike those, he's

13   bringing dual discrimination and Constitutional claims --

14             THE COURT:  But do we even get there?  Because

15   he's asked for monetary judgment in reference to the First

16   Amendment claim.

17             MS. YANG:  Right.  Right.  So he has asked for

18   both.  He's asked for monetary relief, as well as equitable

19   relief.

20             THE COURT:  But the equitable relief listed in the

21   complaint does not appear to go to the First Amendment

22   claim.

23             MS. YANG:  I think that's an excellent point, Your

24   Honor.  And as we discussed in our opening brief, certainly

25   any monetary claims against the Department and these federal

24

1   officials who are sued in their official capacities is off

2   the table immediately, because there's undisputedly been no

3   waiver of sovereign immunity for that kind of claim.

4          Your Honor correctly notes, I believe, that, you

5   know, there may not be a specific request for equitable

6   relief --

7          THE COURT:  That specifically goes to the First

8   Amendment claim.

9          MS. YANG:  Right.  That specifically goes to the

10  First Amendment claim.  So certainly that is an additional

11  thing to consider.

12         You know, litigants are limited by their

13  pleadings.  They can't amend their complaint through

14  briefing or argument.  But, you know, I just wanted to take

15  a step back, too, and say, you know, to the extent that

16  plaintiff wanted to try to amend his complaint to add on a

17  request for equitable relief specific to his First Amendment

18  claim, you know, that is also off the table for all the

19  reasons we've discussed in the briefs.  You know, there's no

20  avenue for him to do that.  Anything that's tied to his

21  Rehab Act claim has to be brought under the Rehab Act.  Any

22  attempt to distinguish himself from the *Elgin* and the *Fausto*

23  line of cases is unsuccessful because that kind of mixed

24  discrimination and non-discrimination case that he describes

25  isn't available to -- isn't available to a foreign service

25

 1   employee by operation of the CSRA and the FSA.

 2          And so that sort of brings us directly into the

 3   holding of *Fausto*, which is that when Congress decides to

 4   exclude a certain category of people from an otherwise

 5   comprehensive scheme, that exclusion has to be given

 6   meaning, it's deliberate, and that person can't then go

 7   around the statute and try to bring other claims some other

 8   way.

 9          So for all these reasons, we would ask for a

10   dismissal of the complaint, and, you know, we welcome any

11   questions that Your Honor may have.

12          THE COURT:  Thank you.

13          MR. SUAREZ:  Good morning, Your Honor.  May it

14   please the Court.  Again, this is Christopher Suarez from

15   Steptoe on behalf of plaintiff.

16          I think it's important to start in this case by

17   taking a bit of a step back and making two points before I

18   get to the individual counts.

19          The first is the standard of review.  As Your

20   Honor noted, we're on a motion to dismiss, and it's about

21   whether we've pleaded a plausible claim as to each element,

22   which is an even lower bar than the prima facie case as the

23   Government concedes.

24          The second point is, it's important in this case

25   to really take a step back and look at the entire context,

                                                          26

 1   as I think you agreed to.  It's that our client was

 2   stationed in China, he was afflicted with this Havana

 3   syndrome, a very extreme illness and a severe situation.  He

 4   was then, against his will, placed indefinitely for

 5   three years, and it continues to this day, in something

 6   that's akin to a domestic desk duty.

 7           Now, he was in diplomatic security.  A good

 8   analogy for this is thinking about when someone gets in

 9   trouble in the police force and they say you're on desk

10   duty.  That's essentially what has happened here with our

11   client, Mr. Lenzi, over the last three years.

12           And so with that in mind, I'm going to go through

13   the three counts.  And I'm going to start actually with the

14   disparate treatment count, because I think that

15   contextualizes the case and allows Your Honor, I think, to

16   have the proper framework to analyze the counts and whether

17   they should proceed.

18           So for disparate treatment, the law says he has to

19   show he's disabled, he's otherwise qualified for employment,

20   and he nonetheless suffered an adverse employment action.

21   The first two about disability and being qualified for

22   employment, there's no dispute.  We've repeatedly put counts

23   in the complaint showing that he's well qualified, he's

24   received great performance reviews over many years.

25           The only element that really is in dispute is the

                                                              27

1  third element of whether there's an adverse action.  In this

2  case, there have been at least two such adverse actions.

3  Your Honor pointed to the first one, which is this

4  indefinite reassignment.  He's been placed in this

5  employment purgatory for three years and ongoing, domestic

6  desk duty, and that's despite his ongoing request to be

7  moved overseas throughout the time.

8          It is black-letter law from the Burlington case

9  that reassignment with significantly different

10  responsibilities -- directly from the Supreme Court -- or a

11  decision causing significant change in benefits is an

12  adverse action.  They never disputed that in their brief.

13  They seem to make new arguments today, but that was never

14  disputed.

15          And if you look at Section 2302 of the statute,

16  personnel action is a detailed transfer reassignment, a

17  decision concerning pay benefits or awards, or any other

18  significant change in duties or responsibilities.  Right.

19          And so there's two reasons why the indefinite

20  reassignment to domestic desk duty is an adverse action.

21  First, it caused a significant change in compensation and

22  benefits; and second, it significantly altered Mr. Lenzi's

23  day-to-day job responsibilities.

24          THE COURT:  But the respondents' argue that

25  it's -- you know, it's just not any compensation, it has to

                                                          28

1   be specifically salary.

2          MR. MEZGER:  Yeah.  And Your Honor, they did not

3   cite any case that stands for that specific proposition that

4   it's this specific salary, and the statutory language and

5   the Supreme Court language says benefits.

6          And the key here, Your Honor, is counsel mentioned

7   changes in like regional pay and things like that, you know,

8   if you have the same job in the United States.  You've got

9   to remember, we've got to -- again, looking at the context,

10  he's a foreign service officer who is, you know, stationed

11  abroad, and with that comes a lot of extra benefits.  Those

12  include pay for your kids' school, those include housing

13  benefits, those include hazard pay.

14         Now, maybe you can take the hazard pay, you know,

15  and put that in the different, you know, regions.  Maybe.  I

16  don't think so.  But, you know, there are multiple layers of

17  benefits that Mr. Lenzi loses as a result of being shuttled,

18  and as counsel mentioned, it's called directed into an

19  assignment.  Has been repeatedly directed into this

20  assignment.

21         And so that benefits piece alone shows there's an

22  adverse action.  But we don't even have to go there, Your

23  Honor, because there's an independent basis, which is the

24  significant change in responsibilities.  We've pleaded in

25  the complaint that he had language skills that were suitable

                                                          29

1    for these positions abroad, that he, you know, is someone

2    who really loves and enjoys this kind of overseas work.  And

3    those come with certain responsibilities and duties.

4          And we've pleaded throughout the complaint that

5    his duties were diminished, and he was placed in a state

6    where, in our view of the case, they're trying to kind of

7    force him to want to quit because it makes his life not as

8    exciting and interesting as it would be if he were to be in

9    the standard responsibilities.  And that's why the law

10   accounts for the diminishing of responsibilities and duties

11   and those sorts of things.

12         And we have multiple, you know, cites to the

13   record on that, you know, complaint.  So on the

14   compensation, it's complaint paragraph 12, Note 4.  The

15   benefits, complaints paragraphs 15 and 16.  And in the

16   demotion of duties, it's complaint paragraph 8, complaint

17   paragraph 9, complaint paragraph 12.

18         So on this count, Your Honor, that, alone, is

19   sufficient for us to survive a motion to dismiss.  And there

20   was no argument from counsel about exhaustion as to that

21   issue.  So that, alone, gets us over the line.

22         Now, I will briefly address failure to promote,

23   which they also don't dispute.  We've pleaded facts -- or at

24   least on the merits, I didn't hear much of a dispute.  We've

25   pleaded facts that shows he was told he was going to be

                                                              30

```
 1    promoted to FP-2.  And FP-2 is better than FP-3.  It's
 2    somewhat counterintuitive.  And he was told he's going to be
 3    at FP-2, and here's an assignment where you're going to be
 4    FP-2.  Then he gets injured, he gets this radiation, you
 5    know, or whatever causes the Havana syndrome, and then he's
 6    moved and he never gets FP-2, despite being told in his
 7    review he's going to get FP-2.  And that's sort of -- you're
 8    right on the cusp of it Mr. Lenzi, no, we're not going to
 9    give it to you.
10         And to Your Honor's point about the temporal
11    aspect, for three years he's hasn't been promoted.  And we
12    also pleaded details about how -- or at least mentioned in
13    our brief that typically these promotions occur within one
14    or two years.  So that's circumstantial evidence that makes
15    our point.  And they've also given him these stretch
16    assignments that are at an FP-2 level, but they're still
17    paying him and keeping him at FP-3 for purposes of his pay
18    and all of those sorts of things.  So all of those things
19    are very significant.
20         Now, with regard to the exhaustion point, I want,
21    again, to take a step back.  Because throughout the
22    Government's arguments, they've never mentioned the standard
23    for exhaustion.  Right.  There's a standard for that.  And
24    one point I want to make sure is clear for the record, too,
25    is he filled out these complaints which, you know, are very
```

31

1    detailed, they're 150 pages.  You know, he did his best.

2    But he did draft these on his own.  I have that on authority

3    from my client.  He did check a box that he had some family

4    friend lawyer that maybe he knew or something.  But no

5    lawyer helped create these EEO complaints.  So I think

6    that's an important context for Your Honor to have.

7            But, apart from that, we noted multiple cases from

8    the Fourth Circuit and from this Court, the Eastern District

9    of Virginia, that show that the standard is what is

10   reasonably expected to follow from the charge based on all

11   of the allegations that are pleaded.

12           There's also case law we cited in our brief that

13   says magic words are not required that they didn't respond

14   to.  Because I think what the Government wants is a standard

15   where you have to say "failure to promote" or, you know,

16   "failure to accommodate," exact words.

17           THE COURT:  Well, the case law says that you do

18   have to identify what type of discrimination you're talking

19   about, and that is one that is referred to specifically when

20   it's a failure to promote, and that's the allegation.

21           And I don't think that you need a lawyer to help

22   you come up with that claim because, you know, what he did

23   prepare is extensive and goes through, you know, the

24   allegations of what he said has happened to him.  But in

25   those, he does not -- he never says they did not promote me;

                                                           32

```
 1   he says that he was not assigned to an overseas --
 2           MR. SUAREZ:  Yeah.  Thank you for that, Your
 3   Honor.  I will say, even if we get there, he actually did
 4   say he wasn't promoted.  He actually talked about this
 5   issue.
 6           THE COURT:  Well, if he did, you didn't cite that
 7   in your pleadings.  Because what I read that you -- that you
 8   did cite talks about -- it was a passing reference to what a
 9   supervisor said that he should be promoted at some time.
10   And that, at some point, they stopped mentioning those
11   things, that something disappeared.  But that's not saying
12   the same thing as they failed to promote me.
13           MR. SUAREZ:  So, Your Honor, I appreciate your
14   comment.  With your indulgence, I would say we cited a
15   couple places.  So one was, I think you referenced DEX 1 at
16   78 which is where he does reference the supervisor saying
17   he's going to be promoted.  And so I agree with you that
18   one, taken alone, probably is not enough.
19           I think what does get us over the line, again
20   under this standard, is if we look at DEX 1 at 80 that we
21   did cite in our brief.  And that specific one did reference
22   the fact that things began to -- began to get worse, and
23   he -- they made no mentions of promotions and they stopped
24   doing that after he was afflicted with the disability.
25   So --
```

                                                                 33

1          THE COURT:  But that's not saying the same thing

2     as they failed to promote me, they stopped mentioning it in

3     my reviews.  Because even if something is mentioned in a

4     review doesn't mean it's going to happen; it's a suggestion.

5     And even if the review, it appeared as a -- you know, like

6     this should happen.

7          MR. SUAREZ:  Yeah.  I think -- I think

8     respectfully that, you know, I guess we might have a

9     slightly different view of interpretation of that.

10         But, you know, regardless, on this particular

11    count, the disparate treatment count, we don't even need to

12    go to the exhaustion because of the fact of the indefinite

13    employment purgatory.  So the failure to promote is a

14    separate issue.  It doesn't matter for today's purposes in

15    terms of whether there's a permissible motion to dismiss.

16    You know, we do submit that there's enough to get across the

17    line, but we obviously respect Your Honor's position on

18    that.

19         So let me turn to the failure to accommodate

20    issue.  And, again, focusing on the legal elements of that

21    claim.  To establish a failure to accommodate, Mr. Lenzi

22    must show he was an individual with a disability; two, the

23    employer had notice of the disability; and three, with

24    reasonable accommodation, he could perform the essential

25    functions of the position and the employer refused to make

34

1    the accommodation.

2         What happened -- so here, again, the Government

3    doesn't dispute that Mr. Lenzi had a disability.  Havana

4    syndrome has not come out of the Government's mouth a single

5    time, and that is the key here.

6         Number 2, the employer had notice of the

7    disability, and that was undisputed.  There's no dispute on

8    that.

9         Number 3, with reasonable accommodation to perform

10   the essential functions, we've pleaded extensively about his

11   ability to perform the functions.  And for most of these

12   positions he requested reassignment, he's got a Class 2

13   medical clearance, which means that the office assessed

14   whether he's qualified and assessed whether he could be

15   permitted to work there with accommodation, and they

16   determined that he could.

17        THE COURT:  Let me focus you on this claim and

18   what I have the issue with.

19        In your complaint, you talk about how Mr. Lenzi

20   requested certain accommodations, and how those were given

21   to him.  I believe he requested them, and he says that he

22   received those, and he was -- based on receiving those, he

23   was able to perform those duties.

24        My issue is that you are trying to call the

25   overseas assignment the accommodation, and that was never

                                                          35

1    requested as an accommodation.  I don't even know if that

2    particular assignment could be requested as an accommodation

3    based on the meaning of accommodation.  But even in what you

4    cite, I think it's at DE-1 page 6, "Consulate Frankfurt was

5    recommended to me by a State Department DRAD specialist as

6    the best overseas mission set up to handle DRAD

7    accommodations like mine."

8            So, again, it's evident, based on how he's

9    speaking about it, it's that these accommodations that he

10   received, which were -- let me see.  I don't know where he

11   listed out all of the accommodations.  But they included,

12   like, telework and something with the computer to help with

13   the light sensitivity and all of those things.  And so those

14   are the accommodations.  The overseas assignment is what he

15   prefers and wants based on his skill set, but that, in and

16   of itself, is not the accommodation.

17           MR. SUAREZ:  I appreciate Your Honor's points.

18   And I will -- I'll concede at the threshold before I give

19   this response.  This case doesn't fit into the typical

20   framework for a reassignment accommodation, and I think

21   giving you some context and stepping back will help the

22   response as you evaluate this.

23           The first point is, reassignments are an

24   accommodation in the statute.  You probably are aware of

25   that, but just for the record, 42 USC 12111(9)(B).

                                                              36

1    Reassignments are an accommodation.

2              THE COURT:  They can be.

3              MR. SUAREZ:  Yes, absolutely.

4              THE COURT:  Yes, they can be.  Because he was

5    reassigned from his -- the position over in China --

6              MR. SUAREZ:  Yeah.

7              THE COURT:  -- back to the United States.

8              MR. SUAREZ:  The fundamental key here is, and

9    admittedly, this case would be -- it's a unique fact

10   pattern.  That's just candid for the record, it's a unique

11   fact pattern.  But what we explain in our brief and what is

12   compelling here and why this claim should most certainly

13   proceed is because of the points Your Honor made before.

14             The *Wirtes* case that they initially cited and we

15   responded to, and then we didn't hear much of a reply,

16   right, it stands for the proposition that in the typical

17   case, the Government's trying to do reassignments because --

18   and they're trying to put someone in a position they might

19   not like very much.  And it's usually the plaintiffs

20   fighting against the reassignment, and that's why it's

21   usually an accommodation of last resort and why the case law

22   in the Fourth Circuit says "unusual circumstances call for

23   reassignment as an accommodation."

24             Well, this is sort of the reverse situation.  It's

25   a very odd situation.  Because of what Your Honor pointed

                                                            37

1   out, that he has been in this directed assignment for three

2   years, against his will, involuntary, that's exactly what

3   the *Wirtes* case and the *Lowe's* case we cited specifically

4   counsel against.  The Fourth Circuit wants to make sure

5   people are not put in situations like Mark Lenzi.  And those

6   cases, precedential Fourth Circuit opinions, stand very

7   strongly for that proposition.  Again, no rebuttal on that

8   in reply from the Government.

9          And so it's in this context where, you know, if

10  you do not permit this claim to proceed, Your Honor, what

11  you're essentially allowing the Government to do is say,

12  well, we're going to just put him in a directed assignment

13  against his will.  We're going to pick and choose some

14  accommodations.  We'll give him some glasses, we'll give him

15  a typewriter, we'll give him a few things, but we're not

16  going to allow him to have the fundamental thing he always

17  had.  And as you alluded to in referencing our DEX exhibits,

18  the PEX and DEX, he talked to his DRAD officer about these

19  accommodations.  That's in the complaint.

20         THE COURT:  But not about the overseas assignment

21  as an accommodation.

22         MR. SUAREZ:  Well, Your Honor, I would submit on

23  that that --

24         THE COURT:  And even in your brief at one point

25  you said he could have performed the duties of the Belgrade

                                                              38

```
 1    job with accommodation.  With accommodation.  Not that that
 2    was the accommodation.  He could do that job with
 3    accommodation.  And that is said repeatedly through your --
 4    the EEO complaint.
 5              MR. SUAREZ:  Yeah.  So I would go back.  You know,
 6    so on that, I -- I would submit that that is not a correct
 7    legal proposition.  If you look at the four elements of a
 8    failure to accommodate claim, it's one, individual with a
 9    disability; two, employer had notice of disability; three,
10    reasonable accommodation, he could perform the essential
11    functions; and four, the employer refused to make such
12    accommodation.  He is asking for an accommodation so that he
13    can perform the duties that he always performed for a
14    decade.  That is what he's asking to do.
15              THE COURT:  But that's not what he says here.  He
16    says I can do my job.  That's what the argument is here.
17              MR. SUAREZ:  Yeah.
18              THE COURT:  The argument is -- here is, I
19    shouldn't have been removed from my overseas locations.  Or
20    even if I was removed at the time, I should be able to do my
21    overseas assignments because I can do them if you give me
22    the same accommodations that you have given me here.  That's
23    what his argument is.  But the overseas -- this is not --
24              MR. SUAREZ:  I think --
25              THE COURT:  I understand -- I understand your
```

1    position on this.

2         MR. SUAREZ:  Yeah.  It's in -- my point is -- and

3    this is why I argued the disparate treatment first, because

4    I think these arguments are intertwined.

5         So we're at a motion to dismiss stage, and the

6    question is whether it was a plausible claim.  So our view

7    is that the case should be permitted to proceed.  If you

8    look at -- and I think -- I think Your Honor does

9    acknowledge he discussed, you know, these reassignments with

10   DRAD, with MED, it was all intertwined.  And so the notion

11   that we would place form over function, so to speak, and say

12   he didn't say specifically I request that as a reasonable

13   accommodation, we submit that that would be contradictory to

14   the, you know, Fourth Circuit law about reasonably following

15   from the charge and all of that.

16        And so, again, given the posture, given the --

17        THE COURT:  I understand your position.

18        MR. SUAREZ:  Okay.  Thank you, Your Honor.

19        So I'd say then -- I'll move on to retaliation,

20   because I think Your Honor understands that the four

21   positions we talked about were all denied on the merits in

22   terms of their -- in terms of their requested assignment,

23   and they were denied.  So we don't have to go into detail

24   about that.

25        So on retaliation, I think Your Honor, again, hit

                                                          40

1    the nail on the head here in terms of where the rubber hits

2    the road.  There was a lot -- you know, there's sort of two

3    issues.  And I think we can survive the motion -- there's no

4    exhaustion on this count, first of all.

5          But second of all, if we go straight to the

6    Belgrade position that you were alluding to, that one alone

7    gets us across the line if we just look at the facts of that

8    and we walk through them.

9          On October 19th, 2020, there was a New York Times

10   article that quoted our client providing statements

11   regarding how the State Department handles his disability.

12   That's in paragraph 122, we cited it in Footnote 1 of our

13   opening brief.  He was complaining, at least in part, about

14   disability discrimination.

15         Two weeks later, the Belgrade job was offered to

16   someone else on November 4th, 2020.  And that's at

17   paragraph 65.  Then he was in an assignment challenge called

18   The Shootout in the State Department, and he submitted

19   documentation showing that he's medically qualified for this

20   position on November 10th, 2020.  That's in paragraph 66.

21   But then within four hours of submitting that saying, hey, I

22   can do this position, I talked to the embassy, he was

23   demoted from Class 1 medical clearance to Class 5.  This was

24   the only time that that happened.  He ultimately got

25   Class 2, but really quickly they demoted him to that

                                                            41

```
 1    Class 5.  So that was just long enough he didn't get the
 2    position.  And then that timing alone, that suspicious
 3    timing of two weeks was enough.  We cited the *Jones* case, we
 4    cited the *Ali* cases.
 5         And then if that were not enough, Your Honor
 6    alluded to something else, which is important, which is
 7    paragraph 69 of the complaint where we pleaded that
 8    Andrew Kaleczyc, who was his career development officer.
 9    This is the guy who was supposed to be helping his career,
10    but our allegations are that he was actually affirmatively
11    trying to hurt our client's career.  He sent an action memo
12    that -- I'm reading from the paragraph right now that
13    advised Director General -- sorry, Director General Perez --
14    he drafted an action memo to Director General Perez advising
15    her to deny Lenzi's request.  His memo cited Mr. Lenzi's
16    disability and states that he regularly conducts media
17    interviews which are widely reported around the world,
18    referring to Mr. Lenzi's public comments about his
19    disability and the ANC's retaliatory acts against him.
20         So that, you know, apart from the suspicious
21    timing, confirms that we have a plausible claim of
22    retaliation.  It's circumstantial evidence that there was
23    a -- a nefarious motive on the part of the agency based on
24    his advocacy public statements, you know, about the -- about
25    the disability discrimination.  And so, for those reasons
```

42

1    alone, we feel that the retaliation claim should not be

2    dismissed.

3           Your Honor also noted some points about the

4    continuing pattern of discrimination over many years, which

5    we agree with.  You know, there are multiple -- you know,

6    there are multiple attempts to file EEO complaints and the

7    seriatim denial of every position, you know, might be

8    coincidental after one, but after four or five, you start to

9    see a pattern.  You know, so we feel that there is a

10   continuing pattern of retaliation based on that, and those

11   kind of claims can be cognizable as well.  But, again,

12   Belgrade alone gets us there.

13          And then we also discussed the specifics of the

14   Warsaw position, January 28, 2021, medical clearance.  Then

15   he filed the EEO complaint February 5th, 2021, and the

16   Warsaw position was denied just six days later.  The case

17   law says when you have that kind of timing, that in and of

18   itself is enough.  So that's another independent basis for

19   surviving on that.

20          So does Your Honor have any further questions on

21   retaliation?

22          THE COURT:  I do not.

23          MR. SUAREZ:  Okay.  So then I'll just go to the

24   final count, the First Amendment issue.

25          So I think just a couple things at the threshold,

43

```
1    and I might as well just get straight to the point on a
2    couple issues you raised.  Number 1 is, you know, we
3    understand Your Honor's point regarding in the count itself,
4    it referenced monetary damages.  You know, we would submit
5    that the prayer for relief covers --
6              THE COURT:  I'm even looking at the prayer for
7    relief, and I'm saying the relief that you have requested
8    there does not appear to go to your First Amendment
9    argument.
10             MR. SUAREZ:  I see.  Okay.  I appreciate the
11   clarification.
12             I think some of it does, and obviously there's the
13   catch-all, any other relief the Court deems just improper,
14   that's in there as well.  And so, you know, our view is
15   that, you know, that would encompass, you know, injunctions
16   and issues relating to retaliation pertaining to public
17   statements, not retaliating if he goes on 60 -- he's been on
18   60 Minutes, he's been in the New York Times, all these sorts
19   of things.  So we do believe that this does encompass, you
20   know, it's -- it also talks about ordering defendant to
21   permit employees to reference their disability and --
22             THE COURT:  But in the -- but when they're doing
23   their comments for employee evaluation reports, that --
24             MR. SUAREZ:  Yeah.  So there's another one that
25   says "enjoin defendant from classifying employees with
```

44

```
 1    overcomplement."  That could -- you know, there could be
 2    retaliation to classifying employees as an overcomplement as
 3    a result of --
 4              THE COURT:  I'm speaking to your First Amendment
 5    claim.
 6              MR. SUAREZ:  Yeah.  Yeah.  No.  And I guess my
 7    point is is that I think those -- because I take -- your
 8    point is well taken about -- that some of them may not seem
 9    to go to it.  But I think ones like enjoining the
10    overcomplement goes to both.  Because you can see a
11    situation where other employees advocate on the 60 Minutes,
12    advocate on New York Times and these things.  And there may
13    be situations where they don't necessarily talk about the
14    disability discrimination.  Perhaps they talk about, you
15    know, issues relating to directed radiation, perhaps they
16    talk about other issues.
17              THE COURT:  But this is -- this has nothing to do
18    with media statements; this is specifically referencing what
19    employees can say in their employee evaluation reports.  And
20    it gives a list, and then behind it is a list of items that
21    they should be free to list in their employee evaluation
22    reports.
23              MR. SUAREZ:  Yeah.  No.  And I --
24              THE COURT:  Because I think what --
25              MR. SUAREZ:  I understand that, which is why --
```

                                                              45

```
 1              THE COURT:  Because I think what you're doing --
 2    we can't do amendment through, you know, these types of
 3    pleadings --
 4              MR. SUAREZ:  No.  No.  No.
 5              THE COURT:  -- and arguments in court; it has to
 6    be here.
 7              MR. SUAREZ:  I understand.  And actually what I
 8    was saying is I went off of that particular one.  What I was
 9    focusing on was J, just to give you an example.  Because J
10    talks about enjoining defendant from continuing to classify
11    as overcomplement.  And that could have a nexus to First
12    Amendment activity; not just to necessarily the
13    disability-related activity.
14              THE COURT:  I understand your position.
15              MR. SUAREZ:  So -- okay.  So but I appreciate Your
16    Honor's indulgence in that.
17              And because, you know, we have obviously requested
18    any dismissal to be without prejudice, I'll just briefly
19    touch on whether there can be jurisdiction to this claim, to
20    the extent Your Honor has a view on the prayer for relief.
21              Our view is that with respect to equitable or
22    declaratory relief, there is no sovereign immunity.  We've
23    cited numerous cases from numerous circuits that confirm
24    that.
25              And then with regard to the -- the sort of notion
```

46

1    of the Foreign Service Act preempting, we explain that in

2    our response brief that under the CSRA, this case is

3    properly here as a mixed case.  And under the FSA, if you

4    look at the statutory scheme, cases like this would also go

5    to District Court under like 22 USC, I believe it's 2140 or

6    2139, some of those provisions.  And so as a result -- sorry

7    4139.  4139 and 4140 22 USC permit Foreign Service Act

8    claims to go.  And in their opening brief, they treated the

9    CSRA and FSA as kind of being analogous and similar, and

10   then they kind of backed off that and went to FSA only for

11   the final thing.

12            And then we note, too, that there are cases like

13   *Garcetti v. Ceballos* from the Supreme Court, 547 US 410,

14   that public employees do not surrender their First Amendment

15   rights.

16            And then I think it's important to talk about

17   *Elgin* for a moment because *Elgin*, which they relied on

18   heavily, it specifically says on page 10, "the CSRA does not

19   foreclose all judicial review of petitioner's Constitutional

20   claims, but merely directs that the judicial review shall

21   occur in the Federal circuit."  So that case was largely

22   about what the right forum should be, and that was an MSPB

23   and, you know, other situations.

24            So, again, because they don't dispute that we're

25   properly in District Court, assuming Your Honor agrees with

47

1  us that there is a right to equitable and declaratory relief

2  where sovereign immunity has been waived, we do submit that

3  there's a cognizable claim here.  And so -- you know, and

4  there's plenty of evidence of a retaliation.  There's no

5  12(b)(6) argument on this count.

6        And so we would submit that to the extent Your

7  Honor is inclined to dismiss that count, we would seek

8  permission to amend, per Your Honor's guidance to the extent

9  that you believe that we can establish jurisdiction with a

10 more properly pleaded complaint.

11       So unless -- and -- oh, I guess one last argument

12 they made was they made an exhaustion argument on that as

13 well.  There are plenty of citations that show that he

14 talked about First Amendment retaliation in his EEO

15 complaint.

16       So, for example, he talked about it DEX-2 at 169,

17 DEX-2 at 8, PEX-2 at 26 to 29, DEX-2 at 5, DEX-1 at 15,

18 DEX-1 at 16.  And all of these reference him talking to the

19 New York Times.  One actually says "the Bureau of Diplomatic

20 Security has retaliated against me for the negative press it

21 has received from media outlets such as 60 Minutes and the

22 New York Times."  And that's the one at DEX-2 at 169.  So we

23 believe we've exhausted that as well.

24       THE COURT:  Was that just a general reference,

25 though, to media coverage or indicating the coverage that he

                                                         48

```
 1   participated in?

 2            MR. SUAREZ:  It's referencing the stuff he

 3   participated in.  Actually, one of the cites we provided is

 4   one of the New York Times articles itself in the

 5   administrative complaint.  So he put some of that in the

 6   record that he submitted.  So we think that's significant.

 7            And the very last point I'll say before I sit

 8   down, Your Honor, is that we understand that -- you know,

 9   the position that some of these claims obviously do relate

10   to disability, some of these public statements, specifically

11   disability.  But there is more of a general issue of public

12   concern with regard to the Havana syndrome that Mr. Lenzi's

13   been talking about.  And so there's not a one-to-one

14   correspondence between all of the public advocacy and the

15   disability discrimination.  It's part of it, but it's not

16   all of it.  And so that's why we submit that there shouldn't

17   be preemption with regard to the First Amendment claim.  We

18   feel it's part and parcel of the overall purpose of facts

19   that needs to proceed in this case.

20            So unless Your Honor has any other questions, I

21   thank you for your time, and I submit the case.  Thank you.

22            THE COURT:  Thank you.

23            MS. YANG:  Thank you, Your Honor.  I have just a

24   few brief high-level points to make.

25            So the first overarching point I think is to
```

49

1    underscore that, you know, on a motion to dismiss at the

2    pleading stage, each claim that a plaintiff identifies in

3    his complaint has to be plausibly pled.  If it's not, it has

4    to be dismissed.  And so how the Court comes out on, you

5    know, failure to accommodate or disability discrimination or

6    retaliation or the First Amendment claim is absolutely

7    critical to understanding what claims are allowed to proceed

8    past the pleading stage.

9            And similarly with respect to the subparts of each

10   of those individual claims, so whether, you know, under

11   disability discrimination we're talking about failure to

12   promote or non-selection, how the Court comes out on each of

13   those -- on whether each of those aspects is properly pled

14   is absolutely critical to understand at the dismissal stage.

15           And, again, even breaking it out even further,

16   whether the Court believes that specific adverse actions

17   have been pled, whether it's the Belgrade position or the

18   Warsaw position or the Athens position, so on and so forth,

19   each of those, again, has to be plausibly pled.  So that's

20   my first overall point.

21           The second is that, you know, at their core,

22   discrete act disability and retaliatory claims are discrete

23   act claims, they are disparate treatment claims.  There's no

24   such thing as a continuing violation of a disparate

25   treatment claim.  The Supreme Court in the *Morgan* case made

50

1    that abundantly clear.  And so the notion that they have --

2    that there's this indefinite reassignment as an adverse

3    action, that's not a thing, that's not a claim under the

4    disparate treatment discrete act framework the plaintiff has

5    brought his claims under.

6             The next thing I would mention is that I heard

7    some argument on the failure to promote about going to the

8    exhaustion point.  Your Honor, the standard is in our

9    briefs.  Exhaustion is what's in the charge and what a

10   reasonable investigation would uncover from the things in

11   the charge.  I don't think there's any reasonable dispute

12   that failure to promote is nowhere in the charge asserted as

13   a claim.  It certainly did not continue to the end of the

14   administrative proceedings where plaintiff alleges the very

15   scope of what his claims actually were.  We see that they

16   don't include failure to promote.  But even the other part

17   can -- you know, what a reasonable investigation can

18   uncover.

19            As I mentioned at the outset, within the foreign

20   service, promotion and assignment are completely separate.

21   They have totally different decision-makers, totally

22   different processes.  So I don't think there's really, you

23   know, a good-faith way to say that investigation into

24   assignment decisions could reasonably expect to lead to

25   investigation to promotion decisions.

                                                           51

1          On the failure to accommodate piece, I think Your

2     Honor understands our position on that, you know, so I won't

3     belabor the point.  Clearly he didn't request overseas

4     assignment as an accommodation.  He couldn't have either

5     because the law is unequivocal that an accommodation under

6     the Rehabilitation Act has to address limitations associated

7     with a disability.

8          Overseas assignment doesn't address -- isn't

9     alleged to address any of the limitations associated with

10    the plaintiff's disability.  I didn't hear any response on

11    that piece -- on that critical piece in the reply just now.

12         Also, you know, we responded to plaintiff's

13    citation to *Wirtes* and the reassignment point at page 5 of

14    our reply just so Your Honor has that citation ready.

15         On retaliation, the plaintiff's argument focused,

16    again, on the same things that he identified in his

17    opposition brief.  We fully addressed each of those points

18    in our reply brief, so I'll refer the Court to that portion

19    of our reply brief on that.

20         And finally, on the preclusion point, we

21    absolutely dispute the First Amendment claim is properly

22    before the District Court in this action, just to be clear.

23    The Foreign Service Act sets out a very clear path to

24    District Court review, one that plaintiff does not allege

25    he's followed, one in which he undisputedly has not

                                                              52

1   followed. And his attempt to say that he repeatedly

2   referenced First Amendment activity in his EEO complaint is

3   misplaced. Because as I mentioned at the outset, a mixed

4   case complaint is not available by statute to a foreign

5   service employee. That exclusion is in the statute at 5 USC

6   7511(B)(6). It expressly says this section does not apply

7   to foreign service employees. And so the claim is

8   precluded.

9           For all those reasons, we would request that the

10  claims be dismissed, and that the failure to accommodate

11  claim be dismissed with prejudice because no amendment can

12  cure the deficiencies, that the First Amendment claim be

13  dismissed without prejudice for lack of jurisdiction for the

14  reasons stated today and in our briefs. Thank you very

15  much.

16          MR. SUAREZ: May I make one short point? Okay.

17  We'll be one minute.

18          So the fundamental point, going back to the

19  failure to accommodate, the ostensible basis the Government

20  had for putting him in the domestic desk duty in the first

21  place was because of his disability. That is why he was

22  removed from these positions.

23          And so as Your Honor evaluates this, ask yourself,

24  is it appropriate for someone to do that and then disallow

25  him from proceeding a claim to be made return to that

1   position when the basis for him being removed was because,

2   allegedly, he didn't perform the essential functions.  Now

3   he's saying he can, reassign me there, and they're denying

4   it.  That is a textbook claim, and that's all intertwined

5   with what he put in his complaint and everything under the

6   standard.  So we would submit that's a notion that it's

7   disconnected from his disability.  That's a fiction that the

8   Government created itself.

9           And then, finally, I would just say with regard to

10  the First Amendment again, the case is properly here in the

11  District Court.  They don't dispute that.  And there's no

12  case that says the Foreign Service Act precludes a

13  constitutional claim to move forward.  So we submit that the

14  claim can proceed and there can be jurisdiction or is

15  jurisdiction.

16          Thank you, Your Honor.

17          THE COURT:  Thank you.

18          This matter is before the court on the defendants'

19  motion to dismiss.  And at this stage, I'm just looking at

20  whether or not the plaintiff in the complaint set forth a

21  claim of relief that is plausible on its face.  And I'm to

22  draw all inferences in the light that's most favorable to

23  the plaintiff.

24          And here what I'm -- in Count 1, the failure to

25  accommodate.  The threshold issue here is whether or not

                                                            54

this claim was exhausted.  I understand plaintiff's
position, but I find that it was not.  Because in the EEO
complaint, plaintiff never raised or alleged that the
overseas assignment was an accommodation request.  It was
presented as I stated, that he could do the assignment there
with his accommodations.  And so as a matter of law, I'm
granting the motion as to Count 1, and that claim is
dismissed.

As to Count 2, the retaliation.  And here the
plaintiff alleges retaliation based on a number of things.
His complaints to supervisors about assignments to his
foreign post, or not having assignments to those foreign
posts, disclosure of medical conditions, requested and
received accommodations, and the filing of the EEO
complaints.  Those are all bases that you allege in the
complaint as indicative of retaliation.

And here -- we didn't have specific argument on it
here today, but there was in the briefs, and the disclosure
of medical conditions in general are not protected activity.

In regards to plaintiff's general complaints to
supervisors about not giving or receiving overseas
assignments, general complaints to supervisors aren't
protected activity either.  And as the complaint reads, it
alleges that he complained about the failure to get overseas
assignments after years of exemplary service.  And that

55

1   reads nothing more than like a general complaint to a

2   supervisor.  And so you haven't, at this stage, alleged any

3   more.  So the motion to dismiss is going to be granted as to

4   that argument, but I'm going to give you leave to amend.

5   Because perhaps there are other statements that he made to

6   supervisors that would be actionable or would be considered

7   protected activity.

8           But as opposed to the requested and received

9   accommodations and the filing of those EEO complaints, the

10  defendants are alleging that those claims fail because

11  there's no causal connection between the request for

12  accommodations or protected activity.  And that also there

13  are no factual allegations that could -- from which we can

14  possibly infer denial of assignments were the result of a

15  retaliatory animus.  And I disagree for all the reasons that

16  I was talking about earlier.

17          I do think that there are sufficient facts and

18  inferences here in the light most favorable to the plaintiff

19  that there was retaliation in this case, and I'm not getting

20  into the merits, but there were multiple things that were

21  alleged here.  The overcomplement status being in there for

22  the three years.  The fact that he was denied his overseas

23  request in 2020 and 2021.  The time period between those EEO

24  complaints, the June, July and August complaints, and then

25  those that -- the later decisions in October and November.

56

1            I do -- I'm not going to go through all the facts

2    here, but I do think when I read the complaint in the light

3    most favorable to the plaintiff and draw all reasonable

4    inferences, that there is a retaliation claim here that

5    should go forward.  And so I'm going to -- the motion in

6    that respect is granted in part and denied in part.  It's

7    granted as to -- as I said, to the complaints about the

8    supervisors, as well as the general disclosures of medical

9    conditions, but it's denied in other respects.

10           Then in terms of Count 3, the disparate treatment.

11   There, the allegations are the claim from plaintiff's

12   prospect it's about the failure to promote, that he was

13   treated different than employees who were not disabled, the

14   fact that he was refused for overseas assignments and his

15   designation and continued designation in the overcomplement

16   status.

17           The failure to promote was not exhaustive.  I

18   understand plaintiff's position on that, but it was not

19   something that was identified in the EEO complaint.  But as

20   to the balance, I do think for all of the reasons that, you

21   know, I've referenced earlier in some of my questions that

22   the facts here are sufficient for the claim to go forward on

23   disparate treatment here.  And so, again, the motion is

24   granted in certain parts and denied in certain respects.

25           But as to Count 4, you have pled for monetary

1    damages in reference to your First Amendment arguments, and

2    you talk about, well, I do ask for other relief.  But I'm

3    not going to imagine what other relief could be here and

4    relate it to -- and what's related to the First Amendment.

5    Because right now on these pleadings, it is not here.  And

6    so the motion to dismiss is granted as to Count 4 as well.

7            All exceptions preserved, and I'll issue an order.

8            MR. MEZGER:  Thank you, Your Honor.

9            THE COURT:  I thank counsel for your briefs and

10   your advocacy here today.  Thank you.  We're adjourned.

11           (Proceedings adjourned at 11:44 a.m.)

12           ----------------------------------

13   I certify that the foregoing is a true and accurate

14   transcription of my stenographic notes.

15

16                        _Stephanie Austin_

17                        Stephanie M. Austin, RPR, CRR

18

19

20

21

22

23

24

25

                                                          58