```
                    UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA


   MARK LENZI,                        :
                                      :
              Plaintiff,              :   Civil Action
                                      :   No. 1:21-CV-01371
         v.                           :
                                      :
   UNITED STATES DEPARTMENT OF        :   December 2, 2022
   STATE AND                          :   10:27 a.m.
   ANTHONY J. BLINKEN,                :
                                      :
                                      :
                                      :
              Defendants.             :
                                      :
   ...........................        :
```

**TRANSCRIPT OF MOTION HEARING PROCEEDINGS**
**BEFORE THE HONORABLE IVAN D. DAVIS,**
**UNITED STATES DISTRICT COURT MAGISTRATE JUDGE**

APPEARANCES:

For the Plaintiff:          Steptoe & Johnson LLP
                            Christopher Alan Suarez, Esq.
                            1330 Connecticut Avenue, NW
                            Washington, DC 20036
                            202-429-8131

                            Steptoe & Johnson LLP (DC-NA)
                            Shannon Reid, Esq.
                            1330 Connecticut Avenue, NW
                            Washington, DC 20036
                            202-429-3900
                            Fax: 202-429-3902
                            Email: Sreid@steptoe.com

For the Defendants:         United States Attorney's Office
                            (Alexandria)
                            Matthew J. Mezger, Assistant U.S.
                            Attorney
                            2100 Jamieson Avenue
                            Alexandria, VA 22314
                            703-299-3700
                            Matthew.mezger@usdoj.gov

APPEARANCES:   (Cont.)

For the Defendants:              United States Attorney's Office
                                (Alexandria)
                                Joseph Borson, Assistant U.S.
                                Attorney
                                2100 Jamieson Avenue
                                Alexandria, VA 22314
                                703-299-3700
                                Joeph.Borson@usdoj.gov


                                United States Attorney's Office
                                (Alexandria)
                                Catherine Yang, Assistant U.S.
                                Attorney
                                2100 Jamieson Avenue
                                Alexandria, VA 22314
                                703-299-3700
                                Catherine.yang@usdoj.gov



Court Reporter:                  Scott L. Wallace, RDR, RMR, CRR
                                Official Court Reporter
                                United States District Court
                                401 Courthouse Square
                                Alexandria, VA  22314-5798
                                Cell: 202-277-3739
                                Email: Scottwallace.edva@gmail.com


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

<u>**MORNING SESSION, DECEMBER 5, 2022**</u>

1
2   (10:27 a.m.)
3        THE COURTROOM CLERK:  Civil Action Number 22-cv-1371
4   [sic], *Mark Lenzi versus the Department of State, et al.*
5        Would counsel please come to the podium and state your
6   name for the record.
7        MR. SUAREZ:  Good morning, Your Honor.  This is
8   Christopher Suarez from Steptoe & Johnson on behalf of the
9   plaintiff, Mr. Mark Lenzi.
10        THE COURT:  Good morning.
11        MS. REID:  Good morning, Your Honor, this is Shannon Reid,
12   Steptoe & Johnson, on behalf of Plaintiff Mark Lenzi.
13        THE COURT:  Good morning.
14        MR. MEZGER:  Good morning, Your Honor.  Assistant United
15   States Attorney Matthew Mezger on behalf of defendants.  I'm
16   joined at counsel's table today by Mr. Joseph Borson and Ms.
17   Catherine Yang, trial attorneys from the Department of Justice.
18   Mr. Borson will be arguing before the Court today on behalf of
19   defendants.
20        THE COURT:  Good morning.  This matter is before the Court
21   on the plaintiff's motion to compel the deposition of Michael
22   Pompeo and the production of unclassified portions of custodial
23   documents from the defendant's quote/unquote ClassNet system.
24   The Court has had an opportunity to review the motion, the
25   memoranda in support, the opposition to that motion, and the

1    reply to that opposition.

2        Is there anything that the plaintiffs would like to add to

3    your motions at this time?

4        MR. SUAREZ:  Your Honor, if the Court will indulge

5    argument, I was just wondering if Your Honor would prefer us to

6    argue each motion separately, the first motion to compel

7    Mr. Pompeo, and then I can sit down followed by the argument on

8    the second motion, or would you leak me to go through both the

9    motions?

10        THE COURT:  Seeing that I have to hear the argument on

11    both either way, it's up to counsel.

12        MR. SUAREZ:  Okay.  We'll go ahead and we'll start.  I'll

13    go through both, with Your Honor's indulgence, and then -- but if

14    you would like me to sit down, I will sit down as well.

15        So, we have two motions, Your Honor.  The first motion is

16    the motion to compel the deposition of Mike Pompeo.  We noticed

17    the deposition of Mike Pompeo in October after learning in

18    depositions and in documents produced by the government that

19    Mr. Pompeo, who was appointed to be the Secretary of State in

20    April of 2018, became personally involved with our client,

21    Mr. Mark Lenzi's situation.  There were meetings at the highest

22    level of the department about Mr. Lenzi speaking about his

23    situation.

24        THE COURT:  And what does that mean, "speaking about his

25    situation"?

1    MR. SUAREZ:  What that means is that there were conference

2  calls about Mr. Lenzi.  He had sent e-mails to the State

3  Department about his condition talking about his disability,

4  talking about the Havana Syndrome diagnosis he had received, and

5  at that point Mr. Pompeo was involved in discussions around what

6  to do with Mr. Lenzi.

7    THE COURT:  So there were discussions, and I'm assuming

8  these -- Mr. Pompeo wasn't discussing the matters with himself.

9    MR. SUAREZ:  He was --

10    THE COURT:  That would suggest there were others involved

11  in the discussions.

12    MR. SUAREZ:  Yes.

13    THE COURT:  So then, if there were discussions that

14  involved Mr. Pompeo and other individuals, how was Mr. Pompeo's

15  knowledge about those discussions unique to Mr. Pompeo?

16    MR. SUAREZ:  Well, so, there are a couple of questions in

17  there that I will unpack.  So, first off, the knowledge is unique

18  to Mr. Pompeo relative to discovery that's happened in this case

19  because in the --

20    THE COURT:  And what do you mean by "relevant to the

21  discussion or the discovery that happened in this case"?

22    MR. SUAREZ:  So, the State Department placed ten

23  individuals on their initial disclosures who are the people they

24  believe are the most relevant, and we'll talk about them when we

25  get to the ClassNet discussion after this.

1        Those individuals are several levels down the totem pole

2   from Mr. Pompeo because Mr. Pompeo was the head of the agency.

3   When we deposed some of the individuals that they put on their

4   initial disclosures, they testified that they were four, five

5   levels down from Mr. Pompeo and that they weren't personally in

6   the meetings with Mr. Pompeo.

7        THE COURT:  Well, who else was in the -- Then you ask the

8   question, of course, well who else was in the meeting with

9   Mr. Pompeo?  And then you requested a deposition of those people.

10       MR. SUAREZ:  We haven't requested a deposition of those

11  people.

12       THE COURT:  Then why are we going straight to the top,

13  because you know they're going to stand up and make arguments

14  like apex doctrine and those types of things, and this is exactly

15  why, because part of the rules are that you try to get the

16  information from other places that you can't get from this person

17  because it's disruptive because of their high-level, because of

18  all of these things.

19       MR. SUAREZ:  Well, because of the documents that they

20  produced that specifically said that this individual is a

21  concern.  We cited it in the brief.  It says, Sect State is

22  personally concerned; S is concerned."

23       THE COURT:  That confuses me.  So, Mr. Pompeo is concerned

24  about what, about Mr. Lenzi's health condition?

25       MR. SUAREZ:  Well, that's part of why we have discovery.

```
1          THE COURT:  What?  So you don't even know what he was
2    concerned about?
3          MR. SUAREZ:  Well, we do know.  We do know what he was
4    concerned about.  One of the things --
5          THE COURT:  Well, what is he concerned about?
6          MR. SUAREZ:  One of the things he was concerned about was
7    Mr. Lenzi's advocacy; that he was speaking up about his
8    disability, and that's why Mr. Stewart in his deposition, he
9    personally made the order to say "you're not even going to get on
10   your open e-mails, let alone classified e-mails.  You're just not
11   going to get on e-mails full stop, and this all happened around
12   the time that Mr. Lenzi was medevac'd.
13         THE COURT:  So did Mr. Pompeo have the ability to stop or
14   to disconnect Mr. Lenzi from the utilization of this e-mail
15   system?
16         MR. SUAREZ:  He had the ability to make the order that --
17         THE COURT:  No, no. My question is, did he have the
18   ability to disconnect him from using the system?
19         MR. SUAREZ:  I don't know if he personally disconnected
20   him.
21         THE COURT:  Okay.  So who did?
22         MR. SUAREZ:  I'm not sure who --
23         THE COURT:  And why did they do it?
24         MR. SUAREZ:  On the orders of Mr. Pompeo.
25         THE COURT:  How do you know that?  Did you depose the
```

1    Person who disconnected Mr. Pompeo from the e-mail system?

2         MR. SUAREZ:  So, I deposed Mr. Stewart, and it said -- the

3    e-mail document said specifically that his open Net access was

4    revoked by the Secretary of State, and Mr. --

5         THE COURT:  -- I understand that.  You're missing the

6    whole point.  Simply because Mr. Pompeo's name -- or maybe not

7    his name, just his position was mentioned in discovery, doesn't

8    mean you have a right to depose him, period.

9         There's a whole bunch of people who are listed in

10   discovery, hundreds of people.  You don't get to depose hundreds

11   of people.  Sometimes that's just the case.  Like we used to say

12   in the military, we like to start from the lowest level, if

13   possible, if we can resolve the circumstances that way, before we

14   go to the higher level.  That's just the way we do things.

15   That's the way things are supposed to be done in the discovery

16   process.

17        So, if someone disconnected it, it would seem rational and

18   logical, in order to determine why that occurred, is to speak to

19   the person who did it, you know, the person who actually

20   physically disconnected him from the system and say, Okay, you

21   disconnected him on this day.  Why?  And if there's a "because I

22   was told by so-and-so to disconnect him."  What?  Did they tell

23   you why?

24        Then you go to Mr. So-and-so because I'm sure that the

25   person who disconnected him didn't get direct orders from

1   Mr. Pompeo.  And then you go ask that person.  And he says,

2   Mr. Pompeo told me, and then maybe you have some information

3   if Mr. Pompeo does have unique, personal knowledge because, well,

4   we can't deal with a hearsay situation, or it may not be hearsay

5   because of this, or we may need to take that route in order to

6   avoid all of that.  Then you have a basis to go to Mr. Pompeo all

7   the way to the top.

8        MR. SUAREZ:  Well, I think that -- And, Your Honor, I

9   wouldn't normally go straight to the top for the reason Your

10  Honor articulated.  It's a unique case.

11       THE COURT:  What's unique about it?

12       MR. SUAREZ:  What's unique about it is --

13       THE COURT:  Information is acquired through the same route

14  no matter what that information is and who has the ability to

15  give it, unless the only person who has the ability to give it is

16  the person at the top.  Otherwise, the routes and the rules

17  require you to go up the chain.

18       MR. SUAREZ:  He is the only person who knew why he made

19  the decision to push down that order to restrict him from --

20       THE COURT:  So that's what you're looking for?

21       MR. SUAREZ:  That's what we're looking for.

22       THE COURT:  That why he told him to disconnect.

23       MR. SUAREZ:  We're looking for the motivation because we

24  believe there's discriminatory animus based on his disability,

25  and a disability that --

1        THE COURT:  Okay.  And why do you believe that is?

2        MR. SUAREZ:  We believe that is because what precipitated

3    it is Mr. Lenzi talking about his disability and advocating on

4    behalf of himself about his disability.

5        THE COURT:  So, you believe that -- because Mr. Pompeo,

6    because he believed that an individual may have been exercising

7    his rights made a determination to discriminate against him?

8    What information do you have that that's the type of individual

9    that Mr. Pompeo was, or is this just a theory that fits your case

10   that you would like to explore?

11       MR. SUAREZ:  I think it -- you know, this is a case of

12   national significance.  It has been --

13       THE COURT:  What significance?  This case has absolutely

14   nothing to do with what you have the right to in the discovery

15   process.  What's reasonably calculated to lead to the discovery

16   of admissible evidence is the same no matter what the importance

17   of the case is, whether it's a case between two individuals who

18   are completely unknown by the entire world or two entire states

19   being the United States and a foreign state or anybody else.

20   What's reasonably calculated to lead to the discovery of

21   admissible evidence is the same in both instances.

22       MR. SUAREZ:  Right.  And because we have e-mails that

23   specifically says that he was personally involved and made the

24   decisions.

25       THE COURT:  All you provided me almost in your paperwork

1    is -- and you don't even say the whole concern you provided me;

2    you said he was concerned.  Well, I would hope that an employer

3    who acquired information about a possible illness or malady of

4    one of their employees would always be concerned.

5         MR. SUAREZ:  Well, just to make a case --

6         THE COURT:  So that has absolutely nothing to do with

7    whether or not he took action or ordered others to take action

8    that amounted to retaliation based upon that concern.  Well,

9    then, let's move on to the next one.  The next thing and the only

10   other thing you provided, which is what you're arguing now, is

11   that supposedly he determined -- or he ordered that Mr. Lenzi be

12   disconnected from this particular e-mail system, but you haven't

13   provided me any information on what route you took to determine

14   why he did that, except going straight to Mr. Pompeo.

15        How do you know he's the only person that has that

16   knowledge?  Maybe he told someone.  Maybe he told someone higher

17   up than the person who actually disconnected him from the --

18   Mr. Lenzi from the e-mail, but someone lower than him, because he

19   gave the order to someone because, like I said, he probably

20   didn't talk to the person who disconnected Mr. Lenzi, so he gave

21   the order to somebody, but you haven't given me any information

22   that you attempted to depose that person or those people.

23        MR. SUAREZ:  So, just to give you some context, Your

24   Honor, they listed 10 people on their initial disclosures, and we

25   deposed all of them; they're all four or five levels down from

1    Mr. Pompeo.  If we had done what Your Honor is suggesting, we

2    would have had to notice several depositions and run up the chain

3    of command.  That, frankly, would have been a fishing expedition.

4         THE COURT:  How?  How do you know that Mr. Pompeo actually

5    gave the order to disconnect?

6         MR. SUAREZ:  Well, that's what was represented in the

7    e-mails that they produced.

8         THE COURT:  And then you have ten depositions of people,

9    and I'm sure you asked each one of them -- you presented them

10   with the e-mail and said, did you know Mr. Pompeo ordered that

11   Mr. Lenzi be disconnected from the e-mail system?  They either

12   said yes or they said no.  It's reasonable to infer that at least

13   one of them probably said yes.  So then you pursued the line of

14   questioning and said, Did he tell you why?  Did anyone fell you

15   why?  Do you have any information in your if possession that tell

16   why?  Do you have any information in your possession that

17   suggests why he made that order?  Those were your follow-up

18   questions, correct?

19        MR. SUAREZ:  We asked, were you on the conference calls?

20   And they said oh, we're four or five levels down.  We weren't on

21   the conference calls.

22        THE COURT:  Fine.  Maybe they weren't on the conference

23   call.  You don't have to be on the conference call.  Mr. Pompeo

24   could have walked in your offices and told you, or someone Mr.

25   Pompeo ordered could have walked in your office and told you.

1    I guess the answer to my question is no, you didn't follow up

2    with those questions.

3         MR. SUAREZ:  We did follow-up with some of them.  We

4    didn't ask them for every witness, but we did follow-up with some

5    of those questions, and what we consistently got was that they're

6    four or five levels down from Mr. Pompeo.  Our view -- they tried

7    to argue that they listed 10 people in their initial disclosures.

8    We deposed all of them.  This is our right because we want to be

9    able to cross-examine these people at trial and that's --

10        THE COURT:  -- And so those are the only people you

11   deposed?

12        MR. SUAREZ:  We deposed them, and we only noticed two

13   other depositions for 30(b)(6), Mr. Christopher Teal, who is

14   another person who was involved in some of these employment

15   decisions, and Mr. Pompeo because of this evidence that was

16   uncovered during discovery.

17        THE COURT:  Will you depose the other person besides Mr.

18   Pompeo?

19        MR. SUAREZ:  The other person we're negotiating a date

20   still.  We're still trying to resolve that.

21        THE COURT:  Well, how do you know he doesn't have the

22   information?  At the very least, your motion would be premature.

23        MR. SUAREZ:  So, Mr. Teal was not involved in this.  He

24   came after.  He was involved in other situations after this --

25        THE COURT:  That doesn't mean he doesn't have information

1    about it.

2        MR. SUAREZ:  He may, but the bottom line is --

3        THE COURT:  I'm sure the Secretary of State who took over

4    for Mr. Pompeo has a lot of information that occurred prior to

5    his employment.  That's how government systems work.  People

6    leave -- to pass that corporate knowledge down to the person who

7    takes over.

8        MR. SUAREZ:  So I guess on the Mr. Pompeo thing, I would

9    just say that we think it is most efficient and most productive

10   to have --

11       THE COURT:  But the rule doesn't say "most efficient" once

12   they stand up and make the apex argument.

13       MR. SUAREZ:  Right, which we don't necessarily think --

14       THE COURT:  It's always the most efficient probably to go

15   to the top person of every organization.

16       MR. SUAREZ:  Our view is that the apex doctrine or the

17   mental processes rule doesn't even apply here, as we outline in

18   the briefs.  We don't have to get into that now, but the bottom

19   line is that's the doctrine of -- about policy making and about

20   specific deliberations and adjudications that happen at the

21   highest level, so we don't even think that doctrine applies here,

22   and we don't see any authority points from their side on that

23   point.

24       THE COURT:  So, Mr. Pompeo no longer works there, correct?

25   Who is in his position?

1          MR. SUAREZ:  He does not work there anymore.

2          THE COURT:  So, would he be a third party?

3          MR. SUAREZ:  He is a third party.

4          THE COURT:  Are you not required to not unduly burden the

5     third party if you can acquire the information otherwise, like

6     through the parties?  And This is the whole point of my argument.

7     It appears you have not yet done most of -- many of the things

8     you could have done in an attempt to acquire the information from

9     the party before you burden the third party --

10          THE WITNESS:  -- We --

11          THE COURT:  -- a former executive or not.

12          MR. SUAREZ:  I would submit we've done a lot, but I

13     understand Your Honor's position.  I'll move on with the second

14     motion, if that's okay with you.  Okay.

15          So our second motion, our argument, I think, is even

16     stronger.  So, on this particular issue, these are the ten

17     custodians that they selected and placed in their initial

18     disclosures, so it involves -- and I'll kind of go over them with

19     Your Honor so you're aware.  The first --

20          THE COURT:  You're not going to name all ten of these

21     people.

22          MR. SUAREZ:  I don't have to.  I can shortcut it for you,

23     but the bottom line, there are 442 documents, okay, in this

24     ClassNet system.  As Your Honor pointed out, as you led off the

25     hearing, we're only asking for unclassified portions of those

1    documents.  We're not asking for anything that's classified.

2         THE COURT:  So, what do you say to their argument in

3    opposition to that that they're going to be required to go

4    through the entire process regarding classified information to

5    determine what's not classified, so that doesn't really help them

6    much, that you're only asking for nonclassified, because

7    classified information is so important that when you're asking

8    for nonclassified, we have to go through the classified

9    investigation process to make sure that we're only giving you

10   nonclassified.

11        MR. SUAREZ:  Right.  So the key here is the following:

12   When we deposed Mr. Stewart -- and this is what precipitated our

13   request from Mr. Lenzi two months ago, right -- when we spoke to

14   him, he messaged that he has two commuters, one computer here

15   which is OpenNet.  He has another computer here which has

16   ClassNet.  There is somewhat of a fluidity between using those

17   two computers, and --

18        THE COURT:  What does that mean?

19        MR. SUAREZ:  Well, they can decide when to use ClassNet if

20   they think there might be something classified-related, but the

21   lines are not super clean, so that --

22        THE COURT:  What does that mean, "the lines are not super

23   clean"?

24        MR. SUAREZ:  What that means is that when you go on the

25   ClassNet, everything is not classified, and just because you go

1   into ClassNet, doesn't mean that everything is at the level of

2   sensitivity.  And, in fact, we deposed many people on this, and

3   some seem to have a different standard for when they might use

4   ClassNet and when they might use OpenNet.  And so the point is,

5   in the course of a day, somebody may be talking about Mr. Lenzi

6   on one system, and then you might be talking about Mr. Lenzi on

7   another system.  And all of that reveals the state of mind,

8   animus, you know, potential issues.  And, frankly -- again, these

9   are their ten witnesses they want to hold out for trial that we

10  have a right to cross-examine to complete the picture of their

11  viewpoints and their attitudes towards our client.  And so -- you

12  know, with regard to the issue of reviewing, we raised the issue

13  of classes since the beginning of discovery.  In the beginning of

14  discovery, they tried to put provisions into the joint discovery

15  plan to completely foreclose us from accessing anything on this.

16  We've been saying all along we think classified documents should

17  be searched.  We think they should be searched.  And they have

18  not taken at any point with their ten selected custodians, they

19  have not said, Oh, You know what, we'll run this account, look at

20  the 442, we'll start processing documents.  And even when we

21  raised this in October and they gave us the 442 hit count, they

22  never said, you know what, we're going to start processing

23  documents, we're going to start doing this.  What they tried to

24  do, Your Honor, was they tried to run out the clock and say, Oh,

25  oh, it takes a long time to review these documents for

1    unclassified information, that it --

2          THE COURT:  Do you have any information that it doesn't?

3          MR. SUAREZ:  I'm sorry, what?

4          THE COURT:  Do you have any information that it doesn't

5    take a long time?

6          MR. SUAREZ:  Well, so what we do have is their

7    admission --

8          THE COURT:  No, no, no.  That was a question.  Do you have

9    any information that it doesn't take a long time --

10         MR. SUAREZ:  -- well, I do have --

11         THE COURT:  -- that you can use to say -- in response to

12   say --

13         MR. SUAREZ:  -- the answer --

14         THE COURT:  -- that what we're doing --

15         MR. SUAREZ:  -- the answer is yes.  The answer is yes.  I

16   do have information that it doesn't take as long as they make it

17   out to be because they admitted they can process 500 pages of

18   documents a month.  They can do that.  That is possible.  And the

19   lawyers --

20         THE COURT:  How many pages do you think we're looking at

21   based on the information they provided you?

22         MR. SUAREZ:  So, what they provided us for the ten

23   custodians, 432 -- 442 documents.  First, they said it was 3700.

24         THE COURT:  Did they tell you how many pages it was?

25         MR. SUAREZ:  That's what I'm getting to.  So, it was 442

1   documents.  And first they said it was 3700 pages.  Then they

2   came back and said, Oh, sorry, it's 7,000 pages --

3        THE COURT:  And so 30 how many hundred first?

4        MR. SUAREZ:  What did you say?

5        THE COURT:  3,000-something first?

6        MR. SUAREZ:  3700 first, and then they came back and they

7   said it was 7,000 after that.

8        THE COURT:  So, 3700 divided by five is what over seven

9   months?  I would classify that as a long time.

10       MR. SUAREZ:  I agree.  And so this is where it gets

11  interesting, Your Honor, because we, both before filing this

12  motion to compel and in the motion to compel, offered to narrow

13  this, to compromise.  Because again, these are all documents that

14  say our client's name.  These are not random documents, right?

15       THE COURT:  These are all documents that what?

16       MR. SUAREZ:  That say our client's name, Lenzi.  They say

17  "Lenzi" in the document.

18       THE COURT:  It could be a document out that says, you

19  know, Lenzi's birthday is tomorrow.  What would that have to do

20  with this case?

21       MR. SUAREZ:  They could, but they haven't even agreed to

22  review them, right?  So here's what we proposed, and they have

23  not even answered because they don't want to give --

24       THE COURT:  What do you mean they haven't answered?

25       MR. SUAREZ:  So what we suggested before filing the

1    motion, we said, Please provide us a breakdown by custodian --

2    your ten selected custodians -- of how many documents per

3    custodian and presumably with the page numbers, and then we were

4    willing to say, We'll take maybe two or three of those and look

5    at those, but every time we --

6         THE COURT:  I think that's a good point.  I would like to

7    hear a response to that point because that seems pretty rational

8    and reasonable, because if there are 442 documents, and they say

9    custodian 1 has 300 of them, custodian 2 has 50 of them, that

10   means there's 94 documents split between eight custodians, which

11   means less than 12 documents a piece, they should just say, well,

12   just search custodians 1 and 2.  That seems like a reasonable

13   compromise which would meet this Court's philosophy behind the

14   rule of good faith meet and confer.  So I would like to hear a

15   response as to why that was unacceptable.

16        MR. BORSON:  Of course Your, Honor.  Joseph Borson on

17   behalf of the United States.  The short answer is that what

18   Mr. Suarez is saying ignores the context of the meet and confer

19   that happened and the discussion --

20        THE COURT:  I don't care what it ignored.  That's the

21   past.  We're here right now.  I would like to understand what

22   your rational, logical basis for turning down his alternative

23   compromise.

24        MR. BORSON:  So, our rationale for turning it down is that

25   we made a compromise that was focussed on search terms that were

1    tied to the issues in this case, which is the agreement that we

2    had originally reached.  So Lenzi plus a modifier.  The reason

3    this issue came up in the first place is because we had agreed on

4    a search term of "Lenzi" plus "Savanna Syndrome".  It's not

5    accurate to say we haven't searched classified information.

6    We've been searching and producing --

7         THE COURT:  That doesn't answer my question.  I get that.

8    What you're explaining is how you came up with 442 hits.  My

9    question goes beyond that.  My question goes to, Okay, you came

10   up with 442 hits.  They asked, Can you just tell us the number of

11   hits per custodian.  My question is, what was the problem with

12   that?

13        MR. BORSON:  So the issue there is that in our judgment

14   that wasn't something that was going to reach a reasonable

15   compromise because that wasn't focussed on --

16        THE COURT:  Well, how do you know until you tried it?  So

17   you took it upon yourself to say, Well, we don't think it's going

18   to reach a reasonable compromise because we believe --

19   speculation and assumption -- that when we give them that

20   breakdown, this is the course of action they're going to take,

21   and then we're going to respond this way, and then we're still

22   not going to get to the ultimate compromise.

23        Well, all of that presumes -- because if you simply would

24   have taken the step of giving them the hits per custodian, they

25   may have had a completely different response than you speculated

1   about, and it could have resolved the situation and ending up

2   with this motion not being filed.  That approach does not meet

3   this Court's definition of good faith meet and confer.  If there

4   is any further discovery in this case, we will conduct it in a

5   different manner than that.

6        MR. BORSON:  Yes, Your Honor.  If I can respond on the --

7   on what I think the reasonable path that we were thinking on, or,

8   if that's not helpful, I can move on.

9        THE COURT:  What was your alternative to their

10   alternative?  Because if you don't agree, what a good faith meet

11   and confer, pursuant to the local rules of this Court requires,

12   is for you to provide what you believe is a more reasonable

13   approach.

14        MR. BORSON:  So we did that, Your Honor.  So the issue

15   that counsel brought up and sort of -- the needing to reevaluate

16   the classified search, which, again, is something we had been

17   doing, we set out saying this would take a while, but we need to

18   do it, is the term Savanna Syndrome was not a term that was used

19   in the State Department.  So they said, You guys used the wrong

20   search terms.  We agreed on the parameters of Savanna plus for

21   the custodians, but you used the wrong search terms because there

22   was deposition evidence that said Havana Syndrome isn't used in

23   the State Department.  It turns out that was wrong.  There were a

24   number of documents that were hit through the Savanna plus Lenzi

25   terms.  We will be continuing to produce them, including next

1    Monday.  So our proposal was basically -- this was the concern

2    that you brought to us, that this term is not a correct synonym.

3    Here are five or six synonymous terms that we will propose.

4         THE COURT:  What were those terms?

5         MR. BORSON:  So those terms were -- they were -- sorry.

6    They were UHI, which is unidentified health incident, anomalous

7    health incident, which is the term that's used.  There was

8    overcomplement, which is the status that Mr. Lenzi was put in at

9    the time that he was leaving China, which is where the classified

10   discussions would be in.  There's NOC, which is the acronym for

11   that.  There was AHI, which was a term that we had originally

12   searched for as well.  So these were all synonymous terms.  They

13   were terms that were based on what came out in the deposition

14   that caused this in the first place, and our proposal was, A, to

15   run these terms, which is in keeping to the agreement that we

16   reached and sort of the pattern that we were doing, and B, to the

17   extent that these terms came up with hits and one of them, UHI,

18   did come up with a number of hits -- I think it was four or

19   five -- that we would then process those documents.  So that was

20   the offer that we made to plaintiff which was in keeping with the

21   agreement that we had already reached and the process that we had

22   had for using this -- for setting out this discovery.  So that

23   was the good faith process we were doing, which was to keep --

24        THE COURT:  From your end.

25        MR. BORSON:  Sorry, Your Honor?

1          THE COURT:  From your end.  And then they came back and

2     said, We haven't gotten any documents we anticipated getting, so

3     your approach didn't work either.  So now you have an approach

4     from them that didn't work, an approach from you that didn't

5     work, so the two of you sat down and tried to come up with a

6     third approach, right?

7          MR. BORSON:  I think at that point, frankly --

8          THE COURT:  So both tried once and then we give up.

9     That's what we believe the philosophy behind this Court's local

10    rule is.

11         MR. BORSON:  I think at that point --

12         THE COURT:  Because if that is your belief, in this

13    Court's philosophy of that local rule, I can let you -- inform

14    you now you would be wrong.

15         MR. BORSON:  And I certainly acknowledge that, Your Honor,

16    although I think that is the -- the framework we were doing was

17    in keeping with that, that the offer that we made was certainly

18    in good faith and responsive to the --

19         THE COURT:  But that's the wrong approach.  If something

20    doesn't work, you change it.  If it ain't broke, don't fix it

21    only applies if it ain't broke.  If they come back and say, we're

22    dissatisfied and we think we deserve more, that's at least enough

23    information that would suggest that your approach is at least in

24    their view broken.  Their approach in your view is broken, so the

25    good faith comes up with a compromise between the approaches.

1    What it appears to me are the parties simply used the wrong

2    search terms.  I don't see why that would be so difficult to

3    resolve.

4         MR. BORSON:  So, Your Honor, I think we actually did use

5    correct search terms because the search terms --

6         THE COURT:  Obviously not from their perspective.  What is

7    this case about?  From the government's perspective, it appears,

8    based on the reading of all of this information, that their major

9    concern or issue is the retaliation is based on not giving him

10   certain assignments --

11        MR. BORSON:  That's correct.  That's their theory.

12        THE COURT:  -- in 2020 and 2021.

13        MR. BORSON:  That's correct.

14        THE COURT:  Did we use those search terms, "Lenzi,

15   assignment, 2020; Lenzi assignment 2021"?  And even the places to

16   which those assignments were to be to.  "Lenzi, assignment, Bali,

17   2020, 2021"?

18        MR. BORSON:  We didn't use those search terms.

19        THE COURT:  Well, that seems like a simple solution to

20   this problem.

21        MR. BORSON:  So I think we can certainly go back and plug

22   in Lenzi plus those search terms.  I will say --

23        THE COURT:  You're missing the point.  That -- if the

24   Court in a short amount of time can come up with that as a

25   solution, the Court's concerned about why the parties could not.

1    That concern could only be based on a conclusion that the

2    parties' discussions were not in good faith.

3         Once again, I have this discussion on Fridays a lot.  The

4    Court's definition of good faith is like a settlement conference.

5    It means compromise.  It's not my way or the highway.  It's not

6    take it or leave it.  The only way we resolve issues is if we go

7    into the conference saying I am going to have to give in order to

8    get.

9         MR. BORSON:  I certainly appreciate that, Your Honor, and

10   on any number of issues I think we have been able to reach a fair

11   agreement.  This is the one where we were not able to.  I think

12   we did make good-faith offers of search terms that were based on

13   the things they were asking for, and the reason that we did not

14   offer up these assignments is because we have evidence in the

15   record that this system simply wasn't used to discuss these

16   assignments.

17        THE COURT:  But -- so then what you're saying is because

18   of information in your possession, you're making a unilateral

19   determination, preemptively, that any search is not going to

20   acquire the information they're looking for.  That is not how the

21   Federal Rules of Civil Procedure envisions the discovery process.

22        MR. BORSON:  No, Your Honor, but I think the -- the

23   judgment we made is sort of based on the evidence in the record

24   that this is not likely to be a source of relevant information,

25   combined with the burden and the proportionality of conducting

1    the search of records.

2         THE COURT:  But you at some point made a determination

3    that a relevant search term or two search terms would be "Lenzi"

4    and "UHI," and you got a hit.

5         MR. BORSON:  And we did, and we offered --

6         THE COURT:  So, obviously it came up with something.

7    Whether or not it was useful to their case isn't the issue

8    because that's not what discovery is about.  Not admissible

9    evidence not only leads to admissible evidence, if their request

10   is reasonably calculated to do so, the parties must participate

11   in that process.  And I gave a simple solution just -- you knew

12   what the case was about, so those should be simply the search

13   terms that the parties concluded would have come up with

14   information that would assist in proving the elements of the

15   claims of this case.

16        MR. BORSON:  Your Honor, the reason we didn't use those

17   search terms is because, based on the information we had, some of

18   which came up in testimony or certainly in the record that we

19   filed, we didn't have the belief that those search terms would

20   necessarily --

21        THE COURT:  Okay.  But, you see, that's what discovery is

22   about, acquiring information that you don't have.

23        MR. BORSON:  I have --

24        THE COURT:  Your comments and statements are made

25   about based on the information we have in our possession.  The

1    entire purpose of the discovery process is to acquire additional

2    information that you do not have, otherwise there would be no

3    reason to participate in discovery.  We would go from complaint

4    and answer to the trial.

5        MR. BORSON:  So I certainly appreciate that, Your Honor.

6    I will note that one of the terms we did apply, overcomplement,

7    is a term that is relevant to the assignment, the assignment that

8    Mr. Lenzi was on.

9        THE COURT:  But you didn't even use the word "assignment",

10   which seems basic.  Lenzi plus assignment plus 20 or plus 21.

11       MR. BORSON:  Again, Your Honor, I come back to the fact

12   that we did not believe --

13       THE COURT:  Do we see where this is going?

14       MR. BORSON:  I do see where this is going, Your Honor.

15   I'm just trying to ensure that, you know -- we were acting in

16   good faith.  The reason for that is this was the basis for what

17   we were saying, as well as the fact that we have been producing

18   classified --

19       THE COURT:  Oh, no.  I completely believe that you were

20   acting in your definition of good faith.  I'm not here to argue

21   with you about that.  I'm just here to suggest that for future

22   reference, your argument -- your definition of good faith is a

23   tad narrow, which is not atypical.  The Court finds in many

24   instances that the plaintiff's definition of good faith and

25   relevance for that period is generally overbroad, and the

1   defendant's is generally too narrow.

2        MR. BORSON:  And I appreciate that, and I think -- again,

3   on many of the issues in this case, I think we have been able to

4   work out amicable compromises that we were both able to live

5   with.  This was something where we were not able to.

6        Again, I think part of the issue is the type of

7   information that we knew and that there was testimony in

8   depositions would be on the classified systems, and that the

9   assignment-related material just isn't on those classified

10  systems.

11       THE COURT:  So then what would be the problem with just

12  searching that and just saying that?  It doesn't seem like that

13  would be burdensome at all.  It would have been burdensome 40

14  years ago when people had to do that manually, but when you just

15  have to plug words into a computer, that seems very easy.

16       MR. BORSON:  Because the issue is what happens after that.

17       THE COURT:  No, it's not.  Relevance for the purpose of

18  discovery, as I noted in the previous case, and in this case as

19  well, is not based on what occurs with the information that is

20  acquired.

21       MR. BORSON:  No, that's certainly true, Your Honor.

22       THE COURT:  Discovery is all about acquiring the

23  information.

24       MR. BORSON:  That's true, but the relevance has to be

25  tempered with proportionality.

1      THE COURT:  And I just noted that punching a few words

2  into a computer is not difficult, so the proportionality end of

3  the person who has to punch the numbers in is not high.

4      MR. BORSON:  Of the search, yes.  We agree with you on

5  that, Your Honor.  The issue is then what happens after that.

6      THE COURT:  But the problem --

7      MR. BORSON:  I'm sorry, Your Honor.

8      THE COURT:  But the problem here is you didn't conduct it.

9  If you had conducted it and then they responded in a way that you

10 assumed they would and that would have increased your burden

11 20-fold, then you would have a much better argument standing here

12 today, but the fact that you failed to even conduct it when the

13 burden to do so seems low -- well, not so much.

14     MR. BORSON:  I appreciate that, Your Honor.  I will just

15 note that, again, we did make offers of searches that were

16 targeted to the problem that they made.  We did make offers of

17 processing that were targeted the problems that they identified.

18 That was the basis for what we were doing.

19     And I think, based again on sort of how the parties had

20 expected classified information to be, that's what happened.

21 They never responded to that offer.  I'm not saying that that's

22 not on both sides, but that's the basis of what we had.  We made

23 a targeted offer that was based on that.  They ignored it, and so

24 that's why we're here.  I just want to be clear on that point.

25     THE COURT:  And to be clear on this, ignoring their

 1    alternative is not appropriate either.

 2            MR. BORSON:  I understand that, Your Honor.

 3            THE COURT:  No, I'm speaking to co-counsel.

 4            MR. SUAREZ:  Can I just respond to that, though.

 5            MR. BORSON:  If there's nothing else on this, would you

 6    like me to address the Pompeo issue?

 7            THE COURT:  Yes.

 8            MR. BORSON:  So, I don't really have much to add to that

 9    except for a couple of points.  First of all, we had multiple

10    rounds of RFPs -- RFPs and in interrogatories that were served

11    after the deposition where Mr. Pompeo came up.  None of those are

12    re's [sic] or rogs focused on Mr. Pompeo at all.  They didn't ask

13    for people who were involved in the decision or sort of attempt

14    to trace up the apex pyramid.

15            With respect to Mr. Pompeo himself, as you note, there was

16    only the e-mail that was expressing his concern, which, as the

17    e-mail laid out, was more about the health issues and his

18    e-mailing throughout the department about those issues rather

19    than any sort of job actions or assignment actions or anything

20    like that.  And the unclassified issue, the unclassified e-mail

21    issue was two years before the job assignments.  There's no

22    indication -- and we're essentially done with discovery at this

23    point --

24            THE COURT:  What do you mean, the disconnecting him from

25    the e-mail system?

 1          MR. BORSON:  So the alleged disconnection of Mr. Lenzi

 2     from his OpenNet system that happened in 2018.

 3          THE COURT:  Okay.  You said alleged, so what happened?

 4          MR. BORSON:  So, he was disconnected.  That much we agree

 5     on.  Exactly how that happened, I don't think there's any

 6     evidence, other than this one e-mail that Mr. Pompeo requested

 7     that it happen, but even assuming that Mr. Pompeo did request

 8     that happen -- and again, there's just that one e-mail -- there's

 9     absolutely nothing connecting that to any of the actual claims

10     and defenses in this case; none of the job actions, none of the

11     assignments, which, as Your Honor noted, happened two or three

12     years later.

13          THE COURT:  But that's what they're looking for.

14          MR. BORSON:  But they've had those opportunities because

15     they've had custodial searches of the documents of the

16     decision-makers.  They deposed the decision-makers.

17          THE COURT:  The decision-makers to cut him off from his

18     e-mails?

19          MR. BORSON:  No, the decision-makers who made the

20     employment actions that he's suing over.  He's not suing over the

21     e-mail access issue, he's suing over job decisions that happened

22     multiple years later, and there's nothing in any of those records

23     that show that Pompeo was involved, that show that any of the

24     people who were making decisions on those transactions knew

25     anything about what Pompeo would have thought or took any action

1    on that.

2         So, even assuming that there was some involvement by the

3    Secretary on that one issue, there's nothing tying that to

4    anything related to the case.  And that's something they have had

5    plenty of discovery opportunities to fess out.

6         THE COURT:  So is it your position that the facts that

7    they can at trial utilize to prove retaliation or the conduct

8    they can utilize to prove retaliation is only the conduct alleged

9    in the complaint?

10        MR. BORSON:  No, it's not, Your Honor.  But it has to --

11        THE COURT:  So, if they find through the discovery process

12   that the cutting off of the -- or the disconnecting Mr. Lenzi

13   from the e-mail is part of the retaliation because, if you can't

14   do the e-mail might not be able to do this or whatever, do you

15   not think they could have, if they can make that connection, if

16   there's a cutting off of the e-mail and the assignment, that that

17   could not then be used to support the retaliation argument?

18        MR. BORSON:  I think that could be relevant, but the clear

19   {indiscernible} is the connection, and the connection is

20   discoverable through the people who were actually making the

21   employment decisions in play.

22        THE COURT:  But is that the only place that it's

23   discoverable through?  Maybe some people have more information

24   than others.

25        MR. BORSON:  But, again, I think they made no efforts to

1    fess out that information.

2          THE COURT:  Well, I think I've made that clear to them.

3          MR. BORSON:  So, with that, I'll sit down on that

4    particular argument unless you have further questions on that.

5          THE COURT:  No further questions.  Thank you.

6          MR. SUAREZ:  Just a few points with Your Honor's

7    indulgence.  I'll reserve on what we argued for Mr. Pompeo.  I

8    understand Your Honor's position on that.  But with regard to the

9    motion to compel on the unclassified portions of documents, just

10   a few points.

11         Number one, there was no official agreement as to us

12   binding ourselves to a certain search term.

13         THE COURT:  You should know what question is coming out of

14   the Court's mouth at this time.  What does that mean, "no

15   official"?

16         MR. SUAREZ:  Well, I think, as Your Honor said, like, if

17   it's broke, you've got to go back.  And what we learned is that

18   search term actually had zero hits, and then this Lenzi term,

19   which is our client again, had 442 hits, right?  And what

20   happened -- they're right -- they did come back and offer

21   something, but it was, as we explained in our briefs, a straw

22   man.  They said, Oh, we'll search Lenzi and Havana, Lenzi and --

23         THE COURT:  Let me stop you there.  And this is for future

24   reference based on any discovery, meet and confers that may occur

25   in this case, which I don't know if they will or will not.  It's

1    pretty much the Court's position that when we start to use

2    phrases like "straw man" and the previous one, they're trying to

3    hide this or they're doing that, that doesn't go far in the

4    parties reaching agreements on things.

5         MR. SUAREZ:  Fair point.

6         THE COURT:  It kind of puts the other side on the

7    defensive, and when someone is on the defensive, they tend not to

8    want to cooperate more.

9         MR. SUAREZ:  I respect that position, and that's

10   completely fair.  I appreciate that.  So I guess I would just say

11   that the compromised proposal ended up as just a matter of fact

12   yielding zero hits, and our response to that was to say and

13   reiterate it, Please provide us with the broken down hit counts

14   by custodian.  And if you're unwilling to do that, it appears we

15   are in an impasse and we'll have to file this motion, and that

16   was about three or four days before the motion was filed.  And

17   they didn't respond and say, Oh, you know what, here are the hit

18   counts broken down by custodian.  If they had done that, we

19   wouldn't have filed the motion and we would have been able to

20   have a discussion about, okay, well, maybe -- I think Your Honor

21   articulated it really well.  There might be someone with ten

22   documents that are only 50 pages, and that might be one of the

23   most important witnesses in the case.  So, again, at the end of

24   the day, these are the ten witnesses they are selecting.  They're

25   selecting.  They just said they're the ones involved in the

1    assignment decisions, they're the ones who have the state of

2    mind, Mark Harburg's {ph} discriminatory animus, and so those are

3    the documents, the custodial documents we want to be able to see,

4    what they said in the system, and we think that's fair, we think

5    that's proportional.

6         So, to the points Your Honor made, I just make a couple of

7    submissions.  Number 1, we would request that Your Honor compel

8    the other side to give us those search terms, you know, broken

9    down by --

10        THE COURT:  You mean give you the custodial hits?

11        MR. SUAREZ:  Yes.  So the number of hits per -- by

12   custodian, by the ten custodians, along with the page counts,

13   because we do understand -- Look, we acknowledge in our briefs

14   that there's a concern about how quick the review happens, and we

15   don't want to be unreasonable.  We don't want to have them to

16   review all 7,000 pages.

17        So, as a first instance, we want to see, are there some

18   that only have five or ten documents that only span a few pages,

19   in which case maybe all of those documents should be produced.

20   But to Your Honor's other point, you know, we would be amenable

21   to considering a universe of search terms that could be applied.

22   We actually agreed to many search terms for the documents that

23   aren't in the classified system.  I believe there was something

24   like 70 terms, and they were willing to apply those to the

25   documents that were in the unclassified systems, not classified

1    systems.  But for the discussion of classified information, it

2    evolved into their concerns about burden and all of those types

3    of things, but, to me, as the discovery process unfolded, once I

4    saw that, our client -- there were only 442 hits on our client,

5    that didn't seem like a high number to me, honestly, if you look

6    at the grand scheme of discovery, right, if you look at the

7    thousands of documents that are being produced.

8         And so we just want to know, you know, what is the

9    circumscribed universe that makes sense given the burdens and

10   given everything in this case.

11        So our hope, Your Honor, is that you will compel them to

12   go back to the well, give us those hit counts, breakdowns by

13   custodian.  And also, you know, we can reach some agreement maybe

14   on search terms either separately from the -- from which

15   custodians searched, but, at the end of the day, we think some of

16   these custodians should be searched, and we think that's

17   proportionate to the needs of the case.  So, unless Your Honor

18   has any further questions, that's all I have.

19        MR. BORSON:  Your Honor, I would just like to correct the

20   record on one issue.  Mr. Suarez said that there were no hits on

21   the "Havana" plus "Lenzi" term.  That's incorrect.  There were a

22   number of documents that -- the classified documents that we have

23   produced and are being produced are documents that were gathered

24   in response to that hit count, so it's not accurate to say there

25   were zero hits.  To the extent I never made that precisely clear,

```
 1   I apologize to Mr. Suarez.  I sort of thought that was implicit
 2   given that we had said that was the classified search we had
 3   done, and we were producing documents.  But I do want to be clear
 4   that the "Havana" plus "Lenzi" was not an offset.  It was a well
 5   of classified documents, which we have been producing the
 6   unclassified excerpts on.
 7        MR. SUAREZ:  And just to clarify, Your Honor, there were
 8   four documents that were produced, and so to the extent that I
 9   misspoke, I apologize.  So in the other search terms that were
10   attempted {indiscernible} --
11        MR. BORSON:  We agree with them on that, and there will be
12   additional documents that will be produced on Monday, I believe.
13        THE COURT:  All right.  Having heard oral arguments,
14   the -- I guess the motion to compel at this time, the deposition
15   of Mr. Pompeo, is denied, at the very least, as premature for
16   purposes of too much burden on a third party, at the very least,
17   and the fact that there's insufficient information that says he
18   has any unique personal knowledge at this point in time that
19   would assist in proving the claims or the defenses in this
20   matter.
21        In regard to the motion to compel the production of
22   unclassified portions of custodial documents, the Court will
23   order that the defense provide those number of -- the hits per --
24   the number of hits per custodian and the number of pages those
25   hits relate to.
```

```
1          The Court will order the parties after the provision of

2    that to meet and confer to then determine whether or not a search

3    of all of the custodians is necessary, or the parties can agree

4    to a limited number of those custodians and would strongly urge

5    the parties to confer in regards to some search terms that could

6    satisfy what both parties -- what the plaintiff is looking for

7    and would be reasonably related and calculated to lead to

8    discovery of admissible evidence, including those terms suggested

9    by this Court.

10         MR. SUAREZ:  Your Honor, could I just have one point of

11   clarification?  So, the plaintiff is mindful of the fact that

12   this fact discovery in this matter closes on December 16th and

13   the burden issue, so I would just request that the Court allow us

14   to do what Your Honor has ruled and that production of documents

15   that may occur from this system after December 16th is

16   permissible and without prejudice to the -- you know, the

17   discovery deadline, December 16th, doesn't prejudice this given

18   the sensitivities here and the need to confer and so forth.

19         THE COURT:  Well, yes.  I mean, once the Court orders it,

20   if it takes them more time -- obviously, the Court is not going

21   to say that they don't -- they can't come back and argue, Well,

22   we don't have to give it because it will go past the discovery

23   cutoff because the Court has ordered it to be given.  If that

24   were the case, none of the Court's orders would make much sense

25   because the parties could just drag their feet and say, Well, we
```

```
1    can't get it done by the close of discovery and, therefore, your
2    order is meaningless.  Does that clarify it for you?
3         MR. SUAREZ:  Yes, it does.  Thank you.
4         THE COURT:  Any further clarification necessary, counsel?
5         MR. BORSON:  Nothing for me.
6         THE COURT:  There appearing nothing further, this Court
7    stands adjourned.
8         (Proceedings adjourned at 11:16 p.m.)
9
10                    C E R T I F I C A T E
11
12              I, Scott L. Wallace, RDR-CRR, certify that
         the foregoing transcript of proceedings was prepared from
         an FTR Gold audio recording of proceedings in the
13       above-entitled matter and was produced to the best of my
         ability.  Indiscernible indications in the transcript
14       indicate that the audio captured was not clear enough to
         attest to its accuracy.
15
16       /s/ Scott L. Wallace                  12/6/22
17       ----------------------------      ----------------
         Scott L. Wallace, RDR, CRR               Date
18       Official Court Reporter
19
20
21
22
23
24
25
```