**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| MARK LENZI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:21-cv-1371 (PTG/IDD) |
| | ) | |
| U.S. DEPARTMENT OF STATE and | ) | |
| ANTONY J. BLINKEN, U.S. Secretary of State, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## <u>MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'</u>
## <u>MOTION FOR SUMMARY JUDGMENT</u>

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

STATEMENT OF UNDISPUTED MATERIAL FACTS..................................................1

I.      The Foreign Service and Plaintiff Generally...............................................................1

II.     Plaintiff Requests to Be in New Hampshire Upon Return to Work.............................2

III.    Plaintiff Does Not Become Eligible for Overseas Assignment Until September 2019 ...............4

IV.     The Frankfurt Assignment Is Designated for Entry-Level Use Due to Service Need.................4

V.      Plaintiff Does Not Bid for Another Assignment Until October 2020 ..........................6

VI.     The Athens Assignment Is Designated for Entry-Level Use Due to Service Need ....................7

VII.    An Eligible and Competitive Bidder Is Selected for the Belgrade Assignment............................8

VIII.   An Eligible and Competitive Bidder Is Selected for the Warsaw Assignment ...........................10

IX.     Plaintiff Is Repeatedly Reminded That He May Be Directed Into an Assignment
        If He Does Not Bid on and Secure an Onward Assignment.........................................11

X.      Plaintiff Withdraws from Training Required for the Frankfurt Assignment in 2021 .................11

XI.     A Qualified and Competitive Political Officer Is Selected for the Political Officer
        Assignment in Krakow................................................................................................13

XII.    Plaintiff Is Directed to an SEO Assignment in October 2021......................................14

ARGUMENT....................................................................................................................14

I.      Defendants Are Entitled to Summary Judgment on Plaintiff's Assignment Claims....................14

        A.   The Frankfurt Assignment Was Ceded for Entry-Level Use Due to Service Need...........15

        B.   The Athens Assignment Was Designated for Entry-Level Use Due to Service Need.......16

        C.   An Eligible and Competitive Bidder Was Selected for the Belgrade Assignment...............17

        D.   An Eligible and Competitive Bidder Was Selected for the Warsaw Assignment...............18

        E.   Plaintiff Withdrew from Training Required for the IMTS Assignment................................19

        F.   A Qualified and Competitive Political Officer Was Selected for the Political Officer
             Assignment in Krakow.........................................................................................20

        G.   Plaintiff Was Finally Directed to an SEO Assignment.........................................20

II.     Plaintiff's Non-Assignment Claims Are Not Actionable Because They Are Not
        Exhausted and/or Not Adverse ...................................................................................21

III.    Defendants Are Entitled to Summary Judgment on Damages Barred as a Matter of Law .......24

CONCLUSION ................................................................................................................25

**INTRODUCTION**

In the Foreign Service, employees do not always get their way. It is accepted Service ethos, enshrined in the Foreign Service Act, that assignments occur based on the needs of the Service—not on what employees think they are entitled to. But that is a reality Plaintiff Mark Lenzi has resisted since entering the Service. Even prior to the events giving rise to this lawsuit, Plaintiff complained that his Bureau leadership "has had it out for me for awhile," and declared he would be "raising holy hell" because he did not get the assignments he wanted. DX1 at 23614; DX2 at 22927. And after the onset of his disability, those complaints continued every time Plaintiff did not get what he wanted, only now reframed with accusations of discrimination and retaliation.

The law and the extensive evidentiary record in this case do not support Plaintiff's claims. His only cognizable claims concern seven assignment decisions, but Plaintiff falls short of establishing a prima facie case, and he ultimately cannot surmount the legitimate, non-discriminatory, non-retaliatory reasons for those assignments. The record instead shows that, in each instance, the Service made the decision based on Service needs and rules, whereas Plaintiff repeatedly decided not to bid at all on available assignments (including those overseas) and, when he finally did, bid on unrealistic assignments out of his skill area, beyond his grade level, and on an inappropriate timeline. The Rehabilitation Act does not provide redress for Plaintiff's unhappiness with the results of his own choices and not getting his way, and the Court should grant summary judgment to Defendants.

**STATEMENT OF UNDISPUTED MATERIAL FACTS ("SUMF")**

**I.     The Foreign Service and Plaintiff Generally**

1.     The Foreign Service is governed by the Foreign Service Act and administered by the Secretary of State. 22 U.S.C. § 3901 *et seq.* The work in the Service is assignment-based, with employees required to work both domestically and abroad over the course of their careers. 22 U.S.C. §§ 3982, 3984; DX3; DX4 at 251-52; DX5 at 56, 148-49; DX6 at 337. Employees are responsible for making active, realistic bids on assignments at their grade level, in their skill area, and for which they are eligible and

competitive. DX7 at 7572; DX8 at 1362; DX9 at 6956-57; DX4 at 14, 41, 60, 65, 254; DX6 at 339-42. While the assignment system considers employee preference, assignment decisions are ultimately made based on the needs of the Service. 22 U.S.C. § 3982(a); DX9 at 6950, 6952; DX10 ¶ 3; DX11 at 87-88; DX5 at 183-85, 196-97; *see also, e.g.,* DX12 at 265; DX6 at 53-54, 58-59; DX4 at 95; DX5 at 200-01; DX11 at 126-28 (various employees not receiving their assignments of choice).

2.   Plaintiff is a Specialist in the Security Engineering ("SEO") skill code within the Bureau of Diplomatic Security ("DS"), at the FP-03 (mid-level) grade. DX13 at 2841; DX14 at 7617. Specialists perform technical, professional, or administrative services, and are usually assigned to positions in their area of specialization. DX15 at 7687; DX16 at 25.

3.   Prior to the time period at issue, Plaintiff worked as an SEO domestically and abroad in Germany and China. DX13 at 2841 ("DS/CMP/ECB," "DS/CMP/TSC," "Frankfurt," "Beijing"). He had also been asked to stay domestic longer than his original tour, and there were many overseas assignments that he had applied for but did not receive—both reflecting the expectation that Service employees work domestically as well as abroad, and that assignments occur based on Service need, not employee desire. DX1 at 23610; DX18 at 146-47; DX2 at 22927.

4.   Plaintiff was on assignment in China when he sustained a brain injury. DX19 ¶ 62. He reported symptoms in late May 2018, and in June, was medically evacuated for further evaluation. DX20 at 24314; Dkt. 96 ¶ 27. Back in the United States, he decreed, "my wrath on Post will know no bounds," and "I remain much more mad at State than the country that did this." DX22 at 24473; DX23.

## II.   Plaintiff Requests to Be in New Hampshire Upon Return to Work

5.   By June 5, 2018, even before his medical evacuation, Plaintiff had requested to be reassigned to New Hampshire, for proximity to family and his preferred medical treatments. DX24 at 24249; DX25 at 18600; DX26 at 24732; DX27 at 24877. He reiterated this request throughout fall 2018 while on leave. DX28 at 23818; DX29 at 24270, 24274; DX30 at 24638; DX31 at 24731; DX32 at 24877;

DX19 ¶¶ 29, 30; DX18 at 37-38, 46.

6. After evaluating assignment options and considering Plaintiff for a reasonable accommodation, in November, the Service was able to arrange (among many other accommodations[1]) for Plaintiff to "have an alternate worksite in New Hampshire (in Department facility if possible or in his home residence) to reflect his physical location, while assigned to DS/NOC (over-complement)." DX33 at 36427; *see also* DX29 at 24270; DX35 at 16291; DX36 at 19339-42; DX10 ¶ 23; DX4 at 42 ("Diplomatic Security made an extraordinary sort of extra effort to try to accommodate him, and in very unusual circumstance, he was allowed to have a remote-work agreement while on overcomplement status."), 101; DX37 at 197-201, 384-85; DX5 at 162; DX6 at 164.

7. Overcomplement status (or "NOC") is used when an employee's assignment has ended but, for myriad reasons, they have not secured their next, "onward" assignment. DX38 at 7082; DX4 at 12, 15, 40; DX39 at 46-47; DX5 at 27. It provides flexibility for the employee to perform meaningful work until their situation resolves—at which point the employee's primary duty is to secure their onward assignment as soon as possible. DX38 at 7082, 7084, 7087-88; DX4 at 13-15, 40-41, 85-94, 101-02, 267-69; DX39 at 97-99, 150-53, 161-66; DX6 at 239-42. Although overcomplement status is meant to be temporary, individuals can and do remain on overcomplement for longer depending on their personal circumstances. *E.g.*, DX40 at 14972 (over 100 employees on overcomplement in July 2021, many for more than a year, and more than 30 for longer periods than Plaintiff); DX6 at 9-13.

8. Plaintiff responded that the arrangement to work in New Hampshire while on overcomplement status was "reasonable." DX41; *see also* DX30 at 24638 ("It might be arranged where I am technically in overcomplement status but working remotely out of the Portsmouth field office.

---

[1] The other accommodations included flexibility to work 3 days a week, 4-6 hours a day, time off for breaks, reduced workload, extra time to complete tasks, limited multi-tasking, and other assistive technology. DX33. At Plaintiff's request, the accommodations have been renewed repeatedly since 2018, Dkt. No. 96 ¶ 7, and the Court has dismissed Plaintiff's failure to accommodate claims from this action, Dkt. Nos. 23, 48, 76.

That is fine with me."); DX32 at 24877 ("an arrangement has been worked out where until at least June of next year I work for DS/NOC out of DC and telework…."); DX42 at 24819 (describing the Service's arrangement "as part of my work agreement and at my request"); DX29 at 24274; DX18 at 46 (testifying that he wanted to work in New Hampshire).

9.   Plaintiff returned to work in December 2018 pursuant to the above arrangement, performing the responsibilities of a Government Technical Monitor while on overcomplement status. Dkt. 96 ¶ 27; DX42 at 24819; DX43 at 35375; DX44 at 16240. The Government Technical Monitor role has been performed by other SEOs as well, and shortly after returning to work, Plaintiff expressed satisfaction with the Service "making this happen." DX45 at 232-33; DX6 at 82-83; DX44 at 16240.

## III.   Plaintiff Does Not Become Eligible for Overseas Assignment Until September 2019

10.  In April 2019, the then-Career Development Officer ("CDO") for SEOs, Nathan Lingenfelter, contacted Plaintiff to discuss whether he expected to extend his accommodations; if not, they "should discuss onward assignment options." DX46 at 22920. Plaintiff responded that he anticipated an extension, *id.* at 22919, and in May, the Service approved the extension, including that Plaintiff be able to remain in New Hampshire while on overcomplement status. DX47.

11.  In September, after telling the Bureau of Medical Services that he had "been discharged from all therapies," Plaintiff received a "class 1" medical clearance that made him eligible for overseas assignment. DX48 at 22884; DX49. This was the first time Plaintiff had the medical clearance to work abroad since returning to the United States. DX18 at 73-74.

## IV.   The Frankfurt Assignment Is Designated for Entry-Level Use Due to Service Need

12.  In September 2019, Plaintiff applied for ("bid on") two assignments in Frankfurt, Germany. Dkt. 96 ¶ 62. Two other SEOs, Andrew Suh and Michael Leon, also bid on the Frankfurt assignments, although no one was selected. DX50; DX51; DX18 at 84-85; DX5 at 111-13.

13.  Bids for SEO assignments are reviewed by two panels of DS officials, the first of which makes

recommendations and the second of which approves, denies, or defers for later consideration the recommendations. DX16 at 14-15. It is "not at all unusual" for recommendations to be deferred by the second panel. DX37 at 68-69; DX5 at 86-88, 106-08; DX52; DX 53 (deferrals marked with "DEF"); DX54 (same). If a recommendation is approved and the candidate accepts the "handshake offer," the Bureau of Global Talent Management ("GTM") reviews the assignment for compliance with Service policy and makes the final decision. DX16 at 14-15; DX39 at 168-70; DX5 at 82-86.

14. Consideration of Plaintiff's bids was deferred in November because (1) he had recently served in Frankfurt, and employees are generally expected to work at different posts to expand their expertise; (2) the assignments were similar to the one he previously had, and employees are expected to take on more responsibility as their careers advance; and (3) Plaintiff had stated that the FBI recommended his assignment to Frankfurt and would get involved if needed—a highly unusual claim that DS needed to verify. DX16 at 17-19; DX37 at 68, 73-77, 130-34; DX55 ¶¶ 24, 27; DX56 at 22848; DX57 at 8914; DX18 at 87-88. The FBI did not substantiate Plaintiff's claim. DX16 at 18; DX37 at 77.

15. New SEOs then joined the Service, creating a need to identify suitable entry-level assignments. DX16 at 18. Because there are few entry-level SEO positions, when a new class starts, "the entry-level division will be required to identify positions that are appropriate and available to those employees for their first assignment." DX5 at 60-62, 118-19; DX6 at 265, 269; DX37 at 142-45. Such positions are typically those listed at the 04 and 03 mid-levels, with a focus on overseas assignments. DX5 at 61-62, 133-35, 139-45, 152-54, 197-98; DX6 at 269-70; DX10 ¶ 37. Service policy expressly provides for this "ceding" of mid-level assignments to entry-level to meet Service needs. DX58 at 7003.

16. CDO Lingenfelter and DS identified the two Frankfurt positions and one domestic position as suitable for entry level use because they were at the appropriate grade level, involved the right type of responsibilities, and met the entry-level office's goal "to have opportunities overseas." DX59 at 7919; DX60; DX61; DX5 at 139-42, 152-54; DX10 ¶ 41; DX6 at 270-72 (explaining why positions at

an engineering service center are good for new hires); DX19 ¶¶ 34, 35 (Plaintiff admitting that Frankfurt contains an engineering service center); DX62 at 24230 (Plaintiff's contact confirming that "Frankfurt is a good 'starter' post" and "management does have the right to adjust positions as needed"); DX55 ¶ 27; DX63. The Frankfurt positions had also been ceded to entry level in prior years; indeed, "they had been filled a majority of the time by entry-level SEOs"—including previously by Plaintiff. DX10 ¶ 41; DX13 at 2841; DX37 at 68 ("That was an entry-level position, and Mr. Lenzi had already been in that position."). On March 4, 2020, GTM ceded the Frankfurt assignments to entry level, making them unavailable to non-entry-level employees. DX16 at 19; DX64; DX51.

17.  Other assignments (including in Amman, Jordan and Monterrey, Mexico) remained available after the Frankfurt assignments were ceded, but Plaintiff did not bid on any—even though employees are required to actively bid "until they accept a handshake to an onward assignment," and despite his stated desire to work overseas. DX59 at 7918; DX51; DX66; DX5 at 154-55; DX67 at 2; DX8 at 1362; DX9 at 6956 ("Active participation by employees in the open assignment process is critical."); DX4 at 14, 41, 60, 65, 254; DX5 at 199-200; DX30 at 24638. As a result of his decision not to bid, Plaintiff remained without an onward assignment and in overcomplement status. DX38; DX4 at 50-51 (overcomplement "ends when you're paneled to a follow-on assignment"), 59-64.

## V.   Plaintiff Does Not Bid for Another Assignment Until October 2020

18.  As early as April 2019, CDO Lingenfelter had informed Plaintiff that "[w]hen employees in DS/NOC become eligible [to bid] they bid on available assignments (NOW positions)." DX46 at 22919; *see also* DX10 ¶¶ 19-21, 26; DX18 at 67-72. This is because NOW positions are immediately available, and rather than have employees remain on overcomplement when they are immediately available for assignment, "the goal would be to assign them as quickly as possible to a position that was available immediately." DX4 at 14-15, 18-20, 85-87, 89-94, 206-08, 210-12, 217-22, 267-69; DX5 at 35, 44-45, 174-75; DX39 at 96-99, 150-53, 161-66; DX71 ¶ 5; DX38 at 7088. By contrast, bidders

on the Summer and Winter cycles have a specific "transfer eligibility date" when their current assignment ends and they are able to transition to their next; those bidders bid one year in advance for their next assignment. *E.g.*, DX68 at 1358-59; DX7 at 7569-71; DX18 at 68; DX5 at 33-34.

19. After the Frankfurt assignments were ceded to entry-level, Lingenfelter again reminded Plaintiff to bid on available positions. DX69 at 22754. Lingenfelter identified several immediately available NOW assignments, including one overseas. *Id*; DX4 at 235-37. Plaintiff neither bid on those positions nor responded to Lingenfelter—despite his professed desire to return overseas and the expectation that employees actively bid for an onward assignment. DX70; DX67 at 2; DX8 at 1362; DX9 at 6956; DX4 at 14, 41, 60, 65, 235-40, 254; DX5 at 199-200; DX30 at 24638.

20. In late September 2020, Lingenfelter transitioned off his CDO responsibilities and was replaced by CDO Andrew Kaleczyc. DX70; DX71 ¶ 2. Kaleczyc likewise alerted Plaintiff to the immediately available assignments—which included Monterrey, Mexico where Plaintiff would have the opportunity to be Officer-in-Charge of an Engineering Services Office—and reiterated that Plaintiff needed to bid on NOW assignments. DX72 at 22844; DX71 ¶ 7. Plaintiff did not bid on any of those assignments either, in spite of his stated goal to return overseas. DX67 at 2; DX8 at 1362; DX9 at 6956; DX4 at 235-37; DX30 at 24638.

21. Ignoring those immediately available options, Plaintiff instead bid on assignments in Athens, Greece; Belgrade, Serbia; and Warsaw, Poland—none of them NOW positions, but rather all on the following Summer cycle that would not become available for another 8 to 10 months. DX67 at 2.

## VI.   The Athens Assignment Is Designated for Entry-Level Use Due to Service Need

22. The Athens assignment was at the FP-04 grade level, a level below Plaintiff, and not available until the following summer. DX16 at 19. At the panel discussion considering Plaintiff's bid in October 2020, the panel noted his status as a NOW bidder and that there were appropriate positions immediately available on a NOW basis, including the one in Monterrey, Mexico previously identified

for him. *Id*; DX39 at 140-42. Given the availability of multiple appropriate NOW positions, there was no further discussion of Plaintiff's bid for any Summer position. DX16 at 19.

23. Because two entry-level SEOs would soon be completing their first tour and in need of their second assignment, the Service again needed to identify mid-level overseas assignments for entry-level use. DX73. On January 4, 2021, CDO Kaleczyc and DS identified three available and appropriate possibilities, including Athens. *Id*; DX16 at 20; DX65 ¶ 23; DX6 at 270-71 (positions at engineering service centers are appropriate entry-level positions); DX19 ¶ 41 (Plaintiff admitting Athens is an engineering service center); DX39 at 199-200, 210. They eliminated one option, Moscow, due to difficulties securing necessary visas. DX73; DX16 at 20. GTM approved the remaining options— Athens and Dubai—for entry-level use in early January. *Id*; DX74. Due to its suitability for entry-level SEOs, the Athens position had similarly been designated for entry level the prior year. DX75 at 13895.

24. When Kaleczyc notified Plaintiff that the Athens position was not available for mid-levels, he reiterated that Plaintiff was "required to bid on positions in the NOW cycle" and needed to be actively bidding. DX74 at 7510. Kaleczyc provided a list of 5 available positions, including the overseas Monterrey assignment. *Id*. Plaintiff again did not bid on anything, even though he purportedly just wanted to work overseas and despite his responsibility to bid until he secured an assignment. DX67 at 2; DX8 at 1362; DX9 at 6956; DX4 at 14, 41, 60, 65, 254; DX30 at 24638. Again as a result of his unwillingness to bid, Plaintiff remained without an onward assignment and in overcomplement status. DX38; DX4 at 50-51, 59-64; DX39 at 336-37.

## VII.  An Eligible and Competitive Bidder Is Selected for the Belgrade Assignment

25. The Belgrade assignment was a Summer cycle position that would not become available until June 2021, at least 8 months after Plaintiff's bid. DX76. On November 5, 2020, DS selected another SEO, Richard Moore, for the assignment because he was an at-grade, Summer cycle bidder whose current assignment would end around May 2021, and the assignment would provide a career-

appropriate opportunity for him to serve a second tour overseas and manage a small region. DX77 at 13485-86, 13490; DX16 at 21; *see also* DX78 at 7701 ("Tenured FP-04 Diplomatic Security employees are considered at-grade for FP-03 positions within their skill codes."). Plaintiff, by contrast, was not a Summer cycle bidder and had other career-appropriate assignments immediately available to him as a NOW bidder, including the position in Monterrey, that would give him regional diversity and opportunities to manage a larger office and region. DX77 at 13485-86; DX16 at 21; DX21 ¶¶ 52-53; *see also* DX79 at 6973 ("Summer cycle bidders are employees whose transfer eligibility date (TED) falls between May 1 and October 31, 2021."); DX77 at 13493 (no TED); DX19 ¶ 37 ("Mr. Lenzi admits that at the time he placed a bid on the Belgrade position … he did not have a formal transfer eligibility date due to being on overcomplement status."); DX6 at 31-32, 306-08.

26. Plaintiff challenged the Belgrade decision, first to a GTM panel that unanimously approved it, and then to the Director General. DX16 at 21-22; DX4 at 232-33. Plaintiff's November submission to the Director General conveyed his medical condition and complaints of discrimination and retaliation—points he "absolutely" wanted to go to the Director General and for which his "intent was yes, to get on the record." DX18 at 159-62; DX80.

27. Accordingly, a January 2021 memo to the Director General summarizing the challenge included Plaintiff's points as background, as well as DS' explanation that another SEO had been selected for Belgrade and a different overseas position was appropriate and immediately available for Plaintiff. DX81; *see also* DX11 at 40-41; DX39 at 436-40. Upon consideration of all the materials, the Director General denied Plaintiff's challenge on January 25 and reiterated that "[a]s a NOW bidder in overcomplement status, your search should focus on positions posted on the NOW bidding cycle." DX82 at 38553; DX81; DX16 at 22.

28. In February, CDO Kaleczyc again reminded Plaintiff to bid on available assignments, providing a list of 38 available positions, including 9 overseas. DX83. Plaintiff again did not bid on

any, despite his purported goal to work overseas. DX67 at 2; DX8 at 1362; DX9 at 6956; DX4 at 14, 41, 60, 65, 254; DX30 at 24638. Once more as a result of his decision, Plaintiff remained without an onward assignment and on overcomplement. DX38; DX4 at 50-51, 59-64; DX39 at 336-37.

### VIII. An Eligible and Competitive Bidder Is Selected for the Warsaw Assignment

29. The Warsaw assignment was an FP-02 position, a level above Plaintiff's grade, on the Summer cycle, that would not become available until August 2021, at least 10 months after Plaintiff's bid. DX84. On November 5, 2020, DS selected Stephen Cunningham for the assignment because he was an at-grade FP-02 SEO, a Summer cycle bidder whose current assignment would end around August 2021, and he had a "heavily required" skillset leading technical and physical security upgrades. DX85 at 13108, 13116; DX86 at 13141; DX87 at 8734; DX16 at 23. Plaintiff, by contrast, was not at grade, was not a Summer cycle bidder, and had other career-appropriate assignments immediately available to him as a NOW bidder that would give him regional diversity and opportunities to independently manage an office. DX85 at 13110, 13116; DX86 at 13141; DX65 ¶¶ 45-47; DX34 ¶¶ 27-28; *see also* DX79 at 6973; DX19 ¶ 43 ("Mr. Lenzi admits that at the time he placed a bid on the Warsaw position … he did not have a formal transfer eligibility date due to being on overcomplement status.").

30. Plaintiff challenged the Warsaw decision, first to a GTM panel that unanimously approved it, and then to the Director General. DX16 at 23; DX4 at 241-46. Plaintiff's February 2021 submission to the Director General again conveyed his medical condition and complaints of discrimination and retaliation—points he "was fully hoping" would go to the Director General and "that would be unfair" to omit. DX18 at 179-83; DX88.

31. Thus, a March memo to the Director General summarizing the challenge included Plaintiff's points as background, as well as DS' explanation that another SEO had been selected for Warsaw and a different overseas position was appropriate and immediately available for Plaintiff. DX89; *see also* DX11 at 40-41; DX39 at 436-40. The Director General denied Plaintiff's challenge on March 3 and

once again urged that "[a]s a NOW bidder in overcomplement status, your search should focus on positions posted on the NOW bidding cycle." DX89; DX90 at 38563.

32. Plaintiff still did not bid on any new assignments, let alone any NOW assignments. DX67 at 2; DX8 at 1362; DX9 at 6956; DX4 at 14, 41, 60, 65, 254. His decision not to bid resulted in his continued overcomplement status. DX38; DX 4 at 50-51, 59-64; DX39 at 336-37.

## IX.   Plaintiff Is Repeatedly Reminded That He May Be Directed Into an Assignment If He Does Not Bid on and Secure an Onward Assignment

33. Because the assignment system exists to ensure appropriate staffing pursuant to Service needs, the Director General can "direct" employees who are eligible for but have not obtained an assignment into a specific assignment. DX8; DX11 at 87-93; DX4 at 82-84, 253-54; DX5 at 52-53; *see also* DX91; DX5 at 53-54.

34. The Director General notified Plaintiff in January and March 2021 that he needed to bid on appropriate assignments, and if he continued not to have an onward assignment, the Director General would consider directing him into one. DX82 at 38553; DX92 at 13096. Plaintiff did not place any bids in response to either notification, thus remaining in overcomplement status. DX67 at 2; DX4 at 50-51, 59-64; DX39 at 336-37.

35. As a result, Plaintiff received another notification in April that if he did not secure an onward assignment within 14 days, he would be directed into a specific SEO position. DX93. Only then did Plaintiff finally start to bid on additional assignments—although, with one exception, every bid he placed between April and August was outside of his skill code. DX67 at 2-3; *see also* DX92 at 13096 (instructing Plaintiff to bid on "in-cone" positions).

## X.   Plaintiff Withdraws from Training Required for the Frankfurt Assignment in 2021

36. One of the assignments Plaintiff bid for in April 2021 was a vacant Information Management Technical Specialist ("IMTS") position in Frankfurt, Germany. DX67 at 3. IMTS is a specialty distinct from the SEO specialty, and GTM requires employees doing an "excursion tour" in a different

specialty to complete the introductory training required of specialists in that skill code. DX94 at 23; DX95 ("[T]his position (as it is outside his skill code) requires training in order to go to post. If he is unable to complete the training, he will be unable to take the assignment."); DX96 at 12761; DX97 at 12810; DX98; DX99 at 12917-18; DX100; DX4 at 186-196 ("Everyone was in agreement, the training was needed. We did it in every other case with these specialties."), 202-03 (it "would have been extraordinarily out of line" to circumvent the training "given the feedback from everybody, and the fact that we were consistently having other employees go through the training"), 134-39, 142, 164-69, 170-77, 179-81; DX39 at 218-25; DX18 at 242.

37. After Plaintiff interviewed for the IMTS assignment, Frankfurt leadership ("RIMC") told CDO Kaleczyc on May 7 that "[i]t would be great if we could get him in the June [training] class and have him here by September." DX98; DX94 at 23; DX4 at 179-81. Kaleczyc encouraged RIMC "to extend a handshake offer" to Plaintiff "the sooner the better," and on May 11, RIMC offered Plaintiff a handshake for the position, which Plaintiff accepted. DX98; DX101.

38. Over the next two days, RIMC informed Plaintiff that the training would be in both Plaintiff's and RIMC's best interests because it would "provide you the basic footing on the IMTS field before we deploy you in our AOR [area of responsibility]." DX101 at 22797; DX102 at 22795; DX103 at 13011 ("[W]e are unanimously recommending the 14-weeks of training be taken prior to his arrival here in Frankfurt."); DX104 at 23845 (confirming desire for the training and "no urgency in his arrival from our perspective"); DX105 at 24218-20; DX106; DX4 at 138-39, 179-81, 186-89; DX94 at 23.

39. Plaintiff enrolled in the training, and Kaleczyc approved it, on May 13. DX107; DX108. On May 18, GTM approved the assignment on the express condition that Plaintiff complete the training. DX109 (listing training prior to September arrival in Frankfurt); DX110 ("Mr. Mark Lenzi has been assigned to an excursion tour as an IMTS to Frankfurt via training at FSI."); DX94 at 23-24; DX4 at 191-92; DX39 at 218-25.

40. Plaintiff attended just two days of training before withdrawing on June 3. DX111 at 12724. As a result, Plaintiff was not able to assume the IMTS role in Frankfurt. DX94 at 24; DX97 at 12810 ("I can't send him to this position without the training."); DX4 at 188-96.

## XI.  A Qualified and Competitive Political Officer Is Selected for the Political Officer Assignment in Krakow

41. On July 7, 2021, Plaintiff bid on a Political/Economic Officer assignment in Krakow—a Generalist (Foreign Service Officer), not Specialist, position. DX67 at 4; DX12 at 10 (distinguishing Generalists from Specialists); DX5 at 71-72. The position was a 1-year NOW assignment to fill the period before the next Generalist, Brendan Kyle Hatcher (who had already been selected), arrived, and required experience with political and economic reporting—"the more recent, the better." DX112 at 12275; DX12 at 51-54, 59, 121; DX113 ¶ 13; DX16 at 25.

42. The Consul General in Krakow, Patrick Slowinski, considered Plaintiff against three other candidates, all of whom were experienced Political/Economic Officers: Kerry McIntosh, Darin Foster, and Reena Patel. DX114; DX115; DX12 at 112-15, 121-22. Slowinski and the Bureau of European Affairs also considered the possibility of bringing Hatcher to post early. DX116.

43. After McIntosh and Foster were deemed unavailable, and pending further information on Hatcher, Slowinski confirmed that Patel—who "interviewed well and has the skills and experience needed for this 1-year position"—"would work for Post." DX116; DX117; DX16 at 25; DX118 at 3241-42 (Patel's qualifications); DX12 at 113-17; DX113 ¶¶ 28, 31.

44. By contrast, Slowinski did not include Plaintiff on the "short list" of candidates advanced for consideration, DX117 at 12251, because he was an SEO who lacked the requisite reporting experience. DX16 at 25; DX114 at 12273; DX115; DX12 at 141-46 ("I did ask him: Am I missing some recent reporting you've done? And he wasn't able to provide that."), 149, 154-56 ("The gap in the reporting experience was just too much for me."); DX19 ¶¶ 45, 47 (Plaintiff admitting no experience as a State Department Political or Economic Officer and that his work as an SEO did not require him to

produce political or economic reporting cables for the State Department); DX113 ¶¶ 28, 35.

45. The Bureau offered the position to Patel on July 26, and Slowinski notified Plaintiff the next day that the assignment had been accepted by another candidate. DX119; DX120 at 37158.

## XII.  Plaintiff Is Directed to an SEO Assignment in October 2021

46. In October 2021, due to his decision not to bid for long periods of time, unwillingness to serve in positions except in his preferred region,[2] and bids for non-NOW and out-of-specialty positions, Plaintiff still remained without an onward assignment and thus in overcomplement status. DX121 at 5-9; DX4 at 50-51, 59-64, 239-40 ("for over two years now, [he] had the ability to accept an assignment. He chose not to, even when he was offered positions that he could have bid on"); DX39 at 336-37. The Director General thus directed him to an SEO assignment at the FP-02 grade level in the DS Field Support Branch, which had an immediate vacancy, "met what Diplomatic Security needed in terms of its priority," and for which remote work could be possible. DX122; DX123; DX121 at 9; DX4 at 114-15, 249-50. Plaintiff requested, and was permitted, to continue working remotely from New Hampshire for that assignment. DX124; DX121 at 9.

47. With this onward assignment secured, Plaintiff was removed from overcomplement status and returned to the Summer cycle bidding schedule for his next assignment. DX4 at 50-51; DX13 at 2841 (in January 2022, showing TED of October 29, 2023); DX125 at 7588; DX121 at 9. In the latest Summer cycle, Plaintiff bid for, and received, an onward SEO assignment to Helsinki, Finland, which will begin around August 2023. DX126 at 6.

## ARGUMENT

## I.  Defendants Are Entitled to Summary Judgment on Plaintiff's Assignment Claims.

Plaintiff's claims do not survive the *McDonnell Douglas* framework, which first requires a prima facie case. A prima facie case of discrimination requires the plaintiff to show "(1) that he has a

---

[2] All but 2 of Plaintiff's overseas bids since 2019 have been for positions in Europe. DX67 at 2-4.

disability; (2) he is otherwise qualified for the employment [] in question; and (3) he suffered an adverse employment action solely on the basis of the disability." *Hannah P. v. Coats*, 916 F.3d 327, 342 (4th Cir. 2019). A prima facie case of retaliation requires (1) protected activity; (2) adverse employment action; and (3) a causal connection between the two. *Hooven-Lewis v. Caldera*, 249 F.3d 259, 272 (4th Cir. 2001). If the plaintiff is able to satisfy a prima facie case, the agency may articulate a legitimate, non-discriminatory/retaliatory reason for the employment action. The plaintiff must then prove that the reason is pretextual and discrimination or retaliation "was the real reason for the challenged conduct." *Fry v. Rand Constr. Corp.*, 964 F.3d 239, 246 (4th Cir. 2020); *see also Diamond v. Colonial Life*, 416 F.3d 310, 319 (4th Cir. 2005) ("the ultimate burden … remains at all times with the plaintiff").

Although Defendants do not dispute that Plaintiff has a disability within the meaning of the Rehabilitation Act, Plaintiff still fails to establish a prima facie case for many of his claims, and he ultimately cannot prove that disability discrimination or retaliation was the reason he did not get his desired assignments. Summary judgment is therefore warranted for Defendants on all claims.

### A. The Frankfurt Assignment Was Ceded for Entry-Level Use Due to Service Need.

Plaintiff cannot make a prima facie case of discrimination or retaliation regarding the 2019 Frankfurt assignment. First, he cannot show that he was not selected "solely on the basis of [his] disability." *Hannah P.*, 916 F.3d at 342. Plaintiff's consideration for the position was deferred for reasons having nothing to do with disability (including professional development reasons that Plaintiff admitted to others and that others confirmed, *e.g.*, DX56 at 22848 ("Other SEOs are funny – they are like 'but you have already done a tour there and that would not be great for your career.'")), and he ultimately was not selected because (as in prior years) the position was given to entry-level SEOs—a decision that affected not only Plaintiff, but also two other mid-level SEOs whom Plaintiff does not contend were disabled. SUMF ¶¶ 12, 14-16; DX18 at 84-85, 95. Thus, there is no evidence to indicate that this decision occurred because of disability discrimination. *See also Alexander v. Pharmerica Logistic*

*Servs.*, 2022 WL 5204483, at *8 (D.S.C. 2022) (plaintiff's "termination was not based solely on her disability as a matter of law" when the reasons for the action were "unrelated to any disability").

The retaliation claim is similarly lacking at the threshold. Plaintiff cannot identify any protected activity "very close" in time to the decision from which to infer a causal connection. *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001). He did not file his first EEO complaint until *after* the Frankfurt decision. DX19 ¶¶ 1, 2; DX18 at 102; *Hall v. Greystar Mgmt.*, 637 F. App'x 93, 98 (4th Cir. 2016). And his request for disability accommodation occurred more than a year earlier—and was granted, "completely undercut[ting]" any claim of retaliatory animus. DTX 198; *Ali v. BC Architects*, 832 F. App'x 167, 173 (4th Cir. 2020); *Horne v. Reznick Fedder & Silverman*, 154 F. App'x 361, 364 (4th Cir. 2005); *Hollestelle v. Metro. Wash. Airports*, 145 F.3d 1324, at *4 (4th Cir. 1998); *Jones v. S. Univ.*, 834 App'x 919, 923 (5th Cir. 2020); *Vanyan v. Hagel*, 9 F. Supp. 3d 629, 639 (E.D. Va. 2014).[3]

In any event, the professional development concerns, effort to verify Plaintiff's (ultimately unsubstantiated) statements about FBI involvement, and the need for suitable entry-level assignments are entirely legitimate reasons that Plaintiff did not receive the Frankfurt assignment. *See* SUMF ¶¶ 14-16. Plaintiff may disagree with those reasons (even though colleagues confirmed for him that Frankfurt was a good "starter" post, the Service "ha[s] the right to adjust positions as needed," and a second tour to the same location "would not be great for your career," DX62; DX56; DX18 at 87-88), but those are business judgments beyond the reach of the Rehabilitation Act. *Hannah P.*, 916 F.3d at 345; *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998).

### B.  The Athens Assignment Was Designated for Entry-Level Use Due to Service Need.

Plaintiff's discrimination claim with respect to the Athens assignment, which the Service determined was needed for entry-level SEOs, likewise fails at the prima facie stage because he cannot

---

[3] The Court has also held that Plaintiff cannot assert any retaliation claims based on "generalized complaints to supervisors about assignments and disclosures of [his] medical condition." Dkt. No. 23.

show non-selection solely on the basis of disability. *Hannah P.*, 916 F.3d at 342. Far from having anything to do with Plaintiff's disability, it is standard practice for the Service to identify assignments for entry-level use: it is covered by policy, occurred with numerous assignments (including many that Plaintiff never bid on, such as Dubai, Moscow, Bangkok, Stockholm, Brussels, and various others), and, indeed, had occurred with Athens the very year before. SUMF ¶ 23; *see also, e.g.*, DX58 at 7003; DX60; DX75; DX127; *Alexander*, 2022 WL 5204483, at *8.

Regardless, Plaintiff's discrimination and retaliation claims ultimately both fail because he cannot surmount the Service's legitimate reasons for the Athens decision. Assignment decisions are made based on "the needs of the Service." 22 U.S.C. § 3982(a); DTX 38 at 6950, 6952. The Athens and Dubai assignments, which started in the summer, were suitable for and needed by entry-level specialists requiring assignments in that time period, and Plaintiff could fill a different position (including one overseas) with an immediate need because of his immediate availability. The Court's role is not to decide whether that decision was wise, foolish, or even correct; only whether it was illegal. *Hannah P.*, 916 F.3d at 345. That is a showing Plaintiff cannot make on this record.

**C. An Eligible and Competitive Bidder Was Selected for the Belgrade Assignment.**

Similarly, none of the reasons for selecting another SEO (who was qualified and competitive) for the Belgrade position, and for not selecting Plaintiff, had anything to do with Plaintiff's disability, *see* SUMF ¶¶ 25, 27, and thus Plaintiff cannot satisfy a prima facie case of discrimination. *Hannah P.*, 916 F.3d at 342; *see also Alexander*, 2022 WL 5204483, at *8 (no prima facie case as a matter of law when the reasons for the employment action were "unrelated to any disability").

In any event, the discrimination and retaliation claims both fail because the Service selected SEO Moore and not Plaintiff for legitimate reasons. SUMF ¶¶ 25, 27. As noted, assignments are made based on "the needs of the Service," and those needs include "career development" and "ensuring that the specialists that fill those positions have the breadth and depth where it's needed to develop

and continue to increase responsibility and knowledge throughout the course of their career." DX5 at 65-67. Pursuant to those considerations, DS determined that SEO Moore (who was at-grade) was the better selection because the Belgrade posting would give him the opportunity to manage a smaller office and get regional diversity in a second tour overseas. SUMF ¶ 25. Plaintiff, by contrast, had already had those opportunities, and would benefit more from being in a larger office in a new region. *Id.* Moreover, as had already been communicated to him multiple times, Plaintiff was a NOW bidder at the time, making him immediately eligible for assignment and thus expected to bid on immediately available NOW positions (such as the one in Mexico)—not positions that would require him to wait months before beginning the assignment. *Id.*; *see also* DX4 at 94 ("rather than have an employee linger for months or a year more on overcomplement, the goal would be to assign them as quickly as possible to a position that was available immediately"); DX11 at 87-88. Plaintiff obviously disagrees with these assessments, but that does not make the decision discriminatory or retaliatory—particularly when, at Plaintiff's request, multiple panels reviewed the decision and approved it. SUMF ¶¶ 26-27.

**D. An Eligible and Competitive Bidder Was Selected for the Warsaw Assignment.**

Plaintiff's Warsaw claims fail for similar reasons as to Belgrade. The Service selected an at-grade SEO whose current assignment would end around the time the Warsaw position was to begin, and who had the "heavily required" experience to meet the needs of that post. SUMF ¶¶ 29, 31. At the prima facie stage, there is no evidence the Service made this decision "solely on the basis of disability," especially when Plaintiff was not at grade and there were career-appropriate assignments (including one overseas) immediately available for Plaintiff to fill, and no need for him to wait almost a year for the Warsaw position to open. *Hannah P.*, 916 F.3d at 342; SUMF ¶¶ 29, 31; DX4 at 94; DX11 at 87-88. And, ultimately, selecting a candidate whom the Service assessed as having a better skill set, and who was bidding on the correct timeline and grade—as affirmed by the multiple panels who reviewed and approved the decision, SUMF ¶¶ 30-31—is an unquestionably legitimate reason

18

for an employment action. *Evans v. Techs. Applications*, 80 F.3d 954, 960 (4th Cir. 1996).

### E. Plaintiff Withdrew from Training Required for the IMTS Assignment.

Plaintiff's failure to complete the mandatory training for the out-of-specialty IMTS position dooms his claim at every step. First, there was no adverse action to support a prima facie case for either his discrimination or retaliation claim because Plaintiff unilaterally withdrew from the required training. SUMF ¶ 40; *McGrone v. Austin*, 2022 WL 17833275, at *5 (E.D. Va. 2022) (no adverse action when "Plaintiff ultimately made the choice to withdraw his application"); *see also Cooper v. Smithfield Packing*, 724 F. App'x 197, 202 (4th Cir. 2018) (voluntary actions are not adverse). Plaintiff's discrimination claim is additionally and independently deficient because, without the training, Plaintiff was not "otherwise qualified for [this] position" in a different specialty. SUMF ¶¶ 36-38; *Hannah P.*, 916 F.3d at 342; *Manickavasgar v. VCU*, 667 F. Supp. 2d 635, 644 (E.D. Va. 2009) (defining "otherwise qualified"); *O'Meara v. Wormuth*, 2022 WL 67321, at *7 (E.D. Va. 2022). That other mid-level employees seeking to do this kind of "excursion tour" were required to complete the same training, DX98; DX4 at 189, only confirms that Plaintiff has no viable claim.

But even assuming a prima facie case, the decision that Plaintiff could not do the IMTS position without completing the training is unquestionably legitimate. *E.g.*, *Penhall v. Lake Cnty.*, 2022 WL 4625188, at *12 (N.D. Cal. 2022) ("failure to complete necessary training" was a legitimate, non-discriminatory reason); *Adams-Martin v. Conn. Dep't*, 2012 WL 878306, at *16 (D. Conn. 2012) (legitimate to require attendance at necessary training); *Reeder v. Carter*, 339 F. Supp. 3d 860, 872 (S.D. Ind. 2018) (same). It is not discriminatory to conclude that Plaintiff needed "formal training to have minimum proficiency of an IMTS," DX105 at 24218, when the job was not in his specialty, and when everyone consulted in Frankfurt leadership and GTM—including those with no knowledge of his disability or protected activity—was of the same opinion. SUMF ¶¶ 36-38; DX97 at 12805 ("I can't send him to this position without the training and I'm not involved in his case to this point"). Plaintiff's

personal belief he could do the job without the training ignores that "[i]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." *Evans*, 80 F.3d at 960-61.

### F.  A Qualified and Competitive Political Officer Was Selected for the Political Officer Assignment in Krakow.

Nor can Plaintiff satisfy a prima facie case of discrimination in connection with the Krakow assignment. Plaintiff fails to show that he was "otherwise qualified for" the assignment—a Political/Economic Officer position not only outside his specialty but in the completely separate Generalist field, and that required recent State Department reporting experience he did not have. Nor is there any evidence that he was not selected "solely on the basis of disability" when he did not even advance to the short list due to deficient experience. *Hannah P.*, 916 F.3d at 342; SUMF ¶¶ 41, 44.

But even if Plaintiff could make it past the prima face stage, neither the discrimination nor retaliation claim withstand summary judgment because "relative employee qualifications are widely recognized as valid, non-discriminatory bases for any adverse employment decision." *Russell v. Harlow*, 771 F. App'x 206, 207 (4th Cir. 2019). Most significant to the decisionmaker, Slowinski, was the candidates' political and economic reporting experience—"the more recent, the better"—because that is the "bread and butter" of the Political/Economic Officer. DX12 at 51-54. Slowinski determined that the selected candidate, a seasoned Political Officer who had drafted "cables on a range of topics," had that experience, whereas Plaintiff did not. SUMF ¶¶ 42-44; DX118 at 3241. Although Plaintiff clearly has a different opinion of his qualifications, that is not the relevant assessment. *Evans*, 80 F.3d at 960-61; *Drummond v. Stackley*, 687 F. App'x 277, 278 (4th Cir. 2017).

### G.  Plaintiff Was Finally Directed to an SEO Assignment.

After having failed to secure his next onward assignment for multiple years—in fact, having failed to bid on *any* assignments for long periods despite numerous options (overseas and domestic) being immediately available, SUMF ¶¶ 17, 19, 20, 24, 28, 32—and after receiving (and disregarding) multiple notices that the Service would consider directing him into a position if he continued to not

have an onward assignment, SUMF ¶ 34, Plaintiff was finally directed to an assignment in October 2021. Plaintiff cannot establish a prima facie case of discrimination because he cannot show that this action occurred solely on the basis of his disability. Employees are expected to "actively bid and lobby until they accept a handshake to an onward assignment," and they "become subject to a possible directed assignment" if they remain unassigned. DX8; DX4 at 253; DX11 at 89-93. Nor was this directed assignment process uniquely applied to Plaintiff; in February 2021, 18 others received the same notifications after "not hav[ing] an onward assignment." DX91; *see also* DX5 at 53-54.

In any event, Plaintiff was directed to the SEO assignment for legitimate reasons. The Service must "use its human resources effectively to fill vacancies and place employees in appropriate assignments," DX8, and the assignment Plaintiff received was "an immediate vacancy" in his specialty, at the appropriate grade, involved "increased responsibility," and met the Bureau's priority needs. DX122; DX4 at 114-15, 249-50; SUMF ¶ 46. The Service had "in fact gone beyond normal procedures" to Plaintiff's benefit, *Anderson v. Wachovia Mortg.*, 609 F. Supp. 2d 360, 371 (D. Del. 2009), providing him two years to find an onward assignment—far more than the normal six months—and even finding him a different assignment than the one originally contemplated after he complained about the would-be supervisor. DX4 at 101, 111-12, 114-15, 249-50, 253-54; *see also Hollestelle*, 145 F.3d 1324, at *4 (willingness to accommodate a plaintiff "completely undercuts" retaliation claim); *Vanyan*, 9 F. Supp. 3d at 639 (rejecting discrimination and retaliation claims where "[i]f anything, the record proves that defendant went to great lengths" to work with the plaintiff).

## II. Plaintiff's Non-Assignment Claims Are Not Actionable Because They Are Not Exhausted and/or Not Adverse.

In discovery, Plaintiff asserted a laundry list of complaints beyond the core assignment decisions discussed *supra*, but none present actionable claims. DX128 at 19-23, 35-38.

Failure to exhaust: Rehabilitation Act claims "must comply with the same administrative procedures that govern federal employee Title VII claims." *Stewart v. Iancu*, 912 F.3d 693, 698 (4th Cir.

2019). One such requirement is contact with an EEO counselor within 45 days of the complained-of event. 9 C.F.R. § 1614.105(a)(1); *Khoury v. Meserve*, 85 F. App'x 960, 960 (4th Cir. 2004). Plaintiff admits that his first EEO contact was on March 11, 2020. DX19 ¶ 1; DX18 at 102. Thus, his complaints about an April 2018 counseling by his supervisor, May 2018 psychiatric evaluation, May 2018 ClassNet access revocation, December 2018 overcomplement status, and December 2018 domestic assignment, *see* DX128 at 20-22, 36-37, are all time-barred.[4] Plaintiff also complains about a "decision not to permit [him] to use Administrative Leave," *id.* at 22, 37, but he admits he was allowed to use administrative leave through September 16, 2021, *see* DX19 ¶¶ 73, 74, and he did not contact an EEO counselor within 45 days of that date (indeed, at all) regarding any subsequent decision. Similarly, Plaintiff never contacted an EEO counselor (much less within 45 days) regarding temporary duty assignments ("TDY") in Afghanistan and Rzeszow/Kyiv on August 30, 2021 and October 5, 2022, respectively. DX128 at 22-23, 37-38. Each of those complaints is time-barred as well.

Not adverse: In addition to exhaustion, the Rehabilitation Act requires "adverse employment action," and "not everything that makes an employee unhappy is actionable adverse action." 29 U.S.C. § 791(f); *Sturdivant v. Geren*, 2009 WL 4030738, at *4 (E.D. Va. 2009), *aff'd*, 450 F. App'x 235 (4th Cir. 2010). Only those actions with "significant detrimental effect" on the "terms, conditions, or benefits" of employment are cognizable for discrimination claims. *James v. Booz-Allen*, 368 F.3d 371, 375-76 (4th Cir. 2004); *Edmonson v. Potter*, 118 F. App'x 726, 728 (4th Cir. 2004). For retaliation claims, the action must be "materially adverse." *Burlington N. v. White*, 548 U.S. 53, 68 (2006). The following complaints (*see* DX128 at 20-23, 36-38) do not present an actionable adverse action under these standards:

- April 2018 counseling session, *McKinney v. G4S Gov't Sols.*, 711 F. App'x 130, 137-38 (4th Cir. 2017) ("two counseling forms did not constitute a tangible employment action"); *Thompson v. Potomac Elec.*, 312 F.3d 645, 651 (4th Cir. 2002) ("disciplinary discussion" not adverse action);

---

[4] Not only that, but Plaintiff's ClassNet grievance is not justiciable at all, because the Constitution vests the authority to determine access to classified systems exclusively with the Executive Branch. *Dep't of Navy v. Egan*, 484 U.S. 518 (1988); *Mowery v. NGIA*, 42 F.4th 428 (4th Cir. 2022).

- May 2018 psychiatric evaluation, *Prince-Garrison v. Md. Dep't*, 317 F. App'x 351, 353 (4th Cir. 2009) ("directions to attend counseling[] do not constitute adverse employment actions"); *Pearson v. Prince William Cnty.*, 2021 WL 1150068, at *12 (E.D. Va. 2021), *aff'd*, 858 F. App'x 650 (4th Cir. 2021);

- November 2020 medical clearance, *Silva v. Bowie State*, 172 F. App'x 476, 477 (4th Cir. 2006) (medical evaluation is not an adverse action); DX132 at 30-32 (Office of Medical Clearances "do[es]n't play a role in positions or assignments" and "doesn't consider [] the requirements of the job that the employee holds");

- April 2021 non-endorsement for an award, *Cottman v. Rubin*, 35 F. App'x 53, 55 (4th Cir. 2002) ("not recommending him for the Commissioner's award … do[es] not amount to redressable adverse employment action[]"); *Douglas v. Donovan*, 559 F.3d 549, 553 (D.C. Cir. 2009);

- Application of policies regarding evaluations and leave, *Von Gunten v. Maryland*, 243 F.3d 858, 869 (4th Cir. 2001) ("terms, conditions, or benefits of a person's employment do not typically, if ever, include general immunity from the application of basic employment policies"), *abrogated on different grounds*; DX129 at 7292-93 (policy on evaluations); DX130 (Plaintiff admitting that all "injured State officers"—not just him—were subject to leave policy);[5] and

- August 2021 and October 2022 TDYs, *Austin v. Boeing Co.*, 2021 WL 6494747, at *6 (D.S.C. 2021) ("temporary changes to assigned tasks or workload are not adverse employment actions"); *Moore v. Ashcroft*, 401 F. Supp. 2d 1, 32 (D.D.C. 2005).

Moreover, when an action is one that the employee voluntarily undertakes, "there is no actionable adverse action." *Laird v. Fairfax Cnty.*, 978 F.3d 887, 894 (4th Cir. 2020). In 2018, Plaintiff asked and agreed to work domestically in New Hampshire while on overcomplement, *see* SUMF ¶¶ 5-6, 8-9, and he cannot now contest that arrangement (even if such a claim were exhausted, which it is not). *See Cooper*, 724 F. App'x at 202; *Sercer v. Holder*, 104 F. Supp. 3d 746, 751 (E.D. Va. 2015). And although Plaintiff also tries to challenge his "maintenance" on overcomplement and on domestic duty until 2021, those complaints are not cognizable either. Plaintiff's claims require "discrete" adverse actions; they do not permit "continuing" actions. *Holland v. Wash. Homes*, 487 F.3d 208, 220-21 (4th Cir. 2007); *Shipman v. UPS*, 581 F. App'x 185, 187 (4th Cir. 2014). The only discrete act pertaining to Plaintiff's domestic work and overcomplement status occurred when the Service placed him in that status in December 2018—with his consent. SUMF ¶ 9. He remained in that status solely because he

---

[5] And even if Plaintiff's complaints about administrative leave were exhausted and adverse (they are neither), they still would be precluded by the Federal Employees Compensation Act. *See infra* at 24.

did not secure his next assignment (indeed, did not bid for *any* assignments for long periods and disregarded appropriate assignments immediately available to him). SUMF ¶¶ 17, 19, 20, 24, 28, 32, 34. Those discrete assignment decisions (discussed *supra*) are the only actionable claims in this case.

In short, the remainder of Plaintiff's asserted grievances from 2018 to the present (DX128 at 19-23, 36-38) do not give rise to a claim under the Rehabilitation Act.[6]

## III. Defendants Are Entitled to Summary Judgment on Damages Barred as a Matter of Law.

Plaintiff seeks $31,000 in medical expenses and leave taken for treatment of his on-the-job injury from China, but that claim is precluded by the Federal Employees Compensation Act. *Borneman v. United States*, 213 F.3d 819, 829 n.3 (4th Cir. 2000); *Richards v. CIA*, 837 F. Supp. 2d 574, 579-80 (E.D. Va. 2011); DX19 ¶¶ 62-64; DX18 at 14; DX137 at 148-49. Plaintiff even admits he was permitted to submit a workers' compensation claim but has not done so, because "that makes future litigation claims harder." DX19 ¶¶ 66, 67, 70; DX18 at 294-95; DX17 at 2275; DX6 at 368-69. The law does not permit Plaintiff to bring such claims under the guise of the Rehabilitation Act.

Plaintiff also claims $602,000 to $920,000 in back- and front-pay based on career scenarios that all depend on his being promoted at least two levels, and even a third level into the Senior Foreign Service. Setting aside the many flaws with these scenarios (which Defendants will address in a future motion, if necessary), Plaintiff cannot recover these promotion-dependent damages for the simple

---

[6] Any such claims would fail on the merits in any event. For instance, after Plaintiff himself requested a "downgrade" of his medical clearance, the Office of Medical Clearances changed his clearance to class 5 (domestic only) because the doctor's note unequivocally stated that Plaintiff would have appointments "in Boston approximately once per month for at least the next six months." DX131 at 2519; DX132 at 58-64 ("I felt he was very clear on what the follow-up needed to be, monthly and in Boston."); DX19 ¶ 39. As another example, Plaintiff's supervisor did not endorse him for an award because the supervisor could not corroborate the claims of counterintelligence work on Russia, which was outside Plaintiff's work responsibilities. DX133; DX45 at 144-46, 220-24. And in two other examples, Plaintiff was not approved for the Rzeszow TDY because of staffing shortages (which Plaintiff himself recognized as "understandabl[e]"), DX134, or for the Afghanistan TDY because he had "not followed official guidance to gain approval" and was "scheduled to transfer positions in the middle of the proposed TDY," DX135; *see also* DX136.

reason that they flout the Court's orders dismissing his promotion claims. Dkt. Nos. 23, 48, 76. The law does not allow him to bootstrap damages dependent on dismissed claims to the remaining claims in the case—especially when the Court has already recognized that assignments in the Foreign Service are entirely distinct from promotions. *See Brady v. Thurston Motor Lines*, 753 F.2d 1269, 1278 (4th Cir. 1985) (an employer is "responsible only for losses suffered by the claimant as a result of the discrimination"); *Fox v. Amtrak*, 241 F. App'x 771, 772 (2d Cir. 2007) (no damages for dismissed claims); *McCord v. Brooks, McComb & Fields*, 2018 WL 8514480, at *3 (6th Cir. 2018) (same).

Plaintiff seeks an additional $363,000 to $445,000 in lost "educational opportunities" for his children, but the Rehabilitation Act permits recovery only to the victim of the alleged discrimination. *E.g.*, *Murphy v. Cadillac Rubber & Plastics*, 946 F. Supp. 1108, 1125 (W.D.N.Y. 1996) (rejecting derivative claims); *Narcisse v. Turner Indus.*, 2012 WL 1565293, at *7 (E.D. La. 2012). Plaintiff has not incurred any expenses in securing "educational opportunities" for his children, who attend public school and have never applied for private school. DX18 at 292-93. His own expert testified that the "educational allowance" does not "constitute[] economic loss by Mr. Lenzi." DX137 at 152-53. Thus—and again setting aside for now the many flaws with this calculation—this category of damages is not permissible.

Lastly, Plaintiff requests punitive damages, but such damages are not recoverable from federal agencies. 42 U.S.C. § 1981a(b)(1); *Gibson v. Henderson*, 129 F. Supp. 2d 890, 904 (M.D.N.C 2001).

## CONCLUSION

Plaintiff cannot show that disability discrimination or retaliation was the reason for the seven assignment decisions discussed above. His own experience prior to his disability demonstrates that assignments occur based on Service need, not employee desire. Plaintiff's resistance to that reality, and his unwillingness to participate appropriately in the assignment process after his disability, does not make the Service's actions unlawful. The Court should enter summary judgment for Defendants.

Dated:  February 10, 2023

Respectfully submitted,

JESSICA D. ABER
United States Attorney

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

LAUREN A. WETZLER
Chief, Civil Division

CARLOTTA P. WELLS
Assistant Branch Director

_____/s/_____
MATTHEW J. MEZGER
Assistant United States Attorney
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel:     (703) 299-3741
Fax:     (703) 299-3983
Email:  Matthew.Mezger@usdoj.gov

CATHERINE M. YANG
JOSEPH E. BORSON
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Tel: (202) 514-4336/1944
Email: Catherine.M.Yang@usdoj.gov
      Joseph.Borson@usdoj.gov

*Counsel for Defendants*