**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| Mark Lenzi,<br><br>    Plaintiff,<br><br>    v.<br><br>United States Department of State, and<br>Antony J. Blinken, United States Secretary of<br>State,<br><br>    Defendants. | Case No. 1:21-cv-01371-PTG-IDD |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

Introduction ................................................................................................................. 1

Plaintiff's Statement of Undisputed Material Facts and Response to Defendant's Statement of
    Undisputed Material Facts ....................................................................................... 4

I.      Mr. Lenzi's Employment with Defendants ........................................................... 4

II.     Mr. Lenzi is Afflicted with Havana Syndrome, and Defendants Discriminate and
       Retaliate Against Him. ....................................................................................... 6

III.    Mr. Lenzi Seeks Assignments After Being Medically Evacuated from Guangzhou ........ 8

IV.   Mr. Lenzi is Assigned and Maintained in Overcomplement Status ............................ 10

V.     Mr. Lenzi Applies to and is Repeatedly Denied Overseas Positions .......................... 12

       A.     Frankfurt, Germany—FP-03 SEO (Summer 2020) ....................................... 13

       B.     Athens, Greece—FP-04 SEO (Summer 2021) ............................................ 17

       C.     Belgrade, Serbia—FP-03 SEO (Summer 2021) .......................................... 19

       D.    Warsaw, Poland—FP-02 SEO (Summer 2021) ........................................... 20

       E.     Frankfurt, Germany—FP-03 IMTS (NOW Position) ................................... 22

       F.     Krakow, Poland—FP-03 POL/ECON (NOW Position) ................................. 25

VI.   Defendants Direct Mr. Lenzi to Domestic Assignments Against His Will ................... 26

Legal Standard .......................................................................................................... 27

I.      Summary Judgment ......................................................................................... 27

II.     Discrimination and Retaliation Under § 501 of the Rehabilitation Act of 1973. ........... 28

Argument ................................................................................................................. 29

I.      Defendants Discriminated and Retaliated Against Mr. Lenzi Because of His Havana
       Syndrome-Based Disability. ............................................................................... 30

       A.     Mr. Lenzi was Disabled After Suffering Havana Syndrome and Engaged in
           Disability-Related Protected Activity. ................................................... 30

       B.     Mr. Lenzi Was Qualified for Each the Positions to Which He Applied. ............. 31

       C.     Defendants' Actions Against Mr. Lenzi are Discriminatory and Retaliatory in the
           Aggregate. ....................................................................................... 32

       D.    Defendants' Actions Against Mr. Lenzi are Individually Discriminatory and
           Retaliatory. ...................................................................................... 35

           1.     Frankfurt, Germany SEO Position ............................................. 36

           2.     Athens, Greece SEO Position ................................................... 37

           3.     Belgrade, Serbia SEO Position ................................................. 39

           4.     Warsaw, Poland SEO Position .................................................. 40

           5.     Frankfurt, Germany IMTS Position ........................................... 41

6.  Krakow, Poland Political/Economic Officer Position.................................. 43

7.  Overcomplement Status ................................................................. 44

8.  Directed Assignments to Domestic Only Positions ..................................... 45

II.  Defendants Are Not Entitled to Summary Judgment on Damages.................................. 47

A.  Mr. Lenzi's Medical Expenses are the Direct Result of Defendants' Discriminatory and Retaliatory Actions. ................................................................. 47

B.  Mr. Lenzi Rightfully Requests $363,000 to $445,000 in Lost Education Allowance that Defendants Would Have Paid Absent Discrimination. .............. 47

C.  Plaintiff's Expert Reports Provide Qualitative and Quantitative Support for Mr. Lenzi's Damages Flowing From Defendants' Discrimination and Retaliation and are Not Connected to a Failure to Promote Liability Theory. ............................ 49

Conclusion ............................................................................................................. 50

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abilt v. CIA*,
848 F.3d 305 (4th Cir. 2017) ................................................... 29

*Anderson v. Wachovia Mortg. Corp.*,
609 F. Supp. 2d 360 (D. Del. 2009), *aff'd*, 621 F.3d 261 (3d Cir. 2010) .............................. 46

*Armstrong v. Index Journal Co.*,
647 F.2d 441 (4th Cir. 1981) ................................................... 31

*Biniaris v. Hansel Union Consulting, PLLC*,
382 F. Supp. 3d 467 (E.D. Va. 2019) ......................................... 31

*Bledsoe v. Tennessee Valley Auth. Bd. of Directors*,
42 F.4th 568 (6th Cir. 2022) ................................................... 28

*Boyer-Liberto v. Fontainebleau Corp.*,
786 F.3d 264 (4th Cir. 2015) ................................................... 31

*Brady v. Thurston Motor Lines, Inc.*,
753 F.2d 1269 (4th Cir. 1985) ................................................. 50

*Burgess v. Bowen*,
466 F. App'x 272 (4th Cir. 2012) .......................................... 3, 34

*Burlington Indus., Inc. v. Ellerth*,
524 U.S. 742 (1988) ....................................................... 44, 46

*Burlington N. & Santa Fe Ry. Co. v. White*,
548 U.S. 53 (2006) ....................................................... 32, 35

*Cathcart v. Flagstar Corp.*,
155 F.3d 558 (4th Cir. 1998) ............................................. 28, 34

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ........................................................... 27

*Clark County School District v. Breeden*,
532 U.S. 268 (2001) ..................................................... 30, 36

*Cowgill v. First Data Techs., Inc.*,
41 F.4th 370 (4th Cir. 2022) ......................................... 20, 34, 36

*Dank v. Shinseki*,
    374 F. App'x 396 (4th Cir. 2010) ........................................................28

*Drummond v. Stackley*,
    687 F. App'x 277 (4th Cir. 2017) .......................................................43

*EEOC v. Huntington Ingalls, Inc.*,
    No. 4:17CV113, 2018 WL 6272891 (E.D. Va. Nov. 29, 2018) ...........27

*EEOC v. NFCU*,
    424 F.3d 397 (4th Cir. 2005) .........................................................30, 31

*Evans v. Techs. Applications*,
    80 F.3d 954, 960 (4th Cir. 1996) .......................................................41

*Foster v. Univ. of Maryland-E. Shore*,
    787 F.3d 243 (4th Cir. 2015) .............................................................29

*Fox v. Leland Fire/Rescue Dept., Inc.*,
    648 F. App'x 290 (4th Cir. 2016) .......................................................37

*Hall v. Greystar Mgmt. Servs., L.P.*,
    637 F. App'x 93 (4th Cir. 2016) .........................................................36

*Hannah P. v. Coats*,
    916 F.3d 327 (4th Cir. 2019) .............................................................29

*Haynes v. Waste Connections, Inc.*,
    922 F.3d 219 (4th Cir. 2019) ...................................................3, 33, 40

*Heiko v. Colombo Sav. Bank*,
    F.S.B., 434 F.3d 249 (4th Cir. 2006) ..................................................43

*Herx v. Diocese of Fort Wayne-South Bend, Inc.*,
    No. 1:12-CV-122 RLM, 2015 U.S. Dist. LEXIS 28224 (N.D. Ind. Mar. 9,
    2015) ..................................................................................................49

*Jacobs v. N.C. Admin. Off. of the Cts.*,
    780 F.3d 562 (4th Cir. 2015) ........................................................27, 28

*John v. Robbins*,
    764 F. Supp. 379 (M.D.N.C. 1991) ...................................................47

*Laird v. Fairfax County, Virginia*,
    978 F.3d 887 (4th Cir. 2020) .............................................................45

*Laughlin v. Metropolitan Wash. Airports Authority*,
    149 F.3d 253 (4th Cir. 1998) .............................................................31

*Lettieri v. Equant Inc.*,
    478 F.3d 640 (4th Cir. 2007) ................................................................................33

*Matsushita Elect. Indus. Co., Ltd. V. Zenith Radio Corp.*,
    475 U.S. 574 (1986)..........................................................................................27

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973)....................................................................................28, 34

*McNabb v. United States*,
    No. 4:06–cv–0056–RBH2007 WL 963960 (D.S.C. Mar. 28, 2007) ......................47

*Nat'l R.R. Passenger Corp. v. Morgan*,
    536 U.S. 101 (2002)..........................................................................................35

*Patrick v. Bureau of Alcohol, Tobacco, and Firearms & Explosives*,
    860 F. App'x 828 (4th Cir. 2021) ........................................................................32

*Pinkerton v. Spellings*,
    529 F.3d 513 (5th Cir. 2008) ..............................................................................29

*Ruddell v. Triple Canopy, Inc.*,
    No. 115CV01331LMBJFA, 2016 WL 4529951 (E.D. Va. Aug. 29, 2016) ............28

*Silva v. Bowie State Univ.*,
    172 F. App'x 476 (4th Cir. 2006) ............................................................29, 39, 41

*Smith v. CSRA*,
    12 F.4th 396 (4th Cir. 2021) ....................................................................29, 41

*Texas Dep't of Cmty. Affs. v. Burdine*,
    450 U.S. 248 (1981)..........................................................................................28

*U.S. Postal Serv. Bd. of Governors v. Aikens*,
    460 U.S. 711 (1983)..........................................................................................28

*Warren v. Halstead Indus., Inc.*,
    802 F.2d 746 (4th Cir. 1986), *on reh'g*, 835 F.2d 535 (4th Cir. 1988).............28, 33

*X-IT Prod., L.L.C. v. Walter Kidde Portable Equip., Inc.*,
    155 F. Supp. 2d 577 (E.D. Va. 2001) ..................................................................47

## Statutes

22 U.S.C. 3984................................................................................................11

42 U.S.C. § 2000e-5(e)(1)................................................................................35

42 U.S.C. §§ 12102(1) ....................................................................................30

42 U.S.C. § 12102(2)(A)................................................................30

42 U.S.C. § 12112............................................................................29

42 U.S.C. § 12203(a)........................................................................29

Rehabilitation Act of 1973 § 501.........................................28, 29, 30

**Rules**

29 C.F.R. § 1630.5.14.......................................................................29

Fed. R. Civ. P. 56(a)........................................................................27

Fed. R. Civ. P. 56(c)(4)......................................................................5

Local Rule 56(B)................................................................................4

## INTRODUCTION

This Rehabilitation Act case is about a U.S. Foreign Service Security Engineering Officer ("SEO"), Mark Lenzi, who has served his country with distinction since his 2011 employment by the Department of State ("State Department" or "Defendants"), but whose life at the State Department has been turned upside down since his 2018 affliction with Havana Syndrome while stationed in Guangzhou, China.  Havana Syndrome (which Defendants ignore entirely) is a form of traumatic brain injury that has received world-wide media coverage and is believed to be caused by foreign adversaries aiming directed, microwave radiation at Mr. Lenzi and other U.S. personnel.

Mr. Lenzi has been employed as an SEO for his entire career at the State Department and ensures the safety and security of State Department personnel stationed abroad.[1]  SEOs like Mr. Lenzi are intimately familiar with the technical systems and infrastructures of the State Department's overseas posts, regularly handle classified information, and are consistently stationed overseas to effectively promote and enhance the security of our nation's diplomatic facilities.  Indeed, this is why Mr. Lenzi was one of 200 SEOs in the State Department's Bureau of Diplomatic Security ("DS")—a relatively small, tight knit group of a few hundred Foreign Service Specialists out of the 14,000 foreign service personnel within the State Department.  Overall, regulations require *all* foreign service personnel to spend a "substantial portion" of their time overseas—as this is the very point of being a member of the *foreign* service.  3 FAM 2424.2(b).  From 2011 until approximately mid-2018, Mr. Lenzi was on the fast-track in his career, advanced steadily in grade, and received positive performance reviews.[2]  Moreover, prior to 2018 (and the State Department's knowledge of his disability), Mr. Lenzi received a balance of domestic and overseas assignments and was assigned to overseas tours

---

[1] SEOs "design, install, [and] maintain technical solutions to protect lives, information, [and] property for Department of State facilities."  PX-001 at 30:14-19.
[2] Specifically, Mr. Lenzi advanced in grade from FP-06 to FP-03 in 5 years and 3 months, with his advancement from FP-04 to FP-03 having been competitive.

(temporary or otherwise) as an SEO regularly.

Everything changed, however, in early-2018, after the State Department learned that Mr. Lenzi had been injured in a directed microwave radiation attack in Guangzhou, China and became afflicted with Havana Syndrome.  After experiencing debilitating medical symptoms and observing them in at least one colleague and his family members, Mr. Lenzi began advocating for himself and others afflicted with the Havana Syndrome.[3]  The State Department, rather than commending Mr. Lenzi for his advocacy, branded him as "too emotional," counseled him, stripped him of his email and access to classified information, and promptly medically evacuated ("medevac'd") him to the U.S.  Mr. Lenzi has never had a mental illness, and any "emotionality" he may have experienced was a symptom of his Havana Syndrome disability.  The undisputed facts confirm that in the five years since 2018, Mr. Lenzi has not been stationed overseas a single time (in stark contrast to his assignments pre-disability), and that Mr. Lenzi's efforts were rebuffed at every turn prior to filing this District Court litigation.

Because of Mr. Lenzi's disability and his associated advocacy, the State Department placed and maintained Mr. Lenzi in an indefinite "overcomplement" status after he became disabled. "Overcomplement" is meant to be a temporary status, and, particularly in DS, is typically reserved for employees with a criminal record, suspended or revoked security clearances, or unsatisfactory performance.  Mr. Lenzi falls into none of these categories.  Nonetheless, Mr. Lenzi languished in the purgatory of overcomplement status for *approximately three years*, during which he was relegated to domestic assignments, conveniently precluded from accessing classified systems, and assigned menial, make-work jobs that are rarely, if ever, given to SEOs of his caliber.

---

[3] Mr. Lenzi has continuously advocated for himself and other Havana Syndrome victims, including in detailed emails, articles in the *New York Times* and *Washington Post*, features on *60 Minutes*, and complaints with the Office of Special Counsel ("OSC").  In so doing, Mr. Lenzi has either directly or indirectly criticized his superiors in Diplomatic Security, including John Fitzsimmons, his Career Development Officers ("CDOs") Nathan Lingenfelter and Andrew Kaleczyc, and Tamika Abbott.

Meanwhile, as Mr. Lenzi sought numerous overseas positions—including in Germany, Greece, Serbia, and Poland—and attempted to extricate himself from "overcomplement" status numerous times between 2019 and 2021, the State Department provided pretextual, shifting, and contradictory reasons for denying Mr. Lenzi these positions *on at least six separate occasions* despite his qualifications for each. *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 225 (4th Cir. 2019) (pretextual "reasons for the termination are inconsistent over time, false, or based on mistakes of fact."); *Burgess v. Bowen*, 466 F. App'x 272, 280 (4th Cir. 2012) (inconsistencies in proposed reasons for plaintiff's termination precluded summary judgment). These denials included circumstances where Mr. Lenzi had been the only qualified bidder for the position, where Mr. Lenzi was mysteriously stripped of his medical clearance in the middle of bidding (only to get it back immediately after the position had been assigned to someone else), and where Mr. Lenzi was rendered ineligible because the different positions to which he applied just happened to be ceded to entry level employees. The undisputed facts show that the State Department wanted "anyone but Mr. Lenzi" to get these positions, even if that meant foregoing filling immediately vacant or "hard to fill" positions entirely. PX-036 at 172:9-12. This is no surprise, as DS leadership[4] categorically stated in March 2020 that "*[a]s far as assignments go, we do not believe it appropriate to send [Mr. Lenzi] overseas.*" PX-078 at 1 (emphasis added). DS leadership made this unqualified statement in the midst of Mr. Lenzi's bidding efforts, in an email sent on the State Department's classified email system, hoping that its (now unclassified) contents would never see the light of day. Moreover, this statement was in response to the State Department's own doctor admitting that Mr. Lenzi "has his medical clearance" and could, therefore, serve overseas. But the cat

---

[4] DS leadership included the following: (1) John Fitzsimmons, Deputy Assistant Secretary of the DS Countermeasures Directorate, PX-002 No. 3 at 14; (2) Tamika Abbott, Division Director of the DS Security Operations Division, PX-002 No. 1 at 2, 16; (3) Ronald Stuart, Operations Director of the DS Office of Security Technology, PX-003 at 71:21-72:7; (4) Rahim Theriot, Office Director within DS; and CDOs (5) Nathan Lingenfelter and (6) Andrew Kaleczyc, PX-004.

is out of the bag, and the undisputed facts confirm that DS and the State Department did not want Mr. Lenzi to go abroad *at any point* prior to the filing of this lawsuit.  Even when the State Department directed Mr. Lenzi into assignments of its choosing—*twice*—in 2021, it uniformly chose to place Mr. Lenzi domestically.  Only with these types of assignments would Mr. Lenzi remain in menial positions that kept him banished to the employment purgatory that Defendants orchestrated (and which, coincidentally, has substantially precluded him from accessing classified information for without formal suspension or revocation of his security clearance).

The undisputed facts demonstrate that Mr. Lenzi was discriminated and retaliated against because of his disability and protected activities pertaining thereto, and the various justifications for the State Department's actions are pretextual and hold no water.  Accordingly, summary judgment should be granted on Mr. Lenzi's disparate treatment and retaliation claims.  At a minimum, numerous disputes of material fact necessarily preclude Defendants' summary judgment motion on both claims, and this case should proceed to trial.  Additionally, summary judgment should be denied with respect to Defendants' premature and improper assertions as to damages.

### Plaintiff's Statement of Undisputed Material Facts and Response to Defendant's Statement of Undisputed Material Facts[5]

## I.  Mr. Lenzi's Employment with Defendants

1.  Mr. Lenzi has been employed by Defendants since August 2011 and is currently a tenured, mid-level SEO at grade FP-03.  PX-005 at 1; Dkt. 94 ¶ 2.  Throughout his time at the State Department, Mr. Lenzi has consistently met performance expectations while receiving numerous

---

[5] Pursuant to Local Rule 56(B), Mr. Lenzi provides his statement of undisputed facts in support of his motion for summary judgment.  Where applicable, Mr. Lenzi identifies facts from Defendants' Statement of Undisputed Material Facts ("DSUMF") that he believes, at a minimum, are disputed based on the facts and citations to the record provided herein.  To facilitate the Court's review, a table identifying the disputed facts from DSUMF, with accompanying citations, is attached as Appendix A.

nominations[6] and awards for his professional excellence and disability advocacy.  PX-005-009.

2.      For example, each and every one of Mr. Lenzi's Employee Evaluation Reports ("EERs") has been "consistently positive," indicated that his performance is "satisfactory or better," and "never reflected any performance issues."[7]  PX-010 at 198:5-16; PX-011 at 6, 18.

3.      Prior to his affliction with Havana Syndrome, Mr. Lenzi was consistently awarded overseas assignments and temporary duty assignments ("TDY"), Lenzi Decl. ¶¶ 4, 8;[8] see also PX-012 at 149:25-150:3, and Mr. Lenzi's postings were balanced between domestic and foreign positions.  For example, between August 2011 and June 2018, Mr. Lenzi spent approximately 71% of his time overseas—through TDYs and consecutive postings in Frankfurt, Germany and Guangzhou, China— and 29% of his time domestically—through two postings in Washington, D.C.  PX-005 at 1.[9]  Lenzi Decl., Ex. A.  Mr. Lenzi never spent more than eleven consecutive months domestically prior to mid-2018.[10]  This balance of overseas and domestic positions was consistent with the State Department's own regulations, which instruct that foreign service employees should spend a "substantial portion"

---

[6] For example, DS Special Agent Jessica McTigue nominated Mr. Lenzi for the Careers and the disABLED 2021 Employee of the Year award for advocacy leading to "legislation that led to 3 FAM 3660 and the expansion of benefits and rights for disabled Foreign Service employees."

[7] PX-013 at 5 (2012) ("a talented engineer"); PX-014 at 4 (2013) ("consistently demonstrates outstanding performance"); PX-015 at 3 (2014) ("performed at an extremely high level"); PX-016 at 5 (2014) ("outstanding, well-rounded"); PX-017 at 4 (2015) ("set the standard for integrity and workplace behavior"); PX-018 at 2 (2016) ("performed at an even higher level than last year"); PX-019 at 3 (2017) ("performance is excellent"); PX-020 at 3 (2018) ("eliminated a long-standing issue and ensured . . . future work . . . no longer presents a risk to life safety"); PX-021 at 2 (2019) ("quickly came up to speed"); PX-022 at 3 (2020) ("a tremendous job"); PX-023 at 3 (2021) ("a highly respected member . . . and brings leadership elements that epitomize the best of DS"); PX-024 at 3 (2022) (showed "leadership and initiative").

[8] Mr. Lenzi's Declaration is attached to Plaintiff's Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(c)(4).

[9] Based on the fact that Mr. Lenzi's first two tours were domestic and neither were grade FP-03, Plaintiff disputes DSUMF as stated in the third sentence of ¶ 15.

[10] Mr. Lenzi returned from a TDY in Afghanistan (listed as Dubai) on March 15, 2012 and stayed domestically until February 4, 2013 when he traveled to Manila, Philippines.  PX-031; Lenzi Decl., Ex. A.  Based on the cited paragraph and footnote 11, Plaintiff disputes DSUMF ¶ 3.

of their careers overseas.  3 FAM 2424.2(b); *see also* PX-025.[11]

## II.    Mr. Lenzi is Afflicted with Havana Syndrome, and Defendants Discriminate and Retaliate Against Him.

4.      In March or April 2017, Mr. Lenzi, his wife, and his two small children began to develop physical and cognitive symptoms characteristic of Havana Syndrome.  PX-026 at 1; PX-027 at 4-6.  By February 2018, Mr. Lenzi was experiencing headaches, irritability and emotionality, short-term memory loss, and sleep disturbances.  PX-028; PX-029 at 11; PX-030 at 22.  Defendants do not dispute that "[w]hile performing his official duties as an employee of the Department of State in Guangzhou, China, Mr. Lenzi sustained a brain injury" and that Mr. Lenzi "has a disability within the meaning of the Rehabilitation Act."  Dkt. 78 at ¶ 10; Dkt. 94 at 17.

5.      Despite his symptoms, Mr. Lenzi maintained his standard for excellence.  For example, on May 14, 2018, supervisors stated that Mr. Lenzi is an "invaluable resource" and "possesses the fundamental skills to excel."  PX-020 at 2.

6.      Between February and May 2018, Mr. Lenzi engaged with Defendants regarding his Havana Syndrome symptoms, including contacting his supervisor regarding these symptoms and requesting information about a neighbor who was also afflicted with Havana Syndrome.  Lenzi Decl. ¶¶ 10-12, 15, 16; PX-037 at 3.  Yet, on April 19, 2018, Mr. Lenzi's supervisor ordered him to participate in a counseling session in which he was "reprimanded for increased emotionality," even though this

---

[11] Foreign service assignments are not based on the "needs of the service."  Employee preferences, while not dispositive, are relevant and illustrate why the Foreign Service operates according to a bidding system.  PX-032 ("The open assignments system is designed to obtain the most effective match . . . while maximizing employee and bureau choice.").  Moreover, the "needs of the service" do not justify discrimination and do not exempt Defendants from federal discrimination laws.  PX-033 ("Discrimination . . . will not be tolerated within the Department.");  PX-034.  Finally, several of Defendants' witnesses admitted that their preferences for overseas or domestic posts were respected.  *See* PX-035 at 164:11-19 (never denied opportunity to be posted overseas); PX-036 at 96:1-7 (same).  Based on these facts, Plaintiff disputes DSUMF as stated in the fourth sentence of ¶¶ 1, 15 and ¶ 33.

emotionality was a symptom of his injury.[12]  PX-038; PX-039; PX-040 at 7; PX-029 at 7, 8, 33.

      7.     On May 27, 2018, Mr. Lenzi was compelled to move his family out of State Department provided accommodations and into a hotel out of fear for his personal safety and that of his family.  PX-041 at 32.  On the same day, Mr. Lenzi sent an unclassified email to all Americans at Consulate Guangzhou, warning them of potentially damaging health effects and stating, *inter alia*:

> I have tried everything in my power to get RSO Guangzhou and Post leadership here to engage with my family *and ask questions to my wife and me about our deteriorating health as of late.*
>
>                \*\*\*
>
> I have moved my family to a hotel (paying for it on my own dime) *because of our collective symptoms and close proximity to the evacuated officer's apartment.* I would encourage my friends and colleagues in Tower 7 to seriously consider doing the same. *I would also encourage children who have had play dates with Elyse and Tommy at our apartment to get evaluated as well as those who attended my recent Moldovan wine tasting night at Tower 7.*
>
> I cannot express how let down my family and I have been by a government that I have dedicated the better part of my life serving. To lie is one thing but it is the actions to engage in deceit and a cover-up that has placed my family's health in direct jeopardy that is particularly devastating to me.

PX-044 at 2-3.

      8.     This email, pertaining to Mr. Lenzi's concerns about the State Department's handling of and transparency regarding Havana Syndrome was forwarded to DS leadership within minutes. PX-044; PX-045.  Rahim Theriot then forwarded to Fitzsimmons and Stuart, stating that the email

---

[12] Based on these facts, Plaintiff disputes DSUMF ¶ 4.  Defendants' quoted language leaves out the critical context that Mr. Lenzi's statements were made during the peak of his Havana Syndrome symptoms and Defendants' mistreatment.  The first partial quote was in response to Defendants ignoring Mr. Lenzi's repeated pleas to attain the layout of the apartment where he was injured, which Defendants had on hand.  PX-042 at 1.  The second partial quote leaves out: "It is really weird and maybe a defense mechanism but I remain much more mad at State than the country that did this to us.  If State had listened to you the first time you went to them and pleaded for them to get the other Americans out of T7 or had listened to me when I showed them screenshots of Kristina texting our upstairs neighbor in April 2017 about the weird sounds then I wouldn't feel this way . . . "  PX-043.

was "very reckless.  Post management is discussing [Mr. Lenzi's] actions as I type this."  PX-044 at 2.

Assistant Secretary of DS Michael Evanoff also commented to Fitzsimmons that this email was "[v]ery

unprofessional and uncalled for by SEO."  PX-046.

9.      Two days later, on May 29, 2018, Defendants ordered Mr. Lenzi to undergo a

psychiatric evaluation,[13] locked him out of his workplace, and denied him access to classified

("ClassNet") and non-classified ("OpenNet") email systems on the direct orders of then-Secretary of

State Michael Pompeo.  PX-047; PX-003 at 159:1-160:4, 167:12-168:2, 169:22-170:11; PX-048.

Fitzsimmons helped draft the briefing memo to Secretary Pompeo regarding Mr. Lenzi.  PX-049.

10.     Rescission of ClassNet and OpenNet access were neither precipitated nor

accompanied by any changes to Mr. Lenzi's Top Secret/Sensitive Compartmented Information

security clearance, which Mr. Lenzi maintained, and continues to maintain.  PX-050 Nos. 31, 32 at 9.

11.     Overseas SEO positions require access to ClassNet, PX-051 at 323:21-324:3; PX-036

at 25:5-9; PX-001 at 210:15-19, but the domestic positions to which Mr. Lenzi has been assigned since

2018 do not.  Thus, Mr. Lenzi has not had access to ClassNet since 2018.  Mr. Lenzi's OpenNet access

was reinstated, but not until November 2018.  PX-052 at 1; Lenzi Decl. ¶ 22; PX-036 at 31:19-24; PX-

001 at 289:6-12 (knowledge of six employees who had OpenNet access removed over 30 years), and

Mr. Lenzi still does not have access to ClassNet, despite the fact that at least 90% of his peer SEOs

have such access.  PX-003 at 160:13-21, 178:4-7; PX-001 at 210:5-13; PX-053 at 204:12-17.

### III.    Mr. Lenzi Seeks Assignments After Being Medically Evacuated from Guangzhou

12.     Throughout September and October 2018, and while he was seeking treatment for his

Havana Syndrome-based disability, Mr. Lenzi repeatedly requested to be assigned to a Y-tour[14] at the

Diplomatic Security Service field office in Portsmouth, New Hampshire.  PX-054 at 2; PX-001 at

---

[13] Mr. Lenzi has never been diagnosed with psychiatric illness or mental health deficits.  PX-029 at 25.
[14] Y-tours, also known as "Short Tours," are between four and twelve months in length and can help
employees bridge assignment gaps in the bidding cycle.  PX-055 at 1.

389:2-5 (reasonable to give Mr. Lenzi a Y-tour).  Mr. Lenzi's requests were based on representations made by Assistant Secretary Evanoff and Deputy Under Secretary for Management William Todd, who told Mr. Lenzi—on no less than three occasions—that he could be assigned a Y-Tour.  PX-054 at 2; Lenzi Decl. ¶ 23.  Moreover, none of Defendants' policies would have precluded Mr. Lenzi from being assigned to a Y-tour.  PX-036 at 43:1-13; PX-003 at 219:13-220:5.  If granted a Y-tour, Mr. Lenzi would have been on a normal bidding cycle and would not have been in an overcomplement status of indefinite duration.[15]  PX-036 at 51:4-52:9, 57:16-58:7.

13.     In October 2018, Mr. Lenzi requested an accommodation for his domestic postings from Defendants' Disability and Reasonable Accommodation Division ("DRAD") that was granted on November 15, 2018 and remains in place today.  Dkt. 34 ¶ 7; Dkt. 50 ¶ 7; PX-050 No. 39 at 11. Because of his disability, Mr. Lenzi also requires post-specific, Class 2 medical clearance, which Defendants have not always granted.  Defendants have also not always provided accommodations for the positions that Mr. Lenzi has sought, particularly for the Frankfurt IMTS position.

14.     Defendants, especially DS leadership, have been aware of Mr. Lenzi's Havana Syndrome injury and resulting disability since *at least* early-to-mid 2018.  Mr. Lenzi's May 27, 2018 unclassified email was sent to *all* Americans at Consulate Guangzhou and put hundreds of State Department employees on notice.  Fitzsimmons, Theriot, and Abbott were forwarded this email on the same day.  PX-044; PX-045; PX-046; PX-001 at 125:3-13; PX-056 at 31:11-22 ("All [SEOs] received that email").  Assistant Secretary Evanoff and Deputy Under Secretary Todd were aware as of May 29, 2018.  PX-049.  Lingenfelter was aware by August 2018 (PX-053 at 58:5-20); Raymond Rivera, Mr. Lenzi's supervisor from October 2018 to October 2021, was aware by October 2018 (PX-057; PX-058 at 50:10-15, 190:12-192:9); Kaleczyc was aware by September 30, 2020 (PX-004 at 1; PX-

---

[15] Plaintiff disputes DSUMF ¶¶ 5, 8, 9, 10, 17, and 24 because Mr. Lenzi sought a Y-tour instead of being placed in overcomplement and did not expect to be in overcomplement for nearly three years.

051 at 106:1-12); Patrick Slowinski, Consul General in Krakow, Poland, was aware by July 6, 2021 (PX-059 at 2; PX-060 at 66:2-16); and Frankfurt IMTS supervisors, Anthony Rolow, Nelson-Rey Balagot, Joseph Burrell, and David Mango, were aware by May 3, 2021 (PX-061 at 1).

15.     Defendants have not only been aware of Mr. Lenzi's protected activity, but have made fun of and referred to it as an "escapade." PX-062.  For example, in response to Mr. Lenzi's March 17, 2019 *60 Minutes* interview, in which he discussed the details of his Havana Syndrome injury and "how State tried covering up and downplaying the attacks," emails to Stuart stated, "Jesus.  You don't see a flame-out like this very often," PX-063, and emails to Fitzsimmons stated, "I figured you'd be reaching for the Tums."  PX-064.

## IV.    Mr. Lenzi is Assigned and Maintained in Overcomplement Status

16.     Despite seeking and being promised the Y-Tour, Mr. Lenzi was placed in overcomplement status, which Defendants claim is a "NOW Bidding Status."  None of Defendant's bidding instructions and policies between 2018 and 2021 made *any* reference to NOW bidders, let alone precluded Foreign Service Officers from bidding on or receiving handshakes for summer- or winter-cycle positions.    PX-065.    Moreover, Defendants do not dispute that bidders in overcomplement received summer- and winter-cycle positions, including for Summer 2020.  PX-001 at 78:15-19 (Mr. Lenzi was not deferred for the Frankfurt Summer 2020 position because he was a NOW bidder in overcomplement); PX-036 at 18:24-19:17, 272:1-16; PX-066 at 7, 13, 37.  Tellingly, the only State Department policy precluding NOW bidders from bidding on positions outside of the NOW cycle was enacted on July 20, 2022, approximately seven months after Mr. Lenzi filed this lawsuit.  PX-036 at 221:3-6, 219:6-8; PX-067 at 7.  Accordingly, while in overcomplement, Mr. Lenzi could have bid on and received both NOW and summer- and winter- cycle positions.[16]  PX-068 at 2-

---

[16] Based on these facts, Plaintiff disputes DSUMF ¶ 18, the second sentence of ¶ 20, first sentence of ¶¶ 24, 47, and third sentence of ¶ 25.

3 (Frankfurt IMTS handshake); PX-050 No. 75 at 21-22 (Frankfurt SEO advanced past Advisory Panel).[17]

17.     "As a general rule, an employee should not be assigned to overcomplement" absent "compelling" circumstances, such as criminality, disciplinary actions, and loss of security clearance. PX-051 at 67:20-81:5; PX-069; PX-070 at 102:5-8.  Being in overcomplement status "is not as career enhancing as getting into an assignment."[18]  PX-060 at 20:3-10.  Accordingly, State Department "policy [is] to discourage overcomplement assignments and to limit those that occur to the shortest period of time necessary."  PX-071 at 1; PX-036 at 21:2-24.  The State Department's "main goals" include making "certain that everything possible is done to remove employees from overcomplement status and place them into funded positions as soon as possible."  PX-071 at 1; PX-051 at 265:9-22. Most people only spend a few months in overcomplement status, and it is unusual to be in such status for over a year.  PX-036 at 12:20-13:8; 22:3-8; PX-060 at 19:8-19; PX-001 at 50:14-17.[19]

18.     Mr. Lenzi, by contrast, spent the approximately three years between December 2018 and October 2021 in overcomplement status—contrary to not only Defendants' policies and goals, but also the expectation that foreign service officers spend a "substantial portion" of their careers in overseas assignments."[20]  3 FAM 2424.2(b).  Mr. Lenzi's assignment to overcomplement status was

---

[17] Plaintiff disputes DSUMF ¶¶ 22, 23 because the facts in the cited paragraph demonstrate that Defendants' decisions to prevent Mr. Lenzi from the Athens position by not considering his bid and ceding the position months later were pretextual.

[18] Mr. Lenzi was the only SEO working at DME at the time.  PX-058 at 33:19-21.  The last time an SEO worked in DME was approximately 7 or 8 years prior, and that SEO had bid for the assignment. PX-058 at 33:2-34:21.  Based on these facts and SUMF ¶ 19, Plaintiff disputes DSUMF ¶ 9.

[19] Based on these facts, Plaintiff disputes DSUMF ¶ 7.  Fewer than 30 people (~23) were in overcomplement for periods longer than Mr. Lenzi (compared to ~14,000 members of the Foreign Service) and Defendants do not include descriptions sufficient to determine how many of these were due to loss of medical clearance (as opposed to several where criminal activity resulted in loss of security clearance).  PX-036 at 24:11-25:4, 214:12-216:6.

[20] Those in the foreign service "may not serve continuously in the United States for more than 6 years (by regulation) or 8 years (by law, 22 U.S.C. 3984) without, in either case, an extension granted by the

11

so long as to significantly alter the balance of his career from 71%-overseas and 29%-domestic assignments to only 43%-overseas and 57%-domestic assignments.  PX-005 at 1.  To be clear, *100%* of Mr. Lenzi's time has been spent domestically since June 2018.

19.     Moreover, while CDOs have an "obligation to ensure: (a) that the employee is promptly given meaningful work and (b) that the work assignment is appropriate to the employee's grade and experience," Lingenfelter failed to meet this obligation toward Mr. Lenzi.  PX-071 at 1.  Rivera characterized Mr. Lenzi's work—which had been determined by DS, PX-036 at 58:18-22—as monitoring "just to make sure work is getting done."  PX-058 at 22:8-25; 23:12-14, 28:5-19, 63:17-64:6, 65:4-7, 94:20-22.  He also stated that Mr. Lenzi was "not really doing much for us," PX-072, and that Defendants were merely "keeping him employed."  PX-073.  This is consistent with independent evidence showing that overcomplement is a "make work" status.  PX-074.

## V.     Mr. Lenzi Applies to and is Repeatedly Denied Overseas Positions

20.     In September 2019, after months of intensive therapy for his debilitating Havana Syndrome symptoms, Mr. Lenzi received Class 1 medical clearance, which allowed him to begin bidding on assignments anywhere in the world without prior medical approval.  PX-050 No. 73 at 21; Dkt. 94 ¶ 11.  But, because Mr. Lenzi still needed appropriate accommodations to work overseas, he subsequently sought and obtained Class 2 medical clearance and post-specific approval from the Bureau of Medical Services ("MED") for each of the positions to which he applied.[21]  PX-075 at 1, 3; PX-050 No. 109 at 31; PX-076; PX-077 at 3.  For Class 2 approvals, MED itself determined that Mr. Lenzi's medical needs could have been accommodated in these overseas posts, had Mr. Lenzi been assigned to them.  PX-001 at 101:21-7; PX-078 at 2.  Moreover, "the quality of medical care in the

---

Director General.").  3 FAM 2424.2(b).  There is no such limit for overseas postings.  PX-025. Accordingly, Plaintiff disputes DSUMF as stated in the second sentence of ¶ 1.

[21] Mr. Lenzi did not seek Class 2 medical clearance for the 2019 Frankfurt SEO Position, as he had Class 1 medical clearance at the time.  PX-050 No. 73 at 21.

locations" where Mr. Lenzi bid "would be sufficient to allow him to work overseas."[22]  PX-029 at 43.

21.     Dr. Randall Benson, Plaintiff's neurological expert, confirmed that (1) Mr. Lenzi's "condition stabilized in 2020 such that he could have returned to work as a security engineering officer in overseas positions with appropriate medical accommodations, such as the positions he has had in the past;" and (2) "[f]rom a medical perspective, quality of medical care in locations where [Mr. Lenzi] placed bids … would be sufficient to allow him to work overseas."  PX-029 at 41, 43.  Dr. Ronald Koshes, Plaintiff's psychiatric expert, also confirmed that there is "no reason why [Mr. Lenzi] cannot function in assignments like those he was previously assigned to," and that there were no "psychiatric illness[es], or lingering personality changes that would interfere with Mr. Lenzi's judgement, reliability, and stability."  PX-030 at 23-24.  Indeed, any alleged emotionality that existed in 2018 as a result of Mr. Lenzi's brain injury would have subsided by June 2020.  PX-029 at 42.  Defendants have not tendered any experts to rebut Dr. Benson's or Dr. Koshes's opinions and do not dispute that Mr. Lenzi could have performed the duties required by each of the positions for which he bid—which would have begun in or after Summer 2020—from a medical perspective.

22.     Dr. Leah Greenwood, Plaintiff's vocational rehabilitation expert, reviewed Mr. Lenzi's employment history and vocational record and determined that "Mr. Lenzi could have performed the duties and responsibilities in the job descriptions of any of the overseas positions to which he applied."  PX-079 at 29.  Defendants have not tendered any experts to rebut Dr. Greenwood's vocational opinions.  Moreover, candidates who are at-grade and within the skill code for a position are presumptively qualified.  PX-003 at 255:8-14; PX-036 at 233:3-6; PX-050 No. 77 at 22.

A.      **Frankfurt, Germany—FP-03 SEO (Summer 2020)**

23.     On September 16, 2019, Mr. Lenzi bid on two at-grade FP-03 SEO positions in

---

[22] Plaintiff disputes DSUMF as stated in the first sentence of ¶ 11 because it misrepresents what is required to receive class 1 medical clearance.

Frankfurt, Germany for the Summer 2020 cycle ("Frankfurt SEO Position").[23]  PX-050 Nos. 74 at 21, 78 at 22, 79 at 23; PX-001 at 177:15-178:14; Dkt. 94 ¶ 12.

24.     On October 22, 2019, the ST Advisory Panel ("Advisory Panel") recommended to the DS Assignments Recommendation Panel ("Recommendation Panel") that Mr. Lenzi be assigned to one of these Frankfurt positions as the preferred candidate.  PX-053 at 110:10-13; PX-050 No. 75 at 21-22.  Defendants do not dispute Mr. Lenzi's qualifications.  PX-053 at 27:10-16 ("consensus was that Mr. Lenzi was qualified and at grade"); PX-003 at 334:4-16 ("a qualified SEO. . . . served admirably for us in these domestic . . . as well as the overseas positions.").  Mr. Lenzi advanced past the Advisory Panel despite being on overcomplement status and a supposed "NOW bidder."

25.     On November 15, 2019, the Recommendation Panel met to consider initial handshake offers for the Advisory Panel's preferred candidates, including Mr. Lenzi.  PX-002 No. 3 at 14.  The Recommendation Panel almost always approves the preferred candidates that the Advisory Panel recommends to it.  PX-003 at 281:2-282:2; PX-081.  For example, out of the approximately 403 Summer 2020 applicants, the Recommendation Panel approved 390, or 96.8%, per the Advisory Panel's recommendation; deferred 10, or 2.5%; and disapproved only 2, or 0.5%.  PX-081.[24]

26.     Stuart was chair of the Advisory Panel during Mr. Lenzi's candidacy and saw no reason to preclude Mr. Lenzi from filling the Frankfurt SEO position.  PX-050 No. 82 at 23; PX-003 at 255:16-21, 314:1-18.  Fitzsimmons, however, served on the Recommendation Panel as the Deputy Assistant Secretary overseeing the DS division responsible for security technology.  PX-084 at 2; PX-085 at 1.  Fitzsimmons blocked Mr. Lenzi's assignment to Frankfurt by recommending that the

---

[23] These were Mr. Lenzi's first bids post-disability.  PX-080 No. 19 at 2-4.  Plaintiff disputes the second sentence of DSUMF ¶ 16 because unlike this FP-03 position, Mr. Lenzi's previous Frankfurt position was a nonsupervisory double-stretch position.  Dkt. 86 No. 31; Lenzi Decl. ¶¶ 6, 30.

[24] Similar trends occurred in other years.  *See, e.g.*, PX-083 (337 total; 322 approved (95.5%); 12 deferred (3.6%); 2 not approved (0.6%)); PX-083 (129 total; 123 approved (95.3%); 3 deferred (2.3%); 2 not approved (1.6%); 1 PIP (0.8%)).  Based on these facts, Plaintiff disputes DSUMF ¶ 13.

Recommendation Panel defer offering Mr. Lenzi a handshake.  PX-050 No. 83 at 24; PX-001 at 68:6-9.  As Deputy Assistant Secretary, other panel members would defer to his recommendation.  PX-002 No. 3 at 15; PX-001 at 71:11-14.

27.     Yet, Fitzsimmons neither disputed Mr. Lenzi's qualifications, PX-001 at 68:18-20, nor offered any justifications whatsoever for deferring Mr. Lenzi's assignment.  PX-001 at 71:5-6.

28.     Fitzsimmons's recommendation was driven by personal animus toward and dislike of Mr. Lenzi because of Mr. Lenzi's Havana Syndrome disability.  Fitzsimmons unequivocally targeted Mr. Lenzi.  PX-001 at 363:6-17 (in addition to Mr. Lenzi, Fitzsimmons was specifically involved with "maybe three or four" employees of the 3,000 under his purview—two were criminals, one "was repeatedly engaging in time sheet fraud," and one was "fomenting a revolt").  Moreover, Fitzsimmons made numerous inappropriate, unprofessional, and hostile comments regarding Mr. Lenzi's protected activity.  PX-086 (January 2019 email stating "I know you've probably not had your dose for the day yet, so I am happy to oblige."); PX-001 at 91:5-93:6 (Mr. Lenzi's 2018 Havana Syndrome-related emails and media engagements bothered Fitzsimmons); PX-001 at 200:12-16 (wanting to "preclude another outburst" or "another e-mail broadcast about he's not being treated fairly"), PX-001 at 250:8-251:3 (referring to emails of Mr. Lenzi's advocacy as "sharing the wealth"), PX-001 at 356:13-357:5 (referring to Mr. Lenzi's advocacy as, "[i]t's drama—he's not necessarily wrong, but it's drama"); PX-045 (regarding Mr. Lenzi's May 2018 email, stating that "[i]t never quits"); PX-141 (March 2019 email responding to news about Mr. Lenzi by stating, "[t]hought we could escape this for a bit"); PX-001 at 160:19-161:6 (in December 2019 referring to "all . . . stuff associated with Mr. Lenzi" as a "vortex").[25]

29.     Fitzsimmons—and because of his influence, DS leadership—categorically did not want Mr. Lenzi going overseas at any point between 2019 and 2021.  PX-078 at 1 (March 2020 email

---

[25] Based on these facts, Plaintiff disputes DSUMF ¶¶ 14 and 32.

stating "we do not believe it appropriate to send [Mr. Lenzi] overseas at this point" despite knowledge that Mr. Lenzi had medical clearance and was qualified);[26] PX-001 at 134:5-15 ("we had concerns about Mr. Lenzi going overseas at that time in general"). Fitzsimmons was also focused heavily on completely controlling Mr. Lenzi's access to classified information. PX-001 at 338:13-15 ("always" go through Fitzsimmons "for anything relating to classified").

30.     Lingenfelter, then Mr. Lenzi's CDO—in consultation with DS Leadership— requested that both Frankfurt positions be ceded to entry level despite there being "more [SEO] positions than people to fill them."[27] PX-053 at 88:20-89:2, 129:11-18; PX-087 at 1; PX-088 at 5; PX-089 at 3. At the time, Mr. Lenzi was the only candidate for these positions,[28] PX-050 No. 85 at 24; PX-053 at 166:7-10; PX-090; PX-092, and ceding to entry level guaranteed disqualifying Mr. Lenzi. PX-087 at 1; PX-001 at 136:4-15, 137:17-21, 144:1-8; PX-093 No. 28 at 5; PX-003 at 264:14-265:6. Mr. Lenzi was notified of his denial on March 4, 2020. PX-094; PX-095; Dkt. 94 ¶ 16. These positions had gone unassigned for more than five months and were notably the only two overseas positions ceded to entry level that year. PX-096; PX-003 at 271:19-272:7. On March 12, 2020, *eight days* after the positions were ceded, Fitzsimmons made clear DS had no intention of sending Mr. Lenzi overseas. PX-078 at 1.[29]

31.     On June 1, 2020, Mr. Lenzi filed an EEO Complaint, alleging that Defendants ceded both Frankfurt positions to entry level "expressly to prevent [him] from obtaining one of these two

---

[26] Fitzsimmons inappropriately used ClassNet to email this statement regarding Mr. Lenzi, instead of OpenNet as the email did not contain classified information.
[27] Based on these facts, Plaintiff disputes DSUMF ¶¶ 15, 23.
[28] Andrew Suh and Michael Leon also bid on the Frankfurt SEO Positions, but Leon was not eligible and neither were selected as a preferred candidate. PX-090; PX-066. Therefore, Plaintiff disputes the second sentence of DSUMF ¶ 12. Further, Plaintiff disputes that the decision to cede affected Suh or Leon, because neither was selected as a preferred candidate. PX-081.
[29] Based on these facts, Plaintiff disputes DSUMF as stated in the first sentence of ¶ 16, fourth sentence of ¶ 24, and third sentence of ¶ 28.

positions," which is entirely consistent with the facts cited *supra*. PX-097 at 4; Dkt. 86 ¶ 96.

      **B.**      **Athens, Greece—FP-04 SEO (Summer 2021)**

32.      On September 29, 2020, Kaleczyc replaced Lingenfelter as Mr. Lenzi's CDO. PX-004 at 2; Dkt. 94 ¶ 20. On October 8, 2020, Mr. Lenzi placed the only bid for an FP-04 SEO position in Athens, Greece for the Summer 2021 cycle. PX-098; PX-050 Nos. 99, 100 at 28-29; PX-099 at 1; PX-100; PX-051 at 85:12-86:6, 196:17-19; PX-101 at 5. Defendants do not dispute that as an FP-03 candidate bidding for an FP-04 position, Mr. Lenzi was undoubtedly qualified for the Athens position. PX-079 at 32; PX-002 No. 3 at 16-17. On October 9, 2020, Mr. Lenzi emailed Kaleczyc a copy of his bid list which included Athens, Belgrade, Warsaw, and Sophia. PX-098. Kaleczyc—who had not yet been influenced against Mr. Lenzi by Fitzsimmons and DS leadership—responded four days later that he was "enthusiastic about moving forward with [Mr. Lenzi's] bid list."[30] PX-102.

33.      On October 19, 2020, Mr. Lenzi went on the record with the *New York Times* and was featured prominently in "U.S. Diplomats and Spies Battle Trump Administration over Suspected Attacks," in which Mr. Lenzi confirmed his EEO activity against Defendants for disability discrimination and stated that Defendants were engaged in a "deliberate, high-level cover up" regarding Havana Syndrome incidents in China and had "hung us out to dry." PX-103. This article was circulated within DS leadership, particularly between Fitzsimmons, Stuart, and Abbott. PX-105.

34.      The next day, Kaleczyc informed Mr. Lenzi that *after* his "latest discussions with … DS … it is my understanding that you will not be considered for Summer 2021 positions while Monterrey is considered a viable NOW position" (the "Monterrey position"). PX-106 at 2.

35.      The Advisory Panel met three days later, on October 23, 2020, and did not discuss Mr. Lenzi's bid for the Athens position. PX-002 No. 3 at 16. In contravention of the enthusiasm he had

---

[30] Based on this fact (and Defendants' misleading factual timing), Plaintiff disputes DSUMF as stated in the second and third sentences of ¶ 20 and ¶ 21. Plaintiff further disputes the first sentence of ¶ 22. *See* PX-053 at 121:19-122:3.

expressed just ten days earlier, Kaleczyc stated that Mr. Lenzi "was a NOW bidder and not eligible for summer 2021 positions," despite the *same* Advisory Panel having no such concerns advancing Mr. Lenzi's candidacy for the Frankfurt SEO Position and overcomplement (supposed NOW) bidders being awarded Summer 2021 positions. PX-051 at 408:15-16; PX-082 at 4, 6-7, 14, 20, 22-23. Tamika Abbott, then Division Director of Security Operations, noted that a NOW position was available in Monterrey, Mexico, for which Mr. Lenzi "would be a good candidate."[31]  PX-002 No. 3 at 16.

36.     Mr. Lenzi was neither formally offered nor directed into this Monterrey position. PX-003 at 200:2-19 ("Inform … would be a better word than offer."); PX-106 at 2.  Moreover, the Monterrey position was not compatible with Mr. Lenzi's disability or required accommodations.  Lenzi Decl. ¶ 35; PX-012 at 108:20-110:12; PX-051 at 254:13-257:11; PX-107 at 75:24-76:13, 102:23-104:14.  Specifically, this position required "a lot of being on ladders, by yourself, trying to snake through Cat-5 cable" and "driving in between … Monterrey and its constituent posts," PX-012 at 109:8-10, 13-15, which were difficult, if not impossible, for Mr. Lenzi, given his ongoing "vestibular therapy" and lingering light sensitivity.  PX-012 at 110:6; Lenzi Decl. ¶ 35.  Defendants never checked whether the Monterrey position could accommodate Mr. Lenzi's medical needs or provided any evidence that it could.  PX-001 at 63:4-19 ("I did not look into it. I'm not aware if anyone in my staff did. I did not direct anyone to look into it."); PX-051 at 141:3-12, 258:11-14.  As of approximately March 2021, the position was no longer even available.[32]  PX-051 at 259:6-260:12.

---

[31] Based on these facts, Plaintiff disputes DSUMF as stated in the third sentence of ¶ 22.

[32] Based on these facts, Plaintiff disputes DSUMF as stated in the first sentence of ¶¶ 17, 27, 31; second and third sentences of ¶ 22; third sentence of ¶¶ 25, 29 and ¶¶ 19, 24, 28, 34, 35.  Defendants' brief is the first time the Amman, Jordan position is identified—Defendants never suggested that Mr. Lenzi bid on this position, which is an FP-02 summer cycle that was not on the NOW list in May 2020.  PX-108; PX-109; PX-011; PX-036.  Moreover, Monterrey is a small office isolated from the larger Mexico City center, and therefore would not give Mr. Lenzi the "opportunit[y] to manage a larger office."  PX-056 at 95:3-95:19; PX-053 at 15:12-15:14; PX-051 at 257:7-257:11.

37. Defendants contend that Kaleczyc reviewed all projected overseas SEO vacancies for the Summer 2021 bidding cycle and determined that only three could be ceded to entry level: Athens, Dubai, and Moscow. PX-002 No. 3 at 20. After being informed that the Athens position had been ceded, Mr. Lenzi filed an EEO Complaint.[33] PX-111; PX-050 No. 102 at 29; PX-101.

### C. Belgrade, Serbia—FP-03 SEO (Summer 2021)

38. As stated *supra*, Mr. Lenzi bid on an FP-03 SEO position in Belgrade, Serbia for the Summer 2021 cycle on October 8, 2020. PX-098; Dkt. 94 ¶ 25. In conversations with Mr. Lenzi around this time, Kaleczyc stated that "Belgrade" was "a perfect place" for Mr. Lenzi because of his language skills. PX-012 at 108:11-13; PX-051 at 117:14-18; 125:6-9 (Belgrade was at Mr. Lenzi's grade, within his skill code, "pretty realistic," and reasonable); PX-079 at 31. Defendants do not dispute that Mr. Lenzi's qualifications for the Belgrade position. PX-002 No. 3 at 17-19; PX-036 at 238:25-239:6.

39. During the same October 23, 2020 meeting discussed *supra*, the Advisory Panel again chose not to advance Mr. Lenzi's candidacy. A lesser qualified SEO, Richard Moore, was ultimately given a handshake for the Belgrade position. PX-050 No. 89 at 25; PX-112 at 1; PX-002 No. 3 at 18; PX-036 at 229:25-230:6, 233:3-6. Unlike Mr. Lenzi, Moore was an entry-level employee (FP-04) with half the experience and no language skills listed in his employee profile.[34] PX-113 at 1-2.

40. On November 9, 2020, Mr. Lenzi initiated an assignment challenge for the Belgrade position. PX-050 No. 91 at 26. The *next* day the Director of Medical Clearances downgraded Mr. Lenzi's medical clearance from Class 1 to Class 5, precluding his reassignment. PX-050 No. 92 at 26. PX-114 at 1; PX-036 at 237:18-238:9.[35] Such a drastic change is "odd" absent an intervening medical

---

[33] Based on these facts, Plaintiff disputes DSUMF as stated in the fifth sentence of ¶ 23 and fourth sentence of ¶ 24. Defendants have offered no evidence that the Athens position was previously ceded to entry level despite a mid-level candidate bidding on it.

[34] Based on these facts, Plaintiff disputes DSUMF as stated in the second sentence of ¶ 25.

[35] Under the Foreign Affairs Manual, individuals with a Class 5 medical clearance may only be assigned domestically in the United States. PX-115 at 19.

event, such as a heart attack or stroke.  PX-003 at 208:20-209:17.  Mr. Lenzi's reclassification to Class 5 was inconsistent with multiple contemporaneous medical opinions.  PX-029 at 41, 43; PX-078 at 2.

41.     Mr. Lenzi appealed his medical clearance downgrade the next day, on November 11, 2020.  PX-114 at 1; PX-050 No. 93 at 26-27.  Moore's assignment to Belgrade was approved shortly thereafter, on November 19, 2020.  PX-050 No. 94 at 27.  Approximately one month later, on December 22, 2020, Mr. Lenzi's medical clearance was modified to Class 2, making him medically eligible for Belgrade—as he should have been all along.  PX-050 No. 95 at 27; PX-075.  Regrettably, however, Mr. Lenzi had already lost the Belgrade position and the corresponding assignment challenge to Moore, a below-grade and lesser-qualified bidder.  PX-050 No. 94 at 27.

42.     Mr. Lenzi appealed the results of his Belgrade assignment challenge to the Director General of the Foreign Service, Carol Perez.  PX-050 No. 96 at 27.  Kaleczyc drafted an action memo recommending that the Director General deny Mr. Lenzi's request.  PX-050 No. 97 at 28; PX-116 at 1; PX-051 at 440:7-441:3.  The *first* paragraph of this action memo explicitly references Mr. Lenzi "describ[ing] the U.S. Government's handling of the medical incidents in China as a deliberate, high level coverup." PX-116 at 1 (quotations omitted).[36]  That Kaleczyc *opened* with Mr. Lenzi's provocative reference to Defendants reeks of animus and contempt for Mr. Lenzi and his disability-related protected activity.  Kaleczyc advised further that the Director General should approve Global Talent Management's ("GTM's") order for Mr. Lenzi to bid on NOW positions or be directed into an assignment, despite this being inconsistent with Defendants' past practices and policies.  *Supra* ¶ 24, PX-116 at 1.  Ultimately, Mr. Lenzi lost the appeal.  PX-051 at 440:7-441:3.

D.     **Warsaw, Poland—FP-02 SEO (Summer 2021)**

---

[36] Plaintiff disputes DSUMF ¶¶ 26, 30 and the first sentence of ¶¶ 27, 31 because Defendants' memo in the very first paragraph focuses on Mr. Lenzi "regularly conduct[ing] media interviews which are widely reported around the world…", which was beyond Mr. Lenzi's brief mention of the *60 Minutes* and *New York Times* piece to establish a factual timeline of retaliation.  PX-037 at 4, 5, 7; PX-118 at 1.

43.     Mr. Lenzi also placed a bid on an FP-02 SEO position in Warsaw, Poland on October 8, 2020.  PX-050 No. 106 at 30; Dkt. 94 ¶ 29.  Defendants do not dispute that Mr. Lenzi was qualified for the Warsaw position.  PX-002 No. 3 at 19-21; PX-003 at 347:12-16; PX-117 at 193:19-194:11.  As an SEO with advanced proficiency in Polish and previous Peace Corps experience in Poland, Mr. Lenzi was better suited than others for this language-preferred position.  PX-012 at 169:2-171:12.  Yet, another candidate received a handshake for this position.  PX-050 No. 107 at 30.

44.     On February 11, 2021, Mr. Lenzi was informed that the assignment challenge he had filed on November 24, 2020 was denied.  PX-050 No. 111 at 31.  Mr. Lenzi then appealed to Director General Perez.  PX-050 No. 112 at 32.  On February 18, 2021, Mr. Lenzi filed an EEO complaint regarding the February 11 denial.  PX-119 at 162.

45.     On March 3, 2021, an action memo drafted by Kaleczyc informed Mr. Lenzi that his Warsaw appeal had been denied.  PX-050 No. 113 at 32; PX-120 at 5.  This memo was approved by Kenneth Merten, Principal Deputy Assistant Secretary in the Bureau of Human Resources (now GTM), and stated in part, "As a NOW bidder in overcomplement status, your search should focus on positions posted on the NOW bidding cycle."  PX-120 at 5; PX-035 at 122:1-13.

46.     The October 23, 2020 Advisory Panel did not discuss Mr. Lenzi's candidacy for any Summer 2021 position after determining that Mr. Lenzi was a NOW bidder and that Monterrey would be an appropriate position for him.  PX-002 No. 3 at 21.  In other words, Mr. Lenzi's candidacy was not seriously considered for any of the Summer 2021 positions for which he bid, despite Defendants admitting that no policies precluded NOW Bidders from seeking Summer 2021 positions.  PX-036 at 18:24-19:17; PX-035 at 132:9-13 (search not exclusively directed to NOW bidding cycle positions); PX-035 at 132:17-21 (not foreclosing Mr. Lenzi from bidding on Summer 2021 position).[37]

---

[37] Based on these facts, Plaintiff disputes DSUMF as stated in the second sentence of ¶¶ 27, 29, 31.

47.     Rather than evaluate Mr. Lenzi for the Warsaw position to which he had applied, the February 11, 2021 Recommendation Panel focused exclusively on the Monterrey position, which was neither offered to Mr. Lenzi nor was medically suitable.  *Supra* ¶ 37, PX-117 at 194:7-11.

     **E.**     **Frankfurt, Germany—FP-03 IMTS (NOW Position)**

48.     Mr. Lenzi contacted a senior and well-respected Information Management Technical Specialist ("IMTS") colleague, Barry Gray, to learn more about several open IMTS positions that he had seen.  Lenzi Decl. ¶ 42.  Specifically, Mr. Lenzi inquired about IMTS-specific trainings, such as YW101—Information Management Fundamentals, because he "wasn't going to even bid on the position if a four-month … training was going to be part of the deal."  PX-012 at 243:24-244:1; Lenzi Decl. ¶¶ 42-43.  In response, Gray encouraged Mr. Lenzi to apply and stated that Mr. Lenzi should "expect to A, get the handshake.  B, go there right away because . . . we have been sending out IMTSs without training."  PX-012 at 243:19-23.  Gray's statements were consistent with Mr. Lenzi's personal knowledge of at least one mid-level former SEO, Richard Hall, who was sent to an IMTS posting without the IMTS-specific training.  PX-012 at 254:16-19; Lenzi Decl. ¶ 43.  Defendants do not dispute that "[t]here can be certain types of training that can be waived."[38]  PX-036 at 135:20-21.

49.     On April 12, 2021, Mr. Lenzi bid on an FP-03 IMTS position in Frankfurt, Germany ("IMTS Position").  Dkt. 86 ¶ 86; Dkt. 50 ¶ 86.  Mr. Lenzi's qualifications included his prior technical counterintelligence experience with Aviya, Nortel, and Cisco phones, PX-012 at 244:6-13; Contact Officer Representative Certification; and Network+ and A+ certifications.  PX-122.  Defendants do not dispute that because of his work as an SEO, Mr. Lenzi was qualified and "would have an understanding of" IMTS functions.  PX-036 at 138:5-9; PX-051 at 354:19-355:4; PX-122 at 1.

50.     The IMTS Position was classified as "Hard to Fill" NOW, meaning that it did "not

---

[38] Based on these facts, and the fact that Kaleczyc first raised the training to Frankfurt leadership on May 4, PX-121, Plaintiff disputes DSUMF as stated in the second sentence of ¶ 36 and ¶¶ 37, 38.

have a bidder" but was "determined" to be "one of those priority positions" for which there was "a strong desire to have an employee fill that as soon as possible." PX-036 at 142:18-143:4, 172:9-23. Moreover, none of Defendants' policies or regulations prohibit an applicant from receiving a handshake for a position outside of his or her skill code.[39] PX-036 at 144:19-25.

51.     Mr. Lenzi interfaced directly with the Bureau of European Affairs ("EUR") throughout the bidding and interview process, PX-068 at 2-3; PX-123 (instructing to "actively lobby the offices that control the positions"), during which trainings were never mentioned as required. Lenzi Decl. ¶¶ 44-45. On May 11, 2021, Mr. Lenzi received a handshake for the IMTS Position and confirmed a July 31, 2021 start date with Balagot, who also stated, "[w]e look forward to your arrival here in Frankfurt." PX-068 at 1. IMTS management "completely support[ed] the assignment and welcome[d] Mr. Lenzi to our team." PX-121; PX-036 at 150:23-151:13 (agreeing that the Frankfurt IMTS position supervisors thought Mr. Lenzi was qualified and wanted him to get the position).

52.     When Kaleczyc, however, realized that Mr. Lenzi was going to receive a handshake and go overseas, he quickly inserted the training requirement by raising it with IMTS management. PX-121. Furthermore, in response to Mr. Lenzi's handshake, Kaleczyc stated "to register the handshake in FSBid, please reply to this message acknowledging you understand that successful completion of YW101—Information Management Fundamentals is necessary as a condition of receiving the assignment." PX-122 at 2. The only section of the course planned for the remainder of the year ran from June 1, 2021 to September 3, 2021 and allegedly required "100% attendance," despite Mr. Lenzi's previously confirmed start date being on July 31—five weeks before the training would have ended. PX-122 at 2; PX-002 No. 3 at 23; PX-124 at 2, 5; PX-036 at 193:8-22.

---

[39] Based on these facts, Plaintiff disputes DSUMF as stated in the third sentence of ¶ 1, second sentence of ¶¶ 2, 35, and first sentence of ¶ 41. *See also* PX-051 at 116:15-117:6, 264:4-7; PX-053 at 16:7-15, 184:15-21; PX-053 at 184:15-21.

53.     Mr. Lenzi refused to sign the training acknowledgement form, based on representations from Gray and others during his interview process, the belief that he would not be required to complete the entry level IMTS training as a mid-level SEO, and the position's designation as "critical worldwide shortage."[40] Dkt. 86 ¶ 88; Dkt. 50 ¶ 88; PX-125 at 5-6; PX-012 at 243:1-246:10. Moreover, Mr. Lenzi told Kaleczyc and Balagot that "I simply cannot 'successfully complete' a 12 week non-virtual new hire training in Washington that begins in two weeks because it conflicts with my DRAD accommodation, doctors' appointments, and daily brain injury therapies." PX-126 at 3-4.

54.     Nevertheless, Mr. Lenzi enrolled in the YW101 training "to make a good faith effort at completing portions of the training that did not conflict" with his scheduled medical appointments. PX-125 at 8-9; PX-002 No. 3 at 23.   During his enrollment, Mr. Lenzi requested reasonable accommodations for the training.  Lenzi Decl. ¶ 46; PX-036 at 198:5-199:6.  Yet, Defendants neither attempted to, nor actually provided these accommodations or proposed alternatives, such as on-the-job training.  PX-036 at 186:23-187:5, 197:17-198:1, 198:5-199:6 (Mr. Lenzi requested a reasonable accommodation for the training and DRAD could not waive the 100% attendance requirement).[41]

55.     Mr. Lenzi's handshake was formally approved on May 18, 2021, despite Mr. Lenzi not signing the training acknowledgement form.  PX-002 No. 3 at 23; Dkt. 86 ¶ 88; Dkt. 50 ¶ 88.[42]

56.     Without accommodations, the training exacerbated Mr. Lenzi's Havana Syndrome-based disability symptoms, and he was forced to withdraw on June 3, 2021.  Nevertheless, Mr. Lenzi remained ready to report to Frankfurt.  PX-002 No. 3 at 24; PX-012, Lenzi Dep. 261:6-262:9; PX-125 at 9.  Defendants, however, broke Mr. Lenzi's assignment on July 7, 2021, and did not offer him any

---

[40] Based on these facts, Plaintiff disputes DSUMF as stated in the second sentence of ¶ 39.
[41] Based on these facts, Plaintiff disputes DSUMF as stated in the first sentence of ¶ 39.
[42] Based on the lack of accommodation provided for this training, Plaintiff disputes DSUMF ¶ 6.

medical accommodation that would have allowed him to successfully complete the training.  PX-127.[43]

Mr. Lenzi filed an EEO Complaint on July 22, 2021.  PX-125.

### F.      Krakow, Poland—FP-03 POL/ECON (NOW Position)

57.      On July 2, 2021, Mr. Lenzi emailed Slowinski to express interest in a NOW[44] FP-03
Political/Economic Officer position in Krakow, Poland and state some of his qualifications, including
reporting experience,[45] Polish language skills, and prior work directly with the Polish government.
PX-059 at 3; PX-050 No. 114 at 32; PX-060 at 43:21-44:6.

58.      Mr. Slowinski confirmed that knowing Polish was helpful, and candidates who did not
speak Polish would require a language waiver.  PX-060 at 57:18-58:11.  Mark Brzezinski—now serving
as the U.S. Ambassador to Poland—stated that Mr. Lenzi would have been an "amazing" candidate
for the position.  PX-128; PX-060 at 164:18-165:8.  On July 7, 2021, Mr. Lenzi informed Mr. Slowinski
that he would place a bid, to which Mr. Slowinski responded, "Great news!!!!" and had his assistant
set up an interview for the following day.  PX-129 at 1.

59.      Yet, Mr. Lenzi was not selected for the position—he was the *only* candidate who did
not make it to the shortlist.  PX-130; PX-131 at 1; PX-060 at 68:9-15, 154:2-6; PX-050 No. 116 at 33.
Defendants proffered a lack of sufficiently recent cable writing experience as justification for denying
Mr. Lenzi's application, despite Slowinski admitting that Mr. Lenzi was "a very strong candidate," PX-
132 at 1; PX-060 at 178:16-20; Mr. Lenzi having ample such experience, as discussed *supra*; and
Defendants focusing on academic, rather than cable, writing experience as relevant.  Lenzi Decl. ¶ 49;
PX-060 at 113:22-115:1 (discussing chosen candidate's academic (not cable) writing as relevant).[46]

---

[43] Based on these facts, Plaintiff disputes DSUMF ¶ 40.
[44] Based on these facts, Plaintiff disputes DSUMF ¶ 32.
[45] Mr. Lenzi's experience includes writing and reporting experience (1) in *e.g.*, China and Hungary, (2)
for the Intelligence and Research Bureau of State Department, (3) co-authoring op-eds with
Ambassador Brzezinski, and (4) for then-President of Georgia, Mikheil Saakashvili.  Lenzi Decl. ¶¶
49, 52.
[46] Based on these facts, Plaintiff disputes DSUMF ¶ 44 and the second sentence of ¶ 41.

60.     The candidate who received the handshake had no Polish experience and was not ultimately approved for the position, and the individual who later received the assignment was unable to arrive at post.  PX-050 No. 117 at 33; PX-060 at 113:17-21.  Despite Slowinski's assertion that the position was "very critical to the work of the consulate" and needed to be filled "as soon as possible," PX-060 at 44:7-45:6, 239:19-240:7, the one-year position remained vacant for approximately ten months despite Mr. Lenzi's ongoing interest in it.  PX-060 at 44:7-45:6, 239:19-240:7; PX-059 at 2; PX-050 No. 117 at 33.  Slowinski also did not "get back to" Mr. Lenzi after determining the position no longer had any candidate, notwithstanding his prior promise to do so.[47]  PX-060 at 189:18-21.

61.     On July 28, 2021, Mr. Lenzi filed an EEO Complaint against EUR for disability discrimination.  PX-133.

## VI.     Defendants Direct Mr. Lenzi to Domestic Assignments Against His Will

62.     In addition to the six positions discussed *supra*, Mr. Lenzi also bid on approximately forty-two positions, spanning three continents,[48] between September 2019 and October 2022.  PX-080 No. 19 at 2-4.  Mr. Lenzi was not approved for a single one.

63.     Directing a tenured SEO into an assignment rare, PX-053 at 53:16-; PX-053 at 148:5-7, but on July 2, 2021, Kaleczyc informed Mr. Lenzi that he would be directed into a domestic post (No. S6614601, PX-134) under the supervision of Lingenfelter—against whom Mr. Lenzi had filed retaliation complaints.  PX-135.  By this point, Mr. Lenzi had already been in contact with the OSC, which previously found "a substantial likelihood of wrongdoing" by Defendants.  PX-136 at 2.  The OSC intervened and Defendants withdrew the first domestic directed assignment.[49]  PX-137; PX-051

---

[47] Based on these facts and those of the preceding paragraph, Plaintiff disputes DSUMF ¶¶ 42, 43, 45.
[48] Defendants' implication that Mr. Lenzi was unwilling to serve outside of Europe, DSUMF ¶ 46, is unwarranted and disputed.  Mr. Lenzi applied to positions in three continents and has served in Afghanistan, Philippines, Hong Kong, Chad, Cameroon, Uzbekistan, Taiwan, and China.  PX-080 No. 19 at 2-4; Lenzi Decl., Ex. A.
[49] Based on these facts, Plaintiff disputes DSUMF as stated in the second sentence of ¶ 46.

at 393:15-394:10; PX-036 at 112:10-16, 113:19-114:1.   But instead of directing Mr. Lenzi into an overseas assignment, PX-036 at 249:25-250:4 ("We can direct overseas, correct."), in October 2021, Defendants directed Mr. Lenzi into a second domestic position (No. S6216104, PX-138) in which he remains today.   PX-051 at 395:9-396:3; PX-003 at 160:13-21.   Defendants also deliberately precluded Mr. Lenzi's access to ClassNet in both domestic positions.   PX-139 at 3; PX-001 at 339:3-15.

64.     Mr. Lenzi filed this litigation on December 8, 2021—shortly after being directed into the second domestic assignment.   Nearly one year afterwards, and after Mr. Lenzi's remaining claims survived Defendants' Motions to Dismiss, Mr. Lenzi received and accepted a handshake for an at-grade FP-03 SEO position in Helsinki, Finland starting in October 2023.   PX-140 at 1.   Based on Mr. Lenzi's prior experience and Defendants' pattern of discrimination and retaliation,[50] there is no guarantee that the Defendants will honor the handshake and permit Mr. Lenzi to report overseas.[51]

## LEGAL STANDARD

### I.     Summary Judgment

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a); *see, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568 (4th Cir. 2015) (court below erred in granting summary judgment where "a reasonable jury could conclude that [plaintiff] has set out a prima facie case of disability discrimination and sufficient evidence of pretext to ultimately prevail").   The opposing party "must come forward with specific facts showing that there is a genuine issue for trial."   *Matsushita Elect. Indus. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations and quotations omitted); *EEOC v. Huntington Ingalls, Inc.*, No. 4:17CV113, 2018 WL

---

[50] Since the onset of his disability, Defendants prevented Mr. Lenzi from going to the Frankfurt IMTS Position after he had accepted a handshake and was formally paneled.   In addition, Defendants have also prevented Mr. Lenzi from participating in two scheduled TDYs to Poland and Afghanistan.   PX-142; PX-143; PX-144; PX-145.
[51] Based on these facts, Plaintiff disputes DSUMF as stated in the second sentence of ¶ 47.

6272891, at *3 (E.D. Va. Nov. 29, 2018).

## II.   Discrimination and Retaliation Under § 501 of the Rehabilitation Act of 1973.

Mr. Lenzi's disability discrimination claim is under § 501 of the Rehabilitation Act, Dkt. 50, and is reviewable under the *McDonnell Douglas* burden-shifting framework, in which an employee must prove "(1) that [he] has a disability, (2) that [he] is a 'qualified individual' for the employment in question, and (3) that [his] employer . . . took [an] adverse employment action because of [his] disability." *Jacobs*, 780 F.3d at 572.  *McDonnel Douglas* "does not require direct proof of discrimination." *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714  (1983); *Warren v. Halstead Indus., Inc.*, 802 F.2d 746, 752 (4th Cir. 1986), *on reh'g*, 835 F.2d 535 (4th Cir. 1988); *Cathcart v. Flagstar Corp.*, 155 F.3d 558 (4th Cir. 1998) (Table Decision).  Disparate treatment is discriminatory, 1998 WL 390834, at *9, and the "burden of establishing disparate treatment is not onerous." *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981).  Once a plaintiff establishes a prima facie case, the burden then shifts to the employer to provide a legitimate, nondiscriminatory justification for its conduct; and if the employer provides such a reason, the employee then must show by a preponderance of the evidence that the proffered reason was a pretext for discrimination.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 804 (1973).

"Because of the disability" is the binding legal standard for causation in discrimination claims under § 501.  While this issue is not yet settled in the Fourth Circuit,[52] the Fifth and Sixth Circuits have directly addressed it and found that § 501 imports the Americans with Disabilities Act's ("ADA's") more lenient, "motivating factor" standard, which does not require a showing of sole cause. *Bledsoe v. Tennessee Valley Auth. Bd. of Directors*, 42 F.4th 568, 579-80 (6th Cir. 2022) ("§ 504's sole-cause

---

[52] *See Dank v. Shinseki*, 374 F. App'x 396, 399 (4th Cir. 2010) ("The question of whether the 'solely by reason of' standard applies to section 501 claims is far from settled."); *Ruddell v. Triple Canopy, Inc.*, No. 115CV01331LMBJFA, 2016 WL 4529951, at *6 n.4 (E.D. Va. Aug. 29, 2016) ("The Fourth Circuit has not ruled on whether the more stringent causation standard [under § 504] applies to claims under § 501 of the Rehabilitation Act.").

standard does not apply to claims brought under § 501.") (citing *Dank*, 374 F. App'x at 399 n.4); *Pinkerton v. Spellings*, 529 F.3d 513, 519 (5th Cir. 2008) ("The proper causation standard under the ADA is a 'motivating factor' test . . . . This rule governs cases under Section 501 of the Rehabilitation Act as well.") (quotations omitted). Thus, Defendants' exclusive reliance on cases under § 504 and the "solely on the basis of disability" standard is inapposite to Mr. Lenzi's claims under § 501. *See, e.g.*, *Hannah P. v. Coats*, 916 F.3d 327 (4th Cir. 2019) (discussing standard for § 504 only).[53]

Second, an employer cannot retaliate "against any individual because such individual has opposed any act or practice made unlawful by [the ADA or the Rehabilitation Act] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." 42 U.S.C. § 12203(a). The ADA prohibits "limiting, segregating, or classifying [an] employee in a way that adversely affects the opportunities or status of such … employee because of the disability of such … employee[.]" 42 U.S.C. § 12112; 29 C.F.R. § 1630.5.14. To prove retaliation, an employee must show that "he engaged in protected activity, that he was subject to an adverse employment action, and that there is a causal link between the two." *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015); *Abilt v. CIA*, 848 F.3d 305, 309 (4th Cir. 2017). This causal link can be established through temporal proximity between the protected activity and adverse employment action. *Smith v. CSRA*, 12 F.4th 396, 419 (4th Cir. 2021) (three days between a defendant learning of a plaintiff's protected activity and a defendant's adverse action creates an inference of pretext); *Silva v. Bowie State Univ.*, 172 F. App'x 476, 478 (4th Cir. 2006) ("ten-week lapse of time sufficiently established a prima facie case of retaliation").

## ARGUMENT

---

[53] Mr. Lenzi notes that even if the "solely on the basis of disability" standard applies (and it should not), he is entitled to summary judgment and that, at minimum, summary judgment should be denied as to Defendants.

I.   **Defendants Discriminated and Retaliated Against Mr. Lenzi Because of His Havana Syndrome-Based Disability.**

Mr. Lenzi satisfies the legal requirements for discrimination and retaliation under § 501 of the Rehabilitation Act of 1973 (29 U.S.C. § 791).  Mr. Lenzi has a qualifying disability, engaged in protected activity, and was discriminated and retaliated against because of his disability.

A.   **Mr. Lenzi was Disabled After Suffering Havana Syndrome and Engaged in Disability-Related Protected Activity.**

Mr. Lenzi became disabled after his affliction with Havana Syndrome in 2017; and Defendants do not dispute that Mr. Lenzi has a qualifying disability under the Rehabilitation Act.  42 U.S.C. §§ 12102(1), 12102(2)(A).  SUMF ¶ 4; Dkt. 94 at 15.

Protected activity falls within two categories: "opposition and participation."  *EEOC v. NFCU*, 424 F.3d 397, 406 (4th Cir. 2005).  Since his affliction with Havana Syndrome in 2017, SUMF ¶ 4, Mr. Lenzi has engaged in at least *thirty* instances of protected conduct to thwart Defendants' disability-based discrimination and retaliation and to advocate on behalf of other disabled State Department employees suffering the same fate.

Mr. Lenzi's participatory protected activity includes filing six complaints with the Equal Employment Opportunity Commission (referred to as "EEOs").[54]  *Clark County School District v. Breeden*, 532 U.S. 268 (2001) (holding that filing an EEO complaint is a protected activity).  Each complaint includes claims that Defendants engaged in disability discrimination and retaliation against Mr. Lenzi based on his Havana Syndrome disability.  Defendants do not dispute that Mr. Lenzi's EEO complaints constitute protected activity.  Dkt. 94 at 16, 19.

---

[54] PX-146 (June 1, 2020 EEO Complaint); PX-147 (July 3, 2020 EEO Complaint); PX-148 (Aug. 14, 2020 EEO Complaint); PX-119 (Feb. 5, 2021 EEO Complaint); PX-149 (April 27, 2021 Amendment to February EEO Complaint); PX-125 (July 22, 2021 EEO Complaint); PX-150 (July 28, 2021 EEO Complaint).

Mr. Lenzi's opposition protected activity includes formal[55] and informal[56] complaints of discrimination within the State Department, as well as media appearances[57] regarding Havana Syndrome and Defendants' discrimination and retaliation toward him on the basis of his disability. SUMF ¶¶ 15, 33; *EEOC v. NFCU*, 424 F.3d at 406 (opposition includes "staging informal protests and voicing one's own opinions in order to bring attention to an employer's discriminatory activities"); *Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir. 1981) (using an employer's grievance procedures is protected activity); *Laughlin v. Metropolitan Washington Airports Authority*, 149 F.3d 253, 259 (4th Cir. 1998) (filing an informal grievance is a protected activity).  Defendants do not dispute that Mr. Lenzi reasonably believed Defendants' actions were unlawful when he engaged in protected activity and that his protected activity was reasonable.  *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 282 (4th Cir. 2015); *Armstrong*, 647 F.2d at 448.

### B.    Mr. Lenzi Was Qualified for Each of the Positions to Which He Applied.

Mr. Lenzi could "perform all of the essential functions of his . . . employment" and was well-suited for each of the positions to which he applied with reasonable accommodation.  *Biniaris v. Hansel Union Consulting, PLLC*, 382 F. Supp. 3d 467, 473 (E.D. Va. 2019); PX-079 at 28, 30 (Mr. Lenzi was a "highly qualified SEO" and "qualified to perform with reasonable accommodation"); SUMF ¶¶ 2, 2 n.7, 22, 24, 32, 38, 43, 49, 57, 58.

Defendants do not (and cannot, in good faith) dispute Mr. Lenzi's qualifications or that he could have performed the essential functions of each of the positions to which he applied.  Mr. Lenzi

---

[55] *See e.g.* PX-151 (Mar. 6, 2020 Formal Grievance); PX-152 (June 8, 2020 Formal Grievance); PX-153 (Nov. 20, 2020 Formal Grievance); PX-154 (Nov. 23, 2020 Formal Grievance); PX-155 (Jan. 15, 2021 Formal Grievance); PX-156 (Feb. 26, 2021 Formal Grievance).

[56] PX-044 (May 27, 2018 email); PX-157 (Nov. 25, 2019 email); PX-158 (Mar. 4, 2020 email); PX-159 (Mar. 6, 2020 email); PX-160 (Nov. 17, 2020 email); PX-161 (Nov. 24, 2020 email); PX-162 (Dec. 3, 2020 email); PX-163 (Dec. 11, 2020 email); PX-164 (July 2, 2021 email).

[57] PX-103 (Oct. 19, 2020 NYT Article); PX-165 (Dec. 5, 2020 NYT Article); PX-166 (Oct. 25, 2021 Politico Article); PX-167 (Dec. 3, 2021 NYT Article); PX-168 (Sept. 21, 2021 NYT Article).

demonstrated aptitudes consistent with all six positions at issue, and Defendants do not dispute that Mr. Lenzi was qualified for the SEO positions in Frankfurt, Athens, Belgrade, and Warsaw.  SUMF ¶¶ 24, 27, 32, 38, 43; Dkt. 94 at ¶¶ 12-35.  Defendants have not proffered any material or persuasive evidence to the contrary, and any argument that Mr. Lenzi was unqualified for these four positions is waived for purposes of summary judgment.  *Patrick v. Bureau of Alcohol, Tobacco, and Firearms & Explosives*, 860 F. App'x 828, 833 (4th Cir. 2021) ("arguments raised for the first time in a party's reply brief generally are insufficient for consideration by the district court").

Undisputed facts also demonstrate that Mr. Lenzi was qualified for both the Frankfurt IMTS and Krakow positions.  That Mr. Lenzi was offered and accepted a handshake for the Frankfurt IMTS position is per se evidence of his qualifications for this post, not to mention his relevant technical experience and certifications.  SUMF ¶¶ 49, 51; PX-079 at 34-35.  Moreover, the Ambassador to Poland *himself* confirmed that Mr. Lenzi would be an "amazing" candidate for the Krakow position, based on Mr. Lenzi's significant political and economic reporting experience.  SUMF ¶ 57 n.45, 58; PX-128.  At a minimum, there are disputed issues of material fact regarding Mr. Lenzi's qualifications for the Frankfurt IMTS and Krakow positions.

### C.    Defendants' Actions Against Mr. Lenzi are Discriminatory and Retaliatory in the Aggregate.[58]

The totality of the factual record shows that Defendants discriminated and retaliated against Mr. Lenzi because of his Havana Syndrome disability.  Defendants let Mr. Lenzi waste in overcomplement status as retribution for his advocacy and protected activity.  SUMF ¶¶ 17-19. Defendants precluded Mr. Lenzi from every single one of the *forty-two* positions to which he applied

---

[58] The adverse employment actions discussed in this section support Mr. Lenzi's discrimination and retaliation claims because each action would have "dissuaded a reasonable worker from making or supporting a charge of discrimination," *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006) (citation omitted), which is a lower standard for establishing an adverse action than what is required for Mr. Lenzi's retaliation claim.  *Id.* at 64 ("antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment").

since the onset of his disability.  SUMF ¶ 64.  Not only were Defendants' individually proffered excuses "insufficient," but the "pattern" of denying so many overseas posts in a row, including the six at issue, "is much more troubling and cannot be the result of mere coincidence."  PX-079 at 36; *Warren*, 802 F.2d at 753 ("proffered reasons must be looked at in the context of all . . . evidence, instead of merely standing alone."); *Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007) ("continuing retaliatory conduct and animus" is sufficient for establishing retaliation).

Moreover, Defendants' justifications for denying Mr. Lenzi's bids were inconsistent—shifting from "service need," to status as a NOW bidder, to availability of the Monterrey position, to allegedly required training, to qualifications—and clearly pretextual.  That Defendants wanted "anyone but Mr. Lenzi" to go overseas is particularly obvious in the aggregate.  Defendants had no policies even mentioning NOW bidders prior to this lawsuit, and NOW bidders had received summer- and winter-cycle assignments.  SUMF ¶ 16.  Yet, Mr. Lenzi's status as a NOW bidder was cited in only three of the four positions: the Advisory Panel had no qualms about recommending Mr. Lenzi for the Summer 2020 Frankfurt SEO position.  SUMF ¶¶ 24, 35.  The same Advisory Panel, however, affirmatively cited to Mr. Lenzi's NOW bidder status the *following* year.  SUMF ¶ 35.  After discovering that Mr. Lenzi had bid on the Frankfurt IMTS NOW position, was working directly with EUR, and was going to receive a handshake, Defendants pivoted to stating that Mr. Lenzi needed allegedly mandatory training.  SUMF ¶¶ 51-52.  When Mr. Lenzi bid on the Krakow NOW position—classified as "critical worldwide shortage" that needed to be filled immediately, SUMF ¶ 53—Defendants pivoted again, citing "qualifications," SUMF ¶ 59, and left the position open for *ten* months rather than allowing Mr. Lenzi to go overseas.  SUMF ¶ 60.  Management at post, however, had encouraged Mr. Lenzi to apply in the first place and believed that he would be an "amazing" candidate.  SUMF ¶ 51.

Such inconsistencies preclude summary judgment for Defendants.  *Haynes*, 922 F.3d at 225 ("[T]o show pretext, a plaintiff may show that an employer's proffered nondiscriminatory reasons for

the termination are inconsistent over time, false, or based on mistakes of fact. Once the plaintiff offers such circumstantial evidence, the case must be decided by a trier of fact and cannot be resolved on summary judgment.") (citations omitted); *Burgess v. Bowen*, 466 F. App'x 272, 280 (4th Cir. 2012) (holding that inconsistent proposed reasons for plaintiff's termination precluded summary judgment); 1998 WL 390834, at *12 (evidence questioning "existence or validity" of alleged performance issues sufficient to support plaintiff disability as motivating factor).

Second, only discriminatory animus explains the dramatic change in the balance of Mr. Lenzi's domestic and overseas assignments pre- and post-disability. Between 2011 and 2018, Mr. Lenzi spent 71% of his time overseas. SUMF ¶ 18. After the 2018 onset of his Havana Syndrome disability and his related protected activity, Mr. Lenzi spent 0% of his time overseas. *Id.* Yet, Mr. Lenzi's EERs, which "are a true and correct representation of an employee's performance," PX-001 at 40:6-1, remained consistently positive from 2012 through 2022. SUMF ¶ 5 n.7. 1998 WL 390834, at *11.

Finally, that discrimination and retaliation extinguished Mr. Lenzi's chances of securing an overseas assignment is clearly discernable when comparing Mr. Lenzi to seven other non-disabled SEOs in his skill code. PX-011 at 14-17. This type of comparator evidence is "especially relevant" to showing pretext. *McDonnell Douglas*, 411 U.S. at 804; *Cowgill v. First Data Techs., Inc.*, 41 F.4th 370, 381-82 (4th Cir. 2022) (holding that "[t]here is a sufficient basis for a reasonable factfinder to conclude that a plaintiff-employee—despite being similarly-situated to the comparators—was treated differently" and reversing the district court's grant of summary judgment for the employer).

These seven SEOs are appropriate comparators because they are similarly situated employees who are not disabled, PX-173 No. 7-10: all began their employment at the State Department at or around the same time as Mr. Lenzi, were contemporaneously assigned to the same CDOs as Mr. Lenzi, and followed the same supervisory chain of command as Mr. Lenzi. Unlike the comparator SEOs, however, Mr. Lenzi is the only individual with a disability and corresponding DRAD

accommodations, whose access to ClassNet was restricted and prolonged through indefinite domestic assignments, and who was assigned in overcomplement status. Defendants have not presented any evidence refuting that discriminatory animus and retaliation account for the divergence between Mr. Lenzi's career and that of the comparator SEOs.

### D. Defendants' Actions Against Mr. Lenzi are Individually Discriminatory and Retaliatory.

Defendants took individually discriminatory and retaliatory adverse employment actions[59] against Mr. Lenzi—including denying applications to overseas posts,[60] maintaining in overcomplement status, and directing into domestic assignments—because of their disdain for Mr. Lenzi after the onset of his disability and their abhorrence for his protected activity.

DS leadership, including Fitzsimmons, Abbott, Stuart, Theriot, Lingenfelter, and Kaleczyc, were aware of Mr. Lenzi's disability, SUMF ¶¶ 14, 15, did not approve of Mr. Lenzi's disability advocacy within or outside of the State Department, and responded with discrimination and retaliation. For example, when Mr. Lenzi emailed all Americans at Consulate Guangzhou out of a concern for his safety and that of his colleagues, Defendants not only disabled the email listserv that Mr. Lenzi had used, PX-045, but also rescinded his access to classified and unclassified email systems and used a Marine guard to lock him out of his workplace *just two days later.* Lenzi Decl. ¶¶ 19, 20, SUMF ¶ 9. Defendants continue to preclude Mr. Lenzi's access to classified email. SUMF ¶ 11. Fitzsimmons—who participated in drafting the briefing memo to Secretary Pompeo, referred to Mr.

---

[59] Defendants' argue that several additional examples of their discriminatory and retaliatory conduct against Mr. Lenzi are not adverse and/or exhausted. Dkt. 94 at 21-23. These actions are adverse. *See supra*; *White*, 548 U.S. at 68 (regarding retaliation). To the extent the Court finds each of those instances of discriminatory conduct not individually exhausted or adverse, however, they serve as circumstantial evidence of Defendants' illegal animus and state of mind, which is relevant to both of Mr. Lenzi's claims and therefore should not be precluded from being used at trial. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 102 (2002) (holding that 42 U.S.C. § 2000e-5(e)(1) does not bar an employee from using other acts as "background evidence" to establish animus and pretext).

[60] Defendants do not dispute that denial of Mr. Lenzi's applications to each of the six positions at issue constituted adverse employment actions. Dkt. 94 at 22-23.

Lenzi's disability advocacy as "drama," and stated that dealing with "all … stuff associated with Mr. Lenzi" was a "vortex"—maintained a vice grip on Mr. Lenzi's access to classified information, despite no changes whatsoever to Mr. Lenzi's security clearance.  SUMF ¶¶ 9, 10, 28.  This was not how Mr. Lenzi was treated before his disability.

When Mr. Lenzi continued discussing his disability and Defendants' poor treatment of those with Havana Syndrome—through, for example, features in the *New York Times* and an interview on *60 Minutes*—Defendants called Mr. Lenzi a "flame-out" *on the next day* and, thereafter, resolved to relegate him to the menial tasks of overcomplement status, while denying his every attempt to go overseas.  SUMF ¶¶ 15, 19, 29; *supra* 31 n.57.[61]  An examination of Defendants' response thereto reinforces Defendants' discrimination and retaliation at every turn.

### 1. Frankfurt, Germany SEO Position

*First*, Defendants denied Mr. Lenzi's application for the Frankfurt SEO position because of discriminatory and retaliatory animus.  Not only was Mr. Lenzi at grade and qualified, but the Advisory Panel also recommended that he be assigned.  SUMF ¶¶ 24, 30.  Despite the Recommendation Panel ordinarily approving over 96% of the Advisory Panel's recommendations, SUMF ¶ 25, it deferred Mr. Lenzi's application based only on Fitzsimmons's baseless recommendation.  SUMF ¶ 26.  The record is replete with evidence of Fitzsimmons's animus towards Mr. Lenzi and his protected activity, including that Fitzsimmons specifically targeted Mr. Lenzi; referred to Mr. Lenzi's protected activity as an "outburst," "drama," and was "bothered" by it; and thought that dealing with "stuff associated with Mr. Lenzi" was a "vortex."  SUMF ¶ 28.  Moreover, Fitzsimmons scrupulously prevented Mr.

---

[61] Because Mr. Lenzi engaged in protected activity and additional evidence supports Defendants' animus against Mr. Lenzi *before* he applied for the Frankfurt SEO Positions, Mr. Lenzi's case is distinguished from the cases on which Defendants rely.  *See* Dkt. 94 at 18; *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. at 273 (2001) (holding that three-month gap between knowledge of protected activity and adverse action *on its own* is not sufficient to establish retaliation) (emphasis added); *Hall v. Greystar Mgmt. Servs., L.P.*, 637 F. App'x 93, 96 (4th Cir. 2016) (finding that a plaintiff cannot "infer causation based on facts that occurred *before* [a plaintiff's] protected activity") (emphasis added).

Lenzi from accessing classified material and did not want him "going overseas in general."  SUMF ¶ 29; PX-078 at 1; PX-001 at 134:5-15.

Defendants' arguments are conclusory and their justifications, including feigned concern for Mr. Lenzi's professional development and service need for suitable entry-level assignments, Dkt. 94 at 15-16, are unpersuasive and pretextual.[62]  First, none of these reasons were provided to Mr. Lenzi, Lenzi Decl. ¶ 31, or discussed during the Recommendation Panel's meeting to consider Mr. Lenzi's candidacy.  SUMF ¶ 26, 27; *Fox v. Leland Fire/Rescue Dept., Inc.*, 648 F. App'x 290 (4th Cir. 2016) ("a different explanation for termination, provided at different times, is 'in and of itself, probative of pretext.'").  Second, none of Defendant's policies preclude qualified SEOs from serving in the same location twice.  PX-051 24:3-6, 13-15.  Moreover, not only is any effect on Mr. Lenzi's career irrelevant as to whether Defendants' acted with animus, but the Frankfurt SEO position would have given Mr. Lenzi a leadership role and was superior to the menial work of overcomplement.  SUMF ¶ 19.  Finally, ceding the Frankfurt SEO position to entry level does not comport with the fact that, at the time, there were more vacant postings than SEOs.  PX-053 at 88:20-89:2, 129:11-18.

At minimum, a genuine dispute of material fact exists regarding whether Mr. Lenzi was denied the Frankfurt SEO position for non-discriminatory or pretextual reasons, including whether the position was ceded due to service need.  With all inferences drawn in favor of Mr. Lenzi, a reasonable fact finder could conclude that Mr. Lenzi was denied the Frankfurt SEO position because of discrimination and retaliation, precluding summary judgment in Defendants' favor.

### 2.      Athens, Greece SEO Position

*Second*, Defendants also denied Mr. Lenzi's application for the Athens position because of

---

[62] All of the cases Defendants cite to defend their retaliatory actions regarding the Frankfurt SEO Positions, *see* Dkt. 94 at 15-16, are inapplicable to Mr. Lenzi's claims because all of the plaintiffs in these cases had well-documented performance issues and failed to present *any* evidence of pretext beyond temporal proximity.

discriminatory and retaliatory animus.  When Kaleczyc first started as CDO (and before he became influenced by DS leadership), he had stated that he was "enthusiastic about moving forward with [Mr. Lenzi's] bid list," which included Athens.  SUMF ¶ 32.  Yet—the *day after* a *New York Times* article was published, which prominently featured Mr. Lenzi's comments that Defendants were engaged in a "deliberate, high-level coverup" regarding Havana Syndrome incidents in China—Kaleczyc backpedaled this enthusiasm on instructions from DS and told Mr. Lenzi that he would not be considered for *any* Summer 2021 position while the Monterrey position was still available.  SUMF ¶¶ 32-34.  Mr. Lenzi did not apply to the Monterrey position because, unlike European or Asian positions, it was not compatible with his medical accommodations.  Lenzi Decl. ¶ 35, SUMF ¶¶ 36, 47.  When the Advisory Panel met *four days* after the *New York Times* article, it never even discussed Mr. Lenzi's application, despite Mr. Lenzi's undisputed qualifications or his status as the sole bidder.  Between November and December 2020, Mr. Lenzi filed three formal grievances for retaliation and appeared in a second *New York Times* article.  *Supra* n.56; PX-103.  A mere *one month* after this second *New York Times* appearance, Defendants ceded the Athens SEO position to entry level as the only way to preclude Mr. Lenzi's eligibility.  SUMF ¶¶ 33, 37; PX-079; PX-079 at 32-33.

Defendants' contentions that (1) Mr. Lenzi was ineligible for Summer 2021 positions as a NOW bidder and (2) the Athens position was ceded to entry level because of a service need are incorrect and constitute post-hoc, pretextual justifications.  Dkt. 94 at 16-17.  First, Defendants do not dispute that there was no policy between 2018-2021 mentioning "NOW bidders" at all, let alone prohibiting NOW bidders from applying to summer- and winter-cycle positions.  SUMF ¶ 16.  Multiple overcomplement bidders were awarded Summer 2021 positions, PX-083 at 4, 6-7, 14, 20, 22-23, and the Advisory Panel had recommended Mr. Lenzi's Frankfurt SEO bid while he was in overcomplement status, further undercutting the legitimacy of Defendants' justifications.  SUMF ¶¶ 16, 24; PX-011 at 31 ("the assignments panel can allow someone to have a position even if they are

bidding in a different cycle than the one for which the position is listed . . . neither [Defendants'] testimony nor their assignment process policies support that there is a bright-line rule against bidding for multiple cycles at one time."). Second, Defendants do not dispute that the Monterrey position was medically unsuitable for Mr. Lenzi or that they did not assess the medical suitability of Monterrey. SUMF ¶ 36; PX-001 at 63:4-19. Finally, Defendants do not dispute that they neither formally offered nor directed Mr. Lenzi into the Monterrey position. SUMF ¶ 36, 63; PX-036 at 250:4.[63]

At minimum, a genuine dispute of material fact exists regarding whether Mr. Lenzi was denied the Athens position for non-discriminatory or pretextual reasons, including Mr. Lenzi's status as a NOW bidder and the suitability of the Monterrey position. With all inferences drawn in Mr. Lenzi's favor, a reasonable fact finder could conclude that Mr. Lenzi was denied the Athens position because of discrimination and retaliation, precluding summary judgment in Defendants' favor.

### 3. Belgrade, Serbia SEO Position

*Third*, Defendants denied Mr. Lenzi's bid for the Belgrade position because of discriminatory animus. As with the Athens position discussed *supra*, Mr. Lenzi's bid for the Belgrade position was denied *four* days after he was featured in the *New York Times*. SUMF ¶¶ 33, 35. Moreover, *the day after* Mr. Lenzi initiated an assignment challenge, his medical clearance was coincidentally downgraded from Class 1 to Class 5, rendering him ineligible for overseas postings. SUMF ¶ 40. Defendants do not dispute that such a downgrade is "odd," given that Mr. Lenzi suffered no intervening medical event. SUMF ¶ 40.[64] By the time Mr. Lenzi's medical status was adjusted to Class 2, this position had been awarded to SEO Moore. SUMF ¶ 41. Mr. Lenzi's assignment challenge appeal was also rejected a mere month after his second appearance in the *New York Times*. *Supra* 31 n.57.

---

[63] Christopher Teal was in GTM and served as one of Defendants' 30(b)(6) witnesses.
[64] Defendants' citation to *Silva v. Bowie State*, 172 F. App'x 476, 477 (4th Cir. 2006) for the proposition that the medical clearance change was not an adverse action is inapposite. Dkt. 94 at 23. Whereas in *Silva* the plaintiff failed to meet an existing requirement of employment, Defendants downgraded Mr. Lenzi's medical clearance unilaterally, arbitrarily, and without warning.

Defendants' justifications are pretextual and unpersuasive. First, SEO Moore was hardly "the better selection," Dkt. 94 at 18, as Moore had six years less experience than Mr. Lenzi, was one grade below Mr. Lenzi, and had no language expertise. SUMF ¶¶ 40, 42. Moreover, that Mr. Lenzi "had already had those opportunities," Dkt. 94 at 18, is an admission of his qualifications, and Defendants do not dispute that below-grade bidders (such as Moore) are not seriously considered for positions that at-grade bidders (such as Mr. Lenzi) apply for. PX-035 at 138:11-17. Second, as discussed at length *supra*, Defendants' policies did not preclude NOW bidders from applying to summer- and winter-cycle positions prior to July 20, 2022. SUMF ¶ 16. Finally, that "multiple panels reviewed the decision and approved it," Dkt. 94 at 18, cannot be a guarantor for legitimacy in light of the overwhelming animus that DS leadership felt towards Mr. Lenzi.

At minimum, a genuine dispute of material fact exists regarding whether Mr. Lenzi was denied the Belgrade position for non-discriminatory or pretextual reasons, including Mr. Lenzi's status as a NOW bidder and the qualifications of SEO Moore. With all inferences drawn in Mr. Lenzi's favor, a reasonable fact finder could conclude that Mr. Lenzi was denied the Belgrade position because of discrimination and retaliation, precluding summary judgment in Defendants' favor.

### 4.    Warsaw, Poland SEO Position

*Fourth*, Defendants denied Mr. Lenzi's bid for the Warsaw position because of discriminatory and retaliatory animus and their reasons cannot be "unquestionably legitimate." Dkt. 94 at 18. Defendants do not dispute Mr. Lenzi's qualifications—including Polish-language proficiency and experience working with all levels of the Polish government, SUMF ¶¶ 43, 57—or that that the position was ultimately awarded to an SEO with no such qualifications. SUMF ¶ 43., Dkt. 94 ¶ 29.

As discussed at length *supra*, Defendants' justifications that Mr. Lenzi "was not at grade, was not a Summer cycle bidder, and had other career-appropriate assignments immediately available to him as a NOW bidder," Dkt. 94 at 10, are pretextual, inconsistent, and unsupported by Defendants'

policies.  SUMF ¶ 16, *see Haynes*, 922 F.3d at 225.  Additionally, Defendants' argument that the Warsaw position was awarded to someone "bidding on the correct timeline and grade," Dkt. 94 at 18-19, is also pretextual—candidates can bid for any cycle and for positions one grade above or below (and at grade).[65]  SUMF ¶ 1616; PX-051 at 116:15-18.  Moreover, Mr. Lenzi's bid was denied *four* days after his statements to the *New York Times* accusing Defendants of a "deliberate, high-level coverup," SUMF ¶ 33, and his assignment challenge was denied *less than one month* after he filed an EEO complaint regarding the Athens position.  SUMF ¶¶ 37, 44.  Defendants' actions, therefore, were grounded in retaliatory and disability-based animus.  *See Smith*, 12 F.4th at 419; *Silva*, 172 F. App'x at 478.

At minimum, a genuine dispute of material fact exists regarding whether Mr. Lenzi was denied the Warsaw position for non-discriminatory or pretextual reasons, including Mr. Lenzi's status as a NOW bidder, the suitability of the Monterrey position, and the qualifications of the candidate to whom the bid was awarded.  With all inferences drawn in Mr. Lenzi's favor, a reasonable fact finder could conclude that Mr. Lenzi was denied the Warsaw position because of discrimination and retaliation, precluding summary judgment in Defendants' favor.

## 5.   Frankfurt, Germany IMTS Position

*Fifth*, Defendants rescinded Mr. Lenzi's handshake for the Frankfurt IMTS position because of discriminatory and retaliatory animus.  Mr. Lenzi applied to this NOW position based on representations that the YW101 training would not be required, SUMF ¶¶ 48, 51, 53, consistent with Mr. Lenzi's knowledge of at least one midlevel SEO who filled an IMTS position without the training, SUMF ¶ 48, and the representations of individuals at post who stated Mr. Lenzi could begin overseas in July—five weeks before the allegedly "required" training ended.  SUMF ¶ 51.  As encouraged by policy, Mr. Lenzi worked directly and exclusively with EUR and was awarded a handshake based on

---

[65] Thus, Mr. Lenzi's case is easily distinguished from *Evans v. Techs. Applications*, in which "[t]he record reveal[ed] little, if any, direct or indirect evidence of discriminatory motive" because plaintiff made no effort to obtain discovery.  80 F.3d 954, 960 (4th Cir. 1996); Dkt. 94 at 19.

his qualifications.  SUMF ¶ 51.  Defendants rescinded Mr. Lenzi's handshake *two and a half weeks* after he appeared on New Hampshire Public Radio advocating for better treatment of disabled State Department employees and *only* after DS leadership got involved.  SUMF ¶ 56; PX-091 No. 10 at 31.

Mr. Lenzi's "belief that he could do the job without training" was neither "personal" nor unique to him.  Dkt. 94 at 19.  Not only did Mr. Lenzi's SEO job duties overlap with the requirements of the IMTS position, but the hiring supervisors "felt that the training could be skipped."  PX-051 at 347:1-4.  That Mr. Lenzi was awarded a handshake is per se evidence of his qualifications.

The allegedly mandatory training requirement, Dkt. 94 at 19-20, was pretextual and "designed to keep Mr. Lenzi from being assigned overseas."  PX-079 at 35.  Kaleczyc specifically mentioned the training to individuals at post, who then reversed course and suggested that the training was required. SUMF ¶ 52.  In their haste to point out that Mr. Lenzi did not complete the training, Dkt. 94 at 19, Defendants conveniently omit that they did not even attempt to grant the accommodations that Mr. Lenzi requested, SUMF ¶ 54, and that Mr. Lenzi was forced to withdraw because of worsening headaches that were a symptom of his disability.  SUMF ¶ 56.  Mr. Lenzi's withdrawal was thus neither "unilateral" nor "voluntary."  *Compare* Dkt. 94 at 19 (citing *McGrone v. Austin*, No. 22-cv-375, 2022 WL 17833275, at *5 (E.D. Va. 2022); *Cooper v. Smithfield Packing*, 724 F. App'x 197, 202 (4th Cir. 2018)). Moreover, Defendants did not believe it "appropriate . . . to talk about medical or reasonable accommodation issues" when discussing the training with Frankfurt IMTS hiring managers.  PX-051 at 361:18-19.  Moreover, Defendants' cases are inapposite because none of the plaintiffs were informed that they were *not* required to take a training, unlike Mr. Lenzi.  *See* Dkt. 94 at 19-20 (citing, *inter alia*, *Hannah P.*, 916 F.3d at 342; *Manickavasgar v. VCU*, 667 F. Supp. 2d 635, 644 (E.D. Va. 2009); *O'Meara v. Wormuth*, 20-cv-1160 (RDA/JFA), 2022 WL 67321, at *7 (E.D. Va. 2022)).

At minimum, genuine issues of material fact exist regarding whether Mr. Lenzi was denied the Frankfurt IMTS position for non-discriminatory or pretextual reasons, including whether the YW101

training was mandatory.  With all inferences drawn in Mr. Lenzi's favor, a reasonable fact finder could conclude that Mr. Lenzi was denied the Frankfurt IMTS position because of discrimination and retaliation, precluding summary judgment in Defendants' favor.

### 6.     Krakow, Poland Political/Economic Officer Position

*Sixth,* Defendants denied Mr. Lenzi's application for the Krakow position because of discriminatory and retaliatory animus.  Mr. Lenzi's qualifications for this position included Polish language skill, ample experience working in Poland, and relevant cable and reporting experience.  Lenzi Decl. ¶ 49; SUMF ¶ 57.  Defendants' arguments that Mr. Lenzi was unqualified or that his cable and reporting experience was not "recent" enough are pretextual.  Dkt. 94 at 20; PX-079 at 36 ("just one in a long line of pretextual excuses [Defendants] presented to prevent Mr. Lenzi from gaining the foreign service experience he deserved").  Leadership at post encouraged Mr. Lenzi's application, and the Ambassador to Poland believed Mr. Lenzi was an "amazing" candidate.  SUMF ¶ 58.  *Heiko v. Colombo Sav. Bank*, F.S.B., 434 F.3d 249, 259 (4th Cir. 2006) (A plaintiff "can prove pretext by showing that he was better qualified, or by amassing circumstantial evidence that otherwise undermines the credibility of the employer's stated reasons.").[66]  Moreover, Defendants' policies do not preclude specialists from applying to generalist positions.  PX-060 at 97:20-25.  Finally, despite assertions that this position was "critical to the work of the consulate" and needed to be filled immediately, Defendants allowed a one-year position to sit vacant for *ten months* when its allegedly "preferred candidates" fell through, rather than allowing Mr. Lenzi to fill the position.[67]  SUMF ¶ 60.  Even if Defendants legitimately preferred other candidates (they did not), they provide *no reason* for letting this NOW position lie vacant for ten months, let alone a reason that Mr. Slowinski never "got back to"

---

[66] Defendants' reference to *Drummond v. Stackley*, 687 F. App'x 277, 278 (4th Cir. 2017) is unconvincing, as plaintiff could not establish pretext because she "presented no evidence undermining the decision makers' perception of the selectee," and ranked 11th place out of 14 candidates reviewed.  *Id.*

[67] Coincidentally, Defendants awarded the Krakow position to a different candidate *five* days after Mr. Lenzi filed an EEO complaint regarding the Frankfurt IMTS position.  SUMF ¶¶ 56, 59.

Mr. Lenzi after he had promised to do so. SUMF ¶ 50; PX-060 at 185:5-188:1.

At minimum, a genuine dispute of material fact exists as to whether Mr. Lenzi was denied the Krakow position for non-discriminatory or pretextual reasons, including his qualifications. With all inferences drawn in his favor, a reasonable fact finder could conclude that he was denied the Krakow position because of discrimination and retaliation, precluding summary judgment for Defendants.

### 7. Overcomplement Status

Maintaining Mr. Lenzi in overcomplement status also constitutes an adverse employment action because it significantly changed Mr. Lenzi's job responsibilities. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1988) ("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.").

First, Defendants treat overcomplement status—which is meant to be temporary and minimal—as a punitive, menial, and "make-work" measure reserved for employees who lose their security clearance, have criminal histories, or have personal problems. SUMF ¶¶ 17, 19. Defendants, however, relegated Mr. Lenzi to overcomplement status for *approximately three years*, despite Mr. Lenzi lacking these characteristics. SUMF ¶ 18. Moreover, Defendants maintained Mr. Lenzi in overcomplement status indefinitely instead of assigning him to a Y-Tour of definite duration.

Second, Mr. Lenzi's job responsibilities while in overcomplement were significantly different from what is typical for an SEO. Abroad, Mr. Lenzi engaged in "hands-on" technical engineering work, managed multi-million-dollar projects, and interacted frequently with foreign institutions. *See, e.g.*, PX-019 at 2-3. In overcomplement, Mr. Lenzi's responsibilities amounted to no more than a "tech support desk job," in which he had no overseas communication, access to classified networks, or interactions with an embassy, consulate, or similar entity. SUMF ¶ 19; PX-058 at 22:10-22, 75:22-76:3. Defendants do not dispute this diminution in Mr. Lenzi's job responsibilities. SUMF ¶ 19.

44

Finally, Defendants' position regarding overcomplement status is untenable in light of the factual record and this Court's prior rulings.  Mr. Lenzi neither asked for nor agreed to overcomplement status—Mr. Lenzi was not even familiar with overcomplement until after he received his remote work assignment in Portsmouth, New Hampshire.  PX-012 at 51:5-7.  Moreover, unlike the plaintiff in *Laird v. Fairfax County, Virginia*—who rejected her employer's modified work schedule, voluntarily requested a job transfer, and refused to perform her duties—Defendants offered to place Mr. Lenzi in overcomplement status based on his medical needs, but *maintained* him in this status for much longer than those needs required.  978 F.3d 887, 894 (4th Cir. 2020); *cf.* SUMF ¶¶ 20-21.

Critically, this Court's April 14, 2022 ruling forecloses Defendants' argument that Mr. Lenzi's placement and maintenance in overcomplement status is not actionable, because, as the Court held:

> Then in terms of Count 3, the disparate treatment.  There, the allegations are the claim from plaintiff's prospect it's about the failure to promote, that he was treated different than employees who were not disabled, the fact that he was refused for overseas assignments and *his designation and continued designation in the overcomplement status. . . .*
> *I do think for all of the reasons that, you know, I've referenced earlier in some of my questions that the facts here are sufficient for the claim to go forward on disparate treatment here.*

Dkt. 24 at 57:10-23 (regarding Mr. Lenzi's discrimination claim).  The Court ruled similarly as to overcomplement status regarding Mr. Lenzi's retaliation claim.  *Id.* at 56:17-22.

To the extent that the Government addresses Mr. Lenzi's maintenance on overcomplement status, it tries to blame Mr. Lenzi and his choices of assignments.  But Mr. Lenzi made a wide range of bids, SUMF ¶ 62, and Mr. Lenzi's efforts discussed *supra* show that he repeatedly and consistently tried to exist overcomplement status, only to be thwarted by Defendants at every turn.  A reasonable factfinder could, at minimum, confirm that maintenance in overcomplement status was discriminatory and retaliatory as a result of Mr. Lenzi's advocacy, and that overcomplement status was designed to keep Mr. Lenzi in employment purgatory and without ClassNet access.

**8.    Directed Assignments to Domestic Only Positions**

45

Directing Mr. Lenzi into a domestic posting also constituted an adverse employment action, Dkt. 94 at 20-21, because it deprived him of significant benefits, *Ellerth*, 524 U.S. at 761 (holding that a decrease in benefits constitutes an adverse employment action), including paid housing and schooling for his children, foreign language incentive pay, and location-dependent potential hazard or danger pay.  Lenzi Decl. ¶¶ 2, 9; PX-053 at 137:3-138:15.  Defendants directed Mr. Lenzi into his current domestic assignment only *eight days* after he was featured in a *New York Times* article discussing Defendants' mistreatment of those with Havana Syndrome.  SUMF ¶¶ 33, 63.  Not only had Mr. Lenzi never been directed into an assignment prior to his disability, but Defendants also do not dispute that directing a tenured SEO is rare.  SUMF ¶ 63.  Defendants could have easily directed Mr. Lenzi into an assignment overseas but chose to keep him stationed domestically, in positions in which they could preclude ClassNet access.  SUMF ¶¶ 11, 63.  That, after the six denials discussed *supra*, Defendants directed Mr. Lenzi into *yet another* domestic assignment when they could have done otherwise is telling.

*Anderson v. Wachovia Mortg. Corp.* is distinguishable, and Defendants' argument that they went "beyond normal procedures" to "benefit" Mr. Lenzi is preposterous—maintaining Mr. Lenzi in overcomplement and following the OSC's directive to tweak the directed assignment from one domestic position to another were not done to benefit him, but to protect Defendants from further possible liability and ensure Mr. Lenzi would continue to remain stateside.  609 F. Supp. 2d 360, 371-72 (D. Del. 2009), *aff'd*, 621 F.3d 261 (3d Cir. 2010); PX-036 at 200:15-201:8.  Moreover, in *Anderson*, defendants followed all standard guidelines, benefited plaintiffs with an "exception" loan because they were "preferred customers," and plaintiffs' "entire case rest[ed] on conclusory allegations."  *Id.*

At minimum, a genuine dispute of material fact exists regarding whether Mr. Lenzi was directed into a domestic assignment for non-discriminatory or pretextual reasons. A reasonable fact finder could conclude that Mr. Lenzi was directed into and maintained in a domestic assignment because of discrimination and retaliation, precluding summary judgment in Defendants' favor.

## II.     Defendants Are Not Entitled to Summary Judgment on Damages.

Defendants close their brief with a series of inappropriate attempts to limit Mr. Lenzi's damages.[68]  The issue of damages should be left to a jury and should not be decided at the summary judgment stage.  *X-IT Prod., L.L.C. v. Walter Kidde Portable Equip., Inc.*, 155 F. Supp. 2d 577, 615 (E.D. Va. 2001) ("Damages are typically a question of fact and therefore not an appropriate topic for summary judgment."); *see also John v. Robbins*, 764 F. Supp. 379, 386 (M.D.N.C. 1991) ("[S]uch issues are not properly resolved on summary judgment").

### A.     Mr. Lenzi's Medical Expenses are the Direct Result of Defendants' Discriminatory and Retaliatory Actions.

Defendants incorrectly assert that Mr. Lenzi's claim of $31,000 in out-of-pocket medical expenses and used annual and sick leave is precluded by the Federal Employees Compensation Act ("FECA"), which has no relevance here whatsoever.  *McNabb v. United States*, No. 4:06–cv–0056– RBH2007, WL 963960, at *2 (D.S.C. Mar. 28, 2007) (describing FECA as a "workers' compensation scheme . . . not contingent upon fault.").  Rather, this $31,000 claim constitutes damages resulting from Defendants' violation of the Rehabilitation Act.  PX-169 at 17-19.  The vast majority of the $31,000 constitutes annual and sick leave that Mr. Lenzi was forced to take to attend treatments and therapies, as opposed to the Administrative Leave that Defendants should have allowed him to use per 3 FAM 3660.  Had Mr. Lenzi properly been permitted to use Administrative Leave, he could have been compensated for his accumulated sick and annual leave hours upon his eventual departure from the State Department.  PX-169 at 17.  Mr. Lenzi disputes Defendants' contention that he was not entitled to use Administrative Leave.  There is also a genuine dispute of material fact regarding the extent to which Mr. Lenzi's out-of-pocket medical expenses arose from Defendants' treatment of him.

### B.     Mr. Lenzi Rightfully Requests $363,000 to $445,000 in Lost Education Allowance that Defendants Would Have Paid Absent Discrimination.

---

[68] Mr. Lenzi does not intend to pursue punitive damages.

As part of his damages calculation, Mr. Lenzi claims the replacement cost of the education allowance that he would have received for his children to attend private school abroad, had he not been sidelined domestically. Chad Staller, Plaintiff's damages expert, uses the cost of two private schools in New Hampshire and Maine as a proxy to calculate this replacement cost. PX-170 at 158:25-159:11. Defendants incorrectly suggest that Mr. Lenzi should not be entitled to economic damages for the lost educational opportunities of his children—that the State Department would have paid to Mr. Lenzi—absent Defendants' discrimination and retaliation. Dkt. 94 at 25.

Education allowance is a benefit that accrues to the employee himself. Staller states clearly in his Opening Report that "the true economic cost to Mr. Lenzi as a result of the discrimination is the replacement cost to provide his children with the same incremental educational opportunity that they would have benefitted from in an international private school setting absent the discrimination." PX-169 at 21. Defendants argue this cost is not recoverable based on a single yes-or-no question misleadingly cherry-picked from dozens of pages of deposition testimony on this issue. *See* PX-170 at 46-47, 152-83, 194-98. Staller testified multiple times that all of his conclusions, including the lost benefit to Mr. Lenzi for his children's education, reflected Mr. Lenzi's economic losses as a result of Defendants' discrimination and retaliation. *See, e.g.*, PX-170 at 11:1-19; 46:21-47:7. Staller stated repeatedly throughout his deposition that he calculated the "replacement cost of private education that was an included benefit when he is overseas." PX-170 at 159:25-160:1.

Defendants improperly focus on the fact that Mr. Lenzi's children presently attend public school. Mr. Lenzi stated at deposition he would prefer to send his children to private school if he could. PX-012 at 327:24-328:10. The notion that Mr. Lenzi, a longtime government employee, would only be entitled to these replacement costs if he could afford private school tuition is preposterous. Mr. Lenzi's damages cannot be reduced solely on the basis that he is not independently wealthy. Defendants cite no case showing a plaintiff's lack of means can result in a lower damages award.

Defendants' position that education costs are not recoverable as lost benefits flies in the face of testimony from its own witnesses. Stuart, Rivera, and Slowinski each testified that paid schooling is an attractive employee benefit. PX-003 at 60:18-61:2; PX-058 at 89:18-90:10; PX-060 at 246:2-15. Mr. Lenzi also explained that a main reason he joined the Foreign Service was the educational opportunities it would provide for his children. PX-012 at 326:6-327:23; Lenzi Decl. ¶ 2. Furthermore, the State Department specifically calls out education allowances as part of employees' benefit packages in its advertisements for SEOs. PX-171. Defendants' expert, Joel Lesch, agrees the allowance is "a category of extra pay or cost reimbursement." PX-172 at 117:9-15.

Courts have held that plaintiffs are entitled to the value of educational benefits that their children would have had absent a defendant's discriminatory actions. *See, e.g., Herx v. Diocese of Fort Wayne-South Bend, Inc.*, No. 1:12-CV-122 RLM, 2015 U.S. Dist. LEXIS 28224, at *18 (N.D. Ind. Mar. 9, 2015) ("Mrs. Herx had a right to send her son, without additional cost to her, to a school for which the Diocese charged $3,000 a year in tuition . . . the Diocese took that right — a right worth $3,000 a year — from Mrs. Herx."). The two cases Defendants cite on this issue are irrelevant because Mr. Lenzi is not bringing a derivative claim. Mr. Lenzi is, therefore, entitled to the economic loss he suffered by being denied this benefit, which he would have received absent Defendants' discriminatory and retaliatory conduct. At a minimum, there are numerous disputes of material fact that preclude summary judgment in Defendants' favor as to this category of damages.

**C.  Plaintiff's Expert Reports Provide Qualitative and Quantitative Support for Mr. Lenzi's Damages Flowing From Defendants' Discrimination and Retaliation and are Not Connected to a Failure to Promote Liability Theory.**

Defendants do not dispute that front- and back- pay is recoverable under the Rehabilitation Act. Dkt. 94 at 24-25. In his calculations, Staller relies on several possible career trajectories for Mr. Lenzi developed by Dr. Greenwood, designed to compare the career path Mr. Lenzi would have followed a) absent Defendants' discrimination and retaliation to b) his career path given Defendants'

discrimination and retaliation. *See* PX-079 at 38 (describing "four potential career trajectories that Mr. Lenzi could have followed had the State Department assigned him to one of the vacant foreign assignments to which he applied."), 41 (outlining "three post-discrimination scenarios that estimate Mr. Lenzi's available career trajectories after this litigation, given the irreparable harm to Mr. Lenzi's career prospects"); PX-170 at 10 (using Greenwood scenarios to estimate pay "absent the discrimination"), PX-170 at 13 (using scenarios to estimate pay "given the discrimination"). Those scenarios have no connection to a "failure to promote" theory of liability, and Defendants' claim that these amounts cannot be recovered because the scenarios mention promotion makes little sense. The reality is that discrimination and retaliation (even if not based on a failure to promote *liability* theory), can impact one's career trajectory (and thus promotion potential) for purposes of *damages*. The Court's prior ruling precluding a "failure to promote" liability theory for exhaustion purposes bears no relationship to the theories of damages that flow from the discrimination and retaliation claims.

As stated in Defendants' only cited Fourth Circuit case on this issue, Mr. Lenzi is entitled to recoup "losses suffered by [him] as a result of the discrimination;" in other words, Mr. Lenzi should be returned "to the financial position he would have been in had the unlawful discrimination not occurred." *Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269, 1278 (4th Cir. 1985). This is exactly what Staller calculates using the scenarios developed by Dr. Greenwood. Because promotional trajectory is an issue pertaining only to damages, and not to Defendants' liability or the merits of Mr. Lenzi's claims, Defendants' motion for summary judgment on this issue should be denied.

## CONCLUSION

Mr. Lenzi has established independent grounds entitling him to summary judgment as to both his disparate treatment and retaliation claims, warranting summary judgment. At minimum, Mr. Lenzi has established that there are several genuine disputes of material fact that preclude summary judgment in favor of Defendants, and Defendants' summary judgment motion on damages should be denied.

Date:  February 28, 2023                    Respectfully Submitted,


*/s/ Christopher A. Suarez*
Christopher A. Suarez (94400)
Thomas M. Barba (admitted *pro hac vice*)
Lia Metreveli (admitted *pro hac vice*)
Shannon G. Reid (admitted *pro hac vice*)
Steven R. Kaplan (admitted *pro hac vice*)
Elizabeth A. Goodwin (admitted *pro hac vice*)

Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 429-3000
Email: CSuarez@steptoe.com
          TBarba@steptoe.com
          LMetreveli@steptoe.com
          SReid@steptoe.com
          SKaplan@steptoe.com
          EGoodwin@steptoe.com

Kate E. Fisch (admitted *pro hac vice*)
Steptoe & Johnson LLP
1114 Avenue of the Americas
New York, NY 10036
Telephone: (212) 506-3900
Email: KFisch@steptoe.com

*Counsel for Plaintiff Mark Lenzi*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 28th day of February, 2023, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to all counsel of record.

_/s/ Christopher A. Suarez_
Christopher A. Suarez