UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| Mark Lenzi,<br><br>       Plaintiff,<br><br>  v.<br><br>United States Department of State, and<br>Antony J. Blinken, United States Secretary of<br>State,<br><br>       Defendants. | Case No. 1:21-cv-01371-PTG-IDD |

**DECLARATION OF MARK LENZI IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to 28 U.S.C. § 1746, I, Mark Lenzi, hereby declare and state that I am over twenty-one years of age and am fully competent to make this Declaration. I have personal knowledge of the facts set forth below and would competently testify thereto if called as a witness.

## I.      Educational Background and Employment with Defendants

1.      I graduated from the University of New Hampshire in 1997 with a bachelor's degree in civil engineering and minors in political science and hydrology and water resource management. Since graduating from college, I have dedicated almost the entirety of my career to public service and furthering American interests abroad. For example, between June 1997 and May 2002, I worked as a Consular Fellow at the U.S. Embassy in Budapest, Hungary, a Political Fellow for the State Department's Office of South Central European Affairs ("EUR/SCE"), a Peace Corps Volunteer Engineer in Kielce, Poland, and a Fulbright Scholar attached to the Lithuanian Ministry of Foreign Affairs. Over the next seven years, in addition to working a few positions domestically concerning Central Asia and the Caucasus, I worked in the United Kingdom, Georgia, Ukraine, Macedonia, Bosnia and Herzegovina, and Kazakhstan, among other countries.

2.      I applied to be in the Foreign Service for several reasons, including my passion for serving my country and working abroad. However, the most important consideration for me and my wife was the educational opportunities my children would receive. It was especially important to us that our children attend international schools to learn foreign languages. As a specialist in the Foreign Service, I knew my children would be able to attend the best international schools, comparable to the education received at elite private schools in the United States, like Philips Exeter and Andover Academy, fully funded by the U.S. Government.

3.      On August 15, 2011, I was hired by the Department of State as a Security Engineering Officer ("SEO"). Before I was hired, I successfully interviewed and passed a written examination. I was also ranked number one on the State Department SEO register out of dozens of successful candidates because of my oral and written exam scores combined with passing a

2

Russian language test that provided additional points for my score. After completing an initial seven-week training program, I began working as an SEO at the Emanations Countermeasures Branch ("ECB") at grade FP-06 in October 2011.

4.      Between January and March 2012, I participated in a temporary duty assignment ("TDY") to Embassy Kabul, Afghanistan. Before my injury, I successfully completed many TDYs outside of Europe, including in the Philippines, Hong Kong, Chad, Cameroon, Uzbekistan, Taiwan, and multiple TDYs to Guangzhou, China. A comprehensive list of my TDYs is attached to this Declaration as Exhibit A.

5.      Shortly after my TDY to Afghanistan, in August 2012, I was promoted from FP-06 to FP-05. I continued working in ECB as an FP-05. In August 2013, I began a new assignment as an SEO in the Technical Surveillance Countermeasures Branch. During this assignment, I worked extensively in Guangzhou, China and Moscow, Russia.

6.      In March 2014, I was promoted from FP-05 to FP-04. In September 2014, I began my first foreign posting at the U.S. Consulate in Frankfurt, Germany on a "double stretch" assignment, in which I filled an FP-02 position while at the FP-04 level. I received tenure in May 2015.

7.      In August 2016, I began a new assignment as an SEO in the Engineering Security Office in Guangzhou, China. In November 2016, I was promoted from FP-04 to FP-03.

8.      Prior to my injury, I received numerous awards and accolades for my work in the Foreign Service. In 2015, I was awarded a Group Franklin Award by Ambassador Timothy M. Broas for dedication and professionalism assisting the Regional Security Officer in Amsterdam, and in 2016, I was awarded an individual Franklin Award for specialized technical counterintelligence activities. I was also consistently awarded overseas assignments.

9. Before I was injured, I aspired to be the head of the Security Engineering Office in Kyiv, Ukraine. I knew I would excel in this position due to my passion for Ukrainian politics, my substantial knowledge and experience in Ukraine, my connections to Ukraine experts in the U.S. Government, my expansive work experience in all fifteen former Soviet Union republics, and my Russian and Ukrainian language skills. In 2015, on a TDY, I was acting Officer-in-Charge of the Engineering Security Office of U.S. Embassy Kyiv. I traveled to Ukraine more than a dozen times on work trips prior to my employment with the State Department. Further, Kyiv would have been a career enhancing position. I would have received Language Incentive Pay and I would have likely been promoted. I worked tirelessly to get this position. Foreign Service specialists, including SEOs, are encouraged to lobby for the positions on which they bid. Upon the advice of other SEOs, I reached out to the U.S. Ambassador to Russia at the time, Michael McFaul (my former Fulbright advisor), and the U.S. Ambassador to Ukraine at the time, John Tefft, who happily agreed to write me recommendations for the Kyiv position. This was not an unusual request for a member of the Foreign Service. John Fitzsimmons, the former Deputy Assistant Secretary of the DS Countermeasures Directorate, however, who abhors "outside interference" in DS, was extremely displeased that I received recommendations from two current Ambassadors at that time, asserting to me that I "introduced a predatory animal into [DS's] terrarium." After that experience, every bid I placed on Kyiv was denied.

## II. Affliction with Havana Syndrome, Subsequent Disability, and Medical Evacuation from Guangzhou

10. I first noticed feeling light-headed and dizzy in March 2017 while stationed in Guangzhou. On March 3, 2017, I was in Regional Security Officer Judy Eun Lim's office when I felt so light-headed and dizzy that I immediately went to U.S. Consulate General Guangzhou's Health Unit. They noted I had an unusual spike in high blood pressure and ordered me to

undergo an electrocardiogram.  This was extremely unusual because I never had an issue with blood pressure before.  At that time, I attributed my symptoms to the heavy smog in Guangzhou.

11.     In April 2017, while I was on a TDY to Hong Kong, my wife began hearing strange (Frey Effect) sounds in our apartment as if steel marbles were dropped on glass and rolling in a steel funnel.  My wife texted our upstairs neighbor to ask her to stop making noise, and our neighbor responded that the noise was not coming from her apartment.  In the spring of 2018, I provided screenshots of those texts to the Regional Security Officer and Consulate General Management Officer and asked them to investigate.  No action was ever taken.

12.     Throughout the rest of 2017, I felt increasing lightheadedness and noticed a substantial increase in sleep difficulties, short-term memory issues, and headaches.  At this time, my children started getting bloody noses frequently, which ceased as soon as we evacuated the apartment.  I noted some of my symptoms, such as lightheadedness and headaches, to my colleagues and supervisors on several occasions.  My direct supervisor, Brian Hayes, remarked that I was coming to work late almost every day.

13.     At the height of my symptoms, I also experienced increased emotionality and irritability. I have always been recognized, both in my professional and personal relationships, as being levelheaded and calm under pressure.  Increased emotionality, I later learned from my doctors, is a very common symptom of a brain injury, along with the other symptoms I experienced including headaches, dizziness, and light-headedness.  Havana Syndrome changed the way I felt and expressed emotions.

14.     As a result of my increased emotionality, I was ordered by SEO Hayes to attend an official counseling session on April 19th, 2018, in which I was directed to be less "emotional" in my dealings with others at Post.  I later learned this counseling session occurred only days after

my neighbor, Catherine Werner, who was living with her husband and mother, was evacuated from Guangzhou with similar symptoms. The Regional Security Office ("RSO") never informed me of her evacuation even though I was experiencing the same symptoms and I lived mere feet away from her apartment. The State Department knew about Havana Syndrome, knew my symptoms were consistent with Havana Syndrome, and knew I lived in close proximity to another American who was evacuated with Havana Syndrome. Instead of supporting me or guiding my family to safety, the State Department reprimanded me for my disability and pretended it did not exist.

15. After my neighbor was evacuated, SEO Rahim Theriot came from Embassy Beijing to perform a technical inspection of Werner's apartment. When he arrived, he informed me that "DS had reason to suspect that a Foreign Service member in Guangzhou had similar symptoms to Havana." He then specifically asked to use an antiquated piece of radiofrequency detection equipment. When I pointed to a portable, state-of-the-art piece of U.S. Government equipment operating on my work desk that was perfectly suited to the task he was conducting, he stated, "Come on, man, this is a check the box exercise." Theriot then stated, "John [Fitzsimmons] wants me to use this [inferior piece of equipment.]"

16. On May 23, 2018, the Consul General of U.S. Consulate General Guangzhou held a Town Hall meeting for Foreign Service officers in Guangzhou. At this Town Hall, the Consul General and Post leadership announced that "security personnel have conducted testing in [Werner's] apartment and did not find anything out of the ordinary." They did not mention that they had used deliberately inferior equipment. Further, they did not mention that the testing was conducted in the middle of the day when the Frey Effect sounds were always reported in the evening. An officer's wife, clearly worried for the safety of her family, asked the Consul

General whether any family members were affected. The Consul General falsely and misleadingly responded that only the officer was injured and no family was affected. He lied and did not state that my neighbor's mother was also injured.

17. After the Town Hall meeting, I put everything together, including that I had not seen my neighbor in some time and I had been experiencing symptoms for almost a year. I called my neighbor, Catherine Warner, on Skype, who at the time was being treated in the hospital at the University of Pennsylvania's Brain Injury and Repair Center in Philadelphia, Pennsylvania ("UPenn"). Catherine explained how, on three different occasions, she requested that the State Department evacuate the rest of the American Foreign Service personnel and their families from Canton Residence Tower 7. The State Department ignored her pleas every time. Catherine then told me to "get [my] family out and get them out today."

18. Catherine also confirmed to me that a microwave detector had recorded high levels of microwave radiation in her apartment, and this was the reason she and her mother were evacuated by the U.S. Government from Guangzhou. I was later informed that this detector was a Trifield 100 XE. This device, which is made in the United States, is a respected piece of microwave detection equipment by the U.S. Government and measures microwave radiation up to 3 GHz, recorded dangerous levels of microwave radiation exceeding 1 $mW/cm^2$ in her apartment and near my apartment.

19. I felt frustrated that the State Department did not tell us the truth and repeatedly dismissed my concerns and my neighbor's concerns. They failed to protect me and my family, as well as the dozens of Americans in Guangzhou. The next day, desperate to keep my wife and children safe, I evacuated my family out of our apartment in Tower 7 and into a hotel, and I sent an email, with Catherine's authorization, to all Americans at Consulate Guangzhou informing

them that the State Department was not telling us the truth.  After I sent that email, I received an outpouring of support from American officers in Guangzhou.  Dozens of officers thanked me for sending that email and told me that they and their families were going to get Havana Acquired Brain Injury Tests ("HABIT").

20.     Despite this support from fellow officers, however, the State Department treated me like a criminal.  Two days later, on May 29th, they ordered me to undergo a psychiatric evaluation, locked me out of my workplace, and denied me access to my classified (ClassNet) and unclassified (OpenNet) email systems.  When I tried to access my workspace, a U.S. Marine Corps Security Guard, who I played recreational sports with and knew personally, pointedly told me that he could not let me into my workplace per DS orders.

21.     After being repeatedly ignored and having my concerns dismissed by my State Department supervisors, I felt I had no choice but to speak to the media.  In early June of 2018, I spoke with Christian Caryl at the *Washington Post*.  I had known and trusted Christian since approximately 2002 when he would reach out to me frequently about my expertise on Belarus.  Until this point, DS repeatedly ignored me and gave me a counseling session for the issues I was raising.  I felt speaking to the media would be the only way the State Department would listen.

22.     I regained access to my unclassified email approximately six months later in November 2018.  To this day, I still do not have access to my classified email, despite retaining my Top Secret/Sensitive Compartmented Information security clearance and despite needing classified email for my domestic duties.

### III. Seeking Assignments After Being Medevac'd from Guangzhou

23.     Around the time my wife and I both failed HABIT tests, Diplomatic Security Assistant

8

Secretary of State Michael Evanoff and Ambassador William Todd, Director General of the Foreign Service, flew to Guangzhou specifically to be briefed by me on the radiofrequency attack on my apartment and my neighbor's apartment.  I briefed Assistant Secretary Evanoff three times in unclassified locations and once in a classified location about our symptoms and how I had repeatedly reached out to Diplomatic Security ("DS") for help.  Assistant Secretary Evanoff teared up when my wife and I described to him how badly DS had treated and abandoned us.  When we begged him for help, Assistant Secretary Evanoff stated that we were part of the DS family and would be treated as such.

24. Assistant Secretary Evanoff informed me that the State Department could create a Y-tour for me.  Before this, I was unfamiliar with what a Y-tour would entail.  I asked Assistant Secretary Evanoff to explain a Y-tour, and he responded that it is "a tour under extraordinary circumstances that we have the authority to make for an officer."  He represented to me that he could create a Y-tour so I could be in close proximity to my family and doctors in New Hampshire while I underwent grueling vestibular therapy and medical appointments.

25. On June 1, 2018, my wife and I both failed HABIT testing.  On or around June 7, 2018, my family and I were medically evacuated ("medevac'd") to UPenn.

**IV. Assigned to Overcomplement**

26. Despite promises by Assistant Secretary Evanoff and my requests to HR/CDA, I was never placed on a Y-tour.  Instead I was placed in overcomplement status in 2018, and I remained in overcomplement until October 2021 when I was directed into a domestic position.  Before I was assigned to overcomplement, I did not know what it meant to be in overcomplement status.

**V. Applies to and is Repeatedly Denied Overseas Positions**

27.     While I was in overcomplement from 2018 to 2021, I was denied every overseas and domestic position to which I applied.  Since I was taken off overcomplement, I have been denied every overseas and domestic position to which I applied with the exception of an SEO position at U.S. Embassy Helsinki, Finland.

        **A. Frankfurt, Germany – FP-03 SEO (Summer 2020)**

28.     After more than a year of grueling brain injury therapies, the State Department Medical Services Bureau granted me a Class 1 medical clearance, allowing me to bid on overseas positions.  In September 2019, I placed bids on two at-grade FP-03 SEO positions in Frankfurt, Germany (in addition to several others).

29.     I discussed applying to the Frankfurt positions with FBI Special Agent Laura Pagel, the Special Agent in Charge for diplomats medevac'd to UPenn with brain injury symptoms.  She believed Frankfurt would be a secure location for me and my family because we would be living on a controlled compound in a NATO country.  In my bid statement for Frankfurt, I mentioned that FBI Special Agent Pagel stated, "I hope you get the slot in Frankfurt, Germany."  She expressed concern for my health and my family's health, but neither she nor I ever discussed her being present at a DS assignments panel.

30.     Although I had been assigned as an SEO to Frankfurt in 2014, this position was different because, as a tenured officer, I would have increased responsibilities, including supervisory responsibilities.  In this position, I would have the opportunity to manage and supervise other SEOs, which I did not have in my 2014 Frankfurt position.  Supervisory responsibilities are an important consideration for Employee Evaluation Reports and are considered for promotion.

31.     In March 2020, I learned that both positions in Frankfurt were ceded to entry-level.

10

However, no one ever told me why these two positions were ceded.

### B. Athens, Greece – FP-04 SEO (Summer 2021)

32. On October 8, 2020, I bid on an FP-04 SEO position in Athens, Greece. At the time I bid on Athens, there were no other bidders.

33. I was very excited about the Athens position in part because I would work with a Regional Security Officer, Maureen McGeough, who I had worked under before at U.S. Embassy Copenhagen, Denmark. We worked well together, I thrived working under her, and I knew she appreciated and valued my specialized, technical counterintelligence work. The Athens position was also within my skill code, and I had the technical skill subset that was needed for the position.

34. On October 19, 2020, the *New York Times* published a front-page article, in which I am quoted, about my injury and the State Department's mistreatment of me. The article described how the State Department "has produced inconsistent assessments of patients and events [in China and Cuba], ignored outside medical diagnoses, and withheld basic information from Congress." The article concludes that State Department leaders realized that pursuing a similar course of action in China as they had with Cuba could cripple diplomatic and economic relationships. On October 23, 2020, the Athens position was ceded to entry-level. I do not believe that the dates were coincidental, and I believe that I was not awarded the Athens position as retaliation for my engagement with the press about my mistreatment.

35. In June 2020, SEO Zachary Lutz informed me that a position in Monterrey, Mexico would be coming available and asked if I would be interested in the position. I was never formally offered the position in Monterrey. I told Lutz that a previous supervisor of mine, SEO Phillip Blanton, had served in Monterrey and informed me that this position required being on

11

ladders and driving long-distances late at night between Monterrey and other posts. I could not take this position because it was not compatible with my disability nor my Reasonable Accommodation. Given my vestibular issues, lingering light sensitivity, and frequent brain injury therapies, these tasks would be difficult, if not impossible, for me to perform. I informed SEO Lutz of this, and he agreed with me. He said he would inform DS/ST management that the Monterrey position would be incompatible with my disability and my accommodations, which I believe he did.

36. I was never offered formally or informally a position in Amman, Jordan.

**C. Belgrade, Serbia – FP-03 SEO (Summer 2021); Warsaw, Poland – FP-02 SEO (Summer 2021)**

37. On October 8, 2020, in addition to placing a bid on Athens, I bid on an FP-03 SEO position in Belgrade, Serbia and an FP-02 SEO position in Warsaw, Poland.

38. The Belgrade position would have been a perfect fit for me because it was at-grade and within my skill cone. The position was also language-preferred and I have Serbo-Croatian language skills. Further, I have extensive knowledge of and experience with the Balkan region. I worked in Serbia for the State Department's Office of South Central Europe Affairs and worked in Kosovo shortly after the 1999 NATO military operation, "Allied Force."

39. Given my Peace Corps experience in Poland and my advanced proficiency in Polish, I was also uniquely qualified for the Warsaw, Poland position. This position was language-preferred, and I have a U.S. Government rating in Polish language. This position was within my skill cone, and I had served at an FP-02 level before when I was an FP-04.

40. On October 9, 2020, I emailed my CDO, Andrew Kaleczyc, a copy of my Bid Priority Ranking, which, in addition to Athens, also included Belgrade, Warsaw, and Sofia. Kaleczyc responded on October 13, 2020 that he was "enthusiastic about moving forward with

12

[my] bid list." During this time, I also interfaced with Kaleczyc over email and phone and was consistently met with enthusiasm regarding my bidding. He was particularly excited about Belgrade which he told me was a "perfect place" for me because of my language skills. Kaleczyc was aware that each of these positions was a Summer 2021 position.

41.     On November 9, 2020, I initiated an assignment challenge for the Belgrade position. The next day, on November 10, my medical clearance was downgraded from Class 1 to Class 5, making me ineligible for the Belgrade position. Again, I do not believe that the timing was coincidental. I appealed the downgrade of my medical clearance the following day. However, my medical clearance was not adjudicated to Class 2, until approximately six weeks later. At that time, the Belgrade position had been filled.

**D. Frankfurt, Germany – FP-03 IMTS (NOW Position)**

42.     On April 12, 2021 I reached out to Barry Gray, a senior Information Management Technical Specialist ("IMTS"), to learn more about several IMTS position postings I had seen. The next day, on April 13, Barry Gray and I had a phone conversation in which he informed me that they desperately needed people to go to Frankfurt and that these IMTS positions in Frankfurt were designated as "critical world-wide shortage." IMTS's were therefore not receiving training in Washington, D.C. for these positions and were being sent into the field for on-the-job training. Additionally, IMTS positions were being filled without the training due to the COVID-19 pandemic.

43.     Barry told me I would be well-qualified to work as an IMTS on digital phones because I had worked on Avaya, Cisco, and Nortel phones previously. Further, because I had worked with these phones before, I would not need training. I was not surprised to learn this as I was aware of at least one other SEO, Richard Hall, who was sent to an IMTS position without the

Department of State YW-101 specific training. Barry Gray has been a family friend for several years, our children had grown up together, and my family had visited his family when he was posted to Thailand. I have no reason to believe that he was not telling me the truth.

44. Throughout the bidding process, I interfaced directly with the Europe and Eurasian Affairs Bureau ("EUR"). State Department policies encourage officers to work directly with Post, so I did not involve DS in my application process. In fact, I tried to keep my Career Development Officer, Andrew Kaleczyc, and DS from learning about my application to the IMTS position in Frankfurt. I was positive that once Kaleczyc and DS learned about the position, they would prevent me from going to Frankfurt.

45. Indeed, after receiving a handshake for the Frankfurt IMTS position, Kaleczyc informed me that I would have to take a required training course. This directly contradicted what I was told by Barry Gray and what was discussed in a subsequent interview I had for the position with Frankfurt IMTS personnel.

46. After learning that I would have to take the training, I enrolled in the training on May 13, 2021. During my enrollment, I checked the box requesting a reasonable accommodation for the training. On May 17, 2021, Christopher Brown, my DRAD case manager, acknowledged my accommodation request after I copied him on an email to my expected Frankfurt supervisors. Kaleczyc, DS, and my expected Frankfurt supervisors were all well aware of my need for a reasonable accommodation.

47. However, I was never given a reasonable accommodation for this training despite the fact that I specifically applied for one. The State Department never proposed modification of training, offered on-the-job training, or strived to meet my requested accommodations. I had to

withdraw from the training after only a few days because the training was causing headaches due to the amount of multi-tasking required.

### E. Krakow, Poland – FP-03 POL/ECON (NOW Position)

48. In July 2021, I saw on FS Bid that EUR was advertising a position for a Political/Economic Officer in Krakow, Poland, which was a perfect fit for my Polish language skills and political work background. I reached out to Consul General Patrick Slowinski who was eager to have me interview.

49. On July 8, 2021, I interviewed for the Krakow position with Slowinski. Portions of the interview were in Polish. We had an excellent conversation and discussed our similar work backgrounds in places such as Turkmenistan and Moscow. Slowinski informed me that the position would be heavily focused on political reporting. I informed him of my recent political reporting experience going back to 1998 when I was in EUR/SCE. I also told him about the political reporting I had done for the Intelligence and Research Bureau of the State Department ("INR"), the Fulbright thesis I wrote on Belarus, and a high-profile op-ed I wrote in the *Chicago Tribune* on Polish President Lech Kaczynski. I also informed him that I extensively relied on the Lithuanian Polish newspaper, *Kurier Wilenski*, for my Fulbright thesis and that I still read and occasionally report on the contents of *Kurier Wilenski* to INR to this day. We also discussed my recent political reporting experience for INR from Xinjing province in China. Slowinski stated that my language skills and political writing background were perfect for the position requirements.

50. Slowinski committed to me that I would be granted a second interview if any of the other

candidates for the position had even close to the Polish language skills and political reporting background as I did. Further, Slowinski assured me that I was "at the top of the list" for the position.

51.  I checked FS Bid on a regular basis after the interview and noted that no other candidates placed bids on the Krakow position after I interviewed and that the other two candidates who had placed bids on Krakow had already interviewed.

52.  I followed up with Slowinski a couple of weeks after my interview, to which he responded that he was waiting for more guidance from Washington. In response, I offered to provide as a reference the current U.S. Ambassador to Poland, Mark Brzezinski, with whom I have co-authored analytical op-eds on Poland. On July 27, 2021, Slowinski informed me that the Bureau had selected another candidate for the Krakow position.

### F. Filing a Lawsuit and Receiving a Handshake for Helsinki

53.  For years I have either been awarded no handshakes or have had my handshakes rescinded. I have also been prevented from participating in two scheduled TDYs to Rzeszow, Poland and to Qatar for Afghanistan evacuation support.

54.  Since I joined the State Department in 2011, I have observed the way DS and the State Department make decisions. Those in leadership positions frequently use their positions of power to grant favors and help their friends and their connections. The State Department and DS especially continue to be a "good ol' boys club."

55.  On December 8, 2021, I filed this lawsuit against the Department of State. Eleven months after this litigation began, I finally received and accepted a handshake for an assignment to U.S. Embassy Helsinki, Finland. However, considering the State Department's prior actions, I would not be surprised if the State Department once again rescinds my handshake for discriminatory reasons.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED this
28th day of February, 2023

_____
Mark Lenzi