# PX-001

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

Mark Lenzi,                    )
                               )
          Plaintiff,           )
                               ) Case No.
     v.                        )
                               ) 1:21-cv-01371-PTG-IDD
United States Department       )
of State, and Antony J.        )
Blinken, United States         )
Secretary of State,            )
                               )
          Defendants.          )
--------------------------X

VIDEOTAPED DEPOSITION OF JOHN EDMUND FITZSIMMONS

   Thursday, November 17, 2022; 9:07 a.m. EST

Reported by:  Cindy L. Sebo, RMR, CRR, RPR, CSR, CCR,

CLR, RSA, California Shorthand Reporter #14409, NYRCR,

NYACR, Remote Counsel Reporter, LiveDeposition

Authorized Reporter

Job No. 877548



Page 2

1          Videotaped Deposition of JOHN EDMUND

2   FITZSIMMONS, held at the law offices of Steptoe &

3   Johnson LLP, 1330 Connecticut Avenue, Northwest,

4   Washington, D.C. 20036, before Cindy L. Sebo,

5   Registered Merit Court Reporter, Certified Real-Time

6   Reporter, Registered Professional Reporter, Certified

7   Shorthand Reporter, Certified Court Reporter,

8   Certified LiveNote Reporter, Real-Time Systems

9   Administrator, California Shorthand Reporter #14409,

10  New York Realtime Certified Reporter, New York

11  Association Certified Reporter, Remote Counsel

12  Reporter, LiveDeposition Authorized Reporter and

13  Notary Public, beginning at approximately 9:07 a.m.

14  EST, when were present on behalf of the respective

15  parties:

16

17

18

19

20

21

22



Page 3

```
 1            A P P E A R A N C E S:
 2     Attorneys for the Plaintiff:
 3         STEPTOE & JOHNSON LLP
 4         CHRISTOPHER A. SUAREZ, ESQUIRE
 5         THOMAS M. BARBA, ESQUIRE
 6         1330 Connecticut Avenue, Northwest
 7         Washington, D.C. 20036
 8         202.429.3000
 9         csuarez@steptoe.com
10         tbarba@steptoe.com
11
       Attorney for the Defendants:
12
           UNITED STATES ATTORNEYS' OFFICES
13
           MATTHEW MEZGER, ESQUIRE
14
           2100 Jamieson Avenue
15
           Alexandria, Virginia 22314
16
           703.299.3700
17
           matthew.mezger@usdoj.gov
18
19     ALSO PRESENT:
20         JONATHAN PERRY, Videographer
21         JASON ROBERTS, State Department
22         CHRISTINE HOULE
```



Page 4

1                         --oOo--

2                 INDEX OF EXAMINATION

3               JOHN EDMUND FITZSIMMONS

4           Lenzi v. United States, et al.

5             Thursday, November 17, 2022

6       CINDY L. SEBO, RMR, CRR, RPR, CSR, CCR, CLR,

        RSA, California Shorthand Reporter #14409,

7          NYRCR, NYACR, Remote Counsel Reporter,

             LiveDeposition Authorized Reporter

8
                          --oOo--

9

10  EXAMINATION BY                             PAGE

11    Mr. Suarez                          24, 184

12    Mr. Mezger                              410

13

14

15  CONTINUED EXAMINATION BY:                  PAGE

16    Mr. Suarez                              415

17

18

19  CERTIFICATE OF REPORTER                    418

20  ERRATA                                     420

21  ACKNOWLEDGMENT OF WITNESS                  422

22



Page 22

1                        --oOo--

2          P R O C E E D I N G S

3                        --oOo--

4                        --oOo--

5      Thursday, November 17, 2022; 9:07 a.m. EST

6                        --oOo--

7

8               THE VIDEOGRAPHER:  We are now on

9        the record.

10              This begins Videotape Number 1 in      09:06:54

11       the deposition of John Fitzsimmons, taken

12       in the matter of Mark Lenzi versus the

13       United States Department of State, et al.,

14       case filed in the U.S. District Court for

15       the Eastern District of Virginia,            09:07:06

16       Case Number 1:21-cv-01371-PTG-IDD.

17              Today's date is November 17th,

18       2022.  The time is 9:07 a.m.

19              We are at the offices of Steptoe &

20       Johnson, 1330 Connecticut Avenue,            09:07:25

21       Northwest, in Washington, D.C.

22              My name is Jonathan Perry.  I'm the



Page 23

```
1      videographer from Magna Legal Services, and    09:07:32

2      the court reporter is Cindy Sebo, also with

3      Magna Legal Services.

4             And will counsel please -- please

5      introduce themselves and state whom they       09:07:41

6      represent?

7             MR. SUAREZ:  Good morning.  This is

8      Christopher Suarez from Steptoe & Johnson

9      on behalf of the Plaintiff, Mr. Lenzi.

10            With me is Tom Barba, also of            09:07:51

11     Steptoe.

12            MR. MEZGER:  Matthew Mezger on

13     behalf of the witness and Defendants.

14            I'm joined by Jason Roberts of the

15     State Department, as well as                    09:08:01

16     Christine Houle.

17            THE VIDEOGRAPHER:  And will the

18     reporter swear in the witness, please?

19                    --oOo--

20            JOHN EDMUND FITZSIMMONS,                 09:08:06

21   after having been first duly sworn remotely

22   by the certified stenographer to tell the truth,
```



Page 24

```
 1     the whole truth, and nothing but the truth,        09:08:06

 2          testified remotely as follows:

 3               --oOo--

 4               CERTIFIED STENOGRAPHER:  The

 5          witness is sworn.                              09:08:26

 6               --oOo--

 7      EXAMINATION BY COUNSEL FOR PLAINTIFF

 8               --oOo--

 9   BY MR. SUAREZ:

10          Q.    Okay.  Good morning,                     09:08:27

11   Mr. Fitzsimmons.

12               How are you?

13          A.    Good morning.

14          Q.    All right.  So you are currently

15   employed at the State Department; is that            09:08:33

16   correct?

17          A.    No.

18          Q.    You are not.

19               Okay.  So when did you leave the

20   State Department?                                    09:08:37

21          A.    November of 2021.

22          Q.    Okay.  So your last day at the
```



Page  30

```
 1    Diplomatic Courier Service, yes --              09:13:07

 2          Q.    Okay.  So --

 3          A.    -- there's three offices.

 4          Q.    -- so where do -- so where do SEOs

 5    fall under that?                                 09:13:12

 6          A.    Under security technology --

 7          Q.    I see.

 8          A.    -- there were a few SEOs that worked

 9    in physical security programs as well.

10          Q.    I see.                               09:13:18

11                So most SEOs are involved in the

12    security technology aspect?

13          A.    Exactly.

14          Q.    Okay.  And what is an SEO's role in

15    the context of security technology?             09:13:29

16          A.    Security engineering officers

17    design, install, maintain technical solutions to

18    protect lives, information, property for

19    Department of State facilities.

20          Q.    When you say they maintain technical 09:13:46

21    solutions, what do you mean by "technical

22    solutions"?
```



Page 50

```
 1          A.    Possible --                        09:33:56

 2          Q.    Okay.

 3          A.    -- it could go more.

 4          Q.    It -- it -- I understand it could go

 5    more, but, typically, in your 30 years or so of  09:34:00

 6    experience at the State Department, it would

 7    typically be less than a year, right?

 8          A.    Typically.

 9          Q.    Okay.  And significantly more than

10    50 percent of the time, it would be less than a   09:34:08

11    year, right?

12          A.    I have no information as to what the

13    statistics on that are.

14          Q.    Okay.  But you would agree that

15    typically, it would be less than a year, based on 09:34:18

16    your personal experience?

17          A.    Typically, yeah.

18          MR. SUAREZ:  Okay.  I'll mark

19       Exhibit 1.

20          CERTIFIED STENOGRAPHER:  Thank you.  09:35:19

21          MR. SUAREZ:  Yep.

22
```



Page 63

```
 1    satisfaction, I believe, at some point with his    09:49:25

 2    medical providers, and -- and he wanted to be

 3    relatively close to that, as I understood.

 4         Q.    Okay.  Did you or anyone in your

 5    chain of command ever evaluate whether Monterrey   09:49:39

 6    could have medically accommodated Mr. Lenzi?

 7         A.    It was not my role.

 8         Q.    Okay.  So -- so you never had anyone

 9    look into that, then?

10         A.    It was not my role.                      09:49:52

11         Q.    Okay.  So the answer to my question,

12    then, is, you did not have anyone look into that,

13    right?

14              MR. MEZGER:  Object to form.

15              The witness may answer.                   09:50:01

16              THE WITNESS:  I did not look into

17         it.  I'm not aware if anyone in my staff

18         did.  I did not direct anyone to look into

19         it.

20    BY MR. SUAREZ:                                      09:50:15

21         Q.    Got it.

22              Would you agree that several
```



```
                                                    Page 68

 1          A.    The DS assignments panel.        09:54:24

 2          Q.    Right.

 3                And -- and you sat on that panel,

 4   right?

 5          A.    I did.                            09:54:29

 6          Q.    Okay.  And you were the person who

 7   personally interceded to defer Mr. Lenzi's

 8   consideration on the Frankfurt position, right?

 9          A.    Correct.

10          Q.    Now, you wouldn't dispute that     09:54:41

11   Mr. Lenzi was qualified for that position, right?

12          A.    That was an entry-level position,

13   and Mr. Lenzi had already been in that position.

14   Qualifications or not, it would have -- it would

15   have essentially been a step backward for him     09:54:57

16   careerwise.

17          Q.    Okay.  So you -- so the answer to my

18   question, you don't dispute that he was qualified

19   for the position, right?

20          A.    Correct.                          09:55:06

21          Q.    Okay.  So -- you would agree that

22   deferrals constitute a pretty small proportion of
```



Page 71

```
1          A.    I was the one that deferred, but      09:57:03

2    that's all I said.

3          Q.    Okay.  So who suggested he should be

4    deferred, then, in the conversation?

5          A.    I said he should be deferred, but      09:57:11

6    there was no further discussion nor explanation.

7          Q.    I see.

8                So during the meeting itself, you

9    just said he should be deferred?

10         A.    Right.                                 09:57:18

11         Q.    And everyone deferred to that

12   statement, correct?

13               MR. MEZGER:  Object to the form.

14               THE WITNESS:  Correct.  Correct.

15   BY MR. SUAREZ:                                     09:57:29

16         Q.    Got it.  Okay.

17               And so during the meeting itself,

18   you didn't articulate a reason; the reason you

19   articulated is something you provided to me just

20   now, right?                                        09:57:37

21               MR. MEZGER:  Object to form.

22               The witness may answer.
```



Page 78

```
1           A.    Right.                              10:04:22

2           Q.    So you don't have any personal

3    knowledge about that?

4           A.    I do not --

5                 MR. MEZGER:  Object to form.        10:04:24

6    BY MR. SUAREZ:

7           Q.    Okay.

8           A.    -- I'm sorry.

9                 I do not.

10          Q.    Now, have you articulated all of the 10:04:33

11   reasons why you defer to Mr. Lenzi from the

12   Frankfurt position in -- that was -- he bid on in

13   2019?

14          A.    Yes.

15          Q.    Okay.  So then, to be clear, one of  10:04:43

16   the reasons that Mr. Lenzi was deferred was not

17   because he was a NOW bidder in overcomplement

18   status, correct?

19          A.    Correct.

20          Q.    Okay.  And, indeed, the advisory     10:04:58

21   panel advanced Mr. Lenzi for that position,

22   notwithstanding the fact that he was a NOW
```



```
 1   BY MR. SUAREZ:                                        10:16:57

 2         Q.    Okay.

 3         A.    -- I would -- fair to say that most

 4   were.

 5         Q.    Okay.  So you would agree, then,          10:16:59

 6   that most of the e-mails and speaking with the

 7   press that Mr. Lenzi conducted in 2018 or later

 8   related to the Havana Syndrome and his views and

 9   treatment by the State Department with regard to

10   the Havana Syndrome, right?                           10:17:11

11              MR. MEZGER:  Object to form.

12              The witness may answer.

13              THE WITNESS:  That's fair.

14   BY MR. SUAREZ:

15         Q.    Okay.  Now, you would agree that,         10:17:16

16   you know, State Department employees have a First

17   Amendment right to, you know, speak their views

18   about issues that are occurring in the State

19   Department, right?

20              MR. MEZGER:  Object to form.               10:17:47

21              The witness may answer.

22              THE WITNESS:  Yeah, but there are
```



Page 92

1        also policies -- established policies on    10:17:50

2        speaking with the press.

3    BY MR. SUAREZ:

4        Q.    Understood.

5        But if those policies run afoul, for 10:17:56

6    example, of the person's constitutional rights,

7    you know, that that would be a problem, right?

8        MR. MEZGER:  Object to form.

9        The witness may answer.

10        THE WITNESS:  I'm not an attorney.    10:18:06

11    BY MR. SUAREZ:

12        Q.    Okay.  Now, you -- you would agree

13    that -- that speaking out to the press -- that --

14    that should not be a reason to retaliate or

15    discriminate against an employee, right?        10:18:19

16        A.    Retaliate or discriminate?

17        Q.    Yeah.

18        A.    That's fair.

19        Q.    But you would also agree that it

20    bothered you that Mr. Lenzi frequently sent blast 10:18:35

21    e-mails and spoke to the press about his concerns

22    about Havana Syndrome, right?



Page 93

```
 1              MR. MEZGER:  Object to the form.     10:18:49

 2              The witness may answer.

 3              THE WITNESS:  It was -- it was also

 4         the tone of the e-mails are highly

 5         disrespectful to senior department         10:18:52

 6         officials.

 7    BY MR. SUAREZ:

 8         Q.    Got it.

 9              Do you think it's disrespectful to

10    Mr. Lenzi to not address his needs with regard to 10:19:15

11    the Havana Syndrome?

12         A.    I don't know that Mr. Lenzi's needs

13    have not been addressed.

14         Q.    Okay.  Do you think that an employee

15    has a right to express frustrations if they've   10:19:31

16    been aggrieved?

17         A.    In the proper venue, certainly.

18         Q.    Okay.  So what are some of the

19    proper venues to express frustrations, in your

20    view?                                            10:19:42

21         A.    EEO process, if that -- if, indeed,

22    that's the employee view -- views it's an EEO
```



Page 101

1    Taplan Moore, who was, I guess, paneled to the     10:43:09

2    Belgrade position.

3              Do you see that?

4         A.    Yes.

5         Q.    Okay.  So you -- you write that you     10:43:14

6    have no knowledge of Taplan Moore's medical

7    status nor EEO activity; however, Global Talent

8    Management vets candidates for appropriate

9    medical clearance prior to submission to the DS

10   assignments panel.                                 10:43:35

11             Do you see that?

12        A.    Yes.

13        Q.    Okay.  And so if someone has a

14   Class 2 clearance for Belgrade, for example, you

15   would agree that they're properly vetted from a    10:43:44

16   medical perspective for that position, right?

17             MR. MEZGER:  Object to form.

18             The witness may answer.

19             THE WITNESS:  Presumably.

20   BY MR. SUAREZ:                                     10:43:52

21        Q.    Okay.  So you would agree that if

22   someone has a Class 1 clearance, which allows



Page 125

```
 1                    THE WITNESS:  Correct.              11:11:12

 2    BY MR. SUAREZ:

 3          Q.    Okay.  And, now, to be clear, you

 4    were aware of Mr. Lenzi's disability, as you say

 5    in Paragraph 9, and -- as of May 2018, right?      11:11:20

 6          A.    I wouldn't -- I don't know that I

 7    would term it "disability."  It was a medical --

 8    the -- the -- the -- the "verbiage" here is

 9    medical -- Complainant's medical condition or

10    impairment, so that's what I responded to, not    11:11:43

11    necessarily --

12          Q.    Understood.

13          A.    -- disability.

14          Q.    Earlier, you testified you became

15    aware of his medical diagnosis of acquired brain  11:11:48

16    injury sometime around June of 2018, right --

17                MR. MEZGER:  Object to form.

18                The witness may answer.

19    BY MR. SUAREZ:

20          Q.    -- per the earlier discussion?         11:11:56

21          A.    I believe it was later than that,

22    but . . .
```



Page 134

```
 1                 The witness may answer.              11:19:11

 2                 THE WITNESS:  Correct.  I'm not

 3           aware of any of those.

 4     BY MR. SUAREZ:

 5           Q.    Why was all of this information      11:19:28

 6     pertinent to whether Mr. Lenzi should have gotten

 7     the Frankfurt position?

 8           A.    It's all factors, particularly

 9     the -- the -- the issue dealing with the FBI,

10     which was Frankfurt-specific.  I think we had      11:19:53

11     concerns about Mr. Lenzi going overseas at that

12     time in general because of the -- of the chain of

13     command insubordination and disrespect issues, as

14     well as the -- the -- the violation of the policy

15     on media engagement.                               11:20:13

16           Q.    Got it.

17                 And you understand that the alleged

18     violations of the -- the media policy were in

19     relation to statements and advocacy Mr. Lenzi was

20     making with regard to the Havana Syndrome and his 11:20:28

21     disability, right?

22                 MR. MEZGER:  Object to form.
```



Page 136

```
1    officer positions.                              11:21:38

2            Do you see that?

3        A.   Yes.

4        Q.   Okay.  You say "subsequently."

5            How many months later was that?        11:21:50

6        A.   I -- I don't remember.

7        Q.   So you're not sure.

8            So it could have been six months

9    later that that subsequently happened, right?

10       A.   I don't think it was that long.       11:21:57

11       Q.   Okay.  It was months later, though,

12   right?

13           MR. MEZGER:  Object to form.

14           The witness may answer.

15           THE WITNESS:  It was a while.          11:22:02

16   BY MR. SUAREZ:

17       Q.   Okay.

18           Okay.  And then, in Paragraph 28,

19   you say that [as read] Around March 3, 2020, the

20   positions were made unavailable for at-grade      11:22:59

21   bidders.

22           Right?
```



Page 137

```
 1          A.    I didn't say that; Mr. Lenzi stated   11:23:03

 2     that.

 3          Q.    Okay.  But you say that that seems

 4     about right, right?

 5          A.    It seems about right, yes.            11:23:10

 6          Q.    Okay.  And -- and you don't dispute

 7     that sometime in early 2020, you were the one who

 8     approved the decision to make the two Frankfurt

 9     positions unavailable for at-grade bidders,

10     right?                                           11:23:27

11          A.    I -- yeah, I approved the decision;

12     I did not make the decision.

13          Q.    Who made the decision?

14          A.    I believe GTM and Mr. Stuart

15     probably made that decision, probably the -- the  11:23:42

16     DS -- the ST assignments recommendation panel.

17          Q.    Okay.  And -- and you understood

18     that once you approved that decision, that meant

19     Mr. Lenzi would no longer be able to get the

20     Frankfurt position, right?                       11:24:03

21          A.    Yeah.

22          Q.    Okay.  And you also understand that
```



Page 144

1                      So was it Nathan Lingenfelter who    11:29:43

2       was the one who requested the entry-level

3       positions, then?

4              A.     Apparently.

5              Q.     Okay.  You're not sure, though?      11:29:52

6              A.     That's -- as it states here,

7       according to Ron, Nathan Lingenfelter -- all I

8       can say is what -- what is stated in here.

9              Q.     Now, who -- who -- who works with

10      the CDO to -- to suggest, you know, what          11:30:03

11      positions might be ceded to entry level?

12             A.     HR or GTM, the entry-level --

13      entry- -- there's a entry-level office or

14      entry-level director.

15             Q.     Got it.                              11:30:24

16                     And then in the second paragraph,

17      you write, Tamika Abbott is the operations

18      division chief that has responsibility for

19      managing and staffing the overseas offices.  And

20      it appears from this that her -- that was her      11:30:32

21      strong preference, to fully staff Frankfurt with

22      the appropriate entry-level staff.



Page 160

```
 1   didn't want to get into a disagreement with        11:47:10

 2   Mr. Lenzi; is that fair?

 3        A.    I don't recall.  I don't recall

 4   exactly --

 5        Q.    Okay.                                     11:47:18

 6        A.    -- what was in there, why.

 7        Q.    Okay.  So there's some

 8   back-and-forth, and we get to December 6th, 2019.

 9   You e-mail Martha Lovejoy, Joy Baca, Ron Stuart

10   and Bart Brown.                                      11:47:34

11             Do you see that?

12        A.    Yes.

13        Q.    Who's Bart Brown?

14        A.    Bart Brown was -- I believe he was

15   the division chief or office director for PII,       11:47:54

16   which was protective intelligence investigations,

17   dealing with threats against employees.

18        Q.    Got it.

19             So you write here, Bart, welcome to

20   the vortex.                                          11:48:30

21             What's the "vortex" you're referring

22   to?
```



Page 161

```
 1          A.    Just all of stuff associated with     11:48:34

 2   Mr. Lenzi.

 3          Q.    Got it.

 4                So Mr. Lenzi -- dealing with

 5   Mr. Lenzi is like dealing with a vortex, right?   11:48:42

 6          A.    In some manner.

 7          Q.    Okay.  And -- and you'll say, You'll

 8   note some Twitter posts below that an employee

 9   maybe was threatening.

10                You -- you don't want to acknowledge 11:48:55

11   here that they actually might be threatening;

12   you're talking to him about Mr. Lenzi's view that

13   they're threatening, right?

14                MR. MEZGER:  Objection to the form.

15                The witness may answer.            11:49:01

16                THE WITNESS:  I wouldn't want to

17          characterize one way or the other.  I

18          would let that -- everything speak for

19          itself.

20   BY MR. SUAREZ:                                    11:49:07

21          Q.    Got it.

22                Let me ask you about your state of
```



Page 177

1    DS Combined Recommendations Panel from Friday,    12:04:35

2    November 15, 2019, correct?

3         A.    Yes.

4         Q.    Okay.  And this is the panel -- a

5    panel you sat on, correct?                         12:04:47

6         A.    It appears so, yes.

7         Q.    All right.  And you recall that this

8    is the particular panel that considered Mr. Lenzi

9    for the Frankfurt position?

10        A.    Perhaps.                                 12:05:02

11        Q.    Okay.

12              All right.  Well, let's look for

13   him.

14        A.    Here it is, Page 17647.

15        Q.    Thank you.                               12:06:48

16              All right.  So it says,

17   SEO Frankfurt, FP-03, 57406000.

18              Correct?

19        A.    Yep.

20        Q.    And it says, ETA 8/2020.                 12:07:04

21              Correct?

22        A.    Yes.



Page 178

1       Q.    Okay.  So that would be August 2020, 12:07:10

2    correct?

3       A.    Yes.

4       Q.    Okay.  And that's in the summer 2020

5    bidding cycle, correct?                              12:07:17

6       A.    It appears so, yes.

7       Q.    And just to tie it in a bow, if you

8    look at 17637, there's a heading that says,

9    Summer 2020 (Overseas).

10            Correct?                                     12:07:41

11      A.    Yes.

12      Q.    And -- and Mr. Lenzi's row in this

13   giant sheet is under that subheading, correct?

14      A.    Yes, it appears that way.

15      Q.    Okay.  And -- and to be clear, this 12:08:01

16   was the action item for Mr. Lenzi that you

17   deferred, correct?

18      A.    I believe so.

19      Q.    Okay.  And I'm just going to ask it

20   again for the record.  Hopefully, we'll figure it 12:08:13

21   out at some point.  But do you know what that IND

22   next to his name refers to?



Page 200

1    moved up to -- to Portsmouth.                      01:20:33

2              Now, he's -- since he was assigned

3    to -- typically, to Washington, D.C., if he was

4    a -- if he had to go into a domestic

5    Washington, D.C. position, he would have to move  01:20:45

6    his vehicle and his household effects at his own

7    expense.

8              And I didn't feel that was right.  I

9    felt -- I felt that the Department should --

10   should pay to -- to move that for him.           01:20:57

11        Q.    Got it.

12             So -- but what do you mean when you

13   say you want to preclude an outburst?

14        A.    Probably to pre- -- preclude a --

15   another -- another e-mail broadcast about he's   01:21:13

16   not being treated fairly.

17        Q.    Okay.  And then you say, Either way,

18   he'll eventually need to come back.

19             What -- what do you mean by coming

20   back?                                            01:21:30

21        A.    Most likely, he would be assigned to

22   Washington, D.C., because the -- at that point,



Page 210

```
 1                    The witness may answer the        01:29:19

 2      question.

 3                    THE WITNESS:  Correct.

 4    BY MR. SUAREZ:

 5         Q.    And -- and the ostensible reason why 01:29:21

 6    Mr. Lenzi has not been given ClassNet

 7    access since he was medevacked from Guangzhou is

 8    because he has had jobs that do not require

 9    ClassNet access, correct?

10                    MR. MEZGER:  Objection.           01:29:33

11                    THE WITNESS:  Correct.

12                    Oh, sorry.

13                    Correct.

14    BY MR. SUAREZ:

15         Q.    And what percentage of overseas       01:29:36

16    positions for SEOs require ClassNet access?

17         A.    I would say almost all of them.

18         Q.    Okay.  So nearly 100 percent?

19         A.    Nearly.

20         Q.    Okay.  Now, you have access to         01:29:47

21    ClassNet, correct?

22         A.    I do not.
```



Page 250

```
 1   3:59 p.m. --                                        02:09:57

 2        A.    Right.

 3        Q.    -- correct?

 4        A.    Yes.

 5        Q.    Okay.  The Subject of the e-mail is     02:10:00

 6   E-mails, correct?

 7        A.    Yes.

 8        Q.    Okay.  And -- and you write, Going

 9   through my box looking for other stuff and

10   thought I better start sharing the wealth.        02:10:22

11             Correct?

12        A.    Yes.

13        Q.    Okay.  And the wealth that you're

14   sharing appears to be several attachments to the

15   e-mail, correct?                                   02:10:38

16        A.    Yes.

17        Q.    And -- and -- and the several

18   attachments to the e-mail that you provide to

19   Mr. Giardino -- what you call "the wealth" are

20   e-mails that relate to Mr. Lenzi's advocacy and,   02:10:54

21   in your view, unprofessional e-mail; is that

22   fair?
```



Page 251

1               MR. MEZGER:  Objection to the form.  02:11:09

2               The witness may answer.

3               THE WITNESS:  Yes.

4     BY MR. SUAREZ:

5         Q.    Okay.  And -- and so it would be      02:11:11

6     fair to say that -- you're welcome to count it,

7     but it would be fair to say that there's

8     something like 20 or 30 e-mails attached to this;

9     is that fair?

10              MR. MEZGER:  Objection to form.      02:11:30

11              The witness may answer.

12              THE WITNESS:  It appears that way.

13    BY MR. SUAREZ:

14        Q.    Okay.  And so you -- you wanted to

15    compile the greatest hits of Mr. Lenzi's         02:11:36

16    allegedly bad e-mails so that Mr. Giardino had

17    this information, correct?

18        A.    Yeah.  And at this point, I wasn't

19    exactly sure when Mr. Gino had -- Giardino had

20    retired and came -- he came to work for us for -- 02:11:56

21    for -- in -- in countermeasures program.  It

22    might have been that this was after that.



Page 289

```
 1              MR. MEZGER:  Same objection.        02:59:47

 2              The witness may answer.

 3              THE WITNESS:  Of a security

 4        clearance.

 5   BY MR. SUAREZ:                                  02:59:50

 6        Q.    Okay.  How many situations over your

 7   30-year career are you familiar with where

 8   someone removed a State Department employee's

 9   access to OpenNet?

10        A.    Several.                             03:00:02

11        Q.    Okay.  How many?

12        A.    Half a dozen, maybe.

13        Q.    Okay.  So about six over the course

14   of your 30-year career; is that fair?

15        A.    Yeah, keeping in mind that for the   03:00:14

16   first 12 years of my career, there wasn't

17   OpenNet.

18        Q.    Explain that.

19        A.    We didn't have -- we didn't have

20   OpenNet until about 2000.                        03:00:23

21        Q.    Okay.  But was -- was -- there --

22   was it -- was it that everything was in a
```



Page 356

```
 1    there was -- there's controversy.              04:25:32

 2              And I -- I don't -- I don't know

 3    that Mark was incorrect in this and just -- just

 4    forwarding it to -- to Todd for his -- his

 5    awareness.                                      04:25:45

 6         Q.    Okay.  Why did you add the color

 7    commentary about it being more drama?

 8              MR. MEZGER:  Objection to form.

 9              The witness may answer.

10              THE WITNESS:  I think it speaks for   04:25:55

11         itself.

12    BY MR. SUAREZ:

13         Q.    You -- you -- you think Lenzi's --

14    Mark -- Mr. Lenzi's -- the issues he's raising

15    are a bunch of drama?                           04:26:02

16         A.    It's drama -- he's not necessarily

17    wrong, but it's drama.

18         Q.    Okay.  So -- so on this issue,

19    you -- you don't think Mr. Lenzi's wrong?

20         A.    I think -- I think he had an         04:26:14

21    expectation that -- that -- that whatever therapy

22    he was going through was going to be counted
```



Page 357

1    as -- as work time.                              04:26:27

2              Appropriate or not, I -- you know,

3    that's -- that's a question for others, but I

4    don't know that it was completely unreasonable

5    for him to think that.                           04:26:38

6              As I recall, Mr. Lenzi had to file

7    with Department of Labor for -- for disability --

8    something.  And I don't know that at this point,

9    he had done that.  And until he had done that, I

10   think -- I don't think that was -- it was -- the  04:26:59

11   Department was willing to count that as -- as

12   work time.

13             But I believe it got all

14   straightened out in Mr. Lenzi's favor.

15        Q.   Are you talking about he was able to 04:27:15

16   get administrative leave for his -- his times

17   going to therapies?

18        A.   As I recall, yes.

19        Q.   Okay.

20             MR. SUAREZ:  Exhibit 34.              04:27:45

21

22



Page 389

```
 1    -- the assignment up in -- in Portsmouth.        05:03:40

 2         Q.    Do you think it would have been

 3    reasonable to give Mr. Lenzi a Y tour, from your

 4    perspective, at least?

 5         A.    From my perspective, yes --          05:03:52

 6         Q.    Okay.

 7         A.    -- from HR's perspective, apparently

 8    they disagreed.

 9         Q.    Okay.

10         MR. SUAREZ:  Okay.  I'm going to          05:05:19

11       hand you 39.

12                    --oOo--

13              (Fitzsimmons Deposition Exhibit

14               Number 39, E-mail string, Bates

15               stamped STATE00020624 through        05:00:34

16               STATE00020625, marked for

17               identification, as of this date.)

18                    --oOo--

19         MR. SUAREZ:  Thirty-nine is 20624

20       and 20625.                                  05:05:58

21    BY MR. SUAREZ:

22         Q.    The Subject of this is PCS Dates,
```



```
 1                    C E R T I F I C A T E
 2          I, Cindy L. Sebo, Nationally Certified Court
 3     Reporter and Notary Public herein do hereby certify
 4     that the foregoing deposition of JOHN EDMUND
 5     FITZSIMMONS was taken before me pursuant to notice,
 6     at the time and place indicated; that said deponent
 7     was by me duly sworn to tell the truth, the whole
 8     truth, and nothing but the truth under penalty of
 9     perjury; that the testimony of said deponent was
10     correctly recorded to the best of my ability in
11     machine shorthand and thereafter transcribed under my
12     supervision with computer-aided transcription; that
13     the deposition is a true and accurate record of the
14     testimony given by the witness; and that I am neither
15     of counsel nor kin to any party in said action, nor
16     interested in the outcome thereof.
17
18     _____
19     Cindy L. Sebo, RMR, CRR, RPR, CSR,
20     CCR, CLR, RSA, NYRCR, NYACR, Remote
       CA CSR #14409, Remote Counsel Reporter,
21     LiveLitigation Authorized Reporter,
       Notary Public
22
```

# PX-002

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| MARK LENZI,                        ) | |
|                               ) | |
|           Plaintiff,           ) | |
|                               ) | |
|      v.                      ) | No. 1:21-cv-1371 (PTG/IDD) |
|                               ) | |
| U.S. DEPARTMENT OF STATE and     ) | |
| ANTONY J. BLINKEN, U.S. Secretary of State,  ) | |
|                               ) | |
|          Defendants.        ) | |
| _____) | |

**DEFENDANTS' OBJECTIONS AND RESPONSES TO PLAINTIFF'S**
**FIRST SET OF INTERROGATORIES TO DEFENDANTS**

Pursuant to Local Rule 26(C) and Federal Rules of Civil Procedure 26 and 33, Defendants, through undersigned counsel, state the following objections and provide the following responses to Plaintiff's First Set of Interrogatories. By providing the information contained in the following responses, Defendants do not waive any objection as to the information's admissibility on the grounds of relevance, materiality, or other appropriate grounds. Responses have been generated as set forth in Defendants' objections and responses below and following a reasonable, good-faith search for information.

**<u>DEFINITIONS</u>**

1.       To the extent Definition 1 and 2, as used throughout Plaintiff's discovery requests, purport to impose an obligation to produce information from the U.S. Secretary of State and/or the U.S. Department of State in its entirety and across its tens of thousands of employees, Defendants object to this definition on the grounds that it seeks information that is not relevant to the claims in this action and is not proportional to the needs of the case. Defendants will conduct a reasonable search for responsive, unprivileged, unclassified information from a

1

reasonable number of State Department employees with specific knowledge about the complained of employment actions in this case.

2.      Defendants object to Definitions 3 and 4 insofar as they purport to request any material that has been classified pursuant to Executive Order 13526 and thus may be protected by the state secrets privilege, or that resides on classified systems, to which private counsel in a civil action are not entitled and may not receive. *E.g.*, *El-Masri v. United States*, 479 F.3d 296, 311 (4th Cir. 2007). Defendants similarly object to the extent these definitions purport to request any material (including, but not limited to, the request for "drafts," as well as materials from "counsel") that is otherwise privileged or protected from disclosure, including but not limited to the attorney client privilege, the deliberative process privilege, the attorney work product protection, and the law enforcement privilege. Defendants object to the scope of "in the possession, custody, or control of you, of any officer, agent, employee, representative, counsel, or other person" in Definition 3, and to the scope of "any" in Definition 4, as there are tens of thousands of State Department employees, and the definitions as written do not consider the relevance of those employees or the proportionality of such a request. Defendants will define "document" and "communication" consistent with the meaning of Federal Rule of Civil Procedure 34 and will conduct a reasonable search for responsive, unprivileged, unclassified information from a reasonable number of State Department employees with specific knowledge about the complained of employment actions in this case.

3.      Defendants object to Definitions 8 and 19 as overbroad and disproportionate to the needs of the case and, as read together, vague and ambiguous because the same terms are defined with different meanings. Defendants will use the ordinary dictionary meanings of "relating" and "concerning." Merriam-Webster defines "relating" as "to show or establish local

or causal connection between," and defines "concerning" as "relating to: regarding."

4.      Defendants object to Definition 11 to the extent it requests information beyond the possession, custody, or control of the State Department. Defendants further object to the extent it requests information that has been classified pursuant to Executive Order 13526 and thus may be protected by the state secrets privilege, or that is located on classified systems, to which private counsel in a civil action are not entitled and may not receive. *E.g.*, *El-Masri v. United States*, 479 F.3d 296, 311 (4th Cir. 2007). Defendants also object to the extent it requests information that is protected from disclosure by the attorney client privilege, the attorney work product protection, the deliberative process privilege, the law enforcement privilege, or any other applicable privilege.

5.      Defendants object to "any subsequent amendments to" in Definitions 12 and 13, as there is only one operative complaint and one operative answer and the parties have represented to the Court that they do not anticipate filing amended pleadings.

6.      Defendants object to Definition 15 to the extent it imposes any obligations beyond those in the Federal and Local Rules, including in Federal Rule of Civil Procedure 33(d), as well as to the extent it imposes any obligations beyond those in the parties' Joint Discovery Plan (Dkt. No. 35). Defendants further object under the Privacy Act to providing an individual's home address.

7.      Defendants object to the inclusion of "any firm, corporation, proprietorship, joint venture, trust or estate, business, association, partnership, or other form of legal entity, unless the context indicates otherwise" in Definition 17 as vague and overbroad, without regard to the relevance to the issues in this action or the proportionality of such a request. Defendants will define "person" as natural persons employed by the State Department with specific knowledge about the complained of employment actions in this case.

8.      With respect to Definition 18, Defendants incorporate by reference their objections to Definitions 1 through 4, stated above.

**<u>INSTRUCTIONS</u>**

1.      Defendants object to Instruction 1 to the extent any interrogatory seeks information that is duplicative, in whole or in part, of that sought in another interrogatory. Defendants further object to the extent the instruction calls upon Defendants to respond to an excess of 30 interrogatories, inclusive of their subparts, in violation of the parties' Joint Discovery Plan (Dkt. No. 35).

2.      With respect to Instruction 2, Defendants incorporate by reference their objections to Definitions 1 through 4. Defendants further object to the extent this instruction imposes obligations beyond those in the Federal and Local Rules. In responding to these interrogatories, Defendants will conduct a reasonable search for responsive, unprivileged, unclassified information from a reasonable number of State Department employees with specific knowledge about the complained of employment actions in this case.

3.      Defendants object to Instruction 3 to the extent it imposes obligations beyond those in the Federal and Local Rules.

4.      Defendants object to Instructions 4 and 5 to the extent and on the grounds that it imposes obligations beyond those in the parties' Joint Discovery Plan (Dkt. No. 35).

5.      Defendants object to Instruction 6 on the grounds that it imposes obligations beyond those in Federal Rule 33(d).

6.      Defendants object to Instruction 7 to the extent it imposes obligations beyond those in the Federal Rules. Defendants will provide appropriate supplements to their responses "in a timely manner" pursuant to Federal Rule 26(e).

## SPECIFIC OBJECTIONS TO INTERROGATORIES

**INTERROGATORY NO. 1:**

Identify the persons and their titles involved in any Assignment Panel and/or a Suitability Review Panel, as well as the dates of those panels, concerning Mr. Lenzi and his bid for Guangzhou, China, as well as other bids by Mr. Lenzi for overseas postings including (1) SEO position numbers 57408002 and 57408004 in Frankfurt, Germany; (2) SEO position number 57408003 in Belgrade, Serbia; (3) SEO position number 56803003 in Athens, Greece; (4) SEO position number 56001010 in Warsaw, Poland; (5) Political/Economic Officer position number 14035112 in Krakow, Poland; and (6) SEO position number 57255028 in Baku, Azerbaijan, as described in the First Amended Complaint.

**OBJECTIONS TO INTERROGATORY NO. 1:** In addition to the above objections to Definitions and Instructions, Defendants object to this interrogatory on the grounds that it improperly presents seven (7) interrogatories on seven different topics; accordingly, Defendants will count this interrogatory as seven separate interrogatories. Defendants also object to the request for information regarding "Mr. Lenzi and his bid for Guangzhou, China" and "SEO position number 57255028 in Baku, Azerbaijan," as neither of those positions are alleged in the Complaint to be among the challenged assignment decisions in this action, *see* Dkt. No. 27 ¶¶ 60–89, and are therefore neither relevant to the claims in this action nor proportionate to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1). Defendants likewise object to the request for information regarding any "Suitability Review Panel" as seeking information that is not relevant and proportional to this action, as Suitability Review Panels are not a part of the assignments process for members of the Foreign Service. Defendants object to the phrase "involved in" as vague and ambiguous and, depending on how tangentially Plaintiff defines the phrase, objects to the request for information that is not proportional to the needs of the case. Defendants additionally assert a Privacy Act objection to the disclosure of information regarding "persons" not named as a party to this action.

**RESPONSE TO INTERROGATORY NO. 1:** Subject to and without waiver of the foregoing objections, and pursuant to the parties' meet and confer discussions to date, Defendants respond to the five separate components of this interrogatory regarding the individuals who sat on the Assignment Panels (if any) concerning Mr. Lenzi's bid for each of the following positions, as well as the approximate date of the panels: (1) Frankfurt, (2) Athens, (3) Belgrade, (4) Warsaw, and (5) Krakow positions. Pursuant to their objections, Defendants are not responding to the sixth and seventh components of this interrogatory regarding Guangzhou or Baku or, more generally, to any unidentified "other bids by Mr. Lenzi for overseas postings."

**Interrogatory No. 1.1 (Frankfurt)**:

- ST Advisory Panel (met on October 22, 2019):

    o Tamika Abbott (Division Director – Bureau of Diplomatic Security, Countermeasures Directorate, Office of Security Technology, Security Technology Operations Division);

    o Mark Graves (Division Director – Bureau of Diplomatic Security, Countermeasures Directorate, Office of Security Technology, Security Systems Integration Division);

    o Joy Herrera-Baca (Division Director – Bureau of Diplomatic Security, Countermeasures Directorate, Office of Security Technology, Facility Security Engineering Division);

    o Gharun Lacy (Division Director – Bureau of Diplomatic Security, Countermeasures Directorate, Office of Security Technology, Countermeasures Program Division);

    o Jim Nicodemus (Division Director – Bureau of Diplomatic Security, Countermeasures Directorate, Office of Security Technology, Facility Security Engineering Division);

    o Matt Percival (Office Director – Bureau of Diplomatic Security, Cyber and Technology Security Directorate, Office of Technology Innovation and Engineering);

    o Victor Ratermanis (Office Director – Bureau of Diplomatic Security, Cyber and Technology Security Directorate, Office of Technology Innovation and Engineering);

    o Chimere Ravenel Waterstreet (Branch Chief – Bureau of Diplomatic Security, Countermeasures Directorate, Office of Security Technology, Overseas Support Branch);

    o Ronald Stuart (Office Director – Bureau of Diplomatic Security, Countermeasures Directorate, Office of Security Technology);

    o Monique Theriot (Senior Security Engineering Officer – Bureau of Diplomatic Security, Countermeasures Directorate, Office of Security Technology, Security Technology Operations Division, Overseas Support Branch);

    o Rahim Theriot (Office Director – Bureau of Diplomatic Services, Training Directorate, Office of the Foreign Affairs Security Training Center, Technical Security Engineering Division).

- DS Advisory Panel (met on November 15, 2019)

  o Todd Brown (Principal Deputy Assistant Secretary – Bureau of Diplomatic Security, Diplomatic Security Service Directorate);

  o Assiya Ashraf-Miller (Deputy Assistant Secretary – Bureau of Diplomatic Security, International Programs Directorate);

  o Ricardo Colon (Deputy Assistant Secretary – Bureau of Diplomatic Security, Domestic Operations Directorate);

  o John Fitzsimmons (Deputy Assistant Secretary – Bureau of Diplomatic Security, Countermeasures Directorate);

  o Carlos Matus (Deputy Assistant Secretary – Bureau of Diplomatic Security, Threat Investigations and Analysis Directorate);

  o Lonnie Price (Deputy Assistant Secretary – Bureau of Diplomatic Security, Cyber and Technology Security Directorate);

  o Greg Sherman (Deputy Assistant Secretary – Bureau of Diplomatic Security, High Threat Programs Directorate);

  o Karl Bultrowicz (Senior Diplomatic Security Representative for GTM/CDA and Senior Assignments Officer for Diplomatic Security Positions);

  o Stephen Dietz (Executive Director – Bureau of Diplomatic Security);

  o Doug Quiram (Senior Coordinator – Bureau of Diplomatic Security, Senior Coordinator for Security Infrastructure, Office of Personnel Security and Suitability);

  o Erin Smart (Office Director – Bureau of Diplomatic Security, Senior Coordinator for Security Infrastructure, Office of Personnel Security and Suitability)

**Interrogatory No. 1.2 (Athens)**:

- ST Advisory Panel (met on October 23, 2020):

  o Tamika Abbott (Division Director – Bureau of Diplomatic Security, Countermeasures Directorate, Office of Security Technology, Security Technology Operations Division);

  o Mark Graves (Division Director – Bureau of Diplomatic Security, Countermeasures Directorate, Office of Security Technology, Security Systems Integration Division);

7

- o Gharun Lacy (Division Director – Bureau of Diplomatic Security, Countermeasures Directorate, Office of Security Technology, Countermeasures Program Division);

- o James Nicodemus (Division Director – Bureau of Diplomatic Security, Countermeasures Directorate, Office of Security Technology, Facility Security Engineering Division);

- o Matthew Percival (Office Director – Bureau of Diplomatic Security, Cyber and Technology Security Directorate, Office of Technology Innovation and Engineering);

- o Victor Ratermanis (Office Director – Bureau of Diplomatic Security, Cyber and Technology Security Directorate, Office of Technology Innovation and Engineering);

- o Chimere Ravenel Waterstreet (Branch Chief – Bureau of Diplomatic Security, Countermeasures Directorate, Office of Security Technology, Overseas Support Branch);

- o Ronald Stuart (Office Director – Bureau of Diplomatic Security, Countermeasures Directorate, Office of Security Technology);

- o Rahim Theriot (Office Director – Bureau of Diplomatic Services, Training Directorate, Office of the Foreign Affairs Security Training Center, Technical Security Engineering Division)

**Interrogatory No. 1.3 (Belgrade)**:

- ST Advisory Panel (met on October 23, 2020):

- o Tamika Abbott (Division Director – Bureau of Diplomatic Security, Countermeasures Directorate, Office of Security Technology, Security Technology Operations Division);

- o Mark Graves (Division Director – Bureau of Diplomatic Security, Countermeasures Directorate, Office of Security Technology, Security Systems Integration Division);

- o Gharun Lacy (Division Director – Bureau of Diplomatic Security, Countermeasures Directorate, Office of Security Technology, Countermeasures Program Division);

- o James Nicodemus (Division Director – Bureau of Diplomatic Security,

Countermeasures Directorate, Office of Security Technology, Facility Security Engineering Division);

- o  Matthew Percival (Office Director – Bureau of Diplomatic Security, Cyber and Technology Security Directorate, Office of Technology Innovation and Engineering);

- o  Victor Ratermanis (Office Director – Bureau of Diplomatic Security, Cyber and Technology Security Directorate, Office of Technology Innovation and Engineering);

- o  Chimere Ravenel Waterstreet (Branch Chief – Bureau of Diplomatic Security, Countermeasures Directorate, Office of Security Technology, Overseas Support Branch);

- o  Ronald Stuart (Office Director – Bureau of Diplomatic Security, Countermeasures Directorate, Office of Security Technology);

- o  Rahim Theriot (Office Director – Bureau of Diplomatic Services, Training Directorate, Office of the Foreign Affairs Security Training Center, Technical Security Engineering Division)

- GTM/CDA Assignment Panel (met on November 19, 2020, to consider Plaintiff's assignment challenge on the Belgrade position)

- o  Elliot Harris (Human Resources Specialist – Bureau of Global Talent Management, Office of Career Development and Assignments);

- o  Chris Teal (Director – Bureau of Global Talent Management, Office of Career Development and Assignments, Mid-Level Division);

- o  Cristina Stokes (Deputy Director, Specialist Unit – Bureau of Global Talent Management, Office of Career Development and Assignments, Entry-Level Division);

- o  Myrna Kerr-Ortiz (Career Development Officer – Bureau of Global Talent Management, Office of Career Development and Assignments, Mid-Level Division);

- o  Terry Boyle (Career Development Officer – Bureau of Global Talent Management, Office of Career Development and Assignments, Mid-Level Division);

- o  Charles Cole (Director of Political Sub-Unit – Bureau of Global Talent Management, Office of Career Development and Assignments, Mid-Level Division);

9

- o Andrea Cameron (Career Development Officer – Bureau of Global Talent Management, Office of Career Development and Assignments, Mid-Level Division);

- o John Schuch (Human Resources Specialist – Bureau of Global Talent Management, Office of Career Development and Assignments);

- o Patrick Gorman (Deputy Assignments Officer – Bureau of Global Talent Management, Office of Career Development and Assignments, Assignment Division);

- o Ann Evans (Human Resources Specialist – Bureau of Global Talent Management, Office of Career Development and Assignments, Assignment Division);

- o Sarah Alonso (Assignments Officer – Bureau of Global Talent Management, Office of Career Development and Assignments, Assignment Division);

- o Baber Sultan (Deputy Assignments Officer – Bureau of Global Talent Management, Office of Career Development and Assignments, Assignment Division);

- o Stacey Steger (Deputy Assignments Officer – Bureau of Global Talent Management, Office of Career Development and Assignments, Assignment Division);

- o Jonathan Mennuti (Office Director – Bureau of Global Talent Management, Office of Career Development and Assignments);

- o Tim Roche (Division Chief – Bureau of Global Talent Management, Office of Career Development and Assignments, Assignment Division);

- o Michael Cragun (Deputy Director – Bureau of Global Talent Management, Office of Career Development and Assignments)

**Interrogatory No. 1.4 (Warsaw)**:

- ST Advisory Panel (met on October 23, 2020):

  - o Tamika Abbott (Division Director – Bureau of Diplomatic Security, Countermeasures Directorate, Office of Security Technology, Security Technology Operations Division);

  - o Mark Graves (Division Director – Bureau of Diplomatic Security, Countermeasures Directorate, Office of Security Technology, Security Systems Integration Division);

- o  Gharun Lacy (Division Director – Bureau of Diplomatic Security, Countermeasures Directorate, Office of Security Technology, Countermeasures Program Division);

- o  James Nicodemus (Division Director – Bureau of Diplomatic Security, Countermeasures Directorate, Office of Security Technology, Facility Security Engineering Division);

- o  Matthew Percival (Office Director – Bureau of Diplomatic Security, Cyber and Technology Security Directorate, Office of Technology Innovation and Engineering);

- o  Victor Ratermanis (Office Director – Bureau of Diplomatic Security, Cyber and Technology Security Directorate, Office of Technology Innovation and Engineering);

- o  Chimere Ravenel Waterstreet (Branch Chief – Bureau of Diplomatic Security, Countermeasures Directorate, Office of Security Technology, Overseas Support Branch);

- o  Ronald Stuart (Office Director – Bureau of Diplomatic Security, Countermeasures Directorate, Office of Security Technology);

- o  Rahim Theriot (Office Director – Bureau of Diplomatic Services, Training Directorate, Office of the Foreign Affairs Security Training Center, Technical Security Engineering Division)

- GTM/CDA Assignment Panel (met on February 11, 2021 to consider Plaintiff's assignment challenge on the Warsaw position)

  - o  Elliot Harris (Human Resources Specialist – Bureau of Global Talent Management, Office of Career Development and Assignments);

  - o  Kim Murphy (Deputy Director – Bureau of Global Talent Management, Office of Career Development and Assignments, Mid-Level Division);

  - o  Sumera Ashruf (Director – Bureau of Global Talent Management, Office of Career Development and Assignments, Entry-Level Division);

  - o  Zahid Raja (Career Development Officer – Bureau of Global Talent Management, Office of Career Development and Assignments, Mid-Level Division);

  - o  Etienne Singleton (Deputy Director for Diplomatic Security Unit – Bureau of Global Talent Management, Office of Career Development and Assignments, Mid-Level Division);

11

- o Jonathan Nellis (Counseling and Assignments Officer – Bureau of Global Talent Management, Office of Career Development and Assignments, Mid-Level Division);

- o Connie Oestreich (Career Development Officer – Bureau of Global Talent Management, Office of Career Development and Assignments, Mid-Level Division);

- o John Schuch (Human Resources Specialist – Bureau of Global Talent Management, Office of Career Development and Assignments);

- o Sophie Gao (Bureau of Global Talent Management, Office of Career Development and Assignments, Assignment Division);

- o Traci Goins (Deputy Assignments Officer – Bureau of Global Talent Management, Office of Career Development and Assignments, Assignment Division);

- o Sarah Alonso (Assignments Officer – Bureau of Global Talent Management, Office of Career Development and Assignments, Assignment Division);

- o Baber Sultan (Deputy Assignments Officer – Bureau of Global Talent Management, Office of Career Development and Assignments, Assignment Division);

- o Lindsey Herrity (Deputy Assignments Officer – Bureau of Global Talent Management, Office of Career Development and Assignments, Assignment Division).

**Interrogatory No. 1.5 (Krakow)**: As Plaintiff was neither selected for, nor placed on a short-list for the Krakow vacancy, no assignment panel considered any decision concerning Plaintiff's bid in connection with the Krakow assignment.

## INTERROGATORY NO. 2:

Identify all individuals stationed overseas with any affiliations with the State Department or any embassy or consulate who had any communications relating to Mr. Lenzi's efforts to pursue overseas postings in each of: (1) SEO position numbers 57408002 and 57408004 in Frankfurt, Germany; (2) SEO position number 57408003 in Belgrade, Serbia; (3) SEO position number 56803003 in Athens, Greece; (4) SEO position number 56001010 in Warsaw, Poland; (5) Political/Economic Officer position number 14035112 in Krakow, Poland; and (6) Officer in Charge position number 57255028 in Baku, Azerbaijan, as described in the First Amended Complaint.

**OBJECTIONS TO INTERROGATORY NO. 2:** In addition to the above objections to

Definitions and Instructions, Defendants object to this interrogatory on the grounds that it improperly presents six (6) interrogatories on six different topics; accordingly, Defendants will count this interrogatory as six separate interrogatories. Defendants also object to the request for information regarding "Officer in Charge position number 57255028 in Baku, Azerbaijan," as that position is not alleged in the Complaint to be among the challenged assignment decisions in this action, *see* Dkt. No. 27 ¶¶ 60–89, and is therefore neither relevant to the claims in this action nor proportionate to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1). Defendants object to the request for "all individuals" "with any affiliations" "who had any communications" as overbroad and disproportionate to the needs of the case, both because those individuals do not make the assignment decisions, and because Plaintiff is already in possession of the information regarding the individuals overseas with whom he spoke about each position at issue—especially since Plaintiff is the only individual who could know what "efforts" he took. Further, as written, this interrogatory would purport to require Defendants to interview "all individuals stationed overseas with any affiliations with the State Department or any embassy or consulate" in order to determine whether such individual "had any communications relating to Mr. Lenzi's efforts to pursue overseas postings." Such a request is not proportionate to the needs of the case and carries the additional burden of ensuring that Defendants would be in compliance with international law to the extent that any of the "affiliates" are foreign nationals. Defendants additionally assert a Privacy Act objection to the disclosure of information regarding "individuals" not named as a party to this action.

**RESPONSE TO INTERROGATORY NO. 2:** Subject to and without waiver of the foregoing objections, and pursuant to the parties' meet and confer discussions to date, Plaintiff will provide Defendants with the names of the embassy/consulate staff with whom he communicated, and Defendants will undertake a reasonable inquiry into additional embassy/consulate staff with whom those individuals had substantive communications about Plaintiff's efforts to pursue an assignment with that embassy/consulate. Defendants will supplement their response to this interrogatory as appropriate.

**INTERROGATORY NO. 3:**

     Identify all facts that were considered in the Agency's decisions not to reassign Mr. Lenzi to the overseas posts to which he bid or applied, and all arguments supporting such decisions, including for (1) SEO position numbers 57408002 and 57408004 in Frankfurt, Germany; (2) SEO position number 57408003 in Belgrade, Serbia; (3) SEO position number 56803003 in Athens, Greece; (4) SEO position number 56001010 in Warsaw, Poland; and (5) Political/Economic Officer position number 14035112 in Krakow, Poland; or to place Mr. Lenzi in (6) SEO position number 57255028 in Baku, Azerbaijan, as described in the First Amended Complaint.

**OBJECTIONS TO INTERROGATORY NO. 3:** In addition to the above objections to Definitions and Instructions, Defendants object to this interrogatory on the grounds that it improperly presents six (6) interrogatories on six different topics; accordingly, Defendants will count this interrogatory as six separate interrogatories. Defendants also object to the request for information regarding "SEO position number 57255028 in Baku, Azerbaijan," as that position is not alleged in the Complaint to be among the challenged assignment decisions in this action, *see* Dkt. No. 27 ¶¶ 60–89, and is therefore neither relevant to the claims in this action nor proportionate to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1). Similarly, Defendants object to the extent that "overseas posts to which he bid or applied" is written to include additional overseas posts beyond those in Frankfurt, Belgrade, Athens, Warsaw, and Krakow, as only those assignments have been challenged in this action. Defendants also object to the phrase "all facts that were considered … and all arguments supporting such decisions" as vague and ambiguous and, as such, overbroad and unduly burdensome.

**RESPONSE TO INTERROGATORY NO. 3:** Subject to and without waiver of the foregoing objections, and pursuant to the parties' meet and confer discussions to date, Defendants respond to the five separate components of this interrogatory regarding the reasons that Plaintiff was not reassigned to the (1) Frankfurt, (2) Athens, (3) Belgrade, (4) Warsaw, and (5) Krakow positions. Pursuant to their objections, Defendants are not responding to the sixth component of this interrogatory regarding Baku or, more generally, to any unidentified "overseas posts to which [Plaintiff] bid or applied."

**Background**: The process of identifying a candidate for a Security Engineering Officer ("SEO") vacancy begins at the Bureau of Diplomatic Security's ("DS") Directorate level. Directorates are subdivisions of an Agency bureau. Senior SEOs from DS's Countermeasures Directorate, Training Directorate, and Cyber and Technology Security Directorate meet as a Security Technology Advisory Panel ("ST Advisory Panel"), typically on a monthly basis, to review vacant SEO positions and individual bidder information, and to identify "preferred candidates" for recommendation to DS's Deputy Assistant Secretaries ("DASes"). After the monthly ST Advisory Panel meeting, DS convenes the DS Assignments Recommendation Panel, during which DS's DASes review the proposed assignment recommendations and approve, deny, or defer for later consideration the proposed recommendations. The DS Assignments

14

Recommendation Panel's approval of a candidate for a position identifies the employee as the bureau's "preferred candidate" and results in a "handshake offer," which is an informal agreement between a bureau and an employee for an assignment proposal, to the identified candidate.  If the handshake offer is accepted by the candidate, the handshake is registered in the Department's bidding software.  After the DS Assignments Recommendation Panel approves a proposed handshake, the Bureau of Global Talent Management's ("GTM") Office of Career Development and Assignments ("GTM/CDA") reviews the proposed assignment for compliance with Agency policy.  If the proposed assignment is compliant, it will go to a GTM/CDA assignment panel for final approval.  Only after the GTM/CDA assignment panel approves is an employee's assignment finalized.

An employee who is not selected for certain Foreign Service positions may initiate an "assignment challenge" (informally known as a "shootout"), which requires the GTM/CDA assignment panel to vote on whether to assign the position at issue to the selected employee or the challenging employee (or employees).  Before voting, the panel will typically review the description of the challenged position, statements provided by each employee, and statements provided by the bureau.  The panel will then discuss the challenge and vote on which employee to assign the position.  An employee may appeal the panel's decision to the Director General of the Foreign Service through a process known as DG Direct within ten business days.  The Director General's decision is final, and GTM/CDA must implement the Director General's decision.

Foreign Service assignments are typically made through a system in which Foreign Service employees bid on assignments in software called FSBid (and subsequently, TalentMAP) during what is known as "Open Assignments Season."  There are generally two cycles for bidders: a summer cycle and a winter cycle.  An employee is eligible to bid for assignments in a particular

cycle when the employee's transfer eligibility date (TED) (the expected end date of an assignment) corresponds with the TED range of that cycle. For example, for 2021 Foreign Service assignments, employees whose TED fell between May 1 and October 31, 2021 were considered Summer (2021) cycle bidders and were eligible to bid on jobs that had TEDs in that same timeframe. In contrast, "NOW" bidders are bidders who are not part of the summer or winter cycles for various reasons, including, but not limited to, having an immediately prior tour cut short. NOW bidders are expected to bid only on assignments designated as NOW assignments—which typically are available to start immediately—not summer or winter cycle assignments (which typically start several months later).

New Foreign Service specialist career candidates, including SEOs, are hired on four-year appointments. With limited exceptions, specialist candidates must receive tenure within those four years to remain in the Foreign Service. Pursuant to GTM's Standard Operating Procedure ("SOP") on specialist assignments, first and second-tour specialists are generally assigned to overseas positions to the extent such positions are available. Providing "entry-level" specialist candidates (Foreign Service specialists who have not yet completed two assignments or tours and have not yet received tenure) an opportunity to work overseas is vital to the Agency's tenure review process. However, given the unpredictable nature of recruitment and hiring authority for smaller Foreign Service skill codes, including SEOs, DS does not reserve overseas positions for the assignment of entry-level SEOs. Thus, in preparation of virtually every Foreign Service assignment cycle, Career Development Officers ("CDOs") who are responsible for DS's SEOs review all projected overseas SEO vacancies to determine which of those vacancies may be "ceded" to entry-level SEOs.

**Interrogatory No. 3.1 (Frankfurt)**: Plaintiff was not assigned to one of the two FP-03 SEO positions in Frankfurt because the positions were ceded to GTM/CDA's Entry Level Division

16

for use by entry-level SEOs before any mid-level bidder was assigned.  On October 22, 2019, the ST Advisory Panel met to review bidder information and recommend the first tranche of handshake offers for the bidding cycle in effect at the time.  During the meeting, the Panel decided to recommend Plaintiff to the DS Assignments Recommendation Panel for one of the vacant Frankfurt positions.  On November 15, 2019, the DS Assignments Recommendation Panel met to consider initial handshake offers for the Summer 2020 cycle, including the ST Advisory Panel's recommendation that Plaintiff be selected for a vacant SEO position in Frankfurt.  During the meeting, the DS Assignments Recommendation Panel deferred consideration of Plaintiff for the Frankfurt position at the suggestion of John Fitzsimmons, who was then DAS of DS's Countermeasures Directorate.

Fitzsimmons recommended that the DS Assignments Recommendation Panel defer considering Plaintiff's bid for the Frankfurt position to a subsequent panel meeting for several reasons.  First, Plaintiff had previously and recently served a tour in Frankfurt.  Foreign Service employees, including Foreign Service Specialists such as Plaintiff, are generally expected to serve at different posts and in different regions to expand their expertise and responsibilities.  Second, the position in Frankfurt was at the Frankfurt Engineering Services Center ("ESC").  Plaintiff had previously served in essentially the same position.  Foreign Service employees, including Foreign Service Specialists such as Plaintiff, are expected to take on new responsibilities and master new skills as they progress throughout their career.  The Frankfurt SEO positions were ideal entry-level positions because they provided new specialists with substantial opportunities for supervision and mentoring.  As Plaintiff was a mid-level SEO, a typical career progression would expect him to be running a small office (generally an Engineering Services Office or "ESO").  Third, prior to the November 15, 2019 DS Assignments Recommendation Panel meeting, Ambassador Robert

Yamate, at the time the Care Coordinator for the Health Incidents Response Task Force, had informed Fitzsimmons that Plaintiff had told Ambassador Yamate that the FBI had recommended that Plaintiff be assigned to Frankfurt because that location could best ensure his personal security and that the FBI would potentially get involved in the assignment if need be. Fitzsimmons sought the deferment at panel, in part, in order to verify this highly unorthodox situation by confirming this information with DS's contacts at the FBI. Fitzsimmons did not explain his reasoning for proposing deferral during the DS Assignments Recommendation Panel meeting, and neither Fitzsimmons nor the other panel members recall any objection to or discussion about the proposal. As Fitzsimmons was the DAS who oversaw the DS division responsible for security technology, it was typical and unremarkable that other panel members would defer to his recommendation. After being informed of the FBI issue, Fitzsimmons reached out to David Whitehead, Senior Advisor in the DS Countermeasures Programs Division, to inquire with that Division's FBI liaison about Plaintiff's claims. Following further discussions with Whitehead, Fitzsimmons understood that the FBI had no information regarding Plaintiff's claim that the FBI would protect him, had not offered to intervene in the Foreign Service assignment process on behalf of Plaintiff, and had no opinion or interest in Plaintiff being assigned to Frankfurt or any other location. Deferring the consideration of Plaintiff for the Frankfurt position did not constitute a decision on the position; it simply meant the panel would make a decision at a subsequent meeting.

The Frankfurt vacancies were not reviewed again by the DS Assignments Recommendation Panel before they were ceded to entry-level SEOs. In or around March 2020, GTM/CDA learned that new SEOs would be joining the April 2020 Foreign Service Specialist orientation class, creating a need to identify positions suitable for entry-level assignments. Plaintiff's CDO Nathan Lingenfelter, who covered SEO assignments, and the ST Advisory Panel

determined that, of the fourteen SEO vacancies that remained at the time, the two Frankfurt vacancies were most suitable for new SEOs. SEO vacancies that are appropriate to cede to entry-level SEOs are overseas vacancies at an Engineering Services Office or ESC where an incoming SEO reports to a more experienced and higher-ranked SEO within the same office or ESC. The Frankfurt vacancies met this criterion. Additionally, they were the only two overseas positions at the FP-03 level, and as entry-level officers are FP-04 and below, only FP-03 and lower positions are appropriate for ceding to entry-level specialist candidates, and they involved "traditional" SEO work, including designing, installing, and maintaining security equipment and conducting countermeasures inspections. GTM/CDA's Entry-Level Division (GTM/CDA/EL) subsequently approved the two Frankfurt positions for ceding to new SEOs in the April 2020 orientation specialist class.

**Interrogatory No. 3.2 (Athens)**: Plaintiff was not assigned to the FP-04 SEO position in Athens (a position below Plaintiff's grade) because the position was ceded to GTM/CDA's Entry Level Division for use by entry-level SEOs before any mid-level bidder was assigned.

On October 23, 2020, the ST Advisory Panel met to determine which recommendations for SEO positions it would present to the DS Assignments Recommendation Panel. Towards the beginning of the meeting, the ST Advisory Panel asked Plaintiff's CDO Andrew Kaleczyc which bid cycle Plaintiff was in, and Kaleczyc advised that Plaintiff was a NOW bidder—as confirmed by GTM/CDA leadership—who wished to be considered for Summer 2021 positions. Tamika Abbott, then the Division Director of DS's Security Operations Division, noted that DS had NOW positions available that would be both career-appropriate and career-enhancing for Plaintiff, including an FP-03 vacancy in Monterrey, Mexico for which he would be a good candidate. There was no further discussion of Plaintiff's candidacy for any Summer 2021 position.

19

On January 4, 2021, Andrew Kaleczyc—who at the time was the CDO for DS's SEOs—reviewed all projected overseas SEO vacancies for the Summer 2021 bidding cycle to determine which of those vacancies could be ceded to entry-level SEOs. Kaleczyc determined that only three projected overseas SEO vacancies in the Summer 2021 bidding cycle met these criteria and cycle timing requirements: an FP-04 position in Athens, Greece; an FP-03 position in Dubai, United Arab Emirates; and an FP-04 position in Moscow, Russia. At the time Kaleczyc reviewed the positions, the Department was experiencing severe delays in securing visas to Russia for Foreign Service employees, which had disrupted the timing of new Foreign Service assignments to that country. As a result, the Moscow vacancy was eliminated from consideration as a viable position for an entry-level SEO. As at least two entry-level SEOs would require overseas assignments in the Summer 2021 assignment cycle, Kaleczyc determined the Athens vacancy and the Dubai vacancy to be the most appropriate options for those SEOs.

Kaleczyc discussed the need to reserve the Athens and Dubai vacancies for entry-level SEOs with Tamika Abbott and other members of DS's Office of Security Technology leadership. Subsequently, Sumera Ashruf (Director of GTM/CDA/EL) and Christina Stokes (Deputy Director of the Specialist Unit in GTM/CDA/EL) approved these positions to be used for two entry-level SEOs who were finishing tours in Washington, D.C. and needed overseas assignments. The Athens and Dubai positions were subsequently removed from the Summer 2021 bidding cycle. The DS Assignments Recommendation Panel played no role in the selection or non-selection of SEOs for the Athens position because the ST Advisory Panel did not identify a recommended candidate for this position for the DS Assignment Recommendation Panel's consideration.

**Interrogatory No. 3.3 (Belgrade)**: Plaintiff was not eligible for assignment to the FP-03 SEO position in Belgrade because he was a NOW bidder attempting to bid for a Summer 2021

position.  The candidate who was recommended by the ST Advisory Panel, who was identified as the bureau-preferred candidate by the DS Assignments Recommendation Panel, and whose assignment was formally approved by GTM/CDA was an eligible and competitive bidder who was bidding for a position within the appropriate assignment cycle (*i.e.*, Summer 2021).

On October 23, 2020, the ST Advisory Panel met to determine which recommendations for SEO positions it would present to the DS Assignments Recommendation Panel.  Towards the beginning of the meeting, the ST Advisory Panel asked Plaintiff's CDO Andrew Kaleczyc which bid cycle Plaintiff was in, and Kaleczyc advised that Plaintiff was a NOW bidder—as confirmed by GTM/CDA leadership—who wished to be considered for Summer 2021 positions.  Tamika Abbott noted that DS had NOW positions available that would be both career-appropriate and career-enhancing for Plaintiff, including an FP-03 vacancy in Monterrey, Mexico for which he would be a good candidate.  There was no further discussion of Plaintiff's candidacy for any Summer 2021 position.  The Panel ultimately decided to recommend a different candidate for the Belgrade position.  The recommended candidate was chosen, in part, because he was an eligible and competitive Summer 2021 bidder, and Belgrade was a position in the Summer 2021 bid cycle.

On November 5, 2020, the DS Assignments Recommendation Panel met and accepted the ST Advisory Panel's proposal to extend a handshake offer for the FP-03 position to its preferred candidate.  The panel did not assess Plaintiff's candidacy for the position because only the candidate recommended by the ST Advisory Panel was brought before it in accordance with the panel's customary practice.  The handshake was subsequently registered in the Agency's online bid system.

On or about November 9, 2020, Plaintiff initiated an assignment challenge for the Belgrade position.  On November 19, 2020, a GTM/CDA assignment panel reviewed the standard

documentation prepared for all assignments challenges, including the employee statements, the DS bureau statement, and employee assignment data. Finding no issues with the assignment recommendation, the GTM/CDA assignment panel unanimously approved the candidate who had been recommended by the ST Advisory Panel and approved by the DS Assignments Recommendation Panel for the FP-03 Belgrade position.

Plaintiff subsequently appealed the GTM/CDA assignment panel's decision to the Director General. In his statement to the Director General in support of his appeal, he stated among other things, that he was interviewed for a segment on *60 Minutes*, and that he had given an interview to the *New York Times* in which he alleged that the Agency had discriminated and/or retaliated against him due to a disability that he incurred while on an overseas Foreign Service assignment. An action memorandum, dated January 22, 2021, from GTM/CDA Acting Director Naomi Lyew to Principal Deputy Assistant Secretary ("PDAS") Kenneth Merten (who was temporarily undertaking the duties of the Director General while the Director General was performing the duties of the vacant position of Under Secretary of State for Management), which was initially drafted by Plaintiff's CDO, Kaleczyc, confirmed Plaintiff's statement that Plaintiff had made media appearances on various outlets. The memo also informed PDAS Merten that Plaintiff was contesting his non-selection for the SEO vacancy in Frankfurt, and that he had rejected Kaleczyc's advice to bid on an overseas NOW position in Monterrey because he would have been a strong candidate for that position. The memo recommended that PDAS Merten disapprove Plaintiff's request to overturn the results of the GTM assignment panel's decision on the Belgrade challenge, and that he approve of GTM informing Plaintiff that he must bid on NOW positions. On January 25, 2021, finding no compelling reason to overturn the GTM/CDA assignment panel shootout decision, PDAS Merten approved GTM/CDA's recommendations in full.

**Interrogatory No. 3.4 (Warsaw)**: Plaintiff was not eligible for assignment to the FP-02 SEO position in Warsaw (a position above Plaintiff's grade) because he was a NOW bidder attempting to bid for a Summer 2021 position. The candidate who was recommended by the ST Advisory Panel, identified as the bureau-preferred candidate by the DS Assignments Recommendation Panel, and whose assignment was formally approved by GTM/CDA, was an eligible and competitive bidder who was bidding for a position within the appropriate assignment cycle (*i.e.*, Summer 2021).

On October 23, 2020, the ST Advisory Panel met to determine which recommendations for SEO positions it would present to the DS Assignments Recommendation Panel. Towards the beginning of the meeting, the ST Advisory Panel asked CDO Andrew Kaleczyc which bid cycle Plaintiff was in, and Kaleczyc advised—as confirmed by GTM/CDA leadership—that Plaintiff was a NOW bidder who wished to be considered for Summer 2021 positions. Tamika Abbott noted that DS had NOW positions that would be both career-appropriate and career-enhancing for Plaintiff, including a vacancy in Monterrey, Mexico for which he would be a good candidate. There was no further discussion of Plaintiff's candidacy for any Summer 2021 position. The Panel ultimately decided to recommend a different candidate for the Warsaw position. The recommended candidate was chosen, in part, because he was an eligible and competitive Summer 2021 bidder, and Warsaw was a position in the Summer 2021 bidding cycle.

On November 5, 2020, the DS Assignments Recommendation Panel met and accepted the ST Advisory Panel's proposal to extend a handshake offer for the FP-02 Warsaw position to its preferred candidate. The panel did not assess Plaintiff's candidacy for the position because only the candidate recommended by the ST Advisory Panel was brought before it in accordance with customary practice. The handshake was subsequently registered in the Agency's online bid

system.

On or about November 24, 2020, Plaintiff initiated an assignment challenge for the Warsaw position. On or about February 11, 2021, a GTM/CDA assignment panel reviewed the standard documentation prepared for all assignments challenges, including the employee statements, the DS bureau statement, and employee assignment data. Finding no compelling reason to overturn the DS Assignments Recommendation Panel's decision, the GTM/CDA assignment panel unanimously approved the candidate who had been recommended by the ST Advisory Panel for the FP-02 Warsaw position.

Plaintiff subsequently appealed the GTM/CDA assignment panel's decision to the Director General. On March 3, 2021, Plaintiff received a communication from PDAS Merten denying his appeal. PDAS Merten instructed Plaintiff that, as a NOW bidder, he should focus on positions in the NOW bidding cycle. He also informed Plaintiff that if he continued to be unassigned, GTM would consider directing him into an assignment. Under 22 U.S.C. §3982(a)(1), the Agency may assign a Foreign Service employee to any position in which the employee is eligible to serve. Where an employee has not received a handshake, or vacant positions are not filled within a reasonable time, the Director General may direct the assignment (known as a "directed assignment") of an employee to a position for which the employee did not bid. Directed assignments are administrative actions to ensure the orderly, effective, and efficient operation of the Foreign Service's open assignments system. All Foreign Service assignments are ultimately subject to the needs of the Service.

**Interrogatory No. 3.5 (Krakow)**: Plaintiff was not assigned to the FO-03 Political/Economic Officer in Krakow (a Foreign Service Generalist position) because he lacked the relevant experience and skills in political and economic reporting, which were critical for a

Political/Economic Officer position.  Unlike Foreign Service Specialists like Plaintiff, Foreign Service Generalists (or Foreign Service Officers) are placed in one of five different career tracks or "cones": Political, Economic, Consular, Management, and Public Diplomacy.  While Foreign Service Generalists specialize in one specific cone, they routinely serve in assignments outside of their cones to broaden their expertise.  Unlike Foreign Service Generalists or Officers, Foreign Service Specialists perform specialized functions—including providing technical, professional, or administrative services—outside of the five generalist cones.  Plaintiff is a Foreign Service Specialist who has worked virtually exclusively as a DS security engineer.  It would thus have been highly atypical for him to be selected for a Generalist position.

Each of the individuals who were selected for the Krakow Political/Economic Officer position were Foreign Service Generalists that had prior and recent experience as a Political, Economic, or Political/Economic Officer.  Reena Patel, who had been an FO-03 since 2016, served tours as a Political Military Affairs Officer, a Political Officer, and a Consular Officer.  Brendan Kyle Hatcher, who had been an FO-03 since 2011, previously served multiple tours as a Political/Economic Officer, a Political Officer, an Economic Officer, and a Consular Officer.  When Hatcher broke the Krakow assignment in early February 2022, Erjon Kruja was selected as his replacement.  Similarly, Kruja had served as a Political/Economic Officer in Europe, as well as a Political/Military Affairs Officer in Washington, D.C., before being assigned to Krakow.  To the contrary, Plaintiff had no experience as a Political/Economic Officer, a Political Officer, an Economic Officer, or an officer in any of the other remaining Generalist cones.

**INTERROGATORY NO. 4:**

Identify all persons with knowledge concerning the questions raised by Mr. Lenzi about the removal of Catherine Warner from Guangzhou, China in 2018, the subsequent investigation of

her apartment, and the RSO-ordered counseling session to which Mr. Lenzi was subjected after Ms. Warner's removal, as described in at least paragraphs 37-45 of the First Amended Complaint.

**OBJECTIONS TO INTERROGATORY NO. 4:** In addition to the above objections to Definitions and Instructions, Defendants object to this interrogatory on the grounds that it improperly presents three (3) interrogatories on three different topics; accordingly, Defendants will count this interrogatory as three separate interrogatories. Defendants also object to this request because it seeks information that is not relevant to the claims in the case and is disproportionate to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1). Plaintiff's claims allege discrimination and retaliation regarding five overseas assignments, occurring between September 2019 at the earliest and July 2021 at the latest; this interrogatory requests information that both predates that time period and does not concern the assignment decisions challenged. Moreover, as written, this interrogatory would purport to require that Defendants interview "all persons"—without limitation—in order to determine whether such person had "knowledge concerning the questions raised by Mr. Lenzi." Such a request is not proportionate to the needs of the case, particularly when Plaintiff is the only one who can know the extent of his "questions raised." Defendants further object to "the questions raised by Mr. Lenzi" and "all persons with knowledge concerning" as vague and ambiguous. Defendants additionally assert a Privacy Act objection to the disclosure of information regarding "persons" not named as a party to this action. Defendants also object to the extent that this interrogatory would require the State Department to disclose information that is classified and thus may be protected by the state secrets privilege, as well as that information that is protected by the law enforcement privilege.

**RESPONSE TO INTERROGATORY NO. 4:** Defendants stand on their objections.


**INTERROGATORY NO. 5:**

Identify persons with decision-making authority pertaining to and describe policies addressing public statements made by employees such as those described in paragraph 138 of the First Amended Complaint.

**OBJECTIONS TO INTERROGATORY NO. 5:** In addition to the above objections to Definition and Instructions, Defendants object to this interrogatory on the grounds and to the extent that it seeks information that is not relevant and is not proportional to the needs of the case, considering the pending motion to dismiss Plaintiff's First Amendment claim for lack of jurisdiction. *See* Dkt. No. 29. Defendants further object to the extent that this interrogatory seeks information from before March 2019, the first instance of alleged First Amendment activity identified in the Complaint. *See* Dkt. No 27 ¶ 138. Defendants objects to "such as those described in paragraph 138 of the First Amended Complaint" as vague and ambiguous, and similarly to "decision-making authority pertaining to," which could be read to ask who has the authority to make such policies or who has the authority to make decisions under such policies. Defendants also assert a Privacy Act objection to the disclosure of information regarding "persons" not named as a party to this action.

**RESPONSE TO INTERROGATORY NO. 5:** Subject to and without waiver of the foregoing

objections, and pursuant to the parties' meet and confer discussions to date, Defendants respond to this interrogatory as follows with respect to the State Department's policies on media engagement:

As authorized by the State Department Basic Authorities Act of 1956, the Agency provides its process for the "Review of Public Speaking, Teaching, Writing, and Media Engagement" for "all personnel in the United States and abroad" that work for the "Department of State and United Sates Agency for International Development" at 3 FAM 4170. The Agency issued further guidance on the 3 FAM 4170 process via its internal "Social Media Hub" webpage in a February 17, 2017 document entitled "3 FAM 4170 Clarification." Additional FAM provisions are relevant when evaluating public communications, including 10 FAM 130, which concerns official communications on behalf of the Department, and 12 FAM 070, which assigns the Bureau of Diplomatic Security's Public Affairs Office (DS/DSS/PA) as the "sole conduit with the Bureau of Global Public Affairs (GPA) to address media inquiries related to DS and the Department's security and law enforcement activities." Department offices and bureaus frequently use official cables and other internal messages to underscore employee obligations to follow the 3 FAM 4170 process for all personal capacity communications of Departmental concern.

Pursuant to 3 FAM 4173.3, the Bureau of Public Affairs (now the Bureau of Global Public Affairs (GPA)) acts as the final reviewer for all personal capacity communications of Departmental concern and GPA has assigned this responsibility to the Managing Director for International Media. Personnel employed in the United States seeking review of personal capacity public communications either send them to a shared GPA email account, directly to a "GPA Reviews" database, or through their individual Bureau's Public Affairs Officer. Those posted overseas seek

27

review from their Embassy leadership and Public Affairs Section, which then routes the communication to GPA for review as needed.

Additionally, pursuant to Federal Rule 33(d), Defendants refer Plaintiff to the media engagement policies that have been produced at the Bates numbers identified in Attachment B.


Dated: September 26, 2022                    Respectfully submitted,

JESSICA D. ABER                             BRIAN M. BOYNTON
United States Attorney                       Principal Deputy Assistant Attorney General

LAUREN A. WETZLER                           CARLOTTA P. WELLS
Chief, Civil Division                        Assistant Branch Director

_____/s/_____
MATTHEW J. MEZGER                           JOSEPH BORSON
Assistant United States Attorney            CATHERINE M. YANG
Office of the United States Attorney        Trial Attorneys
2100 Jamieson Avenue                        United States Department of Justice
Alexandria, Virginia 22314                  Civil Division, Federal Programs Branch
Tel:    (703) 299-3741                      1100 L Street NW
Fax:    (703) 299-3983                      Washington, DC 20005
Email: matthew.mezger@usdoj.gov             Tel: (202) 514-1944/4336
                                            Email: Joseph.Borson@usdoj.gov
*Counsel for Defendants*                    Catherine.M.Yang@usdoj.gov

I hereby declare, under penalty of perjury, that the information I provided in response to Interrogatory Nos. 1 and 3 is true and correct to the best of my knowledge, information, and belief.

Executed on this 26th day of September, 2022

/s/ John Fitzsimmons

Former Deputy Assistant Secretary and Assistant Director, Countermeasures Directorate

Bureau of Diplomatic Security, U.S. Department of State

I hereby declare, under penalty of perjury, that the information I provided in response to Interrogatories Nos. 1 and 3 is true and correct to the best of my knowledge, information, and belief.

Executed on this 26th day of September, 2022

Security Engineering Officer and former Career Development Officer

Bureau of Diplomatic Security, U.S. Department of State

I hereby declare, under penalty of perjury, that the information I provided in response to Interrogatory Nos. 1 and 3 is true and correct to the best of my knowledge, information, and belief.

Executed on this 26th day of September, 2022

Nathan H Lingenfelter

Digitally signed by Nathan H Lingenfelter
Date: 2022.09.26 15:52:22 -04'00'

Security Engineering Office and former Career Development Officer

Bureau of Diplomatic Security, U.S. Department of State

I hereby declare, under penalty of perjury, that the information I provided in response to Interrogatory Nos. 1 and 3 is true and correct to the best of my knowledge, information, and belief.

Executed on this 26th day of September, 2022

Patrick T. Slowinski

/s/ Patrick Slowinski

Former Consul General, U.S. Consulate General in Krakow

Bureau of European and Eurasian Affairs, U.S. Department of State

I hereby declare, under penalty of perjury, that the information I provided in response to Interrogatory No. 5 is true and correct to the best of my knowledge, information, and belief.

Executed on this 26th day of September, 2022

/s/ Elizabeth E. Detmeister

Acting Deputy Assistant Secretary (DAS) for Strategic Messaging and Managing Director for International Media

Bureau of Global Public Affairs, U.S. Department of State

## CERTIFICATE OF SERVICE

I hereby certify that, on September 26, 2022, I served a copy of the foregoing by email on the following counsel of record:

Christopher A. Suarez
Thomas M. Barba
Kate E. Fisch
Steptoe & Johnson LLP
CSuarez@steptoe.com
TBarba@steptoe.com
KFisch@steptoe.com
*Counsel for Plaintiff*

　　　　　　　　　　　　　　　　　　　　　*/s/*
　　　　　　　　　　　　　　　　　CATHERINE M. YANG
　　　　　　　　　　　　　　　　　Trial Attorney
　　　　　　　　　　　　　　　　　United States Department of Justice
　　　　　　　　　　　　　　　　　Civil Division, Federal Programs Branch
　　　　　　　　　　　　　　　　　1100 L Street NW
　　　　　　　　　　　　　　　　　Washington, DC 20005
　　　　　　　　　　　　　　　　　Tel: (202) 514-4336
　　　　　　　　　　　　　　　　　Email: Catherine.M.Yang@usdoj.gov
　　　　　　　　　　　　　　　　　*Counsel for Defendant*

# PX-003

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

ALEXANDRIA DIVISION


_____
                              )
MARK LENZI,                   )
                              )
        Plaintiff,            )
                              )          Civil Action
vs.                           )
                              )          No. 1:21-cv-01371
UNITED STATES DEPARTMENT      )              PTG-IDD
OF STATE, AND ANTONY J.       )
BLINKEN, UNITED STATES        )
SECRETARY OF STATE,           )
                              )
        Defendants.           )
_____)




            DEPOSITION OF RONALD STUART
                  Washington, DC
                October 14, 2022




Reported by:  John L. Harmonson, RPR
Job No. 884870



Page 2

1

2

3

4

5                                    October 14, 2022

6                                    7:58 a.m.

7

8

9        Deposition of RONALD STUART, taken at the

10   offices of Steptoe & Johnson LLP, 1330

11   Connecticut Avenue NW, Washington, DC, pursuant

12   to the Federal Rules of Civil Procedure, subject

13   to such stipulations as may be recited herein or

14   attached hereto, before John L. Harmonson, a

15   Registered Professional Reporter and Notary

16   Public of the District of Columbia, who

17   officiated in administering the oath to the

18   witness.

19

20

21

22



```
                                                    Page 3
  1                 A P P E A R A N C E S
  2
  3    On behalf of Plaintiff:
  4          STEPTOE & JOHNSON, LLP
             1330 Connecticut Avenue, NW
  5          Washington, DC  20036
             202.429.3000
  6          BY:  CHRISTOPHER A. SUAREZ, ESQ.
                  SHANNON REID, ESQ.
  7               THOMAS M. BARBA, ESQ.
                  csuarez@steptoe.com
  8               sreid@steptoe.com
                  tbarba@steptoe.com
  9
 10          STEPTOE & JOHNSON, LLP
             1114 Avenue of the Americas
 11          New York, NY  10036
             212.506.3900
 12          BY:  KATE E. FISCH, ESQ.
                  kfisch@steptoe.com
 13
 14
 15    On behalf of Defendants:
 16          US DEPARTMENT OF STATE
             Office of the Legal Adviser
 17          2201 C Street, NW
             Washington, DC  20520
 18          202.647.5036
             BY:  JASON C. ROBERTS, ESQ.
 19               robertsjc2@state.gov
 20
 21
 22
```



Page 4

```
 1              APPEARANCES (Cont.'d)

 2

 3       US ATTORNEY'S OFFICE
         2100 Jamieson Avenue
 4       Alexandria, VA  22314
         703.299.3700
 5       BY:  MATTHEW J. MEZGER, ESQ.
              matthew.mezger@usdoj.gov

 6

 7

 8   ALSO PRESENT:
 9       APRIL CARTER, Videographer
10

11

12

13

14

15

16

17

18

19

20

21

22
```



Page 5

```
 1                    EXAMINATION INDEX

 2   WITNESS                                        PAGE

 3   RONALD STUART

 4     Examination by Mr. Suarez                       8

 5                         *  *  *

 6

 7                     EXHIBIT INDEX

 8   EXHIBIT NO.                                    PAGE

 9   Exhibit 1     Email; STATE00012117              63

10   Exhibit 2     Email; STATE00011695 - 11697      84

11   Exhibit 3     Email; STATE00011687 - 11690     101

12   Exhibit 4     Excerpt from Foreign Affairs     115

13                 Manual, 5 FAM 870 Networks

14   Exhibit 5     Email; STATE00011649 - 11652     136

15   Exhibit 6     Email; STATE00011644             146

16   Exhibit 7     Email; STATE00011699 - 11700     152

17   Exhibit 8     Email; STATE00011640 - 11641     156

18   Exhibit 9     Email; STATE00011635 - 11636     167

19   Exhibit 10    Email; STATE00011309 - 11310     184

20   Exhibit 11    Photograph; STATE00011148        216

21   Exhibit 12    Email; STATE00011087 - 11097     218

22   Exhibit 13    Email; STATE00011075 - 11077     226
```



Page 6

1                    EXHIBIT INDEX (Cont.'d)

2    EXHIBIT NO.                                        PAGE

3    Exhibit 14    Email; STATE00012036                 228

4    Exhibit 15    Email; STATE00011045 - 11047         233

5    Exhibit 16    Affidavit; STATE00000575 - 589       246

6    Exhibit 17    Affidavit; LENZI0003175 - 3183       246

7    Exhibit 18    DS Combined Recommendations          277

8                  Panel Report; STATE00007981 -

9                  8021

10   Exhibit 19    Email; STATE00008914                 289

11   Exhibit 20    Email; STATE00009508 - 9510          361

12   Exhibit 21    Screenshot                           369

13   Exhibit 22    Email; STATE00008588 - 8590          372

14   Exhibit 23    Email; STATE00009212                 382

15   Exhibit 24    Email; STATE00009235                 385

16   Exhibit 25    Email; STATE00009302 - 9305          396

17   Exhibit 26    Email; STATE00011015 - 11034         404

18

19

20

21

22



Page 7

```
1    --------------------------------------------------
2              P R O C E E D I N G S
3                 MORNING SESSION
4                    7:58 a.m.
5    --------------------------------------------------
6            THE VIDEOGRAPHER:  Good morning.  We
7    are now on the record.  This begins videotape
8    1 in the deposition of Ronald Stuart, in the
9    matter of Mark Lenzi v. US Department of State,
10   et al., in the US District Court, Eastern
11   District of Virginia, Alexandria Division.
12            Today is October 14, 2022, and the
13   time is 7:58 a.m.  This deposition is being taken
14   at 1330 Connecticut Avenue, Northwest,
15   Washington, DC 20036.
16            The videographer is April Carter of
17   Magna Legal Services, and the court reporter is
18   John Harmonson of Magna Legal Services.
19            Will counsel and all parties present
20   state their appearances and whom they represent.
21            MR. SUAREZ:  Good morning.  My name is
22   Christopher Suarez from Steptoe & Johnson on
```



Page 8

1  behalf of plaintiff Mark Lenzi.  With me today is

2  Shannon Reid, also from Steptoe & Johnson.

3          THE WITNESS:  Ronald Stuart for the

4  Department of State.

5          MR. MEZGER:  Matthew Mezger with

6  Department of Justice on behalf of the witness

7  and Department of State, and joining me is Jason

8  Roberts from the Department of State.

9          THE VIDEOGRAPHER:  Thank you.

10          Will the court reporter please swear

11  in the witness.

12                    *  *  *

13  Whereupon:

14              RONALD STUART,

15  after having been first duly sworn or affirmed,

16  was examined and did testify under oath as

17  follows:

18                 EXAMINATION

19  BY MR. SUAREZ:

20      Q.    Good morning, Mr. Stuart.  How are you

21  doing?

22      A.    I'm well, thank you.  Yourself?



Page 71

```
 1        Q.    So it wasn't just Mr. Lenzi who got

 2   med-evac'd for what came to be known as Havana

 3   syndrome, it was also this other individual in

 4   the adjoining apartment; right?

 5        A.    I don't know -- and again, I don't

 6   know technically if it was adjoining or where it

 7   was.  But I do know there was another person that

 8   was close to his apartment, whether it was

 9   adjoining, adjacent, above, below, but it was in

10   the similar vicinity, yes.

11        Q.    Now, you had mentioned before that

12   your wife wasn't interested in going to China.

13   What were her concerns about going to China?

14        A.    I don't know.  She just -- it was one

15   of those places she had never been interested in

16   living in.

17        Q.    Now, why did you get involved in 2018

18   such that you had a conversation with Mr. Lenzi

19   on the phone, or have two conversations with

20   Mr. Lenzi on the phone?

21        A.    So my position in 2018 at the time, I

22   was ST, Office of Security Technology, where the
```



Page 72

1   majority of the SEOs work.  I was the operations

2   director, which meant that the overseas -- our

3   overseas staff eventually reported up through me.

4   So I was responsible for our overseas staff.  And

5   I'm responsible for them from the Security

6   Technology Operations division as that director

7   to five regional directors.

8          Those regional directors then were

9   responsible for the ESCs, engineering services

10  center, which is a larger office.  And the ESCs

11  are responsible for the ESOs, or engineering

12  services security offices.  And then there are a

13  few TSOs, technical security offices, that fall

14  under them which are the OICs, officer in charge.

15  They're SGSs, very junior officers.

16          So Mr. Lenzi was at an ESO in

17  Guangzhou which would report to ESE Beijing,

18  which would go to the RD from Bangkok, which

19  would then come to me.  I was told that something

20  was going on with him, and I felt it my place to

21  be able to commit the government for expense to

22  get him out of his house.



Page 159

1          And then it says:  "John.  Post RSO,

2   in consultation with SRSO Beijing, decided today

3   to restrict Mark's access to the F building based

4   on his erratic behavior and his mental health."

5          Do you see that?

6     A.     Yes.

7     Q.     So who would post RSO and SRSO Beijing

8   be referring to?

9     A.     So the post RSO Rahim is referring to

10  is Judy Lim from Guangzhou in consultation with

11  the senior regional security officer Beijing,

12  which is Andrew Wroblewski.

13    Q.     So I want to be precise.  They

14  restricted his access at this time?

15    A.     Correct.

16    Q.     Okay.  And that was done based on his

17  medical situation with erratic behavior and

18  mental health; right?

19    A.     According to this, yes.

20    Q.     "He can still access the compound and

21  med unit, but needs to coordinate with RSO if he

22  wants to access the F building."



Page 160

1          A.      Correct.

2          Q.      Okay.   So is that where his ClassNet

3     would have been?

4          A.      Yes.

5          Q.      Okay.   So basically as of this

6     May 29th date, he wasn't allowed to access

7     ClassNet; right?

8          A.      No, that's not what it's saying.   It's

9     saying that he would have to have somebody escort

10    him or coordinate with the RSO to get into the F

11    building to access that and he wouldn't be able

12    to freely to go there on his own volition.

13         Q.      You understand that Mr. Lenzi has not

14    had access to ClassNet for the last four years;

15    right?

16         A.      I have understanding that in his

17    domestic assignments, he hasn't had -- he hasn't

18    been in an assignment that required access to

19    classified information.   I don't know that he's

20    been denied access, but I do know that his

21    assignments haven't required that.

22         Q.      And baked into a decision to place



Page 167

1    STATE00011635 to 636.

2              (Exhibit 9 marked for identification

3         and attached hereto.)

4    BY MR. SUAREZ:

5         Q.    I'm going to start three email downs.

6    There is an email from Judy Lim on May 29, 2018,

7    at 8:55 p.m.  Do you see that one?

8         A.    8:39?

9         Q.    No.  The one at 8:55 on the first

10   page, three down.

11        A.    Yep.

12        Q.    So it says:  "I spoke with our PAS

13   officer who is friends with Mark and has been

14   texting with him.  As expected, Mark is pretty

15   upset he does not have free access to F

16   building."

17             Do you see that?

18        A.    I see that.

19        Q.    So that is a reference to the

20   restriction on him having access to classified

21   information at this time; right?

22        A.    Accessing the entirety of the CA



Page 168

1   building.  It's more than just classified

2   information.

3        Q.    By the way, you mentioned official

4   channels earlier.  You know what the OSC is,

5   right, Office of Special Counsel?

6        A.    Yes.

7        Q.    You would agree that's an official

8   channel to lodge a complaint; right?

9        A.    Yes.

10       Q.    Okay.  Are you aware that Mr. Lenzi

11   has raised a complaint with the OSC in the past

12   regarding his revocation of access to ClassNet?

13       A.    I am aware that there was a complaint.

14   I didn't know the exact specifics of it.

15       Q.    So would it surprise you that there

16   was a complaint to the OSC about that?

17             MR. MEZGER:  Object to form.

18             The witness may answer.

19             THE WITNESS:  "Surprise" is the wrong

20   term for me.  Mr. Lenzi has numerous avenues of

21   areas to dissent, complain, et cetera.

22   "Complain" is the wrong word.  Voice his



Page 169

1    concerns.  And that is one of them.  So he's

2    utilizing them all.

3    BY MR. SUAREZ:

4        Q.    And you agree that that's a valid one

5    to use; right?

6        A.    Correct.  Yes, I do.

7        Q.    All right.  Let's go to the email

8    above it.  Andrew Wroblewski, Rahim Theriot,

9    9:37 p.m. on May 29th.  "We received this message

10   from IP."

11            Who is IP?

12       A.    International Programs.  So within the

13   directorate of Diplomatic Security, one of the

14   directorates is International Programs.

15       Q.    Okay.  Is that in the main State

16   office in DC?

17       A.    No.  So that's in DS in Rosslyn in

18   SA20.  Our overseas office within DS from the

19   agent side are overseen by two different

20   organizations, International Programs and

21   High-Threat Programs.

22       Q.    And this says:  "The secretary has



Page 170

1    asked the DS assistant secretary to convey to

2    post that, effective immediately, Mark Lenzi's

3    access to OpenNet should be rescinded."  Right?

4          A.     Correct.

5          Q.     So to be clear, this was coming from

6    Pompeo; right?

7          A.     Yes.

8          Q.     So Pompeo himself said, at least as of

9    this time frame, he shouldn't even get into

10   OpenNet; right?

11         A.     Correct.

12         Q.     So again, highest levels of the

13   department making decisions about Mr. Lenzi;

14   right?

15         A.     Yes.

16         Q.     Who is DS assistant secretary?

17         A.     Can I see this one?

18                MR. MEZGER:  The witness asked for

19   Exhibit 8.

20                THE WITNESS:  7.

21                MR. MEZGER:  The witness asked for

22   Exhibit 7.



Page 178

1              The witness may answer.

2              THE WITNESS:  5 percent-ish.

3    BY MR. SUAREZ:

4         Q.    Okay.  So 95 percent of SEOs have

5    access to ClassNet.  Is that correct,

6    approximately?

7         A.    Approximately.

8         Q.    Okay.  So are you aware of -- you

9    testified that the ones who are not in positions

10   that require ClassNet are the ones who don't have

11   access to ClassNet.

12        A.    Correct.

13        Q.    Are you aware of any SEO who is in a

14   position that requires ClassNet but for whom

15   their ClassNet access has been restricted or

16   revoked?

17        A.    To clarify that, they're in a position

18   currently that requires this and they're not

19   allowed to access that?

20        Q.    Right.

21        A.    No.  Because they would be moved out

22   of that kind of position.  The individuals that



Page 200

1    there is an OIC position, great for him, somebody

2    ought to inform him.  That would be a better word

3    than offer.  Somebody should inform him that this

4    is an OIC position at grade.  We say overseas

5    even though it's in Mexico.  It's not technically

6    overseas, but for the department it's an overseas

7    position.

8        Q.    So back to the question.  With whom

9    amongst the seniors did you have this discussion

10   about informing Mr. Lenzi that Monterrey was an

11   option?

12       A.    All of our division directors at the

13   time.  During an advisory panel, we would have

14   discussed open assignments.  And so it would have

15   been Tamika Abbott, an STO.  Rahim Theriot at

16   that point was in training.  I'm fairly certain

17   Jim Nicodemus was the FSE division director.  And

18   there's one other, and I don't know who.  It

19   might have been Mark Graves.

20       Q.    And who were the two individuals who

21   you believe informed Mr. Lenzi about this

22   position?



Page 208

1    informed of his DRAD exceptions or accommodations

2    for his current assignment, or the past two

3    assignments domestically.

4         Q.    You're aware at one time Mr. Lenzi had

5    a Class 1 medical clearance?

6         A.    Yes.

7         Q.    And then he applied to a position in

8    Frankfurt.  Do you recall that?

9         A.    Yes.

10        Q.    And then after he applied for the

11   position in Frankfurt, he was moved to a Class 5.

12   Do you remember that?

13        A.    I didn't know he was moved to a

14   Class 5.

15        Q.    Are you familiar with a situation --

16   or did you know that Mr. Lenzi at one point was

17   moved from a Class 1 directly to a Class 5

18   medical clearance?

19        A.    No.  Class 5 would be domestic only.

20        Q.    Right.  Are you aware of any situation

21   ever where someone has been moved from a Class 1

22   medical clearance directly to a Class 5?



Page 209

 1          A.      Yes.

 2          Q.      What were those situations?

 3          A.      I know some people that have had a

 4    stroke, a heart attack.

 5          Q.      So usually there's an intervening

 6    medical event between a shift from a Class 1

 7    medical clearance directly to a Class 5; right?

 8          A.      Yes.

 9          Q.      Okay.  So it would be kind of odd if a

10    medical clearance was changed directly from

11    Class 1 to Class 5 if there was not an

12    intervening medical event; right?

13                  MR. MEZGER:  Object to form.

14                  The witness may answer.

15                  THE WITNESS:  Maybe.  I don't do the

16    medical clearance.  My assumption would be that

17    would be odd.

18                  Now, you can get a Class 5 medical

19    clearance for spouses or children as well that

20    affects your assignments, which means we cannot

21    assign you to a certain place because of your

22    family members.



Page 210

1   BY MR. SUAREZ:

2        Q.    Okay.  So now other than the position

3   in Monterrey, is there any other position you're

4   aware of where Mr. Lenzi was informed that he

5   could bid on and receive the position?

6        A.    I think saying "bid on and receive the

7   position" -- when we informed him, it wasn't

8   guaranteed he would receive the position.  We

9   informed him this was at grade, in cone, that met

10  what he needed under the department's bidding

11  guidelines.  It still has to go through the DS

12  panel and the HR panel.

13       Q.    So he wouldn't even have been

14  guaranteed Monterrey?

15       A.    Correct.  It was our advisory side

16  where we would have fed to the DS panel that we

17  advised that Mr. Lenzi meets the criteria to go

18  to this post.

19       Q.    Right.  And in fact, you were on the

20  advisory panel when Mr. Lenzi applied for a

21  Frankfurt position; right?

22       A.    Correct.



Page 219

1       Q.     Does that refresh your recollection

2   that he was broken out of a Baku assignment?

3       A.     No.  But it does make sense that he

4   would have gone to Baku.

5       Q.     Okay.  And again, this in 2018 we are

6   talking about, that like he got med-evac'd in the

7   middle of 2018 and any plans to go to Baku would

8   have been disrupted; right?

9       A.     They would have been disrupted.

10      Q.     And after this he was placed on

11  overcomplement status; right?

12      A.     Yes.

13      Q.     Okay.  So what's a Y tour?

14      A.     An out-of-assignment kind of tour.

15  Within Security Technology we had an IRM person,

16  information resource management person, that is

17  an IRM specialist that came to work for us in an

18  SEO position as a radio specialist.  But since he

19  doesn't have that skill code to be within that

20  tour, they assigned him a Y tour.

21              And a Y tour for an SEO could be

22  somewhere where we don't have an office



Page 220

1    potentially to -- we have assigned an STS to a

2    post before that we didn't have an STS assigned

3    to so we created a Y tour, which is kind of an

4    out-of-normal numerical number for a position

5    tour.  GTM can give you an exact definition.

6         Q.    Okay.  What is the difference between

7    a Y tour and overcomplement status?

8         A.    I don't know.

9         Q.    Okay.

10        A.    There is a difference, yes, but...

11        Q.    You're just not privy to the

12   differences?

13        A.    Correct.

14        Q.    Okay, fair enough.

15             So I want to look at the bottom email

16   on the first page at 11087.  It's from someone

17   named Michele Crone to Mark Lenzi and

18   Lingenfelter.

19        A.    Yes.

20        Q.    It actually looks like his wife might

21   be on it as well, Kristalin.  Do you see that?

22        A.    Yes.



Page 255

1      Q.     -- for consideration?

2      A.     Yes.

3      Q.     And as the chair, you did not say

4   anything during the meeting to disqualify

5   Mr. Lenzi from consideration for the Frankfurt

6   position; right?

7      A.     No.

8      Q.     And you reviewed Mr. Lenzi's

9   credentials and qualifications to be considered

10   for the Frankfurt positions?

11      A.     Not that in-depth.  I mean, he's an

12   SEO.  He's at grade.  He can serve at this kind

13   of position.  I mean, it's assumed his

14   credentials and everything else already exist.

15      Q.     Got it.

16             But from your perspective, as of the

17   time the panel met on October 22, 2019, you saw

18   no reason that Mr. Lenzi should have been

19   precluded from being allowed to go to one of the

20   two vacant FP-03 positions in Frankfurt; right?

21      A.     Correct.

22      Q.     What role does the panel play in



Page 264

1           The witness may answer.

2           THE WITNESS:  My answer would be the

3   complainant alleged the two positions remained

4   open for six months, yes.

5   BY MR. SUAREZ:

6       Q.   Okay.  Thank you.

7           So then "Complainant alleged on or

8   about March 3" --

9       A.   One second.  When I say complainant

10  alleged these, and then I say yes, I don't know

11  if they alleged that or not.  But what I can say

12  is the two positions more than likely remained

13  open for six months, yes.

14      Q.   Understood.  Thank you.

15          So now looking at 28.  "Complainant

16  alleged on or about March 3, 2020, the DS/ST

17  assignment panel made the decision to make the

18  two positions unavailable for at-grade bidders."

19          Do you see that?

20      A.   I see that.

21      Q.   And so you state:  "The two FS-03

22  positions remained open until February.  Advisory



Page 265

1  panel recommended the positions be designated as

2  two of the three required options for the 156th

3  specialist class."

4           So they were moved from the vacancy

5  list for that reason; right?

6      A.    Correct.

7      Q.    And so the idea was that they were

8  reassigned to be entry-level positions; right?

9      A.    As FS-03 is the most junior position

10  we have anywhere in the world, they count for

11  entry level all the way through, like, until

12  you're making 2.  So whether you're a 6, 5, 4 or

13  3, you're bidding on 3-level positions.

14      Q.    Got it.

15           And you agreed that the two positions

16  remained open until February; right?

17      A.    Correct.  Well, they were still active

18  on the standard bid list.  Entry level is a whole

19  other thing.  So they weren't available -- the

20  entry level, they were available for midlevel

21  employees to bid on.

22      Q.    What happened to the FP-02 and 01



Page 271

1    supervision to start their career.  Because we do

2    have 3-level positions that are more senior

3    junior-level at some very small ESO offices.

4         Q.    And you say in 32 that two domestic

5    and two junior positions at an ESC were ceded;

6    right?

7         A.    Yes.

8         Q.    And so to be clear for the record, the

9    only overseas positions that were ceded out of

10   all of the positions correspond to the position

11   Mr. Lenzi had been offered to get; right?

12        A.    He hadn't been offered.  He had

13   been -- we had advised the DS panel -- Mr. Lenzi

14   would not be aware of any of this, but we had

15   recommended him for that.  And the two positions

16   that were available, I think, within the ESCs at

17   that time were Frankfurt.

18        Q.    Got it.

19              And so to be clear for the record, the

20   only overseas positions that were ceded,

21   c-e-d-e-d, out of all the positions that were

22   being considered by the panel were the two



Page 272

1   positions that corresponded to Mr. Lenzi's grade

2   and for which the panel had recommended he

3   advance; right?

4       A.    Only two positions that were ceded out

5   of the availability of -- on the DS panel, the HR

6   panel, the positions available, the two were

7   Frankfurt, yes, for overseas.

8       Q.    And again, that just happened to

9   coincide with the one that Mr. Lenzi had been

10  recommended to receive?

11          MR. MEZGER:  Object.

12          THE WITNESS:  From my recollection,

13  there were no additional overseas assignments at

14  the FS or FP-3 level.

15  BY MR. SUAREZ:

16      Q.    And again, that was just a

17  coincidence; right?

18          MR. MEZGER:  Object to form.

19          The witness may answer.

20          THE WITNESS:  I don't think it -- I

21  don't know if it's a coincidence or not.  It's

22  just the way it works out sometimes.



Page 281

1    with that, because they turn it into this.

2         Q.    Now, most of the people on here, it

3    says AP; right?

4         A.    The first two pages, there is one

5    each, deferred.  Everybody else is AP, yes.

6         Q.    So it's fair to say the vast majority

7    of people who go before this panel get approved;

8    right?

9         A.    I do see several DEFs and several not

10   approveds.

11        Q.    Well, let's --

12        A.    The next page is then yes, yes, going

13   through a significant number of approveds or APs.

14        Q.    It looks like you can do the counting

15   and check my math, but each page seems to have

16   approximately ten positions; right?  It looks

17   like it varies 10 to 12, depending on the page.

18        A.    Yes.  You can see some highlighted on

19   page STATE8008 where it actually says withdraw or

20   WDR, and the next page says defer or DEF.  So DEF

21   is defer.

22        Q.    Over 90 percent of the people in here



Page 282

1    are approved; right?

2         A.    It does look that way.

3         Q.    Okay.  So now going briefly to

4    STATE8020.

5         A.    Which STATE?

6         Q.    8020.

7         A.    Uh-huh.

8         Q.    So that says "Extension Requests."

9    Right?

10        A.    Yes.

11        Q.    So we were talking about this earlier.

12   To go beyond one or two years that's typical, you

13   have to put in these extension requests to get

14   approved; right?

15        A.    To go beyond -- the majority of the

16   jobs of these overseas are three years.  But yes,

17   to go beyond whatever your assignment was, you

18   need an extension request.

19        Q.    And so those extension requests go

20   through the panel as well; right?

21        A.    Correct.

22        Q.    And the first two, there is an



Page 314

1      Q.    Number 8 says:  "Are you aware of

2   whether or not the complainant suffers from any

3   medical conditions or impairments?"

4            And you state:  "I am aware that mild

5   traumatic brain injury is one of the medical

6   issues."  Right?

7      A.    Correct.

8      Q.    So that's consistent with your earlier

9   testimony that you've been aware of his injury,

10  medical situation since around May of 2018;

11  right?

12     A.    More details.  I was getting more and

13  more details as this goes on.

14     Q.    You knew he had a medical condition as

15  of May 2018, but now at this point you're also

16  aware of a diagnosis of mild traumatic brain

17  injury; right?

18     A.    Correct.

19     Q.    And then it says:  "When and how did

20  you become aware of the complainant's medical

21  condition?"

22            "The department notified his branch



Page 334

1        Q.     You're not aware if they related to

2    his ability to be accommodated in Monterrey?

3        A.     Correct, I'm not aware.

4        Q.     So why do you not have any discomfort

5    with Mr. Lenzi taking a foreign post assignment?

6        A.     I think he's a qualified SEO.  I think

7    he's served admirably for us in these domestic

8    positions he's been in as well as the overseas

9    positions.  I think he went outside department

10   guidelines when he wasn't getting answers that he

11   was looking for in China.  But I can empathize

12   and I understand that, while I may disagree with

13   it since the department has bona fide methods for

14   dissent.  I don't know of any physical

15   restriction that would keep him from doing his

16   job.

17       Q.     So you're not aware of any physical or

18   medical restriction that would prevent him from

19   serving as an SEO overseas?

20       A.     Correct.  If he's given a Class 1

21   medical clearance, even a Class 2 medical

22   clearance, he can serve.  Class 2 the majority of



Page 347

1      Q.     Got it.

2             So this one was not about the

3    distinction between now and the summer?

4      A.     Correct.

5      Q.     Okay.  46.  "Were there changes to

6    complainant's qualifications that denied him the

7    bid to serve at the Warsaw post?"

8             Your answer:  "I am unaware of any

9    changes to the complainant's qualifications."

10   Right?

11     A.     Correct.

12     Q.     So consistent with your prior

13   testimony, there was no reason from a

14   qualification or medical capacity standpoint that

15   Mr. Lenzi could not have served in Warsaw; right?

16     A.     Correct.

17     Q.     48.  It says:  "Who made the decision

18   to deny complainant bidding on serving at the

19   Warsaw post?"

20             You say:  "I am unaware if or how a

21   decision was made to deny the complainant bidding

22   on the position."  Right?



Page 409

1           C E R T I F I C A T E

2    DISTRICT OF COLUMBIA

3               I, JOHN L. HARMONSON, a Notary Public

4    within and for the District of Columbia, do

5    hereby certify that RONALD STUART, the witness

6    whose deposition is hereinbefore set forth, was

7    duly sworn by me and that such deposition is a

8    true record of the testimony given by such

9    witness.

10              That before completion of the

11   proceedings, review and signature of the

12   transcript was reserved.

13              I further certify that I am not related

14   to any of the parties to this action by blood or

15   marriage; and that I am in no way interested in

16   the outcome of this matter.

17              IN WITNESS WHEREOF, I have hereunto set

18   my hand this 25th day of October, 2022.

19

20   _____

21   JOHN L. HARMONSON, RPR

22              My commission expires: 04/14/26



# PX-004

| Message | |
| --- | --- |
| From: | Lenzi, Mark R (Portsmouth NH) [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=695943D2B9BD4DCA831F83701E1083FD-LENZI, MARK] |
| Sent: | 9/30/2020 2:11:50 PM |
| To: | Kaleczyc, Andrew W [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=6a0071707ab04b9986fc33784dd0536b-Kaleczyc, A] |
| Subject: | Re: bidding/assignments discussion |
| Attachments: | 20200930_094058.jpg |

Hi Andy:

Thanks for the email. (I think we may have been in contact when I was in Guangzhou and you were in Japan (?) but I'm not sure about that.)

Regarding bidding, thank you for your pro-active email to work with me before bids are due October 16. Especially because of my Disability and Reasonable Accommodation and security considerations, over the past summer I have spent countless hours researching posts and working with multiple posts' medical units and RSOs on researching bids at my grade. Somewhat surprisingly, it turns out that Embassy Belgrade is the post that is by far the best fit of all the specific medical, DRAD, security, etc. criteria for me and my family. Please see below which is from a draft of my BPS. I will submit the final BPS to you well before October 16.

There is one important issue I wanted to bring to your attention and have you look into prior to October 16. I have a an active EEO complaint against the ST Assignments Panel for discrimination (see attached) and my claims of discrimination have been formally accepted by the Department. Because this is an active EEO complaint, it is my belief that members of last year's assignment's panel should recuse themselves from this year's assignment's panel when considering my assignment. I would ask that you speak with GTM about this and possibly have a solution where another panel such as for Special Agents decides my assignment. It is not fair nor is it ethical to have the same ST assignment panel members from last year that committed discrimination and retaliation against me in a position to again commit discrimination and retaliation. So I would please ask that you speak with others in GTM about this and perhaps a CDO for Special Agents and depending on GTM's proposed resolution I will have my employment lawyer involved in this process.

Yes, I would very much like to have a call/Teams meeting with you. I have a lot of brain injury doctors appointments this week so perhaps next Tuesday we could speak via Teams?

Thanks and best regards,
Mark

(SBU/PII) For reasons known to DS leadership that include *inter alia* my involvement with FBI in the Mueller investigation when I was injured in 2018, one of the most important bidding considerations for my family is to live in housing that is observed by DS Surveillance Detection guards and is near to post. After discussion with multiple RSOs, Embassy Belgrade is best

LENZI0007264

suited for security and housing considerations. The Health Unit and working conditions (including amount of ESO constituent posts) at Embassy Belgrade is also best suited to accommodate the provisions in my Disability and Reasonable Accommodation (DRAD). Working at Embassy Belgrade would be by far the best of any potential posts for security, medical, HR/OAA/DRAD, and Department of Labor (DoL) Workers Compensation considerations.

(SBU) Unable to use bidding privileges from Guangzhou because my wife and I were both medevac'd with brain injuries, there is a chance that our medical clearances could be downgraded to Class 2 and Embassy Belgrade is aware of this possibility and best able to accommodate if that happened.

(SBU) I have the support of EUR DAS Matthew Palmer for this bid to Embassy Belgrade. I worked Serbian issues for EUR/SCE before joining the Foreign Service, have a working knowledge of Serbo-Croatian and have worked extensively in Serbia and Kosovo. I would be happy to provide numerous other high level DoS references for this bid to Emb Belgrade.

---

**From:** Kaleczyc, Andrew W <KaleczycA@state.gov>
**Sent:** Tuesday, September 29, 2020 4:51 PM
**To:** Lenzi, Mark R (Portsmouth NH) <LenziMR@state.gov>
**Subject:** bidding/assignments discussion

Hi Mark,
My name is Andy and I am the new CDO replacing Nathan Lingenfelter.
I would like to work with you on identifying potential assignments that are a good fit for you, whether domestic or overseas. Would you be interested in a telephone or Teams call to discuss? The Summer 2021 bid list posted last week and if there are positions you're interested in then I'd like to advocate on your behalf as early in the process as possible, before assignments start going to other bidders.
I look forward to hearing back from you.
Regards,
Andy

LENZI0007265

# PX-005

1/31/22, 10:51 AM

HROnline Report Print

Department of State
EMPLOYEE PROFILE

Report ID: EMPLOYEE PROFILE

Name: LENZI,MARK R

| | | |
|---|---|---|
| LEGLRS: NH | MARITAL ST: M | SCD: 10/17/2009 | ST: A |
| HMLVRES: NH | | EOD-FS: 08/14/2011 | SEX: M |
| BIRTHPL: NH | | EOD-DP: 08/14/2011 | VET: 1 |
| TEN: 1 | | PP-CL: FP 03 | |
| TYPE APPT: Career (Competitive Svc Perm) | | EMP. PROGRAM: Not Applicable | |
| TOURTYP: E - 2 YRS TRANSFER | | SALARY: $127,205.00 | STEP: 10 |
| SKIL1.1: 2550 SECURITY ENGINEERING | | TED: 10/29/2023 | AGN: ST 00 |
| SKIL1.2: 2550 SECURITY ENGINEERING | | EXLIMAPP: | WGI DUE: 11/05/2023 |
| SKIL1.3: | | CURORG: 175213 - DS/FSE/FSB | FEGLI: D0 |
| DIPLOMATIC TITLE: - | | POSNO: S6216104 | FEHB: 402 |

PAST ASSIGN

| PAST ASSIGN | DATE | SPRD | POSTION SKILL <--CURRENT--> DATE | POSITION TITLE | DATE | SPRD | DATE <--HIGH--> | WORKING TITLE | NTE | GRADE | DATE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DS/FSE/FSB | 10.21 | 2 2+ | SECURITY ENGINEERING 09/11 | SECURITY OFCR - ENGINEERING | | 2 2+ | 09/11 | | | FP 03 | 11/16 |
| DS/NOC | 10.21 | | REASSIGNMENT | REASSIGNMENT | | | | | | FP 04 | 03/14 |
| DS/NOC | 12.18 | | REASSIGNMENT | REASSIGNMENT | | | | | | FP 05 | 08/12 |
| BEIJING | 08.16 | | SECURITY ENGINEERING | SECURITY OFCR - ENGINEERING | | | | | | FP 06 | 08/11 |
| FRANKFURT | 09.14 | 1 1 | SECURITY ENGINEERING 09/17 | SECURITY OFCR - ENGINEERING | | 1 1 | 09/17 | | | | |
| DS/CMP/TSC | 08.13 | | SECURITY ENGINEERING | SECURITY OFCR - ENGINEERING | | | | | | | |
| DS/CMP/ECB | 09.11 | | SECURITY ENGINEERING | SECURITY OFCR - ENGINEERING | | | | | | | |
| HR/FSSI | 08.11 | | SECURITY ENGINEERING | SECURITY OFCR - ENGINEERING | | | | | | | |

DETAIL/TEMPORARY DUTY HISTORY

| PAST ASSIGN | DATE | POSTION SKILL <--CURRENT--> DATE | POSITION TITLE | DATE | WORKING TITLE | DATE |
|---|---|---|---|---|---|---|

| AWARDS | DATE |
|---|---|
| FRANKLIN AWARD | 04/2016 |
| GROUP FRANKLIN AWARD | 06/2015 |

MSI/OSI
11/2015

| LANGUAGES | | |
|---|---|---|
| RU - Russian | | |
| UK - Ukrainian | | |

MLAF:

| DEPENDENT NAME | RELATION | DOB |
|---|---|---|

| COURSE | EMP-IN-SERV-TRAIN | DATE |
|---|---|---|
| EX250 | Counterintelligence Awareness | 02/23/2021 |
| EX250 | Counterintelligence Awareness | 03/04/2020 |
| PA296 | How to be a Contracting Office | 05/24/2019 |
| PP468 | Promoting Intl. Religious Free | 03/07/2019 |
| EX250 | Counterintelligence Awareness | 01/28/2019 |
| EX250 | Counterintelligence Awareness | 08/22/2017 |
| PK323 | Classified and SBU Info: ID an | 11/18/2016 |
| EX250 | Counterintelligence Awareness | 09/02/2016 |

WARNING: Disclose to Authorized Persons Only (22CFR 6A)
Contains Information Protected by the Privacy Act of 1974

https://hrweb.hr.state.sbu/prd/hronline/circuits/EP/index.cfm?action=report.ee_profile&menuID=18

STATE00002841

1/31/22, 10:51 AM

**HROnline Report Print**

Department of State
EMPLOYEE PROFILE

Report ID: EMPLOYEE PROFILE
Oprid: thompsonj2
Emplid: 157155
Name: LENZI,MARK R

| COURSE | EMP-IN-SERV-TRAIN | DATE |
|---|---|---|
| EX250 | Counterintelligence Awareness | 09/30/2015 |
| PK323 | Classified and SBU Info: ID an | 09/30/2015 |
| EX250 | Counterintelligence Awareness | 09/30/2014 |
| MO911 | SOS: Security Overseas Seminar | 08/05/2014 |
| TT101 | Overseas Security Engineering | 12/04/2013 |
| PT401 | No FEAR Act Training | 11/19/2013 |
| SE102 | Basic Security Engineering Off | 11/30/2012 |
| I8290 | TSCM Fundamentals | 11/21/2012 |
| SE425 | TSCM Essentials 2 | 08/30/2012 |
| CSCTNTAT12 | CompTIA Network+ 2009: Network | 06/20/2012 |
| CSCTNTA11 | CompTIA Network+ 2009: Trblsho | 06/15/2012 |
| CSCTNTA09 | CompTIA Network+ 2009: Routing | 06/13/2012 |
| CSCTNTA08 | CompTIA Network+ 2009: Network | 05/29/2012 |
| CSCTNTA06 | CompTIA Network+ 2009: Wide Ar | 05/24/2012 |
| CSCTNTA07 | CompTIA Network+ 2009: Wireles | 05/24/2012 |
| CSCTNTA05 | CompTIA Network+ 2009: Network | 05/22/2012 |
| SE293 | CU-50 Alarm System In-Service | 05/11/2012 |
| PT227 | Managing Your Time Effectively | 04/04/2012 |
| OT610 | Foreign Affairs Counter Threat | 12/09/2011 |
| MGMT34.A01 | Recognize/Diagnose Problem Per | 11/30/2011 |
| TEAM03.A04 | Leading Teams: Bldg Trust and | 11/30/2011 |
| MGMT07A03 | Managing Delegation | 11/29/2011 |
| PROJ16A01 | Introduction to Program Manage | 11/29/2011 |
| MGMT19A01 | Transitioning from Technical P | 11/28/2011 |
| MGMT19A02 | Strategies for Transitioning t | 11/28/2011 |
| MGMT19A03 | Managing Technical Professiona | 11/28/2011 |
| MGMT23A02 | Cross-Functional Strategic Man | 11/28/2011 |
| SE292 | Protector Alarm System In-Serv | 11/15/2011 |
| CSCTNTA03 | CompTIA Network+ 2009: Network | 10/31/2011 |
| CSCTNTA02 | CompTIA Ntwk+ 09: Network Comp | 10/26/2011 |
| PA296 | How to be a Contracting Office | 10/24/2011 |
| CSCTNTA01 | CompTIA Network+ 2009: Network | 10/21/2011 |
| PK323 | Classified and SBU Info: ID an | 10/21/2011 |
| CSCTNTA10 | CompTIA Network+ 2009: Mng and | 10/19/2011 |
| SPETHA08 | Cryptography (2) | 10/18/2011 |
| CSAPTA04 | A+ Practical Appl 2009: Mainta | 10/04/2011 |
| CSAPTA05 | A+ Practical Application 2009: | 10/04/2011 |

WARNING: Disclose to Authorized Persons Only (22CFR 6A)
Contains Information Protected by the Privacy Act of 1974

STATE00002842

1/31/22, 10:51 AM

HROnline Report Print

Department of State
EMPLOYEE PROFILE

Report ID: EMPLOYEE PROFILE

Name: LENZI,MARK R

| COURSE | EMP-IN-SERV-TRAIN | DATE |
|--------|-------------------|------|
| CS.APETA04 | A+ Essentials 2009: Using and | 09/29/2011 |
| CS.APITA03 | A+ Prac Application 2009: Main | 09/29/2011 |
| SE291 | High Security Alarm System In- | 09/28/2011 |
| CS.APETA05 | A+ Essentials 2009: Trblsht Co | 09/26/2011 |
| CS.APETA07 | A+ Essentials 2009: Oper Proc/ | 09/26/2011 |
| PA198 | E2 Solutions: Travel Approver | 09/19/2011 |
| PK195 | Travel Preparation and Regulat | 09/19/2011 |
| PK196 | E2 Solutions: Travel Arranger | 09/19/2011 |
| PK197 | E2 Solutions: Traveler | 09/19/2011 |
| CS.APITA01 | A+ Prac Appl 2009: Pers Comput | 09/13/2011 |
| PA448 | ePerformance for Foreign Servi | 09/13/2011 |
| PN113 | Introduction to Working in an | 09/13/2011 |
| CS.APETA02 | A+ Essent 2009: Cnfg Displays, | 09/11/2011 |
| CS.APETA03 | A+ Essent 09: Install Win Oper | 09/11/2011 |
| CS.APITA02 | A+ Prac Application 2009: Trbl | 09/11/2011 |
| CS.APETA01 | A+ Essent 2009: Comp Hardware | 09/10/2011 |
| PN106 | Orientation – Foreign Service | 09/02/2011 |
| PA451 | Ethics Orientation for New Emp | 08/18/2011 |
| PA459 | Protecting Personally Identifi | 08/18/2011 |
| PT401 | No FEAR Act Training | 08/18/2011 |

-----------------------------------------

WARNING: Disclose to Authorized Persons Only (22CFR 6A)
Contains Information Protected by the Privacy Act of 1974

STATE00002843

# PX-006

# UNITED STATES DEPARTMENT OF STATE





United States Department of State

Washington, D.C. 20520

MEMORANDUM

TO:        DS/NOC– Mark Lenzi

FROM:      DS – Todd Brown

SUBJECT:   Length of Service Award

It gives me great pleasure as Principal Deputy Assistant Secretary for Diplomatic Security to present to you this Length of Service Award for 10 years of service to our country. It is a privilege to spend a career in public service and to act as a representative of the American people. All who successfully meet the many challenges of government service can take pride in their work and know that their accomplishments served our nation's interest.

On behalf of DS and all of your colleagues in the Department of State, please accept my congratulations on this important milestone.



# DEPARTMENT OF STATE

Official recognition and appreciation
are tendered to

## Mark R. Lenzi

for completion of 10 years of service
with the United States Government

Todd J. Brown
Principal Deputy Assistant Secretary
Bureau of Diplomatic Security
October 2019

LENZI0003827

# PX-007

UNCLASSIFIED



| | |
|---|---|
| **MRN:** | 21 STATE 114370 |
| **Date/DTG:** | Nov 12, 2021 / 122227Z NOV 21 |
| **From:** | SECSTATE WASHDC |
| **Action:** | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *IMMEDIATE* |
| **E.O.:** | 13526 |
| **TAGS:** | APER, AMGT |
| **Pass Line:** | CONSULS FOR SREP, ICAO, UNESCO, FODAG, UNEP |
| **Correction Reason:** | CORRECTED COPY: Change Repulic of Macedonia to North Macedonia per Eatmon, Frederica P - DG |
| **Subject:** | 2021 Department Annual Awards: Robert C. Bannerman Diplomatic Security Employee of the Year Award |

1. The Department is pleased to announce the selection of Ronald L. Roof Jr., Special Agent, DS/HTP/SP, as the recipient of the 2021 Robert C. Bannerman Award based on his initiative and leadership in directing United States Embassy Rangoon's security programs during a year that included extreme violence and a military coup all while dealing with COVID-19.

2. This prestigious award recognizes sustained superior achievement, initiative and leadership in planning, organizing, or directing a major program. This award consists of a certificate signed by the Secretary of State, and a cash award of $10,000.00 contingent upon availability of funds.

3. The Selection Committee was chaired by Todd J. Brown, Acting Assistant Secretary, Bureau of Diplomatic Security. The other members were Carlos Matus, Acting Director DS/DSS; Cornell Chasten, Deputy Assistant Secretary DS/IP; and Stephen B. Dietz, III, Executive Director for Bureau of Diplomatic Security.

4. The Committee was impressed with Ronald's leadership, insight, and flexibility. During multiple waves of COVID in Burma he directed the closing of redundant facility access points and organized guards so as to limit their exposure to visitors and other colleagues. He developed split living and working arrangements for the assigned Marines. As fighting broke out among ethnic armed groups, and later during a full-fledged military coup, he personally organized assistance from the Burmese to evacuate non-governmental Americans working in remote areas to avoid interaction with armed groups. Ronald relied on carefully researched data, garnered from a network of contacts, in-person research, and other reliable sources to separate fact from rumor in order to support the Emergency Action Committee. Through his calm and specific delivery, Ronald not only allowed people to feel safe, but he also enlisted them in ensuring their own safety.

5. Other nominees for this award were: Erin Smart, DS/SI/PSS; Ezra Casteel, DS; Jennifer

LENZI0003828

Volz, DS/CMP/TAB; Jerry Kessler, DS/SSI/PTB; Kahled Hafid, DS/IP/AF; Steven Haines, DS/MGT/CAP; Maria Bradham, DS/DC/ARDCH; Brittany Schlotzhauer, Bangkok, Thailand; Jerry Meras, DS/C/DC/WRDCD; Cote d'Ivoire; Rachel Sosin, DS/C/DC/MRDCH; Brian Hayes, DS/CMP/TSC; Derek Hugo, Montevideo, Uruguay; Elbert Calpo, Kabul, Afghanistan; Jeremy Holliman, DS/ST/STO; John Savu, Bangkok, Thailand; Lucinda Selk, Lima, Peru; Mark Lenzi, DS/C/FSE/DME; Trisha Marks, Frankfurt, Germany; Joseph Thornsberry, Bamako, Mali; Keith Evans, Bridgetown, Barbados; Matthew Moore, Jerusalem, Israel; Richard Shaw, Kinshasa, Democratic Republic of the Congo; Thomas Smith, DS/SSI/NSM; Adam Lason, NSC; Charles Harrison, Karachi, Pakistan; David Howell, Bamako, Mali; Fernando Matus, Kabul, Afghanistan; Heath Ward, Skopje, North Macedonia; Leonard Danquah, Nassau, Bahamas; Paul Higgins, Mogadishu, Somalia; Peter Dinoia, Baghdad, Iraq; Robert Holbrook, Tunis, Tunisia; Robert Kelty, Sofia, Bulgaria; Ryan LaBranch, CG Cape Town, South Africa; Collin Stephens, New Delhi, India.

6. The Department takes this opportunity to emphasize the importance of the Robert C. Bannerman Award and to encourage participation in future competitions for this prestigious honor.

| Signature: | Blinken |
|---|---|
| **Drafted By:** | DS/EX/HRM:Gallian, Izumu |
| **Cleared By:** | M:Vass, Valerie M |
| | AF/EX:Newton, Christopher M |
| | WHA/EX:Shields, Matthew L |
| | EUR-IO/EX/HR:Shreve, Renae J |
| | EAP/EX:Benavidez, Debra A |
| | NEA-SCA/EX:Varnes, Nicole E |
| | GTM/PE:Vickers, Lisa A |
| | GTM/PE:Siekman, Kelly O |
| | GTM/OAA/AD:Babbili, Mary |
| | GTM/SCU:Peterson, Stephanie W |
| | GTM/DGTM:Juliao, Jeanne M |
| | SES\SlackA |
| **Approved By:** | GTM/DGTM:Lussier, Philippe A |
| **Released By:** | DOM HR_DGHR:Eatmon, Frederica P |
| **XMT:** | BASRAH, AMCONSUL; CARACAS, AMEMBASSY; CHENGDU, AMCONSUL; KABUL, AMEMBASSY; SANAA, AMEMBASSY; ST PETERSBURG, AMCONSUL; VLADIVOSTOK, AMCONSUL; YEKATERINBURG, AMCONSUL |
| **Dissemination Rule:** | Archive Copy |

<u>UNCLASSIFIED</u>

LENZI0003829

# PX-008

UNCLASSIFIED

UNCLASSIFIED



| | |
|---|---|
| **MRN:** | 16 STATE 108752 |
| **Date/DTG:** | Oct 03, 2016 / 031618Z OCT 16 |
| **From:** | SECSTATE WASHDC |
| **Action:** | SOMALIA, USMISSION *IMMEDIATE*; ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *IMMEDIATE* |
| **E.O.:** | 13526 |
| **TAGS:** | AMGT, APER |
| **Pass Line:** | PASS TO: INFORM CONSULS FOR SREP, ICAO, UNESCO, FODG, UNEP |
| **Subject:** | 2016 ROBERT C. BANNERMAN DIPLOMATIC SECURITY EMPLOYEE OF THE YEAR AWARD |

1. The Department is pleased to announce the selection of Jesse C. Thomas Jr., Regional Security Officer, Embassy Ouagadougou, as the winner of the 2016 Robert C. Bannerman Diplomatic Security Employee of the Year Award.  This selection was based on his leadership and steadfast commitment to the safety of the Mission's community and U.S. Citizens during a volatile year of political transition in Burkina Faso which saw a coup d'Ã©tat, historic elections, and a terrorist attack.

2. This award recognizes outstanding contributions in the following categories: civil service employees, couriers, security engineering officers, security officers, site security managers, and security technical specialists. The award is given to a Department of State employee who has made outstanding contributions to the Department's security programs. The award consists of a certificate signed by the Secretary of State and $10,000.

3. The Selection Committee was chaired by Stephen B. Dietz, III, Executive Director, DS/EX. The other members were:  Bill A. Miller, Director of Diplomatic Security Services; and Lisa D. Grice, Overseas Advisory Council Deputy Executive Director.

4. The committee was impressed with Mr. Thomas's heroic response to an AQIM terrorist attack on a hotel and cafÃ© in Ouagadougou, killing thirty people over a period of several hours.  Mr. Thomas's response to this incident helped save the lives of U.S. citizens and local nationals.  As attackers walked between hotel and cafÃ©, shooting Westerners and Burkinabe, Mr. Thomas who was on the scene in an armored vehicle within minutes, extracted eight U.S. citizens plus others and brought them to a safe haven where he helped stabilize a Burkinabe shot in the leg.  He spent the rest of the night at the scene coordinating with security forces to identify the location and to safely extract U.S. citizens during the shooting.  He maintained communication with the Front Office and Consul and coordinated the Embassy's approval of

LENZI0003830

U.S. military assets to assist the Burkinabe and French Special Forces in their counter assault. After the operation concluded, he stayed to help U.S. citizen victims get follow up assistance and helped others find their Embassy or immediate medical help. He left only after there was nearly full accountability of U.S. citizens, and then he immediately switched focus to coordinate the arrival of FBI agents to assist with the investigation.

5.  The Selection Committee chose James V. Dasney, Reginal Diplomatic Courier, Frankfurt, as runner-up, for his dynamic leadership which was crucial in streamlining the classified pipeline from the Department of State to U.S. missions throughout East Africa.  His sustained superior achievement in supporting Mission Nairobi, strengthened interagency efforts throughout a region that is critical to our national security.

6.  Other nominees for this award were:  Kaustubh M. Bhawe, Addis Ababa; Christopher J. Clarkin, DS/C/FRDCD; William K. Cornett, Islamabad; Eric V. Crawford, DS/C/MRDCD; Joseph P. Desmarais, Nuevo Laredo; Peter A. Dinoia, Managua; Benjamin J. Eby, ESC Dakar; Thomas W. Eckert, Hanoi; Michael P. Fowler, DS/OPS; David S. Grogan, Bangkok; Kayla J. Hall, DS/DO/ICI; Mark S. Harris, Yaoundé; Michael R. Haughey, Beijing; Timothy S. Hovanec, DS/STO/SES; Christopher F. Jones, Peshawar; Mark R. Lenzi, Frankfurt; Scott P. Lewis, Baghdad; Timothy A. Longanacre, DS/ICI/CR/VPAU; Gabriel A. Macias, Recife; Steven S. May, Milan; Eric A. McKenzie, Bangkok; Jessica J. McTigue, N'Djamena; Richard J. Nelson, DS/ST/SIM; John E. Oakes Jr., Geneva; Christopher T. O'Brien, CT/SCAN; Angela M. Olson, DS/FLD/CFO/MIRO; Kevin M. O'Neil, DS/P/DP; Lawrence C. Parker, Seoul; Francesco D. Pasqualino, Doha; Christopher R. Potts, PRDCH; Scott W. Redinger, DS/ST/CMP/ECB; David C. Richardson, Canberra; Robert G. Tusing, Montevideo; Kelly L. Wheeler, DS/C/FRDCD;  Jay R. Williams, Frankfurt;  and Jason R. Willis, Bamako.

7.  The Department takes this opportunity to emphasize the importance of the Robert C. Bannerman Diplomatic Security Employee of the Year Award and to encourage participation in future competitions for this prestigious honor.

8.  Minimize considered.

| Signature: | Kerry |
| --- | --- |

| Drafted By: | HR/PE:EHomer |
| --- | --- |
| Cleared By: | AF/EX: Eric Stromayer |
| | EAP/EX: KDeBlauw |
| | EUR-IO/EX: DAkins |
| | NEA/SCA/EX:EAlford |
| | WHA/EX:KSullivan |
| | M:DWinters |
| | M/PRI: SCimino |
| | HR/PE:BCole |
| | HR/PCPierangelo |

LENZI0003831

UNCLASSIFIED

S/ES-O: AKirkpatrick
WASHDC\HoltAC

**Approved By:** Director General Chacon
**Released By:** IRM_OPS_MSO:Holt, Angela A
**XMT:** SANAA, AMEMBASSY

**Dissemination Rule:** Archive Copy

UNCLASSIFIED

UNCLASSIFIED

LENZI0003832

# PX-009

UNCLASSIFIED

UNCLASSIFIED



| | |
|---|---|
| MRN: | 17 STATE 102852 |
| Date/DTG: | Oct 11, 2017 / 111906Z OCT 17 |
| From: | SECSTATE WASHDC |
| Action: | SOMALIA, USMISSION *IMMEDIATE*; ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *IMMEDIATE* |
| E.O.: | 13526 |
| TAGS: | APER, AMGT |
| Pass Line: | CONSULS FOR SREP, ICAO, UNESCO, FODAG, UNEP |
| Subject: | 2017 ROBERT C. BANNERMAN DIPLOMATIC SECURITY EMPLOYEE OF THE YEAR AWARD |

1. The Department is pleased to announce the selection of Tamika D. Abbott, former Officer in Charge of the Security Engineering Service Center (ESC) for Kabul, based in Bangkok, as the winner of the 2017 Robert C. Bannerman Diplomatic Security Employee of the Year Award. This selection was based on Ms. Abbott's outstanding performance as Officer in Charge of the Security Engineering Services Center, Kabul, Afghanistan.

2. This prestigious award recognizes outstanding contributions in the following categories: civil servants, couriers, security engineering officers, security officers, site security managers, and security technical specialists. The award consists of a certificate signed by the Secretary of State and $10,000, contingent upon availability of funds.

3. The Selection Committee was chaired by Christian J. Schurman, Deputy Assistant Secretary for International Programs, DS/IP. The other members were: Stephen B. Dietz, III, Executive Director, DS/EX; Wayne B. Ashbery, Deputy Assistant Secretary for Countermeasures, DS/C; and Ricardo Colon, Director of Protection, DS/DO/P.

4. The committee was impressed with Ms. Abbott's leadership and management of the Security Engineering Office throughout multiple terrorist attacks in Kabul, her work to create an aerial protection system to counter drone attacks on the Embassy compound, and her quick reaction to information technology systems hazards.

5. The Selection Committee chose Anton G. Kort, Regional Security Officer, Istanbul, as runner-up, for his efforts to ensure the safety of United States personnel and property in Istanbul despite numerous terrorist attacks and an attempted military coup.

6. Other nominees for this award were: Jeffrey E. Anders, DS/C/FRDCD; Paul P. Avallone, Athens; John W. Brandt, A/LM/PMP/DPM; Felix A. Galindo, Athens; Ralph A. Gaspard II, DS/ST/CMP; Dennis J. Goodall, Frankfurt; John C. Hicks, Kabul; Chad D. Hill, DS/STO/SES;

LENZI0003833

Timothy M. Howlin, FRDCD; Scottie Jefferson, Basrah; Mark R. Lenzi, Bangkok; Patrick S. Mills, Karachi; Shane E. Morris, DS/C/DC/WRDCD; Ummi M. Myelle, DS/C/WRDCD; David B. Noble, Athens; Robbin Ryan Petersen, DS/FSE/TDB; Jason R. Pfistner, Tbilisi; Dean M. Phillip, Brazzaville; Christopher R. Potts, DS/C/DC/PRDCH; Chimere D. Ravenel, DS/STO/SES; Claire Rubino, DS/DC/FRDCD; Shawn Sherlock, DS/T/TPS; Jiro R. Waters, ARDCH; Joshua D. Weisman, DS/PII/ILD; Weylon N. Bulloch, Cairo; Jason R. Willis, Bamako.

7. The Department takes this opportunity to emphasize the importance of the Robert C. Bannerman Diplomatic Security Employee of the Year Award and to encourage participation in future competitions for this prestigious honor.

8. Minimize considered.

| | |
|---|---|
| **Signature:** | Tillerson |
| **Drafted By:** | HR/PE:Spinner, Mikayla |
| **Cleared By:** | M:Fields, Jacqueline |
| | AF/EX:Dille, Benjamin B |
| | WHA/EX:Pan, Angela P |
| | EAP/EX:Verloop, Marja D |
| | EUR-IO/EX/PMO:Watson, John K |
| | NEA-SCA/EX:Inzerillo, Suzanne M |
| | HR/PE:Siekman, Kelly O |
| | HR/PE:Scandola, Joni |
| | SES\WellsAS |
| **Approved By:** | HR:Todd, William E (Ambassador) |
| **Released By:** | HR_DGHR:Eatmon, Frederica P - DG |
| **XMT:** | SANAA, AMEMBASSY |
| **Dissemination Rule:** | Archive Copy |

UNCLASSIFIED

# PX-010

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA


Mark Lenzi,                              )

                                         )

                    Plaintiff,)

                                         ) Case No.

          v.                             ) 1:21-cv-01371 PTG IDD

                                         )

United States Department of    )

State, and Antony J. Blinken,  )

United States Secretary of     )

State,                                   )

                                         )

                    Defendants.)

------------------------------X




                    * * * * * * *

          CONTAINS CONFIDENTIAL INFORMATION

     VIDEOTAPED DEPOSITION OF KELLY SIEKMAN

     Wednesday, January 11, 2023, 9:44 a.m. EDT

                    Washington, D.C.




               MAGNA LEGAL SERVICES

                    (866)624-6221

                    www.MagnaLS.com




Page 2

1

2    The Videotaped deposition of KELLY SIEKMAN, was held

3     at STEPTOE & JOHNSON LLP, 1330 Connecticut Avenue,

4     Northwest, Washington, D.C., commencing January 11,

5    2023 at 9:44 a.m., on the above date, before JEANINN

6     ALEXIS, a Stenographer and Notary Public in and for

7                   the District of Columbia.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22



Page 3

1    APPEARANCES:

2    ON BEHALF OF THE PLAINTIFFS:

3    CHRISTOPHER A. SUAREZ, ESQUIRE

             STEPTOE & JOHNSON LLP

4            1330 Connecticut Avenue, Northwest

             Washington, D.C. 20036

5            202.429.8131

             sreed@steptoe.com

6

7    ON BEHALF OF THE DEFENDANTS:

8    CATHERINE YANG, ESQUIRE

             U.S. ATTORNEY'S OFFICE

9            2100 Jamieson Avenue

             Alexandria, Virginia 22314

10           703.299.3741

             matthew.mezger@usdoj.gov

11

12

13   ALSO PRESENT:

14   Joe Weltz, VIDEOGRAPHER

15

16

17

18

19

20

21

22



Page 4

1                        I N D E X

2         VIDEOTAPED DEPOSITION OF KELLY SIEKMAN

                 WEDNESDAY, JANUARY 11TH, 2023

3

4    EXAMINATION BY:                                PAGE

5    MR. SUAREZ                                         7

6    MS. YANG                                         278

7

8    EXHIBITS:    DESCRIPTION:                       PAGE

9    Exhibit 1    LinkedIn Profile                     26

10   Exhibit 2    Defendant's Disclosure               27

11   Exhibit 3    DS-5055 Form Change FAQ             121

12   Exhibit 4    Defendant's Supplemental Disclosure 161

13   Exhibit 5    Defendant's Supplemental Disclosure 166

14   Exhibit 6    Foreign Service Employee Evaluation Report 170

15   Exhibit 7    U.S. Foreign Service Employee Evaluation  173
                  Report 5/14/2018

16

     Exhibit 8    U.S. Foreign Service Employee Evaluation  198
17                Report 4/9/2019

18   Exhibit 9    U.S. Foreign Service Employee Evaluation  206
                  Report 5/14/20

19

     Exhibit 10   U.S. Foreign Service Employee Evaluation  215
20                Report 4/22/2021

21   Exhibit 11   U.S. Foreign Service Employee Evaluation  235
                  Report 3/3/2022

22



1                    Report 5/15/2022

2     Exhibit 13   Decision Criteria for Tenure and Promotion   252
                   in the Foreign Service
3
      Exhibit 14   Procedural Precepts for the 2022 Foreign      253
4                  Service Selection Boards Table of Contents

5     Exhibit 15   U.S. Foreign Service Employee Evaluation      259
                   Report 5/2/2012
6
      Exhibit 16   U.S. Foreign Service Employee Evaluation      261
7                  Report 4/23/2013

8     Exhibit 17   U.S. Foreign Service Employee Evaluation      266
                   Report 5/8/2015
9
      Exhibit 18   U.S. Foreign Service Employee Evaluation      271
10                 Report 5/2/2016

11    Exhibit 19   U.S. Foreign Service Employee Evaluation      273
                   Report 4/25/2017

12

13    (Exhibits attached hereto.)

14

15

16

17

18

19

20

21

22



Page 6

1              P-R-O-C-E-E-D-I-N-G-S

2                                   (9:44 a.m.)

3         THE VIDEOGRAPHER:  We are now on the record.

4    This begins Videotape No. 1 in the deposition of Kelly

5    Siekman in the matter of Mark Lenzi versus the United

6    States Department of State, and Antony J. Blinken, in

7    the United States District Court, Eastern District of

8    Virginia.

9              Today's date is January 11th, 2023.  The

10   time on the monitor is 9:44.  This deposition is being

11   taken at Steptoe & Johnson, LLP, 1330 Connecticut

12   Avenue, Northwest, at the request of Steptoe and

13   Johnson, LLP.

14             The videographer is Joe Weltz of Magna Legal

15   Services, and the court reporter is Jeaninn Alexis of

16   Magna Legal Services.

17             Will counsel and all parties present state

18   their appearances and who they represent.

19             MR. SUAREZ:  Good morning.  This is

20   Christopher Suarez from Steptoe & Johnson on behalf of

21   plaintiff, Mark Lenzi.  With me is Elizabeth Goodwin

22   also from Steptoe & Johnson.



Page 7

1          MS. YANG:  Catherine Yang from DOJ on behalf

2    of the witness.

3          THE VIDEOGRAPHER:  Will the court reporter

4    please swear in the witness.

5    Whereupon,

6                    KELLY SIEKMAN,

7     the deponent herein, called for oral examination in

8    the matter pending, being first duly sworn to tell the

9     truth, the whole truth, and nothing but the truth,

10                  testifies as follows:

11                      EXAMINATION

12          BY MR. SUAREZ:

13      Q    Good morning.

14      A    Good morning.

15      Q    Could you state your name for the record,

16    please?

17      A    Yes.  My name is Kelly Siekman.

18      Q    I wanted to make sure I said it correctly.

19    I thought it was Siekman, but I just wanted to make

20    sure.

21      A    It's okay.  I answer to either.

22      Q    Okay.  Good.  Well, I will -- I will refer



Page 198

1          MS. YANG:  Objection.

2          THE DEPONENT:  There's no stated rule to

3   that effect.

4          BY MR. SUAREZ:

5     Q    Okay.  And you would agree in this one, the

6   rater provided an assessment he was satisfactory or

7   better; correct?

8     A    Yes, the rater did do that.

9     Q    So the reference is to tone and contents of

10  communications in the development of the rater didn't

11  deem that sufficient to rate the employee

12  unsatisfactory; correct?

13         MS. YANG:  Objection.

14         THE DEPONENT:  As the rater indicated, the

15  overall performance was satisfactory or better, I

16  would say no.

17         (Siekman Deposition Exhibit 8 marked for

18  identification.)

19         BY MR. SUAREZ:

20    Q    Okay.  I'm going to give you Exhibit 8.  Is

21  it eight?

22         Okay.  For the record, Exhibit 8 is Bates



Page 301

1                    REPORTER'S CERTIFICATE

2    DISTRICT OF COLUMBIA

3

4            I, Jeaninn Y. Alexis, a Notary Public of the

5    District of Columbia, do hereby certify that the

6    with-named witness personally appeared before me at

7    the time and place herein set out, and after having

8    been duly sworn by me, according to law, was examined

9    by counsel.

10           I further certify that the examination was recorded

11   stenographically by me, and that this transcript is a true

12   record of the proceedings.

13           I further certify that I am not of counsel to any of

14   the parties, nor an employee of counsel, nor related to any of

15   the parties nor in any way interested in the outcome of the

16   action.

17           THE REPORTER:  As witness my hand and seal

18   this 18th day of January, 2023.

19

20                    _Jeaninn Alexis_
                      _____
                      JEANINN ALEXIS

21                    My Commission Expires: 11/30/2023

22



# PX-011

# (Withheld from Public Docket)

# PX-012

THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

- - - - - - - - - - - - - - - - - x
                                  :
MARK LENZI,                       :
                                  :
            Plaintiff,            :
                                  :
      v.                          :   Civil Action No.
                                  :   1:21-CV-1371 (PTG/IDD)
DEPARTMENT OF STATE, et al.,      :
                                  :
            Defendants.           :
- - - - - - - - - - - - - - - - - x


                        Alexandria, VA


                        Monday, December 12, 2022

**Contains Confidential Information Subject to Protective Order**

Deposition of:

                    MARK LENZI

a witness of lawful age, taken on behalf of the Defendant in
the above-entitled action, before Kevin Carr, Notary Public
in and for the District of Columbia, in the Office of the
United States Attorney, 2100 Jamieson Avenue, commencing
at 9:00 a.m.


            Diversified Reporting Services, Inc.


                    (202) 467-9200

APPEARANCES:


     On Behalf of the Plaintiff:

        CHRISTOPHER A. SUAREZ, ESQ.

        STEVEN KAPLAN, ESQ.

        SHANNON REID, ESQ.

        Steptoe & Johnson LLP

        1330 Connecticut Avenue, NW

        Washington, D.C. 20036

        (202) 429-8131

        CSuarez@steptoe.com



     On Behalf of the Defendant:


        MATTHEW J. MEZGER, ESQ.

        LAUREN WETZLER, ESQ.

        Assistant United States Attorneys

        Office of the United States Attorney

        2100 Jamieson Avenue

        Alexandria, Virginia 22314

        (703) 299-3741

        matthew.mezger@usdoj.gov

        CATHERINE YANG, ESQ.

        Trial Attorney

        United States Department of Justice Civil Division

        1100 L Street, NW

        Washington, DC 20005

        (202) 514-4336/1944

        Catherine.M.Yang@usdoj.gov


        EMMA BROCHES

        Attorney Advisor

        U.S. Department of State

Page 3

C O N T E N T S

WITNESS                                                      PAGE

Mark Lenzi                                                     4

DEPOSITION EXHIBITS:
 1 - E-mail from Evanoff to Crone dated 9/20/18              38
 2 - E-mail from McKay to Lenzi / Approval of Reasonable
     Accommodations                                          49

 3 - E-mail from Crone to Lingenfelter dated 10/30/18        59

 4 - E-mail from Lingenfelter to Lenzi dated 4/8/19          71

 5 - E-mail from Lenzi to Karl Field dated 9/13/19           75

 6 - E-mail from Lenzi to Karl Field dated 9/13/19           82

 7 - E-mail from Lenzi to Yamate dated 10/17/19              93

 8 - E-mail from Lenzi to Yelland dated 11/5/20             132

 9 - E-mail from Lenzi to Lebron dated 11/17/20            140

10 - Letter from Ross Zafonte dated 11/18/20               145

11 - E-mail from Lenzi to Eatmon dated 11/23/20            159

12 - E-mail from Lenzi to Eatmon dated 2/18/21             179

13 - E-mail from Lenzi to Kevin Kocher date 12/10/19       208

14 - E-mail from Lenzi to Kent Ratzlaff dated 1/24/18      214

15 - E-mail from Lenzi to J Vincent Dasney dated 4/25/18   219

16 - E-mail from Lenzi to Rahim Theriot dated 5/1/18       228

17 - E-mail from Raymond Rivera to Lenzi dated 3/21/19     230

18 - E-mail from Brown to Lenzi dated 5/28/21              272

19 - E-mail from Rivera to Watson dated 4/15/21            316

Page 4

1                    P R O C E E D I N G S

2           MR. MEZGER:  You can swear the witness, please.

3           COURT REPORTER:  Good morning.  Please raise your

4    right hand, sir.

5    Whereupon,

6                         MARK LENZI

7    was called as a witness and, having been first duly sworn,

8    was examined and testified as follows:

9              EXAMINATION BY COUNSEL FOR DEFENDANT

10          BY MR. MEZGER:

11      Q    Good morning, Mr. Lenzi.  I know we just met a

12   moment ago but for the record now, my name is Matthew

13   Mezger, and I am joined today by Lauren Wetzler.  And also

14   here from the Department of State is Emma Broches.  We

15   represent the Defendant in this action.

16           Can you please state and spell your name for the

17   record?

18      A    Sure.  It's Mark Lenzi, L-e-n-z-i.

19      Q    I am just going to go through the general

20   instructions for today's deposition.  The court reporter is

21   transcribing down your testimony today.  Therefore, to

22   preserve a clear record of testimony, it's important for us

23   to following -- to follow the following ground rules:  Do

24   you understand that you have just taken an oath to tell the

25   truth and it is the same oath that you would take if you

1    work in DME until I go to Belgrade.

2           MR. MEZGER:  Do you recall that on or around

3    October 22, 2020, Andrew Kaleczyc you Monterey was a NOW

4    position on which you could bid?

5           THE WITNESS:  I --

6           MR. SUAREZ:  Objection, to form.

7           THE WITNESS:  I remember that he -- I remember

8    being -- it was very striking how he -- in conversations I

9    had with him both on the phone and then e-mail about him

10   being very enthusiastic about my bid list.  And saying he

11   was very enthusiastic about it.  Oh, yes, and Belgrade

12   that's a perfect place for your, you know, language

13   positions, everything else, language skills.

14          Okay.  And then only a few days after saying that,

15   then he said oh, well, yeah.  What about Monterey?  How

16   would you feel about going to Monterey?  And I said to him,

17   oh, they have already -- they meaning the security

18   technology division.  They have already asked me about that

19   because I had a phone call with -- Jack Lutz is his name.

20          At the time, he was the officer in charge, OIC in

21   Mexico City of our office, of our engineering services

22   center, Mexico City.  This was approximately June of 2020,

23   when I had that phone call with him.

24          And he brought up Monterey with me.  And said

25   would you be interested?  Monterey is under me.  I am in

Page 109

1    Mexico City.  Would you be interested in going to Monterey?

2     And I said I actually know a lot about Monterey.

3            Because Phil Blanton, my previous boss, SEO

4    Phillip Blanton was my previous boss before, Brian Hayes in

5    Guangzhou.  Said that that place is really tough medically.

6     You are out in the -- kind of by yourself.  You don't even

7    have a technician working for you.  You are basically a

8    glorified technician.  It's a lot of being on ladders, by

9    yourself, trying to snake through Cat-5 cable, and things

10   like this.

11           And then he said there is also a lot of driving.

12   This is in approximately 2016 when he told me this when we

13   were both in Guangzhou.  He said there is a lot of driving

14   in between posts between Monterey and its constituent posts,

15   other smaller U.S. consults.  And he said you are driving

16   from, you know, five hours in the desert at night by

17   yourself.  And he said like it's not the type of place you

18   want to send a young SEO to.

19           So I had remembered what Phil told me about

20   Monterey.  So and Jack Lutz called me about Monterey to

21   quote, unquote, you know, "Feel you out on it.  What do you

22   think about that," I said appreciate you calling me about it

23   because I do want to go overseas.  But I said I know about

24   Monterey because Blanton, SEO Blanton told me.  Has told me

25   all about it.  Everything I know about Monterey is I won't

1    be able to do that with my medical situation.

2            And he said well, for example?  And I said well, I

3    remember Blanton told me that I am going to be on -- that I

4    would be on the OIC like he was.  He was on ladders a lot

5    there.  I said if you are by yourself on ladders, I said,

6    for instance, my vestibular therapy, I was like that's not

7    conducive to Monterey.

8            And he said thank you for that example.  He said

9    That's what I thought anyways.  I know about your situation.

10     I want to wish you the best because I have been following

11    you, and I will relay what you said.  I support you in that.

12     I don't blame you.

13            He said I will relay that to -- he didn't say, but

14    I got the impression that it was Ronald Stuart that you

15    relayed that to that I said I couldn't go there.  And he

16    thanked me for the call.  Again, this is approximately June

17    of 2020.  He thanked me for the call.

18            And then -- so to answer your question, when

19    Kaleczyc brought up in Monterey in September or October of

20    2020, I said well, I have already talked with Jack Lutz

21    about that.  Like no, I can't go to Monterey.

22            MR. MEZGER:  Jack Lutz and Phil Blanton, are the

23    employees of MED?

24            THE WITNESS:  No.  They are security engineering

25    office.

Page  113

 1   am -- yes.  I am enthusiastic about your bid list,

 2   especially meaning Belgrade being at the top of that bell --

 3   of that bid list.

 4        **Q     Okay.**

 5        A    So my wife and I were very happy to receive that

 6   e-mail from him.

 7        **Q     Okay.  So is it a call or an e-mail or both?**

 8        A    It was both.

 9        **Q     Okay.**

10        A    At that time, I think Kaleczyc knew that probably

11   in the handover -- I don't know.  But in the handover that

12   he had from Lingenfelter, Lingenfelter probably said -- I

13   imagine that hey -- the Frankfurt situation probably briefed

14   him on that.  So Kaleczyc seemed kind of very aware of that.

15    Well, we want to -- let's get out in the front.  Let's have

16   good communication.  Let's talk both by Microsoft Teams.  I

17   think he might even talked to cell phone and e-mail as well.

18            And I appreciated that because I thought talking

19   to Andy at the time that he recognized that kind of

20   Frankfurt was a fiasco.  And he didn't want to repeat that.

21    So my wife and I, yes, we are very happy when he sent that

22   e-mail saying what he was saying, and orally.  But having

23   that in writing, saying he is enthusiastic about my bid

24   list.

25            MR. MEZGER:  So his e-mail confirmation, is -- was

Page 114

1    it an effective memorialization of your phone call in your

2    opinion?

3              MR. SUAREZ:  Objection, to form.

4              THE WITNESS:  No.  It wasn't a memorial.  It just

5    confirmed.  What I was happy about is a lot of times in the

6    State Department things are said orally.  Like what happened

7    with -- I am scarred.  I -- the experience that I had with

8    Assistant Secretary Evanoff where he said we are going to

9    try to do everything in our power to get you a Y-Tour to

10   Portsmouth, and then not have that happen.

11             And more than that, basically have Michelle Crone

12   and others say to me, no, he said there was never a

13   conversation about that.  That's honestly, typically what

14   happens at State Department.  Things are said orally,

15   promises are made and then, of course, there is oh, I never

16   said that.

17             So, yes, I was happy that Andy, at least confirmed

18   that.  Because that was something in writing that it wasn't

19   just he couldn't deny later, right?  So my wife -- that's

20   why I keep saying my wife.  My wife was on that MS Teams

21   call, that initial one with him, and she heard that too.

22             So we were both happy to have something in writing

23   where the typical kind of -- our experience would be that

24   oh, Andy just denied it.  So oh, he was never enthusiastic

25   about the bid list.  So yes, we were happy to see that in

Page 115

1    writing.

2           BY MR. MEZGER:

3       **Q    And around October of 2020, Andrew Kaleczyc sent**

4    **you a list of domestic NOW positions, but also pointed out**

5    **that Monterey was the only overseas NOW position, correct?**

6       A    I believe so.  Yes.

7       **Q    Okay.  And Andrew Kaleczyc told you that if DRAD**

8    **determines that no accommodation can be made for Monterrey,**

9    **that DS would be willing to consider you for other overseas**

10   **assignments.  Does that sound correct?**

11      A    It sounds -- yes.  It sounds familiar.  Because I

12   remember thinking, whoa, wait a minute.  Something happened

13   here in the last couple of days that I don't know about.

14   But his tone, everything about -- something had happened

15   with him or somebody had said something to him.

16           Because his tone was markedly different.  It was

17   more -- how to say -- very formal.  And I think he even went

18   to calling me like Mr. Lenzi, instead of Mark, and stuff

19   like that or whatever, that sort of thing.  So yeah, that

20   was striking for me.  But yes, I believe so.

21      **Q    Did you ever write to DRAD asking for**

22   **accommodations in Monterey?**

23      A    I did not.

24      **Q    No one from DRAD ever told you that the Monterey**

25   **assignment could not -- strike that.  No one from DRAD ever**

Page 149

1    and it will just be -- it's a waste of everyone's time.  He

2    said I strongly advise you to go to Baku.  You'll get the

3    language bonus there.  Think of it as Kyiv light.  I know

4    you want to go to Kyiv and really do that.

5           But he is like I don't want to by you doing the

6    shoot-out in Kyiv, I don't want you to undermine the fact

7    that you could go to Baku.  You have been to Baku before.

8    You have Baku wired.  You are -- you have got a lot of

9    context there.  You are going to do great in Baku.  Just do

10   it.

11          And so then I had this debate with my wife at the

12   time whether I was going to shoot out Kyiv or not.  I can't

13   tell you.  I can't say for certainty whether I did shoot-out

14   Kyiv or not.  I don't think I ended up doing it, but I -- so

15   all that to say is I think it was a total of three times

16   always for Kyiv prior to injury that I shot out.

17       **Q     Just those three were the only shoot-outs in**

18   **your -- pre-Belgrade in your tenure?**

19       A     Pre --

20       **Q     That was the point of my question.  Let me**

21   **withdraw it, and I will ask you this.  So apart from those**

22   **three shoot-outs and your debate about the potential**

23   **fourth --**

24       A     Yes.

25       **Q     -- shoot-out, were those the only shoot-outs that**

Page 150

1    **you had in your State Department career prior to the**

2    **Belgrade shoot-out?**

3         A    I believe so.

4         **Q    Okay.**

5         A    And that's why I -- because Frankfurt, which we

6    have already discussed, that Frankfurt 2020 position, I

7    maintained then, and I still maintain now, that they -- that

8    DS made those -- designated those entry-level.  Because they

9    knew I had a history.  They knew I knew the system how to do

10   a shoot-out.  So that was a big reasoning factor for them.

11   They knew that I -- they knew very well that I knew how to

12   do a shoot-out.  Knew what to do as far as contact people,

13   and get letters of reference and all this other stuff.  And

14   that I would do it.

15        So I would have shot out Kyiv if afforded the

16   opportunity if it wasn't designated entry-level.  But yes, I

17   believe -- I could be wrong, but I believe those Kyiv shoot-

18   outs were my only ones prior to Belgrade.  Yes.

19        **Q    Okay.  Back to the more specific to the Belgrade**

20   **position here.  Do you know who the Department of State's --**

21   **or diplomatic securities, rather, preferred candidate was**

22   **for the Belgrade position?**

23        A    After -- I didn't at the time.  After I initiated

24   an EEO complaint for the Belgrade position, then I think

25   through discovery, yes.  I was made aware of who that was.

Page 169

1    foundation.

2            THE WITNESS:  Without knowing who it was, I can't

3    speak to that.  But I will say because it's Poland and

4    because that's where I did my Peace Corps., and because

5    that's where I have a U.S. Government rating in the Polish

6    language of advanced/high, and because that Warsaw

7    position -- excuse me -- it's listed as language-preferred,

8    I find it highly unlikely that there would be another SEO

9    that would be more qualified than me to go to Warsaw.

10           I can't say that with absolute certainty, of

11   course.  Maybe there is somebody.  I mean SEO -- again,

12   there is only about 198 of the skill code.  I am 99.99

13   percent sure I would know if there was another Polish

14   speaker in our cadre and somebody that was as into the,

15   let's say, everything about Poland as I am, but I can't say

16   with 100 percent certainty.

17           But I can say -- I can state with a large degree

18   of certainty that I would be the most qualified SEO

19   candidate of any SEO for Warsaw.

20           BY MR. MEZGER:

21       **Q    Is that your position even if the other bidder was**

22   **at the grade of the post, FPO 2?**

23       A    It is actually.

24       **Q    Okay.**

25       A    Because granted, I was a 3, and that was a stretch

Page 170

1    position.  But keep in mind, I had already received a

2    handshake when I was in Guangzhou and accepted that

3    handshake for Baku which was a stretch position, right?  So

4    I knew that there wasn't some magic thing.  They already

5    knew my management skills and everything else.  I could

6    handle a B officer in charge of an office.

7          They knew based on who I was working with in

8    Frankfurt and stuff like that, that I could do it.  So no,

9    it wasn't -- the 3 and 2 designation at those points, it's

10   really just a -- it's kind of a formality, but for things

11   like shoot-outs.

12         Now, I knew -- I was very aware of if they gave

13   that a handshake to that officer, regardless of whether you

14   knew Polish or language-preferred thing and everything else.

15    But if that officer was a 2, and I am a 3, and I do a

16   shoot-out for that, I was cognizant of the fact that my

17   likelihood of success of that shoot-out, given the fact that

18   I have done all these shoot-outs at-grade before, and I

19   still lost them, I was very aware that I likely wouldn't win

20   a shoot-out for Warsaw.

21   **Q    Was there a language preference for this post?**

22   A    I believe so.  Yeah.  Polish with 0/0 in -- listed

23   next to it in the FSBid.  Yes.

24   **Q    Okay.  Is it your belief that language is a**

25   **determining factor for assignment shoot-out challenges?**

Page 171

1          A     Not a determining factor, but it is what exactly

2     it says in the regs.  If you look up in the State Department

3     regs in the Foreign Affairs Manual or the Foreign Affairs

4     Handbook, quote, unquote, "language-preferred," it's that.

5     It's exactly that.  They don't put that 0/0 for Polish for

6     the fun of it, right?  They have sat down.

7               The State Department, HR, and DS HR have sat down

8     and said, okay, well, these positions are were language-

9     preferred because of all these reasons that they come up

10    with HR.  So they -- a lot of serious thought goes into

11    that.  So yes, that's a big consideration.  They wouldn't

12    list that if -- for nothing, right?  So yeah.

13         **Q     For this post, and for others, you said 0/0,**

14    **right?  Does that just mean proficiency in the language?**

15         A     Yes.  That means -- well, yes, it does.  It means

16    proficiency.  Ideally, it means if you go in -- let's say

17    with Serbo-Croatian, for instance.  Like that's not a

18    language that I speak at a -- like a -- what we call it 3/3

19    level like my like Russian or Polish is at.  But it's a

20    language that I could go in there and muck through

21    conversation and get a 1/1.

22              So 0/0 is something where you can -- you go in.

23    You are -- you have the guts enough because it's kind of

24    embarrassing, but officers do this all the time so they can

25    get that language preferred.  They go in and say, I am going

Page 243

1                MR. MEZGER:  Okay.  And you were told that because

2    this was an excursion tour outside your specialty, you would

3    need to complete training before you got to post, correct?

4                MR. SUAREZ:  Objection, to form.

5                THE WITNESS:  No.  That's actually incorrect in

6    the sense that I -- when I interviewed for the position, I

7    had multiple interviews for the position in Frankfurt with

8    personnel, IRM personnel in Frankfurt.  And they told me,

9    along with other IMTS management -- specifically, there is a

10   guy.  There is an -- he is not an officer.  He is a

11   specialist named Barry Gray, who's a 2 level IMTS.

12               And he is -- which is -- for IMTS is very senior.

13    Like they have a much different kind of promotion scale

14   than SEOs.  And Barry Gray is somebody that I know and as a

15   family friend from my days in Frankfurt.  Our children kind

16   of grew up together and still play -- still, you know, game

17   online and stuff like this.

18               And Barry Gray told me that as an IMTS, he said

19   you would be great at it.  You should apply for it.  And he

20   said expect to A, get the handshake.  B, go there right away

21   because he said we, meaning the IMTS, skill code, are --

22   have been -- we have been sending out IMTSs without

23   training.

24               And so that was music to my ears because I wasn't

25   going to even bid on the position if a four-month, you know,

Page  244

1    training was going to be part of the deal.  The whole -- the

2    alluring thing for me is that Barry said they wanted people

3    right away, that I would be like the only person applying.

4    Specifically for me in this IMTS -- the specific -- there is

5    a lot of IMTS positions available.

6            But this IMT -- this particular IMTS position was

7    because of my experience, my technical experience with

8    Avaya, A-v-i-y-a telephones, and Nortel telephones, and also

9    Cisco, C-i-s-c-o phones.  Specifically, I did a lot of

10   technical counterintelligence things with those three type

11   of phones that gave me a lot of experience with let's see

12   the digital networking aspect and security aspect of those

13   phones.

14           So Barry said apply for this specific IMTS.

15   Because IMTSs could also be radio techs, radio frequency

16   techs where you are installing antennas on the top of

17   embassies and consulates, something like this.  But he said

18   you would be perfect for, and I know we are desperately --

19   we desperately need these telephone techs.  Specifically, I

20   think he said for Avaya phones.

21           So yeah, I bid on it.  And when I bid on it, then

22   I think I got an e-mail from David Mango and maybe some

23   other person and another person or two in Frankfurt.  And I

24   had a series of interviews with who would be my supervisors

25   there, interviewing me to judge my qualifications for my

Page 245

1    candidacy, for my bid for the IMTS Frankfurt 2021 position.

2            And those -- in those interviews, it confirmed,

3    they confirmed what Barry Gray, IMTS Barry Gray, said to me.

4     That no, we really were happy with your experience.  It's

5    perfect, especially with Avaya phones.  We need somebody I

6    think yesterday was almost like the direct quote.  It was,

7    you know, we need somebody very fast.  No.  You will not

8    need the training.  Barry was right about that.  And they

9    were very good interviews.

10           So no, to answer your question.  It was

11   represented to me with IRM personnel multiple times that I

12   would not be -- need the IMTS training.

13           MR. MEZGER:  Okay.  So it's your testimony that

14   you were never told at any time that you needed to complete

15   the training before you go to post.  That's your testimony?

16           MR. SUAREZ:  Objection, to form.  Go ahead.

17           THE WITNESS:  It is not my testimony.

18           MR. MEZGER:  Okay.

19           THE WITNESS:  My testimony was in my interviews

20   and everything, discussions with IRM personnel that had

21   they, at any time, told me that I would need the training --

22   I specifically asked about this.  Because it was a deal

23   breaker for me.  I am on a, you know, DRAD, yes.  That was a

24   prime concern to me that look, no training for this.

25           I have got -- already got the stuff, the

Page 246

1    experience that you want in these Avaya telephones.  I can

2    go out tomorrow and install these, and network these in

3    certain embassies.  And had, at any time, whether it be

4    Barry Gray -- if Barry Gray had told me initially that there

5    was a training requirement, I would not have bid on the

6    position.

7            But the fact of the matter is he said there wasn't

8    so, therefore, I did bid on the position.  And when I bid on

9    the position, it was in interviews represented to me then

10   that there was no training requirement.

11           Subsequent to that, after I received a handshake,

12   which is a big deal in the State Department.  To get a

13   handshake for a position, it means you are 99.999 percent

14   there.  You are going.  Only after I received that

15   handshake, did I get something from -- did I get a

16   communication, an e-mail, from Andy Kaleczyc, my CDO, that

17   said oh, I see you got a handshake for that.

18   Congratulations.  And if you want to talk about sarcasm, I

19   believe that congratulations was fellow sarcasm there.

20           But regardless of whether it was or not, he said

21   congratulations.  Let me check into -- there might be a

22   training requirement.  And let me look into that.  And I

23   said to him in an e-mail correspondence back, oh, I have

24   already discussed this training.  No.  There is no training

25   requirement.  They are waiving it because they want me there

Page 254

1   the State Department all the time, where it's, heaven

2   forbid, it probably does not occur in the U.S. Attorney's

3   Office.  But in the State Department it occurs all the time,

4   when you call it -- when you slow-walk something or when you

5   say, oh, yeah, I will do that.  But when you say, yeah, I

6   will advocate for that, when you -- everything else.

7            It's so you can say you are advocating but what

8   you are doing in practice is actually undermining or slow-

9   walking or otherwise undermining what you are saying.

10           And that's a classic example of what in State

11  Department Andy said to me, oh, let me see.  Let me get

12  involved here, and I think I can advocate for you and let me

13  look into getting that training waived, and I will see.  And

14  I -- my firm belief is that he did not advocate.  He

15  undermined.

16           Because how else to explain with other SEOs that

17  were in my class, SEO Richard Hall, for instance, was a

18  2550.  And then goes to be an IMTS without having that State

19  Department training.  There is people that I know that did

20  that.  Barry Gray, again, that 2 level IMTS told, quote,

21  unquote, "We are doing it all the time now, especially

22  because of COVID.  We're sending out IMTSs without that

23  training."

24           So by information and believe everything that I

25  have seen firsthand, you know I knew that this was not only

Page 261

1           Because normally, they don't have -- normally,

2    they just have -- a class is just comprised of all new

3    people going into the Foreign Service.  So they were very

4    happy the instructors were that I gave this presentation.

5    That was like day two.

6           Then day three, was like hardcore PowerShell

7    that -- where you had to follow along, no breaks or very

8    minimal breaks.  Follow along in like Linux systems and just

9    hardcore computer PowerShell and programming.  And that, I

10   found, not only -- as I knew I would, and especially without

11   a reasonable accommodation for that, I found that exhausting

12   and headache-inducing.

13          BY MR. MEZGER:

14       Q    Got it.  So you had told the training personnel

15   that there was 100 percent attendance policy for good reason

16   with this course.  Is that correct?

17       A    Yes.

18       Q    And you could -- you informed the training

19   personnel that you saw that the pace of the course is so

20   quick and intense.  Is that right?

21       A    I don't know.  But yes.  I think that's to Steven

22   like Ryde or R-y-d-e or something.  Yes.  Yes.

23       Q    And you would agree you didn't complete the

24   training, correct?

25       A    I would agree that I don't even know if I

Page 262

1  completed the first week of -- I might have completed the

2  first week of the training.

3       Q     Okay.

4       A     But yes.  I did not complete the training.

5       Q     And you -- as part of your reason for withdrawal,

6  you cited your medical appointments in Philadelphia and

7  Boston.  Is that right?

8       A     I think I might have cited my headaches for that.

9   But yes, I probably said upcoming medical appointments too.

10      Q     Appointments that were in Boston and Philadelphia?

11      A     Correct.  At UPenn and at Mass General Hospital.

12      Q     Physically in Philadelphia?

13      A     Yep.  Going to UPenn.

14      Q     Physically in Boston?

15      A     Yes.

16      Q     And at this time, you had a Class 2 medical

17  clearance, right?

18      A     This is?

19      Q     This is 2021.  And I am sorry for my interruption.

20      A     Yes.  Because I think I received my Class 2 for

21  Frankfurt.  You know I can't say for sure if I had a

22  Class -- I had Class 2 for Belgrade.  I had a Class 2 for

23  Warsaw.  I don't know if I actually had a Class 2, at that

24  time, for Frankfurt.  But I had Class 2, at least, for

25  others and possibly Frankfurt at that time.  Yes.

C E R T I F I C A T E


THE UNITED STATES OF AMERICA  )
                              )
IN THE DISTRICT OF COLUMBIA   )


         I, Kevin E. Carr, Notary Public, before whom the

foregoing deposition was taken, do hereby certify that the

witness whose testimony appears in the foregoing pages was

duly sworn by me; that the testimony of said witness was

reported by me by digital record, and thereafter reduced to

typewritten form; that said deposition is a true record of

the testimony given by said witness; that I am neither

counsel for, related to, nor employed by any of the parties

to the action in which this deposition was taken; and,

further, that I am not a relative or employee of any

attorney or counsel employed by the parties thereto, nor

financially or otherwise interested in the outcome of this

action.


                              _____
                                     Kevin E. Carr
                              Notary Public in and for the
                                   District of Columbia


My commission expires:

October 14, 2023

# PX-013

See Instructions Before Completing
U.S. Department of State

# U.S. FOREIGN SERVICE EMPLOYEE EVALUATION REPORT

For employees at Class FS-03 and below and all career candidates regardless of grade

## SUBMISSION CONTROL

| DATE RECEIVED IN POST/BUREAU *(mm-dd-yyyy)* | DATE RECEIVED IN HR/PE *(mm-dd-yyyy)* | DATE RELEASED TO DEPARTMENT FILES *(mm-dd-yyyy)* |
|---|---|---|
| 05-02-2012 | 05-07-2013 | 05-08-2013 |

NAME OF EMPLOYEE BEING RATED *(Last, First, MI)*

LENZI, MARK R.

| TYPE OF REPORT | GRADE | SSN |
|---|---|---|
| REGULAR ☐  CAREER CANDIDATE ☒  VOLUNTARY ☐ | FS - 06 | XXX-XX-4434 |
| INTERIM: Change of Rater ☐  Duties ☐  Assignment ☐ | POSITION TITLE SECURITY OFCR - ENGINEERING | |

| POST OR ORGANIZATION | PERIOD COVERED *(mm-dd-yyyy)* | |
|---|---|---|
| 175233 - DS/CMP/ECB | From  10-03-2011  To  04-15-2012 | |

| RATER: JOHNSTONE, GREGG M. | REVIEWER: THERIOT, RAHIM |
|---|---|
| GRADE: FS - 02 | GRADE: FS - 02 |
| TITLE: SECURITY ENGINEERING OFFICER | TITLE: SECURITY OFCR - ENGINEERING |

After careful review, I consider this report to be complete, in conformance with the instructions, and adequately documented by specific examples of performance.

A. /s/ GREGG JOHNSTONE    05-02-2012
Rater's signature upon completion of Sections I, III, IV, and V    Date (mm-dd-yyyy)

B. /s/ RAHIM THERIOT    05-02-2012
Reviewer's signature upon completion of Section VI    Date (mm-dd-yyyy)

## I. CERTIFICATION - WORK REQUIREMENTS AND COUNSELING

Work requirements were established by rater, reviewer, and employee on *(mm-dd-yyyy)*    10-08-2011

If applicable, requirements were revised on *(mm-dd-yyyy)* _____

Rater and rated employee held counseling sessions to discuss performance on at least two dates as follows: *(mm-dd-yyyy)*

1. 11-16-2011    2. 03-27-2012    3. _____    4. _____

In the case of an unsatisfactory performance rating, this is also to certify that the requirements of 3 FAH-1 H-2814.3 (tenured employees), 3 FAH-1 H-2326 (employees subject to administrative promotion), or 3 FAM 2248 (FSO Career Candidates) have been met.

*I certify that counseling sessions took place during the rating period and that at least one of them was documented in writing using the Counseling Certification Form (DS-1974).*

/s/ GREGG JOHNSTONE
Rating Officer

/s/ MARK LENZI
Rated Employee

04-30-2012
Date *(mm-dd-yyyy)*

## II. REVIEW PANEL STATEMENT *(Completed by Review Panel)*

A. **Examples of Performance:** Specific examples have been provided in all sections ☒ Yes *(If not, return for rewrite)*

B. **Certification:** This report has been prepared according to the regulations and contains no inadmissible material.

05-02-2012
Date *(mm-dd-yyyy)*

MICHAEL E. BISHOP
Panel Chairperson's Name - Type

/s/ MICHAEL BISHOP
Signature

C. **Comments:** *(If submitted late, indicate who is responsible for delay.)*

| DS-1829 04-2010 | When completed on a Foreign Service employee, this is a performance evaluation report that shall be subject to inspection only by those persons authorized by Sec. 604 of the Foreign Service Act of 1980. | Page 1 of 6 |
|---|---|---|

**III. EMPLOYEE'S POSITION AND WORK REQUIREMENTS (Established by Rater, Reviewer and Employee)**

A. Describe the position and where it fits in the staffing pattern; indicate the number and kind of employees supervised or team affiliation(s) and tasking(s), whichever is applicable.

Mark Lenzi is a Security Engineering Officer (SEO) in the Emanations Countermeasures Branch (ECB), which is a part of the Countermeasures Program Division. The branch provides technical and policy countermeasure support to overseas Engineering Service Centers and Engineering Service Offices. Mark is responsible for providing engineering services to the Certified Tempest Technical Authority section, an activity in ECB. He will occasionally direct other SEOs and/or contractors on assigned projects.

B. Divide work requirements into two categories: continuing responsibilities and specific objectives (including, as appropriate, professional development activities), listing these in descending priority order.

Continuing Responsibilities:
1. Provide engineering services to the Certified Tempest Technical Authority section.

2. Conduct TEMPTEST Countermeasure reviews as directed by the CTTA.

3. Prepare written correspondence, reports, and telegrams, in a timely manner, on product evaluations, identified vulnerabilities, countermeasures, and other technical matters as required.

4. Apply internal control measures to protect organizational integrity and prevent unauthorized disclosure of classified and sensitive materials, report security incidents to the appropriate management officials, and properly safeguard all classified and sensitive materials and equipment in assigned areas.

5. Ensure that all physical, material, and human resources are safeguarded against waste, fraud, and unauthorized us or misappropriation, obligations incurred comply with applicable laws and regulations, and revenues and expenditures pertaining to the incumbent's operation are promptly recorded and accounted for in accordance with DoS procedures.

6. Uphold the principles of Equal Employment Opportunity.

7. Direct other SEOs and contractors on assigned projects.

Specific Objectives:
1. Review and become familiar with the DS security standards and policies in the 12 FAH 6 and 12 FAH 5 as applicable to the execution of Security Engineering Officer.

2. Learn about the other branches and section within the Countermeasures Program.

3. Participate in an Overseas TDY.

4. Assist the CMP Special projects coordinator with duties and task.

C. Describe any special circumstances influencing the work program.

STATE00002845

EER FOR LENZI, MARK R.  XXX-XX-4434  Rating Period From 10-03-2011 to 04-13-2012

---

### IV. EVALUATION OF PERFORMANCE AND ACCOMPLISHMENTS *(Completed by Rater)*
For employees at Class FS-03 and below and all career candidates regardless of grade

**A. General Appraisal:**

All Employees:  Performance was satisfactory or better (If no, see instructions for documenting unsatisfactory performance)

YES ☒    NO ☐

**B. Discussion:**    Identify at least three of the work requirements including continuing responsibilities and/or specific objectives listed in Section III.
For each, using examples, describe the employee's performance and accomplishments.

Mark Lenzi has demonstrated that he is capable of a very successful career as a Security Engineering Officer. This reviewing officer strongly recommends that Mr. Lenzi be tenured and promoted at the earliest opportunity. He has made a large contribution to the Emanations Countermeasures Branch through a combination of his prior engineering experiences and his pro-active and flexible approach to challenging engineering and policy issues.

Provide engineering services to the Certified Tempest Technical Authority section.
Mark supported the Certified Tempest Technical Authority section through answering technical customer service requests related to classified automated processing systems. These requests came from domestic and overseas Department offices ranging from responding in a timely manner to a technical question of how to handle and dispose of specialized computer processing equipment from an Information Resource Management (IRM) domestic office branch in Virginia to providing guidance on a wireless communication system for a Department office in Indonesia. In both of these cases, Mark's timely and informative technical guidance allowed both these domestic and foreign Department offices to maintain operational tempo thereby helping them to stay focused on meeting Department operational demands.

Prepare written correspondence, reports, and telegrams, in a timely manner, on product  evaluations, identified vulnerabilities, countermeasures, and other technical matters as required.
Mark has demonstrated strong collaborative skills by co-authoring a comprehensive 19-page manual for engineers, technical users and field personnel on TEMPEST program requirements for classified information processing as well as guidelines for classified information processing inspections. The manual that Lenzi co-authored with other engineers from the Emanations Countermeasures Branch will provide hundreds of Security Engineering Officers, Information Management Officers, Regional Computer Security Officers and Regional Security Officers necessary information and guidelines to perform field inspections and/or assessments of procedural and physical TEMPEST countermeasures. Mr. Lenzi worked closely in a collaborative effort to design the manual to include a procedural checklist for computing and information processing systems inspections for Posts to perform on a regular basis.

Conduct TEMPTEST Countermeasure reviews as directed by the CTTA
Mr. Lenzi has performed at a high level - particularly in written communications - as evidenced by his 30 November 2011 seven page classified memorandum for the Emanations Countermeasure Branch Chief and the Certified Tempest Technical Authority Section Chief that provided a summary of procedural and construction issues identified in a Technical Security Assessment for an embassy in Asia. This well written and succinct memorandum demonstrated Lenzi's impressive writing and analytical skills by making recommendations on how to mitigate some of the systemic procedural security issues that were occurring at the embassy.

Participate in an Overseas TDY.
Mark successfully completed a TDY to Afghanistan for two months during this rating period. He guided himself through the maze of prerequisite training, and the mountain of forms. As evidenced by the attached Memorandum of Performance. He performed very well under difficult and strenuous conditions some of which were not listed in the usual duties of a Security Engineering Officer.

---

**DS-1829**

Page 3 of 6

Case 1:21-cv-01371-PTG-IDD Document 112-4 Filed 02/28/23 Page 167 of 207 PageID# 3273

## V. EVALUATION OF POTENTIAL *(Completed by Rater)*

**A.** **For Career Candidates only:** *Assessment of career potential as a Foreign Service Officer or Foreign Service Specialist:*

☐ Unable to assess potential from observations to date

☐ Candidate is unlikely to serve effectively even with additional experience

☐ Candidate is likely to serve effectively but judgment is contingent on additional evaluated experience

☒ Candidate is recommended for tenure and can be expected to serve successfully across a normal career span  *(see instructions)*
*(Support your choice by discussing below the candidate's potential for successful service across a normal career span, citing examples which illustrate strengths and weaknesses in each of the competencies cited below.)*

**B.** **For employees at Class FS-03 and below and all career candidates regardless of grade:**
For each of the competency groups listed below, draw on specific examples of performance to describe the rated employee's potential for advancement in the Service.  *(See Core Precepts for definitions of competencies.)*
1. Leadership Skills  2. Managerial Skills  3. Interpersonal Skills  4. Communication and Foreign Language Skills
5. Intellectual Skills  6. Substantive Knowledge

Leadership Skills: During his Temporary Duty (TDY) to Afghanistan, Mark helped created an organization-wide environment which encouraged innovation by taking the initiative to design and build from the ground up a comprehensive wiring (signal and power) and mount system for a new installation of a $330,000 Forward Looking Infrared (FLIR) camera that was of vital importance to Embassy Kabul's security – especially for night operations. Anticipating and preparing for a future security situation in Afghanistan with American troop levels significantly reduced from current levels, Mark took not only a tactical but, more importantly, a long-term view of the project and acted as a catalyst and team leader for Security Engineering Officers, Navy Seabees, Facility Managers and Security Technical Specialists from the initial design to project completion.

Managerial Skills: Drawing upon managerial background before he joined the Department of State, Mark set a high standard for managerial performance. During his TDY to Afghanistan he established performance expectations in accordance with the Department's goals and objectives. An example of his managerial ability was brought out when he led both Navy Seabees and Security Technical Specialists on numerous security repair (e.g. various types of security locks, sliding gates, barriers, alarms, classified paper shredders, etc.) and installation projects all around the country of Afghanistan.

Interpersonal Skills:  On all of these diverse missions, Mark encouraged, developed and provided feedback to the efforts of staff working with and under him to enhance their effectiveness. Mark set for himself a high level of integrity and workplace behavior by example and instruction as demonstrated by the fact that he has never lost composure under stress or in crisis working in a variety of extremely difficult working environments whether in Washington or Afghanistan.

Communication and Foreign Language Skills: In addition to outstanding oral and written communication skills in the English language, during this rating period, Mark studied for and achieved a 2/2+ score for Russian language at the State Department's Foreign Service Institute which will qualifies him to receive language incentive pay when serving abroad in Russian speaking countries. Mark practiced and honed his Russian language skills while serving in Afghanistan during this rating period by communicating on security matters with Armenian armed forces personnel who were guarding the German military base he was stationed at in Mazar e Sharif while working at the future U.S. consulate.

Intellectual Skills: Mark has impressive and well rounded intellectual skills that go beyond his engineering skills. Personnel from the Department's Intelligence and Research (INR) Bureau and the Central Intelligence Agency continue to ask Mark, on an informal basis, for his analysis on political developments in the Eurasia region. This is an example of his varied intellectual skills being of significant value to the U.S. Government.

Substantive Knowledge: Mark has forged his previous foreign work and travel experience into a tool that has allowed him to integrate work flow and outreach efforts with other Departments and Agencies to monitor internal and external sources for information to analyze potential threats to Department personnel and facilities. To advance additional substantive knowledge, Mark has pro-actively utilized FSI training by taking such courses as Managing Your Time Effectively as well as the 40 hour Contract Officer Representative (CoR) course of which he passed the certification test and is CoR certified.

STATE00002847

EER FOR LENZI, MARK R. XXX-XX-4434 Rating Period From 10-03-2011 to 04-13-2012

---

**C. Areas for Improvement:** The following must be completed. Employees should be made aware of areas where they should concentrate their efforts to improve. Specify at least one area in which he/she might best direct such efforts. Area(s) cited must be explicitly linked to one or more of the competency groups listed in Section V B and must have been discussed with the employee in counseling during the rating period. Justify your recommendation with examples and indicate below competency group(s) being addressed. **_(The response is not to be directed as a need for formal training.)_**

Specify Competency <u>Substantive Knowledge</u>      Specify Competency _____

Mark has an excellent technical knowledge base. However, he should work to gain a better understanding of how Diplomatic Security interacts with other departments and agencies within an Embassy. I would recommend that he consult with other senior SEO's who have that experience at every opportunity.

---

## VI. REVIEW STATEMENT _(Completed by Reviewer)_

Assess the employee's performance and potential (if a career candidate, potential to serve across a normal career span - see instructions). Independent observations are encouraged and must be supported by additional examples of performance observed this rating period. Note differences with the rater's appraisal or recommendations. Comment on relations between rater and employee.

Mark is a talented engineer. He was dependable, a team builder and an effective communicator in his role as a Security Engineering Officer within the ECB program. As a motivated self-starter, Mark made significant contributions to the DS mission. I agree with Gregg's assessment of this first tour SEO and recommend him for tenure as soon as possible. He was effective in his role supporting ECB, the CTTA and ST field offices overseas.

Mark was a very dependable employee during this rating period. For an engineer at his level, I could always depend on him to complete assignments as scheduled. In every situation, Mark would follow a task through to completion and finish according to the guidelines established. He was also proactive in the executing these tasks. I recall once when I assigned Mark to review a technical security assessment and to provide me with a summary of the post's profile. He delivered the recommendations within a few days and followed up with our SEO at post to get updates on the report before I tasked him to do so. He often worked to complete assignments ahead of their due dates. He effectively balancing day-to-day task with other assigned duties.

In the branch, teamwork is often a required aspect of the ECB. No one exhibited this concept better than Mark. He would always look to assist his fellow engineers on their tasks. For example, when a special project required a fellow SEO to abandon his regular tasks, Mark volunteered to cover his weekly reporting until the engineer returned two weeks later. He successfully managed his workload and these additional duties. He also displayed exceptional ease working with colleagues at all levels and in all roles. He helped with simple and collaborated on more complex tasks effortlessly. His work with another engineer and senior technicians on the TEMPEST checklist is a great example of Mark's ability. Mark consistently brought the team together.

Producing reports for the TEMPEST CTTA showed that Mark knew how to convey a positive, persuasive position in written form. He presented information in a clear and effective manner. Employing an understandable structure in the memos and reports, he always provided details appropriate to the audience whether it was the front office or the intelligence community. He also always took the time to proofread all written documents, thus minimizing any spelling or grammar errors. He was the person others would go to review their documents. He was open to learning from coworkers and hearing what they had to say.

During a 45-Day TDY, Mark was able to install alarm systems, repair force entry doors and perform general maintenance. His performance in the theatre gave Mark a firsthand perspective into the role of a SEO and that role supports the Department's mission. His impact was significant and stated by the technicians that worked with him. One told me that Mark was a great person and a hard worker. The Officer-in-Charge also thanked Mark for his service.

Mark's was a great asset to have in the branch. With his innate ability to positively engage people and execute the mission in Washington and in the field, Mark was very successful this rating period. I recommend the Department tenure him as soon as possible.

---

**DS-1829**

STATE00002848

EER FOR LENZI, MARK R.  XXX-XX-4454  Rating Period From 10-03-2011 to 04-13-2012

| VII. STATEMENT BY RATED EMPLOYEE |
|---|

**A. Discussion:**  This section is intended to provide the rated employee's views on the period of performance appraised.  You must comment on your most significant achievements during the period.  You may also address any activities or problems not adequately covered in this report, or aspects of the appraisal which need clarification or correction.  You are encouraged to state your current career goals including training and assignments desired over the next 5 years.  **(Continuation sheets may be used.)**

I would first like to thank Messrs. Theriot and Johnstone for counseling and mentoring me. Their support has been invaluable. I am very proud of my work accomplishments for the State Department and it is due mostly to the team effort that I have been a part of in the Emanations and Countermeasures Branch (ECB) as well as in the Engineering Services Office at the U.S. Embassy in Kabul, Afghanistan.

In addition to helping ECB support the field on a daily basis, I am most proud of helping to create an organization-wide environment which encourages innovation at the U.S. Embassy in Kabul by taking the initiative to design and build from the ground up a complex mount system for a new installation of an expensive Forward Looking Infrared (FLIR) camera that was of vital importance to Embassy Kabul's security – especially for night operations. I feel this project showcased my managerial skills as I acted as a catalyst and team leader for Security Engineering Officers, Navy Seabees, Facility Managers and Security Technical Specialists from the initial design to project completion. I was especially pleased to recently receive feedback from Embassy Kabul that this FLIR system was used extensively and was of vital importance during a high profile and complex attack on the embassy on April 15, 2012.

I feel that my efforts to strengthen my foreign language skills over the last rating period are symbolic of the pro-active way in which I am always trying to better myself to more effectively serve the Department. I am proud that I tested at a level in Russian that qualifies me for a language bonus but, more importantly, learning this language has already had direct positive impact on my work in the field such as when I used Russian to communicate with military personnel from Armenia at a German army base in Mazar e Sharif, Afghanistan, when I was conducting a Technical Security Survey for the new U.S. consulate in that city.

My goals remain the same as when I joined the State Department: to continue to constantly better myself and be a leader within the organization to more effectively serve the Department to accomplish its strategic goal of creating a more secure, democratic, and prosperous world for the benefit of the American people and the international community.

**B. I acknowledge receipt of this report.**

Date Section VII completed  *(mm-dd-yyyy)*      05-02-2012                      /s/ MARK LENZI

Employee's Signature

STATE00002849

# PX-014

See Instructions Before Completing
U.S. Department of State

# U.S. FOREIGN SERVICE EMPLOYEE EVALUATION REPORT

For all Career Candidate employees and Limited Non-Career Appointees (LNAs)

## SUBMISSION CONTROL

| DATE RECEIVED IN POST/BUREAU (mm-dd-yyyy) | DATE RECEIVED IN HR/PE (mm-dd-yyyy) | DATE RELEASED TO DEPARTMENT FILES (mm-dd-yyyy) |
|---|---|---|
| 04-23-2013 | 04-29-2013 | 04-30-2013 |

NAME OF EMPLOYEE BEING RATED (Last, First, MI)
**LENZI, MARK R.**

| TYPE OF REPORT | GRADE | SSN |
|---|---|---|
| ☐ REGULAR ☒ CAREER CANDIDATE ☐ LNA ☐ VOLUNTARY | FS - 05 | XXX-XX-4434 |
| INTERIM: ☒ Change of Rater ☐ Duties ☐ Assignment | POSITION TITLE **SECURITY ENGINEERING OFFICER** | |

| POST OR ORGANIZATION | PERIOD COVERED (mm-dd-yyyy) | |
|---|---|---|
| 175233 - DS/CMP/ECB | From 08-01-2012 | To 04-15-2013 |

| RATER: NICODEMUS, JAMES E. | REVIEWER: BARELA, MICHAEL J. |
|---|---|
| GRADE: FS - 02 | GRADE: FE - OC |
| TITLE: EMANATIONS COUNTERMEASURES BRANCH CHIEF | TITLE: COUNTERMEASURES PROGRAM DIVISION DIRECTOR |

After careful review, I consider this report to be complete, in conformance with the instructions, and adequately documented by specific examples of performance.

A. /s/ JAMES NICODEMUS    04-23-2013
Rater's signature upon completion of Sections I, III, IV, and V    Date (mm-dd-yyyy)

B. /s/ MICHAEL BARELA    04-23-2013
Reviewer's signature upon completion of Section VI    Date (mm-dd-yyyy)

## I. CERTIFICATION - WORK REQUIREMENTS AND COUNSELING

Work requirements were established by rater, reviewer, and employee on (mm-dd-yyyy)    08-15-2012

If applicable, requirements were revised on (mm-dd-yyyy) _____

Rater and rated employee held counseling sessions to discuss performance on at least two dates as follows: (mm-dd-yyyy)

1. 01-29-2013    2. 02-15-2013    3. 03-22-2013    4. _____

In the case of an unsatisfactory performance rating, this is also to certify that the requirements of 3 FAH-1 H-2814.3 (tenured employees), 3 FAH-1 H-2326 (employees subject to administrative promotion), or 3 FAM 2248 (FSO Career Candidates) have been met.

*I certify that counseling sessions took place during the rating period and that at least one of them was documented in writing using the Counseling Certification Form (DS-1974).*

/s/ JAMES NICODEMUS    /s/ MARK LENZI    04-23-2013
Rating Officer    Rated Employee    Date (mm-dd-yyyy)

## II. REVIEW PANEL STATEMENT (Completed by Review Panel)

A. **Examples of Performance:** Specific examples have been provided in all sections ☒ Yes (If not, return for rewrite)

B. **Certification:** This report has been prepared according to the regulations and contains no inadmissible material.

04-23-2013    ERIK S. WINTERHALTER    /s/ ERIK WINTERHALTER
Date (mm-dd-yyyy)    Panel Chairperson's Name - Type    Signature

C. **Comments:** (If submitted late, indicate who is responsible for delay.)

DS-1829
09-2012

When completed on a Foreign Service employee, this is a performance evaluation report that shall be subject to inspection only by those persons authorized by Sec. 604 of the Foreign Service Act of 1980.

Page 1 of 6

STATE00002850

Case 1:21-cv-01371-PTG-IDD Document 112-4 Filed 02/28/23 Page 172 of 207 PageID# 3778

## III. EMPLOYEE'S POSITION AND WORK REQUIREMENTS (Established by Rater, Reviewer and Employee)

A. Describe the position and where it fits in the staffing pattern; indicate the number and kind of employees supervised or team affiliation(s) and tasking(s), whichever is applicable.

Incumbent is a Security Engineering Officer (SEO) in the TEMPEST Countermeasures section in the Emanations Countermeasures Branch (ECB), Countermeasures Programs Division, Office of Security Technology in the Bureau of Diplomatic Security. The TEMPEST Countermeasures section is the Department's sole technical authority for TEMPEST countermeasures and requirements for all domestic and overseas missions. The section ensures compliance with technical security standards and countermeasures through TEMPEST countermeasure surveys and review of existing policies. The incumbent does not directly supervise any personnel but does serve as team leader, directing other SEOs and contactors on various projects.

B. Divide work requirements into two categories: continuing responsibilities and specific objectives (including, as appropriate, professional development activities), listing these in descending priority order.

CONTINUING RESPONSIBILITIES:

1. Provide engineering services to the Certified TEMPEST Technical Authority (CTTA) section.
2. Assist with TEMPEST Countermeasure reviews as directed by the CTTA.
3. Interface with other bureaus and agencies to meet the goals of the TEMPEST Countermeasures section.
4. Prepare written correspondence, reports, and telegrams, in a timely manner, on product evaluations, identified vulnerabilities, and other technical matters as required. Review and make recommendations for Foreign Affairs Manual and Handbook policies.
5. Prepare written products that communicate technical matters or convey recommendations for decision-making by the ECB Chief.
6. Apply internal control measures to protect organizational integrity and prevent unauthorized disclosure of classified and sensitive materials, report security incidents to the appropriate management officials, and properly safeguard all classified and sensitive materials and equipment in assigned areas.
7. Develop and maintain a clear understanding of Diplomatic Security policies, standards, and regulations, including relevant Foreign Affairs Manuals and Handbooks.
8. Ensure that all physical, material, and human resources are safeguarded against waste, fraud, and unauthorized use or misappropriation, obligations incurred comply with applicable laws and regulations, and revenues and expenditures pertaining to the incumbent's operation are promptly recorded and accounted for in accordance with Department procedures.
9. Adhere to established U.S. Government Equal Employment Opportunities and diversity policies.
10. Direct other Security Engineering Officers, interns, and contractors as assigned.

SPECIFIC OBJECTIVES:

1. Continue to learn about the other branches and sections within the Countermeasures Program Division and undertake trainings and activities that advance Diplomatic Security's counter-terrorism and interagency activities.
2. Provide technical security support to the Engineering Services Center of U.S. Embassy Manila through an overseas training trip sponsored by the Security Technical Operations Division.
3. Continue to assist the Technical Security Countermeasures Branch with telephone inspections.
4. Seek training opportunities that will both enhance job performance and support office objectives.
5. Assist the Office of Security Technology on special projects on an as needed basis.

C. Describe any special circumstances influencing the work program.

The budget for ECB will take a 15 percent funding cut in FY 2013 that will require the TEMPEST Countermeasures section to modify support roles to meet performance goals within budget constraints. Additionally, six of the branch's nine Security Engineering Officers are entry level and will periodically be out of the office for training requirements which will require Mark to assume additional responsibilities and assist other sections within ECB throughout the year. Mark is serving in a FS-04 position in a stretch capacity.

STATE00002851

EER FOR LENZI, MARK R. XXX-XX-4454  Rating Period From 08-01-2012 to 04-13-2013

## IV. EVALUATION OF PERFORMANCE AND ACCOMPLISHMENTS *(Completed by Rater)*
For all Career Candidate employees and Limited Non-Career Appointees (LNAs)

**A. General Appraisal:**                                                                                     YES    NO

All Employees:  Performance was satisfactory or better (If no, see instructions for documenting unsatisfactory performance)    ☒    ☐

**B. Limited-Non-Career Appointees:**                                                                          YES    NO

Employee is recommended for extension if required by service needs.                                            ☐    ☐

**C. Discussion:**    Identify at least three of the work requirements including continuing responsibilities and/or specific objectives listed in Section III. For each, using examples, describe the employee's performance and accomplishments.

Mark Lenzi is approaching the end of quite a solid tour with Emanations Countermeasures Branch (ECB) and will be missed.  Throughout his tenure with ECB, Mark has ensured Emanations Countermeasures Branch met Diplomatic Security goals through his decisive and flexible approach to challenging policy and engineering issues.  He has augmented his skills through leadership training that he has used in practical ways to advance the branch's goals. Mark definitely should be promoted to FS-04 and tenured at the earliest opportunity.

Last year Mark was selected to participate in - and graduated from – the Joint Special Operations University's prestigious Combating Terrorist Networks interagency course at MacDill Air Force Base in Florida.  During this course Mark presented to his peers his past experience working in combat environments in Iraq and Afghanistan and was called on to describe to his classmates from the U.S. military and various U.S. government agencies specific, detailed best practices experiences from working on high profile security projects for Diplomatic Security in Kabul and Herat, Afghanistan.

As part of his efforts to increase his work production for the Emanations Countermeasures Branch, Mark pro-actively pursued many training opportunities which he parlayed into improved work performance.  The training that he has taken over the course of this rating period include the twenty-two week Basic Security Engineering Officer Fundamentals training program in conjunction with the National Security Agency's Interagency Training Center.  In his training evaluation report of Mark, Security Evaluation Branch Chief Jose Moreno wrote "my staff and I observed SEO Lenzi's positive attitude toward the training requirements; his respect for and assistance to his co-workers and instructors.  He is very likely to serve successfully over a normal career span."  Mark aptly applied principles learned from these courses when he assisted the Engineering Services Center in Manila, Philippines on several important projects, including extensive work on the Embassy's public address system.  Mark's efforts were so well received that the Officer in Charge invited Mark to extend his visit to complete a few ongoing projects.

Mark provided superior engineering services to the Certified Tempest Technical Authority section, especially through his adept handling of complicated customer service requests and providing technical assistance and advice on TEMPEST and emanations countermeasures issues.  These requests often came from embassies that are working at high operational levels such as Kabul and Baghdad.  In numerous cases, Mark's timely and informative technical guidance allowed field offices to maintain operational tempo thereby helping them to stay focused on meeting Department operational demands.  He led efforts to prepare written correspondence, reports, and telegrams in a timely manner on security vulnerabilities at posts and designed mitigation efforts custom tailored for the security challenges and requirements for specific posts.  Over the course of this rating period, he superbly responded to posts and their inquiries in a highly professional manner, and the utmost level of customer service.

As part of his duties for Diplomatic Security's TEMPEST program, Mark took the lead in coordinating an inter-Bureau design review process for a consulate in the Middle East.  Mark demonstrated his collaborative skills by working with the Bureau of Overseas Building Operations to develop a working strategy to mitigate potential technical threat issues while laying the groundwork for construction of a key component of the consulate to increase its operational readiness.  On this project in particular, Mark made concise and pertinent recommendations to not only the Bureau of Diplomatic Security but also the Bureau of Overseas Building Operations.

Mark is preparing to depart ECB this summer for onward assignment with the Technical Security Countermeasures Branch.  I am positive he will continue to expand his capabilities as an SEO and will serve his new office with the same distinction as he has served ECB.

STATE00002852

Case 1:21-cv-01371-PTG-IDD Document 112-4 Filed 02/28/23 Page 174 of 207 PageID# 3780

| V. EVALUATION OF POTENTIAL *(Completed by Rater)* |
|---|

**A. For Career Candidates only:** *Assessment of career potential as a Foreign Service Officer or Foreign Service Specialist:*

☐ Unable to assess potential from observations to date

☐ Candidate is unlikely to serve effectively even with additional experience

☐ Candidate is likely to serve effectively but judgment is contingent on additional evaluated experience

☒ Candidate is recommended for tenure and can be expected to serve successfully across a normal career span      *(see instructions)*
*(Support your choice by discussing below the candidate's potential for successful service across a normal career span, citing examples which illustrate strengths and weaknesses in each of the competencies cited below.)*

**B. For all career candidates regardless of grade:**
For each of the competency groups listed below, draw on specific examples of performance to describe the rated employee's potential for advancement in the Service. *(See Core Precepts for definitions of competencies.)*
1. Leadership Skills   2. Managerial Skills   3. Interpersonal Skills   4. Communication and Foreign Language Skills
5. Intellectual Skills   6. Substantive Knowledge
**Note: This section should be left blank for Limited Non-Career Appointees (LNAs).**

Mark consistently demonstrates outstanding performance as a Security Engineering Officer and has demonstrated the ability to serve a long and fruitful career with the Foreign Service. He should be tenured at the first available opportunity.

Mark demonstrated impressive leadership skills during his three week support visit to Manila, Philippines when leading a team of other junior Security Engineers, Security Technical Specialists, and Navy Seabees to diagnose and repair security cameras that were exhibiting poor video quality. Mark analyzed the problem and then led a brainstorming session with technicians and engineers on possible solutions. Instead of separating power lines from the signal which was suggested and would have been a costly solution, Mark led an effort to install ground loop isolators on the camera wiring. This fully solved the problem and potentially saved the government thousands of dollars in budget and time costs had the lines been dug up and separated as was originally suggested.

Mark set a high standard for managerial performance. He established and clearly communicated performance expectations in accordance with the Department's goals and objectives. He inspired a high level of performance in ECB staff – ranging from an intern that he developed in-depth training programs to the large number of entry-level engineers in the Division. Mark regularly volunteers to take lead on projects to ensure customer requirements are completed on schedule and works directly with our Division's front office staff to ensure Branch replies to field requests are clear and fully understood. Recently, Mark worked with personnel in a different Diplomatic Security office to assist them to answer a computer security question to ECB that fell outside of our purview. Inter-office efforts such as this greatly contribute to a positive view of the Countermeasures Program division by posts which, in the long run, increases adherence of security policies in the field.

Mark's interpersonal skills are excellent and set the standard for integrity and workplace behavior in our office. Mark has always fostered a work place climate based on mutual respect and trust, whether it be out in the field participating in the decertification of a classified material diplomatic shipping container with State Department and U.S. Naval personnel while in Asia or at interagency working group meetings and technical product evaluations with the Federal Bureau of Investigation, National Security Agency and other U.S. Government agencies here in the States.

Mark exhibits full mastery of written communication as demonstrated by his internal technical memorandums and policy guidance revision suggestions. His work as the ECB help desk officer to support missions abroad and field personnel demonstrates his sophisticated ability to analyze, synthesize, and advocate in a timely manner. Mark made very important edits to draft Foreign Affairs Manual policy that will guide ECB future efforts to mitigate risks for posts to deploy secure video teleconferencing worldwide. Mark also continued to practice his Russian language skills that are currently at the 2/2+ level which qualifies him to receive language incentive pay when posted abroad in Russian speaking countries. That Mark has continually practiced and honed his Russian language skills during this rating period is testament to his commitment to become a well rounded member of the Foreign Service.

Mark demonstrated high level intellectual skills when he worked with his section chief and others in Diplomatic Security to develop a viable solution to an important project in Iraq which involved protection of employees working in country and a key step in the U.S. glide path plan for Iraq. Mark identified issues with power systems and directed Bureau of Overseas Operations personnel to correct outstanding deficiencies.

Mark greatly increased his substantive knowledge through a grueling course of security engineering courses, all totaled over twenty-four weeks of coursework. He skillfully incorporated what he learned to solve issues arising in ECB to formulate and implement policies and programs that advance the overarching agenda of Diplomatic Security's Countermeasures Program.

STATE00002853

**C.** **Areas for Improvement:** The following must be completed. Employees should be made aware of areas where they should concentrate their efforts to improve. Specify at least one area in which he/she might best direct such efforts. Area(s) cited must be explicitly linked to one or more of the competency groups listed in Section V B and must have been discussed with the employee in counseling during the rating period. Justify your recommendation with examples and indicate below competency group(s) being addressed. ***(The response is not to be directed as a need for formal training.)***

Specify Competency <u>Substantive Knowledge</u>          Specify Competency _____

Mark has developed a knowledge of important State Department technical policies that far surpasses any of his peers through his tenure with CMP. He should compliment these skills by developing a better understanding of how Diplomatic Security management formulates policy decisions and communicates these directives to other bureaus and diplomatic missions within the Department. I recommend that he continue to seek the advice of myself and other senior SEO's to gain a better understanding of Diplomatic Security's policy formulation process.

## VI. REVIEW STATEMENT *(Completed by Reviewer)*

Assess the employee's performance and potential (if a career candidate, potential to serve across a normal career span - see instructions). Independent observations are encouraged and must be supported by additional examples of performance observed this rating period. Note differences with the rater's appraisal or recommendations. Comment on relations between rater and employee.

Mark Lenzi has demonstrated excellent technical and analytical skill as Security Engineer in the Emanations Countermeasures Branch this year. His leadership was important in ensuring a number of high priority projects were kept on schedule and the branch was able to achieve bureau goals.

Emanations Countermeasures Branch technical evaluations identify potential hardware and software to further its work to protect diplomatic missions worldwide. Mark effectively uses his technical and analytical skills to evaluate numerous security products ranging from radio frequency and infrared shielded windows to high tech short range infrared cameras. Mark demonstrated his analytical writing skills by drafting a countermeasures equipment acquisition strategy based on his product evaluations. Mark's excellent writing was further applied to cogent technical memorandums and policy and guidance revisions. This includes policy for the Department's secure video teleconferencing systems. Mark also demonstrated his excellent technical and communication skills as an Emanations Countermeasures Branch help desk officer. Providing technical support to personnel in missions abroad, his ability to solicit requirements and provide support in a timely manner has ensured the program meets or exceeds customer expectations.

Mark's work included a very important organizational role for a planned countermeasures program abroad. He coordinated participation and involvement by technical experts in other Federal agencies. Mark developed work strategies and team rosters to ensure roles and responsibilities were understood. The program is about to launch and I credit Mark with significantly contributing to the preparation and organization of this classified effort.

Mark and his rater, James Nicodemus, work closely to review branch metrics and goals and develop strategies for exceeding management expectations. Mark has accepted a diverse array of assignments and through his strong analytical skill set been fully successful in his assigned duties.

Mark is a dedicated, talented officer and manager who understands the Department and the Foreign Affairs community. I agree with the rater that he should be considered for tenure. His assignment to another branch within our division this summer will allow for further demonstration of his technical countermeasures skills and broaden his knowledge of counterintelligence tradecraft abroad.

STATE00002854

EER FOR LENZI, MARK R. XXX-XX-4454 Rating Period From 08-01-2012 to 04-13-2013

## VII. STATEMENT BY RATED EMPLOYEE

**A. Discussion:** This section is intended to provide the rated employee's views on the period of performance appraised. You must comment on your most significant achievements during the period. You may also address any activities or problems not adequately covered in this report, or aspects of the appraisal which need clarification or correction. Career Candidates are encouraged to state their current career goals including training and assignments desired over the next 5 years.
*(Continuation sheets may be used.)*

I would like to thank my Rating and Reviewing Officers for mentoring and counseling me. Their encouragement and support has been very beneficial. I remain proud of my work accomplishments for the State Department and for trying to foster a team spirit both inside and outside the office such as by playing on the State Department basketball team after work or on temporary duty to Embassy Manila where I helped build team spirit between the Marine Security Guards and the Engineering Services Center by playing for the Marine Security Guards' basketball team.

During a temporary duty assignment to the Philippines during this rating period, I was able to work on alarm systems, change locks, design a layout for a Closed Circuit Television (CCTV) system at an embassy compound, conduct Radio Frequency testing, work with Navy Seabees on classified safe repairs, de-certify a classified shipment container, and perform general security engineering duties at Post. I feel my impact was profound and my excellent performance was noted by the technicians and other security engineers that worked with me.

I am also proud of the fact that during this rating period I have been called upon to use my extensive prior work experience in Eastern Europe and contacts in the Eurasia region to provide political analysis and insight to analysts from the Central Intelligence Agency (CIA), Defense Intelligence Agency (DIA), National Security Agency (NSA), and the Department's Intelligence and Research Bureau (INR). These analysts have called upon me to provide political insight because they know from my work prior to joining the Department and my educational background that I am often able to correctly predict political trends in the Eurasia region when information and analysis is often incomplete. I also briefed Ambassador Richard Norland on Georgian politics before he departed for Post in the summer of 2012. My interagency work has provided key experience and contacts across government that have helped me immensely in my work for Diplomatic Security such as a classified interagency project that I am now performing at a critical threat post in Europe. I have been able to use my past engineering, political and language skills working in this particular country in Eastern Europe as well as my prior experience working with interagency teams to effectively prepare a 20+ person interagency team for the mission and play an effective role on the ground in a complex and difficult security working environment.

My goals remain the same as last year and when I joined the State Department: to continue to constantly better myself and be a leader within the organization to more effectively serve the Department to accomplish its strategic goal of creating a more secure, democratic, and prosperous world for the benefit of the American people and the international community.

**B. I acknowledge receipt of this report.**

Date Section VII completed   *(mm-dd-yyyy)*        04-23-2013          /s/ MARK LENZI

                                                                        Employee's Signature

STATE00002855

# PX-015

See Instructions Before Completing
U.S. Department of State

# U.S. FOREIGN SERVICE EMPLOYEE EVALUATION REPORT

For all Career Candidate employees and Limited Non-Career Appointees (LNAs)

## SUBMISSION CONTROL

| DATE RECEIVED IN POST/BUREAU *(mm-dd-yyyy)* | DATE RECEIVED IN HR/PE *(mm-dd-yyyy)* | DATE RELEASED TO DEPARTMENT FILES *(mm-dd-yyyy)* |
|---|---|---|
| 05-23-2014 | 05-23-2014 | 05-27-2014 |

NAME OF EMPLOYEE BEING RATED *(Last, First, MI)*

LENZI, MARK R.

| TYPE OF REPORT | GRADE | SSN |
|---|---|---|
| ☐ REGULAR ☒ CAREER CANDIDATE ☐ LNA ☐ VOLUNTARY | FS - 04 | XXX-XX-4434 |

INTERIM: ☐ Change of Rater ☐ Duties ☐ Assignment

POSITION TITLE

SECURITY ENGINEERING OFFICER

| POST OR ORGANIZATION | PERIOD COVERED *(mm-dd-yyyy)* | |
|---|---|---|
| 175231 - DS/CMP/TSC | From 08-07-2013 | To 04-15-2014 |

RATER: BATCHELOR, JEFFREY B.
GRADE: FS - 01
TITLE: BRANCH CHIEF

REVIEWER: BARELA, MICHAEL J.
GRADE: FE - OC
TITLE: DIVISION DIRECTOR

After careful review, I consider this report to be complete, in conformance with the instructions, and adequately documented by specific examples of performance.

A. /s/ JEFFREY BATCHELOR    05-19-2014
Rater's signature upon completion of Sections I, III, IV, and V    Date (mm-dd-yyyy)

B. /s/ MICHAEL BARELA    05-19-2014
Reviewer's signature upon completion of Section VI    Date (mm-dd-yyyy)

## I. CERTIFICATION - WORK REQUIREMENTS AND COUNSELING

Work requirements were established by rater, reviewer, and employee on *(mm-dd-yyyy)*    09-26-2013

If applicable, requirements were revised on *(mm-dd-yyyy)* _____

Rater and rated employee held counseling sessions to discuss performance on at least two dates as follows: *(mm-dd-yyyy)*

1. 09-26-2013    2. 01-15-2014    3. _____    4. _____

In the case of an unsatisfactory performance rating, this is also to certify that the requirements of 3 FAH-1 H-2814.3 (tenured employees), 3 FAH-1 H-2326 (employees subject to administrative promotion), or 3 FAM 2248 (FSO Career Candidates) have been met.

*I certify that counseling sessions took place during the rating period and that at least one of them was documented in writing using the Counseling Certification Form (DS-1974).*

/s/ JEFFREY BATCHELOR    /s/ MARK LENZI    05-16-2014
Rating Officer    Rated Employee    Date *(mm-dd-yyyy)*

## II. REVIEW PANEL STATEMENT *(Completed by Review Panel)*

A. **Examples of Performance:** Specific examples have been provided in all sections ☒ Yes *(If not, return for rewrite)*

B. **Certification:** This report has been prepared according to the regulations and contains no inadmissible material.

05-23-2014    THOMAS J. COLIN    /s/ THOMAS COLIN
Date *(mm-dd-yyyy)*    Panel Chairperson's Name - Type    Signature

C. **Comments:** *(If submitted late, indicate who is responsible for delay.)*

DS-1829
09-2012

When completed on a Foreign Service employee, this is a performance evaluation report that shall be subject to inspection only by those persons authorized by Sec. 604 of the Foreign Service Act of 1980.

Page 1 of 6

STATE00002856

EER FOR LENZI, MARK R.  XXX-XX-4434  Rating Period from 08-07-2013 to 04-15-2014

**III. EMPLOYEE'S POSITION AND WORK REQUIREMENTS (Established by Rater, Reviewer and Employee)**

A.  Describe the position and where it fits in the staffing pattern; indicate the number and kind of employees supervised or team affiliation(s) and tasking(s), whichever is applicable.

The incumbent is a Security Engineering Officer (SEO) in the Technical Surveillance Countermeasures (TSC) Branch under the Countermeasures Program (CMP) Division within the Office of Security Technology (ST).  The incumbent reports to the TSC Branch Chief.  The incumbent will supervise contract staff and take part in support trips as the lead engineer or as a team member.  He will also serve as the TSC liaison to the Special Countermeasures Program (SCP).

B.  Divide work requirements into two categories: continuing responsibilities and specific objectives (including, as appropriate, professional development activities), listing these in descending priority order.

CONTINUING RESPONSIBILITES:
1. Work with the SCP section chief on overseas and domestic projects.
2. In a timely manner, prepare written correspondence, reports, and telegrams on product evaluations, identified vulnerabilities, countermeasures, and other technical matters as required.
3. Apply internal control measures to protect organizational integrity and prevent unauthorized disclosure of classified and sensitive materials, report security incidents to the appropriate management officials, and properly safeguard all classified and sensitive materials and equipment in assigned areas.
4. Ensure that all physical, material, and human resources are safeguarded against waste, fraud, and unauthorized use of misappropriation, that all obligations incurred comply with applicable laws and regulations, and that all revenues and expenditures pertaining to the incumbent's operation are promptly recorded and accounted for in accordance with Department of State procedures.
5. Uphold the principles of Equal Employment Opportunity.
6. Perform other duties as required and assigned.
7. Monitor and assist with maintaining the SCP budget.
8. Coordinate and network within the intelligence community to conduct and evaluate new technologies.
9. Continue development of Concept of Operations methodology to improve the TSC Branch programs.

SPECIFIC OBJECTIVES:
1. Take the Overseas Security Engineering Officer course in preparation for an overseas assignment.
2. Participate in at least one SCP support trip.

C.  Describe any special circumstances influencing the work program.

DS-1829

STATE00002857

Case 1:21-cv-01371-RTG-JDD   Document 112-4   Filed 02/28/23   Page 180 of 207 PageID# 3786

---

### IV. EVALUATION OF PERFORMANCE AND ACCOMPLISHMENTS *(Completed by Rater)*
For all Career Candidate employees and Limited Non-Career Appointees (LNAs)

**A.  General Appraisal:**                                                                                    YES   NO

    All Employees:  Performance was satisfactory or better (If no, see instructions for documenting unsatisfactory performance)    ☒   ☐

**B.  Limited-Non-Career Appointees:**                                                          YES   NO

    Employee is recommended for extension if required by service needs.    ☐   ☐

**C.  Discussion:**   Identify at least three of the work requirements including continuing responsibilities and/or specific objectives listed in Section III.
For each, using examples, describe the employee's performance and accomplishments.

Mark Lenzi has thrived as a Security Engineering Officer in the Technical Surveillance Countermeasures (TSC) Branch. Mark is in a unique position as the TSC liaison to the Special Countermeasures Program and is one of the few Security Engineering Officers to work on a daily basis with members of the Intelligence Community and on Special Access Programs dealing with some of the most cutting edge security and technology challenges facing the Department of State.  Mark has performed at an extremely high level in difficult and challenging overseas environments and has shown he has the potential to serve effectively within the Department of State and at higher levels of responsibility.  Tenure and promotion to FS-03 are highly recommended.

Mark continues to advance TSC's goals through a well-rounded and practical approach to working with other offices in the Department of State and other agencies on some of the most profound technical security challenges facing the United States. As TSC's liaison to - and Deputy Program Manager of - Diplomatic Security's Special Countermeasures Program, Mark has provided effective support to the Department of State and U.S. Government as a whole.  During this rating period, Mark led the planning and execution of a five member interagency team on a three week overseas deployment to conduct specialized technical support.  Mark provided interagency coordination and took the lead in working with other U.S. Government agencies that had contributed personnel and technical support to the mission.  Over the course of the project, Mark showed great flexibility in widely diverse situations that ran the gamut from doing extreme physical labor with various hand tools to briefing a U.S. Ambassador.  Much of the success of this project can be attributed to Mark's hard work.

Mark is cognizant that he will be sent overseas within the next two years and has taken an active role to increase his overall knowledge of overseas operations.  In preparation of his upcoming overseas assignment, Mark took a six week Overseas Security Engineering Officer course from October to December 2013.  This course dealt with such issues as how to install and repair different types of high security alarm systems, surveillance cameras, security locks, computer networking equipment, tear gas systems, and physical barrier equipment such as mechanical Delta barriers. All of this equipment can be found at our overseas locations and his participation in this course will increase his familiarity and overall effectiveness with the equipment.

Mark has also worked extensively with the DS Training Center and other agencies to evaluate a technical system that can act as a countermeasure to a particular threat facing U.S. missions worldwide.  Mark conducted extensive research to identify and track the particular threat and then worked with various elements within the State Department and outside agencies to test and evaluate the countermeasure.  He then drafted an extremely well written and succinct memorandum that clearly delineated the threat, identified the countermeasure testing procedure, and made substantive recommendations.  This memorandum was widely distributed and praised by management within the Department.  It is an excellent example of Mark's pro-active and collaborative interagency approach to solving technical challenges.

\

---

STATE00002858

## V. EVALUATION OF POTENTIAL *(Completed by Rater)*

A. **For Career Candidates only:** *Assessment of career potential as a Foreign Service Officer or Foreign Service Specialist:*

☐ Unable to assess potential from observations to date

☐ Candidate is unlikely to serve effectively even with additional experience

☐ Candidate is likely to serve effectively but judgment is contingent on additional evaluated experience

☒ Candidate is recommended for tenure and can be expected to serve successfully across a normal career span     *(see instructions)*
*(Support your choice by discussing below the candidate's potential for successful service across a normal career span, citing examples which illustrate strengths and weaknesses in each of the competencies cited below.)*

B. **For all career candidates regardless of grade:**
For each of the competency groups listed below, draw on specific examples of performance to describe the rated employee's potential for advancement in the Service.  *(See Core Precepts for definitions of competencies.)*
1. Leadership Skills   2. Managerial Skills   3. Interpersonal Skills   4. Communication and Foreign Language Skills
5. Intellectual Skills   6. Substantive Knowledge
**Note: This section should be left blank for Limited Non-Career Appointees (LNAs).**

It is important to note that Mark's intellectual skills are far greater than simply his engineering knowledge.  Mark integrates a wide range of information and experience which allows him to maintain ongoing relationships with his peers in the Department and his colleagues in other agencies.  These ongoing relationships give him a better understanding of the overarching context of physical and technical threat reporting associated with Department of State facilities.  This knowledge enhances his ability to implement more effective and focused technical security support.

Mark's interpersonal skills are excellent and set a standard workplace behavior as demonstrated by the fact that he consistently remains composed under stressful work situations that are prevalent in overseas work environments.  Mark is also cognizant that he is part of a team and always strives to engender mutual respect and trust with everyone he works with.

Mark exhibits full mastery of written communication and had been particularly proficient with assisting the Special Countermeasures Program (SCP) director with internal technical memorandums and policy guidance.  He also led an effort to implement a comprehensive testing and evaluation protocol for a complex technical countermeasures system.  This effort was done in conjunction with interagency partners and demonstrated a sophisticated ability to analyze, synthesize, and advocate in a timely manner.  Leading various agencies and personnel in this effort required excellent managerial skills and required clear communication on performance expectations and objectives.

As a team leader Mark strives to inspire a high level of performance and has encouraged, developed, and rewarded efforts of his team members to enhance their effectiveness.  During a recent trip to a post in a challenging technical work environment, Mark demonstrated excellent leadership skills and won praise for improving team morale by organizing and participating in athletic activities such as basketball and competitive ice skating.

In the area of communication and foreign language skills, Mark exhibits a number of qualities that have made him very effective in his activities.  In addition to excellent oral and written communication skills, Mark has continued to work on his Russian language skills and has put these skills to good use during his visits to Russian speaking locations.  During several support visits Mark was involved in interagency technical operations where he communicated extensively in the Russian language and was called on to translate for other Security Engineering Officers.  This linguistic ability enhanced the operational effectiveness of the team.

The substantive knowledge that Mark brings to being a Security Engineering Officer is impressive.  With his extensive overseas and interagency experience combined with his language and engineering skills, he is able to effectively operate in overseas environments and on interagency projects.  He has also been proficient at assisting with the formulation and implementation of SCP policies and programs that have advanced Diplomatic Security's Countermeasures Program.  Mark continually monitors internal and external sources for information and ideas and uses this knowledge to shape outcomes that are beneficial to the SCP program.

STATE00002859

EER FOR LENZI, MARK R.  XXX-XX-4431  Rating Period from 08-07-2013 to 04-15-2014

---

**C.   Areas for Improvement:** The following must be completed.  Employees should be made aware of areas where they should concentrate their efforts to improve.  Specify at least one area in which he/she might best direct such efforts.  Area(s) cited must be explicitly linked to one or more of the competency groups listed in Section V B and must have been discussed with the employee in counseling during the rating period.  Justify your recommendation with examples and indicate below competency group(s) being addressed.   ***(The response is not to be directed as a need for formal training.)***

Specify Competency  __Substantive Knowledge_____          Specify Competency  _____

Mark has been very effective in his role as SCP liaison and is very knowledgeable about the program's policies and procedures but his knowledge of overseas field operations and other DS activities is not complete.  That said, he is a new officer and this lack of knowledge is understandable.  I have no doubt his knowledge gaps will be addressed once he has an overseas assignment and more experience.

---

## VI. REVIEW STATEMENT *(Completed by Reviewer)*

Assess the employee's performance and potential (if a career candidate, potential to serve across a normal career span - see instructions).  Independent observations are encouraged and must be supported by additional examples of performance observed this rating period.  Note differences with the rater's appraisal or recommendations.  Comment on relations between rater and employee.

Mark Lenzi demonstrates engineering skill in working on a diverse set of responsibilities in support of our most sensitive missions abroad.  His interpersonal skills are excellent; his language aptitude has furthered program work on numerous occasions.

I commend Mark on his choice of the Technical Surveillance Countermeasures branch as a second domestic assignment.  His skill set and performance earned him assignment to our Special Countermeasures Program, which provides protection to our most vulnerable technical counterintelligence posts.  Mark distinguished himself in a number of assignments.  A special program to review a facility prior to deconstruction was enhanced by Mark's leadership, technical acumen, and liaison with other counterintelligence agencies.  Mark's excellent technical ability was demonstrated in a special program to evaluate a class of vulnerabilities at two missions this period.  His work abroad was excellent and his liaison with post management informative.  Mark collaborated with the investigative team and drafted compelling reporting to be reviewed within the interagency.

Mark has many personal and professional contacts within foreign affairs, with U.S. officials, and policy makers in other countries.  His knowledge of current events and interactions among officials provides him professional and personal insight.  But Mark's direct discussion with an Ambassador this period led to an issue.  His outreach to the U.S. Ambassador to Kyiv after a media leak resulted in the mission having expectations contrary to ongoing Department efforts.  Despite the Ambassador and RSO thanking Mark for his offer to assist and their desire for him to look into two specific issues, I requested that Mark disengage from this issue and he did so immediately.  During this rating period, Rater Batchelor has discussed policies with Mark to clarify chain of command and bureau policy on discussions.  Mark has focused himself on assigned tasks, which he completed promptly and efficiently.

Rater Brian Batchelor and Mark have held several formal and informal discussions on performance, career information, and expectations.  Mark has benefited from these discussions.   He is diligent in applying himself to assigned projects and his work has been successful as a result.  I believe Mark is a bright, capable engineer who has shown potential to have a successful career in the Foreign Service.  I agree that he should be considered for tenure.  Additional performance at grade is recommended.

---

**DS-1829**

STATE00002860

EER FOR LENZI, MARK R.  XXX-XX-4434  Rating Period from 08-07-2013 to 04-15-2014

## VII. STATEMENT BY RATED EMPLOYEE

**A. Discussion:**  This section is intended to provide the rated employee's views on the period of performance appraised.  You must comment on your most significant achievements during the period.  You may also address any activities or problems not adequately covered in this report, or aspects of the appraisal which need clarification or correction.  Career Candidates are encouraged to state their current career goals including training and assignments desired over the next 5 years.
*(Continuation sheets may be used.)*

I am extremely proud to work for Diplomatic Security, especially with the JASONs Advisory Group and two of their quantum physics professors from Yale and Harvard on a complex electrical security project involving highly threatened posts in Asia and Europe.  What I love about my job, and believe my work reflects, is that I feel as comfortable working on challenging technical security issues with leading academics as I do handling radars and drills in various missions around the world.

Being selected by the Bureau of Diplomatic Security (DS) to work directly on Special Access Programs with the Intelligence Community on technical issues of extreme importance overseas has been a distinct honor.  I look forward to continuing this and building relationships within both the State Department and the Intelligence Community to broaden my Security Engineering Officer skills and advance U.S. foreign policy priorities.

Some of the work that I feel has been of most impact for DS during this rating period is a lessons learned write-up I did on a large scale terrorist attack that occurred at Consulate Herat.  In 2012, I put considerable effort into repairing a main sliding vehicle gate for the consulate.  During this rating period this gate withstood a major Vehicle Borne Improvised Explosive Device (VBIED) attack and attempts by terrorists to breech it which gave U.S. security personnel the time necessary to neutralize them as threats to American personnel.  The DS Physical Security Research and Development Branch Chief wrote to praise my Herat write-up, noting it could help Diplomatic Security's Training Center apply lessons learned and better educate DS personnel to defend against similar attacks elsewhere.

I would like to thank my Rating and Reviewing Officers as well as the senior officers in DS and beyond who have mentored me.  Their support and encouragement to take a holistic approach when trying to solve issues vital to the Department has been extremely beneficial to my career development.

My long term goals remain the same as when I joined the Department: to continue to better myself and help our organization create a more secure, democratic, and prosperous world for the American people and the international community.  Regarding short term goals I hope to receive tenure this year, as this and previous EERs recommend. I also look forward to leading more DS interagency teams on TDYs to challenging overseas posts, like the ones cited by my Rater that drew on my engineering and management skills and where I used my near-fluent Russian language skills during both work and personal interactions to make our team more cohesive and our work more efficient.  For my next assignment, I feel I am ready to contribute in an overseas SEO position at a regional Engineering Services Center and look forward to this opportunity.

**B. I acknowledge receipt of this report.**

Date Section VII completed  *(mm-dd-yyyy)*         05-23-2014              /s/ MARK LENZI
                                                                                          Employee's Signature

STATE00002861

# PX-016



See Instructions Before Completing
U.S. Department of State

# U.S. FOREIGN SERVICE EMPLOYEE EVALUATION REPORT

For all Career Candidate employees and Limited Non-Career Appointees (LNAs)

## SUBMISSION CONTROL

| DATE RECEIVED IN POST/BUREAU *(mm-dd-yyyy)* | DATE RECEIVED IN HR/PE *(mm-dd-yyyy)* | DATE RELEASED TO DEPARTMENT FILES *(mm-dd-yyyy)* |
|---|---|---|
| 05-28-2015 | 06-01-2015 | 06-02-2015 |

NAME OF EMPLOYEE BEING RATED *(Last, First, MI)*

LENZI, MARK R.

| TYPE OF REPORT | | GRADE | SSN |
|---|---|---|---|
| ☐ REGULAR  ☒ CAREER CANDIDATE  ☐ LNA  ☐ VOLUNTARY | | FS - 04 | XXX-XX-4434 |

INTERIM: ☐ Change of Rater  ☐ Duties  ☒ Assignment

POSITION TITLE

SECURITY OFCR - ENGINEERING

| POST OR ORGANIZATION | PERIOD COVERED *(mm-dd-yyyy)* | |
|---|---|---|
| 175231 - DS/CMP/TSC | From  04-16-2014 | To  09-12-2014 |

RATER:  WANG, EGAN Y.
GRADE:  FS - 02
TITLE:  OPERATIONS CHIEF

REVIEWER: BATTISTONE, GREGORY F.
GRADE: FS - 01
TITLE:  BRANCH CHIEF

After careful review, I consider this report to be complete, in conformance with the instructions, and adequately documented by specific examples of performance.

A. /s/ EGAN WANG                      05-28-2015
   Rater's signature upon completion of Sections I, III, IV, and V          Date (mm-dd-yyyy)

B. /s/ GREGORY BATTISTONE              05-28-2015
   Reviewer's signature upon completion of Section VI          Date (mm-dd-yyyy)

## I. CERTIFICATION - WORK REQUIREMENTS AND COUNSELING

Work requirements were established by rater, reviewer, and employee on *(mm-dd-yyyy)*   04-17-2014

If applicable, requirements were revised on *(mm-dd-yyyy)*   _____

Rater and rated employee held counseling sessions to discuss performance on at least two dates as follows: *(mm-dd-yyyy)*

1.  05-06-2014     2.  07-21-2014     3.  _____     4.  _____

In the case of an unsatisfactory performance rating, this is also to certify that the requirements of 3 FAH-1 H-2814.3 (tenured employees), 3 FAH-1 H-2326 (employees subject to administrative promotion), or 3 FAM 2248 (FSO Career Candidates) have been met.

*I certify that counseling sessions took place during the rating period and that at least one of them was documented in writing using the Counseling Certification Form (DS-1974).*

/s/ EGAN WANG                 /s/ MARK LENZI                      05-22-2015
Rating Officer                Rated Employee                     Date *(mm-dd-yyyy)*

## II. REVIEW PANEL STATEMENT   *(Completed by Review Panel)*

A. **Examples of Performance:**   Specific examples have been provided in all sections  ☒ Yes  *(If not, return for rewrite)*

B. **Certification:** This report has been prepared according to the regulations and contains no inadmissible material.

05-28-2015                  CARLOS F. MATUS                     /s/ CARLOS MATUS
Date *(mm-dd-yyyy)*          Panel Chairperson's Name - Type          Signature

C. **Comments:**   *(If submitted late, indicate who is responsible for delay.)*

---

DS-1829
09-2012

When completed on a Foreign Service employee, this is a performance evaluation report that shall be subject to inspection only by those persons authorized by Sec. 604 of the Foreign Service Act of 1980.

Page 1 of 6

STATE00002862

EER FOR LENZI, MARK R.  XXX-XX-4434  Rating Period from 04-16-2014 to 09-12-2014

## III. EMPLOYEE'S POSITION AND WORK REQUIREMENTS (Established by Rater, Reviewer and Employee)

A.  Describe the position and where it fits in the staffing pattern; indicate the number and kind of employees supervised or team affiliation(s) and tasking(s), whichever is applicable.

The incumbent is a Security Engineering Officer (SEO) in the Technical Surveillance Countermeasures (TSC) Branch under the Countermeasures Program (CMP) Division within the Office of Security Technology (ST).  The incumbent reports to the Operations Chief and is rated by the TSC Branch Chief.  As a relatively new SEO, the incumbent will increase his knowledge of Diplomatic Security policies, procedures, and practices.  In addition, he will supervise contract staff and take part in support trips as the lead engineer or as a team member, as required, and will also serve as the TSC liaison to the Special Countermeasures Program (SCP).

B.  Divide work requirements into two categories: continuing responsibilities and specific objectives (including, as appropriate, professional development activities), listing these in descending priority order.

CONTINUING RESPONSIBILITES:

1. Manage the Department's Technical Security Countermeasures (TSCM) overseas inspection program.
2. In a timely manner, prepare written correspondence, reports, and telegrams on product evaluations, identified vulnerabilities, countermeasures, and other technical matters, as required.
3. Apply internal control measures to protect organizational integrity and prevent unauthorized disclosure of classified and sensitive materials, report security incidents to the appropriate management officials, and properly safeguard all classified and sensitive materials and equipment in assigned areas.
4. Ensure that all physical, material, and human resources are safeguarded against waste, fraud, and unauthorized use misappropriation, that all obligations incurred comply with applicable laws and regulations, and that all revenues and expenditures pertaining to the incumbent's operation are promptly recorded and accounted for in accordance with Department of State procedures.
5. Uphold the Department of State's six core values (accountability, character, community, diversity, loyalty, service) and the Department's Leadership and Management Principles; observe and implement EEO principles.
6. Perform other duties as required and assigned.
7. Monitor and maintain the budget of the CMP05 accounting code.
8. Coordinate and network within the intelligence community to conduct and evaluate new technologies.
9. Continue development of Concept of Operations methodology to improve the TSC Branch programs.
10. Ensure active risk management through monitoring the security environment
concurrent to the scope of official duties and responsibilities; follow security directives, regulations, and policies; safeguard classified information, material, and equipment.

SPECIFIC OBJECTIVES:

1. Continue training to improve skills as a SEO at the Interagency Training Center and the Diplomatic Security Training Center.
2. Perform and coordinate technical services in special posts falling under the aegis of the SCP and with other posts as required.

C.  Describe any special circumstances influencing the work program.

STATE00002863

Case 1:21-cv-01371-RTG-JDD Document 112-4 Filed 02/28/23 Page 187 of 207 PageID# 3793

---

## IV. EVALUATION OF PERFORMANCE AND ACCOMPLISHMENTS *(Completed by Rater)*

For all Career Candidate employees and Limited Non-Career Appointees (LNAs)

**A. General Appraisal:**
    All Employees: Performance was satisfactory or better (If no, see instructions for documenting unsatisfactory performance)
    YES ☒   NO ☐

**B. Limited-Non-Career Appointees:**
    Employee is recommended for extension if required by service needs.
    YES ☐   NO ☐

**C. Discussion:** Identify at least three of the work requirements including continuing responsibilities and/or specific objectives listed in Section III. For each, using examples, describe the employee's performance and accomplishments.

Mark Lenzi has been a vital SEO in the TSC Branch. Mark is the TSC liaison to the Special Countermeasures Program. In this capacity he is one of a very few people in all of the Department to have Cryptographic Access and work on a daily basis on the Joint Worldwide Intelligence Communications System (JWICS) with Top Secret material as well as Special Access Programs (SAPs) that deal with some of the most sensitive technical security challenges facing U.S. embassies and consulates. Tenure as soon as possible and promotion to FS-03 are highly recommended.

Through his excellent substantive knowledge Mark advanced TSC's domestic and overseas security engineering agenda, and has provided outstanding technical support to Diplomatic Security and the U.S. government as a whole. As the Deputy Program Manager of Diplomatic Security's SCP, Mark has been particularly effective in cutting edge technical research and testing work with the JASON academic-intelligence advisory group, which brings together the brightest academics from U.S. universities with members of the Intelligence Community (IC) to work on some of the most complex physics and engineering challenges facing the U.S. government.

During this rating period, Mark worked with the JASON advisory group (working closest with two physics professors from Yale and Harvard Universities) and the IC to research, test, and solve a highly complex electrical engineering issue that was present at a U.S. government facility in a hostile country.

Mark also helped lead the planning and execution for a Diplomatic Security mission to a U.S. Government facility in a country with which the U.S. has difficult diplomatic relations. His work received praise from not only his colleagues from the Bureau of Overseas Building Operations (OBO) on the team, but also from American personnel assigned full-time to the facility. Mark flew directly from this mission and employed his excellent writing and oral briefing skills to report results and findings of the technical mission to members of the IC and JASON Advisory Group at a formal meeting in California.

Mark has, in a timely and pro-active manner, prepared written correspondence, reports, and telegrams on product evaluations for the SCP and has studied technical vulnerabilities of U.S. Government facilities and identified potential countermeasures. An obvious example of this is Mark's work to identify and evaluate a particular technical system that can act as a countermeasure to a particular threat facing U.S. missions worldwide. Mark conducted extensive research at the Top Secret level to identify and track the particular threat and then worked with various elements within the State Department and outside agencies (including the National Security Agency, Department of Defense, Central Intelligence Agency and Federal Bureau of Investigation) to test and evaluate the countermeasure. He then presented and demonstrated the countermeasure to senior IC management at an interagency exercise in the Washington, DC, area during this rating period.

Mark's substantive knowledge of technical security engineering issues and his practical, easy going work manner will be sincerely missed when he rotates out of TSC at the end of this summer to assume duties at Engineering Services Center in Frankfurt, Germany.

---

DS-1829

STATE00002864

EER FOR LENZI, MARK R.   XXX-XX-4434   Rating Period from 04-16-2014 to 09-12-2014

| V. EVALUATION OF POTENTIAL *(Completed by Rater)* |
|---|

**A.   For Career Candidates only:**  *Assessment of career potential as a Foreign Service Officer or Foreign Service Specialist:*

- ☐ Unable to assess potential from observations to date
- ☐ Candidate is unlikely to serve effectively even with additional experience
- ☐ Candidate is likely to serve effectively but judgment is contingent on additional evaluated experience
- ☒ Candidate is recommended for tenure and can be expected to serve successfully across a normal career span     *(see instructions)*
  *(Support your choice by discussing below the candidate's potential for successful service across a normal career span, citing examples which illustrate strengths and weaknesses in each of the competencies cited below.)*

**B.   For all career candidates regardless of grade:**
For each of the competency groups listed below, draw on specific examples of performance to describe the rated employee's potential for advancement in the Service.  *(See Core Precepts for definitions of competencies.)*
1. Leadership Skills    2. Managerial Skills    3. Interpersonal Skills    4. Communication and Foreign Language Skills
5. Intellectual Skills    6. Substantive Knowledge
**Note: This section should be left blank for Limited Non-Career Appointees (LNAs).**

Mark has all of the qualities that I believe will make for a successful career in the Foreign Service; therefore, he should be tenured and promoted to FS-03 at the earliest opportunity.  The following are examples of his work in TSC that address each of the Department's Core Precepts:

As a team leader during a Diplomatic Security led mission to a critical threat post in Asia, Mark inspired a high level of performance and encouraged, developed, and rewarded efforts of his team members both during and after work to enhance their effectiveness.  Mark won praise for his leadership efforts of the team he oversaw from Post management including the Regional Security Officer.

Mark excels in the area of Interpersonal Skills.  His work during this rating period with Diplomatic Security technicians and engineers from other U.S. government agencies on cutting edge research for an Electrically Conductive Concrete (ECC) project was outstanding and is largely a testament to the close personal relationships he has forged with other engineers and technicians in the Intelligence Community.

Mark has excellent managerial skills as evidenced by his work during this rating period on a technical surveillance countermeasure investigation at a high profile post in Europe.  Because of Mark's language, cultural, and work background in this particular country, he was sought out for technical advice on a possible technical penetration. Using his managerial skills, Mark sought out others in Diplomatic Security and the Intelligence Community with background knowledge of the particular country and familiarity with historical technical threats in the region and led an interagency meeting on the issue.

The communication and foreign language skills precept is an area where Mark distinguishes himself from many other Security Engineering Officers in that he has tested and is Language Incentive Pay (LIP) rated in the Russian language.  During his time working in TSC Mark has been able to use his Russian language skills numerous times on TDY to Russia and has been called upon to translate for colleagues both in Russia and in Washington.

Mark's intellectual skills are profound and were continuously demonstrated during his time at TSC – a good example being when he was called upon to be the lead technical writer for a Diplomatic Security led interagency report on an electrical testing project that was conducted at a medium-sized post in Europe.  Mark's writing was vibrant and concise, which was not an easy task given the highly technical nature of the report.

Perhaps Mark's strongest core precept is substantive knowledge, because he is able to formulate, through knowledge of physical and technical security issues, effective solutions to complex engineering challenges facing the TSC Branch while monitoring internal and external sources for information and ideas.  Quite simply, Mark's security and technical knowledge combined with his language and cultural skills make him an extremely productive and effective member of the Foreign Service, generally, and DS, specifically.

DS-1829

STATE00002865

Case 1:21-cv-01371-RTG-JDD Document 112-4 Filed 02/28/23 Page 189 of 207 PageID# 3795

**C.** **Areas for Improvement:** The following must be completed. Employees should be made aware of areas where they should concentrate their efforts to improve. Specify at least one area in which he/she might best direct such efforts. Area(s) cited must be explicitly linked to one or more of the competency groups listed in Section V B and must have been discussed with the employee in counseling during the rating period. Justify your recommendation with examples and indicate below competency group(s) being addressed. *(The response is not to be directed as a need for formal training.)*

Specify Competency _Leadership_____    Specify Competency _____

Mark should expand his leadership skills from leading Diplomatic Security technical teams to leading teams that also comprise security specialists from the U.S. military. He will have this opportunity when he serves as a Security Engineering Officer at Consulate Frankfurt with U.S. Navy Seabee security technicians.

## VI. REVIEW STATEMENT *(Completed by Reviewer)*

Assess the employee's performance and potential (if a career candidate, potential to serve across a normal career span - see instructions). Independent observations are encouraged and must be supported by additional examples of performance observed this rating period. Note differences with the rater's appraisal or recommendations. Comment on relations between rater and employee.

Mark Lenzi is an outstanding, well-rounded Foreign Service Specialist and has performed at a high level for the Technical Surveillance Countermeasures (TSC) Branch. His leadership and technical skills were crucial in ensuring a number of high priority projects were kept on schedule, and the branch was able to achieve bureau goals. I agree with the rater that he should be tenured and promoted to FS-03 immediately.

Much of TSC's work requires undertaking temporary duty assignments in countries that have difficult and often hostile diplomatic relations with the U.S. With his diverse technical and language skills, Mark has thrived working in these challenging environments while excelling in all of the Department's core precept areas.

During this rating period Mark effectively used his analytical and security engineering skills to test and evaluate a piece of high tech equipment that Mark identified as having a potential technical countermeasure capability. Mark proactively assembled a Diplomatic Security led interagency testing team that demonstrated the unique capabilities of the equipment against a significant technical security challenge facing the Department. Mark not only drafted an excellent memorandum for me recommending the procurement of the equipment, but also led a demonstration of the equipment for Intelligence Community (IC) management and briefed them on the results of the testing during a high level IC training exercise that I attended.

More than any other Security Engineering Officer during this rating period, Mark has worked the closest with the JASON advisory group on cutting edge, national-level, counterintelligence security issues. During this rating period he conducted a highly sensitive and technical mission to a critical threat post in Asia in conjunction with the Intelligence Community and then briefed an annual meeting of the JASON advisory group in La Jolla, California about his electrical testing work and details about the mission. For his efforts, he received a special commendation from the JASONs, which is a rare and prestigious honor.

Because of Mark's prior work in a particular country in Europe, he was called upon by a Regional Security Officer (RSO) to look into a technical issue at an embassy he was extremely familiar with. Mark used his security engineering knowledge, linguistic, and historical knowledge to lead an investigation into the issue. He also incorporated his extensive contacts in the IC to bring in appropriate technicians to work in a collaborative group effort that was appreciated and noted not only by the RSO but by members of the IC and Diplomatic Security management.

I have full confidence that Mark will have a highly successful career in the Foreign Service and would like to reiterate my support for SEO Wang's recommendation that he should be tenured and promoted to FS-03 as soon as possible.

STATE00002866

Case 1:21-cv-01371-RTG-JDD  Document 112-4  Filed 02/28/23  Page 190 of 207 PageID# 3796

## VII. STATEMENT BY RATED EMPLOYEE

**A. Discussion:** This section is intended to provide the rated employee's views on the period of performance appraised. You must comment on your most significant achievements during the period. You may also address any activities or problems not adequately covered in this report, or aspects of the appraisal which need clarification or correction. Career Candidates are encouraged to state their current career goals including training and assignments desired over the next 5 years.
*(Continuation sheets may be used.)*

Working with Diplomatic Security's Technical Surveillance Countermeasures (TSC) Branch this rating period has been one of my career highlights as collaborating to solve national-level technical security challenges has given me profound intellectual stimulation and job satisfaction. I would like to thank my rater and reviewer for mentoring me and providing me with numerous opportunities for professional and personal growth.

I feel that I am truly in my element as a Security Engineering Officer (SEO) as my work during this rating period has showcased my ability to combine my engineering background with my foreign language and cultural skills to advance the Department's security and diplomatic agenda.

Working with the JASON Advisory Group and the Intelligence Community (IC) on cutting edge national security technical issues has been a particular highlight for me during this rating period and I am extremely proud to have earned the respect and confidence of some of the United States' leading academics and IC personnel.

Leading the planning and execution of a Diplomatic Security mission to a consulate in a hostile country was particularly rewarding in that I was able to perform highly technical hands-on work and testing at this facility and then fly directly from this mission to brief members of the IC, JASON Advisory Group and the Department on my findings. To play such a leading role in solving high profile and pressing security issues facing the U.S. is but one example of why I feel that being a SEO for the Department is realizing a call to service and is truly how I am best able to utilize my unique skill set to advance American foreign policy goals.

Another example where my technical, language and cultural skills were used to great effectiveness by Diplomatic Security management was when I was called upon to lead a high level investigation into a possible technical penetration into an embassy in Europe I had unique familiarity with. The Regional Security Officer of the embassy relied on my linguistic skills to translate and evaluate technical items. I incorporated my historical and political knowledge of the country into my analysis and brought in key players from the IC into the investigation. My report on the investigation's findings won praise from DS management and my role in the investigation demonstrates how I am able to meld my technical, linguistic and cultural backgrounds to lead a high profile mission.

My efforts to identify and evaluate a technical system that can act as a countermeasure to a specific threat facing State Department missions worldwide have proved to be particularly gratifying. I coordinated an interagency research and development effort often working at the Top Secret level. I am extremely proud to have led a presentation team during this rating period that briefed the results of our research and demonstrated the countermeasure to senior IC officers and management at a senior level IC exercise.

Regarding short term goals, I hope to receive tenure and promotion to FS-03 this year and I very much look forward to my assignment as an SEO at Engineering Services Center Frankfurt, Germany, where I will have the opportunity to continue to advance the Department's security and diplomatic goals.

**B. I acknowledge receipt of this report.**

Date Section VII completed *(mm-dd-yyyy)*   05-28-2015      /s/ MARK LENZI

Employee's Signature

STATE00002867

# PX-017

See Instructions Before Completing

U.S. Department of State

# U.S. FOREIGN SERVICE EMPLOYEE EVALUATION REPORT

For all Career Candidate employees and Limited Non-Career Appointees (LNAs)

## SUBMISSION CONTROL

| DATE RECEIVED IN POST/BUREAU *(mm-dd-yyyy)*<br>05-08-2015 | DATE RECEIVED IN HR/PE *(mm-dd-yyyy)*<br>05-13-2015 | DATE RELEASED TO DEPARTMENT FILES *(mm-dd-yyyy)*<br>05-13-2015 |
|---|---|---|

NAME OF EMPLOYEE BEING RATED *(Last, First, MI)*
**LENZI, MARK R.**

| TYPE OF REPORT | GRADE | SSN |
|---|---|---|
| ☒ REGULAR ☐ CAREER CANDIDATE ☐ LNA ☐ VOLUNTARY | **FS - 04** | **XXX-XX-4434** |
| INTERIM: ☐ Change of Rater ☐ Duties ☐ Assignment | POSITION TITLE **SECURITY ENGINEERING OFFICER** | |

| POST OR ORGANIZATION<br>**324068 - FRANKFURT** | PERIOD COVERED *(mm-dd-yyyy)*<br>From **09-18-2014** To **04-15-2015** |
|---|---|

| RATER: **KEMENY, GABRIEL**<br>GRADE: **FS - 01**<br>TITLE: **OFFICER IN CHARGE, ENGINEERING SERVICES CENTER** | REVIEWER: **BARELA, MICHAEL J.**<br>GRADE: **FE - OC**<br>TITLE: **REGIONAL DIRECTOR FOR SECURITY ENGINEERING, EUROPE** |
|---|---|

After careful review, I consider this report to be complete, in conformance with the instructions, and adequately documented by specific examples of performance.

A. /s/ GABRIEL KEMENY    05-08-2015
Rater's signature upon completion of Sections I, III, IV, and V    Date (mm-dd-yyyy)

B. /s/ MICHAEL BARELA    05-08-2015
Reviewer's signature upon completion of Section VI    Date (mm-dd-yyyy)

## I. CERTIFICATION - WORK REQUIREMENTS AND COUNSELING

Work requirements were established by rater, reviewer, and employee on *(mm-dd-yyyy)* **10-08-2014**

If applicable, requirements were revised on *(mm-dd-yyyy)* _____

Rater and rated employee held counseling sessions to discuss performance on at least two dates as follows: *(mm-dd-yyyy)*

1. **10-28-2014**    2. **02-02-2015**    3. _____    4. _____

In the case of an unsatisfactory performance rating, this is also to certify that the requirements of 3 FAH-1 H-2814.3 (tenured employees), 3 FAH-1 H-2326 (employees subject to administrative promotion), or 3 FAM 2248 (FSO Career Candidates) have been met.

*I certify that counseling sessions took place during the rating period and that at least one of them was documented in writing using the Counseling Certification Form (DS-1974).*

/s/ GABRIEL KEMENY     /s/ MARK LENZI     05-08-2015
Rating Officer        Rated Employee        Date (mm-dd-yyyy)

## II. REVIEW PANEL STATEMENT *(Completed by Review Panel)*

A. **Examples of Performance:** Specific examples have been provided in all sections ☒ Yes *(If not, return for rewrite)*

B. **Certification:** This report has been prepared according to the regulations and contains no inadmissible material.

05-13-2015     MAUREEN C. YATES     /s/ MAUREEN YATES
Date *(mm-dd-yyyy)*     Panel Chairperson's Name - Type     Signature

C. **Comments:** *(If submitted late, indicate who is responsible for delay.)*

When completed on a Foreign Service employee, this is a performance evaluation report that shall be subject to inspection only by those persons authorized by Sec. 604 of the Foreign Service Act of 1980.

Page 1 of 6

STATE00002868<br>STATE00002868

Case 1:21-cv-01371-PTG-IDD   Document 112-4   Filed 03/28/23   Page 193 of 207 PageID# 9299

## III. EMPLOYEE'S POSITION AND WORK REQUIREMENTS (Established by Rater, Reviewer and Employee)

A. Describe the position and where it fits in the staffing pattern; indicate the number and kind of employees supervised or team affiliation(s) and tasking(s), whichever is applicable.

Mark Lenzi is a Security Engineering Officer (SEO) in the U.S. Consulate General Frankfurt Engineering Services Center (ESC) under the Security Technology Operations (STO) Division within the Office of Security Technology (ST). Mark reports to the ESC Frankfurt Officer in Charge (OIC). He does not have supervisory responsibilities but on occasion may oversee the efforts of other SEOs, Security Technical Specialists (STSs), contractors and U.S. Navy Seabees during specific projects.

B. Divide work requirements into two categories: continuing responsibilities and specific objectives (including, as appropriate, professional development activities), listing these in descending priority order.

CONTINUING RESPONSIBILITIES:

1. Uphold the Department of State's six core values (accountability, character, community, diversity, loyalty, service) and the Department's Leadership and Management Principles; observe and implement EEO principles.
2. Practice security awareness; report and/or address possible safety hazards and/or unsafe practices; follow security directives, regulations, and policies; safeguard classified information, material, and equipment.
3. Manage the technical security needs of U.S. Embassy The Hague. Services include designing, installing and/or maintaining closed circuit television, intrusion detection, electric access control, emergency notification, tear gas, emergency destruction systems, perimeter protection systems, non-structural hardline door components, safe and lock repair, and lock combination changes.
4. Provide technical security services to ensure constituent posts maintain superior technical and physical security postures.
5. Provide technical security services for the Secretary of State and other high-ranking visitors in the region.
6. Coordinate headquarters-driven technical and physical security projects with posts, including Technical Security Upgrade (TSU) projects. Serve as a technical advisor during surveys to ensure that all issues are addressed. Monitor project development by reviewing scopes of work and drawing submissions. Oversee installations and conduct final project acceptance surveys.
7. As directed by the OIC, manage ESC sponsored technical security projects. Develop documentation necessary to define and justify the projects. Coordinate and schedule resources. Perform or oversee installations. Fully document all projects with written reports and as-built drawings.
8. Conduct technical security assessments (TSA) and technical security countermeasures inspections in accordance with Diplomatic Security (DS) guidelines and as directed by the OIC. Complete required reporting: TSAs, Engineering Service Reports (ESSR), trip reports, and on time vouchers.
9. Keep abreast of developments in technical security equipment, policy, procedures, and regulations. Interpret technical security standards for post personnel. Ensure technical security database data is complete and timely.

SPECIFIC OBJECTIVES:

1. Design and lead the installation of an Imminent Danger Notification System (IDNS) for U.S. Embassy The Hague.
2. Maintain ESC Frankfurt's Technical Security Countermeasures (TSCM) equipment and submit the yearly inventory.
3. Assist with the design and installation of an alarm system upgrade for U.S. Consulate General Amsterdam.
4. Conduct two TSCM inspections–one as a team member and one as team lead.

C. Describe any special circumstances influencing the work program.

STATE00002869
STATE00002868

Case 1:21-cv-01371-PTG-IDD Document 112-4 Filed 02/28/23 Page 194 of 207 PageID# 3800

| IV. EVALUATION OF PERFORMANCE AND ACCOMPLISHMENTS  *(Completed by Rater)* |
|---|

For all Career Candidate employees and Limited Non-Career Appointees (LNAs)

**A. General Appraisal:**   YES ☒   NO ☐

All Employees:  Performance was satisfactory or better (If no, see instructions for documenting unsatisfactory performance)

**B. Limited-Non-Career Appointees:**   YES ☐   NO ☐

Employee is recommended for extension if required by service needs.

**C. Discussion:**   Identify at least three of the work requirements including continuing responsibilities and/or specific objectives listed in Section III. For each, using examples, describe the employee's performance and accomplishments.

Mark has been an invaluable member of ESC Frankfurt while upholding the Department's six core values.  Mark is currently filling an FS-02 position, and he has ensured that ESC Frankfurt has not only met but exceeded DS and the Department's goals through his well-rounded, flexible, and innovative approach to challenging security engineering issues in high visibility posts such as U.S. Embassy The Hague.  He augmented his impressive technical ability with outstanding interpersonal skills that stressed team building.  Mark should be promoted to FS-03 and tenured at the earliest opportunity.

During this rating period, Mark demonstrated his engineering and technical prowess by leading the design and installation of an Imminent Danger Notification System (IDNS) for U.S. Embassy The Hague.  Demonstrating his collaborative skills, Mark led the IDNS design and installation team comprising of SEOs, STSs, Seabees, Regional Security Officers (RSOs), and the local Regional Security Technician (RST).  Mark solicited input for his design while taking into account The Hague's unique physical and technical security requirements.  Mark also took the lead on physically setting up and programming the system at post with the aforementioned team members assisting him.  Because the installation required coordination with Washington and a high level of technical skill, Mark led the coordination efforts with the DS Command Center and made sure appropriate DS personnel monitoring the situation were briefed on the installation.

After the successful installation of the IDNS system, Mark then demonstrated his outstanding communication skills by briefing the Marine Security Guards (MSGs), RSOs, local Dutch security guards, and the RST on how to operate the system – especially in a high stress environment if the embassy is under attack.  Mark won praise from the RSO for not only the successful implementation of the engineering design and layout of the system, but for the time he took to thoroughly brief all security personnel.  This advanced not only post's immediate and future security needs but DS's overarching security goals as well.  From the ESC's perspective, I valued that Mark was proactive in sharing his lessons learned from the Inovonics system installation with other SEOs as well as STSs and Seabees back in Frankfurt, which in turn, led to successful installation upgrades of this system at other posts in the region.

Mark parlayed his responsibilities of managing ESC Frankfurt's TSCM equipment into improved security engineering work performance in conducting TSCMs, in not only the European (EUR) region but the Near Eastern Affairs region as well.  Often working under tight deadlines with highly specific technical and classified work requirements, Mark demonstrated outstanding managerial and customer service skills through his support in coordinating the classified pouching of equipment to posts in the EUR region and beyond.  Drawing on his profound experience in conducting TSCMs prior to his arrival at ESC Frankfurt, Mark is able to advise SEOs on the best TSCM equipment to use for their specific requirements at their post.  In fact, Mark specifically was requested by SEOs in the field to help them conduct TSCMs because they value his expertise in this area, his easy-to-work-with manner, and his collaborative skills.  Mark further demonstrated his TSCM skills during this rating period by playing a crucial role on a TSCM inspection conducted at a high profile embassy in the EUR region.  He briefed other members of the team on the proper use of a particular piece of highly technical equipment and then worked with them directly to familiarize them with the equipment's unique technical requirements and nuances.

In addition to being the lead SEO for U.S. Embassy The Hague, a high profile and up tempo post in the EUR region, Mark's efforts to provide excellent engineering service to support security operations at U.S. Consulate Amsterdam should also be noted.  Mark not only assisted with the engineering design for an alarm system upgrade for the consulate but also accomplished numerous highly physical technical tasks, including assisting Seabees drill out a steel door to provide an emergency exit lock.  Mark's eagerness to not only be involved in high level engineering security design issues, but to get his hands dirty with actual physical security implementations has led to increased office cohesion in the ESC, which is greatly appreciated by DS and Seabee management.

STATE00002870

STATE00002868

EER FOR LENZI, MARK R.  XXX-XX-4434  Rating Period from 09-18-2014 to 04-13-2015

## V. EVALUATION OF POTENTIAL *(Completed by Rater)*

**A.  For Career Candidates only:** *Assessment of career potential as a Foreign Service Officer or Foreign Service Specialist:*

☐ Unable to assess potential from observations to date

☐ Candidate is unlikely to serve effectively even with additional experience

☐ Candidate is likely to serve effectively but judgment is contingent on additional evaluated experience

☒ Candidate is recommended for tenure and can be expected to serve successfully across a normal career span *(see instructions)*
*(Support your choice by discussing below the candidate's potential for successful service across a normal career span, citing examples which illustrate strengths and weaknesses in each of the competencies cited below.)*

**B.  For all career candidates regardless of grade:**
For each of the competency groups listed below, draw on specific examples of performance to describe the rated employee's potential for advancement in the Service. *(See Core Precepts for definitions of competencies.)*
1. Leadership Skills   2. Managerial Skills   3. Interpersonal Skills   4. Communication and Foreign Language Skills
5. Intellectual Skills   6. Substantive Knowledge
**Note: This section should be left blank for Limited Non-Career Appointees (LNAs).**

Mark greatly increased his substantive knowledge of overseas DS security engineering regulations and practices by his collaborative efforts to study and research security engineering challenges and then implement highly technical and innovative solutions that comply with DS standards.  His efforts to increase his knowledge of nuances of the Inovonics IDNS deserve particular praise in addition to his efforts to increase his engineering knowledge of various types of systems including closed circuit television, intrusion detection, electric access control, emergency notification, tear gas, emergency destruction systems, perimeter protection systems, non-structural hardline door components, and safe and lock repair.

Mark demonstrated impressive leadership skills during an almost three week specialized TSCM mission to a high visibility embassy in the region.  Being the only member of a 15 strong team that had used a particular piece of highly technical counterintelligence equipment, Mark not only took the lead in the use of the equipment itself, but more importantly, taught other SEOs how to use this equipment; he achieved this orally briefing them and then working with them directly on the unique technical requirements and nuances of this particular piece of highly sensitive equipment.  Mark continually demonstrated his leadership skills when acting as Duty Officer for ESC Frankfurt.  In one particular instance, Mark calmly helped the Deputy RSO of Consulate Frankfurt coordinate an emergency response with the Regional Director of Security Engineering of ESC Frankfurt in a case involving violence against a U.S. citizen with a significant German police response.  In another instance he proactively put together a Duty Officer Standard Operating Procedure for access rights and keys expressly for working after hours and on weekends.

Mark set a high standard for managerial performance in performing Security Management System enterprise (SMSe) computer hardware and software upgrades at numerous posts in the EUR region.  He established and clearly communicated performance expectations in accordance with the Department's goals and objectives with Seabees, RSTs, RSOs, and contractor support staff in Washington.  Mark has performed the most SMSe upgrades at ESC Frankfurt this rating period and has been able to share his knowledge with DS security personnel both at ESC Frankfurt and at posts in the region.  This support has won praise from numerous RSOs.

Mark's interpersonal skills are outstanding and set the standard for integrity and workplace behavior in our office.  Mark has fostered a work place climate based on mutual respect and trust, whether it is out in the field participating in SMSe, alarm or IDNS upgrades, or by organizing team building activities for ESC Frankfurt such as touch football games.  The latter is an example where Mark invited colleagues from another U.S. government agency to participate in ESC football games he organized, and this relationship led to increased technical collaboration between the ESC and this particular U.S. government agency thus advancing overall DS security goals.

In addition to his aforementioned interpersonal skills, Mark exhibits full mastery of written communication as demonstrated by the well-argued Engineering Security Services Reports (ESSRs) that he wrote in a succinct and efficient manner on various engineering security subjects such as TSCM reports or TSAs for posts in the ESC Frankfurt region.

Mark demonstrated high-level intellectual skills during this rating period, especially when acting as the ESC's Duty Officer.  During these numerous times, he had to develop fast response times to emergency security situations, such as an employee being locked out or an alarm that was responding to input.  Mark is able to calmly and judiciously prioritize a rank order of tasks that need to be completed, and he often coordinates a response with the head of Facilities in Consulate Frankfurt along with others outside of the ESC such as MSGs.  Mark also is an active participant in security and technical training provided by ESC Frankfurt.

DS-1829

Page 4 of 6

STATE00002871
STATE00002868

EER FOR LENZI, MARK R. XXX-XX-4434 Rating Period From 09-18-2014 to 04-15-2015

C. **Areas for Improvement:** The following must be completed. Employees should be made aware of areas where they should concentrate their efforts to improve. Specify at least one area in which he/she might best direct such efforts. Area(s) cited must be explicitly linked to one or more of the competency groups listed in Section V B and must have been discussed with the employee in counseling during the rating period. Justify your recommendation with examples and indicate below competency group(s) being addressed. *(The response is not to be directed as a need for formal training.)*

Specify Competency __Communication & Foreign Lang__     Specify Competency _____

Mark should seek out temporary duty assignment opportunities in the EUR and South and Central Asian regions to further hone and practice his 2/2+ Russian language skills which would benefit his work for Diplomatic Security in the regions that ESC Frankfurt covers.

## VI. REVIEW STATEMENT *(Completed by Reviewer)*

Assess the employee's performance and potential (if a career candidate, potential to serve across a normal career span - see instructions). Independent observations are encouraged and must be supported by additional examples of performance observed this rating period. Note differences with the rater's appraisal or recommendations. Comment on relations between rater and employee.

Mark Lenzi demonstrates breadth of skill and knowledge in his work within Europe. Success as both a Security Engineer and as a member of the Foreign Service is dependent on achievement, especially in work abroad. I believe Mark has reached that level this year, and I expect him to have a very successful career in the Foreign Service.

The first criteria I look for in a successful officer is the ability to perform well in design and implementation of technical security systems at U.S. missions. Mark successfully integrates with his team members in Frankfurt to solve daily maintenance and repairs; for example, opening a damaged classified container or by leading other Security Engineers on projects such as comprehensive Technical Security Assessments of embassies and consulates. His delegating style for such work sets a positive tone for operations. Likewise in The Hague, Mark's post support and systems installations solicited numerous messages of superb customer support from post management. His implementation of enhanced video recording equipment in Frankfurt was completed ahead of schedule due to Mark's knowledge of the Department's Security Management System network. Mark performed network and infrastructure upgrades in facilities ranging from a small U.S. Delegation building to the U.S. Embassy Copenhagen to the large U.S. Consulate General in Frankfurt.

I also look at an officer's ability to work well in embassy and consulate environments. Mark has excellent relations with his supervisor Gabriel Kemeny. They work together to provide excellent customer service to their missions. Mark's interactions with Regional Security Officers and Front Office personnel have been outstanding. Mark's collaborative style allows Gabriel to select Mark as team lead and to mentor incoming first-tour officers. As a Duty Officer this year, Mark displayed exceptional leadership and discretion during a domestic issue involving another consulate employee. He contacted me, provided a situation briefing, and was available to assist me in handling the issue with the Regional Security Office staff.

Mark definitively shows he is an excellent officer and essential member of the Frankfurt Engineering Services Center. His accomplishments provide concrete examples of his career success. I endorse the rating officer's recommendation for tenure now and promotion.

STATE00002872
STATE00002868

Case 1:21-cv-01371-PTG-IDD  Document 112-4  Filed 03/28/23  Page 197 of 207 PageID# 3893

## VII. STATEMENT BY RATED EMPLOYEE

**A. Discussion:** This section is intended to provide the rated employee's views on the period of performance appraised. You must comment on your most significant achievements during the period. You may also address any activities or problems not adequately covered in this report, or aspects of the appraisal which need clarification or correction. Career Candidates are encouraged to state their current career goals including training and assignments desired over the next 5 years.
*(Continuation sheets may be used.)*

I am gratified and proud to be such an integral member of the Engineering Services Center (ESC) in Frankfurt, Germany and would like to thank my rater and reviewer for their mentorship and recommendations for tenure and promotion to FS-03. It is highly rewarding to be challenged on a daily basis with complex technical problems that need to be solved quickly and efficiently. I am grateful that my work during this rating period at the U.S. Consulate Amsterdam for an alarm upgrade project, countermeasures survey and an access denial project among other work was considered so professional and vital that the Regional Security Officer (RSO) in Amsterdam nominated me for the Department's Franklin Award.

The FS-02 position that I am filling in Frankfurt is challenging and multifaceted; I am not only responsible for all of the technical security needs for U.S. Embassy The Hague, a high tempo embassy with unique security requirements, I have also thrived in managing ESC Frankfurt's Technical Security Countermeasures (TSCM) equipment for the EUR region and am responsible for the yearly inventory and logistics (diplomatic pouching, etc.) of millions of dollars worth of highly complex equipment deployed in the EUR, NEA and SCA regions.

I believe one of my best strengths as a Security Engineering Officer (SEO) is my versatility as I am as comfortable trying to solve a complex electrical engineering issue in a fast paced embassy as I am with doing intense physical labor such as pulling fiber optic cable.

I am proud that I have brought a well-rounded skill set and background to ESC Frankfurt that has added to team camaraderie and cohesion. I have gone out of my way to include U.S. Navy Seabee technicians in work activities at U.S. Embassy The Hague and have also made it a priority to include them in after work activities I have organized such as football games that bring together various agencies from Consulate Frankfurt. These activities I have arranged have not only been appreciated by the wider consulate community but have led to much closer work collaboration between Diplomatic Security personnel and other U.S. Government agencies at the consulate.

It has also been gratifying to continue to hone my foreign language skills this rating period. For instance, in March I read an article in a Polish newspaper about an issue that had the potential to immediately impact certain technical functionality at U.S. Embassy The Hague. I raised the issue and its potential implications to the Regional Security Office (RSO) team at U.S. Embassy The Hague and requested they monitor a possible corresponding technical issue. I have consistently earned praise from the RSO team at The Hague and from others in Diplomatic Security for my well-rounded work approach and for products such as this that comprise multifaceted disciplines.

My long term goals remain the same as when I joined the Foreign Service: to continue to better myself and help the Department create a more secure, democratic, and prosperous world for the American people. Regarding short term goals I hope to receive tenure this year and be promoted to FS-03. I look forward to further honing my technical and management skills over the next year and then serving as Officer in Charge at an Engineering Services Office.

**B. I acknowledge receipt of this report.**

Date Section VII completed  *(mm-dd-yyyy)*   05-08-2015     /s/ MARK LENZI

Employee's Signature

STATE00002873
STATE00002868

# PX-018

U.S. Department of State

## U.S. FOREIGN SERVICE EMPLOYEE EVALUATION REPORT

| I. SUBMISSION CONTROL | | | | |
|---|---|---|---|---|
| DATE RECEIVED IN POST/BUREAU *(mm-dd-yyyy)*<br>05-02-2016 | | DATE RECEIVED IN HR/PE *(mm-dd-yyyy)*<br>05-11-2016 | | |
| NAME OF EMPLOYEE BEING RATED *(Last, First, MI)*<br>LENZI, MARK R. | | | GRADE<br>FS-04 | EMPLOYEE IDENTIFICATION NUMBER<br>157155 |
| TYPE OF REPORT<br>Regular | POSITION TITLE<br>SECURITY ENGINEERING OFFICER | POST OR ORGANIZATION<br>FRANKFURT | | PERIOD COVERED *(mm-dd-yyyy)*<br>From 04-16-2015 To 04-15-2016 |
| RATER - NAME, TITLE<br>KEMENY, GABRIEL<br>OFFICER IN CHARGE ENGINEERING SERVIC | | RATER GRADE<br>FS-01 | REVIEWER - NAME, TITLE<br>BARELA, MICHAEL J.<br>REGIONAL DIRECTOR SECURITY ENGINEERI | REVIEWER GRADE<br>FE-OC |

*I consider this report to be complete, in conformance with the instructions, and adequately documented by specific examples of performance.*

| Signature of Rater after completion of Sections II, V, and VII<br>/s/ GABRIEL KEMENY | Date<br>05-02-2016 | Signature of Reviewer after completion of Section VIII<br>/s/ MICHAEL BARELA | Date<br>05-02-2016 |
|---|---|---|---|

### II. CERTIFICATION OF WORK RESPONSIBILITIES AND PERFORMANCE REVIEWS

Work responsibilities were established by rater, reviewer, and employee on *(mm-dd-yyyy)* _____ 12-15-2015 _____

Rater and rated employee held performance review sessions on at least two dates as follows: *(mm-dd-yyyy)*

1. ___ 10-07-2015 ___   2. ___ 02-25-2016 ___

### III. ACKNOWLEDGEMENT OF RECEIPT (Completed by Rated Employee)

*I acknowledge receipt of this report, which has been completed for submission to a review panel.*

| Signature of Rated Employee<br>/s/ MARK LENZI | Date<br>05-02-2016 |
|---|---|

### IV. REVIEW PANEL STATEMENT (Completed by Review Panel)

A. **Examples of Performance:** Have specific examples been provided in all sections?   Yes ☒   No ☐

B. **Certification:** This report has been prepared according to the regulations and contains no inadmissible material.   Yes ☒   No ☐

C. **If this report is submitted late or does not conform to regulations and instructions, indicate who is responsible:**

| Signature of Panel Chairperson<br>/s/ PETER CROWTHER | Name of Panel Chairperson<br>PETER N. CROWTHER | Date<br>05-11-2016 |
|---|---|---|

### V. POSITION DESCRIPTION, RESPONSIBILITIES, SPECIAL CIRCUMSTANCES

**Position Description: Size and function of the work unit and its position within the Mission or Bureau, number of employees rated and reviewed, amount and purpose of financial and physical resources for which the employee is accountable.**
Mark Lenzi is a Security Engineering Officer (SEO) in the U.S. Consulate General Frankfurt Engineering Services Center (ESC). Mark reports to the ESC Frankfurt Officer in Charge (OIC). He may on occasion oversee the efforts of other personnel during specific projects.

**Core Work Responsibilities**

Model the Department of State's six core values (accountability, character, community, diversity, loyalty, service) and the Department's Leadership and Management Principles; observe and implement EEO principles.

Security Responsibilities: Ensure active risk management through monitoring the security environment concurrent to the scope of official duties and responsibilities; follow security directives, regulations, and policies; safeguard classified information, material, and equipment.

Manage the technical security needs of U.S. Embassy The Hague. Services include designing, installing and/or maintaining closed circuit television (CCTV), intrusion detection, access control, emergency notification, tear gas systems, emergency destruction systems, safe and lock repair, and lock combination changes.

Goals/Specific Objectives: List in priority order the outcomes the employee seeks to achieve in support of Mission, Bureau, or Department goals.
1. Assist with the hiring of a new Post Security Technician (PST) at U.S. Embassy The Hague.
2. Participate in at least one Technical Surveillance Countermeasures (TSCM) assignment where, in addition to normal work activities, he also trains other personnel on a new advanced piece of technical equipment.
3. Participate in at least one Counter Intelligence Working Group (CIWG) meeting convened by the Regional Security Officer at U.S. Embassy The Hague

When completed on a Foreign Service employee, this is a performance evaluation report that shall be subject to inspection only by those persons authorized by Sec. 604 of the Foreign Service Act of 1980.   **Page 1 of 4**

STATE00002874
STATE00002874

**V. POSITION DESCRIPTION, RESPONSIBILITIES, SPECIAL CIRCUMSTANCES - CONT.**

Special Circumstances: Unusual, unexpected or unpredictable circumstances that significantly altered operational conditions.

---

**VI. DESCRIPTION OF ACCOMPLISHMENTS (Completed by Rated Employee)**

**Describe your individual and collaborative accomplishments that advanced the Department's mission.**
This rating period I have strived to apply my management and foreign language abilities in addition to my technical and engineering skills to bring a well-rounded approach to challenges confronting Engineering Services Center (ESC) Frankfurt. As the only Security Engineering Officer (SEO) at ESC Frankfurt with Cryptographic Access and a professional knowledge of the Russian language, I have been called on numerous times to work on some of the most sensitive technical security issues facing U.S. embassies and consulates in the EUR, SCA and AF regions which has contributed to enhancing the safety and technical security of diplomatic facilities and State Department personnel.

Honing my management skills, I played a leading role in the recruitment and hiring process for a new Post Security Technician (PST) for U.S. Embassy The Hague. I led the process in identifying potential American candidates with security clearances as well as interviewing prospective technicians. This was a complex endeavor given the complicated local Dutch labor laws and unique technical requirements of the job. Working with U.S. Embassy The Hague Human Resources officers and the RSO Office, I led efforts to train our new PST and the results so far of his work have been spectacular by all accounts from embassy management.

Due in large part to my communication and management skills, I was selected to be the Chairman of multiple EER Review Panels during this rating period which involved extensive written and verbal coordination with other panel members. On numerous occasions I identified inadmissible comments and worked with the employee to not only mitigate and correct language but to strengthen the overall writing quality of the EER. I won praise from Consulate General Frankfurt's management for ensuring that my fellow panel members were educated with written and video informational materials on EER review tips.

I have earned plaudits from Diplomatic Security (DS) management for my efforts to train SEOs in the latest counterintelligence technology – whether that be by proactively organizing a presentation for eight SEOs at ESC Frankfurt or by training SEOs individually as part of temporary duty missions to U.S. Embassy Copenhagen and U.S. Embassy N'djamena; the latter culminating in a Franklin Award nomination from my supervisor.

One of the aspects of my job that I have enjoyed the most during this rating period is advising the Regional Security Officer (RSO) of U.S. Embassy The Hague on technical counterintelligence threats facing U.S. interests in The Netherlands. As part of these efforts, I led preparations and planning for an interagency Counterintelligence Working Group (CIWG) that focused on urgent cyber security issues facing U.S. government missions in The Netherlands. In addition, I was called upon to brief the U.S. Ambassador to The Netherlands on specific counterintelligence threats to U.S. interests in The Netherlands and the EUR region as a whole.

---

**VII. EVALUATION OF PERFORMANCE AND POTENTIAL (Completed by Rater)**

**A. Appraise the employee's accomplishments in the areas of informational, operational, and relational effectiveness. Cite specific policy and programmatic outcomes and their impact on the Department's mission.**
During this rating period SEO Lenzi performed at an even higher level than last year, particularly in managing the technical security needs of U.S. Embassy The Hague. As the SEO who oversees technical security for The Hague, Mark supervises the maintenance of video, alarm, access control, emergency notification and perimeter protection systems as well as classified safe and lock repair. Mark's attention to detail and ingenuity in maintaining these complex technical systems has allowed Embassy The Hague as well as Consulate General Amsterdam (where he received a Franklin Group Award for technical guidance to the Regional Security Officer in June 2015) to operate and process classified material at a high tempo in a fast paced political, diplomatic and commerce environment.

On temporary duty (TDY) assignments to Moldova and Ukraine, Mark was able to demonstrate not only technical proficiency by operating the latest technical counterintelligence equipment in challenging environments but also incorporated his Russian language skills to discern and adjudicate possible intelligence threats. This use of his language skills contributed to the overall success of the missions thus furthering Department security goals.

Because of his managerial skills and customer service attitude, Mark was one of only two Foreign Service specialists selected in the ESC to be consular duty officer for U.S. Consulate General Frankfurt, the largest U.S. consulate in the world. During his week of consulate duty, he assisted numerous American citizens find lost relatives, assisted on hospitalization and emergency care cases, deaths, repatriations, visa issues and lost passports. His handling of and reporting on these often complex and stress inducing cases won praise from Consulate General Frankfurt management

DS-5055                                                                                                    Page 2 of 4

STATE00002875
STATE00002874

because it contributed to greater overall consular outreach and responsiveness thus fulfilling an overarching Department of State goal.

A good example of Mark's well rounded and inclusive work style is when I selected him for a special interregional counterintelligence mission to N'Djamena, Chad in part because of his proficiency with a piece of technical equipment that few SEOs have experience operating. Once in Chad, Mark was called upon to brief the Ambassador on the overall inspection mission as well as the aforementioned piece of equipment that he was using in the Ambassador's office. The briefing went so well that the Ambassador requested to be debriefed by Mark at the conclusion of the inspection.

In addition to his normal duties with the technical inspection mission, Mark proactively worked with the Marine Security Guards (MSGs) in Chad on identifying the cause of an issue they were having with the Imminent Danger Notification System (IDNS). The Regional Security Officer (RSO) was so impressed with Mark's ability to identify the underlying cause of the problem and his overall knowledge of the system that she requested that Mark teach the weekly MSG School that week on the IDNS system. Mark received praise from the RSO for his ability to teach a highly technical system to twelve Marines in a clear and concise fashion.

One of the aspects of Mark's performance in Chad that most pleased the Ambassador and the RSO was his pro-active nature to work with another U.S. Government agency to lead and perform a full technical inspection of their classified work space in the embassy, something that is not normally done by SEOs on a mission of this nature. Mark's efforts in this regard saved the U.S. Government tens of thousands of dollars and led to enhanced technical security cooperation between the Department and this particular government agency.

Mark's performance in an FP-02 position this rating period - including when he has been Acting Officer in Charge of ESC Frankfurt, the largest overseas security engineering office in the Department of State - has only improved over last year when he received an MSI and I highly recommend him for promotion to FP-03.

**B. Developmental area: Competency that needs the greatest strengthening to entrust employee with greater responsibilities. Cite example(s) from the current rating period.**
**Specify competency** Substantive Knowledge

While Mark experienced some work on access and alarm systems, he should make an effort to involve himself in more such projects to expand his knowledge of them. A more thorough understanding of such systems will allow him to better manage both the systems and the resources it takes to maintain them.

**C. Rater's Summary Judgment**
For All Employees: Was performance satisfactory or better?   Yes [X]   No [ ]
For Untenured Employees:   [ ] The career candidate is likely to perform effectively across a normal career span
[ ] Additional development and observation is needed
[ ] The career candidate is unlikely to perform effectively even with additional experience

**VIII. REVIEW STATEMENT (Completed by Reviewer)**
**Assess the rated employee's preparedness for positions of greater responsibility, citing examples of performance. Describe the employee's relations with the rater, peers and subordinates.**
This year, Mark Lenzi continues to provide superior protection of U.S. missions in Europe. Rocked by terrorism in Brussels, neighboring embassies and consulates required security assessments to ensure protection. Review by Diplomatic Security management showed Mark's conscientious security support for The Hague and Amsterdam ensured security during the heightened threat. Mark continues to be a leader in counterintelligence for my engineering services offices in Europe. He provided extended countermeasures support to an African post. Mark also instructed Security Engineering Officers at training here in Frankfurt. His expertise in leading technical counterintelligence missions led to his selection by the bureau for an interagency exercise in Virginia later this year. Mark and his rater, Gabe Kemeny, have a very strong and productive relationship. Gabe has placed Mark in charge of the Engineering Services Center several times this year. Mark's oversight provided continuity in European security operations.

Mark demonstrates his acumen for working within the consulate community. He is an integral member of the First and Second Tour officer group. His volunteerism at the consulate Fourth of July event ensured the success of this key outreach event. Mark volunteers to chair employee evaluation panels on behalf of human resources. His work provides assessments ready for the employee evaluative process, key to State's workforce development program. Mark also volunteered as the post duty officer for Consulate General Frankfurt. Fielding numerous American citizen inquiries and coordinating timely responses, he was the public face for the mission for a week. Mark is an integral part of our regional support for diplomatic missions in Europe and he will be missed after he departs to assume duties in Guangzhou, China this summer. His strong performance rates my recommendation for promotion by this year's panel.

DS-5055                                                                                     Page 3 of 4

## IX. PERFORMANCE PAY (For SFS Only - Completed by Rater)

**Assess Performance keyed directed to the Performance Pay Criteria.**

## X. OPTIONAL STATEMENT BY RATED EMPLOYEE

**The rated employee may use this section to address activities or problems that the Rater or Reviewer did not adequately cover or aspects of the report that he or she believes should be clarified or corrected. Continuation sheets may be used.**

**DS-5055**                                                                                                                          **Page 4 of 4**

STATE00002877
STATE00002874

# PX-019

See Instructions Before Completing (DS-5055i)
U.S. Department of State

# U.S. FOREIGN SERVICE EMPLOYEE EVALUATION REPORT

## I. SUBMISSION CONTROL

| | |
|---|---|
| DATE RECEIVED IN POST/BUREAU  *(mm-dd-yyyy)*<br>04-25-2017 | DATE RECEIVED IN HR/PE  *(mm-dd-yyyy)*<br>04-25-2017 |

| NAME OF EMPLOYEE BEING RATED  *(Last, First, MI)*<br>LENZI, MARK R. | GRADE<br>FS-03 | EMPLOYEE IDENTIFICATION NUMBER<br>157155 |
|---|---|---|

| TYPE OF REPORT<br>Regular | POSITION TITLE<br>SECURITY ENGINEERING OFFICER | POST OR ORGANIZATION<br>BEIJING | PERIOD COVERED  *(mm-dd-yyyy)*<br>From 08-11-2016 To 04-15-2017 |
|---|---|---|---|

| RATER - NAME, TITLE<br>BLANTON, PHILLIP H.<br>OIC ESO GUANGZHOU | RATER GRADE<br>FS-02 | REVIEWER - NAME, TITLE<br>LIM, EUN J.<br>RSO GUANGZHOU | REVIEWER GRADE<br>FS-03 |
|---|---|---|---|

*I consider this report to be complete, in conformance with the instructions, and adequately documented by specific examples of performance.*

| Signature of Rater after completion of Sections II, V, and VII<br>/s/ PHILLIP BLANTON | Date<br>04-25-2017 | Signature of Reviewer after completion of Section VIII<br>/s/ EUN LIM | Date<br>04-25-2017 |
|---|---|---|---|

## II. CERTIFICATION OF WORK RESPONSIBILITIES AND PERFORMANCE REVIEWS

Work responsibilities were established by rater, reviewer, and employee on *(mm-dd-yyyy)*   09-22-2016

Rater and rated employee held performance review sessions on at least two dates as follows:   *(mm-dd-yyyy)*

1.   09-21-2016        2.   01-03-2017

## III. ACKNOWLEDGEMENT OF RECEIPT (Completed by Rated Employee)

*I acknowledge receipt of this report, which has been completed for submission to a review panel.*

| Signature of Rated Employee<br>/s/ MARK LENZI | Date<br>04-25-2017 |
|---|---|

## IV. REVIEW PANEL STATEMENT  (Completed by Review Panel)

**A.  Examples of Performance:**  Have specific examples been provided in all sections?     Yes  ☒   No  ☐

**B.  Certification:** This report has been prepared according to the regulations and contains no inadmissible material.     Yes  ☒   No  ☐

**C.  If this report is submitted late or does not conform to regulations and instructions, indicate who is responsible:**

| Signature of Panel Chairperson<br>/s/ JOSEPH ZADROZNY | Name of Panel Chairperson<br>JOSEPH E. ZADROZNY | Date<br>04-21-2017 |
|---|---|---|

## V. POSITION DESCRIPTION, RESPONSIBILITIES, SPECIAL CIRCUMSTANCES

**Position Description: Size and function of the work unit and its position within the Mission or Bureau, number of employees rated and reviewed, amount and purpose of financial and physical resources for which the employee is accountable.**

The position is within the Engineering Services Office (ESO) Guangzhou, China, a field element of Diplomatic Security that applies technology to protect the people, information, and property at U.S Consulate Hong Kong and U.S. Consulate Guangzhou. The position supervises the ESO logistician and $2.5 million dollars of inventory.

**Core Work Responsibilities**

**Model the Department of State's six core values (accountability, character, community, diversity, loyalty, service) and the Department's Leadership and Management Principles; observe and implement EEO principles.**

**Security Responsibilities:  Ensure active risk management through monitoring the security environment concurrent to the scope of official duties and responsibilities; follow security directives, regulations, and policies; safeguard classified information, material, and equipment.**

Provide technical security services to ensure posts maintain a superior technical and physical security posture. Manage ESO sponsored technical security projects. Develop documentation necessary to define and justify the projects. Coordinate and schedule resources. Conduct Technical Security Assessments (TSA) within the region.

**Goals/Specific Objectives: List in priority order the outcomes the employee seeks to achieve in support of Mission, Bureau, or Department goals.**

1. Provide policy guidance, perform inspections, and draft official correspondence for the three security upgrade projects in the region.
2. Kickoff phase 2 of the Technical Security Upgrade at U.S. Consulate Hong Kong. Identify the issues that must be addressed with post management or Washington.
3. Oversee the annual technical security equipment inventory reconciliation.
4. Complete the monthly reporting and administer the security networks and countermeasures unique to Mission China.

| | |
|---|---|
| DS-5055<br>05-2015 | When completed on a Foreign Service employee, this is a performance evaluation report that shall be subject to inspection only by those persons authorized by Sec. 604 of the Foreign Service Act of 1980. |

STATE00002878

**V. POSITION DESCRIPTION, RESPONSIBILITIES, SPECIAL CIRCUMSTANCES - CONT.**

Special Circumstances: Unusual, unexpected or unpredictable circumstances that significantly altered operational conditions.

**VI. DESCRIPTION OF ACCOMPLISHMENTS (Completed by Rated Employee)**

Describe your individual and collaborative accomplishments that advanced the Department's mission.

This rating period I was nominated to be Security Engineering Officer (SEO) of the year and I have thrived in a challenging technical security environment in Guangzhou while upholding the Department's six core values. I have not only met but exceeded the Department's goals through a well-rounded, flexible, and innovative approach to challenging security engineering issues not only in Guangzhou but in our high tempo constituent Consulate General Hong Kong. I have augmented my technical ability with interpersonal skills that stress team building.

Demonstrating my collaborative skills, I led an investigation into a high profile facility issue affecting a consulate in the EAP region which required not only technical ability but coordination among Locally Employed Staff, American contractors, management and facility officers, as well as SEOs, Security Technical Specialists (STSs), Seabees and Regional Security Officers (RSOs). I solicited input for my investigation while taking into account this particular consulate's unique physical and technical security requirements. I also took the lead on coordinating the investigation with consulate management and Washington and made sure appropriate DS personnel were fully briefed.

I parlayed my responsibilities of managing ESO Guangzhou's technical counterintelligence equipment into improved security engineering work performance in conducting technical counterintelligence surveys in the EAP region. Often working under tight deadlines with highly specific technical and classified work requirements, I demonstrated managerial and customer service skills through my technical support of a high profile U.S. mission where my unique background and skill set on a particular issue meant that Washington specifically requested my assistance not only because of my expertise in this area but because of my easy-to-work-with manner, and my collaborative skills. I briefed the RSO and members of the Senior Foreign Service about the technical issue of concern and outlined mitigation solutions to be undertaken.

Besides leading technical counterintelligence efforts for Consulate General Guangzhou, I have also played a key role in providing prompt engineering service to support security operations at U.S. Consulate General Hong Kong where I have helped manage two concurrent and complex technical security team upgrades for specialized door enhancement and comprehensive alarm system installation. Personnel at each post have appreciated that I have not only helped manage and oversee the teams and implemented high level engineering security design issues, but have also gotten my hands dirty side by side with upgrade team members by, for example, pulling electrical wire for an installation.

In addition to my technical work and project management, one of the things I am most proud of is my teambuilding efforts to build cohesion and camaraderie among the RSO section and the Marine Security Guards. I have organized consulate flag football games that have not only increased esprit de corps within these two key consulate sections but among the consulate as a whole including local staff and members of the wider consulate community.

**VII. EVALUATION OF PERFORMANCE AND POTENTIAL (Completed by Rater)**

A. Appraise the employee's accomplishments in the areas of informational, operational, and relational effectiveness. Cite specific policy and programmatic outcomes and their impact on the Department's mission.

SEO Mark Lenzi's performance is excellent in all areas and his potential for advancement and achievement in the Foreign Service is high. He volunteered for a complex assignment at the American Institute in Taiwan Taipei Office (AIT/T) that required broad knowledge of 12-FAH-6 technical security policy, managed the security programs and reporting requirements unique to Mission China, and served as the Officer in Charge of the ESO on many occasions. As the officer responsible for ESO Guangzhou's logistics activity, Mark effectively supervised a logistics manager by designing meaningful work requirements and setting reasonable goals.Throughout the year the ESO hosts dozens of visitors from within the region and from Washington, D.C. Mark is the control officer for these visits, sets the agenda, and organizes meetings with post management. He ensures that the Regional Security Officer (RSO) is kept informed of all matters that impact security. This requires Mark's awareness on all maintenance and construction work that affect the building's security systems. For example, Post's facilities maintenance staff assumed that frequent rain storms and a low water table was causing flooding in the buried conduits and manholes that support the consulate's electrical and security systems. It was through Mark's commitment to solving this problem that Post identified the real reason for this potentially catastrophic hazard. By analyzing the drainage pattern of 36 manholes, he located the problem and then had the water chemically analyzed to find its source. Results pointed to a water leak in the consulate's main supply line as the primary cause of the problem. By correlating this evidence to high water utility bills, Mark got management to see the importance of the problem. When Post was experiencing problems with the fire alarm system, Mark was the RSO's expert advisor. He took part in the repair process by attending meetings, consulting with the experts, and then briefed the RSO as to the cause of the problem and the fix. He explained the complexities of

STATE00002879

the fire alarm problem to stakeholders in the region and Washington, D.C. and proposed solutions to correct it. It was Mark's comprehensive written and verbal communications that persuaded headquarters to send a team of fire alarm experts to repair the problems. By submitting after-action Engineering Security Survey Reports to the right DS offices in Washington, D.C., Mark ensured that records of these incidents were retained. Mark is the lead SEO for U.S. Consulate General Hong Kong's Technical Security Upgrade (TSU), a year-long multi-million dollar project that modernized every security system at post. He ensured that Post management understood the contract's deliverables and the projects impact on daily operations. He approved contractual changes, heavily scrutinizing costs and time constraints, and supplemented the project with ESO labor and material in order to keep the project within budget. Because Mark became familiar with every aspect of the project's scope of work and corrected contractual gaps before they surfaced, we are expecting an on-time and within-budget completion. I appreciate that Mark set a high standard for managerial performance by managing and rating the ESO logistician. It was this collaborative relationship that led to the success of this year's security equipment inventory reconciliation. Unlike previous years, a TSU project added and removed hundreds of pieces of security equipment that all had to be accounted for. Mark oversaw a team of ESO staff that counted thousands of installed and in-stock items and corrected the inaccuracies. This task demonstrated Mark's attention to detail, teamwork, and leadership skills.

**B. Developmental area: Competency that needs the greatest strengthening to entrust employee with greater responsibilities. Cite example(s) from the current rating period.**
**Specify competency** <u>Managerial Skills</u>
SEO Lenzi must be more perceptive of when and how to use the chain of command and limit his participation with problems outside the ESO's area of responsibility. In such cases, Mark must only advise in the ESO's areas of responsibility and use the chain of command to alert outside parties.

**C. Rater's Summary Judgment**
**For All Employees: Was performance satisfactory or better?**      Yes  ☒   No  ☐
**For Untenured Employees:**      ☐  The career candidate is likely to perform effectively across a normal career span
☐  Additional development and observation is needed
☐  The career candidate is unlikely to perform effectively even with additional experience

**VIII. REVIEW STATEMENT (Completed by Reviewer)**
**Assess the rated employee's preparedness for positions of greater responsibility, citing examples of performance. Describe the employee's relations with the rater, peers and subordinates.**
In his eight months at post, Mark Lenzi has not only demonstrated his excellent technical and managerial skills but also has made significant contributions to post morale. Mark is well-liked by his colleagues – subordinates, peers and supervisors alike. Mark shares an excellent collaborative relationship with his rater and is well on his way to performing at an FP-02 level and should be promoted at the next opportunity.

This rating period, I have been impressed with Mark's excellent technical and managerial skills – particularly when he was Acting Officer in Charge of the Engineering Services Office performing a technical investigation for our Consulate on a high profile security and facility issue and when he assisted on an interagency emergency repair that required coordination with Beijing's Regional Security Office and multiple government agencies in Washington.

Mark also demonstrates excellent communication skills whether he's drafting technical Concept of Operations documents used in sensitive countermeasures activities or briefing members of high profile delegations on specialized countermeasures and facility infrastructure installation for high risk facilities.

Mark's professional capabilities are undeniable, but what makes him stand out are his contributions to the larger consulate community and post morale. He has organized popular consulate touch football fundraising games that raise money for our consulate's Marine Security Guard Detachment's annual ball and has led to greater cohesion amongst all our consulate sections. We are very lucky to have an officer of Mark's caliber who is an invaluable member to our consulate's security and morale.

## IX. PERFORMANCE PAY (For SFS Only - Completed by Rater)

**Assess Performance keyed directly to the Performance Pay Criteria.**

## X. OPTIONAL STATEMENT BY RATED EMPLOYEE

**The rated employee may use this section to address activities or problems that the Rater or Reviewer did not adequately cover or aspects of the report that he or she believes should be clarified or corrected. Continuation sheets may be used.**

**DS-5055**

**Page 4 of 4**

STATE00002881