# PX-033

PROCEDURAL PRECEPTS FOR THE 2022 FOREIGN SERVICE SELECTION BOARDS
TABLE OF CONTENTS

PART I - PURPOSE AND PROCEDURES
   A. OVERVIEW
   B. MAJOR RESPONSIBILITIES
      1. Promotion
      2. Low-ranking and Referral to a Performance Standards Board
   C. ADDITIONAL AUTHORITIES AND RESPONSIBILITIES
      1. Limited Career Extensions
      2. Non-Rates
      3. Bidding Privileges
      4. Counseling
      5. Commendation
      6. Board Recommendations
   D. BRIEFINGS, MATERIALS, AND GENERAL GUIDANCE
   E. RECUSAL
   F. FINDINGS AND RECOMMENDATIONS
   G. OATH OF OFFICE

PART II - ELIGIBILITY
   A. ELIGIBILITY FOR BOARD REVIEW
   B. ELIGIBILITY FOR LIMITED CAREER EXTENSIONS

PART III - ORGANIZATION OF THE BOARDS
   A. SENIOR BOARDS
      1. Minister-Counselor Board (SFS-II)
      2. Counselor Board (SFS-III)
      3. Senior Specialist and Specialist Threshold Board (SFS-IV)
      4. Generalist Threshold Boards (Boards SFS-V)
   B. INTERMEDIATE BOARDS
      1. Boards G-II and G-III
      2. Boards G-IV
      3. Board S-I
      4. Boards S-II
      5. Board S-III
      6. Boards S-IV
      7. Boards S-V

Addenda
    1. Security Awareness
    2. Equal Employment Opportunity Principles
    3. The Department's Leadership and Management Principles for Department Employees (3 FAM 1214)
    4. Requirements for OMS Promotion to FP-02
    5. Requirements for Promotion into the Senior Foreign Service

SENSITIVE BUT UNCLASSIFIED

Confidential – Subject to Protective Order

PROCEDURAL PRECEPTS FOR THE 2022 FOREIGN SERVICE
SELECTION BOARDS

| Equality of Consideration |
|---|
| All employees will be compared and judged solely on merit with absolute fairness and justice. No employee will be discriminated against, directly or indirectly, for reasons of race, color, religion, sex (including pregnancy, sexual orientation, and gender identity), national origin, disability, age, genetic information, retaliation, political affiliation, or means of entry into the Service. |

## PART I.  PURPOSE AND PROCEDURES

These Procedural Precepts (Precepts) establish the organization and responsibilities of the Foreign Service (FS) Selection Boards (Boards) and describe the criteria they use in reaching their determinations.  These Precepts are negotiated annually with the American Foreign Service Association (AFSA).  If the language of the Precepts varies from that in the Foreign Affairs Manual (FAM) or Foreign Affairs Handbook (FAH), the language in the Precepts shall be governing.

### A.  OVERVIEW

Decisions by the Department on the number of employees to be promoted are based upon a systematic long-term projection of personnel flows and staffing needs.  The Boards identify and rank in order of merit those employees recommended for immediate promotion, without regard to the number of promotion opportunities available.  Boards make their decisions based on the Decision Criteria for Tenure and Promotion in the FS (Core Precepts), to include the "Areas of Effectiveness" and Core Competencies, as reflected by the employee's effectiveness in policy leadership and program management, collaboration across functional lines and human resources development, and potential for continued success in these areas if assigned higher level responsibilities.

Board responsibilities at a glance:

- ➢ Base recommendations solely on objective, merit-based consideration of what is in the performance folder;
- ➢ Identify and recommend for promotion employees whose files demonstrate their potential to succeed at positions of greater responsibility;
- ➢ Rank in order of merit those employees that the Board recommends for promotion;
- ➢ Identify those whose performance merits low-ranking or direct referral to the Performance Standards Board;

2

Confidential - Subject to Protective Order          STATE00006042

## B. MAJOR RESPONSIBILITIES

1. Promotion

Promotion is recognition that an employee has demonstrated potential to successfully perform at the next highest level. In recommending an employee for promotion, Boards identify those, whose performance and potential as documented in the Official Performance Folder (OPF) and in accordance with the Core and Procedural Precepts, they deem qualified to be entrusted with the duties and responsibilities of the next higher level. A Board's recommendation for promotion is not a reward for prior service. Promotions will be granted according to the number authorized by the Director General (DG) and in the rank order established by the Boards.

Employees recommended for promotion should demonstrate a commitment to the performance objectives as the Department defines them in the Core Precepts and the three effectiveness criteria. Boards will review employees in direct competition with others of their skill code and grade.

If a Board recommends fewer employees for promotion than the number of promotion opportunities available, the Board may reconsider its findings and identify additional employees to be ranked. Boards must base such recommendations solely on the determination, in accordance with the Precepts and without regard to the number of promotion opportunities available, that each employee has demonstrated the potential to carry out successfully the responsibilities required at the next higher level.

An employee's positions or assignment pattern will not be the basis for determining their competitiveness for promotion, or whether to low-rank or refer an employee to the Performance Standards Board (PSB). Boards will look to the complexity of work, the employee's performance, and the strength of the examples provided according to the Core Precepts and the three effectiveness criteria, when determining promotability. Boards are reminded that employees should not be penalized for assignments out of their primary skill codes and that creditable performance in assignments out of an employee's primary skill code shall be considered positively – including long term training, details, interagency assignments, etc... An employee's knowledge and skills gained throughout-of-cone experience can be a great asset to the Department. For example, Deputy Chief of Mission (DCM), Principal Officer (PO), and many other senior positions require both exceptional in-cone and out-of-cone experience and knowledge. Regarding rater and/or reviewer recommendation for or against promotion, Boards are reminded that the authority to recommend an employee for promotion resides solely with the Selection Board.

The Department values both overseas and domestic assignments. The Boards should consider the complexity of the work as having equal weight regardless of whether the assignment is based domestically or overseas. Supervising U.S. Direct Hires (USDH) is not a mandatory criterion for promotion; thus, boards should not weigh the supervision of USDHs more heavily or more favorably than supervision of locally employed staff or third-country national employees. The supervision of all employment categories of direct reports (contractors, Civil Service, Foreign

3

Confidential - Subject to Protective Order          STATE00006043

Service, etc.) should be weighed equally. Boards should positively consider the successful acquisition and/or use of a foreign language, particularly across multiple assignments. Boards should weigh challenges and accomplishments across all assignments when making their recommendations and rankings.

2. Low-Ranking and Referral to a Performance Standards Board

Career employees reviewed for promotion shall also be reviewed for low-ranking and possible direct referral to a Performance Standards Board (PSB) for failing to meet the standards of performance drawn from the Core Precepts and the Three Effectiveness Criteria. Boards will additionally review for low-ranking and possible direct referral to a PSB the OPFs of employees who were eligible to apply for consideration for promotion, but who did not elect to do so. Boards will review the OPFs of employees whose maximum time in class (TIC) or time in service (TIS) is subject to the annuity exception per 3 FAM 6213.6 for low-ranking and possible direct referral to a PSB. These candidates will be reviewed by grade and, unless otherwise stated, primary skill code.

Low-ranking is an indication to the employee and the Department of problem areas or inadequacies in needed skills, performance, and/or potential. It shall not be based on secondary considerations, such as relatively recent promotion, type or pattern of assignments, including service in or out of a primary skill code, or less extensively documented successful performance. Employees should not be penalized for taking assignments out of their primary skill codes or for taking Leave Without Pay (LWOP). Inadequacies in needed skills that lead to low-ranking must be documented by examples of performance from the most recent five years. Boards must not rely solely on critical comments in a Developmental Area section unless those comments are supported by examples elsewhere in evaluations from the most recent five years in the OPF. Boards are reminded that the Developmental Area section is mandatory for all employees. Boards should not rely solely on an employee's Description of Accomplishments as a basis for low-ranking. Low-ranking statements and/or PSB direct referrals shall not be based solely on disciplinary letters. Selection Boards have no obligation to low-rank or refer to a PSB employees who have a disciplinary letter in their file. Boards may mid-rank such employees or even recommend them for promotion. A majority of Board members must concur in the low-ranking of an employee or direct referral of an employee to a PSB.

Demonstrated weakness in one or more of the following areas, by itself, may be grounds for a low-ranking or for direct referral to a PSB:

(1) Reluctance to accept responsibility;
(2) Failure to carry out properly assigned tasks within a reasonable time;
(3) Low productivity or work poorly done;
(4) Failure to adapt to the office environment or to a foreign culture;
(5) Refusal to accept or carry out legitimate directives from properly authorized officials;
(6) A pattern of failure to safeguard properly classified material and information. For employees at FS/FP-02 and above, see also Addendum 1;

4

Confidential - Subject to Protective Order                                          STATE00006044

(7) Inability to work effectively and cooperatively with supervisors, colleagues, teammates, or subordinates, including contributing to or failing to address intimidation, humiliation, belittlement, and similar bullying or otherwise toxic behaviors in the workplace;

(8) A lack of adherence to EEO principles or lack of sensitivity to the importance of diversity, equity, inclusion, and accessibility (DEIA) (see Addendum 2); and/or

(9) Indifference to or failure to carry out supervisory responsibilities.

If weaknesses in any one of these areas are cited in a low ranking or referral to a PSB, examples are required.

Boards will review the file of each low-ranked employee and identify those whose records indicate they may not have met the standards of performance for their class. These employees may be directly referred to a PSB, which will independently make selection-out recommendations after reviewing the performance folders of the employees referred to it. Boards should be scrupulous in identifying and directly referring to the PSB employees who are obviously substandard performers.

1) For each employee identified for direct referral to a PSB for substandard performance, the Board will prepare a statement to justify the referral. These statements must draw on material from more than one rating period and from more than one rating official and cite specific examples from the OPF of the most recent five years of active service. To assist the PSB in evaluating the employee's overall career record, Boards must fully describe the employee's weaknesses in performance that have resulted in direct referral to a PSB. Boards may reference or discuss positive examples of performance, as well, if these are available, to ensure fairness and balance.

2) For each employee low-ranked but not referred to a PSB, Boards will prepare an individual statement explaining the reasons for the low-ranking through a reasonable presentation of the employee's weaknesses and addressing areas in which performance or potential might be improved. These statements should draw on material from more than one rating period and from more than one rating official and must include specific examples of performance from the most recent five years. Boards may also identify employee strengths and positive accomplishments to the extent they determine appropriate.

Untenured Specialists may be low ranked by a Board; however, as they are not considered "career employees" until tenured, they will be removed from the list of those to be referred to a PSB. The DG may, in consultation with the Office of Career Development and Assignments (GTM/CDA), determine that for compelling compassionate reasons, an employee should not be certified to the PSB or given a copy of the Board's low-ranking statement. In this event, the employee will be considered as having been "non-rated" by the 2022 Boards and the Scorecard will be so annotated in accordance with these Precepts, but the employee will not be granted any additional period of TIC/TIS.

5

Confidential - Subject to Protective Order

Employees identified for low-ranking in the most recent Board who were also low-ranked in one or more of the past five years based on performance documented in an EER from a different rating official, will be administratively referred to a PSB. This referral requires no action by Boards.

## C.  ADDITIONAL AUTHORITIES AND RESPONSIBILITIES

1.  Limited Career Extensions

If the DG has determined the Department may grant a limited number of Limited Career Extensions (LCEs), the Director of GTM/PE will provide the Board the names of eligible career employees in the competition group who are in their last year of TIC or TIS. After completing their review for promotion, possible low-ranking, or direct referral to a PSB, the Board will review the records of employees eligible for LCEs. The DG may provide the Board additional information on specialized skills that the Under Secretary of Management has determined to be in short supply for the subsequent three-year period. The DG will grant LCEs only to employees the Board has found qualified and in the rank order established by the Board (3 FAM 6213.7).

In reviewing the OPFs of employees eligible for an LCE, the Board will apply the same criteria as for promotion. Recognizing that employees extended will serve only in their present class, the Board will give less weight to evidence of potential to perform at the next higher class and substantial weight to the quality of performance and potential for continued outstanding service in the class in which the employee is being considered for an LCE.

2.  Non-Rates

It is normal for FS careers and assignment patterns to result in periods undocumented in the OPF. This should not discount an employee's standing before the Board. If a Board determines that it cannot make a determination about a candidate ranking based on the content of the file, then the Board, with the concurrence of the Director of GTM/PE, may determine that the candidate's ranking cannot be adequately assessed based upon the documents reviewed and non-rate an employee. Boards will prepare a written explanation of each non-rate determination, with a copy to the non-rated employee. Pursuant to 3 FAM 6213.5, periods for which a Board has non-rated a member of the Service are not included in the calculation of TIC/TIS.

Boards are reminded that they have the option to, but are not required to, non-rate an employee when it is apparent that the employee is serving in a domestic position that is significantly below their grade and/or skill level. This type of assignment could indicate the employee may be constrained from demonstrating their full potential by issues that are beyond their control.

3.  Bidding Privileges

Employees recommended for promotion by the Senior Threshold and Intermediate Boards but not promoted because of limited promotion opportunities will be deemed qualified to bid at the

6

Confidential - Subject to Protective Order

next higher grade in the next assignment cycle at a rate of 10% of their competition pool and will have a statement indicating this added to their OPF.

4. Counseling Function

Boards have an important role to play in counseling employees. All employees under review, including those mid-ranked or recommended for promotion, or their raters and reviewers, may benefit from a Board's guidance and perspective. Boards may notice a small but noteworthy performance issue, poorly written evaluations, or the lack of an important skill that training could remedy. From its unique perspective viewing the broad range of a competition group, the Board may counsel any employee, their raters and reviewers, by issuing a counseling statement. This is a private communication between the Board and the employee, has no formal career consequences, and will not be placed in the OPF of the employee(s).

Commendation: Boards may identify raters and reviewers who merit commendation for the quality of evaluations they prepared in the most recent rating period. Boards may commend raters and reviewers who show diligence in measuring performance by seeking input from the staff and peers of the employee being rated. For each employee commended, the Board will prepare a written official statement of commendation that will be placed in the commended employee's OPF.

Boards also may identify rated employees who demonstrate superior leadership and mentoring skills during the most recent rating period, or accomplishment in fostering an environment of respect, diversity, equity, and inclusion, and accessibility. Boards may review the general leadership skills and qualities they should look for in Addendum 3 to these Precepts. For each employee commended, the Board will prepare an individual written official statement of commendation that will be placed in the commended employee's OPF.

Boards may prepare individual written counseling statements where raters, reviewers, or review panel chairs, in the opinion of the Board, have failed to properly execute their responsibilities, and recommend to GTM/PE that inappropriate or inadmissible comments from the most recent rating period be expunged. Such counseling statements will not be placed in the OPF of the responsible employee but will be shared with them to encourage adherence to performance management standards.

5. Board Recommendations

Boards will make recommendations to the Director General regarding the candidate pools under consideration, the materials used in the evaluation process, or improvements to the evaluation and Selection Board process. If a Board has no recommendations to make, it shall so state. Such recommendations will be made available to designated officials of AFSA as the Director General deems appropriate.

## D. BRIEFINGS, MATERIALS AND GENERAL GUIDANCE

7

SENSITIVE BUT UNCLASSIFIED

Confidential - Subject to Protective Order

1. GTM/PE will guide the Boards on the technical procedures to be followed. GTM/PE will provide Board members an oral briefing on voting and related procedures at the outset of Board deliberations. The Boards will address all queries regarding their work and the facilitation thereof only to GTM/PE staff.

2. At grades FS-02 and above, the security incident record and employee responses described in Addendum 1 to these Precepts will also be provided. No additional information about an employee will be provided. Board members will have available relevant reference materials, including the Core Precepts and the Procedural Precepts, Instructions for the Preparation of EERs, a copy of the Foreign Service Act of 1980, as amended, and the FAM.

3. Boards will base their decisions only on material that is properly a part of the employee's OPF and, at grades FS-02 and above, on the security incident record and employee responses described in Addendum 1 to these Precepts.

4. Boards have access to each employee's entire performance folder and should place the greatest emphasis on the **five most recent years of evaluative material** (to include training and details) or to the most recent promotion., whichever period is longer. They should not give undue weight to any single evaluation report in isolation from other reports covering the employee's last five years of evaluative material. Board members must not seek, receive, nor relate any information about an employee under review to or from other board members except that which is properly included in the OPF.

   a. The OPFs of some employees who entered the FS in classes above customary levels of entry or after prior service in another foreign affairs agency, or whose service was interrupted, may contain information from previous periods of government employment; other employees who have similar prior experience may have performance folders relatively lacking in evidence of extended past performance. Employees should not be disadvantaged because of such differences in their performance records or because information on earlier work experience may be lacking through no fault of the employee reviewed.

5. Boards should review evaluative material that covers periods within an employee's current career track. Previous employment, such as transfers within the Foreign Service that required the employee to reacquire tenure, Limited Non-Career Appointments, and employment in the Civil Service do not necessarily predict an employee's ability to perform at the next highest level within their current Generalist or Specialist track.

   a. Boards are advised that the Uniformed Services Employment and Reemployment Rights Act (USERRA) provides that employees called to military service are "entitled to the seniority and other rights and benefits determined by seniority that the person had on the date of the commencement of service in the uniformed services plus the additional seniority and rights and benefits that such person would have attained if the person had remained continuously employed" at the Department. Each Board member must take USERRA training, and the Board Advisor will certify to the

8

Director of GTM/PE that this training has been completed prior to the start of Board reviews. USERRA's implementing regulations require employees who are absent due to uniformed service be considered for promotion. Therefore, Boards are instructed to consider and weigh carefully military evaluation reports and award nominations provided by an employee covering the period of time when the employee was absent due to active military duty. Boards must also review carefully any statement submitted by an employee concerning the relevance of their military service to their work in the FS and to the Core Precepts. If there is no military evaluation, no negative or positive inference may be made on such non-documented periods.

b. A Gap Report is a document in an employee's OPF through which the Department recognizes and acknowledges a period of time for which there is no evaluative material. Whether a Gap Report is present or not, Boards should not discount an employee's overall standing in any way because of a period of performance not documented in the employee's OPF or make assumptions about the employee's career trajectory. No negative or positive inference may be made on such non-documented periods. Boards should not discuss or consider any information about the reasons for gaps in an employee's performance file.

c. Board members may be acquainted with employees under review. Board members must not reveal information about an employee or an employee's performance not properly included in the OPF.

d. Boards should disregard any disciplinary letters in an employee's OPF that should have been removed from the folder and should bring the existence of such letters promptly to the attention of the GTM/PE staff.

e. Boards are reminded that due to the prevailing worldwide security environment, Chiefs of Mission, Deputy Chiefs of Mission, and Principal Officers specifically are required to include Emergency Action Plan responsibilities in their Work Requirements and to ensure that those commitments are linked to the goals both of promoting good personal, information, and physical security measures on an organization-wide basis, and of leading crisis management for the entire organizational unit. Their EERs should reflect any relevant actions taken in accordance with those Work Requirements and Work Responsibilities during the rating period.

f. Employees may choose to write their EER narrative with the name in their OPF, their name of daily usage, or another term of identification (regardless of whether an employee has obtained a name change order). Boards must not make any inference based on this choice.

g. Employees may choose to write their EER narrative with the gender pronoun of their choice or a gender-neutral pronoun (regardless of any gender marker appearing in the

9

Confidential - Subject to Protective Order

employee's personnel records or their pronouns of daily usage). Boards must not make any inference based on this choice. Raters' and reviewers' narratives must use the same term of identification and pronoun as the employee does. No inference should be made if employee's previous/other evaluative material has differing terms of identification and/or pronouns.

6. Boards will establish the internal organization of their workload, deliberations, discussions, and decisions, as they deem appropriate and consistent with these Precepts and supplementary technical guidance.

7. Boards will practice and uphold EEO principles as they carry out their duties and should not consider an employee's personal characteristics, as outlined in 3 FAM 2815.1(b), when reviewing files or making promotion recommendations.

## E. RECUSAL

1. A Board member must recuse themself from the review of the file of any relative. A "relative" is a spouse or ex-spouse, domestic partner or ex-domestic partner as described in 3 FAM 1610, father, mother, son, daughter, brother, sister, uncle, aunt, first cousin, nephew, niece, father-in-law, mother-in-law, son-in-law, daughter-in-law, brother-in-law, sister-in-law, stepfather, stepmother, stepson, stepdaughter, stepbrother, stepsister, half-brother, or half-sister. A Board member who must recuse will inform GTM/PE of any such recusal.

2. A Board member may recuse themself from consideration of any employee's file, when a Board member believes that they may be unable to render a fair and unbiased judgement of an employee. Board members must inform GTM/PE promptly of any such recusal before the employee's file is discussed by the Board.

3. A Board member who was the rating or reviewing official of an employee under review while such employee has been in their present class will be recused from participating in the Board's consideration of that file if the employee being reviewed requests a recusal in writing in a timely manner. GTM/PE will notify the Board member of any such case and recuse them from consideration of the employee's file.

4. When an employee under review believes that a Board member may be unable to apply the Precepts fairly and without bias in assessing their performance and wishes to have that Board member recused, the employee under review must, in a timely manner, submit a recusal request to the Director of GTM/PE stating the reason they believe the Board member cannot render an unbiased judgment. This request must be in writing; an email will meet this requirement. In cases where it is necessary to evaluate the basis for recusal, requests may be shared with the Board member in question and/or other offices or individuals who may have knowledge relevant to the request. The Director of GTM/PE shall consider the request to determine whether the stated reason for the request would lead a reasonable person to conclude that the Board member would be unable to apply the Precepts fairly and without

10

Confidential - Subject to Protective Order   STATE00006050

bias in assessing the requester's performance file. The Director's decision to approve/disapprove the employee's request for a Board member's recusal is final. If the request is approved, GTM/PE will notify the Board member and the Board Member will be recused from consideration of the employee.

5. A Board member must recuse themself from participating in a Board's consideration of any employee who they are aware has previously named them as a responsible management official or witness in a complaint, including before the EEOC or the U.S. Office of Special Counsel.

6. Recusal requests under paragraphs three and five above must be submitted in writing in accordance with the procedures stipulated by ALDAC when the names of the Board members are published.

7. Recusals under paragraphs one through four above will be documented by a standard recusal statement with a copy provided to the recused Board member and the Board chair. Recusal statements will be filed with the Board report.

8. When a Board member is recused from considering the file of an employee under any of the provisions above, the Board member will continue to participate in the other activities of the Board.

9. A Board member is recused from participating in the Board's consideration of their own file and is not allowed to serve on a board for a rank for which they are competing.

## F. FINDINGS AND RECOMMENDATIONS

Each Board's findings will be forwarded to the Director General (DG) under cover of a transmittal letter signed by the Board members. The DG may return the Board's findings for reconsideration if there are questions regarding the procedures used by the Board or conformity with the Precepts. If the findings are not returned for one of these reasons, the DG shall accept the Board's findings. Each Board will prepare the following as part of its report, as applicable:

1. A rank-order list for each competition category of employees whom the Board recommends for promotion;

2. An alphabetical list of the employees low-ranked with a low-rank statement for each employee who was not referred to a PSB;

3. An alphabetical list of employees to be referred to a PSB with a statement explaining the reason for each direct referral;

4. Alphabetical lists of all other employees reviewed in each competition category (where appropriate);

11

Confidential - Subject to Protective Order                    STATE00006051

5. Separate rank-order lists for each competition group reviewed for LCEs of employees the Board finds qualified for LCEs;

6. An alphabetical list for each competition group of all other employees reviewed for LCEs;

7. A list of raters and reviewers who have demonstrated superior drafting of EERs during the most recent rating period along with the written letters of commendation the Boards prepared for each;

8. A list of raters and reviewers whose EER drafting warrants written counseling;

9. A list of employees who receive written counseling statements;

10. A list of employees who have demonstrated clear leadership and mentoring skills, or accomplishment in fostering an environment of respect, diversity, equity, inclusion, and accessibility during the most recent rating period, along with the written letters of commendation the Boards prepared for each;

11. Recommendations on the training, assignment, counseling, or related personnel matters for any employee or group of employees reviewed and/or recommendations concerning policies and procedures for subsequent Boards and improvements to the performance evaluation system, except that if a Board has no recommendation to make, it shall so state.

All Board members must concur in the final report to the DG. The contents of the Board's official report to the DG and the file scoresheets are the only official documents retained of the Board's deliberations.

### G. OATH OF OFFICE

Board members will heed and sign the following oath of office and adhere to the Precepts. A copy of each signed oath will be retained as part of the final Board report. The Oath may be performed virtually and the signature may be electronic. Board members should report to the Director of GTM/PE, any attempt to provide them information not authorized by the Precepts. Board members should report any attempts to solicit information from them, even if it is authorized by the Precepts. Failure to observe these instructions may result in disciplinary action or penalties as prescribed by the Privacy Act.

OATH

"I ,_____, do solemnly swear (or affirm) that I will perform the duties of a member of a Selection Board faithfully and to the best of my ability; that I will adhere to the Precepts; that I will apply the Precepts and promotion criteria without prejudice or partiality; that any introduction into board deliberations of non-record material will be reported to the director of the Office of Performance Evaluation, and that I will not reveal to unauthorized persons any

12

information concerning the personnel records used or the deliberations and recommendations of the Board ."

## PART II. ELIGIBILITY

### A. ELIGIBILITY FOR BOARD REVIEW

1. Senior Boards will consider employees serving under career or senior career candidate appointments in the classes of Minister-Counselor (FE-MC), Counselor (FE-OC), and FS-01.

2. Intermediate Generalist and Specialist Boards will consider career and candidate employees in classes FS-02 through FS-05, excluding generalists not yet recommended for tenure[1] and employees in classes and occupational categories subject to administrative promotion.

3. Employees who have been separated with reemployment rights and transferred under 5 CFR 352, including to the Multinational Force in the Sinai and employees who have been detailed to international organizations under this authority, as well as employees who are military reservists called to active duty, will be considered if otherwise eligible.

4. Employees will not be eligible for promotion during the period that their maximum time-in-TIC or TIS is subject to the annuity exception (3 FAM 6213.6). Boards will still review the OPFs of those employees for low-ranking and possible direct referral to a PSB.

5. Boards will review the OPFs of only the employees described above who have been assigned the tenure codes 01, 02, and 03.

6. Boards will not review the OPFs of the following categories of personnel:

    a. Employees not on career or career conditional appointments;

    b. Employees granted interim relief from separation during the grievance process;

    c. Employees whose effective date of separation has been postponed by the DG in the public interest, such as employees designated for separation by a PSB; whose controlling TIC has expired; who will turn age 65 prior to the effective date of promotions; or who already are on age waivers;

    d. Employees holding non-worldwide tenure or skill codes;

    e. Employees from other agencies;

    f. Employees on Leave Without Pay for more than eight months during the rating period, except for military reservists called for active duty;

---

[1] FS Generalist Career Candidates recommended for tenure by the Summer 2022 Commissioning and Tenure Board or previous will be eligible for review for promotion.

13

Confidential - Subject to Protective Order

g.  Employees serving on LCEs;

h.  Employees recalled to FS duty under Section 308 of the Foreign Service Act.

7.  Time-in-Grade

a.  Employees in the following grades will be eligible for promotion consideration by the 2022 Boards only if their last promotion took place before the following dates:

| | |
|---|---|
| FE-MC | July 1, 2018 (4 years) |
| FE-OC | July 1, 2020 (2 years) |
| FS-01, FS-02, FS-03 | July 1, 2020 (2 years) |
| FS-04*, FS-05 | July 1, 2021 (1 year) |

*Generalist Career Candidates recommended for tenure by the Spring and Summer 2022 Commissioning and Tenure Board or previous are eligible for review by the 2022 Boards.

b.  For employees who converted into the Senior Foreign Service (SFS) or to the FS Salary Schedule from non-FS pay plans (3 FAM 2210) or were reappointed to the FS after separation (3 FAM 2131), credit toward eligibility for promotion will be given for time spent in previous equivalent grades if the employee was converted or reappointed in the same or equivalent skill group.  The employee's official Date of Grade reflects the basis on which eligibility for review will be considered.

c.  Employees who have been approved by the DG for a change of skill code on or before May 16, 2022 will be reviewed, if eligible, by the Board appropriate for their new skill code.  Employees whose skill code change is approved by the DG after May 16 will be competed under the employee's skill code of record as of May 16.

d.  As provided in 13 FAM 300, as of April 7, 2021, employees in the following grades must complete the following leadership and management courses or their equivalents:

FS-03 employees, PT501 – Leading at State
FS-02 employees, PT601 – Leading with Influence
FS-01 employees, PT701 – Leading Strategically
FE-OC employees, PT801 – Leading at the Executive Level

For employees who have not completed the required leadership and management course (or its equivalent), Boards may recommend an employee for promotion conditioned upon subsequent completion of the appropriate course on or before June 1, 2023.  In such cases, the Board's action will not take effect until the employee completes the training.  The employee will notify GTM/PE that the requirement has been fulfilled, GTM/CDA and GTM/PE will validate those

14

SENSITIVE BUT UNCLASSIFIED

Confidential - Subject to Protective Order       STATE00006054

results, and GTM/PE will initiate action to promote the employee to the next higher grade effective the beginning of the first pay period following completion of training this promotion cycle, except in the case of recommendations for promotions into and within the SFS, which will be put forward to the White House on the next nomination list following validation of completion of training. If the employee does not satisfy the training requirement on or before June 1, 2023, the employee will re-compete for promotion in 2023, if otherwise eligible for consideration by the Boards.

8. Promotion into the Senior Foreign Service

Only the OPFs of eligible career employees in class FS-01 who formally applied for threshold review by February 18, 2022, and who have met the requirements for review, will be considered by the 2022 SFS-IV and SFS-V Boards. The OPFs of employees whose requests are received in GTM/PE after February 18, 2022 are not eligible to compete for promotion into the SFS this promotion cycle.

9. Promotion across the Office Management Specialist (OMS) Threshold

Only the performance folders of eligible career FS OMS employees in class FS-03 who applied to GTM/CDA for threshold review by May 6, 2022, and who have met the requirements for review, will be considered by the 2022 S-V Boards. The OPFs of FP-02 OMS will be reviewed for possible low-ranking or direct referral to a PSB. (see Part I.B.2. above.)

B. ELIGIBILITY FOR LIMITED CAREER EXTENSIONS

Section 607(b) of the FS Act authorizes the Secretary to grant LCEs, based on recommendations of Boards, to employees in their last year of TIC or TIS if they have attained the highest grade for their respective occupational category or, in the case of employees of the SFS, in designated salary classes. Only employees as described above whose controlling TIC will expire between July 1, 2022, and June 30, 32023, are eligible for consideration, if LCEs are available. The limited number of LCEs that may be granted will be determined by specific Service needs to retain expertise and experience that are in short supply and in accordance with 3 FAM 6213.7.

**PART III. ORGANIZATION OF THE BOARDS**

A. ORGANIZATION OVERVIEW

Foreign Service Selection Boards (FSSBs or Boards) are organized based on the grade and skill code of individual employees. Boards are subsequently identified as either Senior Boards, for those being promoted into and within the Senior Foreign Service, or as Intermediate Boards, for all other Foreign Service Employees.

While there are Boards that will review multiple skill codes/cones and grades of employees, all employees' competition groups are reviewed alongside their colleagues at the same grade and within the same skill code/cone. GTM/PE will evaluate and administratively reorganize the skill code/cone composition of the Boards on an annual basis to limit the number of candidates

15

Confidential - Subject to Protective Order

reviewed by a given board. GTM/PE has created the below breakdown of the length in which Boards are expected to meet, as well as when the office would consider splitting ~~the~~ a board to avoid undue pressure on the Board members and ensure board completion prior to the annual announcement of the promotion lists.

0 – 300 Candidates: 3 – 4 Weeks
300 – 450 Candidates: 5 Weeks
450 – 600 Candidates: 6 Weeks
600+ Candidates: Consider Board Reorganization

B. SENIOR BOARDS

Pursuant to the FS Act, the SFS is "characterized by strong policy formulation capabilities, outstanding executive leadership qualities and highly developed functional, foreign language, and area expertise." In considering employees for promotion within and into the SFS, Boards should give due credit to evidence of achievement and competency in these and other critical areas, such as public outreach based on policy objectives. Boards should give weight to evidence of competency and accomplishment in carrying out executive responsibilities in both the employee's primary skill code, outside of cone and collaboration with other cones, specialties, sections, bureaus, and agencies.

In reviewing employees for promotion within the SFS, Boards will note that some SFS employees have been commended for being among those recommended by the Department Senior Review Board (DSRB) for further consideration for a Presidential Rank Award. Boards should give equal weight to such commendations regardless of whether the commendation letter/memo was signed by the Deputy Secretary of State or included by Memorandum from the Director of GTM/PE.

The Generalist and Specialist Threshold Boards will review the OPFs of FS-01 employees with primary skill codes in the occupational categories under review who were eligible to apply for promotion consideration but did not apply, to identify those who should be low-ranked or referred to a PSB. No negative implication shall be drawn from the fact that an employee eligible to request promotion consideration chose not to do so.

1. Minister-Counselor Board (SFS-II)

SFS-II will review the OPFs of eligible employees (generalists and specialists) of the class of MC on a class-wide basis. The FS has a need for its most capable, competent, and inspiring senior leaders for the full range of its largest, most complex resource management, program, and policy challenges. The Board should seek to identify those few employees who demonstrate the exceptional qualifications warranting advancement to the class of CM. The Board should only recommend for promotion those employees who have demonstrated, through superior achievement in positions demanding broad leadership, program and resource management, policy direction, and public outreach, that the employee is fully qualified to fill the most senior

16

Confidential - Subject to Protective Order

and responsible positions.  In making its determinations, the Board should give particular weight to outstanding performance as Chief of Mission or in positions of comparable responsibility such as Deputy Assistant Secretary and other senior executive positions, as well as to the employee's ability to continue to perform at this level of responsibility.

2.  Counselor Board (SFS-III)

SFS-III will review the OPFs of eligible employees of the class of OC who have generalist primary skill codes as below.  Employees will be reviewed by grade and skill codes.

| Category | Skill Codes |
| --- | --- |
| Management | 2010 |
| Consular | 3001 |
| Public Diplomacy | 4400 |
| Economic | 5015 |
| Political | 5505 |

3.  Senior Specialist and Specialist Threshold Board (SFS-IV)

SFS-IV will review the OPFs of eligible employees in the class of OC who have primary skill codes in the following specialist skill codes.  The Board will also review the OPFs of eligible employees of class FP-01 who requested consideration for promotion into the SFS and met applicable requirements.

| Category | Skill Codes |
| --- | --- |
| Financial Management Officer | 2101 |
| Human Resources Officer | 2201 |
| General Services Officer | 2301 |
| Security Officer | 2501 |
| Security Engineering Officer | 2550 |
| Diplomatic Courier | 2580 |
| Information Technology Manager | 2884 |
| *Public Engagement | 4200 |
| English Language Programs | 4300 |
| Medical Officer | 6110 |
| *Medical Provider | 6115 |
| Psychiatrist | 6125 |
| Facilities Manager | 6217 |
| Construction Engineer | 6218 |

*Two skill code groups changed names.  Skill code 4200 changed from Information Resource to Regional Public Engagement in December 2016.  Skill code 6115 changed from Health Practitioner to Medical Provider in March 2015.

17

Confidential - Subject to Protective Order   STATE00006057

The Board will consider employees within each class (OC and FP-01) by skill code, except that Security Officers and Security Engineering Officers at the OC level will compete together for promotion. The Board will review by skill code, for low-ranking and possible direct referral to a PSB, the performance folders of FP-01 employees with primary skill codes under review who were eligible to apply for promotion consideration but did not.

4. Generalist Threshold Boards (Boards SFS-V)

Boards SFS-V (A and B) will review by skill code the OPFs of eligible employees of class FS-01 who requested consideration for promotion into the SFS and met applicable requirements. The Department continues to need employees with strong competency in their primary skill code as well as employees with broad experience and perspective, particularly across skill codes and cones who can lead and manage organizations across a wide array of functions.

Promotion across the threshold into the SFS represents a determination that the employee is capable of carrying out the demanding duties in senior-level positions of the FS. Some employees under review may not have demonstrated the potential to serve in the SFS and should more appropriately complete their careers at the FS-01 level. Others may simply need deeper or broader experience or additional competency development and should seek those experiences at the FS-02 or FS-01 level in order to be successful at crossing the threshold.

In 2022, the skill codes will be distributed among the Boards as follows:

SFS-V A       FS-01 Political (5505)/Public Diplomacy (4400)
SFS-V B       FS-01 Economic (5015)/Consular (3001)/Management (2010)

The Boards will review by skill code, for low-rank and possible direct referral to a PSB, the performance folders of FS-01 employees with primary skill codes under review who were eligible to apply for promotion consideration but did not.

C. INTERMEDIATE BOARDS

Intermediate Boards will review by skill code and grade the eligible employees in classes as described below, except in the case of Board G-IV as stipulated. Boards will evaluate employees in accordance with the Core Precepts and the Three Effectiveness criteria, with emphasis on demonstrated performance and potential in and outside the employee's primary skill code.

The Department values employees with strong competency in their primary skill codes as well as experience outside their skill codes. Service in out-of-cone assignments should be afforded the same weight as assignments in the employee's own primary skill code(s).

Promotion across the OMS threshold (03 to 02) represents a determination that the employee has taken on the demanding duties in high-level OMS positions. OMSs considered for promotion at

18

Confidential - Subject to Protective Order

the highest levels should demonstrate accomplishments across an array of assignments to broaden experience, deepen expertise, and amplify leadership and adaptive capacity.

1. Boards G-II and G-III

Boards G-II (A and B) and G-III (A and B) will review by skill code and grade the performance folders of eligible employees who have generalist primary skill codes. In 2022, the skill codes will be distributed among the Boards as follows.

| | |
|---|---|
| G-II A | FS-02 Management (2010)/Public Diplomacy (4400) |
| G-II B | FS-02 Economic (5015)/Consular (30013001) |
| G-II C | FS-02 Political Affairs (5505) |
| | |
| G-III A | FS-03 Political5505Management2010Political (5505)/Management (2010) |
| G-III B | FS-03 Economic (5015)/Public Diplomacy (4400) |
| G-III C | FS-03 Consular Affairs (3001) |

2. Boards G-IV

G-IV will review the performance folders of all eligible generalists in class FS-04, and Generalist Career Candidates recommended for tenure by the spring and summer 2022 Commissioning and Tenure Board (CTB) or previous CTBs.

| | |
|---|---|
| G-IV | FS-04 Generalists |

3. Board S-I

Board S-I will review by skill code and grade the eligible employees in classes FP-04 through FP-02 as described below.

| Category | Skill Code |
|---|---|
| Financial Management Officer | 2101 |
| Human Resources Officer | 2201 |
| General Services Officer | 2301 |
| Public Engagement | 4200 |
| English Language Programs | 4300 |
| Medical Provider | 6115 |
| *Medical Laboratory Scientist | 6145 |
| Facilities Manager | 6217 |
| Construction Engineer | 6218 |

*Skill code 6145 has changed from Medical Technologist to Medical Laboratory Scientist in 2017.

SENSITIVE BUT UNCLASSIFIED

Confidential - Subject to Protective Order   STATE00006059

4. Boards S-II

Boards S-II (A, B and C) will review eligible Security Officers (2501) by grade as described below. The S-II Boards should ensure that no employee is disadvantaged because of the lack of an assignment abroad, given that a preponderance of the positions in the Security Officer category are located in the United States. FP-03 Security Officers candidates reviewed by the S-II B Boards will be evenly divided between the two boards.

| | |
|---|---|
| S-II A Security Officer (2501) | FP-02 |
| S-II B/1 Security Officer (2501) | FP-03 |
| S-II B/2 Security Officer (2501) | FP-03 |
| S-II C Security Officer (2501) | FP-04 |

5. Board S-III

Board S-III will review by skill code and grade the eligible employees in classes FP-04 through FP-02 as described below.

| Category | Skill Code |
|---|---|
| Security Engineering Officer | 2550 |
| Security Technician | 2560 |
| Diplomatic Courier | 2580 |

6. Boards S-IV

Boards S-IV (A and B) will review by skill code and grade eligible employees as described below.

| S-IVA | |
|---|---|
| Information Technology Manager (2884) | FP-02 |
| Information Management Specialist (2880) | FP-03 |
| Information Management Technical Specialist (2882) | FP-03 |

| S-IVB | |
|---|---|
| Information Technology Specialist (2880) | FP-04 |
| Information Management Technical Specialist (2882) | FP-04 |

The S-IV Boards should be aware that at the FP-02 level, former Information Management Specialists (2880) and Information Management Technical Specialists (2882) compete for promotion as Information Technology Managers with the 2884 skill code. In considering FP-03s for promotion, the S-IVA Board should consider whether employees in skill codes 2880 and 2882 have gained leadership, management, and supervisory experience by serving in 2880 or 2882 management positions.

20

Confidential - Subject to Protective Order

STATE00006060

The Boards should evaluate employees in skill code 2880 placing emphasis on those employees who have shown initiative, to the extent opportunities exist, in acquiring (through formal or informal means) skills in the broad-based Information Management Specialist (IMS) category. The Boards shall place priority consideration on those employees who have demonstrated skills, performance, and potential in multiple disciplines (the former computer systems and telecommunications skills of the 2880 group).

The Boards shall give particular credit to those employees in the 2882 category who have shown initiative, to the extent opportunities exist, in acquiring (through formal or informal means) skills in the areas of computer systems, telecommunication, radio, telephone, and software operating systems to meet the changing information technology needs of the Department.

7. Board S-V

Board S-V will review eligible OMSs (9017) by grade as described below.

      Office Management Specialist (9017)       FP-02 through 05

Board S-V will review FP-05, FP-04 OMS and eligible FP-03 OMS who have elected to compete for promotion to FP-02. OMS at FP-03, who have not elected to compete for promotion to FP-02, will be reviewed for possible low-ranking or direct referral to a PSB.

Board S-V is reminded that the growth of office automation, diminishing resources, and the changing face of workplace technologies have led to a more multifaceted role for OMSs and to expanding duties in office and knowledge management. These duties include substantive tasks related to the work of the office and can involve use of foreign languages. The Department views the FS OMS as an employee who has the potential to perform a variety of functions. These include staff assistant assignments, domestic human resources assignments, managing information and public affairs responsibilities, among others. OMSs should be evaluated against the Core Precepts, regardless of the nature of the position they hold.

The Boards must not disadvantage any OMS who appears interested in or prepared to move to another career field or who has served a substantial part of their duties in non-traditional OMS functions. The Boards shall give full credit to the performance of OMSs in jobs involving non-traditional duties. They shall also give full credit to those filling executive OMS positions.

21

Confidential - Subject to Protective Order

ADDENDUM 1 TO THE 2022 PROCEDURAL PRECEPTS

## SECURITY AWARENESS

Security is an inherent, inextricable, and indispensable component of all employee positions at the Department of State, but especially in our most senior positions. Employees competing for selection to senior positions are expected to be leaders in security awareness. Selection Boards have at their disposal information regarding an employee's security record, including the security incident history report. Employees who have an egregious security record over the recent past are traditionally not competitive for senior positions.

Every employee's work responsibilities include a statement about the proper management of classified material and information. Where an employee has demonstrated a pattern of failure with respect to safeguarding classified material and information, this will be reflected in the evaluation report. Failure to safeguard classified material and information is one of the areas of weakness that may be grounds for a Selection Board's decision to low rank an employee.

Boards will be given the security incident record for the five years prior to May 1, 2022, for each employee competing for promotion to FS-01 and above. Employees may request a copy of their security incident record from the Bureau of Diplomatic Security and may submit to GTM/PE by June 1, 2022, a response regarding their security incident record for consideration by the appropriate Selection Board.

Selection Boards will use the security incident reports, and any response from employees regarding their own security incident reports, in conjunction with the material in the performance folders to determine the competitiveness of those employees for promotions, performance pay, and Presidential awards. Security incident reports also may be considered by Selection Boards for other decisions, such as low-ranking.

Core Work Responsibilities on security are:

Entry level: Practices security awareness; reports and/or addresses possible safety hazards and/or unsafe practices; follows security directives, regulations and policies; safeguards classified information, material, and equipment.

Mid-level: Ensures active risk management through monitoring the security environment concurrent to the scope of official duties and responsibilities; follows security directives, regulations and policies; safeguards classified information, material, and equipment.

Senior level: Ensures active management by staff within the scope of their duties and responsibilities, including promoting security consciousness and implementing and/or following directives, regulations, and policies; safeguards classified information, material, and equipment.

SENSITIVE BUT UNCLASSIFIED

Confidential - Subject to Protective Order

ADDENDUM 2 TO THE 2022 PROCEDURAL PRECEPTS

## EQUAL EMPLOYMENT OPPORTUNITY PRINCIPLES

Employees of and applicants for employment with the Department of State (DOS) are protected from discrimination on the following bases under Federal law and/or Executive Order:

- RACE, COLOR, RELIGION, SEX (including pregnancy, sexual orientation, and gender identity), NATIONAL ORIGIN
- DISABILITY
- AGE
- GENETIC INFORMATION
- POLITICAL AFFILIATION
- RETALIATION FOR ENGAGING IN A PROTECTED ACTIVITY

As a matter of Department policy, all non-discrimination principles apply to Locally Employed Staff.

Harassment is a form of employment discrimination that violates federal law. Harassment is unwelcome conduct that is based on any of the protected bases that is so severe/pervasive it alters working conditions and either creates a hostile work environment or results in a tangible employment action.

Discrimination, including sexual harassment (3 FAM 1525) and discriminatory harassment (3 FAM 1526), will not be tolerated within the Department.

23

Confidential - Subject to Protective Order

ADDENDUM 3 TO THE 2022 PROCEDURAL PRECEPTS

## LEADERSHIP AND MANAGEMENT PRINCIPLES (3 FAM 1214)

1. **Model Integrity** – Hold yourself and others to the highest standards of conduct, performance, and ethics, especially when faced with difficult situations. Act in the interest of and protect the welfare of your team and organization. Generously share credit for the accomplishments of the organization. Take responsibility for yourself, your resources, your decisions, and your action;

2. **Plan Strategically** – Develop and promote attainable, shared short and long term goals with stakeholders for your project, program, team, or organization. Provide a clear focus, establish expectations, give direction, and monitor results. Seek consensus and unified effort by anticipating, preventing, and discouraging counter-productive confrontation;

3. **Be Decisive and Take Responsibility** – Provide clear and concise guidance, training, and support, and make effective use of resources. Grant employees ownership over their work. Take responsibility when mistakes are made and treat them as an opportunity to learn. Formally and informally recognize high quality performance;

4. **Communicate** – Express yourself clearly and effectively. Be approachable and listen actively. Offer and solicit constructive feedback from others. Be cognizant of the morale and attitude of your team. Anticipate varying points of view by soliciting input;

5. **Learn and Innovate Constantly** – Strive for personal and professional improvement. Display humility by acknowledging shortcomings and working to improve your own skills and substantive knowledge. Foster an environment where fresh perspectives are encouraged and new ideas thrive. Promote a culture of creativity and exploration;

6. **Be Self-Aware** – Be open, sensitive to others, and value diversity. Be attuned to the overall attitude and morale of the team and be proactive about understanding and soliciting varying points of view;

7. **Collaborate** – Establish constructive working relationships with all mission elements to further goals. Share best practices, quality procedures, and innovative ideas to eliminate redundancies and reduce costs. Create a sense of pride and mutual support through openness;

8. **Value and Develop People** – Empower others by encouraging personal and professional development through mentoring, coaching and other opportunities. Commit to developing the next generation. Cultivate talent to maximize strengths and mitigate mission-critical weaknesses;

24

Confidential - Subject to Protective Order

9. **Manage Conflict** - Encourage an atmosphere of open dialogue and trust. Embrace healthy competition and ideas. Anticipate, prevent, and discourage counterproductive confrontation. Follow courageously by dissenting respectfully when appropriate; and

10. **Foster Resilience** – Embrace new challenges and learn from them. Persist in the face of adversity. Take calculated risks, manage pressure, be flexible and acknowledge failures. Show empathy, strength, and encouragement to others in difficult times.

SENSITIVE BUT UNCLASSIFIED

Confidential - Subject to Protective Order

STATE00006065

ADDENDUM 4 TO THE 2022 PROCEDURAL PRECEPTS

**Requirements for Promotion to FP-02 for Office Management Specialist**

Starting in the 2022 promotion cycle, all Office Management Specialists seeking promotion to the FP-02 level must meet all the following PDP requirements:

- OPERATIONAL EFFECTIVENESS: All OMS must have 15 years of experience and meet two of the three remaining requirements;

- LEADERSHIP AND MANAGEMENT EFFECTIVENESS: Employees may compete for promotion without completing the required class PT501 Leading at State. Recommendations for promotion will be held in abeyance until the required course is completed. Employees must complete the class by June 1 of the following year for any promotion to be effective.

- PROFESSIONAL AND TECHNICAL PROFICIENCY: Successfully complete a minimum of two professional development training courses;

- SERVICE NEEDS: Applicant needs only to meet the service need component of the original PDP which is "service at a 15 percent or greater hardship and/or danger pay differential post (one tour, after tour, or two directed entry-level tours).

OPERATIONAL EFFECTIVENESS. Mandatory Requirements:

1) Be at grade FP-03;
2) Have a minimum of 15 years in the Foreign Service; and
2) A completed tour in an executive office as the OMS to a Chief of Mission, Deputy Chief of Mission, Under Secretary, Assistant Secretary, Principal Deputy Assistant Secretary, Deputy Assistant Secretary, or their equivalents; and
3) A completed tour in Washington, D.C; and
4) One of the following:
- Completed tour in a Functional Bureau (including, but not limited to, GTM, IRM, INL, EB, ECA, OES, FSI, OBO, INL); or
- A completed tour in the Executive Secretariat or the Operations Center; or
- One completed tour in a non-traditional or out-of-skill-code assignment that demonstrates cross functional experience (including, but not limited to, excursion tours, non-OMS positions at the Foreign Service Institute, service as a Career Development Officer, or service in a position with a skill code other than 9017)

26

SENSITIVE BUT UNCLASSIFIED

Confidential - Subject to Protective Order

LEADERSHIP AND MANAGEMENT EFFECTIVENESS.  Mandatory Requirements:

1) One year of demonstrated leadership service (including but not limited to EEO Counselor, EER Review Panel member, post housing board member, post employee association board member, overseas school board member, or other overseas community board member); and
2) One year of supervisory responsibility documented in the Work Requirements Statement (WRS) and the employee's Employee Evaluation Report (EER), demonstrating effective supervision of one or more employees. Such assignments could include positions that assign work, develop and set priorities, counsel employees and evaluate performance, resolve disputes, recommend or implement minor disciplinary measures, and interview and recommend candidates for positions within the executive office; and
3) Completion of FSI leadership training courses Fundamentals of Supervision (PT230) and EEO Diversity and Awareness (PT107); and
4) In accordance with the Procedural Precepts, FP-03s must complete Basic Leadership Skills (PK245) before eligibility to compete for promotion to FP-02.

PROFESSIONAL AND TECHNICAL PROFICIENCY.  Mandatory Requirements:

Successfully complete a minimum of three professional development training courses in addition to all other mandatory course requirements above and training received upon entry into the Foreign Service. The following meet the training requirements:
A. FSI sponsored coursework delivered in a classroom
B. Coursework pursued at recognized/accredited organizations.
C. Language training of a minimum of 240 hours meets this requirement (to include post language training or a combination of a FAST Course followed by post language training).

Applicants must include documentation of any training not administered by FSI and/or reflected on their Employee Profile.

SERVICE NEEDS.  Mandatory Requirements:
1) Completed tour at a 25 percent or greater (hardship and/or danger pay) differential post from entry into the FS; OR a completed tour at a SIP from entry into the FS; and
2) Completed tour at a 20 percent or greater (hardship and/or danger pay) differential post after tenure in the FS.

27

Confidential - Subject to Protective Order

ADDENDUM 5 TO THE 2022 PROCEDURAL PRECEPTS

**Requirements for Promotion into the Senior Foreign Service**

- All employees seeking to cross the senior threshold in the 2022 promotion cycle must meet the requirements listed here.  All those eligible for promotion across the senior threshold in 2022 must self-certify that they meet the relevant requirements.

- All employees promoted to FS-01 in 2005 or before must serve at least one full tour after tenure at a post with a differential of five percent or greater before consideration for promotion into the SFS.  Regional Medical Officers are exempt.

- All employees promoted to FS-01 in 2006 or after must serve at least one full tour after tenure at a post with a differential of 15 percent or greater before consideration for promotion into the SFS. Regional Medical Officers are exempt.

- All employees must complete required leadership and management training as stated in Part II.A.7.d.

- Generalists must have demonstrated language proficiency at the 3/3 level or above as indicated by an FSI-approved test.  Those subject to the requirements of the CDP should carefully review Addendum 5 as well.  Language proficiency under the CDP generally requires a test of 3/3 within seven years of requesting to compete for promotion into the SFS.  There currently is no minimum language proficiency requirement for specialists.  Those who are subject to the requirements of the PDP should review Addendum 6.  Language proficiency under the PDP generally requires a test of 3/3 level (or at the 3/2 level for a hard or super hard language) tested after tenure, or one language at the 4/4 level (tested either before or after tenure).

- All Recruitment Language Program service commitments must be satisfied before employees can compete for promotion into the SFS.

SENSITIVE BUT UNCLASSIFIED

Confidential - Subject to Protective Order

STATE00006068

# PX-034

PROCEDURAL PRECEPTS FOR THE 2021 FOREIGN SERVICE
PERFORMANCE PAY AND DEPARTMENT SENIOR REVIEW BOARDS
TABLE OF CONTENTS

PART I – PURPOSE AND PROCEDURES
    A. OVERVIEW
    B. MAJOR RESPONSIBILITIES FOR THE PERFORMANCE PAY BOARDS AND
       THE DEPARTMENT SENIOR REVIEW BOARD
    C. RECUSAL
    D. FINDINGS AND RECOMMENDATIONS OF THE BOARDS
    E. OATH OF OFFICE

PART II – ELIGIBILITY FOR PERFORMANCE PAY AND PRESIDENTIAL AWARDS
CONSIDERATION

PART III – ORGANIZATION OF THE BOARDS
    A. PERFORMANCE PAY BOARDS
    B. DEPARTMENT SENIOR REVIEW BOARD

Addenda
    1 - Security Awareness
    2 - Equal Employment Opportunity Principles
    3 - The Department's Leadership and Management Principles

Confidential - Subject to Protective Order

STATE00005433

PROCEDURAL PRECEPTS FOR THE 2021 FOREIGN SERVICE
PERFORMANCE PAY AND DEPARTMENT SENIOR REVIEW BOARDS

| Equality of Consideration |
|---|
| All employees will be compared and judged solely on merit with absolute fairness and justice. In particular, no employee will be discriminated against, directly or indirectly, for reasons of race, color, religion, sex (including pregnancy and gender identity), national origin, disability, age, sexual orientation, genetic information, retaliation, or means of entry into the Service. |

**PART I - PURPOSE AND PROCEDURES**

These Precepts establish the scope, organization, and responsibilities of the Foreign Service (FS) Performance Pay Boards (PPB) and the Department Senior Review Board (DSRB) (collectively, "the Boards") and describe the criteria used by the Boards in making their recommendations. These Precepts are negotiated annually with the American Foreign Service Association (AFSA). To the extent that the language of the Precepts varies from that in the Foreign Affairs Manual (FAM) or Foreign Affairs Handbook (FAH), the language in these Precepts shall be governing.

A. OVERVIEW

The PPBs will review the appropriate evaluative content (as specified below) in the performance file of the electronic Official Personnel Folders (eOPF) of eligible employees to recommend and rank order them for Performance Pay cash awards.

The DSRB will review the appropriate evaluative content (as specified below) of the eOPF of eligible employees to recommend and rank order eligible employees for further consideration by an Inter-Agency Selection Board (IASB) for Presidential Rank Awards (PRAs).

B. MAJOR RESPONSIBILITIES FOR THE PERFORMANCE PAY AND DEPARTMENT SENIOR REVIEW BOARDS

1. GTM/PE staff will guide the Boards on the technical procedures to be followed; GTM/PE will provide Board members with an oral briefing on voting and related procedures at the outset of Board deliberations. The Boards will address all queries regarding their work only to GTM/PE staff.

2. No information will be provided about an employee under review except that which is part of the performance file of the eOPF, the security incident record, and employee responses described in Addendum 1 to these Precepts. In addition, Board members will have available relevant reference materials, including the Core Precepts and these Precepts, Instructions for the Preparation of EERs, a copy of the Foreign Service Act of 1980, as amended, and 3 FAM 2870.

Confidential - Subject to Protective Order

3

3. Board members should keep in mind that discrepancies in position titles and other technical areas, including words dropped as a result of technical parameters or scanning or elements (e.g., work requirements statements) displayed in an abbreviated form, as a result of ePerformance or eForms applications must not be allowed to influence the evaluation of employees under review. Board decisions should be based on the content of an employee's performance as documented in the performance file of the eOPF. Similarly, Board members should always remember that the official source of evaluative information to be weighed by the Board is in the performance file of the eOPF.

4. Boards will base their recommendations only on material that is properly part of the member's performance file of the eOPF, on the security incident record, and employee responses as described in Addendum 1 to these Precepts. The PPBs will base recommendations for Performance Pay on material in the eOPF from the most recent annual rating period. The DSRB will base recommendations for PRAs on material in the eOPF from the three most recent annual rating periods while in SFS classes or their equivalent, as of the end of the last annual rating period.

a. Boards are advised that the Uniformed Services Employment and Reemployment Rights Act (USERRA) provides that employees called to military service are, "entitled to the seniority and other rights and benefits determined by seniority that the person had on the date of the commencement of service in the uniformed services plus the additional seniority and rights and benefits that such person would have attained if the person had remained continuously employed," at the Department. Boards are instructed to consider and weigh carefully an employee's military service, including military evaluation reports and award nominations, included in the employee's eOPF, if those reports and award nominations cover the rating period(s) under consideration by the Board. Boards must also review carefully any statement submitted by an employee concerning the relevance of his or her military service (during the rating period under consideration by the Board) to his or her FS work and to these Precepts and/or Performance Pay criteria. No negative or positive inference can be made from any lack of military evaluation reports or award nominations for a period of active military duty during the rating period under consideration by the Board.

b. Boards may not discount an employee's overall standing in any way because of a period of performance not rated by an evaluation report. No negative or positive inference can be made from such non-documented periods, or any Gap Memo covering those periods.

c. Board members may be acquainted with employees under review. Board members will not reveal information about an employee or an employee's performance not included in the official performance folder.

d. Boards shall disregard any disciplinary letters and/or response to a disciplinary letter in an employee's performance folder that, by their terms, should have been removed from the folder prior to its review, and should bring the existence of such letters promptly to the attention of the GTM/PE staff.

5. Boards will establish the internal organization of their workload, deliberations, discussions, and decisions, as they deem appropriate and consistent with these Precepts and relevant supplementary technical guidance.

## C. RECUSAL

1. A Board member must recuse him/herself from the review of the file of any relative. A "relative" is a spouse or ex-spouse (including, a domestic partner as described in 3 FAM 1612), father, mother, son, daughter, brother, sister, uncle, aunt, first cousin, nephew, niece, father-in-law, mother-in-law, son-in-law, daughter-in-law, brother-in-law, sister-in-law, stepfather, stepmother, stepson, stepdaughter, stepbrother, stepsister, half-brother, or half-sister. A Board member who must recuse on this basis will inform GTM/PE of any such recusal.

2. A Board member may recuse him/herself from consideration of any employee's file when a Board member believes that s/he may be unable to render a fair and unbiased judgment of an employee's file. Board members must inform GTM/PE promptly of any such recusal before the employee's file is discussed by the Board.

3. A Board member who was the rating or reviewing official of an employee under review while such employee has been in his/her present class will be recused from participating in the Board's consideration of that file if the employee being reviewed requests such a recusal in writing in a timely manner. GTM/PE will notify the Board member of any such case and recuse him/her from consideration of the employee's file.

4. When an employee under review believes that a Board member may be unable to apply the Precepts fairly and without bias in assessing his/her performance and wishes to have that Board member recused, the employee under review must submit a recusal request in a timely manner to the Director of GTM/PE stating the reason s/he believes the Board member cannot render an unbiased judgment. This request must be in writing; an email will meet this requirement. In cases where it is necessary to evaluate the basis for recusal, requests may be shared with the Board member in question and/or other offices or individuals who may have knowledge relevant to the request. The Director of GTM/PE shall consider the request to determine whether the stated reason for the request would lead a reasonable person to conclude that the Board member would be unable to apply the Precepts fairly and without bias in assessing the requester's performance file. The Director's decision to approve/disapprove the employee's request for a Board member's recusal is final. If the request is approved, GTM/PE will notify the Board member and the Board Member will be recused from consideration of the employee.

5. Recusal requests under paragraphs three and four above must be submitted in writing in accordance with the procedures stipulated by ALDAC when the names of the Board members are published. Recusal requests must be submitted by the date designated in the ALDAC.

6. A Board member is recused from participating in a Board's consideration of his/her own file. A recusal statement is not required for this action.

Confidential - Subject to Protective Order

7. Recusals under paragraphs one through four above will be documented by a recusal statement with a copy provided to the recused Board member and the Board Chair. Recusal statements will be filed with the Board report.

8. When a Board member is recused from considering the file of an employee under any of the provisions above, the Board member will continue to participate in the other activities of the Board.

## D. FINDINGS AND RECOMMENDATIONS OF THE BOARDS

Each Board's findings and recommendations will be forwarded to the DG under cover of a transmittal letter signed by the Board members. The DG may return the Board's findings or recommendations for reconsideration if there are questions regarding the procedures used by the Board or conformity with the Precepts. If the findings and recommendations are not returned for one of these reasons, the DG shall accept the Board's findings and recommendations. Each Board will prepare a report with the following:

    a.  A rank order list of the employees the Board recommends for Performance Pay or for consideration by the IASB for a PRA, as applicable.
    b.  Alphabetical lists of the other employees reviewed.
    c.  The DSRB will prepare a statement of justification of no more than two pages in length for each SFS employee recommended for a PRA in accordance with 3 FAH-1 H-2872.3.
    d.  Recommendations concerning policies and procedures for subsequent Boards and improvements to the performance evaluation system, except that if a Board has no recommendation to make, it shall so state.

## E. OATH OF OFFICE

Board members will heed and sign the following oath of office and adhere to the Precepts. A copy of each signed oath will be retained as part of the final Board report. Board members should report to the Director of GTM/PE any attempt to provide them information not authorized by the Precepts. Failure to observe these instructions may result in disciplinary action or penalties as prescribed by the Privacy Act.

## OATH

"I, _____ , do solemnly swear (or affirm) that I will perform the duties of a member of a Performance Pay Board or Department Senior Review Board faithfully and to the best of my ability; that I will adhere to the Precepts; that I will apply the Precepts and Performance Pay criteria without prejudice or partiality; that any introduction into Board deliberations of non-record material will be reported to the Director of the Office of Performance Evaluation, and that I will not reveal to unauthorized persons any information concerning the personnel records used or the deliberations and recommendations of the Board (so help me God)."

Confidential - Subject to Protective Order

## PART II - ELIGIBILITY

### A. ELIGIBILITY FOR CONSIDERATION FOR PERFORMANCE PAY AND PRESIDENTIAL RANK AWARDS

1. The PPBs will consider for Performance Pay the performance folders of all eligible Career Ambassadors (FE-CA), Career Ministers (FE-CM), Minister-Counselors (FE-MC), and Counselors (FE-OC), as well as all State Department career Civil Service employees serving on limited non-career appointments in the SFS as of the end of the rating period on April 15, 2021. Pursuant to 3 FAM 2872.2, members of the Senior Foreign Service who wish to compete for 2021 Performance Pay, the 2021 Presidential Rank Awards, and remain eligible for any 2021 Senior Salary Adjustment that may be implemented, should have been evaluated on the Employee Evaluation Report (EER) Form, or with other evaluative material as otherwise prescribed in applicable regulations and procedures during the most recently-concluded rating period. While it is preferable that employees be rated for a period of at least 120 days, evaluations for a period of service less than 120 days during the annual rating period are acceptable.

2. The same eligibility requirements apply to those employees eligible for consideration for Presidential Rank Awards by the DSRB, except that a minimum of three years of service in the SFS is required as of the end of the rating period on April 15, 2021.

3. Career members of the SFS whose time in class has expired but who continue to serve under career appointments under Foreign Service Act section 607(d), or who have reached mandatory retirement age but whose service has been extended under section 812(b) of the Foreign Service Act, will be considered for Performance Pay and a Presidential Rank Award until the final rating cycle during the period of extension of their appointments (provided the employee has elected to retain the salary and benefits of his/her SFS class and works in a current assignment or in an assignment specified by GTM/CDA as of the end of the rating period on April 15, 2021).

4. An employee whose effective date of separation has been postponed due to service in a Presidential Appointment requiring Senate confirmation will be reviewed for Performance Pay and a Presidential Rank Award, if otherwise eligible.

5. Employees who have been separated with reemployment rights and transferred to the Multinational Force in the Sinai, employees who are military reservists called to active duty, and employees who have been detailed (as defined in 3 FAH-1 H-2421) to international or other organizations will be considered if otherwise eligible.

6. Boards will review the performance folders of only the SFS members described above who have been assigned the following tenure codes: 01, 02, 03, 04 and 05.

7. Boards will not review the performance folders of the following categories of personnel:

Confidential - Subject to Protective Order

a.  SFS employees not serving on career or career conditional appointments;
b.  SFS employees who have been granted interim relief from separation during the grievance process;
c.  SFS employees designated for separation by a Performance Standards Board (PSB);
d.  SFS employees holding non-worldwide tenure or skill codes;
e.  Part-time, Intermittent, or Temporary employees;
f.  SFS employees from other agencies;
g.  SFS employees on Leave Without Pay for more than eight months during the rating period, except for military reservists called for active duty;
h.  SFS employees recalled to FS duty under Section 308 of the Foreign Service Act;
i.  SFS employees who have been separated with reemployment rights and transferred (as defined in 3 FAH-1, H-2421), except in the case of employees who have been separated with reemployment rights and transferred to the Multinational Force in the Sinai.

## PART III - ORGANIZATION OF THE BOARDS

### A. PERFORMANCE PAY

The PPBs, one for generalists and one for specialists, will consider for Performance Pay awards the performance file of the eOPFs of all eligible employees serving in the classes (or equivalent grades) of FE-CA, FE-CM, FE-MC, and FE-OC. The PPB for generalists considers all SFS generalists together for Performance Pay awards as a group regardless of class. The PPB for specialists considers all SFS specialists together for Performance Pay as a group regardless of class. PPBs may recommend up to 60 percent of all eligible employees for further review for Performance Pay awards and will prepare a rank-order list of those recommended. The Under Secretary for Management will determine the number and amounts of Performance Pay cash awards authorized.

The PPBs will rank order eligible SFS employees on the basis of their performance in the most recent rating period only. The PPBs shall consider the degree of challenge and accomplishments across the full range of SFS responsibilities, whether in or beyond the primary skill code.
In addition to the Core Precepts, the PPBs shall consider and apply the following four criteria in making their respective rank order determinations.

1.  Significant and substantial contributions to and advancement of U.S. Government or Departmental/Mission policy goals and to the framework for implementing those goals – political, defense/security, shared prosperity, human security, rule of law, advocacy and public diplomacy.
2.  Leadership: strategic thinking and execution; modeling integrity, loyalty, respect and service; fostering the next generation and strengthening the institution; forging interagency linkages and collaboration; confronting emerging and transnational challenges and opportunities across the full range of Department interests.
3.  Management: effective and innovative direction and stewardship of programs, resources, and human resources; getting results in systems, processes, outcomes; safeguarding people, facilities, information, and material; leading and supporting operations at domestic offices and overseas posts and in cooperation with the interagency.

4. People: establishing and running a diverse, productive, collaborative, high performance work environment that respects and inspires employees, engaging in effective communication that influences internal and external audiences, including messaging to and influencing of stakeholders and communities of interest.

Note: The PPBs shall consider negatively deficiencies, shortcomings, or weaknesses in security/risk management, performance evaluation/management, and commitment to the Department's status as a model employer.

B. PRESIDENTIAL RANK AWARDS

For Presidential Rank Award recommendations, the DSRB reviews performance files of eligible employees separate and apart from the PPBs. The DSRB review will encompass performance ratings from the last three annual rating periods, while the employee was in the SFS or equivalent grades. The DSRB may recommend up to 15 percent of eligible SFS employees for consideration for Presidential Rank Awards by the IASB. The DSRB will prepare a rank-order list of those recommended.

Not more than 6 percent of the members of the Senior Foreign Service may receive performance pay in any fiscal year in an amount which exceeds the percentage limitation specified in Section 494(b((2) of the Foreign Service Act of 1980 (as amended). Payments under this paragraph to a member of the Senior Foreign Service may not exceed, in any fiscal year, the percentage of basic pay established under section 4507(e)(1) of title 5 for a Meritorious Executive, except that payments of the percentage of the basic pay established under section 4507(e)(2) of such title for Distinguished Executives may be made in any fiscal year to up to 1 percent of the members of the Senior Foreign Service.

SFS employees reviewed for a PRA, in addition to being judged by the four criteria for Performance Pay in Part III.A above, must consistently have demonstrated sustained accomplishment at a superior or extraordinary level as an employee of the SFS, or in equivalent grades, for the last three annual rating periods. They must also have demonstrated the qualities of integrity and creativity, and have maintained a high degree of public trust. Evidence of significant sustained accomplishment may be found in such areas as the following:

(1) Significant contributions to U.S. Government and Departmental/Mission policy in the field of foreign affairs, including public diplomacy and international trade and development; or in areas of foreign or domestic policy;
(2) Service in the promotion of internationally recognized human rights, including the right to freedom of religion;
(3) Managerial accomplishments in cooperative efforts with other foreign affairs agencies, other Federal agencies, other U.S. Government entities, and/or with the private sector; and/or
(4) Achievement of Department-wide importance in policy, technical, program, and/or human resource terms.

Confidential - Subject to Protective Order

ADDENDUM 1 TO THE 2021 PROCEDURAL PRECEPTS FOR PERFORMANCE PAY
AND DEPARTMENT SENIOR REVIEW BOARDS

SECURITY AWARENESS

Security is an inherent, inextricable, and indispensable component of all employee positions at the Department of State, but especially in our most senior positions. Employees competing for performance pay are expected to be leaders in security awareness. PPBs and the DSRB have at their disposal information regarding an employee's security record, including the security incident history report. Employees who have an egregious security record over the recent past are traditionally not competitive for performance pay or Presidential Awards.

Every employee's work responsibilities must include a statement about the proper management of classified material and information. Where an employee has demonstrated a pattern of failure with respect to safeguarding classified material and information, this will be reflected in the evaluation report. Failure to safeguard classified material and information is one of the areas of weakness that may be grounds for a board's lower ranking of a file.

Boards will be given the security incident record for the five years prior to May 1, 2021, for each employee competing for performance pay. Employees may request a copy of their security incident record from the Bureau of Diplomatic Security and may submit to GTM/PE within five days of the convening of the Boards, as announced in the ALDAC, a response regarding their security incident record for consideration by the appropriate board.

Boards will use the security incident reports, and any response from employees regarding their own security incident reports, in conjunction with the material in the performance folders to determine the competitiveness of those employees for performance pay.

Core Work Responsibilities on security are:

Entry level: Practice security awareness; report and/or address possible safety hazards and/or unsafe practices; follow security directives, regulations and policies; safeguard classified information, material, and equipment.

Mid-level: Ensure active risk management through monitoring the security environment concurrent to the scope of official duties and responsibilities; follow security directives, regulations and policies; safeguard classified information, material, and equipment.

Senior level: Ensure active risk management by themselves and staff members within the scope of their duties and responsibilities, including promotion of security consciousness and implementing and/or following security directives, regulations, and policies; safeguard classified information, material, and equipment.

Confidential - Subject to Protective Order

10

ADDENDUM 2 TO THE 2021 PROCEDURAL PRECEPTS FOR
PERFORMANCE PAY AND DEPARTMENT SENIOR REVIEW BOARDS

| EQUAL EMPLOYMENT OPPORTUNITY PRINCIPLES |
| --- |

Employees of and applicants for employment with the Department of State (DOS) are protected from discrimination on the following bases under Federal law and/or Executive Order:

- RACE, COLOR, RELIGION, SEX (including pregnancy and gender identity), NATIONAL ORIGIN
- DISABILITY
- AGE
- SEXUAL ORIENTATION
- GENETIC INFORMATION
- RETALIATION

As a matter of Department policy, all non-discrimination principles apply to locally employed staff.

Harassment is a form of employment discrimination that violates federal law. Harassment is unwelcome conduct that is based on any of the protected bases that is so severe or pervasive it alters working conditions and either creates a hostile work environment or results in a tangible employment action.

Discrimination, including sexual harassment (3 FAM 1525) and discriminatory harassment (3 FAM 1526), will not be tolerated within the Department.

Confidential - Subject to Protective Order

ADDENDUM 3 TO THE 2021 PROCEDURAL PRECEPTS FOR
PERFORMANCE PAY AND DEPARTMENT SENIOR REVIEW BOARDS

THE DEPARTMENT'S LEADERSHIP AND MANAGEMENT PRINCIPLES
(3 FAM 1214)
ACCOUNTABILITY, CHARACTER, COMMUNITY, DIVERSITY, LOYALTY,
SERVICE

The Department relies on all employees to represent the U.S. Government in the
course of carrying out its mission. The Foreign Service Core Precepts and the
Office of Personnel Management's Executive Core Qualifications, in addition to
existing Leadership and Management Tenets, such as those established by Consular
Affairs, Diplomatic Security, Economic and Business Affairs, and Public
Diplomacy, set clear expectations for their employees. Additionally, the
Department as an institution embraces an overarching set of Leadership Principles.
The established Department-wide Leadership Principles apply to and can be used
by anyone, regardless of rank or employment status (e.g. Civil or Foreign Service,
Locally Employed Staff, or contractors).

Supervisors and managers have a unique opportunity and responsibility to lead by
example and foster the highest attainable degree of employee morale and
productivity. However, you do not need to be a manager to be the leader. The
following principles reflect the values the Department believes are important for all
employees to cultivate:

(1) **Model Integrity** – Hold yourself and others to the highest standards of conduct,
performance, and ethics, especially when faced with difficult situations. Act in the
interest of and protect the welfare of your team and organization. Generously share
credit for the accomplishments of the organization. Take responsibility for yourself,
your resources, your decisions, and your action;

(2) **Plan Strategically** – Develop and promote attainable, shared short and long
term goals with stakeholders for your project, program, team, or organization.
Provide a clear focus, establish expectations, give direction, and monitor results.
Seek consensus and unified effort by anticipating, preventing, and discouraging
counter-productive confrontation;

(3) **Be Decisive and Take Responsibility** – Provide clear and concise guidance,
training, and support, and make effective use of resources. Grant employees
ownership over their work. Take responsibility when mistakes are made and treat
them as an opportunity to learn. Formally and informally recognize high quality
performance;

(4) **Communicate** – Express yourself clearly and effectively. Be approachable and
listen actively. Offer and solicit constructive feedback from others. Be cognizant of
the morale and attitude of your team. Anticipate varying points of view by soliciting
input;

Confidential - Subject to Protective Order

(5) **Learn and Innovate Constantly** – Strive for personal and professional improvement. Display humility by acknowledging shortcomings and working continuously to improve your own skills and substantive knowledge. Foster an environment where fresh perspectives are encouraged and new ideas thrive. Promote a culture of creativity and exploration;

(6) **Be Self-Aware** – Be open, sensitive to others, and value diversity. Be tuned in to the overall attitude and morale of the team and be proactive about understanding and soliciting varying points of view;

(7) **Collaborate** – Establish constructive working relationships with all mission elements to further goals. Share best practices, quality procedures, and innovative ideas to eliminate redundancies and reduce costs. Create a sense of pride and mutual support through openness;

(8) **Value and Develop People** – Empower others by encouraging personal and professional development through mentoring, coaching and other opportunities. Commit to developing the next generation. Cultivate talent to maximize strengths and mitigate mission-critical weaknesses;

(9) **Manage Conflict** - Encourage an atmosphere of open dialogue and trust. Embrace healthy competition and ideas. Anticipate, prevent, and discourage counter-productive confrontation. Follow courageously by dissenting respectfully when appropriate; and

(10) **Foster Resilience** – Embrace new challenges and learn from them. Persist in the face of adversity. Take calculated risks, manage pressure, be flexible and acknowledge failures. Show empathy, strength, and encouragement to others in difficult times.

Confidential - Subject to Protective Order

STATE00005444

# PX-035

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

ALEXANDRIA DIVISION


_____
                               )
MARK LENZI,                    )
                               )
        Plaintiff,             )
                               )        Civil Action
vs.                            )
                               )        No. 1:21-cv-01371
UNITED STATES DEPARTMENT       )            PTG-IDD
OF STATE, AND ANTONY J.        )
BLINKEN, UNITED STATES         )
SECRETARY OF STATE,            )
                               )
        Defendants.            )
_____)




DEPOSITION OF KENNETH MERTEN

Washington, DC

November 9, 2022






Reported by:  John L. Harmonson, RPR

Job No. 887952



Page 2

1

2

3

4

5                               November 9, 2022

6                               9:06 a.m.

7

8

9        Deposition of KENNETH MERTEN, taken at the

10    offices of Steptoe & Johnson LLP, 1330

11    Connecticut Avenue NW, Washington, DC, pursuant

12    to the Federal Rules of Civil Procedure, subject

13    to such stipulations as may be recited herein or

14    attached hereto, before John L. Harmonson, a

15    Registered Professional Reporter and Notary

16    Public of the District of Columbia, who

17    officiated in administering the oath to the

18    witness.

19

20

21

22



Page 3

```
 1                A P P E A R A N C E S
 2
 3   On behalf of Plaintiff:
 4        STEPTOE & JOHNSON, LLP
          1330 Connecticut Avenue, NW
 5        Washington, DC  20036
          202.429.3000
 6        BY:  CHRISTOPHER A. SUAREZ, ESQ.
               THOMAS M. BARBA, ESQ.
 7             csuarez@steptoe.com
               tbarba@steptoe.com
 8
 9
10   On behalf of Defendants:
11        US DEPARTMENT OF STATE
          Office of the Legal Adviser
12        2201 C Street, NW
          Washington, DC  20520
13        202.647.5036
          BY:  JEFFREY BAE, ESQ.
14             EMMA BROCHES, ESQ.
15
16        US DEPARTMENT OF JUSTICE
          1100 L Street, NW
17        Washington, DC  20005
          BY:  CATHERINE YANG, ESQ.
18             catherine.m.yang@usdoj.gov
19
20
21   ALSO PRESENT:
22        DREW VELTZ, Videographer
```



Page 4

```
 1                    EXAMINATION INDEX
 2   WITNESS                                          PAGE
 3   KENNETH MERTEN
 4     Examination by Mr. Suarez
 5     Examination by Ms. Yang
 6     Examination by Mr. Suarez
 7                         *  *  *
 8
 9                     EXHIBIT INDEX
10   EXHIBIT NO.                                      PAGE
11   Exhibit 1    Action Memo; STATE00006162 -
12                6166
13   Exhibit 2    Email; LENZI0002522 - 2527
14   Exhibit 3    Telegram; STATE00013714 - 13730
15   Exhibit 4    Action Memo; STATE00016983 -
16                16985
17   Exhibit 5    Action Memo; STATE00016932 -
18                16936
19   Exhibit 6    Letter; LENZI0001910
20   Exhibit 7    Letter; STATE00015102
21   Exhibit 8    Action Memo; STATE00016961 -
22                16963
```



Page 5

```
 1                 EXHIBIT INDEX (Cont.'d)

 2    EXHIBIT NO.                                  PAGE

 3    Exhibit 9    Email; STATE00007764 - 7769

 4    Exhibit 10   Email; STATE00015090 - 15094

 5    Exhibit 11   Email; STATE00015085 - 15089

 6    Exhibit 12   Email; STATE00015080 - 15084

 7    Exhibit 13   Email; (no Bates)

 8    Exhibit 14   Email; STATE00015087

 9    Exhibit 15   Email; STATE00015078

10    Exhibit 16   Email; STATE00015079

11    Exhibit 17   Email; STATE00014975

12    Exhibit 18   Email; STATE00014988 - 14993

13    Exhibit 19   Email; STATE00014971 - 14972

14    Exhibit 20   Email; (no Bates)

15    Exhibit 21   Email; STATE00015064

16    Exhibit 22   Email; STATE00015062

17    Exhibit 23   Action Memo; STATE00016927 -

18                 16927

19    Exhibit 24   Letter; LENZI0009884

20    Exhibit 25   Email; STATE00015034

21    Exhibit 26   Email; STATE00015016

22    Exhibit 27   Email; LENZI0010120
```



Page 6

```
 1    -------------------------------------------------
 2               P R O C E E D I N G S
 3                 MORNING SESSION
 4                   9:06 a.m.
 5    -------------------------------------------------
 6              THE VIDEOGRAPHER:  We are now on the
 7    record.  This begins videotape number 1 in the
 8    deposition of Kenneth Merten, in the matter of
 9    Mark Lenzi v. United States Department of State
10    and Antony J. Blinken, in the United States
11    District Court, Eastern District of Virginia,
12    Alexandria Division, 1:21-cv-01371-PTG-IDD.
13              Today's date is November 9, 2022, and
14    the time on the video monitor is 9:07.  This
15    deposition is being taken at 1330 Connecticut
16    Avenue, Northwest, Washington, DC, at the request
17    of Steptoe & Johnson, LLP.
18              The videographer is Drew Veltz of
19    Magna Legal Services, and the court reporter is
20    John Harmonson of Magna Legal Services.
21              Will counsel and all parties present
22    state their appearances and who they represent.
```



Page 7

```
 1              MR. SUAREZ:  Good morning.  This is
 2    Christopher Suarez from Steptoe & Johnson on
 3    behalf of the plaintiff Mr. Mark Lenzi.  With me
 4    today is Tom Barba also of Steptoe & Johnson.
 5              MS. YANG:  Catherine Yang from DOJ on
 6    behalf of the defendants and the witness.  With
 7    me today are Jeffrey Bae and Emma Broches from
 8    the State Department.
 9                          *  *  *
10    Whereupon:
11                   KENNETH MERTEN,
12    after having been first duly sworn or affirmed,
13    was examined and did testify under oath as
14    follows:
15                     EXAMINATION
16    BY MR. SUAREZ:
17        Q.    Good morning, Mr. Merten.  How are you
18    doing?
19        A.    Fine.  How are you?
20        Q.    I'm well, thank you.
21              So I would like to start with your
22    background.  You have been with the State
```



Page 122

1        Q.     Got it.

2               And as you see in the front here of

3   the exhibit, 16932, you circled "Approve," and

4   you put your initials on this on March 3, 2021;

5   right?

6        A.     Yes, I did.

7        Q.     So you approved on this letter at

8   16936 going out to Mr. Lenzi; right?

9        A.     Yes, I did.

10       Q.     Okay.  And so that means you read this

11  proposed letter and you agreed with everything in

12  it; right?

13       A.     Yes.

14       Q.     You wouldn't have signed something

15  that was wrong; right?

16       A.     One would hope not, yeah.  Not saying

17  I've never made a mistake but...

18       Q.     Understood.  I just want to make sure

19  I understand.

20              Okay.  So now over the time when you

21  were in this director general position, I guess

22  from January 2021 to October 2021, how many of



Page 132

 1     A.    Again, we don't have the rest of the

 2  information here.  I am assuming that there were

 3  other jobs available that the team, including his

 4  career development officer, thought that he was

 5  qualified to bid on and that would be potentially

 6  good fits, at least from a skills perspective,

 7  for your client.

 8     Q.    Got it.

 9           Now, in this letter which you signed

10  off on, it doesn't say that your search must be

11  exclusively directed to positions on the now

12  bidding cycle; correct?

13     A.    It does not say that.

14     Q.    And --

15     A.    It says "should focus on positions

16  posted on the now bidding cycle."

17     Q.    Right.  So with this letter, you

18  weren't trying to foreclose Mr. Lenzi from

19  bidding on summer 2021 positions, for example;

20  right?

21     A.    I certainly don't believe so.  I think

22  the goal, as I said, is to match people with open



Page 138

```
 1        Q.    Now, it says under that:  "In
 2   October 2020, Mr. Lenzi placed four bids, all in
 3   the summer 2021 bid cycle.  Three of the four
 4   bids were stretch positions outside of
 5   Mr. Lenzi's grade.  The only at-grade FP-03
 6   position was Belgrade.  He did bid on up stretch
 7   FP-02 positions in Warsaw and Sofia and a down
 8   stretch FP-04 position in Athens."
 9              Do you see that?
10        A.    I do.
11        Q.    Now to be clear, any foreign service
12   employee, they're able to bid one up and one down
13   from their grade; right?  You're aware of that?
14        A.    I guess they are.  I believe they are.
15   But my understanding is people are told that
16   they're not going to be considered for jobs at
17   which they're -- they're not going to be
18   considered seriously for jobs at which they are
19   not at grade because that would be -- as I said
20   earlier, typically you have, especially some of
21   these posts which are pretty sought after places,
22   they are going to be other people more than
```



Page 164

1    We discussed that earlier; right?

2         A.    Yes.

3         Q.    Besides the Haiti six-month thing we

4    talked about earlier, have you sought to go

5    overseas during that time frame at all between

6    2015 and 2022?

7         A.    I did not.

8         Q.    So you wanted to be domestic for those

9    seven years; right?

10        A.    Yes.

11        Q.    Okay.  Have you ever been in a

12   situation where you wanted to go overseas and you

13   weren't able to for several years?

14        A.    I don't think so, no.

15        Q.    Let's ask the reverse.  Have you ever

16   been in a situation where you've been overseas

17   and wanted to go domestic and you couldn't get

18   domestic for several years?

19        A.    No.

20             MR. SUAREZ:  Let's go ahead and mark

21   9.

22             (Exhibit 9 marked for identification



Page 304

1                    C E R T I F I C A T E

2    DISTRICT OF COLUMBIA

3            I, JOHN L. HARMONSON, a Notary Public

4    within and for the District of Columbia, do

5    hereby certify that KENNETH MERTEN, the witness

6    whose deposition is hereinbefore set forth, was

7    duly sworn by me and that such deposition is a

8    true record of the testimony given by such

9    witness.

10           That before completion of the

11   proceedings, review and signature of the

12   transcript was requested.

13           I further certify that I am not related

14   to any of the parties to this action by blood or

15   marriage; and that I am in no way interested in

16   the outcome of this matter.

17           IN WITNESS WHEREOF, I have hereunto set

18   my hand this 17th day of November, 2022.

19

20   _____
     *John L. Harmonson*

21   JOHN L. HARMONSON, RPR

22   My commission expires: 04/14/26



# PX-036

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA


Mark Lenzi,                              )
                                         )
         Plaintiff,                      ) Case No.
                                         ) 1:21-cv-01371
v.                                       ) PTG IDD
                                         )
United States Department of              )
State, and Antony J. Blinken,            )
United States Secretary of State,        )
                                         )
         Defendants.                     )
_____        )




Videotaped Deposition of CHRISTOPHER TEAL

(Given Remotely)

Tuesday, December 13, 2022

9:46 a.m.




Reported by:  Karen Kidwell, RMR, CRR




Magna Legal Services

866-624-6221

www.MagnaLS.com



Page 2

```
 1   APPEARANCES:
 2   On Behalf of Plaintiff:
 3        CHRISTOPHER A. SUAREZ, ESQ.
          ELIZABETH GOODWIN, ESQ.
 4        STEPTOE & JOHNSON LLP
          1330 Connecticut Avenue, Northwest
 5        Washington, D.C.  20036
          202.429.8131
 6        csuarez@steptoe.com
          egoodwin@steptoe.com
 7
 8
     On Behalf of Defendants:
 9
          JOSEPH E. BORSON, TRIAL ATTORNEY
10        United States Department of Justice
          Civil Division, Federal Programs Branch
11        1100 L Street, Northwest
          Washington, D.C.  20005
12        202.514.1944
          joseph.borson@usdoj.gov
13
14        JEFFREY BAE, ESQ.
          United States Department of State
15        Office of the Legal Adviser
          2201 C Street, Northwest
16        Washington, D.C.  20520
          202.647.5036
17        joseph.borson@state.gov
18
19
20   Also Remotely Present:
21        Teresa McCullough, Videographer
22
23
24
25
```



Page 3

```
 1                  I N D E X
 2  WITNESS/EXAMINATION                          Page
 3  CHRISTOPHER TEAL
 4    By Mr. Suarez                                 7
 5    By Mr. Borson                               263
 6    Further by Mr. Suarez                       271
 7
 8
 9                  E X H I B I T S
10    Number            Description             Page
11  Exhibit 1   Plaintiff Mark Lenzi's Notice .....16
                of Deposition Pursuant to
12              Fed.R.Civ.P. 30(b)(6) to
                Defendant United States
13              Department of State
14  Exhibit 2   E-mail chain, top e-mail .........33
                7/6/2021, with attachments,
15              Bates STATE00012602-12664
16  Exhibit 3   Global Talent Management, .........50
                GTM/CDA Standard Operating
17              Procedure A-14, Short-Tour
                (Y-Tour) Program, (10-04-2021)
18
    Exhibit 4   E-mail chain, top e-mail .........67
19              10/21/2020, and other
                documents, Bates
20              LENZI00007252-7254
21  Exhibit 5   Standard Operating Procedure .....121
                A-14, Revised and Approved
22              10/05, Short Tour Program (Y
                Tour)
23
    Exhibit 6   Standard Operating Procedure .....121
24              A-14, Revised and Approved
                4/2019, Short Tour Program (Y
25              Tour*)
```



```
                                                      Page 4
 1                   E X H I B I T S (Cont'd)
 2      Number              Description                    Page
 3   Exhibit 7    Global Talent Management .........121
                  GTM/CDA Standard Operating
 4                Procedure A-14, Short Tour
                  (Y-Tour) Program (06-05-2020)
 5
     Exhibit 8    E-mail chain, top e-mail .........139
 6                5/3/2021 Mark Lenzi to Jillian
                  Barron, Bates ML_ID00006018
 7
     Exhibit 9    E-mail chain, top e-mail .........152
 8                5/11/2021 Mark Lenzi to
                  Jillian Barron, Bates
 9                ML_ID00006126
10   Exhibit 10   E-mail chain, top e-mail 5/12, ...159
                  2021, Balagot to Mango and
11                Wagganer, Subject: RE:
                  training for excursion tours
12                as an IMTS
13   Exhibit 11   E-mail chain, top e-mail .........182
                  5/13/2021, Balagot to Wagganer
14                and Mango, Subject: RE:
                  Frankfurt IMTS - Mark Lenzi
15
     Exhibit 12   E-mail chain, top e-mail .........195
16                5/18/2021, Jami Thompson to
                  Andrew Kaleczyc, Subject:
17                Frankfurt IMTS, Bates
                  STATE00012945-12947
18
     Exhibit 13   E-mail chain, top e-mail .........201
19                5/13/2021, Nelson Balagot to
                  Mark Lenzi, Subject: RE:
20                Frankfurt IMTS
21   Exhibit 14   8/26/2020 Memo, SECSTATE .........205
                  Washington, D.C., Bidding
22                Instructions 2021 Open
                  Assignments Cycle, Bates
23                STATE00006971-6987
24
25
```



Page 5

```
 1                    E X H I B I T S (Cont'd)
 2     Number        Description                      Page
 3   Exhibit 15   Standard Operating Procedure .....209
                  B-06, Revised and Approved
 4                02/2016, Overcomplement and
                  Dual Incumbency Assignments,
 5                Bates STATE00001367
 6   Exhibit 16   Global Talent Management, ........210
                  GTM/CDA Standard Operating
 7                Procedure A-09,
                  Over-Complement and In-Transit
 8                Assignments (07-20-2022),
                  Bates STATE00007082-7089
 9
     Exhibit 17   E-mail chain, top e-mail ........225
10                7/7/2021, Kenneth Merten to
                  Mark Lenzi, Subject:  RE:
11                Handshake Response for Mark
                  Lenzi - Frankfurt
12
     Exhibit 18   9/28/2021 Action Memo for PDAS ...247
13                Merten - (DGTM),  from Naomi
                  Lyew (Acting), Subject: (SBU)
14                Directed Assignment for Mark
                  R. Lenzi, FP-03, Security
15                Engineering Officer,
                  Confidential, Subject to
16                Protective Order, Bates
                  STATE00016927-16931
17
     Exhibit 19   2/24/2021 Action Memo for PDAS ...252
18                Merten - (DGTM) from GTM/CDA -
                  Michelle Logsdon, Acting,
19                Subject: April-May Step One
                  Letters for Unassigned
20                Generalists and Specialists,
                  Confidential - Subject to
21                Protective Order, Bates
                  00016983-16985
22
     Exhibit 20   Timeline document  ..............255
23
24
25
```



Page 6

1                TUESDAY, DECEMBER 13, 2022

2                  P R O C E E D I N G S

3                        - - -

4          VIDEOGRAPHER:  We are now on the record.

5     This begins Videotape Number 1 in the deposition

6     of Christopher Teal, in the matter of Mark

7     Lenzi v. United States Department of State and

8     Antony J. Blinken, United States Secretary of

9     State.

10          Today is Tuesday, December 13th, 2022, and

11     the time is 9:46 a.m.  This deposition is being

12     taken virtually, at the request of Steptoe &

13     Johnson LLP.

14          The videographer is Teresa McCullough of

15     Magna Legal Services, and the court reporter is

16     Karen Kidwell of Magna Legal Services.

17          Will counsel and all parties present state

18     their appearances and whom they represent.

19          MR. SUAREZ:  Yes, good morning.  This is

20     Christopher Suarez, from Steptoe & Johnson LLP,

21     on behalf of the Plaintiff, Mr. Mark Lenzi.

22     With me today I believe are Elizabeth Goodwin,

23     also from Steptoe & Johnson.

24          MR. BORSON:  And good morning.  Joseph

25     Borson, of the Department of Justice.  I'm also



Page 7

1          joined by Jeffrey Bae, Department of State.

2                  VIDEOGRAPHER:  Thank you.  And will the

3          court reporter please swear in the witness.

4                          CHRISTOPHER TEAL

5      having agreed to testify under penalties of perjury,

6      testified as follows:

7                            EXAMINATION

8      BY MR. SUAREZ:

9          Q.   Good morning, Mr. Teal.  How are you?

10         A.   Very good, thank you.

11         Q.   Good.  Where are you seated today, just

12     so --

13         A.   I'm physically located at my office at

14     George Washington University.

15         Q.   Got it.  Okay.  So you -- you actually are

16     back in Washington, D.C., right now?

17         A.   That's correct.

18         Q.   Okay.  I understood that you had to be out

19     of Washington, D.C. before for a family situation; is

20     that right?

21         A.   Yeah, that's correct.  My mother recently

22     contracted COVID, so I had to go assist her as she

23     was recuperating.

24         Q.   Okay.  Understood.  Okay.  But you're back

25     in D.C. as you sit here today?



Page 12

1          Q.    So at any point in time, you would -- it

2    would be fair to say that 1 to 2 percent of the

3    midlevel employees might be an overcomplement; is

4    that fair?

5          A.    That -- that could be.  Again, those would

6    be just snapshots, but that could be a rough

7    estimate.

8          Q.    Okay.  Now, you also just testified that

9    overcomplement is a temporary status.  When you say

10   that, what do you mean?

11         A.    Well, it's not a defined tour of duty.

12   And our assignment system seeks to put individuals

13   into assigned tours of duty that have tour dates,

14   essentially; a beginning date and an end date, as I

15   discussed with my arrival at the GTM.

16               And so overcomplement would be a status

17   that individuals are in until they are able to line

18   up and -- and accept and be assigned to a follow-on

19   tour of duty.

20         Q.    Got it.  And so -- you said there's a lot

21   of flow-through.  So how long are employees that you

22   were involved with typically on overcomplement

23   status?

24         A.    I would say in general -- and we do have

25   some SOPs that guide us on this -- I would say in



Page 13

1   general, it might be just a few months.  Some

2   individuals come back for different reasons on

3   overcomplement, and so part of what we are working to

4   do with those that are in overcomplement is to

5   provide maximum flexibility, because there can just

6   be a variety of issues they have to deal with.

7           And so in general, I would say it's --

8   it's a few months.

9       Q.   Okay.  So you said that for those who are

10  more than a few months, sometimes that's needed to

11  provide flexibility.  Is that what I -- I heard?

12      A.   It's really with everyone that's on

13  overcomplement that we work with, that often they

14  need flexibility in order to find an onward.  And so

15  that's -- that's why, in part, overcomplement status

16  doesn't have a specific end date with a tour of

17  duty -- as a tour of duty.

18      Q.   Got it.  So would you say, as a general

19  proposition from your experience in Global Talent

20  Management, that it is optimal for employees to get

21  off of overcomplement status within a few months?

22      A.   Yes, I would say that's correct.  And --

23  and we work with them to help them find onward

24  assignments so that they can -- they can then begin

25  their next tour.



Page 18

1  our documents that relate to both overcomplement as

2  well as directed assignments, that we use as

3  guidelines.

4      Q.  Okay.  So your -- your testimony is that

5  then, to be clear for the record, that there is no

6  policy that bars Mr. Lenzi, or anyone in

7  overcomplement status, from bidding on a summer or

8  winter cycle position, correct?

9      A.  They could bid on those.  The question

10  would be -- would be, I think, from an assignment

11  process standpoint, are they bidding on a timeline

12  that's a reasonable timeline?  And what other

13  available positions -- that would be NOW positions

14  for them, since they are considered NOW bidders --

15  would they be eligible to bid on and could they

16  receive as offers?

17          And also one of the factors I think we

18  would consider would be the length of time in

19  overcomplement.  And as per our -- our guidance on --

20  on directed assignments, it -- it provides sort of

21  the guidance of no longer than six months in

22  overcomplement status prior to be potentially

23  directed into a follow-on assignment.

24      Q.  Okay.  I don't think that answered my

25  question.  My question was, is there a rule or policy



Page 19

1   you can point me to that precludes a bidder on

2   overcomplement or NOW status from bidding on winter

3   and summer positions?

4       A.   There's nothing that precludes it.

5   However, the question again would relate to their NOW

6   bidding, and are they compliant with their NOW

7   bidding obligations.

8       Q.   Okay.  Next question:  Is there any policy

9   that's written, that you can point me to, that

10  precludes someone on overcomplement or NOW bidding

11  status from receiving a handshake for a position on

12  the winter or summer bidding cycle?

13      A.   There is nothing that would preclude it,

14  and in fact, if there were training required that

15  would provide -- that the individual would need to

16  take, that would allow them to be eligible for an

17  out-cycle bid.  That could be acceptable.

18      Q.   Okay.  I'm not asking if there's training

19  required.  Just as a general proposition, is there

20  any policy that precludes someone on overcomplement

21  status, who is a NOW bidder, from receiving a

22  handshake and an onward assignment to a position that

23  is in the summer cycle or the winter cycle?

24      A.   I think those factors would be taken into

25  consideration, and that's why it's relevant, so -- if



Page 21

1    BY MR. SUAREZ:

2        Q.   So, now, with regard to the policies of

3    overcomplement status, you would agree that the

4    written policies establish that overcomplement is

5    meant to be a temporary status, correct?

6        A.   That is correct.

7        Q.   And so you would agree, then, to be

8    consistent with the policy, the State Department

9    should attempt to avoid situations where people are

10   on overcomplement status for extended periods of

11   time, correct?

12       A.   Yes.  In fact the policy makes reference

13   to that.

14       Q.   Thank you.  And so you would agree that

15   being on overcomplement status for over a year, that

16   would constitute an unusually long time on

17   overcomplement status, right?

18       A.   Well, as I mentioned, there are a variety

19   of reasons individuals can be on overcomplement.  I

20   would say, for individuals who have not lost their

21   security clearance, or have a security clearance

22   suspended, but if they were -- if otherwise they were

23   normally able to be assigned, more than a year would

24   be unusual, yes.

25       Q.   Okay.  Thank you for bringing that up,



Page 22

1    because that's a very important point in this case

2    that I want to discuss with you.

3              So, first of all, let's just break that

4    out.  Putting aside employees who have lost a

5    security clearance, you agree that it is unusual to

6    be in overcomplement status for over a year, right?

7         A.   In my experience, that is unusual,

8    correct.

9         Q.   Okay.  Now, so you would agree, then, that

10   most -- or -- well, I don't want to speak for you,

11   but many of the employees who are on overcomplement

12   status for an extended period of time have lost their

13   security clearance; is that fair?

14        A.   There's a small number that is a subset

15   of -- of that total number that we've discussed

16   earlier.

17        Q.   Actually, that's a good point, too.

18   Let's -- let's go -- let's unpack that.  Because

19   you -- you had testified earlier that there were

20   between 100 and 200 people at any point in time out

21   of the 9,000 who might be in overcomplement status,

22   right?

23        A.   Uh-huh.

24        Q.   Is that correct?

25        A.   That's correct.



Page 24

1   given period of time.  But --

2        Q.   Okay.  So you would agree, then, out of

3   the entire Foreign Service that you oversaw -- the

4   midlevels, approximately 9,000 -- between .1 and

5   .2 percent of those had been on overcomplement for

6   extended periods of time, more than a year, as a

7   result of losing security clearances; is that fair?

8        A.   It's a very small number.  That -- I don't

9   know the exact percentage, but it would be a very

10  small number.

11       Q.   Now, why is it that people who have lost

12  their security clearances tend to be on

13  overcomplement status for longer periods of time?

14       A.   Those individuals are not able to be

15  assigned to a normal tour of duty and a normal

16  assignment.  They are expected to do work, and

17  overcomplement can give them unclassified work to do.

18       Q.   Okay.  So when you say that they are

19  unable to be assigned to a normal tour of duty and

20  normal assignment, can you explain that, please?

21       A.   Sure.  Positions within the -- State

22  Department Foreign Service positions require a

23  security clearance.  And if an individual has a

24  suspended security clearance, they would not be able

25  to fulfill the obligations of those positions.



Page 25

1            In overcomplement, we are able to carve

2    out unclassified work for those individuals, and the

3    amount of time it takes to adjudicate those cases are

4    going to vary, based on the circumstances.

5            Q.   Okay.  And so would you agree that most,

6    if not all, positions that are overseas in the

7    Foreign Service require access to classified

8    information?

9            A.   That's my understanding, correct.

10           Q.   And so what are the positions, the types

11   of positions that those employees who have lost their

12   security clearances restricted to while they're on

13   overcomplement status?

14           A.   The types of positions or the types of

15   work that they may be doing?  I'm not -- the question

16   is not clear.

17           Q.   Oh, fair enough.  Because

18   "overcomplement," arguably is not even a position.

19           So what -- what are the types of work that

20   the people who are placed on overcomplement status

21   who have lost their security clearance allowed to do?

22           A.   Well, again, cases are going to vary based

23   on -- on individuals.  There is a significant amount

24   of unclassified work that could be done.  Some

25   individuals might have experience working on budget



Page 31

1        Q.    Yeah, and I'll rephrase the question,

2    because that wasn't what I was going after.

3              Are you aware of any employees, out of the

4    hundreds of employees you've worked with, whose

5    OpenNet access has been rescinded by the State

6    Department?

7        A.    Yes, there are situations where people

8    don't have access to OpenNet.  And in fact one of the

9    roles a CDO might have is to actually place bids for

10   those individuals.

11       Q.    Okay.  So why -- why would access to

12   OpenNet be rescinded?

13       A.    A very specific example:  If -- if an

14   individual was on leave without pay.  And so they're

15   still a State Department employee, but they may have

16   taken six months, a year of leave without pay.

17   They're still in employee status, but their access to

18   OpenNet is cut off at that point.

19       Q.    Okay.  How about employees who are still

20   active and going into the office?  Have you heard of

21   any situations where their access to OpenNet's been

22   rescinded?

23       A.    I'm not personally aware of any.  Perhaps

24   it's happened, but I'm not personally aware.

25       Q.    Okay.  So you're not aware, then, that



Page 43

1      Q.    Okay.  Now -- okay.

2            Is there any policy -- from 2018, policy

3   document you can point me to that precluded the State

4   Department from assigning Mr. Lenzi to a Y-tour in

5   2018?

6      A.    No.  In fact there would be nothing that

7   would have precluded him from being assigned to a

8   Y-tour, taking a Y-tour.

9            Again, as of 2018, those were Washington

10  assignments, and so he would have, as for a normal

11  process with overcomplement, been required to be

12  based out of Washington during -- during the

13  2018-2019 time period.

14     Q.    So -- but is it your testimony that it

15  was -- is there any policy that precluded Mr. Lenzi

16  from working remotely in Portsmouth on a Y-tour?

17     A.    Yes.

18     Q.    Okay.  What is the written policy you can

19  point me to that says that?

20     A.    That would have been our SOP on Y-tours.

21  And it required --

22     Q.    SOP -- which SOP number is that?

23     A.    If I could refer to the record, our record

24  here on that.

25            Our SOP A-14.



Page 51

1    follow-on assignment.

2         Q.    Right.  So -- and my question could have

3    been clearer.

4              With respect to overcomplement status,

5    there is an indefinite end date to the tour.  You

6    don't know when it's going to end.  Right?

7         A.    That's correct.

8         Q.    And so with Y-tours, one of the

9    differences is that the Y-tour gives you a clear

10   start and end date, which perhaps makes it a little

11   easier for the bidding process; is that fair?

12        A.    That's correct.  And -- and this -- this

13   gets to your earlier question about bidding something

14   that's not a NOW position.

15             That could be a year in advance.  Having a

16   Y-tour or having training is -- is a reasonable way

17   through the assignment cycle to say, "Yes, I'm going

18   to fill this year with these following things."

19             And it could be eight months of a Y-tour

20   plus four months of training, and then they're able

21   to take a follow-on assignment.

22        Q.    Okay.  And just going to some of the

23   policies for Y-tour, so I'm on Exhibit 3, A-14.2.

24             It says:  "Y-tours are for specific,

25   clearly defined, nonrecurring projects that can be



Page 52

1    completed in no fewer than six months and no more

2    than twelve months."  Right?

3         A.   Correct.

4         Q.   Okay.  And so the assignment -- the tour

5    length can be 6 to 12 months; is that right?

6         A.   It could be.  We did have the

7    authorization to do them slightly under six, if -- if

8    the work required so.  But typically it was between

9    6 and 12 months, that's right.

10        Q.   Okay.  And who -- and it says the Y-tour

11   coordinator is the director of CDA/ML.  Who is that?

12        A.   That would have been me.

13        Q.   Okay.  So were -- so were you then -- so

14   you coordinated Y-tours during the time you were

15   at GTM?

16        A.   That's correct.  And so I also oversaw

17   that transition where we allowed for remote-work

18   agreements.

19        Q.   And you said that was an outgrowth of the

20   pandemic?

21        A.   That's -- that's exactly right.

22        Q.   And so you wanted to clarify that, so that

23   people who, you know, were working remotely would be

24   able to get Y-tours?

25        A.   Just sort of as general background, during



Page 57

1        A.    He was doing that, yeah.

2        Q.    And he was under the supervision of a

3  Mr. Ray Rivera during that time, right?

4        A.    I -- I believe that's right.  Correct.

5        Q.    Okay.  And it would have been possible for

6  Mr. Lenzi to have been assigned a Y-tour in GTM for a

7  duration of six months to a year, had the Department

8  approved that, right?

9        A.    And so -- I just want to clarify.  During

10  this time period, Mr. Lenzi, my understanding was,

11  had a medical clearance that required a domestic

12  assignment.  And so a Y-tour would have to be

13  domestic.  But he could have also gotten a

14  traditional domestic assignment doing similar work as

15  well.  So either would have been an option for him.

16        Q.    Right.  But -- but among the options for

17  him, instead of being overcomplement, where you're

18  not even formally assigned an official position -- I

19  think as you have articulated several times -- he

20  could have been assigned a Y-tour to the government

21  technical monitor position for, say, 12 months,

22  right?

23        A.    That's correct.  He could have done that.

24        Q.    And had that happened, Mr. Lenzi would

25  have been on a more traditional bidding cycle,



Page 58

1    perhaps making bidding for summer or winter cycle

2    positions easier for him; is that fair?

3         A.   That's right.  Had he taken a -- a Y-tour,

4    that would have allowed him to bid as a traditional

5    summer bidder.  There -- he would have just returned

6    to kind of the normal bidding process that everyone

7    goes through.

8         Q.   Now, while we're on this topic, what is

9    the basis for the State Department's decision to

10   direct Mr. Lenzi into overcomplement status as a

11   government technical monitor, rather than some other

12   position, as you mentioned, Y-tour, domestic, other X

13   position, and so forth, why did he -- why did they do

14   that?

15        A.   Well, he wasn't directed as a government

16   technical monitor.  He was -- he was put in

17   overcomplement status because of the loss of his

18   clearance in 2018.  The nature of the work was

19   determined by Diplomatic Security at the bureau

20   that -- that has his position that he reports to.

21   And so that was determined by DS.  It wasn't

22   determined by GTM.

23        Q.   So your testimony is that he was put there

24   because he lost his security clearance in 2018?

25        A.   No, no.  Did I -- did I say "security



Page 70

 1    a total of seven positions, correct?

 2         A.   That's right.

 3         Q.   They're all NOW and winter cycle

 4    positions, right?

 5         A.   Yes, they're -- they're all effectively

 6    positions that he would be immediately eligible to --

 7    to go to.

 8         Q.   Right.  And six out of the seven

 9    positions, they're domestic, right?

10         A.   That is correct.

11         Q.   And the only overseas position that was

12    suggested for Mr. Lenzi was the Monterrey, Mexico,

13    position, number 57255040, right?

14         A.   That's right.

15         Q.   Okay.  Now, based on your preparations for

16    this topic, are you aware of any other positions,

17    besides the one listed on 7253, that were suggested

18    to Mr. Lenzi for bidding during his time at the State

19    Department?

20         A.   At this -- at this point in time, I'm not

21    aware that there were other positions that were

22    suggested to him.

23         Q.   Okay.  So then you would agree, then,

24    based on your preparation for Topic 7, that the

25    positions listed here on this document, on page 7253,



Page 71

1   comprise all the positions that were suggested to

2   Mr. Lenzi for bidding by the State Department while

3   he was on overcomplement status, right?

4        A.   As of this time, that's -- that's what I'm

5   aware, correct.

6        Q.   And when you say "as of this time," that's

7   as of the preparation you've been provided --

8        A.   I'm sorry.  As of -- as of the date of --

9   as of the date of this e-mail, which is from -- the

10  August 2020.

11       Q.   Okay.  So then let me ask another

12  question.

13            By the way, this e-mail is October 2020,

14  right?  You said "August."

15       A.   I'm sorry.  He had an initial e-mail, I

16  think, that was from August 2020, from his previous

17  CDO, that -- similar listing.

18       Q.   Understood, yeah, and let's confirm that,

19  because that is true.  So Mr. Kaleczyc had actually

20  had this same list of positions that he had passed on

21  to Mr. Kaleczyc to send to Mr. Lenzi during the

22  transition, right?

23       A.   Mr. Lingenfelter had passed on to

24  Mr. Kaleczyc, yes.

25       Q.   Sorry, I -- I misspoke.  Yes.



Page 81

1   points of contact, and posts if bidding overseas, to

2   lobby for the jobs on your bid list."

3            Do you see that?

4        A.   Yes.

5        Q.   Okay.  So my first question is:  What does

6   the policy mean by "regular assignment"?

7        A.   Well, so that would be a position that

8   would be on a bid list, available positions in our

9   open assignment system, so just to differentiate

10   between bidding an assignment with a tour of duty, as

11   opposed to overcomplement, which is an indefinite

12   status.

13        Q.   Understood.  That's what I thought.  So

14   "regular assignment," it can refer to a summer cycle

15   position, a winter cycle position, or a NOW position;

16   is that right?

17        A.   Correct.  Yeah.

18        Q.   All right.  And then -- and then it says:

19   "Including reaching out to points of contact, and

20   posts if bidding overseas, to lobby for the jobs on

21   your bid list."  Do you see that?

22        A.   That's right.

23        Q.   So you would agree that this policy

24   encourages efforts by the employee to reach out to

25   post and people in the bureau to secure assignments,



Page 82

1  right?

2      A.   Yes, that's typically what happens when an

3  individual is researching a position.  They will

4  reach out to post, ask a series of questions -- not

5  simply about the nature of the work, but they might

6  ask about education for children.  They might ask

7  about, you know, living circumstances.

8           They need to reach out to the bureau to

9  talk to bureau hiring managers, because at the end of

10  the -- the bureaus are the ones that coordinate that

11  and deconflict when there are multiple bids.

12          So it's -- it's really a dual-track way of

13  going through an interview process.

14      Q.   Got it.  So lobbying for assignments with

15  posts and getting clarification of the nature and

16  details of the assignments, that's encouraged by the

17  policy, right?

18      A.   Yes, that's right.  That would be normal.

19      Q.   Okay.  And then it says:  "You need to

20  replenish your bid list as necessary."  So that just

21  means keeping active bids, I assume; is that right?

22      A.   Yeah, correct, active bids.  Because you

23  may have bid a position that was offered to someone

24  else, and that's no longer an opportunity for you to

25  bid on that assignment.  So the goal would be --



Page 96

1        Q.    Got it.  But there was never an extended

2    period of time where you wanted to be overseas where

3    you were continually denied positions to go overseas;

4    is that fair?

5        A.    Yeah -- no, that's -- I haven't been

6    denied positions to go overseas, if I were

7    exclusively bidding those.

8        Q.    Okay.  Now, going back to SOP B-06 -- and

9    you're welcome to go back to the full version of it.

10    I think I marked it in Exhibit 2, it was interspersed

11    in Exhibit 2.

12              In that entire policy, there's no mention

13    of NOW bidding, right?

14        A.    That's correct.

15        Q.    Okay.  And are you -- I'm just curious.

16    Are you aware of any policies that refer to NOW

17    bidding within GTM?

18        A.    Again, to the extent that our -- our

19    guiding principles relate to both directed

20    assignments as well as overcomplement, one

21    overcomplement limiting it to the shortest amount of

22    time possible, directed assignments give us a

23    guideline of about six months.  Those would fall

24    within NOW positions and NOW assignments.

25        Q.    Okay.  Now, in preparation for your



Page 112

1      Q.    Yeah, if it were just up to you, you would

2  have just allowed him to be directed into DME,

3  correct?

4            MR. BORSON:  Objection to form.

5            THE WITNESS:  No.  In fact we -- we

6       continually, over this period of time, worked

7       very closely with Mr. Lenzi to try to be as

8       accommodating as possible.

9  BY MR. SUAREZ:

10     Q.    Well, OSC raised the concern and suggested

11 to you that maybe you should not assign Mr. Lenzi to

12 DME, correct?

13     A.    That -- that was part of the

14 consideration, although at the end of the day, you

15 know, I think both GTM and DS found that there was

16 another position that was suitable.

17     Q.    Okay.  And -- and OSC, that has a more

18 independent role, vis-à-vis the State Department.

19 You would agree, right?

20     A.    In general, yeah, that's right.

21     Q.    And so they must have had some problem

22 with how Mr. Lingenfelter, the prior CDO, had been

23 handling Mr. Lenzi's situation, right?

24            MR. BORSON:  Objection.  Form.

25            THE WITNESS:  I have no knowledge of that,



Page 113

1        no.

2    BY MR. SUAREZ:

3        Q.    Sitting here today, you have no knowledge

4    of -- of the OSC's position?

5        A.    With regard to Mr. Lingenfelter, no, I

6    don't.

7        Q.    Okay.  But you're aware that part of the

8    reason why you did not assign Mr. Lenzi to DME was

9    because there was a concern about him working with

10   Mr. Lingenfelter, correct?

11       A.    That Mr. Lenzi himself had raised.

12       Q.    And that had been investigated by the

13   Office of Special Counsel, correct?

14       A.    Again, we were trying our best to be as

15   accommodating as possible to Mr. Lenzi, and so --

16       Q.    Right.

17       A.    -- we did take action that was per his

18   request.

19       Q.    And part of -- and I just want to be clear

20   for the record.  There wasn't only a request from

21   Mr. Lenzi.  There was also a request from the Office

22   of Special Counsel.  Correct?

23       A.    I -- I am aware that there was an inquiry

24   from the Office of Special Counsel.  Again, we worked

25   to try to find a reasonable accommodation that was a



Page 114

1    solution for all.

2         Q.   So when Mr. Lenzi raised concerns about

3    the prior CDO, Mr. Lingenfelter, an independent

4    agency investigated that and said, "Hmm.  It's not a

5    good idea to assign Mr. Lenzi under

6    Mr. Lingenfelter."  Correct?

7              MR. BORSON:  Objection.  Form.

8              THE WITNESS:  I'm not -- I'm not certain

9         about the specifics to -- to which you're

10        referring.

11   BY MR. SUAREZ:

12        Q.   Interesting.  Okay.

13             So after the DME directed assignment plan

14   fell through, there was a lot of back-and-forth of

15   "what we do with Mark" after that, correct?

16        A.   I think we had discussions with Diplomatic

17   Security to find an adequate onward assignment.

18             Again, that was really within the scope of

19   what Diplomatic Security needed and were

20   prioritizing.  So from our standpoint, if it met our

21   standards of being, you know, essentially a -- a

22   position that he could relatively quickly go into,

23   and that it was within his skill code, grade, it --

24   it seemed to make sense to us.

25        Q.   Okay.  And so that was when you explored



Page 135

1   A. The FAM doesn't speak about specific types

2 of training.  It -- it does make reference to the

3 fact that if there is training required for a

4 position, the employee must take it.

5   Q. Okay.  Are you able to provide me the

6 provision you're referencing?

7   A. I think this generally comes from

8 3 FAM 2424.

9   Q. Okay.  Are you aware if this FAM rule or

10 regulation was ever cited to Mr. Lenzi at any point?

11   A. I'm not certain if -- if that particularly

12 was cited with him by his CDO, no.

13   Q. Is it your testimony that training

14 requirements are never waived within the State

15 Department?

16   A. No, that's not my testimony.

17   Q. Okay.  So you would agree, then, that

18 training requirements can be waived within the State

19 Department; is that right?

20   A. There can be certain types of training

21 that can be waived, correct.

22   Q. And -- and you would agree in fact that

23 this particular training has been waived for certain

24 employees, right?

25   A. That, I'm not aware, no.



Page 138

1    simply be waived.  That's -- that would not happen.

2         Q.    Okay.  Now, you understand that Mr. Lenzi

3    was a security engineering officer, right?

4         A.    Yes.

5         Q.    Okay.  And a lot of that work actually

6    does involve information technology, cybersecurity,

7    things of that nature.  Right?

8         A.    There are some parts that -- that he would

9    have an understanding of, correct.

10        Q.    Right.  And you know that IMTS is -- is

11   information management, and like IT, essentially,

12   right?

13        A.    In part.  It also involves radio,

14   telecommunications, phone exchange system -- things

15   that a security engineer wouldn't necessarily be

16   interacting with.

17        Q.    Well, you understand that some of the

18   duties that were being sought in this particular

19   position relating to -- were related to use of

20   phones.  You just mentioned that.  Use of phones,

21   like Avaya phone, and some of those types of things,

22   right?

23        A.    Yes.  That would be common for IMTS,

24   right.

25        Q.    And you're aware, right, that Mr. Lenzi



Page 142

1   in the "multiple open 03 IMTS positions"; is that

2   right?

3        A.   That's -- that's what it looks like,

4   correct.

5        Q.   Okay.  And so to be clear, the fact that

6   they're 03 IMTS positions, that means they're FP-03,

7   right?

8        A.   Yes.  That would be his grade, although at

9   a different skill code.

10       Q.   Understood.  But we -- as we discussed

11   earlier, there wasn't a complete mismatch between SEO

12   functions and IT functions in IMTS, right?  That's

13   fair?

14       A.   They are different skill codes, and there

15   are different requirements for the position.

16       Q.   Okay.  We'll -- we'll leave that.  That's

17   fine.

18            So -- now, you understood that these IMTS

19   positions, they were NOW positions, right?

20       A.   Yes, that -- that would not be uncommon in

21   Frankfurt, given that it's a hub.  It has a number of

22   positions, and they may have several that at any one

23   time might have not been filled.

24       Q.   Right.  So -- so here, this was Mr. Lenzi

25   attempting to get a NOW position, right?  You agree?



Page 143

1          A.    A NOW position, albeit outside of his

2    skill code, correct.

3          Q.    Right.  But a NOW position, right?

4          A.    Yes.  As of April 2021, correct.

5          Q.    And I believe you had the context for us,

6    so I'll just confirm it.  One of the reasons he was

7    applying for these positions in April was because

8    PDAS Merten had sent him a warning letter saying,

9    "You have to bid NOW, otherwise I'm going to direct

10   you to an assignment."  Right?

11         A.    I -- I wouldn't refer to it as -- as a

12   warning letter.  He received a Step 1 letter, which

13   is a normal process that any bidder who -- any

14   employee who does not have an already onward

15   assignment lined up would receive a notice that

16   indicates, "We're aware you haven't received

17   assignments.  You know, we're -- we're just following

18   up."

19              And so PDAS Merten's letter would be kind

20   of our normal process that we would go through at

21   that point in the -- in the bid cycle.

22         Q.    All right.  And I -- I can pull -- I can

23   pull up a letter if you want, but like, you know,

24   these letters say, "If you don't bid on NOW

25   positions, or bid on positions soon and find an



Page 144

1    onward assignment, we reserve the right to direct you

2    to an assignment," don't they?

3         A.   Yes, that's the nature of it.  There's a

4    Step 1 and a Step 2 process, to let the employee know

5    that if they're not able to find an assignment, we

6    can use a mechanism to direct them into assignment

7    that would help them be able to get an onward.

8         Q.   Right.  And so Mr. Lenzi didn't sit on his

9    hands in response to that.  He actually did bid on a

10   NOW position for which, as you acknowledged earlier,

11   he was paneled and received a handshake, right?

12        A.   That's correct.  He bid on this IMTS and

13   was paneled for his -- his position outside of his

14   skill code.

15        Q.   And he was paneled for it notwithstanding

16   your repetition of "outside of the skill code,"

17   right?

18        A.   Yes, he was paneled for it.

19        Q.   All right.  And so there's -- again,

20   there's nothing in the State Department rules or

21   regulations that prohibit someone from receiving a

22   handshake or assignment to a position that's outside

23   of their skill code, correct?

24        A.   Yes, that's correct.  You can receive a

25   position outside of your skill code.



Page 150

1    that, but that's what it looks like.

2         A.   Yeah, he refers to his medical clearance,

3    right.

4         Q.   Right.  And so in the May 3rd, 2021,

5    e-mail, he's saying, "Hi Tony:  I have been working

6    with MED . . . I should be getting a Class 2 medical

7    clearance for Frankfurt . . .

8              "As discussed, I would be able to provide

9    you and the team with IRM, DS, and EUR references."

10             He mentions he was nominated for DS

11   employee of the year, and:  "If offered a

12   handshake . . . I would accept."  Do you see that?

13        A.   Yes.  Uh-huh.

14        Q.   Okay.  And he -- he has some

15   correspondence with MED about getting a Class 2

16   clearance for Frankfurt, and that's in there, right?

17        A.   Uh-huh.  Right.

18        Q.   So there was no issue, from a medical

19   clearance standpoint, for him to be stationed in

20   Frankfurt.  Right?

21        A.   Yeah, eventually he was cleared for the

22   position in Frankfurt, yes.

23        Q.   Okay.  And then David Mango responds,

24   Monday, May 3, 2021 -- again with these other subject

25   matter experts, Anthony Rolow, Nelson-Rey Balagot,



Page 151

1    and Joseph Burrell cc'd -- and says, "Hi Mark,

2    Thanks.  We alerted your CDO (Andy) earlier today

3    that we'd love to have you.  Just work with Nelson

4    and Tony on the specific position.

5         "Thanks."  Do you see that?

6         A.    Yes.

7         Q.    So they liked -- based on the interview,

8    based on the representations Mr. Lenzi made, you

9    would agree that these individuals thought Mr. Lenzi

10   was qualified and wanted him to get the position,

11   right?

12        A.    That is right.  They were going to offer

13   the handshake.

14        Q.    Okay.  And -- and you would agree that --

15   that Mr. Lenzi -- or, sorry, that they notified

16   Kaleczyc, Andy, I guess sometime around May 3rd; is

17   that right?

18        A.    It appears that they did.  I don't know

19   that I have that communication on May 3rd, but they

20   are saying that they were in touch with Andy around

21   that date.

22        Q.    Yeah.  And to be clear for the record,

23   nothing in this exhibit that I've gone over with you

24   mentions anything about -- "Hey, you're going to need

25   to take a training," or anything like that, right?



Page 172

1    because you just testified this.  Like Nelson Balagot

2    and these folks on May 7th, they were really

3    enthusiastic about Mark showing up, right?

4         A.   Yes.

5         Q.   You -- you would agree that they did not

6    want the result of this to be that Mark couldn't show

7    up to post, right?

8         A.   No one wanted that to be the result, no.

9         Q.   And in fact, you -- you know, this --

10   these IMTS positions were categorized as, quote,

11   "hard-to-fill positions," right?

12        A.   That's right.

13        Q.   And what is a hard-to-fill position?

14        A.   Hard to fill is a position that

15   technically does not have a bidder, but that the

16   bureau has determined it is one of those priority

17   positions that I think I referred to earlier.  And so

18   there -- there's a strong desire to have an employee

19   fill that as soon as possible.

20        Q.   Right.  And so there was a real need for

21   Mr. Lenzi to go to post as soon as possible, right?

22        A.   Yes, they needed a qualified employee as

23   soon as possible.

24        Q.   And so don't you think it would have been

25   helpful for Mr. Balagot, Mr. Rolow, Mr. Mango,



Page 186

1    am I correct to assume that our position would be to

2    waive the training, so we can get him here in time

3    for his kids to get in school in August?  This would

4    mean OJT in lieu of training for the most part like

5    what his CDO initially asked for."

6              Do you see that?

7         A.   Yes, right.

8         Q.   Okay.  And -- and then he says -- David

9    Mango, after that, says:  "I'd say we try to find a

10   compromise . . . but we should work with him."

11             So -- "Use your best judgment."

12             So they're looking for a compromise, but

13   ultimately there isn't a compromise, right?  It's

14   just go to all 14 -- 14 weeks of training, right?

15        A.   Well, David Mango, in that -- in that

16   e-mail also says, "He should definitely take the

17   formal training."

18             So it's not as though post is saying,

19   "Yeah, don't worry about any of the training.  None

20   of it matters."

21             They are consistently coming back to the

22   same point, that he needs to take the training.

23        Q.   But -- but to be clear for the record, no

24   compromise was ever provided to Mr. Lenzi, right?

25        A.   That's what I think -- everyone was



Page 187

1    looking to see if there were a possibility.  And it

2    was determined by subject matter experts, who

3    actually deal with this very sophisticated

4    technology, that no, in fact he needed to take the

5    training.

6         Q.    Right.  But if we look at the e-mail on

7    the second page here, from Nelson Balagot again --

8         A.    This is Balagot to Mango on --

9         Q.    Yeah.

10        A.    -- May 12th?

11        Q.    It says:  "I just spoke with Andy."

12            The second paragraph says:  "Andy said

13   that GTM is pretty much set on making sure that

14   people requesting excursion tours to go through the

15   skill code training prior to arriving at their new

16   assignment.  It has something to do with the fact

17   that people use training as an excuse when

18   performance issue arise, so they are pretty strict on

19   the required training.  Right now Andy believes that

20   unless he can come up with a strong justification as

21   to why training should be waived or bypassed that

22   there is a low chance that Mark will get the

23   assignment.  The responsibility would lie on Mark and

24   RIMC to justify why the required training should be

25   skipped."  Do you see that?



Page 193

1   several modules over the course of those 14 weeks,

2   and so they're -- you know.  Mr. Balagot is really

3   trying to see if they can substitute some of that.

4            Again, it's just part of this continued

5   discussion to see what they can do to help, or maybe

6   to augment when they need additional training on

7   site, if he were to arrive at Frankfurt.

8       Q.   Right.  You would agree, if Mr. Lenzi had

9   been told "Hey, you're going to have to take part of

10  this training that's relevant to what you're about to

11  do, but you only have to take a subset of courses,

12  and here are the dates of those courses," you would

13  agree, in that circumstances, it would have been a

14  lot easier for him, from a medical perspective, to

15  succeed in the training, right?

16            MR. BORSON:  Objection to form.

17            THE WITNESS:  I -- I really can't answer

18       that.  The expectation from Foreign Service

19       Institute was that all employees needed to take

20       all of the training, and it required 100 percent

21       attendance.  There weren't parts that they could

22       simply waive.

23  BY MR. SUAREZ:

24       Q.   Got it.  So despite the fact that the

25  subject matter experts felt it reasonable to limit



Page 197

1      Q.   Okay.  And this is where -- so basically
2   Andy says, "You're going to be required to do the
3   training, and if you don't take the training and you
4   don't get an accommodation, you're -- you're going to
5   be reassigned."  Right?
6      A.   I think he wanted to alert him to the fact
7   that if he was unable to complete the training, that
8   he was going to not be able to go ahead and begin his
9   assignment; and that in the absence of him bidding
10   another assignment, we had a directed assignment that
11   we were going to be able to put him into.
12      Q.   At the time, the directed assignment was
13   going to be that position with Mr. Lingenfelter that
14   wasn't going to work out, right?
15      A.   Yeah, that we subsequently changed,
16   correct.
17      Q.   Okay.  So this e-mail doesn't suggest
18   there can be any change in the number of days of the
19   training to attend, or the scope of the course, or
20   anything like that, correct?
21      A.   I think by this point there had been a
22   number of back-and-forths that in fact we have
23   already reviewed, that there was questions about what
24   could be done, what couldn't be done.  And at the
25   end, it was determined he just needed to go ahead and



Page 198

1  take the 14 weeks.

2       Q.   Now, you're aware that Mr. Lenzi did sign

3  up for the training eventually, right?

4       A.   He did.  He signed up for the training.

5       Q.   And you understand that when he signed up

6  for the training, he checked a box to receive a

7  reasonable accommodation, right?

8       A.   That's my understanding, correct.

9       Q.   And even though he checked that box, there

10 was never a proposed accommodation offered to

11 Mr. Lenzi.  You understand that?

12      A.   Well, in a situation where an employee is

13 going to require a reasonable accommodation, they

14 need to follow up with the reasonable accommodations

15 office.  And Mr. Lenzi had multiple reasonable

16 accommodation requests that had been submitted and

17 approved.  He was very familiar with the process.

18           So again, there was interaction between

19 Mr. Lenzi and that office.  And there was discussion

20 with FSI about offering some flexibility to allow him

21 some personal time to make doctors' appointments,

22 et cetera.  In fact there was some follow-up based on

23 his request.

24      Q.   Right.  But my question was, did DRAD ever

25 propose an accommodation for Mr. Lenzi that would



Page 199

1    allow him to complete the training?

2        A.   Yes, I -- I think they had discussed

3    with -- those flexibilities with Foreign Service

4    Institute, that agreed that they could provide some

5    flexibility.  What they could not waive was

6    100 percent attendance, however.

7        Q.   Right.  So they weren't willing to

8    prevent -- or to waive him attending every class,

9    every day, for the full day.  Right?

10       A.   They weren't willing to waive being every

11   day in class.  FSI was willing to allow some

12   accommodations and some flexible time, as he needed

13   to make appointments.

14       Q.   Okay.  Are you aware of any document that

15   outlines a proposal for Mr. Lenzi to be accommodated

16   during the training?

17       A.   I think he would have had to submit a

18   series of appointments that he had scheduled,

19   submitted that to FSI, and have them approve it.

20   That would have been his responsibility to make those

21   appointments.

22       Q.   Got it.  Do you understand that that would

23   have only accommodated one aspect -- you know,

24   providing him flexibility for the appointments, that

25   would have only accommodated one aspect of



Page 200

1    Mr. Lenzi's needs.  You understand that?

2          A.    Again, what he works out with both FSI and

3    DRAD is really up to them.  We're not involved with

4    that aspect of -- of the training.

5          Q.    Okay.  So as far as you're aware, there

6    was not any proposal, from DRAD or anyone else, to

7    say, you know, "Dear Mark, given our past extensive

8    work with you, as you represented, you know, we think

9    this might be an appropriate accommodation for your

10   needs for the training."

11         That was never done, right?

12         A.    I don't know that the DRAD office had

13   additional comments.  And I don't know that Mr. Lenzi

14   provided additional information or alternatives.

15         Q.    Anyway, after that e-mail, let's look at

16   what happens next.  So Andy Kaleczyc forwards this to

17   Jami Thompson, and Jami Thompson is a State

18   Department attorney, right?

19         A.    Yeah, at that time she's assigned in the

20   Office of the Legal Adviser, correct.

21         Q.    And she is the one you talked to at least

22   a half a dozen times, right?

23         A.    She'd be the one that was our principal

24   point of contact on this case.

25         Q.    And she says, "I sent this" -- he says:



Page 201

1  "Hi Jami, I sent this earlier today."  And then part

2  of it is I guess redacted for privilege.  Do you see

3  that?

4      A.   Yes.

5      Q.   Okay.  And then Jami Thompson's response

6  is:  "Thanks for the update.  I look forward to

7  reading his reply."  Do you see that?

8      A.   Yes.

9      Q.   Do you think that's professional?

10     A.   Yeah.  I think there had been a number of

11 back-and-forths with Mr. Lenzi.  He didn't appear

12 that he was going to comply with the training, and so

13 we were waiting to hear what -- what actually

14 happened with him and his willingness to -- to be

15 involved with the training.

16          I think all of us were anxiously

17 interested to see what his response was going to be.

18     Q.   Okay.  Let's go to Exhibit 13, which is

19 the "Balagot to Lenzi - 5.13" e-mail.  Can you open

20 that one, please?

21     (Exhibit 13 was marked for identification.)

22          THE WITNESS:  Just a moment.  See if I can

23     see it.  Balagot to Lenzi -- okay.  I see it

24     now.

25



Page 214

1          Q.    And Mr. Lenzi received Washington, D.C.,

2    locality pay, as far as are represented, correct?

3          A.    That would have been in conjunction with

4    his initial assignment to overcomplement in

5    Washington.  That was subsequently changed.

6          Q.    When was that changed?

7          A.    Well, the Bureau of Diplomatic Security

8    made an agreement with him so that he was able to get

9    a remote-work agreement and work out of New

10   Hampshire.  But that had nothing to do with his --

11   his initial assignment to overcomplement.

12         Q.    Now, besides the people who have revoked

13   security clearances who are on overcomplement for

14   extended periods of time, are you aware of other

15   categories of employees who are on overcomplement for

16   extended periods of time?

17         A.    Really, the only individuals that I know

18   are ones that even though they might have their

19   elective security clearance, there may be an issue

20   with a grievance that they filed for, on behalf of

21   tenure, and so they may be in overcomplement status

22   while that grievance process works its way through.

23   That generally -- again, that's a small handful, as

24   well, of -- of Foreign Service employees.

25         Q.    Now, what are some of the reasons that



Page 215

1   employees get revoked security clearances?

2        A.   Oh, a -- a range of issues could happen.

3   Obviously there is some sort of an investigation with

4   Diplomatic Security.  There's an office within

5   Diplomatic Security that's in charge of updating and

6   maintaining security clearance.  So it could be an

7   act that an individual employee has engaged in that

8   might be an illegal act.  And so as an investigation

9   is conducted, security clearance is suspended, and

10  that's when they're brought into the overcomplement

11  status, where they would work on unclassified work.

12       Q.   You would agree that criminal activity

13  might be a basis for putting someone in

14  overcomplement; is that right?

15       A.   Well, criminal activity that results in

16  suspended clearance.  And so there could be criminal

17  activity that's not been discovered yet; but as soon

18  as it's discovered, then the individual's clearance

19  would be revoked -- suspended and potentially

20  revoked.

21       Q.   But you're -- you're aware of some

22  employees who've been on overcomplement for -- for a

23  long time as a result of criminal activity that

24  caused them to lose a clearance, right?

25       A.   I am aware of that, yes.



Page 216

1          Q.   Okay.  Are you also aware of employees who

2    have committed fraud, or similar inappropriate

3    activities, and have been placed on overcomplement as

4    a result of that?

5          A.   Yes.  Pending an investigation, employees

6    could be on overcomplement.

7          Q.   Okay.  I want to look at 7089 here,

8    because it shows the approval list.

9          A.   Okay.  Just let me -- let me pull the

10   document up.

11         Q.   There are a couple things I think we need

12   to clean up for the record here.

13              First of all, on the last page, it says

14   "SOP B-06" at the top, right?

15         A.   I'm sorry, Mr. Suarez.  I'm not seeing

16   7089 on my --

17         Q.   It's in 7082.  It's the page number in --

18   the last of the exhibit.

19         A.   Oh, I apologize.  My mistake.

20              MR. BORSON:  It's page 8 of 8.  It's also

21        labeled B-06.8, at the bottom.

22              THE WITNESS:  Okay.  I -- I was looking

23        for another document.  I apologize.

24              Okay, so I'm back on 7082 now, and I --

25        could you repeat that?



Page 219

1       A.    Right.

2       Q.    -- to Mr. Lenzi when we -- when he was on

3    overcomplement status, as we discussed earlier,

4    correct?

5       A.    That's right.

6       Q.    Okay.  This policy was adopted, per the

7    top of this document, on July 20th of 2022, right?

8       A.    For A-09, July 20, 2022.  That's right.

9       Q.    Okay.  Well, do you have any reason to

10   believe the date is different for B-06, at the bottom

11   here?

12      A.    Well, again, this is a fact sheet, which

13   is -- is not replacing B-06.  This is a fact sheet

14   that describes aspects of B-06.

15      Q.    Okay.  So you see here, it says:

16   "Approved:  GTM/CDA:  HJardine."  Right?

17      A.    Yes.

18      Q.    Okay.  And four people down, it says:

19   "CTeal (0k)."  Right?

20      A.    Right.

21      Q.    That's you, right?

22      A.    That's me.

23      Q.    Okay.  So when was this cleared?

24      A.    Well, it would have been, you know,

25   perhaps not too much prior to that July 2022



Page 221

1    of the spirit of what we've discussed earlier, in

2    terms of NOW bidding and those on overcomplement.

3         Q.   Well, to be clear for the record, this is

4    the first time, in any policy, that "NOW cycle" or

5    "NOW bidder" appears in a policy, correct?

6         A.   Perhaps as a policy document.

7         Q.   Well, you were involved in these policies.

8    And you testified earlier that NOW -- the NOW concept

9    was not in any policies before this.  So you would

10   agree that this is the first time the concept of a

11   NOW cycle, or a NOW cycle bidder, is incorporated

12   into anything related to the overcomplement policies,

13   correct?

14        A.   Yeah.  It does look like we're attempting

15   to clarify that.

16        Q.   And my question is, you were involved in

17   clearing this.  Why did you deem it necessary to add

18   that information in July '22, which was four years

19   after Mr. Lenzi was placed in overcomplement status?

20        A.   Well, perhaps there could have been

21   situations just as Mr. Lenzi, in which we wanted to

22   clarify when individuals needed to bid and what they

23   were -- what they were able to do and expected to do.

24            And so I think for us having as a fact

25   sheet describing NOW bidding certainly is an



Page 229

1      Q.   And you had some involvement in those,

2   correct?

3      A.   Yes.  In both cases I was either chair of

4   the panel or was a voting member of the panel.

5      Q.   Okay.  And in one of the -- in one of

6   those shoot-outs, Mr. Lenzi was actually a higher

7   grade than the person who was advanced, correct?

8      A.   I think he was at grade for the Belgrade

9   position, and it was a stretch assignment for the

10  Warsaw position.

11     Q.   And it was a down -- so -- so he was

12  at grade for the Belgrade position, and the person

13  who was awarded the Belgrade position was an FP-04,

14  correct?

15     A.   I believe that's right.  Tenured officer,

16  but I believe that's right.

17     Q.   Right.  And so you voted on that panel to

18  permit the below-grade bidder to receive the Belgrade

19  position over Mr. Lenzi, right?

20     A.   Yes.  The bureau leading candidate, as the

21  process is called, the bureau decides who they want

22  to offer the handshake to.  Our assignments panel has

23  an opportunity to hear from both employees and the

24  bureau, and then we -- we have a vote.

25     Q.   And do you -- do you dispute that



Page 230

1    Mr. Lenzi was qualified for the Belgrade position?

2         A.   He was -- he was at grade.  So in that

3    respect, he was qualified.  We're not hiring

4    managers, and -- and we will often defer to hiring

5    managers as they're making decisions on who they want

6    to staff their embassy.

7         Q.   Got it.  So you defer to the bureau -- in

8    this case, DS -- in who the preferred candidate is,

9    right?

10        A.   Often.  Although there are many instances

11   where we have voted in favor of a candidate that is

12   not the bureau leading candidate, that is not DS's

13   candidate.

14        Q.   Now, how many -- when you were chairing

15   this -- so you were chair of the shoot-out panel, is

16   that -- or "assignments challenge panel," you call

17   it?

18        A.   For Belgrade, I think I was a voting

19   member.  As midlevel director, I would have been a

20   voting member.

21        Q.   Okay.  How many of these shoot-outs did

22   you participate in over the course of your time at

23   State Department?

24        A.   Oh, yeah, during this assignment, I

25   mean -- you know, there probably was on average about



Page 233

1       A.    In our estimation, the bureau candidate

2  was more qualified.

3       Q.    Okay.  So you would agree, though, that

4  Mr. Lenzi was qualified?

5       A.    In that he was at grade and within the

6  skill code, yes.

7       Q.    Now, is it one of the reasons that the

8  shoot-out process exists is to prevent situations

9  where below-grade bidders are getting placed in

10 positions over at-grade bidders?

11      A.    Not necessarily.  An individual

12 employee -- any employee -- has the right to put

13 themselves forward for any position.  And so that's a

14 right anyone could exercise.  Our CDOs work with them

15 on that process, if they feel that they merit the

16 position, even if they haven't been offered through

17 the hiring process that position.  So that's

18 something that's open for everyone.

19      Q.    Got it.  Now, you realize that if you had

20 allowed Mr. Lenzi to prevail in the Belgrade

21 shoot-out, that we might not even have this

22 litigation?  And you might not even have had to deal

23 with the IMTS position in 2021, or any of those

24 issues.  You understand that?

25           MR. BORSON:  Objection to form.



Page 237

1    determination that Mr. Lenzi could have received the

2    treatment he required in Monterrey, right?

3          A.    Medical determined he could serve

4    anywhere.  That could have been Africa.  It could

5    have been Asia.  It could have been Latin America.

6    And so he could have bid on any position, literally,

7    at that point.

8          Q.    Okay.  But you don't -- you're not a

9    doctor, and you don't know whether he could have been

10   successful, from a medical perspective, had he been

11   assigned to Monterrey.  Correct?

12         A.    No, in these cases we rely on MED to guide

13   us, and that's why they have categories.  The doctors

14   determine he could be assigned anywhere in the world.

15         Q.    And you understand that while -- because

16   you were involved in the Belgrade shoot-out, right?

17         A.    Yes, that's right.

18         Q.    You -- you understand that when he was

19   applying to Belgrade, he had had this Class 1

20   clearance, sought it to be downgraded so he could

21   have a Class 2, which would be -- allow him to be

22   accommodated appropriately wherever he was stationed.

23   You understand that, right?

24         A.    I understand he did ask for his clearance

25   to be readjudicated from Class 1 to post-specific



Page 238

1  clearances, which is effectively what the Class 2

2  would be.  And so in all of those situations, for

3  Class 2 clearances, MED has to clear, specifically,

4  posts that an employee would put themselves forward

5  for.

6      Q.    Right.  And then you understand that they

7  had actually -- they first dropped him down to

8  Class 5 initially, coincidentally --

9      A.    Initially.

10      Q.    -- while the position remained open,

11  right?  And then after this other individual received

12  the position, they moved the clearance back to

13  Class 2 for Belgrade, right?

14      A.    Initially, as he was asking to be

15  readjudicated, I think MED temporarily had him in

16  Class 5.  He provided additional documentation, and

17  they could make him Class 2.  But, you know, that

18  was -- that was, again, acting on his own requests.

19      Q.    And as -- and so as of your decision on

20  the shoot-out, he had been cleared for Class 2 for

21  Belgrade, right?

22      A.    He had subsequently gotten Class 2

23  clearance and was eligible to bid, from a medical

24  standpoint, yes.

25      Q.    And -- and as you said, he was at grade,



Page 239

1   and you're -- you have no reason to dispute that he

2   did not meet the qualifications for the Belgrade

3   position, right?

4        A.   He was qualified in that he was at grade

5   and in the skill code.  I wasn't a hiring manager.  I

6   wasn't involved with any of the hiring process.  And

7   so those determinations, you know, are made by -- by

8   the bureau, or by the post, in -- in different

9   situations, and so we rely on them for -- for their

10  advice.  And that's how it is with -- with every

11  assignment.

12       Q.   Got it.  So you didn't use your

13  perspective in GTM to think about -- "What's the

14  context here?  He's been in overcomplement for two

15  years," or anything like that.  You just deferred to

16  what the bureau said.  Right?

17       A.   Oh, of course context matters.  Mr. Lenzi

18  as I had mentioned had -- for over two years now, had

19  the ability to accept an assignment.  He chose not

20  to, even when he was offered positions that he could

21  have bid on.

22       Q.   Right.  So you felt it appropriate to

23  continue to deny him and punish him because he

24  wasn't -- he didn't --

25       A.   I totally disagree with you.



Page 249

1    position is the position to which he should be

2    directed?

3         A.   I think, as we had discussed earlier,

4    given the special counsel's -- Mark Lenzi's concern

5    raised with the special counsel about being assigned

6    to the initially identified position in PME, we went

7    back -- there was a discussion with DS as a bureau,

8    if another position could be identified.  They

9    determined this position in FSB was more appropriate.

10           That came back to us from -- I think our

11   standpoint, we were happy with it, as long as it

12   seemed to make sense both for Mr. Lenzi as well as

13   for -- for the bureau, in terms of meeting the work

14   need that they had.

15           And so there -- there would have been no

16   objection, given the fact that it was -- it was a

17   position that was considered for him, within his

18   skill code, and it's an FP-02 position, and so he

19   could bid that as -- at grade.  Even though he was

20   an 03, he's given a position that would go to

21   normally an 02.

22           But domestic positions for -- for SEOs,

23   you can actually have a stretch into a higher grade.

24   And so he was offered a stretch into a higher grade.

25        Q.   Got it.  And -- and this -- and to be



Page 250

1   clear, for a directed assignment, the proposal for

2   the directed assignment can be to overseas

3   assignments, correct?

4        A.   We can direct overseas, correct.

5        Q.   Right.  And so the decision was made by

6   the bureau to recommend a domestic position, right?

7        A.   In this case, that was the position they

8   had identified as a prior.

9        Q.   And the prior position that had been

10  identified had been the -- was it DME position?  Is

11  that right?

12       A.   Yeah, that one we replaced.  So the

13  initial one was the DME position.

14       Q.   And that was also a domestic assignment,

15  right?

16       A.   That was a domestic assignment as well.

17       Q.   Right.  And so every time the bureau gets

18  a chance to recommend assignments, they -- they

19  recommend a domestic assignment while Mr. Lenzi is

20  seeking all these overseas assignments; is that

21  right?

22       A.   No, I -- I wouldn't agree with that.

23       Q.   Okay.  Let's take -- so putting the only

24  single position aside, the Monterrey position aside,

25  you'd agree that other than that, every time the



Page 272

1        Q.    And approximately how many overcomplement

2   or NOW bidders obtained assignments for summer

3   positions or winter positions during your tenure in

4   the State Department?

5        A.    I -- I don't know that I would hazard a

6   guess.  But, you know, dozens, I would assume.

7        Q.    Okay.  Your testimony is that dozens of

8   NOW or overcomplement bidders received either summer

9   cycle or winter cycle positions; is that right?

10        A.    Yes, with the caveats that I laid out.

11   Perhaps they had done so as part of -- in filling

12   gaps they had done Y-tours.  We regularly gave

13   individuals Y-tours so that they could fill those

14   gaps.  Or they had additional training that they

15   needed.  So dozens could fit into that category,

16   given some of those caveats.

17        Q.    Okay.  But not all of them necessarily had

18   a Y-tour or something that preceded the assignment to

19   summer or winter; is that correct?

20        A.    That would be a much smaller number.

21   Again, it would -- that would be very unusual, to

22   have somebody allowed to remain in overcomplement for

23   additional series of months while they waited for an

24   assignment to begin the following year.  That just --

25   that just would not be the norm.



```
 1                      CERTIFICATE

 2

 3        I, KAREN K. KIDWELL, Registered Merit Reporter,

 4   and Certified Realtime Reporter, do hereby certify

 5   that prior to the commencement of the examination,

 6   the deponent was remotely sworn to testify to the

 7   truth, the whole truth under penalty of perjury.

 8        I DO FURTHER CERTIFY that the foregoing is a

 9   verbatim transcript of the testimony as taken

10   stenographically by me at the time, place and on the

11   date hereinbefore set forth, to the best of my

12   ability.

13        I DO FURTHER CERTIFY that I am neither a

14   relative nor employee nor attorney nor counsel of any

15   of the parties to this action, and that I am neither

16   a relative nor employee of such attorney or counsel,

17   and that I am not financially interested in this

18   action.

19

20                    _____
                      Karen K. Kidwell
21                    Karen K. Kidwell
                      Registered Merit Reporter
22                    Certified Realtime Reporter
                      Notary Public

23

24

25
```



# PX-037

| Message | |
|---|---|
| **From:** | Lenzi, Mark R (Portsmouth NH) [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=695943D2B9BD4DCA831F83701E1083FD-LENZI, MARK] |
| **Sent:** | 11/23/2020 10:05:48 PM |
| **To:** | Eatmon, Frederica P - DG [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=48b5d6ca13b7446cba5323ee37ae0ed2-Eatmon, Fre]; DG Direct [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=b797542c529d471d96fc04d90f03470e-DG Direct] |
| **CC:** | Merten, Kenneth H [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=6bc45bb1dc8a4f19ae9a7bc41f79bc9f-Merten, Ken] |
| **Subject:** | Mark Lenzi DS/ST Assignment Panel Appeal per 3 FAH-1 H-2425.3-2a |
| **Attachments:** | Attachment 1 Assignment Appeal November 2020 - Unclas NSA MW.pdf; Attachment 2 Assignment Appeal November 2020 - DS Reviewer steering psychiatrist to mental illness diagnosis.jpg; Attachment 3 Assignment Appeal November 2020 - Lenzi Acquired Brain Injury diagnosis HSS Dr. Teena Shetty June 2018.jpg; Attachment 4 Assignment Appeal November 2020 - Lenzi US Dept of Labor official USG brain injury symptoms diagnoses.jpg; Attachment 5 Assignment Appeal November 2020 - DoS Lenzi DRAD disability work agreement.pdf; Attachment 6 Assignment Appeal November 2020 -Lenzi October 2020 Bidder Preference Sheet.pdf; Attachment 7 Assignment Appeal November 2020 - Lenzi initiating formal assignment challenge.pdf; Attachment 8 Assignment Appeal November 2020 - Lenzi response to DRAD case manager and GTM CDO.pdf |

Dear Mr. Merten, Ms. Eatmon, and DG Direct:

I am submitting the below and attached Assignment Panel Appeal per 3 FAH-1 H-2425.3-2a

Thank you in advance for your time and attention to this matter.

Best regards,

Mark

### Mark Lenzi DS Assignments Panel Appeal per 3 FAH-1 H-2425.3-2a November 2020

### Background

(SBU) I am a tenured Security Engineering Officer in the Foreign Service for the Bureau of Diplomatic Security. On April 13, 2018 unbeknownst to me, my closest American neighbor (lived only eight feet from my family's apartment) serving at U.S. Consulate Guangzhou was medevac'd for showing symptoms of a traumatic brain injury e.g. sleep difficulty, eye convergence issues, short term memory loss, headaches, irritability, emotionality, etc. The officer was repeatedly not taken seriously by Diplomatic Security (DS) personnel at U.S. Consulate Guangzhou when reporting symptoms and was medevac'd only after providing evidence to the U.S. Consulate Guangzhou DS Regional Security Office (RSO) of a Radio Frequency (RF) microwave attack against the apartment complex we lived in. According to unclassified U.S. Department of Labor (DoL) Workers Compensation applications, the evidence the medevac'd officer provided to DS included a commercial off the shelf Trifield 100XE RF detection meter that was used to measure dangerous levels of RF microwave energy in our apartment complex. This device has an excellent reputation in U.S. Government for its reliability.

(SBU) **Attachment 1** is an unclassified document from the U.S. National Security Agency describing a known RF weapon of the type used to produce injurious levels of RF microwave energy in our apartment complex in Guangzhou. The country alluded to in Attachment 1 (not China or Cuba) is the same country that committed these standoff RF microwave attacks against my apartment and the adjacent apartment of my medevac'd neighbor. It is a country with which I have had a contentious multi decade history with. DS and the U.S. Government writ large have given me numerous awards for my language skills and expertise working in and on this country - often in hazardous working environments. Because of this expertise and as DS management is fully aware, at the time of my injury in 2018 I was involved in a high-profile FBI counterintelligence investigation concerning this country and I briefed Assistant Secretary of State Michael Evanoff about this during a briefing for him in Guangzhou in June 2018.

LENZI0002522

(SBU) During April and May 2018 and going back to at least November 2017, I and members of my family were experiencing many of the same symptoms as my medevac'd neighbor and her family members. I reported hearing strange sounds in our apartment (and provided text messages between my wife and our upstairs foreign national neighbor about these sounds) related to these RF microwave standoff attacks to RSO Guangzhou office with no response. State Department management at the U.S. Consulate in Guangzhou including my two immediate DS supervisors, Security Engineering Officer (SEO) Brian Hayes and RSO Eun "Judy" Lim, knew I had these same symptoms that caused my neighbor to be medevac'd but rather than getting me and my family proper medical evaluation and medical attention, both chose to keep this information from me and tried to intimidate me to be quiet about my symptoms by e.g. giving me an official counseling session on April 19, 2018 for having some of these symptoms of traumatic brain injury.

(SBU) In mid April 2018 my wife and I were feeling sick a lot with headaches, sleep issues, lightheadedness and our kids were often getting bloody noses at night. I was arriving at work late almost every workday because of sleep deprivation and taking much more sick leave than usual. On April 12 2018 I notified my boss's boss, DS SEO Rahim Theriot at Embassy Beijing that I would not be able to make our scheduled classified secure video teleconference that day because I was feeling sick. As Attachment 3 shows he informed me that he was coming on a "last minute" trip to Guangzhou in a few days. Because I was acting Officer in Charge of the Engineering Security Office, I was concerned that an unscheduled last minute trip for him to Guangzhou was because I somehow was performing poorly in the office. I emailed RSO Lim to ask why he was coming down. After receiving no response, I called her on Friday, April 13 2018 and asked her why SEO Theriot was coming down. There was a long awkward silence and then she said haltingly that he may not be coming. Then she corrected herself and said, "no, he is coming but his TDY is not of your personal concern".

(SBU) When SEO Theriot arrived the following week I asked him why he came down as I was concerned it may be because I was taking a lot of sick leave. He said that his trip was because "an officer here had to be medevac'd and DC thinks it could be the same reasons as the officers getting medevac'd from Cuba" and then asked me to find an antiquated RF detection unit that he wanted to use in the medevac'd officer's apartment. The piece of equipment he asked for was outdated, not working and has an extremely poor reputation with DS SEOs. I informed him that I did not know where that unit was and said, "it is old, a piece of junk and I don't even know where it is because SEOs never use it if they have a choice". I pointed at a $55,000 Radio Frequency detection device running on my desk that is state of the art and designed to do exactly what he requested the inferior device for and I said, "just use this". He then replied, "come on, man, this is a check the box exercise" and asked me again to find the inferior device which I did, got running and gave to him for use.

(SBU) SEO Theriot then used this deliberately inferior device in the medevac'd officer's apartment for a short period of time to complete his DS "check the box exercise". Weeks later on May 23, 2018 (during the same time I recorded screenshots with a classified piece of equipment on the roof of U.S. Consulate Guangzhou Controlled Access Area Building B of a concern in close proximity to the consulate) the Consul General was conducting a Town Hall meeting for hundreds of officers and their family members to announce that an officer had been medevac'd but that "Diplomatic Security technical experts had checked the officer's apartment and found nothing out of the ordinary". By using deliberately inferior equipment in the apartment for a very short period of time, SEO Theriot conducted exactly what he said and DS in Washington wanted: a check the box exercise that would not find any anomalies. This is but one example of DS's consistent see-no-evil willful negligence in this matter that led to my disability. Another example is that Embassy Beijing RSO Andrew Wroblewski declined my repeated attempts in May 2018 to show him the aforementioned screenshots from the roof of the consulate that was from the exact time the Consul General was conducting the Town Hall. In June 2018 DS Assistant Secretary of State Michael Evanoff also tried to decline to see these screenshots but I

insisted repeatedly and made him view the screenshots on the device itself during a briefing I provided for him in Guangzhou along with describing proximity to a hostile country's consulate.

(SBU) The silence and deception from RSO Lim from when my neighbor was medevac'd in April 2018 to when my wife and I were medevac'd in June 2018 caused my and my family's brain injuries to be significantly worse. Had my family and I been properly medically evaluated when my neighbor was medevac'd, or when I was given the official counseling session for "emotionality", my and my families' brain injuries would not have been as severe and likely would not have necessitated me later to have an official Disability and Reasonable Accommodation Division (DRAD) disability accommodation.

(SBU) *I have been prevented by DS from accessing the aforementioned "check the box" report along with other pertinent and vital information pertaining to this assignments panel appeal.*

(SBU) Suspecting that it was my closest American neighbor that was medevac'd but having no proof because RSO Lim was taking active and deceptive measures to prevent me from knowing the location of the medevac'd officer's apartment, I asked SEO Hayes and SEO Theriot numerous times to email me the aforementioned report. When I was on a TDY to Beijing in May 2018 I asked SEO Theriot to his face for the report. He responded, "Fitz (DS DAS John Fitzsimmons in Washington) did not want this report filed in the traditional way on SharePoint and this report was done just for him and at his direction". I replied that I needed to see the report "in case Washington asks me questions about it as I am often acting Officer in Charge". SEO Theriot responded that he would email me the report shortly (he was on Classnet when I asked him for the report) but he never did.

(SBU) On May 24 2018 I sent an email to SEO Hayes about the sleep issues and symptoms my wife and I were having. Prior to this I would only complain about symptoms orally to DS colleagues.

(SBU) On the evening of Friday May 25, 2018 I confronted SEO Hayes while he was using Classnet to email me the report by SEO Theriot. He again balked but I yelled at him to "do it now" and he sent it to me. I then was finally able to confirm the apartment number and what I suspected – that it was my closest American neighbor that was medevac'd. I confronted SEO Hayes angrily and asked why he did not inform me that it was my closest neighbor was medevac'd when he knew I was coming in late every day because of sleep issues, and knew that I was complaining of light-headedness and headaches. He responded, "I do not know where you live and I do not care". I then yelled at him some more and expressed my frustration that my family and I were left in that apartment when he and RSO Lim knew I had many of the same symptoms as my neighbor.

(SBU) The next day, Saturday, May 26 2018 I spoke with SEO Theriot by phone and rather than being concerned about my symptoms, seemed much more anxious that "Judy (RSO Lim) is concerned and upset that you are asking pointed questions to the Consul General directly". A few hours after speaking with SEO Theriot I managed to Skype my medevac'd neighbor who was being treated at UPenn Hospital in Philadelphia. I informed her of the symptoms my wife and family and I were experiencing over the past six months. She stopped me after I described my wife's and my short-term memory loss and she informed me that she was medevac'd and said that I needed to get myself and my family out of our apartment "right now". She said, "I have pleaded with State Department on three different occasions to inform and get my American neighbors out of the Tower 7 Apartment Complex in Guangzhou" but that each time State Department did nothing. She said she had no privacy concerns that would supersede the health and safety of our consulate colleagues and agreed with me that our colleagues should be warned that they had been lied to and deceived by State Department management.

LENZI0002524

(SBU) I then moved my family out of the apartment (by now it was Sunday, May 27 2018) and on this same day – with my medevac'd former neighbor's support – I sent an email to my American Foreign Service colleagues at the consulate (approximately 185 officers) informing them that State Department managers were lying and covering up important facts they should know for their health and safety.

(SBU) After I sent this email, these same State Department managers – DS managers – locked me out of my own work place at the consulate thereby deliberately preventing my access to Classnet, my office desk, and personal and work belongings (including aspirin I had on my desk for headaches). These same managers then tried steering a U.S. Embassy Beijing Psychiatrist to diagnose me with a "mental illness" (**Attachment 2**).

(SBU) DS's decision to lock me out of my own workplace (Marine Security guards informed me in the presence of other consulate workers when denying me entry into Consulate Guangzhou Building B), take away my access to Classnet (which continues to this day), and to try to steer a U.S. Embassy Beijing Psychiatrist to diagnose me with a "mental illness" among other actions has caused *and continues to cause* tremendous harm to my reputation in DS and the U.S. Government writ large.

(SBU) In June of 2018 my wife and I both failed Havana Acquired Brain Injury Tests (HABIT) in Guangzhou and we were both medevac'd to the University of Pennsylvania's (UPenn) Hospital for Brain Injury and Repair. I was formally diagnosed with Acquired Brain Injury (**Attachment 3**; see *60 Minutes* episode of March 17, 2019 for Dr. Teena Shetty describing how increased emotionality – what I received a DS counseling session for – is a symptom of traumatic brain injury). In addition, after a lengthy and detailed application process for DoL workers compensation, the U.S. Government officially diagnosed me with brain injury symptoms from "external causes" (**Attachment 4**).

(U) After I was interviewed by *60 Minutes*, the State Department Medical Bureau downgraded my medical clearance to a Class 5 (which meant that I could only serve domestically). MED did this even though almost all of the other 40 members of my group of officers injured in China and Cuba and enrolled in the UPenn brain injury program have Class 2 medical clearances.

(SBU) In December 2018, State Department's Disability and Reasonable Accommodation Division (HR/OAA/DRAD) provided me with an official accommodation arrangement (**Attachment 5**).

(SBU) In September 2019 after showing State MED extensive documentation of progress in four brain injury therapies, I received my Class 1 medical clearance back so I could serve overseas. DS personnel including my previous supervisor/reviewer, SEO Joy Baca, expressed doubt that a DRAD accommodation is possible with a Class 1 medical clearance. Indeed, many DS managers do not believe (or choose not to believe) that a DRAD accommodation is possible while holding a Class 1 medical clearance.

## Assignments Panel appeal per 3 FAH-1 H-2425.3-2a

(SBU) As all levels of the Bureau of Diplomatic Security (DS) are fully aware, in December 2018, State Department's Disability and Reasonable Accommodation Division (HR/OAA/DRAD) provided me with an official accommodation arrangement because of my injuries in the line of duty. As DS is also aware, my DRAD accommodation has remained in place to this day and University of Pennsylvania brain injury doctors and other doctors have told me that taking into consideration such things as multiple MRIs showing brain damage in specific regions consistent with high levels of RF microwave exposure, prescription medication I still take for headaches, and the four brain injury therapies I still do to this day, that it is likely that my DRAD accommodation will have to remain until the end of my DS career.

LENZI0002525

(SBU) In the summer of 2020 knowing that a Security Engineering Officer position at my grade at U.S. Embassy Belgrade was going to be available for bidding on, I spent dozens of hours working with Regional Security Office (RSO), Regional Medical Office (RMO) and Information Technology (IMO) personnel at Embassy Belgrade to see if each office would be able to accommodate my medical, DRAD and security needs. Each office at U.S. Embassy Belgrade was extremely helpful and it became apparent that Embassy Belgrade would be the best of any upcoming opening position to handle my medical, DRAD and security needs.

(U) In September 2020 the at grade position in my skill code indeed opened and on October 14, 2020 I bid (applied) for it and submitted a Bidder Preference Sheet describing why the position at Embassy Belgrade was by far the best to accommodate my medical, DRAD and security needs (**Attachment 6**).

(U) On October 14, 2020 my Career Development Officer (CDO) DS SEO Andrew Kaleczyc asked that I call him and informed me on the phone that the DS assignments panel wanted to send me to a hardship post at U.S. Consulate Monterrey Mexico. When I informed him that I would not be able to do that because of a multitude of reasons including because of the provisions in my DRAD accommodation, he informed me that "the DS assignments panel does not take into consideration that you have a DRAD accommodation. They only consider that you have a Class 1 medical clearance and since you have a Class 1 medical clearance they consider you worldwide available including to go to U.S. Consulate Monterrey, Mexico." I again said I would not be able to work at U.S. Consulate Mexico and had spent dozens of hours working with U.S. Embassy Belgrade because that position and the embassy there could accommodate my DRAD accommodation needs. CDO Kaleczyc again reiterated that the DS/ST assignments panel does not consider DRAD accommodations at all when determining assignments for Security Engineering Officers (SEO) like myself.

(U) On October 19, 2020 the *New York Times* published a front page article that I was featured in and quoted discussing the retaliation that the State Department and the Diplomatic Security Bureau specifically has incurred upon me for having a disability received in the line of duty that DS does not want to acknowledge.

(U) On November 9, 2020 I noticed on FS Bid that the Embassy Belgrade position was given to another SEO so I initiated (**Attachment 7**) an HR "shootout" also known as an "assignment challenge".

(U) On November 10, 2020 (just weeks after the *NY Times* article came out and exactly like what happened after I was interviewed on *60 Minutes*) the Bureau of Medical Services informed me that they downgraded my Medical Clearance to a Class 5 (domestic only) and therefore I was no longer eligible to work at Embassy Belgrade or any overseas post.

(U) On November 17, 2020 I received an email from Christopher Brown who is my DRAD accommodation case manager (and who has been extremely helpful throughout) that said " Good afternoon – I contacted your CDO, Mr. Kalecyzc, to inform him that DRAD stand ready to implement the same accommodations that you received in your previous assignments. He responded that he has no knowledge of your accommodation needs – so can you start the discussion with him as soon as possible? Once he and MED concur on your next assignment, we will start the process with your direct supervisor & post management. Thanks – Chris"

(U) I then informed Mr. Brown that what CDO Kaleczyc told him was not true and provided evidence that it was not true. (**Attachment 8**)

(U) On November 19, 2020 Mr. Kaleczyc sent me an email that said:

"Hello Mark,

I am writing to inform you that your assignment challenge was presented at GTM panel. GTM panel determined that you were NOT APPROVED for assignment to Belgrade. GTM approved the assignment for another employee.

Regards,
Andy Kaleczyc
Career Development Officer"

(U) The Bureau of Diplomatic Security's retaliation against me for the negative press the Bureau of Diplomatic Security has received from *60 Minutes* and the *NY Times* has caused the Bureau of Diplomatic Security to retaliate against me by, among other unjust and retaliatory actions, deliberately not considering the fact that I have a DRAD accommodation and its provisions when making the assignment decision in November 2020 for the Security Engineering Officer position at U.S. Embassy Belgrade and giving this position to a lesser qualified candidate. Simply comparing the Bidder Preference Sheets and/or the 250 word assignment challenge summaries of each candidate will show you that discrimination by DS has taken place and is the reason for this assignment challenge per 3 FAH-1 H-2425.3-2a.

LENZI0002527

# PX-038

**From:** Hayes, Brian C (Guangzhou)
**Sent:** Friday, May 25, 2018 11:44 AM
**To:** Lenzi, Mark R (Guangzhou) [redacted]
**Cc:** Theriot, Rahim (Beijing) [redacted]
**Subject:** RE: Counseling session date

April 19th

**Official - Transitory**
**UNCLASSIFIED**

**From:** Lenzi, Mark R (Guangzhou)
**Sent:** Friday, May 25, 2018 9:47 AM
**To:** Hayes, Brian C (Guangzhou) [redacted]
**Cc:** Theriot, Rahim (Beijing) [redacted]
**Subject:** Counseling session date

Hi Brian:
Can you please provide me with the date of our counseling session when you informed me that RSO Guangzhou complained to you that I was being too emotional in my handling of a certain issue concerning DS equipment and you then counseled me to be less emotional in my work interactions especially in my interactions with RSO Guangzhou and other RSOs I may deal with in the future.
Thanks and best regards,
Mark

Sent from my BlackBerry 10 smartphone.

LENZI0014015